# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA

## ATLANTA DIVISION

| | |
|---|---|
| **BRANDON COBB, CARLOS HERRERA, JOSEPH NETTLES, ERNEST WILSON, JEREMY WOODY, and JERRY COEN,** on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> **GEORGIA DEPARTMENT OF COMMUNITY SUPERVISION, and MICHAEL NAIL, in his official capacity as Commissioner of the Georgia Department of Community Supervision,** <br><br> Defendants. | Civil Action No. <br><br> **<u>CLASS ACTION</u>** <br><br> **COMPLAINT** |

## <u>INTRODUCTION</u>

1.      The Georgia Department of Community Supervision ("GDCS") has repeatedly and consistently violated the rights of deaf people on probation and parole, simply because they are deaf.   GDCS's refusal to provide communication access—as federal law specifically requires—leaves deaf people unable to understand the complex rules and requirements of their probation or parole, putting them at constant risk of incarceration.   GDCS's abnegation of its responsibility to communicate effectively has deprived deaf people under its supervision of the

freedom to work, the ability to move, and the opportunity to attend rehabilitative services.  While non-deaf people can get support from GDCS to re-integrate into society and avoid incarceration, GDCS provides no such services to deaf people. With no means of knowing what the requirements are for their probation and parole, little liberty to find housing or work, and no support services to help them succeed at re-entering society, deaf people under supervision experience significant stress, anxiety, and trauma.

2.     Plaintiffs in this case are six deaf men who are on probation and parole in Georgia, which is overseen by Defendants GDCS and its commissioner, Michael Nail.  Plaintiffs seek to represent a class of all deaf and hard of hearing people subject to Defendants' supervision.[1]  Plaintiffs and class members are at a heightened risk of being sent to jail or prison because of GDCS's persistent violation of federal law.  Plaintiffs cannot communicate with their supervision officers, do not understand the rules of supervision, and cannot advocate for

---

[1] Plaintiffs use the term "deaf and hard of hearing" to refer to individuals with hearing levels or hearing loss that qualify as disabilities under the Americans with Disabilities Act and the Rehabilitation Act.  Plaintiffs use the term "Deaf" to refer to individuals who self-identify as culturally deaf.  Throughout the Complaint, when Plaintiffs use the phrase "deaf and hard of hearing," Plaintiffs intend that phrase to include deaf, hard of hearing, d/Deaf-Disabled, d/DeafBlind, and Deaf individuals.

themselves, all because of GDCS's refusal to take reasonable, legally-required steps to communicate with deaf and hard of hearing people under its supervision. Plaintiffs and class members are at constant risk of incarceration because of GDCS's violation of the law.

3.      Because they are deaf or hard of hearing, all of the Plaintiffs in this case need interpreters or other services to communicate effectively with hearing people. Most Plaintiffs' primary language is sign language; English is, at best, a second language. Many Plaintiffs know virtually no English. American Sign Language ("ASL"), which many use, is a complete and complex language distinct from English, with its own vocabulary and rules for grammar and syntax—it is not simply English in hand signals. ASL has no written component. For several reasons, including early language deprivation, deaf people often have a very limited ability to read and write in English. Notes and other writings are almost never an effective communication tool for deaf individuals who have limited English, particularly for complex and important topics such as parole and probation requirements. Instead, individuals who are deaf often need qualified sign language interpreters not only for interactions that require conversation, but also for reading, filling out, and understanding written documents—particularly where those documents are complicated or technical. Five of six named

Plaintiffs—Cobb, Coen, Nettles, Herrera, and Woody—require ASL interpreters to understand and fill out written documents.

4.     Some deaf individuals require a team of two types of sign language interpreters—a hearing person who interprets between ASL and English, and a Deaf person who interprets from standard ASL into the specific linguistic format that is most suitable for the deaf person.  Deaf interpreters may also be necessary in situations where the hearing interpreter's fluency in ASL is subpar, where the deaf person uses regional signs or home signs that the hearing interpreter is not familiar with, or where ASL is not the deaf person's first language.  Plaintiffs Cobb and Herrera require Deaf Interpreters.

5.     Defendant GDCS is required to provide auxiliary aids and services and reasonable modifications to ensure effective communication between supervision officials and deaf and hard of hearing people under supervision. Necessary services may include qualified sign language interpreters, qualified Deaf interpreters, and communication access real-time translation ("CART").  These services are required by federal law, under the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("Section 504").  28 C.F.R. § 35.160(a).  Plaintiffs and those similarly situated need these services to understand the terms and conditions of their supervision, and to participate in

-4-

supervision on an equal basis. *Ad hoc* communication attempts such as hand gestures, speech-reading, fingerspelling, and note-writing are almost never effective means of communication with supervised individuals who are deaf and hard of hearing.

6.     While subject to supervision, Plaintiffs, like other participants, live in their communities instead of being confined in jail or prison.  But this freedom is conditioned on meeting specific rules and requirements, such as: maintaining a daily curfew; appearing at specific offices at specific times for meetings, lie-detector tests, or appointments; paying fines and fees on a set schedule; and submitting to searches and drug tests.  Supervised individuals are frequently required to sign long, complex documents that memorialize these requirements. Some participants are subject to the authority of multiple supervision offices, each with its own rules, documents, and requirements.

7.     In order to remain under community supervision and avoid incarceration, participants must understand and comply precisely with complex rules and conditions set out orally and/or in writing.  Failure to comply precisely with each of the requirements of each GDCS office and officer can result in incarceration for months or years.  People subject to community supervision can be incarcerated even for conduct that is not criminal.  Non-criminal, so-called

"technical violations" of supervision send people to jail and prison for mistakes as minor as missing an appointment or forgetting a payment.  In addition to the risk of incarceration, people under supervision may experience increased surveillance by GDCS officers, including more frequent in-home visits, drug tests (with associated increased costs), or more stringent curfews if they violate—or are perceived to violate—the complex rules of supervision.

8.      Despite the explicit requirement to provide effective communication, and the high risks of miscommunication, GDCS routinely and repeatedly fails to provide the interpreters and other auxiliary aids and services that Plaintiffs and others similarly situated require to have an equal opportunity to succeed while supervised.  Without effective communication, Plaintiffs cannot understand or comply with the terms and conditions of their supervision.  As a result, Plaintiffs and similarly situated deaf and hard of hearing individuals face a heightened risk of being cited for supervision violations, subjected to increased liberty restrictions, and sent—unnecessarily—to jail or prison.  Many have been unnecessarily incarcerated.

9.      Defendants' failures to ensure effective communication and an equal opportunity to succeed infuse all stages of supervision.  Upon release from prison, or on the commencement of a term of supervision, people subject to GDCS

supervision must report for initial meetings with their supervision officer or officers.  At these meetings, GDCS officers explain to non-deaf people the terms of their release, including the rules and requirements with which they must comply. At these meetings, non-deaf people can ask questions and seek clarification of the rules and requirements.  But Plaintiffs are denied all of the benefit of these meetings: they do not receive accessible information about the terms of their supervision, and they have no opportunity to communicate, learn, and ask questions about these crucial and complex matters.

10.     Thereafter, people subject to GDCS supervision have regular meetings with probation officers, parole officers, and/or sex offender registration officers throughout the terms of their supervision.  Non-deaf people have an ongoing dialogue with their supervision officer or officers, with periodic opportunities to ask questions and further discuss the terms and requirements of their supervision.  For deaf and hard of hearing supervisees, these meetings are routinely held without interpreters or other necessary auxiliary aids and services. Plaintiffs and similarly situated deaf and hard of hearing supervisees are therefore unable to clarify the conditions and requirements of their supervision or to participate in supervision programs.

11.     As a result of the Georgia Department of Community Supervision's failures, *no* Plaintiff fully understands the terms of his supervision, and *all* Plaintiffs are either entirely or substantially unable to ask questions or obtain clarifications.  For example:

        a.     Plaintiff Nettles has been on supervision for eight years, and has never had an interpreter interpret the rules of his supervision into his language.  He only understands very limited English, yet his supervision officers insist on attempting to communicate with him by writing him notes in English.  Unable to communicate or understand what his supervision officers are writing to him, Mr. Nettles simply does his best to guess what the rules are and hopes that he will not unknowingly run afoul of rules he never understood.

        b.     Plaintiff Woody had a job, but his supervision officer mistakenly believed Mr. Woody could not continue at the job because of the terms of his supervision.  Because GDCS failed to provide interpreters, Mr. Woody was never able to explain what he believed was the GDCS officer's error, clarify the rules of his supervision, or receive permission to continue working.  Mr. Woody feared that if he remained at the job, his supervision officer would accuse him of violating the terms of his probation.  Unwilling

to face the risk of re-incarceration for the perceived failure to comply with the conditions of supervision, Mr. Woody left the job and remains unemployed. Further, Mr. Woody did not know whether he was subject to probation for a total of two years—which he believed written notes with a supervision officer indicated; or 20 years—as documents from the prison suggested.  Because GDCS officers refused to provide interpreters, Mr. Woody had no way to clarify this discrepancy.  He must rely on ongoing research by the lawyers in the present case.  GDCS continues to insist on communicating with Mr. Woody via written notes.

    c.  In October 2018, Plaintiff Herrera received a written letter informing him that he was subject to a curfew from 6pm until 6am on Halloween night, from October 31 until November 1.  Because he cannot read the English letter, and because GDCS does not provide interpreters for his meetings with his supervision officer, Mr. Herrera could not understand the content of the letter, understanding only that he must be in his house from 6pm until 6am.  GDCS provided no way for Mr. Herrera to understand that this curfew was only for a single day.  Because Mr. Herrera has no way to confirm with his supervision officer that the curfew was limited to one day,

Mr. Herrera continues to observe a 12-hour daily curfew out of fear of being returned to prison.

            d.       Plaintiff Wilson became deaf as an adult, and does not use sign language.  He communicates by speaking and reading written notes.  But his probation officers refuse to even write simple notes to him.  He can ask questions, because he speaks, but he cannot understand the answers because GDCS officers refuse to respond in writing.  No GDCS officer has ever used CART (technology similar to that of a court reporter) to communicate effectively with Mr. Wilson.  No GDCS officer has even used simple written notes to communicate with Mr. Wilson.

    12.    Further, while GDCS requires Plaintiffs and similarly situated people to participate in programs as a condition of supervision, GDCS fails to ensure equal access to these programs.  GDCS requires Plaintiff Herrera to appear for periodic lie detector tests, but GDCS refuses to provide an adequate team of interpreters to ensure effective communication at these high-stakes, stressful events.  Instead, GDCS provides a single, hearing interpreter, but then instructs Mr. Herrera to sit entirely still, and not to communicate at all, during the test.  Mr. Herrera has no idea what the test is measuring, or how it is functioning, given that he is prohibited from any sort of communication.  Plaintiff Cobb initially believed

he was required to take classes, but his parole officer said that it would be difficult to get interpreters every week, so apparently dropped the requirement of the class. But Mr. Cobb still does not know whether this requirement was formally waived, and fears that he will get in trouble for not attending the class.

13.     Many deaf and hard of hearing individuals under GDCS supervision, including Plaintiffs, have already experienced the harms of inadequate communication and lack of accommodations at various stages of the criminal legal system.  Many were denied sign language interpreters or other necessary communication aids when they were arrested and interrogated, when they met with their public defenders, and when they were persuaded to accept plea agreements. Many were incarcerated in Georgia Department of Corrections ("GDOC") prisons with little or no opportunity to understand the charges against them, the lengths of their sentences, or their potential eligibility for reduced sentences and supervised release.  Many were denied communication access to understand and complete the prerequisites for parole.  Many served their sentences without effective communication with prison staff and other incarcerated individuals, and without telecommunications access to family, friends, and advocates.  Thus, Plaintiffs and others similarly situated are already at a stark disadvantage when they begin supervision under Defendant GDCS.  But instead of providing the support needed

to ensure these individuals an equal opportunity to succeed, Defendants compound the disadvantages Plaintiffs have suffered by denying Plaintiffs effective communication and other needed auxiliary aids and services.

14.    Through their actions and inactions, Defendants are denying Plaintiffs and those similarly situated their rights under the Americans with Disabilities Act and the Rehabilitation Act to equally effective communication and equal access to programs and activities.  And by failing to ensure effective communication, Defendants are violating the procedural due process rights of Plaintiffs and those similarly situated to Plaintiffs guaranteed by the U.S. Constitution.

15.    Plaintiffs seek, on behalf of themselves and those similarly situated, injunctive relief, declaratory relief, attorneys' fees and costs, and additional remedies.

## **JURISDICTION**

16.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

## **VENUE**

17.    Venue is proper in this District, under 28 U.S.C. § 1391(b), because Defendants reside in the Northern District of Georgia.

18.     Venue is proper in the Atlanta Division, under N.D. Ga. Civil Local

Rule 3.1, because GDCS resides in the Cherokee, Clayton, Cobb, DeKalb,

Douglas, Fulton, Gwinnett, Henry, Newton, and Rockdale counties.

## DEFINITIONS

19.     The term "deaf and hard of hearing" is used to refer to individuals

with hearing levels or hearing loss that qualify as "disabilities" under the

Americans with Disabilities Act and the Rehabilitation Act.  Plaintiffs use the term

"Deaf" to refer to individuals who are culturally deaf and who use sign language as

their primary means of language.  The term "deaf" and the phrase "deaf and hard

of hearing" each includes Deaf individuals.

20.     American Sign Language ("ASL") is a language used by many deaf

and hard of hearing individuals in the United States.  Like spoken languages, ASL

has its own unique rules of grammar and syntax—it is not merely a 1:1 translation

of words into signs.  ASL has no written component.  For many deaf and hard of

hearing individuals, ASL is their primary or only means of communication.  They

cannot use or understand English, written or spoken.

21.     A qualified interpreter is one who is able to communicate effectively,

accurately, and impartially, both receptively and expressively, using any necessary

specialized vocabulary.  *See* 28 C.F.R. § 35.104.  For some deaf individuals who

have limited language fluency, high visual orientation, or who use international or non-traditional sign language, a Deaf Interpreter ("DI") may be necessary to ensure effective communication.  A DI is a Deaf person who works with the (hearing) ASL interpreter to facilitate effective communication as part of a team of interpreters.  A DI is frequently necessary where a deaf individual's communication method is idiosyncratic, highly contextual, or difficult for a hearing person to understand.  Because DIs share with deaf clients a distinct set of linguistic, cultural, and life experiences, communication between the deaf client and DI is often more nuanced and successful than with a hearing interpreter alone. Some people may require a DI for all significant communication with hearing individuals, while others may only require a DI in specific, complex, or high-stakes encounters.

22.    Speech-reading, colloquially known as lip-reading, is the ability to understand some portion of the speech of another by watching the speaker's lips. Speech-reading is an extremely imprecise means of communication.  Only a small amount of the spoken sounds of aural language are visible, and many sounds appear identical on the lips.  The already-limited efficacy of speech-reading can be further reduced by lighting, facial hair, and accents, among other factors.  Even the most adept speech-readers can understand significantly less than half of a spoken

-14-

conversation.  Speech-reading is likely to be even less effective when dealing with complex topics, which likely involve uncommon words, and where small changes in wording can have severe negative consequences.  Speech-reading may be used by some people to supplement other forms of understanding, but is never a substitute for communication through a qualified sign language interpreter.

## PARTIES

### Plaintiffs

23.     Plaintiff BRANDON COBB is a 28-year-old man who is currently subject to GDCS supervision.  Mr. Cobb lives in Douglas County, Georgia.  He believes he will be subject to supervision until 2036.  Mr. Cobb was incarcerated in GDOC prisons from 2014 to 2019.  Mr. Cobb is Deaf and communicates using ASL.  Mr. Cobb uses and understands almost no English.  Mr. Cobb can understand a very few simple words in written English, but he cannot use English to communicate.  Mr. Cobb requires a team of interpreters to ensure effective communication: both a hearing interpreter and a Deaf interpreter.  Mr. Cobb is a qualified person with a disability within the meaning of Title II of the ADA and Section 504.  He has experienced the violations described herein.

24.     Plaintiff CARLOS HERRERA is a 47-year-old man currently subject to GDCS supervision.  Mr. Herrera lives in Floy County, Georgia.  He believes he

will be subject to supervision at least until 2038. Mr. Herrera was incarcerated in GDOC prisons from 2013 to 2018. Mr. Herrera is Deaf and communicates using ASL. Mr. Herrera uses and understands almost no English. Mr. Herrera also has high blood pressure and significant chronic hip pain. Mr. Herrera requires a team of interpreters to ensure effective communication: both a hearing interpreter and a Deaf interpreter. Mr. Herrera is a qualified person with a disability within the meaning of Title II of the ADA and Section 504. He has experienced the violations described herein.

25.     Plaintiff JERRY COEN is a 44-year-old man who is currently subject to GDCS supervision. Mr. Coen lives in Glynn County, Georgia. Mr. Coen believes he will be subject to GDCS supervision until 2027. Mr. Coen was incarcerated in GDOC prisons from 2009 to 2017. Mr. Coen is Deaf and communicates using ASL. Mr. Coen can use and understand very limited written English. Mr. Coen is a qualified person with a disability within the meaning of Title II of the ADA and Section 504. He has experienced the violations described herein.

26.     Plaintiff JOSEPH NETTLES is a 52-year-old man currently subject to GDCS supervision. Mr. Nettles lives in Brantley County, Georgia. Mr. Nettles was incarcerated in GDOC prisons from 2004 to 2011. Mr. Nettles is deaf and

communicates using ASL.  Mr. Nettles can only use and understand very simple

English through reading simple words and very limited speaking.  Mr. Nettles is a

qualified person with a disability within the meaning of Title II of the ADA and

Section 504.   He has experienced the violations described herein.

27.     Plaintiff ERNEST WILSON is a 60-year old man currently under the

supervision of GDCS.  Mr. Wilson lives in Newton County, Georgia.  Mr. Wilson

believes he will be subject to GDCS supervision until at least 2027.  Mr. Wilson

was incarcerated at GDOC prisons from 2007 to 2017.  Mr. Wilson lost his hearing

in the early 2000s.  Mr. Wilson cannot use ASL.  He communicates by speaking

and reading.  Mr. Wilson is a qualified person with a disability within the meaning

of Title II of the ADA and Section 504.  He has experienced violations described

herein.

28.     Plaintiff JEREMY WOODY is a 49-year-old man currently under the

supervision of GDCS.   Mr. Woody lives in DeKalb County, Georgia.  Mr. Woody

believes he will be subject to GDCS supervision until at least 2036.  Mr. Woody

was incarcerated at GDOC prisons from 2013 to 2017.  Mr. Woody is Deaf and

communicates primarily using ASL.  Mr. Woody can read and write simple words

and sentences in English.  He does not speak or read lips.  Mr. Woody also has

significant scoliosis and a history of cancer—both malignant melanoma and

thyroid cancer.  Mr. Woody is a qualified person with a disability within the meaning of Title II of the ADA and Section 504.  He has experienced violations described herein.

**Defendants**

29.     Defendant GDCS is an executive branch agency of the State of Georgia.  Defendant GDCS was established in 2015 to supervise the more than 200,000 people on probation and parole across the state of Georgia.  Defendant GDCS also supervises individuals on the sex offender registry across the state. Defendant GDCS is a state agency with field offices across the state.  Defendant GDCS is a public entity within the meaning of Title II of the ADA, and is legally responsible for ensuring compliance with federal disability nondiscrimination laws and the U.S. Constitution in the probation, parole, and sex offender supervision process.  Defendant GDCS receives federal financial assistance and is therefore also covered by Section 504.  Defendant GDCS's mission is to "protect and serve all Georgia citizens through effective and efficient offender supervision in our communities, while providing opportunities for successful outcomes."[2]

---

[2] Georgia Department of Community Supervision, "Our Mission," https://dcs.georgia.gov/our-mission.

30.    Defendant MICHAEL NAIL is the Commissioner of GDCS.

Defendant Nail is responsible for ensuring compliance with federal disability

nondiscrimination laws and the U.S. Constitution in the programs and activities of

GDCS.  Defendant Nail is legally responsible for the unlawful policies, practices,

and procedures challenged herein, and has the authority and legal obligation to

eliminate and remedy these policies, practices, and procedures.  Defendant Nail is

sued in his official capacity.

## FACTS

31.    Plaintiffs and similarly situated deaf and hard of hearing people are

subject to supervision under various combinations of parole, probation, and the sex

offender registry.  Some people in Georgia are released from prison onto parole

and, after completion of parole, will then serve a term of probation; some are

released from prison for a term of parole with no probation to follow; some are

released from prison directly onto probation; some are sentenced to probation in

lieu of incarceration; and some are subject to the sex offender registry while also

on parole or probation.  Since 2015, all of these supervision programs have been

supervised by Defendant GDCS.[3]

---

[3] See https://dcs.georgia.gov/offender-supervision-0 (people on probation and
parole supervised by GDCS); https://pap.georgia.gov/sex-offender-supervision
(people on sex offender registry supervised by GDCS).

*Defendants Subject Plaintiffs to Complex Rules and Requirements.*

32.     The rules and requirements of parole, probation, and the sex offender registry are distinct, complex, differ from county to county, and are subject to modification by individual officers.  GDCS typically requires people on probation or parole to report to a GDCS officer.  GDCS requires people who are also on the sex offender registry to report to both their GDCS officer and a member of the county sheriff's department staff.   People on the sex offender registry must receive approval from the sheriff's department before moving or accepting a job, and they must follow strict rules about where they may live and work, and who they may see.  Some Georgia counties impose a daily curfew on people subject to probation or parole.

33.     Given the complexity of these requirements, GDCS must provide effective communication with probation officers, parole officers, and sex offender registration officers for people under supervision.  People supervised by GDCS are at risk of heightened supervision requirements, re-arrest, and incarceration if they do not comply fully, completely, and promptly with the complex requirements of their supervision.  GDCS exposes deaf and hard of hearing people who do not fully understand the requirements of their supervision—who often cannot understand the written notification of the requirements and are unable to communicate effectively

with their supervision officers—to a heightened risk of arrest and incarceration simply because of communication failures that are not present for hearing supervisees.

### *Federal Law Requires Defendants to Ensure Effective Communication and to Make Reasonable Modifications.*

34.    Federal law requires that GDCS ensure effective communication and equal access to its programs for deaf and hard of hearing people.  Specifically, the ADA and Section 504 require Defendants to ensure effective communication and make reasonable modifications to their policies and practices for deaf and hard of hearing people.  GDCS must make these changes and provide this communication access as needed to ensure that deaf and hard of hearing people under its supervision can participate equally in—and benefit from—activities and programs offered by GDCS, including but not limited to community supervision and rehabilitation courses.  28 C.F.R. §§ 35.130(b)(1)(ii), (b)(1)(iii), (b)(7), 35.160, 42.503(b)(1)(ii), (b)(1)(iv), (e), (f).

35.    Federal law requires that GDCS ensure that its officers can communicate effectively with deaf and hard of hearing people in order for them have an equal opportunity to succeed on probation and parole and to get and stay out of the criminal legal system.  The law requires GDCS to provide "auxiliary

aids and services" to facilitate effective communication.  The appropriate auxiliary aids and services will vary based on the individual, but many people will need some combination of: qualified sign language interpreters, qualified Deaf interpreters, assistive listening devices, and communication access real-time translation ("CART").  28 C.F.R. §§ 35.104, 35.160(b)(1).  In determining which communication method is best for a person under GDCS's control, federal law requires that GDCS give "primary consideration" to the communication tools the deaf or hard of hearing person requests.  28 C.F.R. § 35.160(b)(2).  If the person indicates that they prefer ASL interpreters over written notes, that must be given primary consideration.  Federal law prohibits Defendants from imposing charges to cover the costs of these communication services, or from asking deaf people to provide or pay for these communication tools themselves.  28 C.F.R. § 35.130(f).

36.    Federal law also requires GDCS to make reasonable modifications to its policies and procedures to ensure equal opportunity for participation for deaf and hard of hearing people.  In this case, reasonable changes might include things like: extra procedural steps to ensure effective communication prior to attempting to revoke someone's parole or probation; preparing written documents in plain language that is accessible to plaintiffs who can read some English; and waiving

non-criminal "technical violations" of supervision where GDCS fails to demonstrate that it has provided effective communication.

37.     Not all deaf people have the same communication methods or communication needs.  The appropriate method(s) of ensuring effective communication depend on the particular needs of the deaf or hard of hearing individual, and depend on the particular preferences expressed by that person.  To ensure that it is providing effective communication, GDCS must conduct an individualized communication needs assessment and determine what communication methods ensure effective communication.  GDCS must then provide auxiliary aids and services, which may include qualified interpreters, teams of deaf and hearing interpreters, real-time captioning, amplification devices, or a combination of these, that ensure effective communication for that individual.

### *Defendants Fail to Ensure Effective Communication, Fail to Make Required Modifications, and Illegally Demand that Plaintiffs Provide and Pay for Interpreters.*

38.     Despite the clear and longstanding legal requirements to ensure effective communication and equal access, Defendants consistently fail to provide Plaintiffs and similarly situated deaf and hard of hearing people with equally effective communication during their participation in GDCS's supervision program.  Defendants routinely fail to provide interpreters, captioning, or other

auxiliary aids or services at meetings with probation, parole, and sex offender officers.  Defendants fail to make reasonable modifications and provide effective communication for programs provided to Plaintiffs as part of their supervision.

39.     Because GDCS fails to ensure effective communication with deaf and hard of hearing supervisees, deaf and hard of hearing people under supervision, including Plaintiffs, do not understand the complex, crucial requirements of their release and supervision.  Even if they understand some of the rules and requirements of probation and parole, many Plaintiffs and people similarly situated cannot access the programs and courses required, because they are excluded from these programs on the basis of their disabilities.  GDCS fails to provide interpreters at required programming and sometimes simply tells Plaintiffs outright not to attend courses because they are deaf.  Plaintiffs are therefore at risk of unknowingly or unavoidably violating these complex rules.

40.     Many deaf individuals, including Plaintiffs, have very limited ability to read and write in English.  Indeed, Plaintiffs Herrera and Cobb, like many deaf people, use virtually no English at all.  Other Plaintiffs are able to recognize some written English words or can speak some words in English, but this use is often extremely limited.  Deaf people who do not read and write fluently require GDCS officers to read the documents aloud so that interpreters can interpret the written

documents into sign language.  Some deaf people, including Plaintiffs Herrera and Cobb, require both a hearing interpreter and a Deaf interpreter in order to communicate effectively with hearing people or to understand written English documents.  Some deaf and hard of hearing people who can read limited English require documents in plain language in order for these documents to be accessible to them.

41.     But GDCS officers fail to take the necessary steps to ensure effective communication with the deaf and hard of hearing people they supervise.  Instead, GDCS officers refuse to provide interpreters.  GDCS officers incorrectly insist that Plaintiffs must procure, and pay for, their own interpreters if they want to understand the rules they must follow while under supervision, or if they want to participate in required programming.  *All* Plaintiffs who use ASL have been informed through written notes, gestures, or communication with their families, and in direct contradiction to federal law—that *they* must find and pay for interpreters if they wish to communicate via ASL with their supervision officers. No Plaintiff can afford this cost, and regulations expressly forbid a public entity from requiring people to provide their own interpreters.  Defendants routinely attempt to rely on Plaintiffs' family members as "interpreters," where family members know only a few, informal signs, and even though the use of family

members as interpreters violates the right to an impartial interpreter enshrined in the ADA and is expressly prohibited by regulation.  No Plaintiff has ever been provided with a Deaf Interpreter.

42.     Having failed to meet their legal obligations to procure qualified interpreters, GDCS supervision officers insist on writing notes back and forth with Plaintiffs.  But many deaf people, including most Plaintiffs, cannot communicate anything but the most simple information by written notes, and cannot read, fill out, or understand written documents without auxiliary aids and services, like interpreters.  When supervision officers insist on communicating and asking questions by written notes with Plaintiffs who do not read and write English, Plaintiffs cannot understand the questions, answer accurately, or ask their own questions.

43.     Supervision officers also sometimes attempt to force Plaintiffs to communicate by reading lips.  But speech-reading (sometimes known as lip-reading) is an extremely imprecise means of communication.  Speech-reading does not provide effective communication for most deaf and hard of hearing individuals, including Plaintiffs.  Speech-reading is likely to be even less effective when dealing with complex topics like parole and probation requirements, where small changes in wording can have severe negative consequences.  And speech-reading

is impossible for people—like most Plaintiffs—who do not understand English in the first instance.

44.     For deaf and hard of hearing individuals who *are* fluent in English, written communication in English may be an effective communication tool. Whether and to what degree written communication can be effective, however, is particular to each interaction and each individual's communication use and preferences.  Some late-deafened individuals are not proficient in ASL and prefer to communicate in writing.  For these people, *all* information must be conveyed clearly in writing for communication to be effective.  Scribbled notes and single words do not constitute effective communication.  Effective communication for deaf and hard of hearing individuals who are fluent in written English includes Communication Access Real-time Translation ("CART").  CART provides real-time typed transcriptions of spoken communication, similar to the technology used by court reporters.

> ### *GDCS' Violations of Federal Law Leave Plaintiffs Unable to Communicate, Unable to Understand the Rules of their Supervision, and at Unnecessary Risk of Re-Incarceration.*

45.     Defendants routinely fail to provide qualified interpreters, CART, and other auxiliary aids and services for deaf and hard of hearing people subject to

GDCS supervision.   Below are just some examples of Plaintiffs' experiences with GDCS.

Jeremy Woody

46.   When Mr. Woody was released from prison, he was required to meet with multiple GDCS officers on a regular basis.  These officers had different locations and hours.  Each officer had strict requirements with which Mr. Woody was required to comply.  In addition, Mr. Woody had to receive approval in advance before signing a lease; he could only move into homes with certain specific characteristics; he could not live in certain counties or take certain jobs; and he had to keep all of his supervision officers apprised of a wide range of life events.  In one county, Mr. Woody had a curfew, but in another he did not.  Any mistake or failure to comply with each and every one of these (changing) requirements could be grounds for Mr. Woody's re-incarceration for violation of his probation requirements.

47.   GDCS and its officers repeatedly refused to provide effective communication for Mr. Woody to understand the conditions and requirements of his supervision.  Because GDCS has failed to provide effective communication, Mr. Woody has had no effective means to fulfill his obligation to inform his supervision officers regarding events in his life like moving or applying for a job—

opening him up to potential re-incarceration.  Mr. Woody has repeatedly written notes stating that he needs an ASL interpreter, but GDCS officials have brushed him off, refusing to provide interpreters and insisting on note-writing even after Mr. Woody attempted to explain that note-writing was not effective.

48.    GDCS officers often insist that Mr. Woody use Video Relay Services, or "VRS" to communicate during in-person meetings, in an apparent attempt by GDCS to avoid paying for or procuring interpreters.  VRS is a telecommunications system for deaf and hearing people to communicate remotely.  It is not designed for communication where both parties are in the same physical location, and Federal Communications Commission ("FCC") regulations prohibit the use of VRS its use in that situation.  When VRS operators realize that both parties are in the same place, they disconnect the call immediately.  Mr. Woody has attempted to inform his GDCS officers on numerous occasions that using VRS for communication where both parties are in the same location violates FCC regulations.  But GDCS officers disregard the legal limits on VRS usage and insist on using this form of communication at meetings with Mr. Woody, causing communication to be frequently interrupted by relay interpreters hanging up.

49.    After Plaintiffs' attorneys contacted Mr. Woody's GDCS officers to inform them of their obligations under disability rights laws, GDCS officers

provided an ASL interpreter for Mr. Woody at a few meetings; however, for the

majority of meetings with GDCS officers—meetings that the GDCS officers

unilaterally deem "insignificant"—GDCS still refuses to provide interpreters.

These meetings are anything but insignificant to Mr. Woody, who has important

questions and concerns regarding the terms of his probation (including, e.g.,

questions about his housing and employment) which he cannot express to his

supervising officers and therefore cannot receive answers to.

<u>Carlos Herrera</u>

50.    Mr. Herrera had no effective communication for meetings in advance

of his release from prison in 2018.  When Mr. Herrera was released, he did not

know what the conditions of his release were, though he knew that he would be

subject to specific and complicated restrictions.  Shortly before his release, Mr.

Herrera had one meeting where an unqualified interpreter was present to discuss

reentry planning.  This interpreter refused to interpret the document outlining the

conditions of Mr. Herrera's release.  The interpreter told Mr. Herrera that the

conditions were very long and that Mr. Herrera should read the conditions himself.

Mr. Herrera cannot read English.

51.    Mr. Herrera was also not provided other resources that hearing people

received to prepare for his release.  On information and belief, hearing people have

access to "in-reach" support before release, through a collaboration between GDCS and the Georgia Department of Corrections.  This support includes assistance in obtaining identification, public benefits, health care, housing, and employment.  But Mr. Herrera was denied access to these services.  Interpreters were not available to assist Mr. Herrera in renewing his SSI benefits upon his release or in understanding how to access housing, physical or mental health services, or other post-release support.  Any and all of these resources would have assisted Mr. Herrera, and their absences left Mr. Herrera worse off than hearing supervisees who, except for their ability to hear, are otherwise similarly situated to Mr. Herrera.  These failures also increased the risk that Mr. Herrera would be unable to meet the conditions of his supervision, leading to potential re-incarceration.

52.    Mr. Herrera had to appear at eight separate meetings in two counties over three days to meet the complicated requirements of simply *registering* with GDCS to begin his supervision.  Failure to navigate this complex process precisely, promptly, and in the required sequence would subject him to immediate re-arrest and 25 more years in prison.

Brandon Cobb

53.    When Mr. Cobb was released from prison in 2019, his parole officer refused to provide an interpreter, but nonetheless required Mr. Cobb to sign 13

pages of documents in complex English.  Mr. Cobb had no way to understand the

rules or requirements of his parole or the contents of the documents he signed.

After an attorney in this case called Mr. Cobb's parole officer, GDCS has provided

a single, hearing interpreter for two appointments, but Mr. Cobb's parole officer

refuses to assure Mr. Cobb that he will have an interpreter at every meeting,

whether at the GDCS office or in his home.  Mr. Cobb's GDCS officers refuse to

provide Deaf interpreters.

<u>Joseph Nettles</u>

54.     Mr. Nettles has been on probation for more than eight years.  GDCS

has never once provided an interpreter for any meeting or inspection with Mr.

Nettles.  GDCS officers routinely go through Mr. Nettles' home and belongings,

without any communication access.  GDCS officers have changed the rules of his

probation, making them more stringent in recent years, but Mr. Nettles has no way

to clarify what the rules are, ask why the rules have changed, or explain any

misunderstandings that he believes led to the rules changing.

<u>Jerry Coen</u>

55.     Mr. Coen was released from prison in 2017.  In the more than two

years since he has been released, Mr. Coen has never had an interpreter to

communicate with his probation officer.  His probation officers insist on using

written notes or text messages to communicate, even though Mr. Coen cannot read or write English. This is not effective communication for Mr. Coen.

Ernest Wilson

56.     Mr. Wilson can speak but cannot hear any sounds. He can only receive information in written form. He does not use sign language. Mr. Wilson's supervision officers do not provide CART or any other form of captioning or full translation of speech into writing. Mr. Wilson's supervision officers refuse to even write any notes for him. Instead, his GDCS officers speak to Mr. Wilson's roommate, or simply enter his house without communicating at all. Mr. Wilson cannot understand anything his supervision officers say. He has no way to get answers to questions, or get clarification about the long, complex forms he has had to sign. Mr. Wilson is not sure if he is subject to a curfew. He cannot get clarification from his probation officer about whether he has a curfew, because his probation officer refuses to write notes or provide CART services. Mr. Wilson subjects himself to a curfew because he is so fearful of returning to prison.

57.     All Plaintiffs are routinely and consistently denied access to effective communication with their supervision officers. All Plaintiffs have been forced to—try to—learn the critically important rules of supervision by an *ad hoc* combination of gestures, struggling to understand written material, and/or lived

experience.  Each Plaintiff has been denied interpreters and other auxiliary aids and services, even though no Plaintiff can communicate reliably without such services. No Plaintiff has ever communicated with a Deaf Interpreter or with CART.  All Plaintiffs face the repeated frustration of denial of communication access.  All Plaintiffs face the constant threat of incarceration solely because they cannot communicate to clarify misunderstandings, explain information or ask questions to avoid running afoul of GDCS's complex rules.

## CLASS ALLEGATIONS

58.    Plaintiffs bring this action on behalf of themselves and on behalf of a class of all those similarly situated pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure.

59.    Plaintiffs seek to represent a class of all present and future deaf or hard of hearing people supervised by GDCS.

60.    Plaintiffs reserve the right to amend or modify the class descriptions with greater specificity or division into subclasses or limitation to particular issues based on the results of discovery and to accommodate any of the Court's manageability concerns.

61.    The class meets the prerequisites of Federal Rule of Civil Procedure 23(a):

a.   **Numerosity (Rule 23(a)(1)).**  The class is so numerous that joinder of all members is impractical.  As of July 2019, the exact number of class members under GDCS supervision is not known but it is determinable by objective criteria and is estimated to include more than 500 people.

b.   **Commonality (Rule 23(a)(2)).**  Common questions of law and fact are applicable to the entire class, including:

1.   Whether Defendants deny deaf and hard of hearing people under supervision equally effective communication;

2.   Whether Defendants have failed to establish policies, training, and procedures to ensure compliance with the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act ("Section 504"), and the Fourteenth Amendment to the United State Constitution for deaf and hard of hearing individuals under supervision of GDCS;

3.   Whether Defendants subject Plaintiffs to retaliation for requesting effective communication;

-35-

4.      Whether Defendants are prepared to waive technical

violations of probation or parole due to Defendants' own

failure to provide effective communication to Plaintiffs.

c.      **Typicality (Rule 23(a)(3)).**  Plaintiffs' claims are typical of the

claims of members of the proposed class, as their claims arise

from the same policies, practices, and courses of conduct, and

their claims are based on the same theory of law as the class

claims.

d.      **Adequacy (Rule 23(a)(4)).**  Plaintiffs will fairly and adequately

protect the interests of the proposed class.  Plaintiffs' interests

do not conflict with the interests of the class members and

Plaintiffs have retained counsel experienced in complex class

action and constitutional litigation to prosecute this case on

behalf of the class.  There are no material conflicts between the

claims of the representative Plaintiffs and the members of the

class that would make class certification inappropriate.

Counsel for the class will vigorously assert the claims of all

class members.

62.    **Final Injunctive Relief (Rule 23(b)(2)).** In addition to satisfying the prerequisites of Rule 23(a), Plaintiffs satisfy the requirements for maintaining a class action under Rule 23(b)(2).  Defendants have acted or refused to act on grounds that apply generally to the proposed class, making final injunctive relief appropriate with respect to the proposed class as a whole.

## CLAIMS FOR RELIEF

## COUNT I

**Discrimination On The Basis Of Disability
In Violation Of Title II Of The ADA
(42 U.S.C. § 12131, *et seq.*)**

*By All Plaintiffs, On Behalf Of Themselves And
All Others Similarly Situated, Against All Defendants*

63.    Plaintiffs allege and incorporate by reference each and every allegation above as if fully set forth herein.

64.    On July 12, 1990, Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."  42 U.S.C. §12101(b)(1).  Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or

activities of a public entity, or be subjected to discrimination by any such entity."

42 U.S.C. § 12132.

65.    Plaintiffs are deaf or hard of hearing and are therefore "qualified

individual[s] with a disability" within the meaning of the ADA.  42 U.S.C.

§ 12132.

66.    Defendants are a "public entity" within the meaning of the ADA.  42

U.S.C. § 12132.

67.    Public entities are required under the ADA to "take appropriate steps

to ensure that communication with . . . participants . . . with disabilities are as

effective as communication with others."  28 C.F.R. § 35.160(a)(1).  Ensuring

effective communication includes "furnish[ing] appropriate auxiliary aids and

services," 28 C.F.R. § 25. 160(b)(1), including "[q]ualified interpreters . . . real-

time computer-aided transcription services . . .  telephone headset amplifiers;

assistive listening devices . . . telephones compatible with hearing aids; open and

closed captioning, including real-time captioning; voice, text, and video-based

telecommunications products and systems, including text telephones (TTYs),

videophones, and captioned telephones[.]"  28 C.F.R. § 35.104.

> The type of auxiliary aid or service necessary to ensure effective
> communication will vary in accordance with the method of
> communication used by the individual; the nature, length, and

complexity of the communication involved; and the context in which the communication is taking place.  In determining what types of auxiliary aids and services are necessary, a public entity shall give primary consideration to the requests of the individuals with disabilities.  In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability.

28 C.F.R. § 35.160(b)(2).

68.    In providing any aid, benefit or service, a public entity "may not . . . [d]eny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit or service;" may not "[a]fford a qualified individual with a disability an opportunity to participate in an aid, benefit, or service that is not equal to that afforded others;" may not "[p]rovide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity . . . as that provided to others;" and may not "[o]therwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others."  28 C.F.R. § 35.130(b)(1)(i), (ii), (iii), (vi).  A public entity must "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the natures of the service,

program, or activity." 28 C.F.R. § 35.130(b)(7). A public entity may not "impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity." 28 C.F.R. § 35.130(b)(8).

69.    Defendants have violated the ADA and its regulations by, *inter alia*, failing to provide necessary auxiliary aids and services to ensure equally effective communication to Plaintiffs during supervision, failing to ensure access to and effective communication at required supervision programs, and failing to make reasonable modifications to policies, practices and procedures to avoid disability discrimination. Defendants have also failed to establish and provide personnel training, course materials, and other mechanisms to ensure that such policies as they have established or may establish in the future to comply with the ADA with regard to deaf or hard of hearing people under GDCS supervision have been and will be propagated effectively to GDCS officers and other personnel to produce necessary understanding and compliance.

70.    Plaintiffs and those similarly situated are entitled to declaratory relief, injunctive relief, attorneys' fees and costs, and such other and further relief as the Court deems just and proper.

71.     In the event that a class is certified, each class representative seeks a reasonable service award.

## COUNT II

### Discrimination On The Basis Of Disability
### In Violation Of Section 504 Of The Rehabilitation Act
### (29 U.S.C. § 794 *et seq.*)

*By All Plaintiffs, On Behalf Of Themselves And*
*All Others Similarly Situated, Against All Defendants*

72.     Plaintiffs allege and incorporate by reference each and every allegation above as if fully set forth herein.

73.     Section 504 of the Rehabilitation Act states that no

qualified individual with a disability in the United States . . . shall, solely by reason of [] disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

29 U.S.C. § 794(a).

74.     Plaintiffs are qualified "individual[s] with a disability" within the meaning of the Rehabilitation Act, 29 U.S.C. § 705(20).

75.     Defendants receive "Federal financial assistance" within the meaning of 29 U.S.C. § 794(a).

76.   The operations of GDCS are "program[s] or activit[ies]" within the meaning of 29 U.S.C. § 794(b)(l)(A)–(B) and/or (b)(2)(B).

77.   The Rehabilitation Act requires that recipients of federal financial assistance, including Defendants,

> shall provide appropriate auxiliary aids to qualified handicapped persons with impaired sensory, manual, or speaking skills where a refusal to make such provision would discriminatorily impair or exclude the participation of such persons in a program or activity receiving federal financial assistance.

28 C.F.R. § 42.503(f).

78.   Appropriate auxiliary aids include, but are not limited to, "qualified interpreters . . . and telephonic devices." 28 C.F.R. § 42.503(f). "Discrimination claims under the Rehabilitation Act are governed by the same standards used in ADA cases." *Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000).

79.   As detailed herein, Defendants have violated Section 504 and its regulations by, *inter alia*, failing to provide equally effective communication to Plaintiffs during supervision, failing to ensure access to and effective communication at required supervision programs, and failing to make reasonable modifications to policies, practices and procedures to avoid disability discrimination. Defendants have also failed to establish and provide personnel

training, course materials, and other mechanisms to ensure that such policies as they have established or may establish in the future to comply with Section 504 with regard to deaf or hard of hearing individuals subject to GDCS supervision have been and will be propagated effectively to GDCS officers and other personnel to produce necessary understanding and compliance.

80.     Plaintiffs and those similarly situated are entitled to declaratory relief, injunctive relief, attorneys' fees and costs, and such other and further relief as the Court deems just and proper.

81.     In the event that a class is certified, each class representative seeks a reasonable service award.

## COUNT III

**Violation Of The Due Process Clause Of The Fourteenth Amendment
(42 U.S.C. § 1983)**

*By All Plaintiffs, On Behalf Of Themselves And
All Others Similarly Situated,
Against Defendant Nail*

82.     Plaintiffs allege and incorporate by reference each and every allegation above as if fully set forth herein.

83.     Under the Fourteenth Amendment of the U.S. Constitution, "[n]o state shall make or enforce any law which shall abridge the privileges or immunities of

citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV.

84.     It has long been established that individuals on probation and parole have significant liberty interests such that they are entitled to procedural due process before their probation or parole may be revoked.  *Gagnon v. Scarpelli*, 411 U.S. 778 (1973); *see also Castillo v. Fla.*, 630 F. App'x 1001, 1006 (11th Cir. 2015).

85.     Defendant Nail, acting in his official capacity, has repeatedly refused to provide Plaintiffs with qualified ASL interpreters, auxiliary aids and services, and reasonable modifications and has thereby denied them adequate notice of the rules and requirements of their supervision.

86.     Defendant Nail, acting in his official capacity, has further refused to provide Plaintiffs with an opportunity to explain whether the rules and requirements of their supervision were effectively communicated to them prior to the imposition of additional liberty constraints, including without limitation GPS monitoring and curfews, and/or the revocation of their supervision.

87.     Defendant, acting in his official capacity, has deprived and continues to deprive Plaintiffs of their due process rights as secured by the Fourteenth

Amendment by failing to provide minimal due process before imposing severe punishments including re-incarceration and increased liberty restrictions.

88.    Defendant Nail deprives individuals of their due process rights by failing to provide adequate notice and meaningful ability to be heard before imposing harsh punishments, including re-incarceration, probation or parole revocation, or increased liberty restrictions such as GPS monitoring, curfews, or increased drug testing.

89.    Defendant Nail's failure to comply with his duties under the Fourteenth Amendment has resulted in harm to Plaintiffs, and will continue to result in harm to Plaintiffs, as Plaintiffs have been or likely will be returned to prison or jail sooner than similarly situated hearing individuals, and continue to be denied the ability to issue complaints to rectify their unlawful treatment.

90.    Plaintiffs and those similarly situated are entitled to declaratory relief, injunctive relief, attorneys' fees and costs, and such other and further relief as the Court deems just and proper.

91.    In the event that a class is certified, each class representative seeks a reasonable service award.

## **PRAYER FOR RELIEF**

1.    For an order certifying the class sought above;

2.      For an order permanently enjoining Defendants from engaging in the

unlawful discrimination complained of herein;

3.      For an order granting such other injunctive relief as may be

appropriate—including, without limitation, directing Defendants to immediately

provide qualified ASL interpreters, auxiliary aids and services, and reasonable

modifications, as determined by each individual's preferred method of

communication, to Plaintiffs and to all other deaf and hard of hearing individuals

subject to GDCS supervision, including: (i) at every meeting and encounter with a

GDCS officer and (ii) to facilitate effective communication of the contents of any

written documents related to the terms of these individuals' supervision;

4.      For declaratory relief;

5.      For reasonable attorneys' fees and costs of suit, including expert fees;

6.      For reasonable service awards for the named Plaintiffs; and

8.      For such other and further relief as the court deems just and proper.


Respectfully submitted this 19th day of July, 2019,


**Kosha S. Tucker**
Kosha S. Tucker, Georgia State Bar No.
214335
Sean J. Young, Georgia State Bar No.

-46-

790399
*Attorneys for Plaintiffs*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF GEORGIA, INC.
P.O. Box 77208
Atlanta, GA 30357
Phone: (678) 981-5295
Fax: (770) 303-0060
KTucker@acluga.org
SYoung@acluga.org

*Pro Hac Vice* Motions Forthcoming:

Susan Mizner
Claudia Center
Zoe Brennan-Krohn,
Talila A. Lewis
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION DISABILITY RIGHTS
PROGRAM
39 Drumm Street
San Francisco, CA 94111
Phone: (415) 343-0781
Fax: (415) 395-0950
SMizner@aclu.org
CCenter@aclu.org
ZBrennan-Krohn@aclu.org
Talila.A.Lewis@gmail.com

Brittany Shrader
NATIONAL ASSOCIATION FOR THE DEAF
LAW AND ADVOCACY CENTER
8630 Fenton Street, Suite 820
Silver Spring, MD 20910
Phone: (301) 587-2907
brittany.shrader@nad.org

Ian Hoffman
Margaret Girard
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave, NW
Washington, DC 20001
Phone: (202) 942-5000
Fax: (202) 942-5999
Ian.Hoffman@arnoldporter.com
Margaret.Girard@arnoldporter.com

Stephanna F. Szotkowski
ARNOLD & PORTER KAYE SCHOLER LLP
70 West Madison Street, Suite 4200
Chicago, Illinois 60602
Phone: (312) 583-2354
Fax: (312) 583-2591
Stephanna.Szotkowski@arnoldporter.com

*Attorneys for Plaintiffs*