# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| **BRANDON COBB, CARLOS HERRERA, JOSEPH NETTLES, ERNEST WILSON, JEREMY WOODY, and JERRY COEN,** on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs,*<br><br>v.<br><br>**GEORGIA DEPARTMENT OF COMMUNITY SUPERVISION, and MICHAEL NAIL, in his official capacity as Commissioner of the Georgia Department of Community Supervision,**<br><br>*Defendants.* | Civil Action No. 1:19-cv-03285-WMR<br><br>**CLASS ACTION** |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS UNDER FED. R. CIV. PROC. 12(B)(1)

## INTRODUCTION

Plaintiffs are deaf and hard of hearing individuals under Defendants'
supervision who are experiencing continuing violations of law. Plaintiffs have
standing to pursue their claims, and their claims are not moot. The policy and
purported changes proffered by Defendants do not meet the "heavy burden"
required to demonstrate mootness. Moreover, while not required to defeat
mootness, Plaintiffs continue to experience the denial of effective communication.

## ARGUMENT

**I.     While the Court May Consider Materials Outside the Pleadings, Here
the Facts Relevant to the Mootness Inquiry Support Plaintiffs – or At
Best Are Disputed While Discovery is Pending.**

While the Court may consider materials outside of the pleadings in ruling on
a motion brought under Rule 12(b)(1), here such facts support Plaintiffs. As
discussed *infra*, Defendants cannot meet the "formidable," "heavy burden" of
voluntary cessation. There is no "unambiguous termination" of Defendants' policy
and practice of refusing and failing to ensure effective communication with
Plaintiffs. This is not a situation in which a challenged statute or regulation has
been repealed or amended.[1] And this is not a situation in which it is undisputed

---

[1] *Cf. Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 474 (1990) (case rendered moot by
Congress's 1987 amendments to the Bank Holding Company Act); *Princeton
Univ. v. Schmid*, 455 U.S. 100, 103 (1982) (case rendered moot by substantial
amendment to university regulations governing solicitation, distribution of
literature, and similar activities on university property by those not affiliated with
the university); *Nat'l Advert. Co. v. City of Miami*, 402 F.3d 1329, 1334-35 (11th
Cir. 2005) (case moot where the City of Miami revised and amended its zoning

based on a review of the record that the necessary auxiliary aid or service has in fact been available consistently over time.[2] This is not a situation in which the revised policy has been consistently applied for years.[3] Rather, Plaintiffs are continuing to face the denial and threatened denial of effective communication, and Defendants' purportedly remedial policy is facially inadequate.[4]

_____

ordinances to make clear that non-commercial messages would be permitted anywhere commercial messages were allowed); *Tanner Advert. Grp., L.L.C. v. Fayette Cty., Ga.*, 451 F.3d 777, 785 (11th Cir. 2006) (repeal of the 1998 Sign Ordinance and the enactment of the 2005 Sign Ordinance rendered challenge moot).

[2] *Cf. Troiano v. Supervisor of Elections in Palm Beach Cty., Fla.,* 382 F.3d 1276, 1285 (11th Cir. 2004) (finding case moot where it was undisputed based on a review of the record that the audio equipment used by blind voters was available in every precinct and for every election since the November 2002 election, and that the remedial changes began prior to the filing of the litigation, reasoning: "LePore has not only ceased the allegedly illegal practice, she did so prior to receiving notice of the litigation. Her decision to implement the changes in the voting machines was well reasoned and her behavior prior to the beginning of this litigation provides ample evidence of her intent to provide audio components in all future elections. … [S]ince making the decision to use audio components in every election, LePore has consistently followed this policy, and taken actions to implement it even prior to the beginning of the litigation. Thus, we can discern no hint that she has any intention of removing the accessible voting machines in the future.").

[3] *Cf. Jews for Jesus, Inc. v. Hillsborough Cty. Aviation Auth.*, 162 F.3d 627, 629 (11th Cir. 1998) ("The new 'open door' policy appears to have been the result of substantial deliberation on the part of airport officials, and the evidence suggests that it has been consistently applied for the past three years. Because there is no reason to think that the airport will change its policy at the conclusion of this lawsuit, we affirm the district court's dismissal of the suit as moot.").

[4] *See Naturist Soc., Inc. v. Fillyaw,* 958 F.2d 1515, 1519 (11th Cir. 1992) (finding that the amendments to the challenged regulations did not moot the Society's

At best Defendants' "facts" are disputed with relevant discovery in its early stages – and with an inadequate policy less than one month old. For example, Plaintiffs are seeking to depose the GDCS officers who supervise them.[5] In those depositions, Plaintiffs will explore whether and how GDCS officers have been trained, directed, and supervised to ensure effective communication with Plaintiffs, and whether and how these officers are changing their practices to ensure effective communication with Plaintiffs. Plaintiffs will also seek discovery including depositions from GDCS decisionmakers regarding the formulation of the policy and its implementation. As a further example, Plaintiffs' expert will testify that Defendants' policy is insufficient to ensure compliance with the ADA and the Rehabilitation Act, including for the reasons discussed in Section III(D), *infra*. And, while not required to defeat a claim of mootness, Plaintiffs will testify that they are continuing to experience the denial of effective communication, following the policy and other changes that purportedly moot this case.

Unsurprisingly, in similar contexts courts have rejected motions by defendants brought under Rule 12(b)(1) arguing that the plaintiffs' claims are

---

claims for injunctive relief because the objectionable features of the prior law were left substantially undisturbed).

[5] Plaintiffs' counsel have been attempting to schedule the depositions of Plaintiffs' GDCS officers for several weeks. While in November 2019, counsel for Defendants initially offered dates in December 2019 for these depositions, defense counsel then took these dates off calendar due to a scheduling conflict that arose. Plaintiffs' counsel are waiting to hear about dates for early 2020.

moot. *See*, *e.g.*, *Smith v. Morgan*, No. 5:18-CV-01111-AKK, 2019 WL 1930764, at
*6 (N.D. Ala. May 1, 2019) ("[B]ecause the court must make 'factual
determinations decisive of [this] motion to dismiss for lack of jurisdiction,' the
court 'must give the plaintiff an opportunity for discovery and for a hearing that is
appropriate to the nature of the motion to dismiss.'") (denying defendants' motion
under Rule 12(b)(1) alleging mootness based on defendants' purported change in
policy regarding service animals made to comply with the ADA); *Rogers v. 5101
Corp.*, No. 16-81294-CIV, 2016 WL 4987620, at *2 (S.D. Fla. Sept. 19, 2016)
("Based on this record, the Court cannot determine whether Defendants have
removed all the barriers in an effort to provide Plaintiff with the relief sought or
whether the challenged conduct will repeat itself. The case is in the early stages of
litigation and Plaintiff has not been afforded the opportunity to take discovery or
visit the premises to make an independent assessment of the condition of the
property.") (denying defendants' motion under Rule 12(b)(1) alleging mootness
based on defendants' removal of architectural barriers made to comply with the
ADA); *Dunn v. Eagle Holdings, LLC*, No. 2:14-CV-539-PWG, 2015 WL 760247,
at *4 (M.D. Ala. Feb. 23, 2015) ("Defendants have not met their basic burden
under *Sheely* [*v. MRI Radiology Network, P.A.*, 505 F.3d 1174, 1182 (11th Cir.
2007)] to show that the 'challenged conduct cannot reasonably be expected to start
up again' as they had not yet remedied the conduct that Plaintiff complains of at
the time the motion was filed.") (denying defendants' motion to dismiss Plaintiffs'

claims of architectural barriers under the ADA despite remedial plan); *see also Leon v. Cont'l AG*, 301 F. Supp. 3d 1203, 1212 (S.D. Fla. 2017) ("While 'a district court has wide discretion to determine the scope of [jurisdictional] discovery, a plaintiff must have ample opportunity to present evidence bearing on the existence of jurisdiction.'") (finding that voluntary recall and repair program did not moot the plaintiffs' claims). Defendants' motion is both unfounded in fact, as discussed below, and procedurally premature.

## II.   Plaintiffs Have Standing to Seek Injunctive and Declaratory Relief

All Plaintiffs have standing to pursue the claims in this action. Defendants' assertion that an "essential premise" of Plaintiffs' claim is the threat of reincarceration, ECF 76 at 1, is misplaced. While the denial of effective communication increases the risk that Plaintiffs will face threatened or actual revocation, Plaintiffs' standing does not turn on this. With or without the threat of reincarceration, Plaintiffs are experiencing ongoing, present denials of effective communication. In a case brought by deaf patients alleging ineffective communication by a hospital, the Eleventh Circuit has explained that such denial, by itself, violates federal law:

> [T]he exchange of information between doctor and patient is part-and-parcel of healthcare services. Thus, regardless of whether a patient ultimately receives the correct diagnosis or medically acceptable treatment, that patient has been denied the equal opportunity *to participate* in healthcare services whenever he or she cannot communicate medically relevant information effectively with medical staff. It is not dispositive that the patient got the same ultimate treatment that would have been obtained even if the patient

were not deaf. …

[W]hat matters is whether the handicapped patient was afforded auxiliary aids sufficient to ensure a *level of communication* about medically relevant information substantially equal to that afforded to non-disabled patients. In other words, the ADA and RA focus on the communication itself, not on the downstream consequences of communication difficulties …

*Silva v. Baptist Health S. Fla., Inc.*, 856 F.3d 824, 834 (11th Cir. 2017) (emphases in original); *accord Crane v. Lifemark Hosps., Inc.*, 898 F.3d 1130, 1135 (11th Cir. 2018) ("[T]he focus of the Court's inquiry … is on Crane's equal opportunity to communicate medically relevant information to hospital staff."); *Seremeth v. Bd. of Cnty. Comm'rs Frederick Cnty.*, 673 F.3d 333, 337 (4th Cir. 2012) ("The injury is the failure to make communication as effective as it would have been among deputies and persons without disabilities."). Here, communication between supervisees and GDCS officers is "part-and-parcel" of supervision. Defendants concede as much. ECF 76-1, Attach. 1 ("Policy") at 9 ("The effective supervision of offenders requires meaningful interactions with the offender;" "Effective communication is vital to ensuring compliance during supervision."). Plaintiffs have standing as they are denied effective communication with their GDCS officers.

Moreover, Plaintiffs are experiencing additional injuries caused by the denial of effective communication, including: denial of access to work, *see* ECF 1 at ¶¶ 2, 11(b), ECF 53-1 at 12-13; anxiety, confusion and stress caused by not being sure of what the GDCS officer is saying; the embarrassment and invasion of

privacy caused by GDCS communicating with Plaintiffs' parents or siblings, *see* ECF 1 at ¶ 1, ECF 53-1 at 14-15; and liberty restrictions that Plaintiffs self-impose as a result of communication failures and Plaintiffs' understandable caution, *see* ECF 1 at ¶ 11(c), ECF 53-1 at 12-13. These harms are present and ongoing.

Defendants' reliance on *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), is unavailing. Plaintiffs are not alleging an "abstract," "conjectural," or "hypothetical" injury. *Cf. id.* at 101-02. There is no speculation or factual predicate to Plaintiffs' present and future injuries – their present and future interactions and efforts to communicate with GDCS do not depend upon their being rearrested, or charged again, or stopped again for a traffic violation or another offense, or again unlawfully seized. *Cf. id.* at 105; *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974); *Kerr v. City of W. Palm Beach*, 875 F.2d 1546, 1554 (11th Cir. 1989). Rather, Plaintiffs are subject to Defendants' control and that they will remain so subject for months and years to come. Plaintiffs describe and face ongoing, routine denial of auxiliary aids and services during court-ordered semi-monthly interactions that will continue to take place at regular intervals for the foreseeable future. They allege that Defendants are responsible through their actions and inactions for the unlawful denial of effective communication.[6]

---

[6] Defendants' brief quotes a selected portion of the Court's opinion in *Lyons*, and thereby misrepresents its holding. The Court found that Lyons did not have standing because he could not demonstrate, first, that he would be stopped again, and second, that during such a stop he would be threatened by an unlawful chokehold. *Lyons*, 461 U.S. at 105-06. With respect to this second showing, the

In *Silva,* the case most on point here, the Eleventh Circuit found that the deaf plaintiffs had standing to pursue injunctive relief, reasoning:

> Plaintiffs collectively have attended Defendants' facilities dozens of times in the years preceding this lawsuit, and Silva has attested that she has recurring health issues. Further, Plaintiffs routinely experienced problems with the VRI devices not working at all or failing to transmit a clear screen image, so there is good reason to believe that will continue to happen at Defendants' facilities when Plaintiffs do return.

856 F.3d at 832.[7] The facts here are even stronger than in *Silva*. Plaintiffs typically meet with the GDCS officers twice a month, and these interactions are required for Plaintiffs to comply with the requirements of their supervision and avoid revocation. GDCS officers can require additional interactions and meetings. During these interactions, Plaintiffs have experienced and are continuing to experience and face denials of effective communication. They have standing.

## III.   Defendants' New Policy Does Not Moot Plaintiffs' Claims.

"It has long been the rule that 'voluntary cessation of allegedly illegal conduct … does not make the case moot.'" *Nat'l Adver. Co. v. City of Miami*, 402

---

Court found that a policy or practice by the City authorizing such chokeholds would suffice, but reasoned that the complaint "did not indicate why Lyons might be realistically threatened by police officers who acted within the strictures of the City's policy." *Id.* at 106. Here, Plaintiffs are so threatened on a routine and continued basis during periodic court-ordered interactions.

[7] *Cf. Shotz v. Cates*, 256 F.3d 1077, 1082 (11th Cir. 2001) ("Most importantly, since their July 1999 visit to the Levy County Courthouse, the plaintiffs have not attempted to return, nor have they alleged that they intend to do so in the future. Absent such an allegation, … the plaintiffs do not have Article III standing.").

F.3d 1329, 1333 (11th Cir. 2005) (citations omitted). Since the defendant is "free to return to his old ways," *United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953), "he bears a heavy burden of demonstrating that his cessation of the challenged conduct renders the controversy moot." *Rich v. Sec'y, Fla. Dep't of Corr.*, 716 F.3d 525, 531 (11th Cir. 2013); *see also Doe v. Wooten*, 747 F.3d 1317, 1322 (11th Cir. 2014) ("[A] defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.") (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc*., 528 U.S. 167, 190 (2000).

For government actors, the court considers "whether the termination of the offending conduct was unambiguous." *Rich*, 716 F.3d at 531. "[T]he timing and content of the decision are … relevant in assessing whether the defendant's 'termination' of the challenged conduct is sufficiently 'unambiguous[.]'" *Harrell v. The Fla. Bar*, 608 F.3d 1241, 1266 (11th Cir. 2010). Also relevant is "whether the change in government policy or conduct appears to be the result of substantial deliberation, or is simply an attempt to manipulate jurisdiction." *Rich*, 716 F.3d at 532 (citations omitted). The court must "ask whether the government has consistently applied a new policy or adhered to a new course of conduct." *Id*. (citation omitted). Here, Defendants seek dismissal of this action, claiming that its new ADA policy dated November 29, 2019, renders Plaintiffs' claims moot. *See*

ECF 76-1, Attach. 1 ("Policy"). The new policy is insufficient to meet Defendants'
heavy burden.

### A.    The Policy Post-Dates and Responds to Plaintiffs' Case.

The timing of voluntary cessation is a crucial factor in determining whether
the defendants' unlawful behavior is likely to recur. When voluntary cessation was
"not made before litigation was threatened," this change is "late in the game" and
therefore suspect. *Rich*, 716 F.3d at 352; *see also Harrell*, 608 F.3d at 1266; *Burns
v. Pa. Dep't of Corr.*, 544 F.3d 279, 284 (3d Cir. 2008) ("[W]e are more skeptical
of voluntary changes that have been made long after litigation has commenced").
Here, the new policy was created in direct response to Plaintiffs' litigation and
Plaintiffs' counsel's critiques of existing policies and practices. *See* ECF 76 at 18.
It was adopted less than one month ago. This is not an unambiguous termination.

### B.    Defendants Aver that They Are Not Bound by Their Policies.

Defendants argue that the Court should ignore any flaws with an existing
policy as "DCS has not considered itself bound to this written policy and, as
explained below, is putting in place a new ADA policy taking effect November 29,
2019." ECF 67 at 10. This is hardly reassuring. If GDCS "has not considered itself
bound" to existing policies, then we cannot be certain that Defendants are
unambiguously committed to its latest policy. The chain of events here, together
with Defendants' characterization of its own policies, suggest that the new policy
is not the result of substantial deliberation and commitment, but a temporary fix to

"deal with" the inconvenience of litigation.

### C.    Plaintiffs Challenge Longstanding and Deliberate Practices.

The Eleventh Circuit is "more likely to find a reasonable expectation of recurrence when the challenged behavior constituted a continuing practice or was otherwise deliberate." *Doe v. Wooten*, 747 F.3d 1317, 1323 (11th Cir. 2014). Here, Plaintiffs' declarations – submitted in support of their motions for preliminary injunction and for class certification – describe a complete lack of communication access going back years and despite many requests and complaints.[8]

### D.    The Policy is Facially Inadequate.

The new policy fails to ensure appropriate affirmative steps by Defendants to ensure effective communication. Instead, it relies upon two interrelated written mechanisms for people under GDCS supervision to request reasonable accommodations or to complain of the lack of such accommodations. The procedures outlined are complex, confusing, laden with technical requirements, and inaccessible to most deaf and hard of hearing supervisees.

#### 1.    The Policy Does Not Require Affirmative Steps by Defendants.

"The ADA expressly provides that a disabled person is discriminated against when an entity fails to '*take such steps as may be necessary* to ensure that no

---

[8] *See, e.g.*, ECF 53-4 at ¶¶ 8-9 (Plaintiff Nettles requested an interpreter upon release in 2011, was denied, had never had an interpreter as of June 2019); ECF 53-6 at ¶¶ 5 (Plaintiff Woody requested interpreters at DCS offices in 2017, was denied, 14 (DCS officers searched Mr. Woody's home without interpreters).

individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services.' … Congress intended to impose an affirmative duty on public entities to create policies or procedures to prevent discrimination based on disability." *Delano-Pyle v. Victoria Cty., Tex.*, 302 F.3d 567, 575 (5th Cir. 2002) (citation omitted, emphasis in original); *accord* 28 C.F.R. § 35.160(a)(1) ("A public entity shall take appropriate steps to ensure that communications with applicants, participants, members of the public, and companions with disabilities are as effective as communications with others."), (b)(1) ("A public entity shall furnish appropriate auxiliary aids and services where necessary to afford qualified individuals with disabilities … an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity.").

The district court in *Pierce v. D.C.*, 128 F. Supp. 3d 250 (D.D.C. 2015), similarly rejected the argument that defendants only needed to provide accommodations when they were explicitly requested:

> [B]ecause Congress was concerned that '[d]iscrimination against the handicapped was ... most often the product, not of invidious animus, but rather of thoughtlessness and indifference—of benign neglect[,]' the express prohibitions against disability-based discrimination in Section 504 and Title II include *an affirmative obligation* to make benefits, services, and programs accessible to disabled people. ….

> [T]he District's insistence here that prison officials have no legal obligation to provide accommodations for disabled inmates unless the inmate specifically requests such aid – and even then, only if it actually turns out that the inmate really needs the requested accommodation – is untenable and

cannot be countenanced. …  [N]othing in the disability discrimination statutes even remotely suggests that covered entities have the option of being passive in their approach to disabled individuals as far as the provision of accommodations is concerned. … Section 504 and Title II mandate that entities act *affirmatively* … to … ensure that people with disabilities will have meaningful access to those services.

*Id.* at 266, 269 (citations omitted, emphases in original).

The new policy fails on its face to meet Defendants' affirmative obligations under federal law. The sole affirmative obligation is an instruction to GDCS officers to ask, at their initial meeting with new supervisees, "Do you have a request for accommodation due to a disability?" Policy at IV.C.1. But the policy says nothing about how to ensure that the question itself is effectively communicated, such as by including a sign language interpreter in the meeting, or by simplifying the language. Outside of this insufficient instruction, the policy says nothing about requiring that GDCS employees will affirmatively ensure effective communication with deaf and hard of hearing supervisees. It says nothing about the thousands of people *already* under GDSC supervision, many of whom require auxiliary aids and services and are long past their initial meeting. There is no guidance for what a GDCS officer should do when an individual is obviously deaf or hard of hearing and has an apparent need for accommodations (whether or not they attended a post-policy initial meeting and/or answered "yes" to the formal question laid out in the policy).

Instead of delineating GDCS's affirmative obligations, the new policy relies in almost all cases upon supervisees themselves requesting auxiliary aids and

services (and filing appeals and grievances) through complex formal written procedures which are inaccessible to many deaf supervisees. *See* Policy at I ("Introduction and Summary" referencing accommodations request process, complaint process, and appeals process), IV.F ("Reasonable Accommodation Request Process"), IV.G ("Appeals Process for Reasonable Accommodation Request"), IV.H ("ADA Grievance Procedure"), IV.I ("ADA Grievance Appeals Process"). This approach is contrary Defendants' position that they are now in compliance with the ADA and Rehabilitation Act.

## 2. The Policy Does Not Ensure Appropriate Auxiliary Aids and Services Needed for Effective Communication.

Even if a GDCS officer wanted to take affirmative steps for a deaf or hard of hearing supervisee, the policy gives no guidance other than to "provide reasonable accommodations." There is no discussion of how an officer can secure an ASL interpreter (in person or remotely through VRI) or a CART provider for a person under supervision who needs these services. There is no reference to how a GDCS officer might obtain a Deaf interpreter for a supervisee who needed that service. There is a reference to the ADA Coordinator, but there is no phone number or email address to contact this person.

The second declaration of Darrell E. Smith states that a GDCS officer may engage VRI services at any time. ECF 76-1 at ¶ 5. However, the policy itself does not say this and it is unknown how officers are apprised of this option or would know when or how to use VRI. Moreover, in many cases VRI will not provide

effective communication. It may not function well due to technological requirements. It does not work when people need CART or a Deaf interpreter. It is not appropriate for long, complex, or high-stakes interactions.[9] Neither the policy nor the Smith declaration indicate how GDCS staff will be trained on the appropriate uses of VRI. Parsing the Smith declaration and the new policy, the only way that communication with a supervisee might include an auxiliary aid or service *other* than VRI is if the *supervisee* makes a formal request, which may be granted or denied 24 or more business days later. *Id.* at ¶ 6 & Policy at IV.F. In short, even if the terms of the Smith declaration and the new policy were fully

---

[9] VRI is appropriate for brief, routine encounters. It is not effective, *inter alia*: in high-stakes encounters; where the technology or internet connection is insufficient to provide a clearly delineated image; where the deaf person is in distress or pain; or for group settings like a classroom. *See Harris v. GDC*, No. 5:18-cv-00365-TES, ECF 60-2 (Declaration of GDC ADA Coordinator) at ¶¶ 14-15 (in GDC facilities, VRI is used for "non-complex, routine interactions," and in-person interpreters "are typically used for more complex, longer, and involved interactions, appointments … and meetings, as well as for … group settings … or when VRI is not otherwise feasible (ex. [incarcerated person] has difficulty viewing screen because of vision loss, cannot be properly positioned to view screen, or because of injury or other conditions) or is not available (ex. the technology is not working)."); *Silva v. Baptist Health S. Fla, Inc.*, 856 F.3d 824 (11th Cir. 2017) (discussing problems with VRI); *id.* at 833 & n.6 (finding that deaf plaintiffs had standing to challenge policies and practices regarding effective communication, and noting: "We also conclude there is a factual dispute concerning Plaintiffs' allegation that Baptist has a policy in violation of the ADA and RA of using VRI across the board, even when an in-person interpreter is warranted.").

implemented (which has not occurred), they are inadequate.

### 3.   The Policy Imposes Multiple Inaccessible Procedures on Deaf and Hard of Hearing Supervisees.

The policy imposes multiple inaccessible procedures on deaf and hard of hearing supervisees who need interpreters and other auxiliary aids and services and modifications in order to communicate. The "Reasonable Accommodation Request Process" begins with the deaf or hard of hearing person filling out a request form, apparently entitled "ADA Reasonable Accommodation Request Form 2." Policy at IV.F. There is no indication in the policy of how the supervisee gets a copy of this form. Neither Plaintiffs nor the Court have received a copy of this form. Many deaf and hard of hearing supervisees are not fluent or proficient in written English, and will not be able to obtain or complete this form. After the supervisee has (hypothetically) managed to acquire, fill out the form, and give it to his GDCS officer, the GDCS officer must forward it to the GDCS ADA Coordinator. *Id.* at IV.F.3. There is no timeframe within which the GDCS officer must forward the request. *Id.* The ADA Coordinator then has 24 business days to respond to the request. *Id.* at IV.F.4. If "additional time is necessary," the ADA Coordinator can unilaterally take unlimited extra time beyond the 24 business days to respond. *Id.* at IV.F.8. Once the ADA Coordinator reaches a decision, he emails his decision to the GDCS officer, who is instructed to notify the person who submitted the request. There is no timeframe within which the GDCS officer must notify the supervisee. *Id.* at IV.F.7-8.

Under the "Appeal Process," once the supervisee has been "notified" of a denial, an "appeal" must be "filed" by the supervisee within 15 calendar days of the date of the "accommodation denial." *Id.* at IV.G. The policy does not explain what it means to "file" an appeal, including whether the person under supervision must fill out a specific form, where he could get that form, and to whom he should give the form. *Id.* Further, the 15-day clock appears to start on the day the ADA Coordinator denies the accommodation, meaning that if a GDCS officer waits two weeks to inform the supervisee of the denial, the supervisee then has one day in which to file an appeal, and if the officer waits 16 days to inform the supervisee, he has no chance to appeal at all. *Id.*

The appeal "must address in writing one or more of [three] bases for appeal." *Id.* at IV.G.1. There is no provision for assisting people who, because of their disabilities, cannot write in English. First, the appeal can "[i]dentify the facts in the record which do not support the accommodation denial and explain why those facts warrant a different outcome," although there is no indication of what constitutes "the record" or how a supervisee could possibly have access to any such "record," given that GDCS' case files are not available to people under supervision. *Id.* at IV.G.1.a. Second, the appeal can "[i]dentify the facts that were not known and could not have been discovered during the interactive process and state how these new facts would change the analysis and decision," although there is no indication of what the "interactive process" means in this context, no

indication that supervisees will be provided "analysis" of the decision, and, again, no way for the person under supervision to know what facts were and were not known or discovered by GDCS. *Id.* at IV.G.1.b. Finally, the appeal can "[i]dentify how the denial was based on factors proscribed by state or federal law," although there is no indication of where, when, or how people under supervision can be expected to access legal documents, cases, and treatises, and no indication that the denial itself must state *any* factors upon which the denial was based. *Id.* at IV.G.1.c. If the person under supervision fails to submit analysis of one of these three issues in their appeal – effectively, if the person under supervision does not have legal training or access to a lawyer – the appeal can be denied. *Id.* at IV.G.2. These requirements are impossible for a lay person to follow, much less one with a disability that may interfere with English literacy, and are inconsistent with Defendants' affirmative legal obligations.

The policy also lays out a separate "ADA Grievance Procedure." There is no explanation of how this interacts with the Accommodation Request process, whether these processes can run simultaneously, or whether one must follow the other. This process also begins with filling out a written form, which has not been provided to the Court or Plaintiffs, which is titled "ADA Formal Complaint Form Version 1." *Id.* at IV.H.2. There is no indication of how a person under supervision could get a copy of this form. There is no provision for GDCS to assist people who, because of their disabilities, cannot fill out forms in English. This document

must be faxed or sent by U.S. mail, *id.*, meaning that it is only available to people who have money to send a fax, or for stamps and envelopes.

The GDCS ADA Coordinator must respond to ADA grievances within 30 days, via email or snail mail. *Id.* at IV.H.4. Under the "ADA Grievance Appeals Process," if a person under supervision disagrees with the grievance response, he must "submit[]" a "notice in writing to the HR Director" within 15 days of ADA Coordinator's decision. *Id.* at IV.I.1. The policy does not account for the time a snail mail letter takes to arrive: the supervisee must, apparently, submit his appeal within 15 days of the ADA Coordinator making his decision, regardless of when the person under supervision actually receives notice of it. *Id.* There is no indication of how a person under supervision should find the name or contact information of the "HR Director." There is no provision for assisting people under supervision who, because of their disabilities, cannot fill out documents in English. The HR director then has 30 days to respond, and has unlimited "additional time" if he so "require[s]." *Id.* at IV.I.3.

These procedures – the "Reasonable Accommodation Request Process," the "Appeals Process for Reasonable Accommodation Request," the "ADA Grievance Procedure," and the "ADA Grievance Appeals Process" – are inadequate, unreasonable, and patently inaccessible to deaf and hard of hearing supervisees. They require competence in reading and writing English, and, for the Accommodation Appeal process, a mastery of legal frameworks and complex

analysis. These processes each take more than two months to complete, and each have provide opportunities for GDCS to extend the process indefinitely. The policy's byzantine, bureaucratic approach is inconsistent with Defendants' affirmative obligation under federal law to ensure that communications with deaf and hard of hearing supervisees "are as effective as communications with others." 28 C.F.R. § 35.160(a)(1).

### E. The Policy Has Not Been Implemented.

Defendants' new policy is just over three weeks old. There is no information about any roll-out or implementation plan. There is no information about any training of staff. There are no assurances that Plaintiffs and class members will receive prompt, accessible information about the contents of the policy. Neither the policy nor the related forms appear on GDCS's website. Plaintiffs' counsel have not seen the forms. Plaintiffs' counsel seek to depose the officers who supervise Plaintiffs as well as the decisionmakers who adopted the new policy to explore these and other matters. Meanwhile, while such facts are not required to defeat Defendants' claim of mootness, Plaintiffs continue to experience communication barriers, including during interactions as recent as December 17, 2019. *See*, *e.g.*, Declaration of Jeremy Jay Woody, filed herewith.

### CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss.

Respectfully submitted this 24th day of December, 2019

/s/ Claudia Center

Ian Hoffman, *pro hac vice*

Susan Mizner, *pro hac vice*

Margaret Girard, *pro hac vice*

Claudia Center, *pro hac vice*

ARNOLD & PORTER KAYE SCHOLER LLP

Zoe Brennan-Krohn, *pro hac vice*

601 Massachusetts Ave, NW

Talila A. Lewis, *pro hac vice*

Washington, DC 20001

AMERICAN CIVIL LIBERTIES UNION

Phone: (202) 942-5000

DISABILITY RIGHTS PROGRAM

Fax: (202) 942-5999

39 Drumm Street

Ian.Hoffman@arnoldporter.com

San Francisco, CA 94111

Margaret.Girard@arnoldporter.com

Phone: (415) 343-0781

Fax: (415) 395-0950

Stephanna F. Szotkowski, *pro hac vice*

SMizner@aclu.org

Kathryn Geoffroy, *pro hac vice*

CCenter@aclu.org

ARNOLD & PORTER KAYE SCHOLER LLP

ZBrennan-Krohn@aclu.org

70 West Madison Street, Suite 4200

Talila.A.Lewis@gmail.com

Chicago, Illinois 60602

Phone: (312) 583-2354

Sean Young, GA State Bar No.

Fax: (312) 583-2591

790399

Stephanna.Szotkowski@arnoldporter.com

Kosha Tucker, GA State Bar No.

Kathryn.Geoffroy@arnoldporter.com

214335

AMERICAN CIVIL LIBERTIES UNION

Brittany Shrader, *pro hac vice*

FOUNDATION OF GEORGIA, INC.

NATIONAL ASSOCIATION OF THE DEAF

P.O. Box 77208

LAW AND ADVOCACY CENTER

Atlanta, GA 30357

8630 Fenton Street, Suite 820

Phone: (678) 981-5295

Silver Spring, MD 20910

Fax: (770) 303-0060

Phone: (301) 587-2907

SYoung@acluga.org

brittany.shrader@nad.org

KTucker@acluga.org

*Attorneys for Plaintiffs*

## **CERTIFICATION OF COMPLIANCE**

I hereby certify that the typeface used herein is 14-point Times New Roman

and that the memorandum is complaint with L.R. 5.1 and L.R. 71.

Respectfully submitted this 24th day of December, 2019

/s/ Claudia Center
Claudia Center, *pro hac vice*
AMERICAN CIVIL LIBERTIES UNION
DISABILITY RIGHTS PROGRAM
39 Drumm Street
San Francisco, CA 94111
Phone: (415) 343-0762
Fax: (415) 395-0950
CCenter@aclu.org

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 24, 2019, I caused the foregoing

Plaintiffs' Opposition to Defendants' Motion to Dismiss to be electronically filed

with the Clerk of Court using the CM/ECF system.

Respectfully submitted this 24th day of December, 2019

/s/ Mika Aoyama

Mika Aoyama
AMERICAN CIVIL LIBERTIES UNION
DISABILITY RIGHTS PROGRAM
39 Drumm Street
San Francisco, CA 94111
Phone: (415) 343-0773
Fax: (415) 395-0950
MAoyama@aclu.org