# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| **BRANDON COBB, MARY HILL, and JOSEPH NETTLES, on behalf of themselves and all others similarly situated,**<br><br>*Plaintiffs,*<br><br>v.<br><br>**GEORGIA DEPARTMENT OF COMMUNITY SUPERVISION, and MICHAEL NAIL, in his official capacity as Commissioner of the Georgia Department of Community Supervision,**<br><br>*Defendants.* | Civil Action No.<br>1:19-cv-03285-WMR<br><br>**CLASS ACTION** |

# PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
# MOTION FOR CLASS CERTIFICATION

# TABLE OF CONTENTS

**Page**

ARGUMENT ...................................................................................................2

I.   Proposed Class Meets the Numerosity Requirement and Is
     Ascertainable .........................................................................................2

II.  Proposed Class Satisfies the Rule 23(a)(2) Commonality Requirement........4

     A.   Whether DCS Policies and Practices Fail to Provide Class
          Members Equally Effective Communication.......................................6

          1.   DCS's ADA Policy Fails to Provide Effective
               Communication..........................................................................7

          2.   DCS Maintains Other Inadequate Policies and Practices
               for Communicating with Class Members ..................................9

               a.   DCS Does Not Adequately Assess the
                    Communication Needs of Class Members ......................9

               b.   DCS Practice Is to Use Video Remote Interpreting
                    ("VRI") In All Situations, Even if Not Appropriate ......11

               c.   DCS Policy Prohibits the Use of Live Interpreters
                    During Field Interactions................................................13

               d.   DCS Never Provides Deaf Interpreters to
                    Supervisees ...................................................................13

          3.   DCS Uses Written Documents Inaccessible to Class
               Members...................................................................................14

     B.   Whether DCS Fails to Employ Effective Communication
          Methods When Trying to Communicate with Class Members...........15

          1.   Reliance on Family Members or Friends to Interpret...............16

          2.   Reliance on Unqualified Interpreters .......................................17

i

3.     Use of Written Notes and Texts to Try to Communicate .........18

C.     Whether DCS's Policies and Practices Deny Class Members Adequate and Equal Access to Programs, Activities, and Services .................................................................................................18

D.     Whether DCS Is Denying Class Members Due Process by Failing to Provide Adequate Notice of Supervision Rules and Conditions .................................................................................19

III.    Plaintiffs Satisfy the Rule 23(a)(3) Typicality Requirement ........................20

IV.    Plaintiffs Satisfy the Rule 23(a)(4) Adequacy Requirement ........................21

V.    Final Injunctive Relief Is Appropriate under Rule 23(b)(2) ........................23

VI.    Rule 23(g)(1): Designating Class Counsel .....................................................25

CONCLUSION ........................................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Access Now, Inc. v. Ambulatory Surgery Ctr. Grp., Ltd.*,
  197 F.R.D. 522 (S.D. Fla. 2000)....................................................................22, 24

*Amchem Prod., Inc. v. Georgia Windsor*,
  521 U.S. 591 (1997).............................................................................................24

*Armstrong v. Davis*,
  No. C-94-2307-CW, ECF No. 345 (N.D. Cal.), *aff'd*, 275 F.3d 849
  (9th Cir. 2001)........................................................................................................2

*Belton v. Georgia*,
  No. 10-cv-0583-RWS, 2011 WL 925565 (N.D. Ga. Aug. 2, 2012)....................5

*Braggs v. Dunn*,
  317 F.R.D. 634 (M.D. Ala. 2016).........................................................................3

*Bumgarner v. NCDOC*,
  276 F.R.D. 452 (E.D.N.C. 2011) ..........................................................................4

*Busby v. JRHBW Realty, Inc.*,
  513 F.3d 1314 (11th Cir. 2008) ....................................................................20, 21

*Carriuolo v. Gen. Motors Co.*,
  823 F.3d 977 (11th Cir. 2016) ...............................................................................4

*Cherry v. Domestic Corp.*,
  986 F.3d 1296 (11th Cir. 2021) .............................................................................3

*Collins v. Int'l Dairy Queen, Inc.*,
  168 F.R.D. 668 (M.D. Ga. 1996).........................................................................20

*Cox v. Am. Cast Iron Pipe Co.*,
  784 F.2d 1546 (11th Cir. 1986) .............................................................................2

*Delano-Pyle v. Victoria Cnty.*,
  302 F.3d 567 (5th Cir. 2002) ...............................................................7

*Dunn v. Dunn*,
  318 F.R.D. 652 (M.D. Ala. 2016).....................................................3, 5

*George v. Acad. Mortg. Corp. (UT)*,
  369 F. Supp. 3d 1356 (N.D. Ga. 2019)...............................................22

*Georgia State Conference of Branches of NAACP v. State of Ga.*,
  99 F.R.D. 16 (S.D. Ga. 1983) .............................................................23

*Harris v. Ga. Dep't of Corr.*,
  18-cv-00365-TES, 2021 WL 6197108 (M.D. Ga. Dec. 29, 2021)..............*passim*

*Hernandez v. Cnty. of Monterey*,
  305 F.R.D. 132 (N.D. Cal. 2015)......................................................3, 4

*Hoffer v. Jones*,
  323 F.R.D. 694 (N.D. Fl. 2017)............................................................5

*Holmes v. Cont'l Can Co.*,
  706 F.2d 1144 (11th Cir. 1983) ..........................................................24

*In re Scientific-Atlanta, Inc. Sec. Lit.*,
  571 F. Supp. 2d 1315 (N.D. Ga. 2007)...............................................20

*Jones v. Advanced Bureau of Collections LLP*,
  317 F.R.D. 284 (M.D. Ga. 2016)...................................................4, 23

*Kirby v. Siegelman*,
  195 F.3d 1285 (11th Cir. 1999) .........................................................19

*Kornberg v. Carnival Cruise Lines, Inc.*,
  741 F.2d 1332 (11th Cir. 1984) .........................................................20

*L.H. v. Schwarzenegger*,
  519 F. Supp. 2d 1072 (E.D. Cal. 2007) ...............................................2

*Lacy v. Cook Cnty.*,
  897 F.3d 847 (7th Cir. 2018) ...............................................................4

*M.H. v. Berry*,
   No. 15-cv-1427-TWT, 2017 WL 2570262 (N.D. Ga. June 14,
   2017) ..................................................................................................4, 24

*Mathews v. Eldridge*,
   424 U.S. 319 (1976)...................................................................................19

*Murray v. Auslander*,
   244 F.3d 807 (11th Cir. 2001) ..................................................................20

*Ortega-Melendres v. Arpaio*,
   836 F. Supp. 2d 959 (D. Ariz. 2011), *aff'd sub nom. Melendres v.
   Arpaio*, 695 F.3d 990 (9th Cir. 2012) ........................................................5

*Valley Drug Co. v. Geneva Pharms. Inc.*,
   350 F.3d 1181 (11th Cir. 2003) ...........................................................21, 22

*Vega v. T-Mobile USA, Inc.*,
   564 F.3d 1256 (11th Cir. 2009) ...................................................................4

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011)......................................................................................4

*Williams v. Mohawk Indus., Inc.*,
   568 F. 3d 1350 (11th Cir. 2009) ..................................................................5

## **Statutes**

Americans with Disabilities Act ....................................................*passim*

Rehabilitation Act ...........................................................................1, 4, 24

## **Other Authorities**

28 C.F.R. § 35.104 ...................................................................6, 17, 18

28 C.F.R. § 35.130(b) ............................................................................7

28 C.F.R. §§ 35.160(a), (b), (c), (d)..................................................*passim*

28 C.F.R. §§ 42.503(a), (b), (f)........................................................6, 7, 8

Fed. R. Civ. P. 23(a)...........................................................................*passim*

Fed. R. Civ. P. 23(b)(2)..............................................................2, 23, 24, 25

Fed. R. Civ. P. 23(g)(1)............................................................................25

U.S. Const. amend. XIV ....................................................................1, 19

Brandon Cobb, Mary Hill, and Joseph Nettles (collectively, "Plaintiffs") are deaf and hard of hearing[1] individuals on probation or parole in Georgia subject to the supervision of Defendants the Georgia Department of Community Supervision and its commissioner, Michael Nail (collectively, "DCS"). DCS is denying Plaintiffs and other deaf and hard of hearing individuals subject to its supervision the auxiliary aids and services and reasonable modifications they need to communicate effectively and to fully participate in DCS programs, services, and activities in violation of the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act ("Section 504"), and the Fourteenth Amendment of the United States Constitution.

Plaintiffs seek to represent a class of all present and future deaf and hard of hearing individuals subject to DCS supervision who require hearing-related accommodations and services—including, but not limited to, interpreters, auxiliary aids and services, and reasonable modifications—to communicate effectively and/or to access or participate equally in programs, services or requirements of DCS.

Plaintiffs respectfully request that the Court certify this class. Plaintiffs have standing and the proposed class satisfies the elements of Rule 23(a): numerosity,

---

[1] Plaintiffs use the term "deaf and hard of hearing" to refer to individuals with hearing levels or hearing loss that qualify as disabilities under the ADA and Section 504. "Deaf" refers to individuals with hearing loss who self-identify as culturally deaf. The phrase "deaf and hard of hearing" used herein includes deaf, hard of hearing, d/Deaf-Disabled, d/DeafBlind, and Deaf individuals.

commonality, typicality, and adequacy. Plaintiffs have also satisfied Rule 23(b)(2),

that final injunctive and declaratory relief is appropriate for the class as a whole,

because DCS has acted or refused to act on grounds that apply generally to the class.

Federal courts routinely certify classes of individuals with disabilities—including

deaf and hard of hearing people—in settings like prisons, jails, and on probation and

parole.[2] The Court should do the same here.

## ARGUMENT

### I.    Proposed Class Meets the Numerosity Requirement and Is Ascertainable

Rule 23(a)(1) requires the "class [be] so numerous that joinder of all members

is impracticable," Fed. R. Civ. P. 23(a)(1), and classes of more than forty members

generally satisfy this requirement in this Circuit. *Cox v. Am. Cast Iron Pipe Co.*, 784

F.2d 1546, 1553 (11th Cir. 1986). This requirement is easily satisfied because DCS

---

[2] *E.g.*, *Harris v. Ga. Dep't of Corr.*, 18-cv-00365-TES, 2021 WL 6197108, at *10-*14 (M.D. Ga. Dec. 29, 2021) (certifying class of "[a]ll present and future deaf and hard of hearing individuals in GDC custody, who require hearing-related accommodations and services to communicate effectively and/or to access or participate equally in programs, services, or activities available to individuals in GDC custody"); *L.H. v. Schwarzenegger*, 519 F. Supp. 2d 1072, 1074 (E.D. Cal. 2007) (certifying class of "juvenile parolees in or under the jurisdiction of California, including all juvenile parolees with disabilities as defined by Section 504 of the Rehabilitation Act and the [ADA]"); *Armstrong v. Davis*, No. C-94-2307-CW, ECF No. 345 (N.D. Cal.) (certifying class of "all present and future [] state prisoners and parolees with mobility, sight, hearing . . . disabilit[ies] that substantially limit one or more of their major life activities"), *aff'd*, 275 F.3d 849, 869 (9th Cir. 2001) (affirming subject to two unrelated exceptions); *see also, e.g.*, App'x A.

is aware of at least 80 individuals who are deaf and hard of hearing and subject to its supervision. Ex. A, Smith Dep. at 109:13-22 (83 individuals as of January 2021); Ex. B, DCS spreadsheet (86 individuals as of April 2021).[3] This figure is likely understated, including because the putative class includes future members (*i.e.*, deaf and hard of hearing individuals who will become subject to DCS supervision and individuals currently on supervision who will experience hearing loss). *See, e.g.*, *Braggs v. Dunn*, 317 F.R.D. 634, 653 (M.D. Ala. 2016) ("[T]he fluid nature of a plaintiff class—as in the prison-litigation context—counsels in favor of certification of all present and future members"); *Dunn v. Dunn*, 318 F.R.D. 652, 662 (M.D. Ala. 2016) (same, collecting cases). The proposed class thus satisfies the threshold size for numerosity and makes joinder of all class members impracticable.

The proposed class is also ascertainable in that its "membership is capable of determination." *Cherry v. Domestic Corp.*, 986 F.3d 1296, 1304 (11th Cir. 2021). It is specific and objective: people under DCS supervision whose hearing disabilities qualify as a "disability" under the ADA. Courts regularly certify classes by reference to the ADA.[4] The putative class can be identified from DCS's own records and

---

[3] All the exhibits referenced herein are attached to the Declaration of Stephanna F. Szotkowski, dated Feb. 9, 2022.

[4] *E.g.*, *Dunn*, 318 F.R.D. at 658 (settlement class including any prisoner "who has a disability" as defined under the ADA); *Hernandez v. Cnty. of Monterey*, 305 F.R.D.

through context, simple inquiry, or self-identification.[5] Plaintiffs therefore satisfy

the ascertainability requirement.

## II.    Proposed Class Satisfies the Rule 23(a)(2) Commonality Requirement

Rule 23(a)(2) requires "questions of law or fact common to the class." Fed.

R. Civ. P. 23(a)(2). However, there is no requirement that all questions of law and

fact be common. *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1268 (11th Cir. 2009).

"[E]ven a single [common] question" will suffice. *Harris*, 2021 WL 6197108, at *11

(quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011)); *Carriuolo v.*

*Gen. Motors Co.*, 823 F.3d 977, 984 (11th Cir. 2016) (same). "[T]he Rule 23(a)(2)

commonality requirement is not meant to be overly burdensome for plaintiffs; in

fact, at least in the Eleventh Circuit, it has been described as a 'low hurdle' to

---

132, 149 (N.D. Cal. 2015) (class of people "who have a disability, as defined by
federal and California law"); *Bumgarner v. NCDOC*, 276 F.R.D. 452, 454, 458
(E.D.N.C. 2011) (class of "'qualified individuals with disabilities' under ADA and
Rehabilitation Act"). Such definitions "are sufficiently narrow" and do not turn on
"subjective standards." *Hernandez*, 305 F.R.D. at 152.

[5] *E.g.*, Ex. A, Smith Dep. at 114:24-117:14; Ex. B; Ex. C, Hilliard Dep. at 118:22-
120:3 (DCS tracks disability in its portal system utilizing ADA profiles which
contain type of disability, *i.e.* "hearing impairment"); *M.H. v. Berry*, No. 15-cv-
1427-TWT, 2017 WL 2570262, at *3 (N.D. Ga. June 14, 2017) (ascertainability
satisfied where class "members can be ascertained through a review of [defendants']
records"); *Jones v. Advanced Bureau of Collections LLP*, 317 F.R.D. 284, 290 (M.D.
Ga. 2016) (same, "administratively feasible procedure" used to identify putative
class members); *see also, e.g., Lacy v. Cook Cnty.*, 897 F.3d 847, 864 n.36 (7th Cir.
2018) (same, defendant's own records "provide an extremely clear and objective
criterion" for determining the class without "highly individualized" determinations).

4

overcome." *Harris*, 2021 WL 6197108, at *11 (citing *Williams v. Mohawk Indus., Inc.*, 568 F. 3d 1350, 1356 (11th Cir. 2009)).

The fact that individual class members may have unique circumstances does not affect this analysis because they "have allegedly been affected by a general policy of the defendant, and the general policy is the focus of the litigation." *Harris*, 2021 WL 6197108, at *12 (commonality satisfied where case "involves a challenge to system-wide practices, policies, and procedures that affect all members of the proposed class," specifically, the "alleged systemic discrimination in policy and practice across the GDC's prison facilities").[6]

Here, Plaintiffs are challenging a systemwide practice and policy that affects all putative class members. Common questions of law and fact exist and make this exactly the type of case appropriate for class-wide resolution. Each of the following common questions of law and fact affects putative class members, is alone sufficient

---

[6] *E.g.*, *Dunn*, 318 F.R.D. at 662-63 (commonality satisfied where prison failed to implement ADA policies for class that included blind, deaf, and wheelchair-using prisoners); *Belton v. Georgia,* No. 10-cv-0583-RWS, 2011 WL 925565, at *4 (N.D. Ga. Aug. 2, 2012) (commonality satisfied where the state failed to provide hearing services throughout its mental health facilities); *see also, e.g.*, *Hoffer v. Jones*, 323 F.R.D. 694, 697-98 (N.D. Fl. 2017) (commonality met where common questions of law related to prison's deliberate indifference to standard of care for prisoners with Hepatitis C); *Ortega-Melendres v. Arpaio*, 836 F. Supp. 2d 959, 989 (D. Ariz. 2011), *aff'd sub nom. Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012) ("In a civil rights suit, commonality is satisfied where the lawsuit challenges a systemwide practice or policy that affects all of the putative class members.") (citation omitted); App'x A.

to satisfy the commonality requirement, and will be analyzed in turn below:

1) Whether DCS policies fail to provide class members equally effective communication;

2) Whether DCS fails to employ effective communication methods when trying to communicate with class members;

3) Whether DCS's policies and practices deny class members adequate and equal access to programs, activities, and services; and

4) Whether DCS is denying class members due process by failing to provide adequate notice of supervision rules and conditions.

In sum, the focus of this litigation is on the alleged systemic discrimination in policy and practice by DCS in its supervision of deaf and hard of hearing individuals, which "is a sufficiently narrowed focus common across members of the proposed class to satisfy the commonality requirement." *Harris*, 2021 WL 6197108, at *12.

## A. Whether DCS Policies and Practices Fail to Provide Class Members Equally Effective Communication

DCS is required to "take appropriate steps to ensure that communications with . . . [individuals] with disabilities are as effective as communications with others" by "furnish[ing] appropriate auxiliary aids and services." 28 C.F.R. §§ 35.160(a)(1), (b)(1).[7] DCS must make reasonable modifications to ensure that these individuals are "afford[ed] an equal opportunity to obtain the same result, to gain the same

---

[7] "Auxiliary aids and services" include for example "[q]ualified interpreters . . . real-time computer-aided transcription services . . . [and] open and closed captioning, including real-time captioning." 28 C.F.R. § 35.104; *see also* 28 C.F.R. § 42.503(f).

benefit, or to reach the same level of achievement as that provided to others." 28 C.F.R. § 35.130(b)(1)(iii); *see also* 28 C.F.R. §§ 42.503(a), (b)(1)(i)-(iii).

### 1.    DCS's ADA Policy Fails to Provide Effective Communication

After Plaintiffs filed this lawsuit, DCS created an ADA policy, which they have continued to revise during the pendency of this suit in response to shortcomings identified by Plaintiffs. Ex. D, Americans with Disabilities Act, Title II, dated June 1, 2021 (current version, the "ADA Policy"). The ADA Policy is facially inadequate for at least three principal reasons, each of which can be shown by class-wide proof.

*First*, the ADA Policy fails to meet DCS's affirmative obligations[8] of ensuring that Plaintiffs and the class receive effective communication and instead states that: DCS "will generally, upon request, provide appropriate aids and services leading to effective communication for qualified persons with disabilities." Ex. D,

---

[8] *E.g.*, 28 C.F.R. §§ 35.160(a)(1) ("A public entity shall take appropriate steps to ensure that communications with [people] with disabilities are as effective as communications with others."), (b)(1) ("A public entity shall furnish appropriate auxiliary aids and services … to afford qualified individuals with disabilities … an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity."); *Delano-Pyle v. Victoria Cnty.*, 302 F.3d 567, 575 (5th Cir. 2002) ("The ADA expressly provides that a disabled person is discriminated against when an entity fails to 'take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services.' . . Congress intended to impose an affirmative duty on public entities to create policies or procedures to prevent discrimination based on disability.").

ADA Policy § IV.E; *id.* §§ IV.G, J. The policy makes provision of needed aids and services discretionary. Additionally, it places the burden of requesting services on individuals under supervision, who without effective communication and proper notice of their rights, may not know about the policy, understand its contents, or know how or to whom to make requests. Indeed, DCS does not provide a copy of the ADA Policy to supervisees, there is no requirement that community supervision officers ("CSOs") discuss it their supervisees, and there is nowhere supervisees can access it. Ex. A, Smith Dep. at 214:10-18, 235:10-236:3.

*Second*, the policy does not require DCS to assess communication needs for supervisees or describe how this would be done, even though DCS must give a preferred method of communication "primary consideration" and ensure that they receive effective communication. 28 C.F.R. §§ 35.160(a)(1), (b)(1)-(2). The policy includes a passing reference to documentation of a supervisee's "preferred method of communication," but does not say how this method of communication will be considered when a supervisee makes a request. Ex. D, ADA Policy §§ IV.C.1, G.

*Third*, the policy imposes multiple inaccessible procedures on deaf and hard of hearing supervisees to seek interpreters and other auxiliary aids and services:

- For a supervisee to make a request, "ADA Reasonable Accommodation Request Form 2" is required to be completed, though it is unclear which auxiliary aids and services could be requested using this form, if any.

8

*Id.* § G.2; Ex. E. DCS staff forwards the form to the ADA Coordinator, who can take up to twenty-four business days to reach a decision on the request. Ex. D, ADA Policy §§ G.3-4.

- The ADA Policy has a separate grievance procedure, which requires the supervisee to complete "ADA Formal Complaint Form Version 1" and fax/mail it to the ADA Coordinator. *Id.* § IV.H. It is unclear how a supervisee would know of or obtain this form. If an individual were able to do so, if that person cannot access the form because of difficulty with written English, he/she would have to contact the DCS ADA Coordinator, but it is also unclear how he/she would know to do this. Ex. A, Smith Dep. at 233:2-234:6. Upon receipt of the form, the ADA Coordinator then has thirty days to make findings and share them with the supervisee by email or mailed letter. Ex. D, ADA Policy § IV.H. The policy does not provide that any auxiliary aids or services will be provided to supervisees attempting to comply with this process. *Id.*

- The ADA Policy also has a grievance appeals process that provides that a supervisee must submit a "notice in writing" to the "HR Director" within fifteen days of a "decision" (presumably, the ADA Coordinator's decision, though it is unclear from the policy). *Id.* § IV.I. The policy does not explain how a supervisee should find the contact information for the "HR Director." And while the policy provides that auxiliary aids and services will be provided in the appeals process, it is unclear how a supervisee can request them. *Id.*

These procedures are inaccessible to deaf and hard of hearing supervisees and are inconsistent with DCS's obligation to ensure that communication with these individuals is "as effective as communication with others." 28 C.F.R. § 35.160(a)(1).

### 2. DCS Maintains Other Inadequate Policies and Practices for Communicating with Class Members

#### a. DCS Does Not Adequately Assess the Communication Needs of Class Members

Other ad hoc and subjective unwritten policies and practices apply to the class

as a whole and lead to a further lack of effective communication. DCS uses CSOs to make complex decisions about how to asses a supervisee's communication needs and which auxiliary aids and services to provide. DCS provides no training or tools to aid CSOs in making these decisions, nor does it provide any basis for an actual, objective assessment.

Communication needs vary by person and by situation and may not be the same for every supervision-related interaction. Ex. F, Shepard-Kegl Dep. at 102:23-104:7. A communication assessment to determine which auxiliary aids and services are right for which circumstances is best performed by a specialist with training. *E.g.*, Ex. G, Moriarty Harrelson Dep. at 109:15-110:6. But DCS does not engage anyone with the relevant training or expertise to make these determinations. Ex. H, Driver Dep. at 46:19-47:9. Rather, DCS relies on CSOs to determine the communication access to provide based on asking a handful of questions and CSOs' subjective impressions of what "appears to be working," and has no apparent plan for what to do if supervisees are unable to communicate their needs to the CSO. *Id.* at 40:19-41:11, 51:15-52:2. As a result, supervisees may be unable to understand or answer questions about their communication needs, share what those needs are at intake, or advocate for the types of communication that could be effective later during supervision. Indeed, CSOs have often been incorrect in their assessments of

class members' communication needs.[9] In this way, DCS has again failed to ensure effective communication. 28 C.F.R. § 35.160(a)(1).

> **b.    DCS Practice Is to Use Video Remote Interpreting ("VRI") In All Situations, Even if Not Appropriate**

Since Plaintiffs brought this lawsuit, DCS has directed CSOs to use VRI for all interactions where they believe an interpreter is needed regardless of individual circumstances (including whether a person needs an ASL interpreter in the first place), unless a person makes a request for an in-person interpreter, which may not be honored. Ex. I; Ex. H, Driver Dep. at 117:7-14; Ex. D, ADA Policy §§ IV.E, G-I. VRI involves a remote interpreter on a screen and requires an internet connection and videoconferencing technology. Ex. J, Expert Report of Shepard-Kegl & Rowley ("Kegl-Rowley Report") at 43-51. Its effectiveness depends on the video screen size, the quality/speed of the internet connection, and the interpreter's skills and understanding of the situation (*e.g.*, context and local signs because VRI interpreters

---

[9] For example, Ashley Barnett's CSO stated that she reads lips well and can complete some tasks in writing, but Dr. Moriarty Harrelson found that she needs American Sign Language ("ASL") to communicate effectively. Ex. K, BodyCam Video, Ashley Barnett (Mar. 8, 2018); Ex. L, Moriarty Harrelson Report at 16-17. Gabriel Cohen's CSO noted that he could communicate effectively through text and speaking, but he also needs ASL to communicate effectively. Ex. L, Moriarty Harrelson Report at 24-26. Courtney Phillips' CSO insisted that he could read lips even after his mother stated he could not. Ex. M, BodyCam Video, Courtney Phillips (Mar. 20, 2019).

could be anywhere in the country). *Id.* Using VRI with a bad internet connection

makes communication next to impossible.

There are many problems with this default practice by DCS, including that:

- VRI often does not work because of a poor internet connection. *E.g.*, Ex. C, Hilliard Dep. at 78:6-18 (describing interruptions of VRI connection due to technical issues); Ex. N, BodyCam Video, Steven Miller (Nov. 7, 2019) (VRI video froze repeatedly); Ex. O, Cobb Suppl. Decl. ¶¶ 25-26; Ex. P, Nettles Suppl. Decl. ¶ 6; Ex. Q, Nettles Dep. at 36:1-18; Ex. R, Hill Dep. at 10:10-20:20; Ex. S, BodyCam Video, Kathy Bullock (May 6, 2020); Ex. T, BodyCam Video, Brian Boozer (Mar. 3, 2020); Ex. U at 2988, 3001, 3036.

- This has caused CSOs to end interactions and has led to anxiety and confusion by supervisees, who cannot communicate with their CSOs. *E.g.*, Ex. P, Nettles Suppl. Decl. ¶ 8. In at least one instance, a CSO threatened harm to a supervisee when the supervisee tried to adjust the screen used for VRI because of the lack of communication. *Id.* ¶ 14.

- DCS has no policies to ensure VRI is being used on an appropriately sized device, with an adequate connection, or with interpreters qualified for the individual/interaction. Ex. H, Driver Dep. at 131:14-24, 133:22-134:11; Ex. A, Smith Dep. at 45:3-14; 28 C.F.R. § 35.160(d).

- CSOs may never make appropriate auxiliary aids and services available even when they are needed, including because it takes more steps to arrange for them instead of VRI. Ex. H, Driver Dep. at 49:15-50:11.

- VRI may be the right technology for some circumstances (*e.g.*, routine interactions with an individual fluent in ASL), but it is not a one-size-fits-all solution, or equivalent to an in-person interpreter. Ex. J, Kegl-Rowley Report at 43-51. It is often inappropriate for high-stakes interactions because of the difficulty of conveying complex information on a two-dimensional screen and the chances for miscommunications with significant consequences. *Id.* It is also ineffective when interpreters are asked to interpret complex information contained in

hard copy documents without the benefit of having access to the documents themselves. *E.g.*, Ex. V, Shepard-Kegl Dep. at 388:22-393:3; Ex. P, Nettles Suppl. Decl. ¶¶ 9, 13.

- In-person interpreters normally do "check ins" with deaf and hard of hearing individuals before the interpreting begins to learn their signing style, to understand the context of the interaction, and to confirm that the communication is effective. VRI interpreters seldom, if ever, provide this "check in." Ex. J, Kegl-Rowley Report at 43-51.

In short, DCS's default use of VRI deprives Plaintiffs and class members of the opportunity to access communication or to address the inadequacy of VRI. VRI should instead be used only when appropriate for the individual and situation. *Id.*

### c.   DCS Policy Prohibits the Use of Live Interpreters During Field Interactions

DCS has a policy and practice of never providing in-person interpreters during home visits and field interactions, regardless of a supervisee's circumstances, and instead relies exclusively on VRI. Ex. H, Driver Dep. at 119:13-25; Ex. W, Smith Dep. at 55:25-56:20; Ex. P, Nettles Suppl. Decl. ¶ 16. This results in the same problems discussed above (*see supra* Point II.A.2.b) and deprives individuals for whom VRI does not provide effective communication. 28 C.F.R. § 35.160(a)(1).

### d.   DCS Never Provides Deaf Interpreters to Supervisees

DCS has a policy or practice of not providing Deaf interpreters [10] to

---

[10] A Deaf interpreter is deaf, has native or near-native fluency in ASL, has knowledge of deafness and Deaf community/culture and has specialized training and/or experience in ways to enhance communication. They work on a team with a

individuals who need them for effective communication. *E.g.*, Ex. X, Cobb Dep. at 56:5-7; Ex. O, Cobb. Suppl. Decl. ¶¶ 4-5, 29; Ex. P, Nettles Suppl. Decl. ¶¶ 4, 11-14, 17; Ex. R, Hill Dep. at 22:6-23:19; 118:16-23; Ex. J, Kegl-Rowley Report at 145; Ex. Y, Kegl-Rowley Report – Hill Assessment at 40-45.

### 3.      DCS Uses Written Documents Inaccessible to Class Members

DCS uses complex, written documents for supervision-related requirements (*e.g.*, ECF No. 34-1, Attach. 1) that may be inaccessible to class members. Deaf and hard of hearing individuals often have a limited ability to read and write in English—ASL and English are distinct languages (only one has a written component)—and English is a second language at best for many of these individuals. Ex. J, Kegl-Rowley Report at 10-11, 20, 25; Ex. L, Moriarty Harrelson Report at 6-7, 10; ECF No. 53-7, Nettles Decl. ¶ 4; Ex. O, Cobb Suppl. Decl. ¶¶ 3-4. DCS does not provide the auxiliary aids and services necessary to effectively communicate crucial information in these documents to supervisees. *E.g.*, ECF No. 53-7, Nettles Decl.

---

hearing interpreter to facilitate effective communication. Ex. J, Kegl-Rowley Report at 35-37. They generally have more familiarly with ASL variations and local/non-standard signs. In contrast, hearing interpreters are often native English speakers and non-native ASL users, and communicate with a deaf or hard of hearing person in a second language. As a result, deaf and hard of hearing individuals may be more comfortable with and better communicate with Deaf interpreters. Many deaf and hard of hearing individuals also grew up with language deprivation and were never fully fluent in any language, and Deaf interpreters could increase communication effectiveness for them. Ex. L, Moriarty Harrelson Report at 6.

¶ 10; Ex. Z, Nettles Dep. at 126:2-127:10 (Nettles signed form on which CSO had checked box saying, "I have read or had read to me this registration notification form and understand its contents" despite no one doing so), 156:3-157:18; Ex. O, Cobb. Suppl. Decl. ¶¶ 11-12; Ex. R, Hill Dep. at 11:10-14:25 (Hill had to sign documents at intake she could not understand); Ex. AA, Hill Dep. at 96:17-24, 162:18-165:2.

### B.   Whether DCS Fails to Employ Effective Communication Methods When Trying to Communicate with Class Members

As a result of the policies and practices described above, DCS routinely fails to provide auxiliary aids and services to Plaintiffs and class members at interactions throughout their supervision. DCS's conduct runs the gamut from failing to provide adequate (or any) interpreters (*e.g.*, ECF No. 53-7, Nettles Decl. ¶ 17; Ex. P, Nettles Suppl. Decl. ¶ 2; Ex. O, Cobb Suppl. Decl. ¶¶ 11-14, 24-26), to causing one of the named plaintiffs, Mary Hill, to waive her right to a contested hearing and counsel, which resulted in her wrongful incarceration as briefly summarized below:

- Ms. Hill is Deaf and has Usher's Syndrome, a condition which causes visual impairment. ECF No. 181, Second Am. Compl. ("Compl.") ¶ 25. Her probation requirements include community service, which she satisfied by cleaning her local DCS office. Because of the incidence of COVID-19 cases at that office, she understood that this requirement was put on "hold." Ex. AA, Hill Dep. at 172:20-177:12.

- On October 2020, during a meeting with her CSO Adam Roper, he informed her that she had violated her probation conditions by failing to complete community service and by failing a drug screen.

- Ms. Hill had no access to communication during the drug screen. Ex. BB, Roper Dep. at 207:15-209:3. Mr. Roper nonetheless had her sign a form in which she "admitted" to using THC, again without any access to communication. *Id.* at 194:12-201:14, 208:4-210:23. The form she signed stated Ms. Hill acknowledged by signing the admission that her probation sentence could be revoked. Ex. CC. Mr. Roper proceeded to arrest Ms. Hill and transport her to jail.

- Once at the jail, Mr. Roper held a laptop with VRI on it up to a thick glass window to review a consent order with Ms. Hill. The order required 60 days incarceration and listed THC use and failure to complete community service as the grounds. Ex. BB, Roper Dep. at 115:17-118:22, 222:4-224:23, 270:11-271:16; Ex. DD. Mr. Roper admitted at deposition that inclusion of community service on this form was a mistake, and his conduct further deprived Ms. Hill of an opportunity to explain why she tested positive for THC (*i.e.*, her friend had given her food with marijuana in it, which she unknowingly consumed). Ex. BB, Roper Dep. at 228:14-232:8, 238:15-242:17, 248:6-13. Mr. Roper failed to communicate to Ms. Hill her right to counsel and to a contested hearing, even though that is his regular practice. He attributed this to this not being a "typical" situation, because Ms. Hill is deaf. *Id.* at 224:11-226:13, 259:11-264:15. Mr. Roper nonetheless testified that: "I did feel like I got the message across effectively." *Id.* at 224:20-23.

- Mr. Roper proceeded to have Ms. Hill sign the consent order and filed it with the judge and Ms. Hill then served the term of her wrongful incarceration. *Id.* at 259:11-262:7, 272:5-273:22.

Below are additional illustrative examples of DCS's conduct.

## 1.    Reliance on Family Members or Friends to Interpret

ADA regulations prohibit: (1) "requir[ing] an individual with a disability to bring another individual to interpret for him or her" (28 C.F.R. § 35.160(c)(1)); and (2) reliance "on an adult accompanying an individual with a disability to interpret or

facilitate communication." *Id.* § 35.160(c)(2). To be a qualified interpreter under the ADA, an interpreter must be impartial (28 C.F.R. § 35.104), which family members are by definition not, even if they have sufficient familiarity with ASL.[11]

DCS's practice has nevertheless been to ask Plaintiffs' and the class's family members to interpret in lieu of providing required auxiliary aids and services.[12] In addition to violating federal law, this practice is problematic because CSOs often attempt to communicate with family members rather than deaf supervisees. This leads to a loss of agency, leaves supervisees out of critical conversations, and makes others privy to sensitive information the supervisee may not have wanted to share.[13]

### 2. Reliance on Unqualified Interpreters

DCS routinely relies on interpreters who otherwise are not "qualified ASL

---

[11] Family members, for example, may have motivations that conflict with a deaf individual's and may not fully share the information conveyed to them. *E.g.*, Ex. J, Kegl-Rowley Report at 15, 51; Ex. L, Moriarty Harrelson Report at 9.

[12] *E.g.*, ECF No. 34-1, Mitchell Decl. ¶ 17; ECF No. 34-4, Worley Decl. ¶ 16; ECF No. 53-7, Nettles Decl. ¶¶ 9-10, 12, 16, 18; Ex. O, Cobb Suppl. Decl. ¶¶ 12-14; Ex. L, Moriarty Harrelson Report at 14-15; Ex. S, BodyCam Video, Kathy Bullock (May 6, 2020); Ex. T, BodyCam Video, Brian Boozer (Mar. 3, 2020); Ex. EE, BodyCam Video, Ashley Barnett (Dec. 3, 2019); Ex. JJ, BodyCam Video, Gabriel Cohen (Jan. 27, 2020); Exhibit KK, BodyCam Video, Jeffrey Wilson (Feb. 21, 2018); Ex. U at 3009, 3035.

[13] *E.g.*, Ex. EE, BodyCam Video, Ashley Barnett (Dec. 3, 2019) (CSO speaking with and obtaining information from class member's companion who had a physical altercation with class member, rather than from the class member herself); Ex. J, Kegl-Rowley Report at 15, 51; Ex. L, Moriarty Harrelson Report at 7, 27, 38-39.

interpreters"[14] because they, for example, are not fluent in ASL and make frequent signing errors. Ex. P, Nettles Suppl. Decl. ¶ 7; Ex. O, Cobb Suppl. Decl. ¶ 18.

### 3. Use of Written Notes and Texts to Try to Communicate

Even though many deaf and hard of hearing people have limited ability to read and write English (*see supra* Point II.A.3), DCS often attempts to communicate by writing notes to Plaintiffs and the class without regard to whether it is appropriate to convey the information in that way (*e.g.*, a meeting time may be fine to communicate in a note, but parole requirements are unlikely to be).[15]

### C. Whether DCS's Policies and Practices Deny Class Members Adequate and Equal Access to Programs, Activities, and Services

DCS requires many supervised individuals to participate in programs (such as counseling) as a condition of supervision, but routinely excludes Plaintiffs and class members from participating because of their hearing disabilities. For example, a condition of a supervisee's probation was that he engage in sex offender treatment to prevent recidivism, but DCS moved the court to remove this supervision condition

---

[14] "Qualified ASL interpreters" are those who can "interpret effectively, accurately, and impartially, both receptively and expressively, using any necessary specialized vocabulary." 28 C.F.R. § 35.104.

[15] *E.g.*, ECF No. 53-7, Nettles Decl. ¶ 15; Ex. P, Nettles Suppl. Decl. ¶ 10; Ex. Q, Nettles Dep. at 22:25-23:25, 30:19-31:4; 34:6-15; Ex. R, Hill Dep. at 79:15-81:20; Ex. AA, Hill Dep. at 147:7-149:2; Ex. BB, Roper Dep. at 163:4-170:4, 173:23-174:21, 186:23-201:18, 208:4-210:23; Ex. L, Moriarty Harrelson Report at 16, 18-19, 29; Ex. II, BodyCam Video, Kathy Bullock (Oct. 21, 2019).

because DSC could not accommodate a deaf person. Ex. FF, Dowdell Dep. at 139:8-143:25; Ex. GG, Pet. for Modification of Sentence.

### D. Whether DCS Is Denying Class Members Due Process by Failing to Provide Adequate Notice of Supervision Rules and Conditions

The Fourteenth Amendment provides that no state shall deprive a person of liberty without due process of law, which requires "notice of the case against him" and a meaningful opportunity to be heard prior to the deprivation. *Mathews v. Eldridge*, 424 U.S. 319, 332-333, 348 (1976); *Kirby v. Siegelman*, 195 F.3d 1285, 1291 (11th Cir. 1999). Defendant Nail, acting in his official capacity, has repeatedly refused to provide Plaintiffs and class members with auxiliary aids and services and reasonable modifications and has denied them adequate notice of the rules and requirements of their supervision. Plaintiff Hill's experience is illustrative. She faced wrongful incarceration and potential probation revocation, without being afforded an opportunity to explain whether the rules and requirements of her supervision were effectively communicated to her, including the community service requirement. *See supra* Point II.B.[16] The prospect of "technical" (non-criminal) violations of the rules of supervision due to DCS's failure to ensure communication access to Plaintiffs and

---

[16] *See also, e.g.*, Ex. HH, BodyCam Video, Brittany Willis (Dec. 27, 2018) (class member appears to not understand what it means to "report" for supervision despite asking several times for clarification of this basic concept).

class members is a further related common question of law or fact.

## III.   Plaintiffs Satisfy the Rule 23(a)(3) Typicality Requirement

Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class," Fed. R. Civ. P. 23(a)(3). It is the measure of whether "a sufficient nexus exists between the claims of the named representatives and those of the class at large." *Busby v. JRHBW Realty, Inc.*, 513 F.3d 1314, 1322-23 (11th Cir. 2008). This nexus exists when the "claims or defenses of the class and the class representatives arise from the same event or practice and are based on the same legal theory." *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984). "[T]here is no requirement that all members of the proposed class share the same experiences." *Harris*, 2021 WL 6197108, at *13. Typicality "may be satisfied even though varying fact patterns support the claims or defenses of individual class members." *Collins v. Int'l Dairy Queen, Inc.*, 168 F.R.D. 668, 674 (M.D. Ga. 1996); *Murray v. Auslander*, 244 F.3d 807, 811 (11th Cir. 2001) ("strong similarity of legal theories" enough); *In re Scientific-Atlanta, Inc. Sec. Lit.*, 571 F. Supp. 2d 1315, 1326 (N.D. Ga. 2007) (typicality test "is not demanding").

Typicality is satisfied because all members of the proposed class experience some form of hearing loss that affects their ability to communicate without the use of hearing-related accommodations. *Harris*, 2021 WL 6197108, at *13. They seek

injunctive and declaratory relief for DCS's failure to provide such accommodations. *Id.* Their grievances all arise from DCS's wrongful policies and practices. *See id.* Plaintiffs, like the class members, have different cultural experiences in the deaf community and require different auxiliary aids and services, including interpreters (hearing and Deaf interpreters).[17] Plaintiffs' interests are aligned with those of the class and Plaintiffs will adequately represent the interests of the entire class.

## IV.    Plaintiffs Satisfy the Rule 23(a)(4) Adequacy Requirement

The last requirement under Rule 23(a) is that the "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "The adequacy-of-representation requirement encompasses two separate inquiries: (1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action." *Busby*, 513 F.3d at 1323 (quoting *Valley Drug Co. v. Geneva Pharms. Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003)).

As to the first requirement, named Plaintiffs share the same interests with the proposed class without conflict. No conflicts foreclose class certification such as

---

[17] Mr. Cobb identifies as Deaf, communicates primarily in ASL, and needs a hearing and Deaf interpreter team to communicate about important matters. Ex. O, Cobb Suppl. Decl. ¶¶ 3-4; Compl. ¶ 23. Mr. Nettles is deaf, communicates in ASL, and needs hearing sign language interpreters. ECF No. 53-7, Nettles Decl. ¶¶ 3-4; Compl. ¶ 24. Ms. Hill is DeafBlind and her preferred language is ASL. Compl. ¶ 25.

"where some party members claim to have been harmed by the same conduct that benefitted other members of the class." *Valley Drug*, 350 F.3d at 1189. Plaintiffs and class members are similarly harmed by DCS's conduct. Plaintiffs, like members of the proposed class, seek injunctive relief, have suffered the same injuries, and can adequately, fully, and fairly represent the class members in the claim for relief. If granted, the relief sought will provide substantially equal benefits and relief to all class members. *Access Now, Inc. v. Ambulatory Surgery Ctr. Grp., Ltd.*, 197 F.R.D. 522, 528 (S.D. Fla. 2000) (adequacy satisfied when class shares same injuries as plaintiffs and relief sought will provide relief to all members).[18]

As to the second requirement, Plaintiffs and their counsel will continue to vigorously prosecute the interests of the class. Plaintiffs' counsel are competent and dedicated advocates. They work at organizations devoted to civil rights advocacy and are experienced in complex class action litigation.[19]

---

[18] And because Plaintiffs are not seeking monetary damages, "the interests of the representative Plaintiffs do not actually or potentially conflict with those of the class." *Id*. A request that class representatives receive a service award is not inconsistent with class certification. *See* Rubenstein, 5 Newberg § 17.3 (5th ed.); *George v. Acad. Mortg. Corp. (UT)*, 369 F. Supp. 3d 1356, 1373-74 (N.D. Ga. 2019) ("Service payments compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation . . . Courts have consistently found service awards to be an efficient and productive way to encourage members of a class to become class representatives.") (internal quotation omitted).

[19] For over 100 years, the ACLU has litigated cases vindicating the constitutional

A sufficient number of experienced and dedicated attorneys are dedicated to representing the class *pro bono*. *Georgia State Conference of Branches of NAACP v. State of Ga.*, 99 F.R.D. 16 at 34 (S.D. Ga. 1983) (adequate representation satisfied with several civil rights organizations and five experienced civil rights attorneys representing the class pro bono); *Jones*, 317 F.R.D. at 293 ("The Court concludes that it is apparent from counsels' ability to manage similar suits in the past that they have the expertise and adequate resources to manage this lawsuit as well.").

*   *   *

Thus, the Rule 23(a) requirements for class certification have been met.

## V.   <u>Final Injunctive Relief Is Appropriate under Rule 23(b)(2)</u>

Rule 23(b)(2) provides for class certification where the "party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting

---

rights of marginalized groups. Arnold & Porter Kaye Scholer, LLP is a foremost international law firm that has been protecting clients for over 70 years and is well-known for its commitment to pro bono matters, including civil rights cases involving deaf and hard of hearing individuals. The National Association of the Deaf is the premier civil rights organization of, by, and for deaf and hard of hearing persons and has been representing them for over 100 years. For over 40 years, the Disability Rights Education & Defense Fund has been a leading national civil rights law and policy center directed by individuals with disabilities and parents who have children with disabilities. The ACLU of Georgia routinely litigates civil rights issues exclusively in Georgia, including complex class actions such as this.

the class as a whole." Fed. R. Civ. P. 23(b)(2); *Amchem Prod., Inc. v. Georgia Windsor*, 521 U.S. 591, 614 (1997); *Holmes v. Cont'l Can Co.*, 706 F.2d 1144, 1155 (11th Cir. 1983). Rule 23(b)(2) "has been liberally applied" in civil rights cases where the primary relief sought is "injunctive or declaratory in nature." *Access Now*, 197 F.R.D. at 529. "Civil rights cases against parties charged with unlawful, class-based discrimination are prime examples" of proper Rule 23(b)(2) classification. *Amchem Prod.*, 521 U.S. at 614; *see also* App'x A.

Plaintiffs are asserting class-wide grievances against DCS for implementing and adhering to unlawful policies and practices that affect the entire class. Compl. ¶¶ 5, 35-51; *Harris*, 2021 WL 6197108, at *13. DCS is denying Plaintiffs and proposed class members their rights under the ADA and Section 504 and is violating their procedural due process rights guaranteed by the U.S. Constitution. DCS is acting or refusing to act on grounds that apply generally to the proposed class. Plaintiffs' claims for systemic relief can be resolved with a declaratory judgment that DCS's actions and/or inactions are unlawful and injunctive relief that enjoins the unlawful policies and practices. *E.g.*, *Berry*, 2017 WL 2570262, at *7 (certifying class under Rule 23(b)(2) where the "class action [could] be resolved in one stroke with an injunctive or declaratory judgment finding the [d]efendants policies and practices to be [unlawful].").

The Rule 23(b)(2) requirements have therefore been satisfied.

## VI.   <u>Rule 23(g)(1): Designating Class Counsel</u>

Rule 23 requires a court that certifies a class to appoint class counsel. Fed. R. Civ. P. 23(g)(1). In doing so, the Court must consider "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." *Id.* 23(g)(1)(A)(i)-(iv).

Based on these factors, the Court should designate Plaintiffs' counsel as class counsel. A team of dedicated and experienced attorneys is representing the Plaintiffs and putative class. Counsel has considerable experience in complex litigation and extensive knowledge of the applicable law of disability rights. Mizner Decl. ¶¶ 4-6; Dimmick Decl. ¶¶ 4-5; Center Decl. ¶¶ 4-6; Young Decl. ¶ 4; Hoffman Decl. ¶¶ 7-12; Shrader Decl. ¶¶ 5-7. These experienced lead attorneys are supervising additional attorneys in this case. Dimmick Decl. ¶ 6; Hoffman Decl. ¶ 14. They are fully committed to devoting all resources necessary to pursue this litigation and have and will continue to devote all resources necessary to prosecute this case vigorously and thoroughly.

Therefore, the Rule 23(g)(1) requirements have been satisfied.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that this Court grant their motion for class certification and certify the proposed class of all present and future deaf and hard of hearing individuals subject to DCS supervision.

Respectfully submitted this 9th day of February 2022.

/s/ Stephanna F. Szotkowski

Susan Mizner, *pro hac vice*
Zoe Brennan-Krohn, *pro hac vice*
Brian L. Dimmick, *pro hac vice*
West Resendes, *pro hac vice*
Talila A. Lewis, *pro hac vice*
AMERICAN CIVIL LIBERTIES UNION
DISABILITY RIGHTS PROGRAM
39 Drumm Street
San Francisco, CA 94111
Phone: (415) 343-0781
Fax: (415) 395-0950
SMizner@aclu.org
ZBrennan-Krohn@aclu.org
BDimmick@aclu.org
WResendes@aclu.org
Talila.A.Lewis@gmail.com

Sean Young, GA State Bar No.
790399
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF GEORGIA, INC.
P.O. Box 77208
Atlanta, GA 30357
Phone:  (678) 981-5295
Fax:  (770) 303-0060
SYoung@acluga.org

Stephanna F. Szotkowski, *pro hac vice*
Kathryn Geoffroy, *pro hac vice*
ARNOLD & PORTER KAYE SCHOLER LLP
70 West Madison Street, Suite 4200
Chicago, Illinois 60602
Phone: (312) 583-2354
Fax: (312) 583-2591
Stephanna.Szotkowski@arnoldporter.com
Kathryn.Geoffroy@arnoldporter.com

Ian Hoffman, *pro hac vice*
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave, NW
Washington, DC 20001
Phone: (202) 942-5000
Fax: (202) 942-5999
Ian.Hoffman@arnoldporter.com

Tyler J. Fink, *pro hac vice*
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, New York 10019
Phone:  (212) 836-8000
Fax:  (212) 836-8689
Tyler.Fink@arnoldporter.com

Claudia Center, *pro hac vice*
DISABILITY RIGHTS EDUCATION AND
DEFENSE FUND
3075 Adeline St, Suite 210
Berkeley, CA 94703
Phone: (510) 644-2555
CCenter@dredf.org

Brittany Shrader, *pro hac vice*
NATIONAL ASSOCIATION OF THE DEAF
LAW AND ADVOCACY CENTER
8630 Fenton Street, Suite 820
Silver Spring, MD 20910
Phone: (301) 587-2907
brittany.shrader@nad.org

*Attorneys for Plaintiffs*

## CERTIFICATION OF COMPLIANCE

I hereby certify that the typeface used herein is 14-point Times New Roman

and that the memorandum is compliant with L.R. 5.1 and 7.1.

Respectfully submitted this 9th day of February 2022.

/s/ Stephanna F. Szotkowski

Ian Hoffman, *pro hac vice*
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave, NW
Washington, DC 20001
Phone: (202) 942-5000
Fax: (202) 942-5999
Ian.Hoffman@arnoldporter.com

Stephanna F. Szotkowski, *pro hac vice*
Kathryn Geoffroy, *pro hac vice*
ARNOLD & PORTER KAYE SCHOLER LLP
70 West Madison Street, Suite 4200
Chicago, Illinois 60602
Phone: (312) 583-2354
Fax: (312) 583-2591
Stephanna.Szotkowski@arnoldporter.com
Kathryn.Geoffroy@arnoldporter.com

Tyler J. Fink, *pro hac vice*
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, New York 10019
Phone:  (212) 836-8000
Fax:  (212) 836-8689
Tyler.Fink@arnoldporter.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 9, 2022, I caused the foregoing Memorandum of Law in Support of Plaintiffs' Motion for Class Certification to be electronically filed with the Clerk of Court using the CM/ECF system.

Respectfully submitted this 9th day of February 2022.

*/s/ Stephanna F. Szotkowski*

Ian Hoffman, *pro hac vice*
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave, NW
Washington, DC 20001
Phone: (202) 942-5000
Fax: (202) 942-5999
Ian.Hoffman@arnoldporter.com

Stephanna F. Szotkowski, *pro hac vice*
Kathryn Geoffroy, *pro hac vice*
ARNOLD & PORTER KAYE SCHOLER LLP
70 West Madison Street, Suite 4200
Chicago, Illinois 60602
Phone: (312) 583-2354
Fax: (312) 583-2591
Stephanna.Szotkowski@arnoldporter.com
Kathryn.Geoffroy@arnoldporter.com

Tyler J. Fink, *pro hac vice*
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, New York 10019
Phone:  (212) 836-8000
Fax:  (212) 836-8689
Tyler.Fink@arnoldporter.com

29