# Exhibit A

1

2                UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF GEORGIA
3                    ATLANTA DIVISION

4          Civil Action No. 1:19-cv-03285-WMR

5    _____

6    BRANDON COBB, et al.,

7              Plaintiffs,

8         vs.

9    GEORGIA DEPARTMENT OF
     COMMUNITY SUPERVISION, et al.,
10
               Defendants.
11   _____

12

13

14

15

16          REMOTE VIDEOTAPED DEPOSITION OF
                    DARRELL SMITH
17

18            Thursday, January 14, 2021

19

20

21

22

23

24   Court Reporter:  Michelle M. Boudreaux, RPR

25   Job No. 188472

1

2

3

4

5

6                          January 14, 2021

7                          10:10 a.m.

8

9

10        Remote videotaped deposition of

11   DARRELL SMITH, conducted at the location of

12   the witness in the state of Georgia, pursuant

13   to Agreement before Michelle M. Boudreaux, a

14   Registered Professional Reporter in the State

15   of Georgia.

16

17

18

19

20

21

22

23

24

25

```
 1

 2                        APPEARANCES

 3                   (Via Videoconference)

 4

 5   On behalf of the Plaintiffs:

 6        BY: BRITTANY SHRADER, Esq.
          National Association of the Deaf
 7        8630 Fenton Street
          Silver Spring, Maryland 20910
 8

 9

10   On behalf of the Defendants:

11        BY: GEORGE WEAVER, Esq.
          Hollberg & Weaver
12        2921 Piedmont Road, N.E.
          Atlanta, Georgia 30305
13

14

15   Also Present:  Brian Dimmick, Esq.
                    James Knox, Esq.
16                  Talila A. Lewis, Esq.
                    Nathan Demsas
17                  Sheela Ranganathan
                    Sydney Menack
18                  Lucy Trieshmann
                    Jaclyn Shettler
19

20   Videographer:  Vladimir Korneychuk

21

22

23

24

25
```

1

2                                  INDEX

3
                              EXAMINATIONS
4
        By Ms. Shrader .............................. 7
5
        By Mr. Weaver .............................. 242
6
                              - - -
7
                              EXHIBITS
8
   Exhibit                                        Page
9
   Exhibit 91 ..................................... 15
10      Notice of Deposition Pursuant to
        F.R.C.P. 30(b)(6)
11
   Exhibit 92 ..................................... 86
12      Email chain [DCS D-010655, etc.]

13 Exhibit 93 ..................................... 148
        Americans with Disabilities Act - Public
14      Notice (includes interpreter symbol)
        [DCS D-002791, etc.]
15
   Exhibit 94 ..................................... 188
16      Department of Community Supervision, Offender
        Interpreter and Disability Service Refusal
17      (Gerald Copeland) [DCS D-013323, etc.]

18 Exhibit 95 ..................................... 191
        Department of Community Supervision, Offender
19      Interpreter and Disability Service Refusal
        (Brian Byrd) [DCS D-013325, etc.]
20

21

22

23

24

25

```
 1                    DARRELL SMITH

 2          THE VIDEOGRAPHER:  Good morning,

 3     Counselors.  My name is Vladimir Korneychuk.

 4     I'm a certified legal videographer in

 5     association with TSG Reporting, Inc.

 6          Due to the severity of the COVID-19 and

 7     following the practice of social distancing,

 8     I will not be in the same room with the

 9     witness.  Instead, I will record this

10     videotaped deposition remotely.  The

11     reporter, Michelle Boudreaux, also will not

12     be in the same room and will swear the

13     witness remotely.

14          Do all parties stipulate to the validity

15     of this video recording and remote swearing

16     and that it will admissible in the courtroom

17     as if it had been taken following Rule 30 of

18     the Federal Rules of Civil Procedures and the

19     State's rules where this case is pending?

20          MR. WEAVER:  On behalf of Defendants,

21     yes, we stipulate.

22          THE VIDEOGRAPHER:  Okay.  Please stand by.

23          THE COURT REPORTER:  Brittany, I think

24     you're on mute.

25          MS. SHRADER:  I'm sorry.  Michelle, did
```

                    DARRELL SMITH

1

2    you hear me stipulate as well?

3         THE COURT REPORTER:  I did not.

4         MS. SHRADER:  I apologize.  Yes, we so

5    stipulate on behalf of Plaintiffs.

6         THE COURT REPORTER:  Thank you.

7         THE VIDEOGRAPHER:  This is the start of

8    Media labeled No. 1 of the 30(b)(6)

9    video-recorded deposition of Georgia

10   Department of Community Supervision in the

11   matter of Brandon Cobb, et al., versus

12   Georgia Department of Community Supervision,

13   et al., in the United States District Court,

14   Northern District of Georgia, Atlanta

15   Division, No. 1:19-cv-03285-WMR.

16        This deposition is being held via Zoom

17   with all attendees appearing remotely on

18   January 14th, 2021, at approximately 10:10

19   a.m.  My name is Vladimir Korneychuk.  I'm

20   the legal video specialist from TSG Reporting

21   Inc., headquartered at 228 East 45th Street,

22   Suite 810, New York, New York 10017.  The

23   court reporter is Michelle Boudreaux, in

24   association with TSG Reporting.

25        Counsel, please introduce yourselves.

1              DARRELL SMITH

2         MS. SHRADER:  [Audio drop] National

3    Association of the Deaf.

4         THE COURT REPORTER:  I'm sorry,

5    Brittany, you didn't come in all the way.

6         MS. SHRADER:  For the plaintiffs,

7    Brittany Shrader from the National

8    Association of the Deaf.

9         MR. WEAVER:  George Weaver, special

10   assistant attorney general for the State of

11   Georgia, on behalf of the Defendants.

12        MS. SHRADER:  Just before we get too

13   much further, is my audio still having

14   issues?

15        (Discussion off the written record.)

16        THE VIDEOGRAPHER:  Would the court

17   reporter please swear in the witness.

18                 DARRELL SMITH,

19   being first duly sworn, was examined and testified as

20   follows:

21                  EXAMINATION

22   BY MS. SHRADER:

23   Q    Good morning, Mr. Smith.  It's nice to see

24   you again even though we're not in person, as I said

25   before.

1                         DARRELL SMITH

2    working with.  So it depends on the officer and that

3    particular supervisee on how they utilize it.

4         Q    And I'm curious, just in terms of the -- you

5    know, obviously we know the larger screen is better in

6    terms of ability to see and all of those things.  Why

7    isn't the default to just -- you know, why aren't the

8    officers trained to just default to using the

9    Chromebook?

10        A    Because there are so many different things

11   that are happening in the interaction.  The interaction

12   could be interaction of them coming to check the home,

13   it could be just a follow-up visit with them, so it

14   just depends on what they -- on what they're -- excuse

15   me -- doing at the time of the visit.

16             If the person is coming in the office, they

17   may use their Chromebook because it's much easier

18   because they're stable in a sitting position.  But if

19   they're going to be walking with the person or doing

20   anything with the -- with the person, they have to

21   utilize what's going to be best for both of them to be

22   able to get the visit done.

23             The ultimate goal is to have effective

24   communication with the offender, with the supervisee,

25   and for that supervisee to not have to be held hostage,

1                    DARRELL SMITH

2   you know, so they can be able to, one, be able to see,

3   see the interpreter, and have a good experience when

4   they walk away.

5        Q    So would it be fair to say that the

6   utilization of the phone is helpful in circumstances

7   where the interaction is mobile in nature, but that the

8   Chromebook is or should be the default in interactions

9   where the person is in, for example, as you mentioned,

10  an office setting where they can, you know, be seated

11  and they're not moving around?

12       A    And that's often the case, but it also

13  depends on the situation with the actual supervisee,

14  you know, when they're coming in, because they can come

15  into the office, a person can come up front knowing

16  that this person is coming to visit, and they may bring

17  their phone up just -- you know, just so they can

18  interpret because it may just be a couple questions

19  that -- for that particular supervisee to answer.  And

20  the supervisee may be asking question -- excuse me,

21  asking questions in that aspect.

22            So it's up to them, you know, depending.  And

23  unless the supervisee says, you know, "That screen

24  doesn't work for me," or whatever, then that officer

25  wouldn't actually know, but they do try to observe to

Page 45

1                         DARRELL SMITH

2    see what's working.

3         Q    So that specific issue, in terms of what

4    method to default to, whether it's, you know, the

5    Chromebook or the mobile device, that's not something

6    that's included in the training; it's more that

7    one-on-one conversation that you're having with the

8    officers about --

9         A    Yes.

10        Q    -- doing that kind of visual check-in to make

11   sure the person is understanding --

12        A    Yes.

13        Q    -- is that right?

14        A    Yes.

15        Q    So I know that you talked about the VRI with

16   the LanguageLine solution.  Do you recall when that

17   rolled out, the utilization of the VRI with

18   LanguageLine?

19        A    October 2019.

20        Q    And that's -- that was after this lawsuit was

21   filed; is that right?

22        A    They were already working on the -- on the --

23   on the actual VRI.  I came onboard in September and

24   they were -- they had been working on it that -- the

25   early part of the year.  So they were already working

Page 46

1                         DARRELL SMITH

2    on the contracts and looking at it, and it just got

3    confirmed in October, yes, ma'am.  And I think that

4    was -- I think the lawsuit was filed before that,

5    before it was confirmed, but they had already been

6    working on it.

7         Q    And when you say "they had already been

8    working on that," you said they had already been

9    working on that earlier in the year of 2019?

10        A    Yes, I was -- I was informed that -- you

11   know, that they were -- I guess our IT people were

12   working with them to see how it would work with our

13   systems and things of that nature.  So when I came

14   onboard, they had already been working on it.

15        Q    And prior to VRI rolling out, what was the

16   default communication method that the officers were

17   supposed to rely on when interacting with deaf and hard

18   of hearing supervisees who utilize that language to

19   communicate?

20        A    From my understanding, because I wasn't in

21   the position at the time, but prior to that, they were

22   utilizing getting interpreters via submitting a

23   submission to our procurement department and through

24   the state contract.

25        Q    Okay.  So I want to talk about that policy,

```
 1                     DARRELL SMITH
 2   in terms of getting interpreters.  And I believe that
 3   that policy was included in the email that was sent to
 4   you this morning.  Let me tell you what it's entitled.
 5   It's entitled "Exhibit No. 11, Interpreters Policy."
 6   Do you have that document?
 7        A    I did not see any -- the document -- the
 8   email that was sent over to me doesn't show any exhibit
 9   numbers.  That's why I was -- when you asked earlier
10   and I was searching, I was like, okay, I don't see any
11   exhibit numbers.
12        Q    I'm going to put this document into the chat
13   so that you --
14             MR. WEAVER:  Let me -- Darrell, the
15        attachments to that email should include an
16        attachment that starts out with the name
17        Exhibit No. 11.  You don't see that?
18             THE WITNESS:  No, sir.
19             MS. SHRADER:  I did just --
20             THE WITNESS:  My actual attachment
21        starts out with the policy.  I've got the
22        policy and it has three attachments in it, an
23        email and --
24             MR. WEAVER:  Well, there are several.
25        If you scroll down, there are a whole bunch
```

1                    DARRELL SMITH

2    officers when this declination form should be filled

3    out?

4         A    No, there isn't, ma'am.

5         Q    Now, we've been talking a lot about these

6    kind of one-on-ones that you've been having with the

7    CSOs.  When did those start?

8         A    I've been doing those since I started back --

9    came in position in September of 2019.  I actually --

10   the official ones, I started -- I started in position

11   in September.  Probably October when I start -- when I

12   started talking with them.

13             And then January of 2020 -- between

14   December -- November, December, and January 2020 was

15   when I was reviewing all of our offenders who are hard

16   of hearing.  And during that time, as each person -- as

17   I looked at the sheet that we had acknowledging those

18   people, I contacted those officers to speak with them

19   each individually pertaining to their supervisee.

20        Q    And this -- one-on-one coaching sessions that

21   you've been doing, is that something that you

22   initiated, or how did those come to be?

23        A    After our meeting in February of that year, I

24   saw that I had to move up a little bit even more in

25   some of the -- some of the dialogue, because the basic

1                     DARRELL SMITH

2   dialogues I was having with them, I wanted to do a

3   little bit more with the officer to make sure, once

4   they left speaking with me, they were comfortable with

5   assisting that supervisee.

6           So after that point, that's when I started

7   turning up my coaching sessions with them, guiding

8   them, and letting them know please don't hesitate to

9   call me for whatever.  And, of course, if they have a

10  question I don't know, then I utilize my resources to

11  find an answer for them and get right back with that

12  person the same day or no later than the following

13  day.

14      Q    And how frequently do you do these one-on-one

15  coaching sessions with the CSOs?

16      A    Oh, wow.  I normally have at least two a

17  week, normally, sometimes, depending on what's going

18  on.  It slows down during the holiday season, of

19  course, but depending on what situation is happening

20  with the offenders.

21          I'm currently going back through now doing an

22  audit now, going back over my list again to

23  double-check and follow up to see how everything is

24  going.  But I just went individually.

25          And then as I get calls from officers who may

1                    DARRELL SMITH

2  say, "I've got a question, Darrell, can you talk to me

3  about this," and then I sit down and we coach and we go

4  through it.  Some calls, it could be 10, 15 minutes,

5  some be 30 minutes.  It just depends on what the actual

6  coaching timing -- coaching subject is at the time that

7  we need to go through.

8        Q    So I want to unpack a lot of what you just

9  said.  I have a lot of questions.

10            How many CSOs are you having these one-on-one

11 coaching sessions with?

12       A    I'm sorry?

13       Q    How many CSOs are you having these one-on-one

14 coaching sessions with?

15       A    Everyone that has an offender that's hard of

16 hearing.

17       Q    And approximately how many --

18       A    Right now, that would be 83.

19       Q    And I just want to make sure I'm clear.  Is

20 that 83 offenders or 83 CSOs?

21       A    Both, because each offender normally has a

22 different officer, I'm finding.  So it can be up to --

23 because I've had some who have dropped, some who have

24 been added.  So roughly in the 80s, I can say, of

25 offenders that -- excuse me, of CSOs I've actually been

1                         DARRELL SMITH

2   able to reach out to and touch.

3        Q    And I just asked that question because I know

4   that, for example, Caleb Worley has more than one --

5        A    Correct.

6        Q    -- supervisee who has --

7        A    Right.  I think he has two or three, yeah.

8        Q    Yeah.  So that was why I asked that follow-up

9   question.  You were talking about the number of CSOs --

10       A    No problem.  No problem.  And I totally

11  understand, because like you said -- it's currently 83,

12  but there were more than that.  There are a couple of

13  supervise -- CSOs who have one or -- one or two.  So I

14  would say roughly up to almost 80, 70, 80, who I've

15  actually contacted, because we have quite a few

16  offenders who are hard of hearing.

17       Q    Okay.  And so you have had at least one

18  one-on-one coaching session with each of those 70 to 80

19  CSOs who have --

20       A    At least one, yes, ma'am.  Unless the

21  offender has been transferred to a new officer and that

22  officer hasn't -- I haven't spoken with him, and that's

23  the reason why I'm going to through my audit now, to do

24  follow-ups again, because if that offender got

25  transferred to a new officer, which happens for one

1                       DARRELL SMITH

2    reason -- either the offender has moved or the officer

3    has transferred to another office or whatever the

4    situation is, and I just like to make sure that each

5    officer has talked to me in regards to their

6    supervisee.

7        Q    And can you kind of just give me a little bit

8    of maybe the agenda of what this first call with one of

9    these officers -- this first coaching session would

10   look like?

11       A    It's not -- it's not actually an agenda,

12   Ms. Shrader, but I guess it could be put in an agenda.

13   But the biggest thing is, is finding out what the

14   offender's needs are, finding out what the needs are,

15   what's their preferred method of communication, finding

16   out what's their level of hearing loss, if that officer

17   knows.  Because sometimes they know that one person may

18   have a hearing loss in one ear or they may have hearing

19   loss in both ears.  So it just depends.

20            So we're looking at the overall offender

21   first, seeing what it is, what the situation is, and

22   then what kind of communication methods are they

23   utilizing with this offender.  And if they utilize --

24   and then once they tell me that, I'm finding out does

25   this offender know American Sign Language.  That's one

1                          DARRELL SMITH

2   of the biggest things that we're asking, you know, are

3   they -- if they know American Sign Language, have

4   we provided an interpreter for this -- for this person.

5              So we look at each one of the steps, and it's

6   like a flowchart.  Depending on what the answer is, we

7   go here.  If the answer is yes, we go here.  If the

8   answer is no, okay, we need to go here.  And that's

9   where the coaching comes into that.

10             Because a lot of our officers are

11  knowledgeable because they are reading information,

12  they're on top of it, they've been coached already by

13  myself and by their chiefs and been -- being guided.

14  And any of them that's new, they welcome -- a lot of

15  them welcome the information, "Hey, what do I need to

16  do," you know, and we sit down and we talk about it.

17             And like I say, sometimes it can go -- the

18  longest I've had has been an hour long, an hour-long

19  session with an officer because she was new with

20  someone, and she wanted to go from start to finish and

21  had a lot of questions.  And that's what I want them to

22  do.  I want them to be able to contact me and ask the

23  questions to see what we can do, and if I don't know, I

24  know how to go ask someone so I can find out.

25       Q    So I think what I hear you saying, and

1                      DARRELL SMITH

2   correct me if I'm wrong, is that these sessions happen

3   after the CSO has at least met once with a person under

4   supervision who has some sort of hearing loss, so they

5   have some idea of who this person is?

6        A    Well, Ms. Shrader, I can't -- I can't say

7   that would be the whole total thing.  That is a portion

8   of it, but I have some CSOs who have contacted me

9   because they're aware that they're getting someone who

10  has a disability.

11            So in that issue, once they find out they're

12  getting an employee -- excuse me, a supervisee that has

13  a disability, we sit down and we talk about it before

14  that person comes.  But those -- you know, because what

15  they found out is, for example, the person comes in and

16  at intake they find out this person has a disability,

17  they're going to work with that person the first day,

18  and then they follow with me, and as soon as they put

19  it in the portal, it alerts me to let me know that

20  something has been put in there, this person is a new

21  person who has just come in.  And when I get my alerts,

22  I immediately contact that officer to see, "Okay, hey,

23  how are we looking, got an alert, what's going on,

24  what's the status," and all the things I told you we

25  discuss with them.

1                    DARRELL SMITH

2      Q    So there's kind of two ways that this could

3  happen.  Either you get an alert --

4      A    Uh-huh.

5      Q    -- that there is, you know, a new --

6      A    A new person.

7      Q    -- person who has hearing loss and you are

8  going to reach out directly to the officer --

9      A    Yes, ma'am.

10      Q    -- and that happens after the intake has

11  already happened --

12      A    Yes, ma'am.

13      Q    -- is that -- is that right?

14      A    Correct.

15      Q    And then the second way that this could

16  happen is if the officer learns, "Hey, I'm getting a

17  deaf or hard of hearing" --

18      A    Yes, ma'am.

19      Q    -- "person on my caseload, I'd like to chat

20  with you about it" --

21      A    Yes, ma'am.

22      Q    -- is that right?

23      A    Yes, ma'am.

24      Q    How many times have you had an officer reach

25  out to you and say, "Hey, I'm getting a deaf or hard of

                        DARRELL SMITH
1
2   hearing person on my caseload.  Can we chat"?

3       A     It's been several.  Right now I can't give

4   you an exact number because I've had -- I've had a few.

5   I've had a few who come who are knowledgeable because,

6   for one reason or another, they knew the person was

7   transferring or because the majority of the people a

8   lot of times come in, they already have -- like if

9   they're coming straight from the court, they won't know

10  until that -- until that supervisee self-identifies or

11  let them know or they realize that they need to utilize

12  service, or if that person is coming from prison, you

13  know, they've already gone -- they've already gone

14  through -- when they're covering intake, they've

15  already done some stuff when they -- when they were in

16  court, you know, somebody's explained it to them, but

17  our team tries to explain it once they get there.  So

18  that happens.

19          So I'll get notification after that person.

20  But the majority of the time, if they know that they're

21  coming, I've had several who have called the

22  administrator and contacted me and say, "Hey, I've got

23  someone coming on my caseload.  Can you talk to me

24  about this?"

25      Q     So typically those are circumstances where a

1                       DARRELL SMITH

2    person is maybe being transferred to another CSO, is

3    that right, because I think --

4        A    That has been the case.

5        Q    I just want to make sure I'm clear because I

6    think I understood you saying that typically the CSOs

7    aren't aware that the person is deaf or hard of hearing

8    until they arrive at the intake unless it's a

9    circumstance where they're being transferred, or I may

10   have misunderstood that.  So I want to --

11       A    Well, I wouldn't say typically, Ms. Shrader,

12   because it depends.  Because sometimes we've had some

13   people who have been noted in the system from

14   corrections that they've had a disability.

15            Now -- so that way, they would know.  But the

16   issue is once it comes over to that person, how quickly

17   it gets to them and how quickly that person shows up.

18   That's the time frame where we have the break where

19   they may have to pull out and use VRI quickly, and they

20   may have to call me afterwards because they just found

21   out the person was coming.

22            But I do find that the majority of times when

23   they have someone and they know, a lot of them -- a lot

24   of them who have not dealt with anyone, they'll call me

25   and say, "Hey, Darrell, listen, can you talk me through

1                        DARRELL SMITH

2    this and talk me off the ledge so I can make sure I

3    know how to -- you know, what I need to be asking when

4    the person comes in," and then we'll discuss it from

5    there.

6        Q    So you indicated you had, you know, several

7    people who have contacted you prior to getting a deaf

8    or hard of hearing person on their caseload to chat

9    with you.  You said you didn't know exactly how many.

10   Would you say it was more than five?

11       A    Yeah.

12       Q    Okay.  Would you say it was more than 10?

13       A    Again, I couldn't give you the exact number,

14   you know, but there have been a few.

15       Q    Okay.  And with regards to people who learned

16   that the person was deaf or hard of hearing and was

17   coming on their caseload prior to intake by perhaps

18   reading it in notes from DOC, for example,

19   approximately how many times have people contacted you

20   in that type of scenario?

21       A    Ms. Shrader, honestly, I couldn't give you an

22   exact number, you know, because that was not something

23   that I maintained.  I just know it's happened, you

24   know, and they have contacted me when they found out

25   that they've got someone coming over, someone is

1                    DARRELL SMITH

2   transferring to them, whatever the case may be, but I

3   haven't kept an exact number of those.

4        Q    And, actually, that leads me to kind of

5   another question.  You indicated that you hadn't kept

6   track of that.  Do you -- is there a way that you track

7   these one-on-one sessions that you have with the CSOs?

8        A    Not necessarily, other than -- other than us

9   having information that they put in the portal, I

10  just -- I just utilize it as our conversations.  Other

11  than the email -- the emails that I forwarded you guys

12  that showed you when I -- when I actually reach out to

13  them to have them call me, that's the way I track it.

14  So I know that there's been communication with that

15  particular officer.  Then I have that officer call me

16  and we go through everything, whatever their needs are

17  for that particular supervisee.

18       Q    So the way that you kind of keep track of who

19  you've spoken to is by keeping an email chain of the

20  "Hey, let's have a call," is that right?

21       A    Yes, yes, yes.

22       Q    Okay.  So there's not a system where you kind

23  of input information about these coaching sessions that

24  you're having to kind of keep track of the fact that

25  this specific officer has had this kind of, you know,

1                      DARRELL SMITH

2    ADA coaching in terms of dealing with supervisees who

3    are deaf or hard of hearing?

4         A    What we've done is, ma'am, Ms. Shrader, is I

5    don't actually put -- once I speak with the actual CSO,

6    they'll go into the system and then they'll document in

7    case notes their conversation with the offender, the

8    supervisee.  They'll go in case notes and update the

9    alerts or whatever and then -- and document it in a

10   case note for them.

11             Since they're the experts on handling the

12   case, I let them type it in, put that information in

13   for me, whatever their conversation, once they have the

14   conversation with the officer.

15        Q    And --

16        A    I'm sorry, with the supervisee.

17        Q    That's all right.

18             Once the CSOs have this conversation with

19   you, is that something that they're also documenting in

20   the case notes?

21        A    They document the action, the action in the

22   case notes.  After they -- after they finish having the

23   conversation with me, then whatever -- then they have

24   the action with the supervisee, and they document the

25   actions.  Some have -- some have put notes in their

1                        DARRELL SMITH

2    talking about this should apply across the board to all

3    individuals under supervision?  If that's the --

4         A    I couldn't tell you --

5         Q    -- case, why is it included simply in a

6    policy about disability services?

7              MR. WEAVER:  Objection, asked and

8         answered.

9              THE WITNESS:  I couldn't give you that

10        answer, Ms. Shrader.  I'm not sure exactly

11        where it's located at this particular moment.

12        Q    (By Ms. Shrader)  So, Mr. Smith, in the

13   section right before that, in J, you talk about the

14   "Referral for Services," is that right?

15        A    Yes, ma'am.

16        Q    And all of the services that are discussed in

17   J relate to communication with persons with

18   disabilities; is that right?

19        A    Yes, ma'am.

20        Q    So J covers services related to disability?

21        A    Yes, ma'am.

22        Q    And K appears to cover services unrelated to

23   disability, services that may be needed by people who

24   have disabilities or who do not have disabilities,

25   correct?

1                    DARRELL SMITH

2       A    No, K also has disabilities in it as well,

3  ma'am, because it talks about auxiliary aids in No. 2.

4       Q    I apologize.  We're talking about K,

5  subsection 1, the section we were just discussing.

6       A    Right.  Right, you said K, so that's why I

7  said no.

8       Q    Yeah, no, I appreciate -- I appreciate that.

9  But K, subsection 1, specifically refers to services

10  that are not simply for persons with disabilities, but

11  for individuals who may or may not have disabilities,

12  correct?  K, subsection 1.

13      A    That's possible.  I'm trying to see

14  something.  Go ahead.

15      Q    So I'd like you to go up to page 5, under C,

16  the "Responsibilities of the Community Supervision

17  Officers," and to Point 2 under C.  Do you see that?

18      A    Yes, ma'am.

19      Q    And it says there, "The CSO will inform the

20  offender of how to access the Department's ADA Title II

21  Provisions policy."  Do you see that?

22      A    I do.

23      Q    When you and I talked before in February, I

24  recall you telling me that this was actually an error

25  in the original policy because the offenders don't have

```
 1                        DARRELL SMITH
 2   access to the policy.  Is that right?
 3        A    It is.
 4        Q    And so is this still an error in the policy?
 5        A    Yes.  What we're trying to do now is trying
 6   to get the offenders -- excuse me, I'm sorry, the CSOs
 7   to actually discuss it with the offender when they come
 8   in for the session.  So I'll have to have that
 9   reworded.
10        Q    And so are the supervisees provided with a
11   copy of the Title II provisions policy when they --
12        A    It's covered with them and that's something
13   we're looking into, ma'am, of giving them a copy of it.
14        Q    So that's something that may be coming in the
15   future but hasn't rolled out yet --
16        A    Yes, ma'am.
17        Q    -- is that accurate?
18        A    Uh-huh.  Yes, ma'am.
19        Q    And so I know that you updated this policy
20   after our discussion.  Did you include in this policy a
21   description for the CSOs as to how to obtain
22   interpreter services?
23        A    I don't believe so, ma'am.
24        Q    Did you include a description of how to
25   obtain CART services?
```

1                    DARRELL SMITH

2        A    No, ma'am.

3        Q    Did you include in this policy a description

4    of how to determine the appropriate auxiliary aids and

5    services to utilize with a supervisee during a given

6    interaction?

7        A    No, ma'am.

8        Q    Did you provide guidance to the CSOs in this

9    policy about how to conduct that module to assess

10   communication needs in the initial interview?

11       A    No, ma'am.

12       Q    And so I just want to refer you to page 6 of

13   the document, E, the very first sentence, "Effective

14   communication is vital to ensuring compliance during

15   supervision."  Is that DCS's position?

16       A    Yes, ma'am.

17       Q    And I notice that the next sentence indicates

18   that DCS will generally, upon request, provide

19   appropriate auxiliary aids and services.

20            The language "upon request," does the

21   individual have to request an auxiliary aid or service

22   before DCS will offer one?

23       A    No.  I think that's more or less verbiage

24   that they put -- that was put in -- and we probably

25   need to tweak that one -- more or less verbiage that

1                        DARRELL SMITH

2   was put in just to say that if the person requested --

3   wants to request an auxiliary aid, they can, which is

4   the reason why we created the form.  But for the most

5   part, when they come in, we want to see what their

6   preferred method is and what they need and what

7   services they need.

8        Q    In terms of the ADA notice that's provided

9   to -- that you have at each of the field offices that

10  provides information in terms of the ability of a

11  supervisee to contact you to request an auxiliary aid

12  or service, that form includes an address, an email

13  address, and a phone number, all of which are methods

14  by which the supervisee could contact you; is that

15  right?

16       A    Yes, ma'am.  Yes, ma'am.

17       Q    Who monitors that -- the address that's on

18  that form?

19       A    They go straight to my HR office.

20       Q    And then who monitors the email address

21  that's on that form?

22       A    It goes straight to me.

23       Q    And the phone number that's on that form, who

24  monitors that phone number?

25       A    My number.

1                    DARRELL SMITH

2      A    It is, ma'am, because it all goes through the

3  contract with -- the state contract.

4      Q    And is there any policy or written document

5  that describes this process for CART?

6      A    No, ma'am.

7      Q    So we talked about the requests that you

8  received; we talked about the denials of services you

9  received.  I'd like to talk some about complaints or

10  grievances that you've received.  And I know that the

11  ADA policy kind of set up this grievance procedure, and

12  you modified that a little bit to make it more

13  streamlined, I think, in the new revisions to the ADA

14  policy on September 30th.  Is that right?

15      A    Yes, ma'am.

16      Q    Since the enactment of the Title II ADA

17  policy back in November, how many grievances have you

18  received that are ADA-related?

19      A    None.

20      Q    And when we were together in February, we

21  discussed that grievance process kind of in, I think,

22  extreme detail.

23      A    Yes, we did.

24      Q    You explained it to me down to the

25  nitty-gritty.

1                        DARRELL SMITH

2       A    Yes, ma'am.

3       Q    You've now streamlined the process a little

4  bit.  So can you explain to me the changes that

5  [indiscernible] with the new revision of the Title II

6  policy?

7       A    What I can remember from -- without looking

8  at the policy -- actually, it's actually here.

9       Q    You can pull it up.  It's not a pop quiz.

10      A    With the ADA grievance policy, you know,

11 because they have -- they have a right to have a

12 grievance against a person if they feel that they

13 haven't met their ADA needs.  They can tell the person

14 that they would like to do a grievance.  If they don't

15 feel comfortable with doing so, my information is

16 posted on the post outside -- in each one of the

17 offices.  So if they want to do it privately, they can

18 shoot me an email as well.  And it covers that and it

19 talks about that in the posting to let them know.

20           And then I would respond back to that person

21 individually to let them know, "Hey, this is what's

22 going on," and ask them more information about it to do

23 an investigation of it to see what it is that -- what

24 their need is, and then I would move forward from

25 there.

1              DARRELL SMITH

2      Q    So I know when we talked before in February,

3  the form that has to be completed, the grievance form,

4  was something --

5      A    Yes, ma'am.

6      Q    -- that was not just accessible in the

7  offices, that someone could come in and pick one up --

8      A    Right.

9      Q    -- it was something they needed to request

10  from a CSO or from a supervisor.

11      A    Right.

12      Q    Is that still the case?

13      A    That's still the case, but the -- that's only

14  if they need to get the form, but it can -- they can

15  just send me -- that's why I informed you about the

16  email.  That's why my email address is there, so that

17  that way if they didn't want to ask for the form, they

18  have another way of getting there of being anonymous so

19  that that person wouldn't know it.

20            They have my telephone number.  If they don't

21  want to -- if they don't want to write it, they can

22  call me, because that's my actual cell number that's on

23  the document.  And they have a fax number for me, which

24  is my individual fax that was set up for me that comes

25  straight to my email, so -- to give them access to me

```
 1                     DARRELL SMITH
 2   in the case we had -- you know, like you said
 3   beforehand, if they -- if they didn't feel comfortable
 4   asking for that document, that's fine, because we still
 5   have another way you can still get to me, just shoot it
 6   to me in an email.
 7       Q    So that's a change to the policy since we
 8   last spoke, that they now can kind of bypass filling --
 9       A    Yes, ma'am.
10       Q    -- out the form --
11       A    Yes, ma'am.
12       Q    -- and speak to you directly?
13       A    Yes, ma'am.
14       Q    And that was kind of, like, in response to
15   our conversation about what if they don't want to ask
16   their supervisor or their --
17       A    Correct.  And that's correct, that's correct.
18       Q    And this process is explained -- I think we
19   were looking before at that initial interview policy.
20   Part of that was that the grievance process is supposed
21   to be explained to the supervisees at that initial
22   intake; is that right?
23       A    Now, there's two different grievances,
24   Ms. Shrader.  The other grievance is a grievance of if
25   they're looking at their supervisional status and then,
```

1                        DARRELL SMITH

2   of course, the grievance for -- if they have an issue

3   with ADA, yes, ma'am.

4        Q    Are they both explained at the initial

5   interview, or is it just the general grievance process?

6        A    I believe -- I think it's more of the general

7   process, but I don't want to speak to that without

8   knowing definitely, but I will follow up on that.

9        Q    And I would appreciate that.

10            In regards to this Title II policy itself, is

11  there a time at which this policy about the provision

12  of auxiliary aids and services and the grievance

13  process and all of that is explained in detail to the

14  supervised individuals?

15       A    Say that one more time, the first part.

16       Q    The ADA policy itself, is there a time --

17       A    Yes, ma'am.

18       Q    -- at which the CSOs go through that policy

19  with the supervisees to explain it to them?

20       A    Some of them were covering it during the

21  initial -- the initial intake, when they were doing it,

22  but I'm looking at trying to provide it so it will be a

23  little more thorough with that.  So that is something

24  that still we're moving forward with, ongoing.

25       Q    And you're looking into actually getting a

1                      DARRELL SMITH

2    physical copy of this for the supervisees as well?

3        A    Uh-huh.  Yes, ma'am.

4             MS. SHRADER:  I think this might be a

5        good time for a quick break.  I just want to

6        take a look through to see if there's any,

7        you know, last things that I want to talk

8        about.  I'm hopeful that we can wrap up here

9        fairly soon.  So let's take a quick break,

10       maybe quick 10-minute break, come back, and

11       hopefully I won't have too many more

12       questions for you.

13            MR. WEAVER:  Okay.

14            THE VIDEOGRAPHER:  Going off the record

15       at 5:20 p.m.

16            (Recess taken.)

17            THE VIDEOGRAPHER:  Going back on the

18       record at 5:32 p.m.

19       Q    (By Ms. Shrader)  All right, Mr. Smith, I

20   just have a couple of just housekeeping and follow-up

21   questions.

22            I know when we spoke last time in February,

23   we went through the description -- your job

24   description, if you recall, as the ADA coordinator.

25   And I recall that in the job description, it talked

1                    DARRELL SMITH

2    about supervision of what was anticipated to be other

3    people who would work under you in the ADA office.  And

4    at that time, you had told me it was -- it was just a

5    one-man show and you were hoping to expand.  So I just

6    wanted to ask if it's still, you know, just you in the

7    ADA office or if you now do have other people working

8    with you.

9        A    Actually -- it actually is still just me, but

10   I have other people who still assist me, which -- our

11   legal counsel, I work with our two deputy directors.

12   So it's not just me doing it.  They're assisting me in

13   getting information out, doing what we need to do to

14   get the training stuff done.  So there are several of

15   us who are working on it until we continue developing

16   the plan, but just to make sure we're executing.

17       Q    And I just had a couple of questions about

18   what happens after these one-on-one coaching sessions

19   that you have with the CSOs.

20       A    Uh-huh.

21       Q    Do you do any sort of follow-up with them to

22   see how they're implementing the things that you

23   discuss in those discussions?

24       A    Yes.  Ms. Shrader, what I actually do is I

25   have them give me a call after they've had interaction.

```
 1                        DARRELL SMITH
 2   So we do a follow-up to see how the interaction went,
 3   to see what form that they used, if they used the VRI,
 4   how did it work, or, you know, if it's their first
 5   initial meeting with the person, what was the -- what
 6   was the takeaways, what was the good, what was the bad.
 7              So, yeah, we actually do -- after I do
 8   coaching with them and they talk with them, once they
 9   meet -- I've even had it where we've scheduled
10   appointments, screen time.  I put on my calendar, okay,
11   are we going to come back three weeks later and talk
12   about this, and we'll put it on the calendar, then
13   we'll follow back up with that person, yes, ma'am.
14        Q    And do you ever do, like -- take a look at,
15   you know, a random sampling of the case notes for the
16   individuals that you, you know, have on your list who
17   are supervisees who have, you know, a disability, for
18   example, who are deaf and hard of hearing, to see how
19   the interactions are going after that follow-up?  I
20   mean, obviously you can't have follow-ups with the
21   officer every week --
22        A    Right.
23        Q    -- so are you ever taking a look at the case
24   notes to see how things are going?
25        A    Ms. Shrader, I am.  I actually have looked --
```

1

2                    C E R T I F I C A T E

3

4    STATE OF GEORGIA

5    COUNTY OF COBB

6

7            I, MICHELLE M. BOUDREAUX, do hereby certify

8    that DARRELL SMITH, the witness whose deposition is

9    hereinbefore set forth, was duly sworn by me and that

10   such deposition is a true record of the testimony given

11   by such witness.

12

13           I further certify that I am not related to

14   any of the parties to this action by blood or marriage

15   and that I am in no way interested in the outcome of

16   this matter.

17

18           IN WITNESS WHEREOF, I have hereunto set my

19   hand this 29th day of January 2021.

20

21   _____

     MICHELLE M. BOUDREAUX, RPR

22

23

24

25

```
 1                    ERRATA SHEET

 2  Case Name:

 3  Deposition Date:

 4  Deponent:

 5  Pg.  No. Now Reads      Should Read  Reason

 6  ____ ____ _____   _____  _____

 7  ____ ____ _____   _____  _____

 8  ____ ____ _____   _____  _____

 9  ____ ____ _____   _____  _____

10  ____ ____ _____   _____  _____

11  ____ ____ _____   _____  _____

12  ____ ____ _____   _____  _____

13  ____ ____ _____   _____  _____

14  ____ ____ _____   _____  _____

15  ____ ____ _____   _____  _____

16  ____ ____ _____   _____  _____

17  ____ ____ _____   _____  _____

18  ____ ____ _____   _____  _____

19  ____ ____ _____   _____  _____

20

                        _____

21                      Signature of Deponent

22  SUBSCRIBED AND SWORN BEFORE ME

23  THIS ____ DAY OF _____, 2021.

24  _____

25  (Notary Public)   MY COMMISSION EXPIRES:_____
```