# Exhibit C

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

Civil Action No. 1:19-cv-03285-WMR

_____

BRANDON COBB, et al.,

            Plaintiffs,

      vs.

GEORGIA DEPARTMENT OF
COMMUNITY SUPERVISION, et al.,

            Defendants.

_____

REMOTE VIDEOTAPED DEPOSITION OF
SHANNON HILLIARD

Friday, August 6, 2021

Court Reporter:  Michelle M. Boudreaux-Phillips, RPR

TSG Job No. 197751

1

2

3

4

5

6                      August 6, 2021

7                      10:45 a.m.

8

9

10       Remote videotaped deposition of

11  SHANNON HILLIARD, conducted at the location

12  of the witness in the state of Georgia,

13  pursuant to Agreement, before Michelle M.

14  Boudreaux-Phillips, a Registered Professional

15  Reporter in the State of Georgia.

16

17

18

19

20

21

22

23

24

25

```
 1

 2                         APPEARANCES

 3                    (Via Videoconference)

 4

 5  On behalf of the Plaintiffs:

 6        BRITTANY SHRADER, Esq.
          National Association of the Deaf
 7        8630 Fenton Street
          Silver Spring, Maryland 20910
 8

 9

10  On behalf of the Defendants:

11        GEORGE WEAVER, Esq.
          Hollberg & Weaver
12        2921 Piedmont Road
          Atlanta, Georgia 30305
13

14

15  Also Present:  Brian Dimmick, Esq.
                   Claudia Center, Esq.
16                 Talila A. Lewis, Esq.
                   Adam Roper
17

18  Videographer:  Michael Arrison

19

20

21

22

23

24

25
```

```
 1

 2                              INDEX

 3
                            EXAMINATIONS
 4
       By Ms. Shrader ............................. 6
 5
                            - - -
 6
                            EXHIBITS
 7
     Exhibit                                        Page
 8
     Exhibit 118 .................................. 48
 9       Excerpted pages from the transcript
         of the February 21, 2020 deposition of
10       Darrell E. Smith

11   Exhibit 119 .................................. 70
         Department of Community Supervision,
12       Policy & Procedure Statement,
         Policy Number 6.340,
13       Effective Date November 29, 2019
         [DCS D-022654, etc.]
14
     Exhibit 120 .................................. 70
15       Bell Forsyth Circuit Plea/Verdict Form
         [DCS D-019130, etc.]
16
     Exhibit 121 .................................. 166
17       Text messages [DCS D-010992, etc.]

18

19

20

21

22

23

24

25
```

1                    SHANNON HILLIARD

2          THE VIDEOGRAPHER:   This begins media

3    labeled No. 1 of the video-recorded

4    deposition of Shannon Hilliard in the matter

5    of Brandon Cobb, et al., versus Georgia

6    Department of Community Supervision, et al.,

7    filed in the U.S. District Court for the

8    Northern District of Georgia, Atlanta

9    Division.

10          This deposition is being held remotely

11   on Friday, August the 6th, 2021, at

12   approximately 10:45 a.m.

13          My name is Michael Arrison.  I am a

14   certified videographer in association with

15   TSG Reporting.  The court reporter is

16   Michelle Boudreaux-Phillips, also in

17   association with TSG Reporting.

18          Due to the severity of COVID-19 and

19   following the practice of social distancing,

20   I will not be in the same room with the

21   witness, but will record this videotaped

22   deposition remotely.  The reporter will also

23   not be in the same room and will swear the

24   witness remotely.

25          Will counsel please introduce yourselves

```
 1                      SHANNON HILLIARD

 2        and indicate for the record whether or not

 3        you stipulate to the validity of this video

 4        recording and remote swearing, that it will

 5        be admissible in the courtroom as if it had

 6        been taken following Rule 30 of the Federal

 7        Rules of Civil Procedure.  Counsel?

 8             MS. SHRADER:  Good morning.  Brittany

 9        Shrader, with the National Association of the

10        Deaf, for plaintiffs in the case.  Plaintiffs

11        so stipulate.

12             MR. WEAVER:  George Weaver on behalf of

13        the defendants, for the Georgia Attorney

14        General's office, and we also stipulate that

15        the video can be used.

16             THE VIDEOGRAPHER:  All right.  Thank

17        you.

18             Will the court reporter please swear in

19        the witness.

20                      SHANNON HILLIARD,

21   being first duly sworn, was examined and testified as

22   follows:

23                      EXAMINATION

24   BY MS. SHRADER:

25        Q    Good morning, Ms. Hilliard.  My name is
```

```
 1              SHANNON HILLIARD

 2        MR. WEAVER:  Brittany, we've been going

 3     for two hours.  Do you want to take a break?

 4        MS. SHRADER:  We sure can.  And I don't

 5     know if y'all want to do a lunch break now.

 6     I know it's cinching up on 1 o'clock.  People

 7     are getting hungry.

 8        MR. WEAVER:  I assume.  Do you think

 9     you'll go for another couple hours at least?

10        MS. SHRADER:  Yeah.

11        MR. WEAVER:  Okay.  Well, let's take a

12     lunch break, and I'll try to make it short

13     since it's my fault we got a late start.

14        THE VIDEOGRAPHER:  Off the record at

15     12:48 p.m.

16        (Lunch recess taken.)

17        THE VIDEOGRAPHER:  On the record at 1:33

18     p.m.

19     Q    (By Ms. Shrader)  So before the break, when I

20  had showed you a form that you had indicated was part

21  of the packet that you received with Mary Hill when she

22  was coming into your office under supervision, at the

23  top that form had indicated that she was deaf and

24  required an interpreter.  Do you recall us looking at

25  that form earlier today?
```

```
 1                    SHANNON HILLIARD

 2        A    Yes.

 3        Q    Okay.  So when that form was received with

 4   that information at the top, what was done to ensure

 5   that Ms. Hill would have an interpreter for that

 6   intake, like the form indicated?

 7        A    Basically on a situation like that, they just

 8   went ahead and brought it to my attention, and that's

 9   why -- I guess you'd say why I initially got involved,

10   where normally I would not be doing an intake, it would

11   be assigned to the officer.  But LanguageLine was very

12   new to us, and rather than let one of my people do

13   something, I try to put myself out there, so I said let

14   me be the guinea pig, I've got to take one for the team

15   and muddle through this if necessary, so I went ahead

16   and actually dealt with Ms. Hill.  So it was -- it was

17   brought to my attention as far as them saying, "Hey,

18   we've got a," you know, "different situation coming

19   in."  And I said, "Well, let me just take it, then."

20        Q    And was that the first time that you had used

21   LanguageLine with someone you were supervising?

22        A    It was.

23        Q    And can you tell us about that experience

24   with LanguageLine?

25        A    The interpreters that I dealt with were I
```

1                    SHANNON HILLIARD

2   believe to be very thorough.  They were very

3   professional, and it was a very simple process with

4   getting connected and them explaining very briefly the

5   process and then just initiating the conversation.

6        Q    Did you have any connectivity issues with the

7   LanguageLine?

8        A    During that intake?

9        Q    Yes.

10       A    Yes.  Yes.  I have a situation where my best

11  connection is through a hot spot.  But generally twice

12  a day, and I don't necessarily know when those two

13  times are going to come up, the WiFi takes over my

14  computer, and I have to either shut down and start back

15  with WiFi or disconnect from the WiFi and go back to my

16  hot spot.  So I did lose our initial interpreter and

17  had to sign back in and have a second interpreter take

18  over the process.

19       Q    And is that generally an issue in your office

20  in terms of the strength of the WiFi versus using a hot

21  spot?

22       A    Different offices and different -- we have a

23  hot spot, a WiFi, and a dongle.  So different offices

24  have different connectivity.  Like, I happen to be in

25  my own office and my best connection is through my hot

1                    SHANNON HILLIARD

2    spot, so that's what I use, but it's different in

3    different areas.

4         Q    And so when you lost the connection with the

5    first interpreter and you accessed LanguageLine the

6    second time, did you get connected with the same

7    interpreter or was it a different interpreter?

8         A    It's different.  It was different that time.

9         Q    Do you recall where in the intake process you

10   were when that disconnection happened?

11        A    I have no idea.

12        Q    And when the second interpreter came online,

13   what information did you provide to the second

14   interpreter before kind of launching back into intake?

15        A    I just introduced myself and advised them as

16   to who they were interpreting on behalf of and a very

17   brief background of the process that we were going

18   through.  And I don't know if it was this time or

19   another time, but basically they have said that they

20   have -- they don't want to know circumstances or

21   anything else.  What they are doing is translating

22   verbatim what either myself or the supervisee is

23   saying.  So all the information that I would deem

24   relevant really is not relevant because they're not

25   having any interpretation.  They're just verbatim

```
 1                  SHANNON HILLIARD
 2   translating.  But I introduced myself and then
 3   Ms. Hill.
 4        Q    Who told you that, that they were verbatim
 5   translating and that context was unimportant?
 6        A    Those are probably a poor choice of words.  I
 7   was trying to explain to one person -- and I don't -- I
 8   don't know which time.  I've used this outside of
 9   Ms. Hill.  And on this particular day, I was trying to
10   explain that we're DCS and here's what we do and, you
11   know, here's the circumstances and here's a docket.
12   And they were like -- you know, they -- that's all not
13   what they do.  They strictly are there to put my spoken
14   word into ASL and that the rest of the background I was
15   trying to give them and information was really just
16   fluff.  They're not here for that.  One of the
17   interpreters was explaining that unless I want her to
18   sign that information, it's not necessary for her.
19   She's strictly there to convey my message to Ms. Hill.
20        Q    And so you indicated that you've used
21   LanguageLine services outside of with Ms. Hill.  Who
22   else have you used them with?
23        A    I don't recall the person's name.  I don't --
24   I don't recall.  It was -- it was -- it was very brief
25   and not even needed because the person actually was
```

1                    SHANNON HILLIARD

2        Q     And when she were to contact your office and

3    another person tried to pull up her file and she gave

4    the name Mary Ann Hill, would that create problems

5    without this alert?

6        A     It -- there's a -- it really shouldn't

7    because if you don't -- if you try the first time and

8    it doesn't work, if you put it in as an alternate,

9    which would be your next go-to if the person doesn't

10   remember their UPI or GDC, it would pull her up from

11   there.

12       Q     And in terms of the alerts, do they kind of

13   remove themselves on their own?  Do you have to go in

14   and remove them?  How does that work?

15       A     You can end them if you elect to end them,

16   but once you initiate it, it has an expiration date.

17   So if you -- if you don't go in and re-create it, it

18   will -- it goes away.  It's no longer present.  I want

19   to say it's 15 or 16 months that it will remain there,

20   but then it will -- it will expire.  And when it

21   expires, it's deleted.  Or you can end them

22   voluntarily.  That's, you know, up to the officer.

23            MS. SHRADER:  We can stop sharing this

24        exhibit, and will you pull up Exhibit 111.

25            MS. CENTER:  Just one moment.

1            SHANNON HILLIARD

2        Q     (By Ms. Shrader)   This is the portal page for

3   Ms. Hill now that Officer Roper is her supervision

4   officer.   Do you see that?

5        A     I do.

6        Q     And it appears that neither of the alerts is

7   here attached to Ms. Hill's profile.   Do you see that?

8        A     I do.

9        Q     In terms of Ms. Hill -- and obviously you saw

10  fit to create the alert to make sure that anyone who

11  pulled her profile knew that she needed an

12  interpreter -- would you expect that that alert would

13  be reentered into Ms. Hill's profile to ensure

14  consistency that when she contacts your office, whoever

15  comes into contact with her knows she needs an

16  interpreter?

17       A     It would be helpful, but she has an ADA

18  profile at that point.   So there's some indication that

19  there's something going on, but the alerts are kind of

20  a shortcut to where you'd have that information pop up

21  at the same time her case did.   But there is an ADA

22  profile that -- the alerts just make it easier.

23       Q     And there was an ADA profile when you created

24  that alert; is that right?

25       A     Oh, Lord, I don't -- I don't know.

1                    SHANNON HILLIARD

2          MS. SHRADER:  Well, let's pull Exhibit

3      110 back up so you can take a look.

4          THE WITNESS:  Yeah, I'm sorry, I don't

5      know.

6          MS. SHRADER:  That's okay.  I'd rather

7      you tell me that than make a guess if you

8      don't know.  That's great.

9      Q    (By Ms. Shrader)  Do you see that at the top

10  right-hand corner there?  Is that the ADA profile?

11     A    It is.  It's there.

12     Q    So it existed and you still saw fit to make

13  sure that this alert was there; is that right?

14     A    Correct.

15         MS. SHRADER:  We can take the exhibit

16     down.

17     Q    (By Ms. Shrader)  In the ADA profile, does

18  it -- what does -- what is listed within the ADA

19  profile if you were to click on that icon?

20     A    It -- there's -- you really can't click on

21  the icon itself up in the right-hand corner.

22     Q    How do you access the ADA profile?

23     A    You can go into the tabs in the portal under

24  the profile tab, and it will tell you, when you click

25  on the profile, as to why it is an ADA profile, that --

1                    SHANNON HILLIARD

2   what the issue is, basically, or what the disability

3   is.

4        Q    So, for example, if you were to do that for

5   Ms. Hill, what do you see?  I think we might -- I think

6   you're frozen.

7             MS. SHRADER:  Is it just on my end or is

8        Ms. Hilliard frozen for everyone?

9             Oh, I think we have you back.

10            THE WITNESS:  I still saw everything.

11       You were the only one frozen, so who knows.

12            MS. SHRADER:  All right.

13       Q    (By Ms. Shrader)  Did you hear what I asked,

14  the question that I asked?

15       A    I did not.

16       Q    If you click on that profile tab that you

17  were just talking about in Ms. Hilliard's [sic]

18  profile, what is it that you see?

19       A    It has the profile description, the type,

20  start date, any other comments, who created it, and the

21  source.

22       Q    And you said that it would show you the ADA

23  information, why she's listed as having an ADA profile?

24       A    Correct.

25       Q    And what does it say?

1                           SHANNON HILLIARD

2        A     I have entered "hearing impairment" for her

3   disability.

4        Q     And is there anything else written there?

5        A     The start date that I added the profile.

6        Q     And is there anything in terms of needing an

7   interpreter or anything along how she -- the lines of

8   how she communicates?

9        A     There is not.

10       Q     So without that alert, the information "needs

11  sign language interpreter" is missing from her profile;

12  is that right?

13       A     Yes.

14       Q     And you explained before that Officer Nero

15  was not ever assigned to supervise Ms. Hill.  I see on

16  December 2nd, 2019 a face-to-face office interaction

17  that was entered by Officer Nero.  Why is it that

18  Officer Nero was meeting with Ms. Hill in December of

19  2019?

20       A     Ms. Nero would have been the OD that day, or

21  officer of the day.  And so when someone comes in, if

22  their assigned officer is not present, then whoever is

23  the officer of the day will meet with that person.  And

24  at some point, I had asked her to come in, Ms. Hill

25  rather, to come back in and get -- when she came in

1                   SHANNON HILLIARD

2  initially, I didn't have all the stuff for her, so I

3  had asked that Ms. Nero see her as the officer of the

4  day and to set up the email and then to set up -- to

5  get her -- to get the forms, basically, because I had

6  not been able to do a complete and thorough with a

7  couple little leftovers, and so I had asked her that

8  she come back in so that, A, we could see her the

9  following month and that, B, then Ms. Nero could get

10  her to sign off on some things that weren't completed,

11  and that way Ms. Hill could have the copies.  Because

12  every once in a while, you know, as you see, I froze a

13  minute ago, you know, you get a glitch in your stuff.

14       Q    Does that type of thing happen frequently,

15  where the officer of the day might see someone who's

16  not their regular supervisee, but is someone who's on

17  another person's regular caseload?

18       A    It -- it's common.  Or if they call the

19  office rather than their officer and we can just direct

20  it to the officer of the day and they can answer it, as

21  opposed to telling them to call their officer and, you

22  know, jumping through hoops, if we can jump on it and

23  just resolve it, then we will direct it to that person.

24            Just -- most of the time, it's very general

25  calls that anyone can deal with, and it's not worth

1                    SHANNON HILLIARD

2   asking the supervisee to not bother you and "Go call

3   your officer," because they could be in court, in the

4   field, you never know, so we have on a -- every single

5   day, someone who serves in that role.

6        Q    And so if Ms. Hill were to show up to meet

7   with the officer of the day, you know, for example,

8   that officer's access to information about Ms. Hill

9   would really be then flipping to her profile page and

10  seeing any alerts, seeing the ADA profile that exists

11  there; is that fair?

12       A    Yes.

13       Q    And so without that alert, the officer of the

14  day might not know that they need to use an interpreter

15  to communicate with Ms. Hill; is that fair?

16       A    Yes, if there were no alerts, they would be

17  limited to what -- to the "hearing impaired" portion.

18       Q    So in terms of Officer Nero's note -- and I

19  know that you said that you -- I believe you said you

20  spoke to Officer Nero, is that right --

21       A    Yes.

22       Q    -- before today's deposition?

23       A    Uh-huh.

24       Q    Officer Nero noted that she used

25  Language Insight to communicate with Ms. Hill.  Is that

1

2                     C E R T I F I C A T E

3

4    STATE OF GEORGIA

5    COUNTY OF COBB

6

7           I, MICHELLE M. BOUDREAUX-PHILLIPS, do hereby

8    certify that SHANNON HILLIARD, the witness whose

9    deposition is hereinbefore set forth, was duly sworn by

10   me and that such deposition is a true record of the

11   testimony given by such witness.

12

13          I further certify that I am not related to

14   any of the parties to this action by blood or marriage

15   and that I am in no way interested in the outcome of

16   this matter.

17

18          IN WITNESS WHEREOF, I have hereunto set my

19   hand this 18th day of August 2021.

20
                     *Michelle M. Boudreaux-Phillips*
21                   _____
                     MICHELLE M. BOUDREAUX-PHILLIPS, RPR
22

23

24

25

1

2            ERRATA SHEET FOR THE TRANSCRIPT OF:

3    Case Name:  Brandon Cobb, et al. versus GDCS, et al.

4    Deposition Date:  August 6, 2021

5    Deponent:  Shannon Hilliard

6    Pg.  Ln.  Now Reads        Should Read       Reason

7    ____  ____  _____     _____     _____

8    ____  ____  _____     _____     _____

9    ____  ____  _____     _____     _____

10   ____  ____  _____     _____     _____

11   ____  ____  _____     _____     _____

12   ____  ____  _____     _____     _____

13   ____  ____  _____     _____     _____

14   ____  ____  _____     _____     _____

15   ____  ____  _____     _____     _____

16   ____  ____  _____     _____     _____

17   ____  ____  _____     _____     _____

18   ____  ____  _____     _____     _____

19

20                        _____
                          Signature of Deponent
21

22
     SUBSCRIBED AND SWORN BEFORE ME
23   THIS _____ DAY OF _____ 20___.

24   _____
     (SIGNATURE OF NOTARY PUBLIC)
25   MY COMMISSION EXPIRES:_____