# Exhibit H

```
 1

 2                  UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF GEORGIA
 3                       ATLANTA DIVISION

 4           Civil Action No. 1:19-cv-03285-WMR

 5   _____

 6   BRANDON COBB, et al.,

 7           Plaintiffs,

 8       vs.

 9   GEORGIA DEPARTMENT OF
     COMMUNITY SUPERVISION, et al.,
10
             Defendants.
11   _____

12

13

14

15

16           REMOTE VIDEOTAPED DEPOSITION OF
                       WILLIAM DRIVER
17

18              Tuesday, January 12, 2021

19

20

21

22

23

24   Reporter By:  Michelle M. Boudreaux, RPR

25   Job No. 188470
```

1

2

3

4

5

6              January 12, 2021

7              10:19 a.m.

8

9

10     Remote videotaped deposition of

11  WILLIAM DRIVER, conducted at the location of

12  the witness in the state of Georgia, pursuant

13  to Agreement before Michelle M. Boudreaux, a

14  Registered Professional Reporter in the State

15  of Georgia.

16

17

18

19

20

21

22

23

24

25

```
 1

 2                        APPEARANCES

 3                   (Via Videoconference)

 4

 5   On behalf of the Plaintiffs:

 6        BY: BRIAN DIMMICK, Esq.
          American Civil Liberties Union Foundation
 7        Disability Rights Program
          39 Drumm Street
 8        San Francisco, California 94111

 9

10        BY: TYLER FINK, Esq.
          Arnold & Porter
11        250 West 55th Street
          New York, New York 10019
12

13

14   On behalf of the Defendants:

15        BY: GEORGE WEAVER, Esq.
          Hollberg & Weaver
16        2921 Piedmont Road, N.E.
          Atlanta, Georgia 30305
17

18

19   Also Present:   James Knox, Esq.
                     Talila A. Lewis, Esq.
20                   Darrell Smith
                     Tamara Stubbs
21
     Videographer:   Matthew Chin-Quee
22

23

24

25
```

1

2                                INDEX

3

                             EXAMINATIONS
4
        By Mr. Dimmick ............................. 8
5
        By Mr. Weaver ............................. 153
6
        By Mr. Dimmick ............................. 161
7
                              - - -
8
                             EXHIBITS
9
     Exhibit                                        Page
10
     Exhibit 83 ..................................... 13
11       Notice of Deposition Pursuant to
         F.R.C.P. 30(b)(6)
12
     Exhibit 84 ..................................... 28
13       Department of Community Supervision Policy &
         Procedure Statement, Policy Number 3.129,
14       Initial Interview, Last Revision December 13,
         2019 [DCS D-001980, etc.]
15
     Exhibit 85 ..................................... 95
16       Department of Community Supervision Policy &
         Procedure Statement, Policy Number 4.207,
17       Counseling/Program Services, Last Revision
         August 21, 2019 [DCS D-001881, etc.]
18
     Exhibit 86 ..................................... 99
19       Department of Community Supervision Policy &
         Procedure Statement, Policy Number 4.301,
20       Georgia Prisoner Reentry Initiative, Last
         Revision April 1, 2017 [DCS D-001957, etc.]
21
     Exhibit 87 ..................................... 112
22       Department of Community Supervision Policy &
         Procedure Statement, Policy Number 6.340,
23       Americans with Disabilities Act Title II,
         Last Revision September 30, 2020
24       [DCS D-003043, etc.]
25

1

2                        INDEX (Cont'd)

3

Exhibit                                           Page

4

Exhibit 88 ..................................... 144
5      Declaration of William Driver
       dated August 28, 2019

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    WILLIAM DRIVER

 2        THE VIDEOGRAPHER:  Good morning.  My

 3   name is Matthew Chin-Quee.  I'm a legal

 4   videographer in association with TSG

 5   Reporting.

 6        Due to COVID-19 and following social

 7   distancing, I will not be in the same room as

 8   the witness.  Instead, I'll record the

 9   deposition remotely.  The reporter, Michelle

10   Boudreaux, also will not be in the same room

11   and will swear the witness remotely.

12        Do all parties stipulate to the validity

13   of the video recording and swearing and that

14   it will be admissible in the courtroom as if

15   it had been taken following Rule 30 of the

16   Federal Rules of Civil Procedure and the

17   State's rules where the case is pending?

18        MR. DIMMICK:  Plaintiffs do.

19        THE VIDEOGRAPHER:  I just want to have

20   vocal confirmation from both parties.

21        MR. DIMMICK:  Plaintiffs so stipulate.

22        MR. WEAVER:  Defendants also.

23        THE VIDEOGRAPHER:  Thank you.

24        This is the start of Tape No. 1 of the

25   videotaped deposition of William Driver in
```

```
 1                    WILLIAM DRIVER

 2        the -- 30(b)(6) deposition in the matter

 3        Brandon Cobb, et al., v. Georgia Department

 4        of Community Supervision, et al., in the

 5        United States District Court, Northern

 6        District of Georgia, Atlanta Division, No.

 7        1:19-cv-03285-WRM -- WMR.  Sorry.

 8            All parties have agreed to appear

 9        remotely on January 12th, 2021, at

10        approximately 10:19 a.m.

11            My name is Matthew Chin-Quee from TSG

12        Reporting, and I'm the legal video

13        specialist.  The court reporter is Michelle

14        Boudreaux, in association with TSG Reporting.

15            Will counsel please introduce

16        yourself.

17            MR. DIMMICK:  Brian Dimmick from the

18        American Civil Liberties Union representing

19        Plaintiffs.

20            MR. WEAVER:  George Weaver, special

21        assistant attorney general on behalf of

22        Defendants.

23            THE VIDEOGRAPHER:  Will the court

24        reporter swear in the witness, please.

25    ///
```

```
1                     WILLIAM DRIVER

2                     WILLIAM DRIVER,

3    being first duly sworn, was examined and testified as

4    follows:

5              MR. DIMMICK:  Okay.  Good morning -- go

6         ahead.

7              MR. WEAVER:  As we start, we'd like to

8         reserve signature for Mr. Driver.

9              MR. DIMMICK:  Okay.

10             MR. WEAVER:  All right?

11             MR. DIMMICK:  All right.  Yes, yes.

12        Okay.

13                     EXAMINATION

14   BY MR. DIMMICK:

15        Q    Good morning, Mr. Driver.  My name is Brian

16   Dimmick, and I represent the plaintiffs in this case.

17             Could you please state and spell your name

18   for the record, please?

19        A    Yes, sir.  My name is William Driver.  First

20   name is W-I-L-L-I-A-M.  Last name is Driver,

21   D-R-I-V-E-R.

22        Q    Thank you.

23             Have you ever had your deposition taken

24   before?

25        A    No, sir.
```

1                        WILLIAM DRIVER

2    home visit, that initial home visit?

3        A    To verify that the residence is actually the

4    residence of record for the offender, to speak with the

5    head of household or family members to advise them of

6    the requirements the offender has to abide by.

7    Because, as I said earlier, the more support that the

8    individual has, the more successful the outcome will

9    be.

10       Q    Okay.

11       A    But it's -- the residence verification itself

12   exists to verify that it is the residence where the

13   offender is living.

14       Q    Okay.  Is the purpose of that to also see how

15   the offend -- the supervisee is doing and is that --

16   does that also happen during these -- that initial home

17   visit?

18       A    Yes.

19       Q    Okay.  Okay, and then are there some -- at

20   least for some supervisees with certain levels of

21   supervision, there are regular additional home visits;

22   is that correct?

23       A    Yes.

24       Q    Okay.  And what is the general purpose of

25   those home visits?

1                          WILLIAM DRIVER

2          A     To adequately supervise the offender or the

3     supervisee, how they're doing, to see how they're

4     progressing with their case plans, to see the

5     environment that they're in.

6          Q     Okay.

7          A     The more severe the level to -- risk to

8     re-offend, the more you would need to see that

9     individual to see how they're doing in the community

10    where they're living.  You decide how to handle their

11    case.

12         Q     Okay.  So it helps the CSO to evaluate what

13    the offender needs or what the supervisee needs and

14    what might be helpful for them to succeed on probation

15    or parole, to actually see where they are in the

16    community, correct?

17         A     Yes.

18         Q     Okay.  Are there other places where CSOs sort

19    of intend to interact with supervisees in the

20    community?  Obviously, they might run into the them at

21    any time and any place, but are there -- do they go

22    meet them at their job?  Do they go meet them at other

23    places?  Is that a regular practice?

24         A     To some extent, yes.  There are some

25    employers that really don't like you coming to their

1                    WILLIAM DRIVER

2  place of work, and we want to respect that if at all

3  possible.  But if we are allowed to see an offender at

4  their place of employment, it just helps us to verify

5  that they are still employed, so we may go there.  And

6  just like everything else, you may also run into an

7  offender at Walmart.

8      Q    Yeah, right.

9      A    You know, and if you have a meaningful

10  conversation about that offender's case plan or that

11  offender's case, then that is an interaction with the

12  offender.

13      Q    Okay.  And all of these interactions, the CSO

14  would document those in the system, correct?

15      A    Yes.

16      Q    Okay.  And that would be in the portal

17  system?

18      A    Yes.

19      Q    Okay.  How does GDCS identify supervisees who

20  may have difficulty communicating or they need aids to

21  be able to fully communicate?

22      A    Of course, if they're identified prior to

23  getting to us from the facilities where they're

24  incarcerated as having a need through ADA, then we look

25  into that at the initial intake.  If they report to us

```
 1                    WILLIAM DRIVER
 2  that they have needs, then, of course, we discuss that
 3  as well.  But there is a portion of the initial
 4  interview process that -- there's a module now in the
 5  portal that that question must be asked of the offender
 6  by the supervising officer that's doing the initial
 7  intake, whether or not they have a need for ADA
 8  compliance -- ADA need.  And if that -- if they answer
 9  yes, then it's referred up to the ADA compliance
10  officer to let us know what all we need to do to
11  address those needs.
12            I'm sorry, Mr. Dimmick, I think you're
13  talking, but I can't hear you.
14            MR. WEAVER:  Brian, we can't hear you.
15      I'll send him an email.
16            (Discussion off the written record.)
17            THE VIDEOGRAPHER:  Do you want to go off
18      the record?
19            MR. WEAVER:  Yeah, just go off the
20      record.
21            (Discussion off the written record.)
22            MR. DIMMICK:  Sorry about that.
23      Q    (By Mr. Dimmick)  So what information does
24  GDCS typically receive, generally, when a supervisee is
25  coming out of the correctional system?  What sort of
```

1                    WILLIAM DRIVER

2   information do you get from the correctional system?

3        A    If a person is -- has a mental health profile

4   or is a registered sex offender, they should have

5   already registered the individual where they're going.

6   If a person has a compliance need through ADA, those

7   type things are noted in the SCRIBE system that they

8   use and we refer over it to see those things.  If it's

9   there, then they notified us.  If it's not, then it's

10  not necessarily there.  So if it's not, we don't know

11  about it until we talk with them.

12       Q    Okay.  So, for example, if the supervisee had

13  been identified by the correctional system as deaf or

14  hard of hearing or someone who needed interpreters

15  while incarcerated, that would -- you would expect that

16  information to be in the SCRIBE system; is that

17  correct?

18       A    You would expect it to be, but it's not

19  always there.

20       Q    Okay.

21            MR. WEAVER:  By "SCRIBE," you mean the

22       portal system?  I think they overlap.

23            MR. DIMMICK:  Well, yeah, I meant

24       whatever system -- it's my understanding that

25       there was a separate system that recorded

1                    WILLIAM DRIVER

2        Department of Corrections information that

3        then was passed on to GDCS.  I may be

4        incorrect in that assumption.

5        Q    (By Mr. Dimmick)  Is it -- is it one system

6    that you share with Department of Corrections or is it

7    two separate systems?

8        A    It's two separate systems.

9        Q    Okay, but you, GDCS or the CSO, would have

10   access to the Department of Corrections' system to look

11   over whatever information they have about the incoming

12   supervisee; is that correct?

13       A    Yes.  Some of their -- some of their

14   information is loaded into the portal system, some is

15   not, and some have access to SCRIBE, and some do not.

16       Q    Okay.  So what sort of information would you

17   get about the hearing needs of an incoming supervisee?

18   I'm just curious if it's just a check box that says

19   "needs interpreters" or if it just says "hard of

20   hearing."

21            Do you sort of know what information that the

22   Department of Corrections records that you then get?

23       A    Without going back and reviewing their case

24   note entries, the -- there is an icon at the top that

25   identifies a person's profile status --

1                     WILLIAM DRIVER

2      Q    Okay.

3      A    -- while incarcerated.  And if it's marked

4  there, then that's our first indicator.

5      Q    Okay.  Okay.

6      A    Before we take up and go forward, it may be

7  overlooked or not read in the actual documentation

8  because it may be three years prior to where it was

9  documented but never actually put on that icon as a

10 profile.

11     Q    Okay.  Great.

12          Does GDCS get any other information from

13 outside the agency, from Department of Corrections or

14 anyone else, about -- well, I shouldn't say Department

15 of Corrections.

16          Do -- does GDCS get any information from any

17 other sources about incoming supervisees before they,

18 you know, get referred to the office for the initial

19 interview?

20     A    I'm sorry, let me ask you this for

21 clarification.

22     Q    Sure.

23     A    Are -- what -- are you referring to other

24 than sentencing information or information for release

25 from Board of Pardons and Paroles?

1                    WILLIAM DRIVER

2      Q    Um, okay, let -- yeah, let's just make sure.

3            So you do get information from the court

4   system, from the sentencing documents, and from the

5   Board of Parole; is that correct?

6      A    Yes.

7      Q    Okay.  Other than that, other than that

8   information from the court system or the parole system,

9   do you get any other information on incoming

10  supervisees?

11     A    Nothing other than what we glean from the

12  system that the -- from DOC.

13     Q    Okay.  Okay, so if it was not recorded

14  generally in the Department of Corrections' system or

15  it didn't transfer over, you would not know whether the

16  individual had any sort of hearing needs; is that

17  correct?

18     A    That's correct, until we talked to the

19  individual.

20     Q    Okay.  Is anyone other than the CSO involved

21  in the sort of initial process of meeting the

22  supervisee at the initial office visit?

23     A    It's possible.

24     Q    Okay.  Who would those staff be?

25     A    It's different officers, and it's mainly

1                    WILLIAM DRIVER

2  determined by size.  A lot of initial intakes are

3  started as an orientation process where several people

4  are there on a certain day and they have an

5  orientation, and then they're assigned to these

6  officers, and then they come back and talk to the

7  officers.

8       Q    Okay.

9       A    So it's possible that other people have a

10  part in it.  It's also possible that an officer who is

11  there when this person reports in will see that person

12  and start the initial intake, and the assigned officer

13  will complete it when they get to see the offender.

14       Q    Okay.

15       A    That way it makes it so that the offender

16  doesn't have to come back within a certain time frame

17  to see a certain officer.  We try to do it so that we

18  can schedule it around that person's time frame.

19       Q    So how would GDCS staff know what an incoming

20  supervisee's communication needs are?  Assuming that

21  you don't know from information you already have from

22  Department of Corrections or some other source, how

23  would -- how do you -- would identify someone who walks

24  into the office for an initial interview as having --

25       A    If we don't receive the information through

1            WILLIAM DRIVER

2  DOC --

3      Q    Okay.

4      A    -- and if the individual does not inform us

5  that they require a service --

6      Q    Uh-huh.

7      A    -- and they answer negatively to the question

8  of whether or not they require service, then we don't

9  know that they need an accommodation.

10     Q    Okay, but are there situations where someone

11 either contacts the office to schedule a visit, the

12 initial visit, or just walks in where it's just -- it's

13 obvious that the person has a hearing impairment?

14     A    I'm sure that there is, but I can't say for

15 certain that that's happened, but I'm almost positive

16 that that would -- that that would be true to some

17 extent.

18     Q    And what would happen in those situations?

19 If -- well, what would happen if the CSO had difficulty

20 even starting the intake process because the person had

21 a -- had a hearing need or, for example, used American

22 Sign Language?

23     A    If the -- if the individual -- I think I

24 understand your question.  Are you asking if the -- if

25 it's obvious the individual needs some type of help --

1              WILLIAM DRIVER

2      Q    Uh-huh.

3      A    -- and if, when asked, the individual says,

4 "Yes, I do," what -- are you asking what would happen

5 then?

6      Q    Well, yeah, I think I'm asking -- I know

7 there is -- we'll get to this in a minute -- there is a

8 part of the intake process that goes over what the

9 individual needs.

10          I'm just asking, if they have hearing

11 challenges such that -- do you go ahead and start the

12 initial interview or do you -- do you go immediately to

13 their hearing needs?  I guess I'm trying to figure out

14 if the -- how a CSO is able to even start the intake

15 process if the supervisee, let's say, is deaf or -- and

16 there's -- and there's no interpreter.  I guess that's

17 what I'm trying to get at.

18      A    Okay.  I think the best answer I can give you

19 is this:  If the person presents with an obvious need,

20 the first thing that a CSO is going to do is ask that

21 person if they do need.

22      Q    Uh-huh.

23      A    And if they identify that they do, then we

24 will use the current technology we have with the

25 LanguageLine interpreters to try to proceed.  And if

1                     WILLIAM DRIVER

2    the person obviously doesn't want to do that or can't

3    do that, then we would -- the CSO would get in touch

4    with his supervisor, the chief, and reschedule a time

5    for this offender to come back and see if we can get

6    approval for a live interpreter to be there.

7         Q    Okay.

8         A    But it would be following the process of

9    doing that.

10        Q    Okay, so -- okay, so am I correct --

11   basically the CSO finds out what the individual's

12   hearing needs are or hearing abilities are by asking

13   that individual; is that correct?

14        A    Yes.

15        Q    Okay.  And then how do -- how does the CSO

16   then determine what will be provided or what they will

17   use to communicate with this individual?

18        A    As I said before, we will start by using the

19   LanguageLine interpreter system that we have available

20   to us through our use of technology.  And if we're

21   capable of communicating effectively with the offender

22   and the offender communicates back, then we can go with

23   that, as long as he's satisfied.

24             If he requests a live interpreter, then we'll

25   stop what we're doing and get with the ADA compliance

1                    WILLIAM DRIVER

2    officer and then with budget, because we have to

3    schedule these things and we have to pay for them

4    through a state contract with providers that provide

5    the interpreters, and we have to work on their schedule

6    then.  When they can -- when they can be there is when

7    we have to schedule the offender to come back.

8        Q    Okay.  So if a supervisee needed a live

9    interpreter, they would have to reschedule the initial

10   interview; is that correct?

11       A    That's correct.

12       Q    Okay.  And what is the approval process for

13   getting a live interpreter, if that's what the

14   individual requested?

15       A    From a CSO's level?

16       Q    Uh-huh.  Yes.

17       A    The CSO would have to go to his chief and

18   then they would contact the ADA compliance officer and

19   budget --

20       Q    Okay.

21       A    -- our finance department.  And once it's

22   determined that the need is there for that live

23   interpreter, then we go to budget and budget contracts

24   through purchasing, through procurement, with a state

25   contract holder to provide an interpreter, and then we

1                   WILLIAM DRIVER

2    are pretty much at their mercy as to when they can

3    schedule someone to be here.

4         Q    Okay.  So the first thing that will be

5    offered to the individual in that situation is the

6    video remote interpreting through the LanguageLine

7    service; is that correct?

8         A    Yes.

9         Q    Okay.  And generally that's done when the

10   supervisee requests it, correct?

11        A    When the supervisee requests it or identifies

12   that there is a need; or the officer recognizes that

13   there's a definite need, he can try to have the

14   offender -- or have the supervisee participate in that.

15        Q    Okay.  How does the CSO judge whether the

16   interpreter provided for the VRI, video remote

17   interpreting, is -- whether that's providing effective

18   communication?

19        A    I'm afraid I can't answer that.  I don't even

20   think I'm qualified to answer that.  I would think --

21   in my opinion, I would say that if you're able to

22   process the information that you're given back from

23   the -- from the supervisee and he's able to process

24   that information from you through that interpreter,

25   then I would say that's effective communication.  But

1                         WILLIAM DRIVER

2    that's the way I would do it.

3         Q    Okay.

4         A    Now, I can't say for an individual person.  I

5    don't know.

6         Q    Okay.  Do CSOs get any training on how to

7    assess whether they're being understood and whether the

8    communication is effective with the supervisee through

9    an interpreter?

10        A    I can't answer that question either.  They

11   are trained on the use of that equipment.

12        Q    Okay.

13        A    The ADA compliance officer has put together

14   that training, in conjunction with our training

15   department, and would be a much better --

16        Q    Okay.

17        A    -- source of information on answering that

18   question.

19        Q    Sure, sure.  But as far as you know, they

20   don't get any specific training on, for example, asking

21   questions to see if the supervisee actually understands

22   what's going on; is that correct?

23             MR. WEAVER:  Objection, misstates his

24        testimony.

25             MR. DIMMICK:  Okay.

```
 1                    WILLIAM DRIVER

 2            MR. WEAVER:  He didn't say that there

 3       was no training.  He said that he's not aware

 4       of what the training is.

 5            MR. DIMMICK:  Okay.

 6       Q    (By Mr. Dimmick)  So as far as you're aware,

 7   there is no training provided to CSOs on how to

 8   determine whether they're being understood and whether

 9   communication is effective?

10            MR. WEAVER:  Objection again, misstates

11       his testimony.  He didn't say as far as he's

12       aware, there's no training.  He said he

13       doesn't know what the training is.  That's a

14       different answer than what you just --

15            MR. DIMMICK:  Okay.  All right.

16       Q    (By Mr. Dimmick)  So we discussed that you

17   ask the supervisee what they need in terms of

18   communication, if there's an identified need.

19            What happens if they decline the LanguageLine

20   interpreter services?

21       A    They have the right to decline any services

22   that they don't want to use.  If they don't want to use

23   the services that we offer, then there's -- as part of

24   the intake, there's a sheet where they can sign stating

25   that they refuse to participate in those services.  So,
```

```
 1                    WILLIAM DRIVER
 2   I mean, if they don't want to, that's entirely up to
 3   them.
 4        Q    Okay.  So if they don't want the services,
 5   they need to sign that form that's part of the process?
 6        A    Yes.
 7        Q    Okay.  If they do elect to sign that form, do
 8   CSOs make any other efforts to determine what other
 9   aids or services they might need?
10        A    Upon their signing that form, they're signing
11   that they don't need any assistance.  That's what
12   this -- that form is for, is that "I don't need
13   assistance."
14        Q    Okay.
15        A    So the CSO wouldn't go any further than that.
16        Q    Okay.  Okay, so they're just not refusing the
17   video remote interpreting by signing that form; they're
18   refusing any type of communication assistance?
19        A    The particular form I'm speaking of, yes,
20   they're saying they don't need that -- our assistance
21   in that.
22        Q    Okay.  So if a supervisee did not want the
23   video interpreting, but wanted some other kind of
24   service, how would they request that?
25        A    They would -- they would tell their
```

1                        WILLIAM DRIVER

2      correct?

3           A     No.

4                MR. WEAVER:  Let me object and ask for

5           clarification, Brian.

6                MR. DIMMICK:  Okay.

7                MR. WEAVER:  Are you saying DCS, the

8           defendant here --

9                MR. DIMMICK:  Yeah.

10               MR. WEAVER:  -- does provide some -- and

11          I missed part of what you said.  What was

12          that?

13          Q     (By Mr. Dimmick)  I was just wondering -- it

14     sounds to me, and maybe you can clarify, that you do at

15     least, in some sense, provide at least psychological

16     and possibly medical services through counseling and

17     treatment that you provide through the Day Reporting

18     Centers and maybe other places.  Is that correct?

19               MR. WEAVER:  So the question is -- let

20          me object as compound.

21               MR. DIMMICK:  Okay.

22               MR. WEAVER:  You're asking about what's

23          provided in terms of psychological, medical,

24          and other services, and you're asking him

25          about the daily -- the Day Reporting Centers

1                    WILLIAM DRIVER

2        and other places, so you've got multiple

3        parts.  Can you break it down?

4        Q    (By Mr. Dimmick)  I guess my -- what I'm

5    asking, I think, is do you consider -- I'll ask it this

6    way:  Do you consider the services of the Day Reporting

7    Centers, like mental health counseling and -- to the

8    extent that's provided, like substance abuse and mental

9    health counseling are provided other places, do you

10   consider that to be medical or psychological services

11   within the meaning of this provision, if you know?

12       A    Is that question for me?

13       Q    Yes, it is.

14       A    My answer is no.

15       Q    Okay.  You do not.

16            All right, so the point of this provision is

17   not -- you've stated GDCS does provide referral and

18   assistance with accessing many of these services, but

19   the point of this policy is that they do not provide

20   them directly; is that correct?

21       A    If I understand you correctly, yes.

22       Q    Okay.

23       A    We do not provide these directly.

24       Q    Okay.

25            MR. WEAVER:  Provide referrals, right?

1                    WILLIAM DRIVER

2        That's what you're asking?

3             THE WITNESS:  We provide referrals.

4             MR. DIMMICK:  Yes.  Okay.  All right.

5        And -- sorry, I need to move to another place

6        in my document.  Here we go.

7        Q    (By Mr. Dimmick)  Okay, so when a supervisee

8    requires the use of an interpreter -- let's assume

9    that, you know, it's then -- either the person has

10   requested it or it's been concluded that they do

11   require one.  Who decides whether that interpreter will

12   be in person or by video, VRI?

13       A    If the person requests an interpreter, we're

14   going to start with the VRI, LanguageLine app.

15       Q    Okay.

16       A    And if a person continues to request a live

17   interpreter, then we follow the process and policy of

18   going through the local chief, through the ADA

19   coordinator, and through procurement if it -- after it

20   goes to the ADA coordinator and he deems it appropriate

21   and needed, then it goes to procurement.

22       Q    Okay, so that -- but that would only

23   happen -- would that only happen after they had --

24   after they had tried the VRI, or can a person

25   request -- can immediately say, "Look, I can't -- VRI

1                           WILLIAM DRIVER

2     doesn't work for me, I need -- I need an in-person

3     interpreter"?

4         A     We would prefer to try VRI first.

5         Q     Okay, but then -- but there is an approval

6     process, then, for determining that an interpreter --

7     that an in-person interpreter would be provided,

8     correct?

9         A     Yes, there is an approval process.

10        Q     Okay.  If the -- would the -- would the

11    individual's preference for having an in-person

12    interpreter be considered in that process?

13        A     Yes.

14        Q     Okay.  Do you know -- are there circumstances

15    where despite that individual having expressed a

16    preference for an in-person interpreter, GDCS would

17    decline to provide one?

18        A     I'm sorry, can you repeat that?

19        Q     Sure.

20              Are there situations where the supervisee has

21    expressed a preference for an in-person interpreter,

22    but GDCS would still decline to provide one?

23        A     I don't know of a specific instance.  It's

24    possible there could have been.

25        Q     Okay.  Are there policies and procedures

1                        WILLIAM DRIVER

2    specifying when an in-person interpreter can or cannot

3    be used?

4        A    I'm sorry, can or cannot be used?

5        Q    Yeah.  Yes.

6        A    There's not a policy that I'm aware of.

7        Q    Okay.  Are there situations, whether in

8    office visits or in field visits, where an in-person

9    interpreter would -- cannot be used?

10       A    We don't used interpreters in the field --

11       Q    Okay.

12       A    -- for -- live interpreters in the field.

13       Q    Okay.  So it is GDCS policy or practice that

14   in-person interpreters will not be provided during

15   field interactions, correct?

16       A    There's no policy for that, but it is common,

17   it is practice, yes.

18       Q    Okay.  What does -- by "field interactions,"

19   does that include anything that's not in an office --

20   in a GDCS office?

21       A    Yes.

22       Q    Okay.  So any home visit, employer visit, any

23   kind of visit to a treatment facility, anything like

24   that?

25       A    Yes.

```
 1                      WILLIAM DRIVER
 2      Q    Okay.  And I -- I'll just refer to all that
 3  as field interactions to keep it simple.
 4           Do you know -- and you said it's not a
 5  policy, but do you know how that -- we'll call it a
 6  practice -- how that practice came to be?
 7      A    It came out of twofold issues, first being
 8  officer safety and security.
 9      Q    Uh-huh.
10      A    Taking a person into the field, into a
11  situation that can be in a dangerous situation at
12  times, places the officer at risk, places that
13  individual at risk, also places the offender at risk,
14  so that's one of the major issues.
15           The second part of that is that
16  supervision -- field interactions are random and
17  unannounced.  In order to have an online -- a full-time
18  interpreter or human interpreter there with you, then
19  you have to arrange a schedule made by that interpreter
20  to have that person with you, and you could only go at
21  that time, so you would have to schedule it with the
22  supervisee, which defeats the purpose of an unannounced
23  field interaction.
24      Q    So has this been the GDCS practice since the
25  creation of the department?
```

1                    WILLIAM DRIVER

2       A    As far as I know, yes, sir.

3       Q    Okay.  And do you know who made the decision

4    that that would be the practice?

5       A    I do not know.

6       Q    Okay.  Is that policy written down -- or that

7    practice memorialized or written down anywhere?

8       A    Not that I'm aware.

9       Q    Okay.  Are there any exceptions -- we talked

10   about interpreters, but I assume -- does this -- well,

11   let me ask it this way:  Does it also mean that other

12   individuals would not be allowed to accompany a CSO on

13   a field interaction?

14      A    What do you mean by "other individuals"?

15      Q    Well, any -- are -- like, are there any

16   people who would be permitted to accompany, like maybe

17   a trainee or maybe someone else outside of GDCS?

18      A    There is a ride-along program that a person

19   has to apply to and sign waivers in order to do so.

20      Q    Okay.  So through that ride-along program,

21   individuals who are not part of GDCS could accompany a

22   CSO into the field?

23      A    Yes.

24      Q    Okay.  Has this practice, to your knowledge,

25   ever been reviewed?

1                      WILLIAM DRIVER

2       Q    Okay.  And you stated that you're not aware

3  of any -- any consideration given by GDCS to modifying

4  this practice, correct?

5       A    Nothing other than updates to the policy as

6  needed and have been done.

7       Q    Okay.  And specifically about the practice of

8  not bringing interpreters in the field, that is -- you

9  said that's not written down as a policy, correct?

10      A    No, it's not.

11      Q    Okay, so -- and you're not aware of -- are

12 you aware of any consideration of putting that in

13 writing as policy?

14      A    I am not aware of any consideration.

15      Q    Okay.  Has GDCS ever considered whether there

16 are practices that could be used to help mitigate any

17 safety risk that's involved in having an interpreter or

18 other individuals accompany CSOs on field interactions?

19      A    Not that I'm aware of.

20           MR. WEAVER:  Than not having them

21      accompanying the officers?

22           MR. DIMMICK:  Yeah.  Let me -- yeah.

23      Q    (By Mr. Dimmick)  Are there any -- yes.  Are

24 they any -- have they considered any practices that

25 could be used to mitigate -- to have the interpreter on

1                    WILLIAM DRIVER

2   site that mitigate any safety risks?  And I'm thinking

3   of things like, you know, having the interpreter wait

4   outside while the interaction begins or having the

5   interpreter positioned in a certain place to minimize

6   any danger.

7       A    Not that I'm aware of.

8       Q    Okay.  Are you aware of whether interpreters,

9   and particularly those who work in legal and law

10  enforcement situations, whether they receive any

11  training on how to deal with situations in the field,

12  how to protect themselves?

13      A    No, I do not.

14      Q    Okay.  Was legal liability for GDCS

15  considered in developing or maintaining this practice?

16      A    Not that I'm aware.

17      Q    Okay.  So just to summarize, it is -- am I

18  correct that it is GDCS policy that in-person

19  interpreters can never be provided during field

20  interactions?

21      A    I don't believe I said there was a policy.

22      Q    Well -- sorry.  It was a practice, then?

23      A    Yes, it's a practice.

24      Q    Okay.  So if a supervisee needs an

25  interpreter during a field interaction, the only option

1                         WILLIAM DRIVER

2    would be VRI, correct?

3         A    At this time, with the technology that we

4    have, yes.

5         Q    Okay.  Are you aware of what technology CSOs

6    employ when using a VRI during field interactions?  And

7    I'm specifically asking about the type of device:

8    phone, tablet, things like that.

9         A    They use -- they can use their issued phones

10   or they can use their issued Chromebooks.

11        Q    Okay.  So they are -- CSOs are issued both a

12   phone and a Chromebook, correct?

13        A    Yes.

14        Q    Okay.  Are there any practices about what --

15   which device or technology should be used for VRI

16   during a field interaction?

17        A    I'm not aware of a specific practice, and I'm

18   not aware of a policy that says that you have to use

19   one or the other.

20        Q    Okay.  Yes, you're not aware of any policies,

21   procedures, or practices that restrict when a CSO can

22   use certain devices or technologies during field

23   interactions?

24        A    I believe that's correct.

25        Q    Okay.  Are there any reasons you're aware of

1                    WILLIAM DRIVER

2  why a CSO might choose to use a phone instead of, say,

3  a Chromebook device or a device with a larger screen

4  when using VRI in the field?

5      A    It's at that officer's discretion.  It -- I

6  can't answer that for the individual officer.

7      Q    Okay.  So that decision, then, is left to the

8  discretion of the CSO?

9      A    At that particular point in time, yes.

10     Q    Okay.  Are you aware that people who are deaf

11 or hard of hearing may have difficulty understanding

12 and communicating in VRI when it's on a small screen

13 like a phone?

14     A    I don't know that, no.

15     Q    Okay.  You've not -- you have not been made

16 aware of that?

17     A    (No audible response.)

18     Q    Is that correct?

19     A    I do not know that, no.

20     Q    Okay.  And you're not aware that that

21 information has ever been used in evaluating any

22 practice related to using VRI for field interactions,

23 correct?

24     A    I'm sorry, can you please --

25     Q    Sure.  Sure, yeah, I'll clarify.

```
 1                      WILLIAM DRIVER

 2              As far as you're aware, information about --

 3    that people who are deaf of or hard of hearing may have

 4    difficulty using VRI on a small screen, that has not

 5    been used in making any decisions about the practices

 6    of using VRI in the field?

 7        A    No, it has not been used in decision-making

 8    practice.

 9        Q    Okay.  Do you know if there has been any

10    training for CSOs or any -- well, start with

11    training -- any training for CSOs about the best ways

12    of using VRI outside of an office setting and in the

13    field, such as during field interactions?

14        A    The training was administered to all staff,

15    but I'm not exactly sure at this time what was included

16    in it.

17        Q    Okay, so you're not aware of whether that

18    training covered things like the best way to use VRI in

19    the field?

20        A    At this time, I can't recall if it did or

21    didn't.

22        Q    Okay.  Are you aware of any guidance that is

23    given to CSOs, other than training, about the best ways

24    to use VRI in the field, things like what device to

25    use?
```

1                    WILLIAM DRIVER

2        A    I am not.

3        Q    Okay, so no train -- you're not aware of

4   whether the training covered the importance of having a

5   larger screen when you're using VRI?

6        A    I am not.

7        Q    Okay.  And so can you think of any reasons

8   generally why a CSO in certain situations might prefer

9   to use the phone rather than a Chromebook, which they

10  have, in using VRI in the field?

11       A    I cannot.

12       Q    Okay.  Would it be fair to say that in some

13  places where field interactions occur, the cell phone

14  or internet reception may not be very good?

15       A    I suppose that's fair.

16       Q    Okay.  Are you aware -- do CSOs ever report

17  that they have difficulty with cell phones or with

18  other wireless technology when they're on field

19  interactions?

20       A    I have not received any reports about it not

21  working.

22       Q    Okay.  Are you aware that poor or slow cell

23  phone or internet connections can make VRI difficult or

24  impossible to use?

25            MR. WEAVER:  You're talking about

1                    WILLIAM DRIVER

2        theoretical possibility?

3            MR. DIMMICK:  Well, yeah.  Yeah.

4        Q    (By Mr. Dimmick)  Are you aware of it --

5    yes -- are you aware that there's that possibility?

6        A    I would assume that there is.

7        Q    Okay.  And it would be fair to say that there

8    would be a certain -- that as VRI requires a video

9    trans -- a video connection, that there would be a

10   certain level of cell service or internet service below

11   which it would be basically impossible to use VRI?  Is

12   that fair to say?

13       A    I can't say that.  I don't know what the

14   levels would be.

15       Q    But you would think there would be some

16   level?  For example, if there's, you know, no internet

17   service at all in a particular area, then it would be

18   impossible to use VRI that required -- that relied on

19   an internet connection, right?

20       A    I'm not a tech guy.  I would assume that's

21   possible, yes.

22       Q    Okay.  What would CSOs be expected to do to

23   communicate with a supervisee -- a supervisee, you

24   know, needs VRI in the field, but they're not able to

25   get VRI to work because of a poor internet connection.

1                    WILLIAM DRIVER

2    What would the CSO be expected to do in that situation?

3         A    To document the fact it didn't work, to at

4    least note the environment and the reasons that they

5    went there to begin with, to see the area and to meet

6    with the -- with the supervisee, perhaps get a

7    collateral contact with a family member without the

8    supervisee present.

9              And then once that contact is done, then they

10   could go as far as having the supervisee meet them at a

11   place, after they've seen everything locally, where

12   phone service is better and they can -- they can

13   complete the interaction.

14        Q    Okay.  So these field interactions are

15   generally unscheduled, but you could then schedule a

16   field interaction as a follow-up to --

17        A    I --

18        Q    Go ahead.

19             Well, I'll ask it this way:  A CSO wouldn't

20   be able to schedule a follow-up meeting or interaction

21   with a supervisee if they were unable to communicate

22   with them on a field interaction, correct?

23        A    Yes.  That's a possibility, yes, but I don't

24   see that as the scheduled interaction because the

25   interaction occurred while they were there.

1

2                    C E R T I F I C A T E

3

4    STATE OF GEORGIA

5    COUNTY OF COBB

6

7            I, MICHELLE M. BOUDREAUX, do hereby certify

8    that WILLIAM DRIVER, the witness whose deposition is

9    hereinbefore set forth, was duly sworn by me and that

10   such deposition is a true record of the testimony given

11   by such witness.

12

13           I further certify that I am not related to

14   any of the parties to this action by blood or marriage

15   and that I am in no way interested in the outcome of

16   this matter.

17

18           IN WITNESS WHEREOF, I have hereunto set my

19   hand this 25th day of January 2021.

20

21   _____
                 MICHELLE M. BOUDREAUX, RPR

22

23

24

25

1                         ERRATA SHEET

2   Case Name:

3   Deposition Date:

4   Deponent:

5   Pg.  No. Now Reads        Should Read  Reason

6   ____ ____ _____      _____  _____

7   ____ ____ _____      _____  _____

8   ____ ____ _____      _____  _____

9   ____ ____ _____      _____  _____

10  ____ ____ _____      _____  _____

11  ____ ____ _____      _____  _____

12  ____ ____ _____      _____  _____

13  ____ ____ _____      _____  _____

14  ____ ____ _____      _____  _____

15  ____ ____ _____      _____  _____

16  ____ ____ _____      _____  _____

17  ____ ____ _____      _____  _____

18  ____ ____ _____      _____  _____

19  ____ ____ _____      _____  _____

20

                            _____

21                          Signature of Deponent

22  SUBSCRIBED AND SWORN BEFORE ME

23  THIS ____ DAY OF _____, 2021.

24  _____

25  (Notary Public)  MY COMMISSION EXPIRES:_____