# Exhibit J

# *Linguistic Consulting Service*

JUDY A. SHEPARD-KEGL, PH.D.                                    (207) 400-0493 (VP/VOICE)
52 WHITNEY FARMS ROAD                                          (207) 400-0493 (CELL)
NORTH YARMOUTH, ME 04097                                       judykegl@gmail.com

AMY JUNE ROWLEY, PH.D.                                         (925) 243 7413 (VP)
1267 KINGS RIVER ROAD                                          (925) 667 8603 (TEXT ONLY)
LIVERMORE, CA 94330                                            ajrpager@gmail.com

**Report:**

**Brandon Cobb**  Dates of Testing: May 25-June 29, 2020; Age at Time of Testing: 32 Date of Birth: June 11, 1988.

**Joseph Nettles**  Dates of Testing: May 25-June 22, 2020; Age at Time of Testing: 52; Date of Birth: July 19, 1967.

**Communication Assessment for:**  Arnold & Porter Kaye Scholer, LLP

**Date of Submission of Report:** August 9, 2020

EXHIBIT
**77**

1

**Evaluator:** Dr. Judy Shepard-Kegl, Ph.D., NIC-M, SC: L, CI/CT, CSC, OTC, ED: K-12, NAD-IV, Core-CHI, QMHI

**From the National Registry of Interpreters for the Deaf:**
Comprehensive Skills Certificate (CSC)
Certificate of Interpretation (CI)
Certificate of Transliteration (CT)
National Interpreter Certification (NIC-Master)
Oral Transliteration Certificate (OTC)
Specialist Certificate: Legal (SC:L)
NAD-IV (recognition of National Association of the Deaf Certification-Level IV)
Educational Certification: K-12 (recognition of EIPA Certification)
Educational Interpreter Performance Assessment (EIPA)-six certifications:
ASL (elementary and secondary)
PSE (elementary and secondary)
MCE (elementary and secondary)

**From the Board of Evaluation of Interpreters, Texas (BEI):**
BEI-Master

**From the Certification Commission for Healthcare Interpreters:**
Core-CHI (Core Certification Health Care Interpreter; from the Certification Commission for Healthcare Interpreters)

**From the Alabama Department of Mental Health:**
Qualified Mental Health Interpreter (QMHI)

**Education:**
B.A. in Anthropology (Brown University)
M.A. in Linguistics (Brown University, Thesis: *Some Observations on Bilingualism: Look at Data from Slovene-English Bilinguals*
Ph.D. in Linguistics (M.I.T., Dissertation:  *Locative Relations in American Sign Language Word Formation, Syntax and Discourse*
Postdoctoral studies: Center for Molecular and Behavioral Neuroscience, Rutgers, The State University of New Jersey)
Master Mentor Certificate, Project T.I.E.M., Northeastern University
Legal Interpreter Certificate Program, Front Range Community College
Training and Approval: (Culturesmart, Inc.; to teach *The Essential Piece* curriculum in medical interpreting)


**Evaluator:** Dr. Amy June Rowley, Ph.D., ASLTA-Master

From American Sign Language Teacher's Association:
ASLTA- Provisional (1997)
ASLTA -Qualified (1999)
ASLTA-Professional (2001)
ASLTA-Master (2017)
From American Sign Language Proficiency Interview:
ASLPI- 5 (Native level)

Education:
B.A. in Biology (Gallaudet University)
M.A. in Deaf Education (Western Maryland College- now McDaniel College)
ASL Specialist Certification (Western Maryland College- now McDaniel College)
Ph.D. in Urban Education in Curriculum and Instruction: Second Language Acquisition (University of Wisconsin-Milwaukee, Dissertation: *American Sign Language Advanced Studies Programs: Implementation Procedures and Identifying Empowering Practices*

# TABLE OF CONTENTS

List of Items Considered in Making This Assessment:                          4

Objectives                                                                    4

Composition of the Expert Team                                                5

People who are deaf, the Deaf community, and Deaf Culture                     9

Misconceptions:                                                              12

    Nodding is an indication of comprehension                   12

    Being able to speak, means being able to hear                16

    Literacy is a matter of learning to crack a writing code     18

    If you know English, you don't need interpreters            22

Background on American Sign Language                                         25

General Background on Interpreting                                           31

    Interpreting and Credentialing of Interpreters               31

    Video Remote Interpreting                                    43

    Should family and friends interpret?                         51

Methodology:                                                                 55

Individual Assessments:                                                      

    Brandon Cobb (male, 32)                                      56

    Joseph Nettles (male, 52)                                    90

Conclusion and Expert Opinions                                             122

Summary of Conclusions based upon our Assessment: Brandon Cobb             122

Expert Opinion: Brandon Cobb                                               128

Summary of Conclusions based upon our Assessment: Joseph Nettles          132

Expert Opinion:  Joseph Nettles                                           139

Overall Opinion                                                           145

Appendices:                                                               146

    Appendix A: Background on Components of the Evaluation       146

    Appendix B: Curriculum vitae:                               186

        Dr. Judy Shepard-Kegl                186

        Dr. Amy June Rowley                  232

    Appendix C: Cases in which each expert has presented testimony   246

        Dr. Judy Anne Shepard-Kegl           246

        Dr. Amy June Rowley                  247

## List of items considered in making this assessment:

Narrative Elicitation Materials:
*Mr. Koumal Flies Like a Bird* (1.5-minute non-verbal cartoon): signed, written, spoken
*Mr. Koumal Battles his Conscience* (1.5-minute non-verbal cartoon): signed, written, spoken
Background conversation
Cultural profile
Comprehension of ASL Stories: *Bird of a Different Feather*; Classifier Story: *DWI*
Topological Relations Task (Reduced version-20 items)
Frog Stories: *Frog, Where are you?; Frog Goes to Dinner*
Flynt-Cooter Reading Inventory (Form A)
San Diego Screening
Lipreading Task
Vocabulary Task
Legal documents: Complaint, including Declarations; Declaration of William Driver (ECF No. 34-7); probation forms signed by named Plaintiff Carlos Herrera; Plaintiff's Exhibit 63; Defendants' Exhibits 5-9; and BodyCam videos taken of named Plaintiffs Brandon Cobb, Carlos Herrera, and Joseph Nettles.

## Objectives:

The objective of this report is to assess the communication needs and what auxiliary aids are required to effectively communicate in law enforcement settings, in particular, probation or parole, court appearances, and incarceration for two individuals: Brandon Cobb and Joseph Nettles (referred to in this report collectively as the "evaluated plaintiffs").

This report addresses several issues: 1. the evaluated plaintiffs' use of interpreters; 2. their primary and preferred mode of communication; and 3. their capacities with respect to the use of American Sign Language (ASL) and of alternate communication modes such as speech, lipreading, reading, and writing in English.

We are not fact witnesses in this case and will not attempt to discern what did or did not happen during specific incidents regarding interactions in the law enforcement context. Our assessment concerns the evaluated plaintiffs' general language proficiency and cultural identification and how that speaks to their communication needs in legal contexts such as the ones noted above. As general background, we will also discuss issues regarding both on-site interpreting and Video Remote Interpreting (VRI). We will also address the role of Deaf interpreters and situations in which the use of a Deaf/Hearing Team of interpreters is required, as well as the uniquely different conditions under which Deaf individuals learn to read, and the issues involved with friends and family serving as interpreters.

4

## Composition of the expert team:

We have been retained in this case to offer our expert opinion on the communication abilities and needs of two Deaf plaintiffs in the context of probation and parole encounters, law enforcement, and incarceration. Dr. Judy Shepard-Kegl offers her opinion as a linguist, a nationally certified interpreter with over 40 years of experience, as an interpreter with credentialing, and as an interpreter trainer familiar with credentialing. Dr. Amy June Rowley offers her opinion as a native signer of ASL with life-long experience in the Deaf community, a nationally certified teacher of American Sign Language, an assessor of ASL language proficiency, and a researcher on second language learners of ASL. Our curriculum vitae appear in Appendix B. The cases we have presented testimony for at deposition or trial over the past four years (and in some cases beyond) appear in Appendix C.

It is important at the outset to discuss the nature of this expert team, which is both equal in its expertise as well as interdependent and complementary. Drs. Shepard-Kegl and Rowley have been working as a team for several years and share in every way in terms of expertise and their contribution to this assessment. Both are equally responsible for and have experience administering every aspect of the assessment used here. In fact, we frequently also test in unison.

Dr. Shepard-Kegl has compiled and vetted the test materials used here over a thirty-year career as an expert witness regarding language, culture, and interpreting issues in legal cases. [Clarification: Were these tests developed solely to serve work as experts, or as part of your general academic work?] Many of the testing materials have also been used in her linguistic and neurolinguistic research with even more individuals. With some changes and some streamlining over the years, these materials have been used to test hundreds of Deaf adults, and part of the reason we tried to keep the core materials the same over the last decades is because these individuals and other Deaf adults serve as a comparison and control group for each other. We have been and will continue to focus on streamlining these materials to make the testing less time intensive, but never at the sake of sufficient coverage of the language and cultural evidence we feel is needed to serve as the foundation for our opinions.

5

Both members of the team currently do all aspects of the testing together or independently. However, because of her ability to hear and her experience with phonetics and phonology, Dr. Shepard-Kegl does the transcription and analysis of the spoken language data. Also, because of her linguistic expertise in the study of argument structure, she does the coding and analysis of that portion of the assessment. Dr. Rowley takes the lead in the assessment of ASL data, but Dr. Shepard-Kegl by virtue of her research experience with transcription often transcribes the ASL data. This helps her to see the nuances in the ASL production and grammar that a native signer like Dr. Rowley can do more easily without recourse to transcription.

The team is in full consensus here regarding the interpretation and conclusions drawn from our testing. While we are equal in our contributions to the team and equally responsible for the opinions provided here, we are also complementary in very important ways—the most important being native fluency and cultural immersion in the two languages and cultures being assessed here.

Dr. Shepard-Kegl is a native speaker of English who is also fluent in American Sign Language. She did her bachelor's level work in linguistic anthropology as well as her master's level work in bilingualism at Brown University, her Ph.D. work in theoretical linguistics at the Massachusetts Institute of Technology, with a dissertation on word formation, syntax and discourse in ASL. She has taught and worked in linguistics, cognitive science, and psychology research laboratories at Northeastern University and Princeton University, where she also consulted with Educational Testing Services on an ASL Developmental Assessment with Dr. Judith Mounty. She did her senior postdoctoral work in cognitive neuroscience at the Center for Molecular and Behavioral Neuroscience at Rutgers, the State University of New Jersey and was eventually hired there as a Research Assistant Professor of Neuroscience, before moving to her current position in linguistics at the University of Southern Maine, where she teaches linguistics and interpreting, directs the Signed Language Research Laboratory, and developed and currently coordinates the ASL/English Interpreting Concentration of the Linguistics major. She has served as a Principal Investigator on grants from both the National Science Foundation and the National Institutes of Health. She engages in linguistic,

neurolinguistic, and cultural research in both spoken and signed languages. Her research is internationally recognized.

Dr. Shepard-Kegl is also nationally credentialed and working as an ASL/English interpreter with specializations in legal interpreting, educational interpreting, and medical interpreting, in addition to being nationally certified in oral transliteration. She has consulted extensively on both the assessment of interpreting (both spoken and signed), ASL language development, and language breakdown (Aphasia and Parkinson disease). She has served as a consultant on the development of the national assessments for the Cued Speech version of the Educational Interpreter Performance Assessment (EIPA-CS), the Core Certified Healthcare Interpreter Assessment, and is currently on the Registry of Interpreters for the Deaf Task Force exploring the structure of a future assessment for Legal Interpreters.

Dr. Rowley is a native signer of ASL, who is also fluent in English. She did her bachelor's level work in biology at Gallaudet University, the primary national post-secondary liberal arts institution for Deaf students in the U.S., although it is also recognized world-wide, and her master's level work in Deaf Education at Western Maryland College. She completed her Ph.D. work in Urban Education, Curriculum, and Instruction, with a focus in Second Language Acquisition at the University of Wisconsin, Milwaukee, with a dissertation on implementation procedures and identifying empowering practices in advanced studies programs in American Sign Language. Dr. Rowley also holds an American Sign Language Specialist Certification from Western Maryland College and has extensive experience teaching ASL and Deaf Studies. In her role as Associate Clinical Professor and Coordinator of American Sign Language Programs in the Department of Exceptional Education at The University of Wisconsin, Milwaukee she was responsible for overseeing five ASL-related programs at both the undergraduate and post-baccalaureate levels. Currently, as a full Professor in the Department of Modern Languages and Literatures at California State University East Bay, she does similar teaching and administrative work, including curricular development. At present she is also working for the University of Maine as a curriculum specialist for distance teaching of ASL, where she supports and trains Deaf instructors as they transition to distance education of ASL. Like Dr. Shepard-Kegl, Dr. Rowley is also a nationally recognized

authority in assessment. She has been involved with portfolio development and assessment for ASL Teacher Training Programs. She served on the American Sign Language Teachers Association Revision Task Force to redesign their Teacher Evaluation and Certification Program. She is currently the Chair of the Evaluations and Certifications Program under the American Sign Language Teachers Association which is the governing body for certifying teachers of ASL in the United States and beyond. Part of the responsibilities of the Chair includes coordinating evaluation assessment, coordinating training for evaluators, and assessments for candidates. Dr. Rowley has published on educational interpreting, the role of ASL in interpreter education, ASL and interpreter education programs, power and privilege, accessibility, and Deaf-related communication access legal cases.

The life experience of the members of this expert team complement each other and are also relevant to the assessments performed. Working in tandem we cover all the bases.

Dr. Rowley, who is Deaf, has full access to ASL and its communities of users, as well as a lifetime of experience navigating a hearing world visually without sound, brings to this expert team native competency in American Sign Language and fluency in English. She was raised in a bilingual/bicultural Deaf home, where ASL was the dominant language. However, she was educated in mainstream schools during the infancy of the IDEA (Individuals with Disabilities Education Act) and has experienced trying to access some of her education without interpreters. She currently lives in a bilingual household with her Deaf spouse and her two Deaf children and a hearing child, where the dominant language is ASL. She also has experience as a mother of children in Deaf and mainstream settings.

Dr. Shepard-Kegl, who can hear and has full access to English its communities of users, as well as a lifetime of experience navigating a hearing world via sound, brings to this expert team native language competency in English in addition fluency in ASL. She was raised in a bilingual/bicultural Slovene/English home, where English was the dominant language. She currently lives in a trilingual English/ASL/Nicaraguan Sign Language (ISN) household with her hearing spouse, Deaf daughter, and hearing grandson and has experienced being the mother of a Deaf child in a Deaf school and mainstream setting. Her

8

research and teaching experience include theoretical linguistics, bilingualism, neurolinguistics, and cultural research in not only spoken and signed languages, but also in emergent languages and cases of language deprivation.

Both Dr. Rowley and Dr. Shepard-Kegl have substantive prior experience as experts and have both produced reports and testified in deposition and at trial. A summary of the cases they have testified in is included in Appendix C. Dr. Shepard-Kegl has been admitted as an expert in courts in Maine, Minnesota, Oregon, Missouri, Louisiana, New Jersey, New York, Pennsylvania, Rhode Island, and Georgia, while Dr. Rowley's testimony preceded their collaboration and was in Wisconsin.

## People who are deaf, the Deaf Community and Deaf Culture

It is helpful at the outset of this discussion to define a few terms and to address several misconceptions that people may have regarding deaf people, their language(s), their culture, and their community.

**Deaf versus deaf.** Throughout this report, when we capitalize the word *Deaf,* we are referring to a person who not only has a hearing loss, but who also identifies with Deaf people and Deaf culture. This person is likely to sign American Sign Language and to seek out other Deaf people and attend Deaf events. This is referred to as a cultural perspective on deafness. When we leave the word *deaf* in lower case, we are referring specifically to a person's medical condition of hearing loss. This is referred to as the medical or pathological perspective on deafness. Sometimes the lines are blurred and a person who is hard of hearing identifies as ***culturally Deaf*** and vice versa, a profoundly deaf person may not identify with Deaf culture but still be profoundly deaf.

**Hearing.**  The use of "hearing person" while understandable is rather uncommon except in discussions where people who can hear are being contrasted with Deaf people.  We will use hearing both for cases in which a person physically can hear and for people who are coming from a perspective of mainstream, hearing culture.

9

**Hard of hearing versus deaf.** A person who is referred to as "hard of hearing" has a mild to moderate hearing loss and can with some difficulty (mild) or when using a hearing aid (moderate) hear sounds within the speech range. A hearing aid can benefit a person whose loss is mild to moderate by amplifying sound. An aid may help a person with a severe hearing loss to hear speech a bit better, but it will not completely correct such a loss. Loss of the ability to hear speech is not a matter of amplitude (loudness); it is an issue of the frequencies at which sounds resonate and whether these frequencies can be detected by a person's auditory system (the nerves in the inner ear that carry sound input to the brain). A person with a profound hearing loss cannot hear sounds within the speech range even when aided. The following chart illustrates these differences. The area in yellow, often referred to as "the speech banana," indicates the range in which speech sounds fall.



Being culturally Deaf means that a person is most comfortable in the company of other Deaf people. It means that they sign ASL, a language completely distinct from English in

modality (visual and gestural as opposed to auditory), grammar (polysynthetic (complex word-internal morphology) versus isolating (strings of words without much internal structure)) and use (differing pragmatics and discourse structure). And it means that the person views themself as a member of a cultural minority rather than as a member of the dominant hearing culture with a pathological deficit—deafness.

Being born Deaf of Deaf parents is a major (but not definitive) factor in predicting ASL as one's primary and preferred language. However, individuals falling into this category are also the most likely to have strongly mastered English writing and literacy skills. This latter correlation is attributed to the fact that such individuals have had a language (in this case ASL) from birth and, therefore, their English acquisition is building upon a strong first-language base.

Attending a residential school for the Deaf is another major factor because this maximizes exposure at an early age to strong ASL language models and to Deaf culture. Beyond these, additional factors indicative of individuals who are likely to be culturally Deaf are the group they choose for social interaction, membership in Deaf organizations, marriage or significant relationships to a Deaf partner, and choice of an occupation that would require little use of English on a day to day basis and would also attract other Deaf people. These are attitudinal indicators of Deaf identity and cultural affiliation.

To better appreciate a greater feeling of affinity with Deaf peers, the chosen social community of many Deaf people, as opposed to their own families in which they may feel foreign, we recommend reading the book, *A Journey into the Deaf World* by Harlan Lane, Robert Hoffmeister, and Ben Bahan.[1] A more detailed overview of American Sign Language appears later in this general section of the report.

There are some people who are profoundly deaf but do not use ASL. Some use more manual signing codes for English, some use Cued Speech (Cued Language) a system that supplements the mouth movements of speech (in real-time) with 8 hand configurations placed at various locations on the face, neck, and side of the face to distinguish those

---

[1] Lane, H., Bahan, B, and Hoffmeister, R. (1996). *A Journey into the Deaf World*. San Diego: Dawn Sign Press.

aspects of a spoken language that are not visible to a lipreader, and some use only speech and lipreading. These individuals tend not to be culturally Deaf. However, there are some who use both ASL and Cued Speech. Some of these individuals, especially ones with both languages (English and ASL) from birth can be bilingual and bicultural. Lipreaders tend to be late deafened or to have had more residual hearing growing up. Users of Cued Speech are far less in number than users of ASL ([http://www.cuedspeech.org/ncsa/about-the-ncsa](http://www.cuedspeech.org/ncsa/about-the-ncsa)).

## Misconceptions:

Before we move on to discussions of ASL and of Interpreting, we feel that it is important to discuss four misconceptions that people frequently hold when they encounter people who are Deaf and try to establish communication with them. These four misconceptions often stand in the way of Deaf people getting the accommodations for communication access that they need. Once these misconceptions are recognized, they support our expert opinion that it is important to take into serious consideration requests by a Deaf person who is asking for an interpreter or indicating that they do not understand. Deaf individuals know best what they themselves can reliably understand and what they cannot.

## Misconception: Nodding one's head is an indication of comprehension

When two people are communicating in English, the receiver often produces a variety of backchanneling signals to show engagement with the person who is talking. The listener may nod their head, which sometimes means agreement with what is being said. Other times shaking the head "no" can indicate disagreement or disbelief. Sometimes, but not always, nodding can mean I am listening and "I get it." Students learning ASL quickly learn that if they watch a Deaf person signing and nod their heads, the person will keep repeating what they are saying, assuming that the student has not understood them.

In Deaf culture, nodding one's head is an indication that the Deaf person is attending to you, but *not* that they are understanding you. ASL signers indicate understanding with a manual gesture of a hand repeatedly moving forward in the handshape of a Y (fist with thumb and index finger extended). This sign is frequently glossed as O-I-C (for *Oh, I see*).

When interpreters are understanding a Deaf speaker whose ASL they will subsequently interpret into English, nodding or a blind stare would mean lack of understanding (deer in the headlights); but a slow and repeated deep nodding and forward movement (almost a scooping) of the head and neck concurrent with the end of utterances can mean, "I get it, keep going." Hearing people are often confused when a Deaf person nods as a question is being asked.  They often assume the answer being given is a *yes*.  And then the person may answer with, "No" or "I don't understand."  One of the first, and much emphasized and repeated, lessons in Interpreting 101 is that nodding is not an indication of understanding. Nodding means, "I am attending to what you are saying," and not "I am understanding what you are saying,"  nor "I am agreeing with what you are saying." This is the point at which the interpreter is instructed to probe for understanding by asking an open-ended question or asking the person to repeat what was just said in their own words.

Another problem that arises because of the strain of conversing in a language that is not one's primary language is that frequently the second language user nods as if understanding, even when not comprehending--as a politeness measure, or just to keep the conversation going. Any of us who have learned a second language or who have conversed with a relatively new second-language learner of English have nodded or been nodded to when we understand very little of what is transpiring. We do so as a kind of politeness gesture to let the person keep going without interrupting every time a point is missed. We also nod when we want to get a conversation over with and aren't really paying attention. For example, "Yes dear. Unh huh. Unh huh." Deaf individuals who spend much of their time with hearing people in this state of non-comprehension are prone to doing this out of exhaustion or sheer frustration. A good interpreter will frequently check that the deaf person truly comprehends the transmitted message by probing with open-ended questions or simply checking for explicit comprehension, never by asking the yes/no question, "Do you understand?" Medical professionals (among others) often assess comprehension by engaging in a process called "teach back," where they ask the patient to summarize something that was just discussed. Interpreters use this technique as well either directly or via asking the hearing consumer to ask the Deaf person to reiterate what was just said.

13

In a situation with a hearing person where lipreading is used (or even where the type of signing used by a given interpreter does not effectively match the consumer), a deaf person will often eventually nod just to get the conversation over with because they are not getting effective access anyway. The hearing person, also pressured by the inability to make oneself understood in this context, readily accepts this nodding as confirmation of comprehension. The desire to believe that lipreading will suffice combined with nodding behavior on the part of a deaf person can lead an individual to attribute unrealistic lipreading abilities to a deaf interlocutor, when in fact, both participants are "faking it," and comprehension is severely limited or completely lacking. Such interactions can lead to the hearing interlocutor's deciding that an interpreter is not necessary, when on the contrary, very little communication is being successfully transmitted. For this reason, it is prudent to heed the request of the Deaf interlocutor when need for an interpreter is expressed. They often have a lifetime of suffering the consequences of impartial, skewed, or inaccessible communication.

This last point regarding "a lifetime of suffering the consequences of impartial, skewed, and inaccessible communication" needs to be emphasized and elaborated a bit. Without having participated in the life experiences of a Deaf individual (including situations in which interpreters have not been provided or inadequate interpreters in terms of not being a match for the Deaf individuals have been provided), it is often difficult for a service provider to see the cumulative impact on the person that has now led them to request interpreting services, and interpreting services of a typical sort. It is also sometimes difficult for service providers to understand from a Deaf individual's perspective why after a single request that is denied by the service provider or that has not been heeded, the Deaf individual may "give up;" or why in other cases a single failure to provide an interpreter for a given Deaf individual might become "the straw that broke the camel's back." Both behaviors are possible, and both are plausible.

Consider elderly Deaf people whose experiences prior to passage of the Americans with Disabilities Act constituted a lifetime of being denied services. Their lives were equally impacted by the lack of interpreters, but they also have had a lifetime of experience not getting what they needed and can be resigned to their situation—resignation should not

be taken as satisfaction or adequate access. Over time, these older individuals were forced to rely upon family members or to just go without. Relying upon family members, who are by definition not impartial, brought with it a host of both privacy problems and empowerment problems.  These family members were given access to personal information the Deaf individual may have wanted to keep private. They are given the opportunity to skew or interject information to suit their own goals for what they would like to see transpire (to the benefit or detriment of the Deaf individual). Or worse, the Deaf individual may lie or withhold information that they might have shared otherwise but that they do not want the family member to be privy to. Very often recognizing that the family member is person that knows personal information about the Deaf individual and is more accessible to a service provider because they can hear and use the same language, the service provider will short circuit the process and begin asking information of the family member directly, disempowering the Deaf person as well as leaving them out of the communication loop.  This is a common occurrence, even when an interpreter is present in the room and is one of the factors they frequently have to deal with.

Let's be more specific to law enforcement contexts. Without access to an interpreter, the Deaf individual is not able to participate in services as an autonomous adult with the privacy they have a right to have.  Relying upon family members in the context of a parole officer sharing sensitive information about an underlying crime or sharing conditions on probation and parole can raise topics that the Deaf individual would rather not have shared with family members.  Asking probing, sensitive questions that intrude on privacy gives those family members access to information that the Deaf individual did not necessarily want to share with them.  It also gives those family members the opportunity to skew or interject information into their "interpretation" that may not be coming from the Deaf individual themself—information that serves the family member's personal agenda.  In addition, in an effort to avoid sharing private information with family members (that may have been willingly shared with the officer), the Deaf individual may lie or hold back information, jeopardizing the conditions of their parole. Finally, such situations the same dynamic of removing the Deaf individual from the loop and communicating directly with the language accessible family member frequently occurs.

Consider also the Deaf patient who seeks the best care and attention they can get from their busy nurses and doctors. They can often fear that persisting in requests can lead to frustration on the part of the provider because the provider's workload has now been expanded to include the procurement of interpreters. Deaf patients often feel that declining to review and sign forms without the aid of an interpreter could seriously delay or hinder their access to treatment. Consider the prisoner or parolee who fears that persistent requests for an interpreter or declining to communicate in the absence of an interpreter with have negative repercussions with the people who make decisions regarding reduced time and privileges in prison, or who fear a return to prison if they are on probation and don't cooperate with any requests, even ones they don't understand.

Some Deaf individuals, in situations where they perceive a power imbalance, often feel trepidation in persisting in arguing for their communication needs for fear of disruption of their rapport with service providers, which may lead to differential treatment or even retribution.

In summary, in contrast with most service providers, Deaf people have had a lifetime of personal negative consequences of not having communication access that have taught them to recognize their own limitations (and the limitations of their interlocutors), especially in high stakes communication situations. They know best when an accommodation is needed and what works and what doesn't.   Their perspective on such needs required serious consideration.

## Misconception: Being able to speak, means being able to hear

It is very tempting to jump to the following conclusion: If they can speak, they can hear. This is not true, and it is one of the most prevalent misconceptions that hearing people have regarding Deaf people. Deaf education has always been controlled by people who can hear and value the ability to speak. There is often a heavy emphasis on "training Deaf people to assimilate" into hearing society which focuses on one-way communication from a Deaf person to a hearing person—using speech even if they cannot hear it or reliably lipread it. This assimilation training is very oppressive for Deaf people because it ignores the importance of their equal access to two-way communication. Talking to a hearing

person who does not know sign language does nothing to ensure that what that hearing person says will come back to the Deaf person clearly.

The average deaf lipreader will catch approximately 30% of what is on the mouth (and typically that speech is predictable and highly routinized, like *What's your name? What's your address?*, etc.). Most speech is occluded from sight. For example, *mom* and *Bob* look the same. One cannot see that one involves nasal bilabial consonants (*mom*, dropping the velum while making exactly the same visible speech gesture, and the other (*Bob*) does not. Everything that can be seen is the same. One has to guess which word was intended and guessing opens up the possibility of more misunderstandings.

The same is true for hearing people trying to "understand" Deaf people who have poor speech. Many Deaf people have been trained and strongly encouraged to talk regardless of how clear their speech is. This can be problematic because both parties have no idea whether what they think is being said is actually accurate. Even when you are right, you cannot be sure.

It is also easy to make assumptions or judgments based on a person's speech. In addition to the assumption that if a person speaks clearly, they can understand clearly as well, we also see people holding the assumption that if a person's speech is not clear or is imprecise in articulation, then they are not smart. As a result, information provided to them is "dumbed down." This latter judgment juvenilizes Deaf adults. Being required to use speech forces a Deaf individual to present a persona that may fall far short of who they really are. This is one of the primary reasons that many Deaf individuals who have some limited speech ability often refuse to use it or feel very self-conscious and demeaned when doing so.

Except in highly exceptional cases, lipreading should not be relied upon for anything other than very superficial communication such as basic needs: *Where is the restroom? What's your name?* Anything more risks taking away the Deaf person's ability to fully and reliably communicate. Even more troubling is when lipreading is required by virtue of a lack of access to any other alternative such as signing or taking the time to write back and forth (while probing frequently for understanding, of course). Deaf people in this situation often

feel forced to accept this as the only option. They may think they are understanding what is being said, but they have no way to know this for sure. And they have had a lifetime of experience that speaks to the unreliability of lipreading. In addition, a Deaf individual who does not have a strong command of English is not only disadvantaged by the limitations of lipreading and impreciseness of their speech, but the unintelligibility of what they say can be exacerbated by a reliance on the grammar of their first language, ASL, to structure the output of their spoken English. In this case, only someone familiar with ASL grammar could decipher what they were saying.  In the same way that a deaf person cannot understand via lipreading a word their don't already know, a hearing person cannot understand from a Deaf person's speech words that are arranged in the grammar of a language with which they are unfamiliar, namely ASL.

## Misconception: Literacy is a matter of learning to crack a writing code

Before discussing the reading assessment tools (Appendix A) or any reading results (Individual Assessments), it is important to address what it means to learn to read as a hearing person who already knows English versus as a Deaf person who uses a signed language or, even worse, has no prior first language and is required to learn written English without the benefit of having heard it all their lives.

When a hearing person learns to read, typically around first grade but also possibly as an adult, what they are learning is to decode a written orthography and to "read aloud" words and sentences that are *already in their language repertoire*. This approach to reading is called *phonics*. Some individuals start with whole and memorization, but for English-speakers, this typically also leads to making phonological generalizations that soon help to break the code. The learner can sound out the words on the page and associate them with words and grammar that he or she *already knows*. If not, the learner would be limited to only reading words he or she has memorized as equivalents of words he or she knows in the auditory modality, resulting in very limited reading. Consider an example of learning to read. A hearing first grader who sounds out the following:

*The cat is under the table.*  **(/ðə kæt͡ Iz ʌndɚ ðə teybəl/)**

already understands and is able to speak the spoken version of this sentence in their everyday life well before they could read it. By age five or six, those of us who can hear and were being raised with auditory access to English could already understand much more complicated stories that were read to us than we ourselves could read. Books like the *Sally, Dick, and Jane* series that many older individuals learned to read with recognized this and used very basic words and sentences as we learned to crack the code.

  

For children who can hear, their English in the spoken/auditory modality is already fully developed before kindergarten. They are simply tasked with learning to decode a writing system (orthography) to access the spoken/auditory language of which they already have mastery. The outcome of "learning to read" is not the same for a Deaf child.

When a hearing person cracks the code, he or she can read anything. The only limitation might be new vocabulary items. This is why reading exams often build upon the foundation of vetted lists of vocabulary mastered at specific grade levels. When familiarity with the vocabulary is established and when the learner is exposed in a natural way to the spoken language and has acquired it at age-level, it can be presumed (based upon vocabulary recognition alone) that the learner already has the language in place to read at that grade level. For children who can hear, their English in the spoken/auditory modality is already fully developed before kindergarten. They are simply decoding a writing system (orthography) to access the spoken/auditory language of which they already have mastery.

Once *a hearing* person cracks the code, he or she can read anything. The only limitation might be new vocabulary items. This is why reading exams often build

upon the foundation of vetted lists of vocabulary mastered at specific grade levels. When familiarity with the vocabulary is established and when the learner is exposed in a natural way to the spoken language in their environment and has acquired it at age-level, it can be presumed that the learner already has the language in place to read at that grade level.

While there may be some missing vocabulary, and maybe for children some syntactic development to undergo (although not much), most people recall that moment of looking at a page of words as foreign and suddenly, when the code is cracked, seeing a familiar sight—a language they already know. Part of why school children are taught to read aloud, is to reinforce the experience that once they can sound it out, they can understand it.

We cannot project this same experience onto a deaf person learning to read. They typically come to school to learn a written form of a language *they do not already know*. They may come with prior fluency in a signed language (a language that is not remotely grammatically related to English), or they may come with no language base at all. Their experience is more like a monolingual English-speaker learning to read Russian Cyrillic orthography, which is a gateway into phonemically decoding Russian, not English.

**ILLUSTRATION:**

| Я не понимаю. |
|:---:|

Russian is even more transparent in its orthography than English: /ya ne ponimayu/. If the learner knows that Я = /ya/ and Ю =/yu/, he or she can work out the rest of the coding by matching the orthographic symbol to the corresponding sound (e.g, н=n, etc.).

One then can pronounce the Russian words. But not having grown up around the Russian language, one is not already a speaker (or comprehender) of Russian. So, without already having spoken Russian in one's repertoire, having broken the code for Cyrillic will not help the learner to read and understand Russian. Similarly, breaking the code for English allows English-speakers to understand the English that they already know but now written on the page. Because of lack of exposure to

Russian English-the  growing up, speakers lack foundation of competency in Russian, just spoken like a Deaf person (who is pre-lingually Deaf) will at some point in their life (perhaps forever) lack the prior foundation of competency for English.

If one were a fluent Russian speaker, sounding out /*ya ne ponimayu*/ would be instantly recognized as the Russian equivalent of "I don't understand." If the learner knew a few words of Russian, like *ne = not,* he or she might even get part of the meaning: *ya **not** ponimayu.* But the patchwork of understanding would be limited by one's pre-existing background in Russian vocabulary and grammar, which for most people not raised speaking Russian is not much.

Service providers cannot assume that because they have said something or written something down (even if the receiver can pronounce it and repeat it back to them), that the individual has understood it. *Farside* cartoons have played on severe cases of this, but it is sobering to remember that just because we produced language in speech or writing, it has not necessarily been understood as we think it has.  It is critical to remember the following *Farside* experience when looking at what a Deaf person can and cannot read as well as what they do when they read aloud.

When Deaf people read aloud, they often produce a sign for a word they know (not always the conceptually accurate sign, but one with a similar spelling) and fingerspell the ones that they do not. Their ability to fingerspell a word is simply the ability to transpose (or code) written letters into fingerspelled letters of the English alphabet. Fingerspelling does not indicate anything beyond the ability to code the written word into fingerspelling—just as the English-speaker transposes Russian Cyrillic into the pronunciation of unfamiliar Russian words and grammar. Ability to fingerspell does not mean that an individual understands what they have fingerspelled. It typically means that they did not. They can simply convert it from one meaningless symbol to another.

It is also possible to buy a phrase book and memorize certain sentences like *ya ne ponimayu* and use them to say *I don't understand*. This would work in specific contexts to convey information, but it would not foster understanding of each word's significance or the sentence grammar. The phrases would be unanalyzable wholes— equivalent to learning a word, but not something that could be productively manipulated to make new words and sentences.

Many Deaf people also have difficulty understanding syntax in the written English language. In most assessments of reading, vocabulary level is coupled with reading level. This is most blatantly evident in the San Diego Screening that will be discussed below. In fact, almost all reading tests are, at heart, vocabulary tests. They work on the premise that if one can recognize the vocabulary at a given grade level, they can read at that grade level. But, critically, the benchmark between someone at a third-to-fourth grade reading level and someone above that level has little to do with vocabulary. It concerns whether an individual can use syntax for reading comprehension. And if one has not mastered the grammar yet, they cannot use its syntax to understand sentences that they can "sound out."

## Misconception: If you know English well, you don't need interpreters

One of the hardest requests for accommodations for hearing service providers to wrap their heads around are requests from the 8% of Deaf consumers, like Dr. Rowley for example, who have proficiency in English, but do not have the sensory access (hearing) that allows them to reliably access the spoken English in their environment.

Out of necessity, all Deaf people in the U.S. are expected to be bilinguals who may use ASL for face-to-face communication but rely upon some form of English for written communication in non-face-to-face situations or when spoken communication breaks down. ASL does not typically have a written version associated with it,[2] so many Deaf individuals use one language for face-to-face communication (ASL) and another language

---

[2] There are written systems for signed languages. One such writing system is SignWriting (www.signwriting.org), which codes signed communication into a written form, using a set of symbols (adapted over time from dance notation) that capture handshapes, movements, facial expression, eye gaze and body posture. SignWriting is used internationally, but its use is not widespread. It has very limited use in the U.S. As with any written system, while it can be re-produced from the written form, understanding it depends upon already knowing the signed language that is written.

for written communication (some level of English). However, as stated earlier in this report, fluency in English is often more challenging for Deaf individuals because of lack of access to the spoken English around them and poor educational upbringing, often resulting from conflicting philosophies in Deaf Education. As a result, there is a significant majority of Deaf people who remain at a third-grade reading level all of their lives. This is below the point where students finally transition from "learning to read to reading to learn."

It is beyond the third-grade reading level that students use syntax (sentence grammar) to decode meaning, rather than relying upon expectation. For example, you don't need syntax to understand the meaning of *The dog bit the mailman* or even *The mailman was bitten by the dog*. You can use your word knowledge and world knowledge to predict the intended meaning. However, to successfully decode and understand *The dog was bitten by the mailman* (an unexpected event), syntax needs to drive the interpretation of the sentence. One cannot rely on other strategies like expected events.

Since many individuals who are Deaf haven't learned how to read with full efficacy, the skills needed to read to learn aren't present and English usage remains low. Yet, 6-10% of the Deaf population are born to either one or two Deaf parents themselves. This small percentage is more likely to have full communication access from birth since they can share their parent's signed language. The chances for this portion of the population (Deaf parented Deaf individuals) to be balanced bilinguals in both ASL and English is much higher than for the rest of the Deaf population.

Being a balanced bilingual means that one will navigate both ASL and written English with much more ease than other Deaf people. Yet, sensory access to *spoken language* still remains out of reach for these people despite being balanced bilinguals. Having competency in written English does not mitigate the need for an interpreter, especially when people who can hear typically access interactive communication with their service providers primarily through spoken communication instead of written communication.

For people who can hear, communicating in spoken language is less cumbersome, much more efficient, and much more spontaneous than communicating through written

language. The same is true for the use of signed language by Deaf people whose primary and preferred language is ASL. While a Deaf signer who is a balanced bilingual in ASL and English might be accommodated by CART (Communication Access Real-time Translation; where a trained stenographer types the message and it appears for the Deaf person on a computer screen), this would be a secondary preference because it also requires scheduling and compensation for the stenographer (similar to contracting with an interpreter) and tends to require attention to the computer screen, distancing the Deaf person from direct interaction with their interlocutor(s), especially in meetings with more than one person. CART can be preferred by such individuals in some classes or meetings where precise access to the exact English form is prioritized over personal interaction.

One might think that another logical alternative is to just write back and forth. Before embracing that option, think for yourself whether you, as a consumer would want to have your interactions with your service providers exclusively via writing back and forth. Would the interchange be truly parallel?

When written communication is expected to be used as the primary form of communication, law enforcement personnel and other individuals tend to rush through and reduce how much they write, since the time needed for writing is much more labor intensive and time consuming than for a spoken language interchange. As a result, the Deaf person is shortchanged from a full discussion on the legal issues. This often leads to the Deaf person "being left in the dark" due to communication limitations.

Setting aside a variety of disincentives to writing back and forth including less use and proficiency with script and more reliance on printing as well as the fact that only a small percentage of Deaf people read English with native-level proficiency, requiring additional probing for understanding, clarification, and contextualization and expansion of information, the law enforcement domain still presents many obstacles for Deaf people when relying only upon written communication.

The legal system is very difficult to navigate even for a hearing person who may not know all the necessary vocabulary or expected rules of behavior. Even a Deaf person with fluent ASL and competent written English may have a low fund of knowledge in this area. Part

of acclimating to such settings, learning how to behave, as well as much information comes from a fluid interchange with the people around them and from overhearing the interactions of others as well.

Deaf balanced bilinguals are also much more likely to have received more academic training. And, with this education level, they want to understand legal issues they may have in more detail. They will ask more questions and expect more detailed answers. This takes more time in a back and forth interchange. Writing takes a long time and as a result people on both sides of the dialogue tend to share less information. This leads to frustration from both parties and curtailed communication. As a result, a Deaf person restricted to reading and writing will not be able to share and access as much information as a hearing person interacting with a hearing service provider using speech.

## <u>Background on American Sign Language</u>

In addition to the misconceptions addressed above,  a very common misconception is that American Sign Language is just a manual coding of English on the hands. *This is not true.* American Sign Language and English are two completely distinct languages that are mutually unintelligible and do not even fall into the same typological categories the way French Italian, and Spanish (Romance languages); or English, German, and Dutch (Germanic languages) do. They grammatically differ in how they mark subjects and objects, in how they ask questions, make relative clauses, order information in the sentence, mark gender on pronouns, omit versus require pronouns in subject position, use prepositions, mark verbal aspect (duration, iteration, etc.), tense (present, past, future), as well as adverbials (carefully, recently, etc.). They are as different from one another as English is from Russian, for example—even more so. In fact, in terms of language typology they fall into even more distinct typological classes. English (like German, Spanish, French, and even Russian) is an *isolating language* that tends to express information in a sequence of isolated words configured in a particular sentence order relative to one another. There is a limited morphology in English that typically adds suffixes to words to indicate person, number, and tense. American Sign Language (like many of the Native American languages (e.g. Algonquian languages,

Greenlandic Eskimo, etc.), on the other hand, is *a polysynthetic language*, with a complex verb-internal morphology that can express via a single word the same kind of information that entire sentences in English convey. These languages differ not only in the modalities in which they are expressed (auditory versus visual) but also in way words are formed, sentences are arranged, and syntactic signaling of questions, conditionals, relative clauses, topics, and other constructions are done.

An interpreter needs to take the input from one language, understand it, and, concept for concept, convey that information in the grammatical forms of another language. Consider some interesting points of confusion for a hearing interlocutor observing ASL. The examples given in this section are characteristic of ASL and not taken from the evaluated plaintiffs in particular. The remaining examples in the individual assessment sections are taken from the evaluated plaintiffs directly.

Suppose a Deaf signer voiced concurrently with signing the following compound sign GOOD^ENOUGH in ASL. The hearing interlocutor might assume that the utterance meant "sufficient, fine" when instead it means "barely adequate, with a lick and a promise."

In the following sign string, the letters *a* and *b* indicate locations in space used to mark the beginning and endpoints of signs to allow establishment of a relationship between a noun phrase referent (e.g., WOMAN or MAN) with a point in space (point a or point b). This is accomplished in ASL by signing the noun phrase and then pointing (IX) to a point in space (a, b, etc.). Later pointing back to those locations (IXa, IXb, i.e., pronouns) or verbs that spatially move *from* or *to* these positions (e.g., bHITa) serve to indicate who did what to whom. Because ASL also marks subject and object (more specifically, the indirect object or locative object that has been incorporated spatially on the verb), many orders are possible. The example below involves topicalization of the object, WOMAN, and the subject MAN in an afterthought position. Information about subject and object in English is conveyed through word order. The noun phrase before *hit* is the subject or agent; the noun phrase after *hit* is the direct object or patient. If one were to voice the nouns and verbs while signing the following grammatical sentence in ASL, a non ASL signer would misunderstand the sentence's intended meaning as "The woman hit the man," but an ASL

interpreter would have no problem ascertaining the correct meaning from the subject and object agreement on the ASL verb: "The man hit the woman."

> Concurrent mouthing/voicing:  woman      hit          man
> ASL signing:          WOMAN IXa,  hit,      MAN IXb
> meaning of glosses:  woman at-point a   person-at-point b-hit-person-at-point a MAN at-point b
> English Translation:  "The man hit the woman."

Obviously, if any factual determinations were being made here without the benefit of an interpreter, dangerous misunderstandings would be possible.

Another potential language-based misunderstanding concerns grammatical facial expressions marking wh-question sentences (those involving *who, what, why, when, how,* etc.) and relative clauses. In spoken languages like English, facial expressions play little role. In fact, for most people facial expressions serve in caricature (making faces) or in showing affect (emotion). However, while these uses are relevant to ASL signers as well, there are also sets of purely grammatical facial expressions that serve an essential grammatical role in the language. Grammatical facial expressions are distinct from affective facial expressions. However, for non-ASL signers for whom these expressions have no distinct grammatical meaning, these expressions are similar enough to be confused with affective facial expressions.  Two types of questions are marked by specific grammatical facial expressions: yes/no questions (questions requiring a "yes" or "no" answer) and wh-questions (questions involving *who, what, where,* etc.). Yes/no questions involve raised eyebrows and a forward projection of the head. Wh-questions involve furrowed brows, a facial expression often also associated with the affective facial expression expressing anger. Question facial expressions sometimes occur over a single wh-word and other times spread across the whole sentence. In these spreading cases they can be easily misunderstood by a non ASL-signing observer as affective in nature--in the case of wh-questions as anger and in the case of yes/no questions as surprise.

We will offer a somewhat extended discussion of relative clauses in ASL as one example of the nature of this language. Relative clauses in ASL are marked by a special facial expression that occurs over the relative clause as in:

> rc_____
> DOG CHASE CAT COME HOME
> "The dog that chased the cat came home."

Without the relative clause facial expression, the same manual string of signs would mean, "The dog chased the cat and it [the dog] came home." Or, it could mean "The dog chased the cat and it [the cat] came home." It all depends upon the spatial agreement on the verb.

DOG[*location a*] [aCHASEb CAT[location b] *a*COME[location of narrator] HOME
"The dog chased the cat and it [the dog] came home."

DOG[location a] [aCHASEb CAT[*location b*] *b*COME[location of narrator] HOME
"The dog chased the cat and it [the cat] came home."

If the verb COME agrees with the dog's location in space (*a*COME), the sentence indicates that "the dog came home." If it agrees with the cat's location (*b*COME), the sentence indicates that "the cat came home." Notice that the ASL word order is the same in both sentences. Only the spatial agreement differs.

If we spread the relative clause facial expression over the first clause in each of the two sentences above, we see an even more drastic difference between the grammars of English and ASL, especially their word orders. Notice that the word order for ASL doesn't change at all, only the spread of facial expression and the spatial agreement.

<u>                                          rc           </u>
DOG[*location a*] [aCHASEb CAT[location b] *a*COME[location of narrator] HOME
"The dog that chased the cat came home."

<u>                                            rc           </u>
DOG[location a] [aCHASEb CAT[*location b*] *b*COME[location of narrator] HOME
"The cat that the dog chased came home."

If the facial expression spread instead over CAT COME HOME, the sentence would mean "The dog chased the cat that came home."

Relative clauses involve a tensing of the cheek muscles and a raising of the upper lip spread over the relativized clause (somewhat similar to the English affective facial expression for disgust). While very different from relative clauses in English, which involve a movement of the relativized noun phrase to the head of the clause, creating a complex noun phrase (e.g., <u>The dog</u> that chased the cat __; or <u>The cat</u> that the dog chased __), the relative clause construction in ASL is within the range of possible relative clauses that occur cross-linguistically. They are much like what is referred to as the "tonosyntax"

of relative clauses in the African languages like Hausa, where a relative clause is marked by a tone that spreads over the relative clause. In ASL, a facial expression is spread over the relative clause without any change in word order or use of a complementizer like *that* or *which*. The closest to what happens in English might be when instead of using the question form of a sentence like *Did he leave yesterday?* we just use a change in intonation to indicate what is called and echo question: *He left yesterday?*

We have presented this expanded example of relative clauses to make the point that American Sign Language, and signed languages in general, are fully fledged members of the class of human languages, with all the structure and complexity of any other language in that class. We have used these examples to point out that ASL is a distinct language that is typologically very different from English. To assume otherwise, as many individuals unfamiliar with signed language may do, opens up the risk of serious communication breakdowns.

The overlap of components of grammatical and affective facial expressions increased the likelihood that non-ASL signers observing ASL conversations will misinterpret a signer's emotional affect. For example, the relative clause facial expressions discussed above have been reported to be confused by non-signers with the facial expression for disgust. Interpreters circumvent this misunderstanding by conveying the signer's actual affect in their voice quality and by explaining the role of grammatical facial expressions if such a misunderstanding were still to arise.

Another potential difference is the fact that ASL is a "null subject" language. This means that in cases where the reference is recoverable from context or from agreement on the verb, subjects may be omitted. In fact, it is stylistically preferable to omit them. Note the missing referents (labeled as "[e]") in the following passage:

> [e] TAKE [e]. [e] THINK-BUBBLE-OPEN(imagine)  [e] FLY [e] TAKE THINK-BUBBLE-CLOSE
> 'He (Mr. Koumal) took them (the feathers) and he imagined himself flying.'
>
> [e] CLIMB-UPWARD++ [e] JUMP-OFF [e] [e] FALL-DOWN-right, down
> 'He climbed upward on the mountain, jumped off of it and he fell down.'

**High Context and Low Context Discourse.**  How individuals express information can vary based on their language and culture. We mentioned earlier how ASL and English differ in backchanneling and how understanding of the message is conveyed. Let's consider a difference between the typical deaf and hearing experience. Hearing individuals are bombarded throughout their day with information about news events and popular culture by radio, TV, overhearing of casual conversation, newspapers, etc. As a result, when hearing people communicate, they presume a great deal of shared knowledge about current events and popular culture. Hearing people speak in abbreviated terms because they presume this shared knowledge. Deaf individuals have less access to information in the ambient environment. They must actively seek it out and definitely miss the redundancy of hearing every issue mulled over numerous times in the passive overhearing of others' conversations. A consequence of this is that in introducing a new topic or answering a question, there is a tendency for a deaf person to go to great lengths to establish the background and context of the new information to be conveyed. An answer to a yes/no question can get a prelude that at times seems to the hearing person like an autobiography or daily diary of events as the signer contextualizes their response. If interpreted verbatim, it comes across as overkill. Frequently, the deaf person's response is cut short on the assumption that there is too much irrelevant information and the response is taken to be a non sequitur. In contrast, a hearing person's conversation comes across to a Deaf person as curt, often sketchy--sometimes as the intentional withholding of information.

In social interactions, similar presumptions can leave a Deaf participant feeling left out. Hearing people presume that individuals present at an event can get the gist of what's going on from passive observation and monitoring of the proceedings. But, hearing the conversation and having a context for what is being said is crucial to this process. Thus, without a concerted effort to include Deaf participants and fill them in on what is happening, they will remain in the dark.

## General Background on Interpreting

**When is an interpreter needed?** Deaf individuals are likely to request an interpreter in situations where they are anxious to be sure that they are able to share and have addressed all their concerns. In the case where Deaf individuals do request clarification on points missed (when they can determine this), a tension can arise between the hearing person and deaf individual as a result of added time, effort and frustration in the communication context. This is a situation most Deaf individuals are all too familiar with. It adds to the stress of the situation because the Deaf individual fears that the services that they receive may be compromised or withheld as the result of a negative rapport with the service provider.

The best rule of thumb is to take a Deaf person's request for an interpreter as a valid indication of need. They know themselves well and know best where communication breakdowns and unreliable communication are likely to occur. It is also important for service providers to recognize they need reliable communication as well and if they sense that communication is not happening, even if the Deaf person does not request one, that an interpreter should be offered. We would not hesitate to do so if the other person were speaking Chinese or French and we don't understand them or they don't seem to be fully understanding us. Not doing so with ASL can follow from the misconception that ASL is "English on the hands" or the assumption that ASL is not a language—both invalid assumptions.

In addition, the Deaf individual is in the best position to determine that a particular interpreter, interpreting team, or other accommodation may not be a good match for them. They may only be able to explain this as, "I don't understand," but they know a breakdown is occurring.

## Interpreting and Credentialing of Interpreters:

In this section, we will review the range of credentials that can be encountered when seeking interpreters. Not all of these credentials would indicate an appropriate interpreter match for a law enforcement situation. However, it is important to review the range of credentials that exist because any of these may be listed as a "certified" interpreter.

So, in law enforcement or legal contexts where rights, obligations, or rules may be discussed, and where there is a possibility of arrest or incarceration or other related power dynamics at play, it is not only prudent to seek certified interpreters, but it is also preferable to seek certified interpreters with a specialization in legal interpreting. Regardless of the setting, if the individual's fund of knowledge is limited, or their signing is compromised or atypical, not every interpreter may be a reasonable match. It would be best in these circumstances to consider a Deaf / Hearing team, which includes a Deaf ASL interpreter familiar with a much wider range of signing variation in ASL. If the person's communication is indicative of severe language deprivation bringing in a Deaf ASL interpreter may not offer the best match—a visual / gestural specialist as opposed to an ASL interpreter may be a better match. Sometimes it takes feedback from the Deaf consumer, recognition by an interpreter that they are not the appropriate match, and access to resources the interpreter or interpreting agency can offer to get the right match.

Finding the right interpreter can be a bit like buying clothes. Most people can buy right off the rack. Others need their clothing altered, or even custom made. Once the consumer tries it on, they can feel and see if it's a good fit. Sometimes, they have to send it back and try something different. Sometimes the person keeps the item, tries to make do with what they got, but it doesn't quite work.  Other times they can't figure out how to return it and it just hangs in the closet unused. The latter would be the Deaf person nodding even though they aren't understanding.

There exists in the United States the National Registry of Interpreters for the Deaf (RID, Inc., 333 Commerce Street, Alexandria, VA 22314; www.rid.org). Until 2016, this body was responsible for the evaluation, certification, and professional maintenance of interpreters nation-wide. Since 2016, RID has shifted responsibility for evaluation and certification to an independent entity and remains focused upon being a registry of interpreters and documenting professional maintenance of signed language interpreters nation-wide. In June 2016, RID established the Center for Assessment of Sign Language Interpretation, LLC (CASLI) to take over the ongoing development and maintenance of credentialing exams. The change-over to a new credentialing system and the development of new credentialing tests has been slower than expected and has been slowed even more by the COVID 19 pandemic.

In 2016, the Specialist Certificate Legal (SC:L) and The Oral Transliterator Certification (OTC) examinations were discontinued. In addition, as of 2016, there is a moratorium on the Educational: K-12 certification (ED:K-12), although the qualifying assessment, the Educational Interpreter Performance Assessment (EIPA) is still offered. Previously passing the EIPA knowledge exam and a score of 4.0 or higher on any one of the six performance exams plus an education requirement of a BA or higher was recognized by RID as ED:K-12 certification. There is a moratorium until RID establishes a set of criteria for recognizing tests other than those developed by RID. Once these criteria have been set, the ED: K-12 as well as other non-RID developed tests like the BEI (discussed below) may be recognized and added to the list of certifications. All previously awarded certifications, such as ED: K-12 and retired certifications, are still recognized by RID.

Passing the RID certification generalist test (CI and CT; CSC; or RSC for Deaf interpreters) or the current RID/NAD National Interpreter Certification (NIC) test or the CDI test for Deaf interpreters assures the <u>minimum</u> standard skills in American Sign Language and English, the interpreting process, and ethical decision making to adequately interpret.

The CDI written test is currently available, and a new performance test is under development. Both the NIC written test and performance tests are currently available, however, a new performance test is expected to be released in a few month (depending upon COVID-19 delays. The CI and CT tests, as well as the previous CSC (Comprehensive Skills Certification) and RSC (Reverse Skills Certificate; focusing specifically on interpreting skills from ASL into English) are no longer offered. The NAD test is also no longer administered. All prior certifications are still recognized.

**Certifications for interpreters who are Deaf.**   It is generally accepted in professional *spoken* language interpreting venues that an interpreter interprets into their A (native) language, not their B (second) language.[3]

---

[3] Seleskovitch, D. 1968 *L'interprète dans les conférences internationales, problèmes de langage et de communication*, Paris, Minard Lettres Modernes, 262 p., 2ème édition 1983. Translated into English as *Interpreting for International Conferences*. 2nd revised edition, Washington D.C, Pen and Booth, 1994.

In high stakes spoken language interpreting (typically interpreting in international conferences), when native fluency cannot be assured on both sides of the interpreted exchange by a single interpreter who is a balanced bilingual with native-level fluency in both the languages in use, a second interpreter is brought in and as a team the two interpreters provide native-level services. Beyond conference interpreting, there are cases where spoken language interpreters are weaker in one language than another.

When a Spanish, Somali, or Chinese interpreter is brought in to a healthcare encounter or law enforcement situation, that interpreter is typically strongest in the language used by the patient as opposed to the majority language (English) used by the dominant language user—the healthcare provider or law enforcement officer. As a result, the service provider, as the receiver of the weaker language interpretation, is in a position to monitor the quality of the interpretation and request a change in interpreter if necessary. Such requests are usually heeded since the service provider has more influence within the situation than the patient does.

The field of sign language interpreting is not unique in also having many practitioners who are natively fluent in only one of the languages they interpret between. However, they are unique in the fact that the interpreter's weaker language (ASL) is typically the one used with the minority culture patient and not with the service provider. As a result, it is the Deaf consumer rather than the hearing provider who is best able to monitor the quality of the interpretation. However, the Deaf consumer does not typically wield the same power and influence in an institution as a service provider working for that institution would. As a result, sub-par performance is harder to detect and less readily acted upon.

To reiterate, service providers who can hear and speak English as their primary language expect native-level interpretation into English. In the case where spoken language interpreters are not balanced bilinguals, their weaker language (or B language) is typically used with the service provider, who is typically a native speaker of the dominant language. This means that the doctor or nurse, lawyer or police officer, or any other consumer from the dominant culture has the ability to monitor the effectiveness of the interpreter working into their weaker language. This is typically *not* the case in

34

interpreting situations involving signed language interpreters. Most sign language interpreters are members of the dominant culture and native speakers of English. Most are second-language users of ASL and have learned it in adulthood. Hearing service providers hear an interpreter working into their native language (English) and can only monitor for short fallings in the ASL interpretation to Deaf consumers via non-sequiturs from their Deaf interlocutors. This difference in the experience of dominant language service providers is significant and speaks strongly to the need for service providers to take special heed of the feedback from Deaf consumers regarding the effectiveness of the interpretation.

The only way to assure native-level interpretation to Deaf consumers is to use interpreters who are balanced bilinguals (typically Deaf parented interpreters) or to use a team of a certified Deaf interpreter as the interface with the Deaf consumer and a native speaking hearing interpreter as the interface with the service provider. Consumers of ASL/English interpreting services, particularly from interpreters not vetted via credentialing in their language and interpreting skills, need to be aware of this potential imbalance in language proficiency and cognizant of the fact that what their consumer is receiving could be considerably less fluent and culturally matched than what they themselves are receiving.

Those of us who are hearing expect native-level interpretation into English. And most of the time, we get it, even in encounters with ASL/English interpreters, since most of these interpreters are native speakers of English. Even if the interpreter had issues with comprehending the ASL, what comes out in English at least sounds good to us. We are less able to recognize when the interpretation isn't working for the Deaf consumer.

**Interpreter Credentialing:**

The overview of interpreting here covers the range of interpreter credentialing broadly.

**Certifications for Interpreters who are Deaf.**  Interpreters who are themselves Deaf and hold the RSC or CDI certification are critical to the provision of linguistically and culturally effective interpreting services.  Deaf interpreters have an intimate familiarity with Deaf culture and are recognized by Deaf consumers as sharing their culture. They are also more likely to be heritage language users who have native-level proficiency in ASL. They have grown up with ASL and intense interaction with the Deaf community (in

school as well as in social interactions). As a result, they are familiar with a much wider range of dialects and idiolects of ASL as well as greater familiarity with using non-linguistic gesture for communication with individuals without a formal signed language in their repertoire, with atypical signing, or whose fund of knowledge in all or in some specialized contexts may be low. Deaf interpreters are skilled at bridging the communication gap for these individuals with atypical communication or limited world experience.

Deaf interpreters are also more adept at providing an ASL interpretation that provides a native-level rendition of the target signed language and are preferred especially in high stakes situations in medical, legal, academic, or professional settings where emotions, stressors, or demands may be high. These are situations in which Deaf consumers need to focus their attention on processing and comprehending the information being conveyed without the hindrance of compensating for the less nuanced ASL interpretation of a second-language user of ASL. The less schema (background knowledge or experience) a consumer has in a given setting, the more essential it is to have interpretation that achieves a native level of expression on both side of the communication equation. Notice that currently emergency broadcasts for high stakes situations (natural disasters, the COVID-19 updates and advisories, etc.) are more often being interpreted by Deaf/Hearing interpreting teams. The person the public sees on screen signing alongside public officials is, in most cases, a Deaf person working in concert with a hearing interpreter that is signing the information to them which they then assure is being transmitted in fully grammatical, native level, ASL signing.

Research has shown that individuals in pain, stress, or emotional duress actually exhibit a reduced ability to process language input. Studies by Elizabeth Bates and her colleagues tested language proficient elderly individuals pre- and post-hip replacement surgery and showed that individuals who tested as fluent processors of spoken languages pre-surgery exhibited evidence of aphasic (severely language deficient) processing in the extended painful period of recovery post-surgery.[4]

---

[4] Blackwell, A. &, Bates, E. (1995). Inducing agrammatic profiles in normals: Evidence for the selective vulnerability of morphology under cognitive resource limitation. *Journal of Cognitive Neuroscience*, 7(2), 228-257.

The same has been found for individuals with clinical depression. Patients with medical appointments tied to potentially serious medical prognoses are often encouraged to bring along a friend or family member that can better process the information and support the patient at such difficult times. Under stress, when in pain, or in situations where the information is dense, complex and unfamiliar; the cognitive resources needed for an individual's language processing are diverted to coping with the stressors at hand and language processing is compromised. In such situations the language provided must be natively fluent and adapted to the individual's processing needs.  Dr. Shepard-Kegl, who works frequently in high stakes medical and legal settings, often finds that the same individual she may work with alone in community or low-stakes settings may well require a Deaf/hearing team for effective communication access in high stakes situations.

Currently, Deaf interpreters can hold the generalist CDI certification, the older Reverse Skills Certificate (RSC; retired), or the Specialist Certification: Legal (SC:L; retired) from RID. RID no longer offers or recognizes the Conditional Legal Interpreting Permit-Relay (CLIP-R) or the Provisional Certified Deaf Interpreter Certification (CDI-P) that offered a temporary legal certification without a credentialing test to Deaf and hard of hearing interpreters who met stringent training and mentoring requirements without having a test available. They do, however, currently offer the Provisional Deaf Interpreter Certificate (PDIC) to qualified Deaf individuals until the new CDI performance test is released.

**Certifications for interpreters who can hear.**  When first introduced, the RID National Interpreter Certification (NIC) had three levels of achievement: NIC, NIC-Advanced, and NIC-Master. The NIC was considered the minimal level of skill needed to interpret. NIC-Advanced (like the old CSC) recognized a higher level of achievement on the same test. NIC Master did not recognize a yet higher level of achievement in interpreting skill than that recognized by NIC-Advanced; rather, it recognized a higher level of achievement both in interpreting skill and in ethical reasoning. While the test was psychometrically valid, there was a lot of concern among the membership that a test developed to assess

---

Dick, F., Bates, E., Wulfeck, B., Utman, J., Dronkers, N., & Gernsbacher, M. (2001). Language deficits, localization and grammar: Evidence for a distributive model of language breakdown in aphasics and normals. *Psychological Review*, October 108(4): 759-88.

the minimal level of skill needed to interpret should also be used to also document higher levels of skill. In response to much argument, on December 1, 2011 the three levels of attainment on the NIC test were discontinued and a revised single-level version of the NIC was introduced that remains to date a test of the minimal skills required to interpret in the field. This test will soon be replaced by a new version with the same assessment goals.

At the National Convention of the Registry of Interpreters for the Deaf in Atlanta, Georgia in 2011, the RID gave the reasons for making the NIC a single-level test and intentions in the future to develop completely independently a second level test (NIC II) that would assess interpreters at a higher level which would qualify them to seek specialist certifications in areas such as legal and medical. This second level of testing has not yet been implemented, nor has the means by which future specialist certifications will be handled, e.g. via testing, portfolio submission, etc. However, there are Task Forces at work addressing such issues. Should new credentialing mechanisms be introduced, all previously awarded credentials will still remain valid.

A few other forms of national credentialing, other than RID Certification, are also recognized by the Registry of Interpreters for the Deaf. The two most prevalent are the National Association for the Deaf Certification (NAD III-V) and the Educational Interpreter Performance Assessment (EIPA) with a score of 4 or above out of a possible 5, plus successfully passing the EIPA Knowledge Exam.

**NAD Certification.** The NAD Certification test is no longer given, but it is still recognized as certification and RID maintains NAD certification for interpreters who continue to acquire the required number of approved Continuing Education Units (CEUs) every four years. The NAD test has five assessment levels: Level I (Novice I), Level II (Novice II), Level III (Generalist), Level IV (Advanced), and Level V (Master). The three certified levels are described as follows:

> **Level III** (Generalist) The individual who attains this level possesses above average voice-to-sign skills, and good sign-to-voice skills, and demonstrates the interpreting skill necessary for some situations.

38

**Level IV** (Advanced): The individual who attains this level possesses excellent voice-to-sign skills and above average sign-to-voice skills, and demonstrates the interpreting skill necessary for most situations.

**Level V** (Master): The individual who attains this level possesses superior voice-to-sign skills and excellent sign-to-voice skills, and demonstrates the interpreting skill necessary for just about all situations.

NAD certification cannot really be compared with the RID certification. It came about at a time when RID was offering separate certification for Interpretation (CI, working into ASL as a target language) and Transliteration (CT, working into Conceptually Accurate Signed English as a target language). Being certified as a CI or CT reflects completely disparate skills. Transliteration may not be appropriate for many ASL signers, just as ASL Interpretation may not be suitable for signers more familiar with heavily English-influenced or English-based forms of signing. NAD took the position that while an interpreter may favor one or the other, they should have the ability to serve both types of signers. This shift in priority is reflected in the current NIC assessment that RID and NAD developed in collaboration. A characterization of the skill levels of NAD tested interpreters appears below:

**Level 1**: POOR/MARGINAL PERFORMANCE
This person demonstrates very little skill on a given task; scattered phrases or concepts may be completed correctly but the person has trouble conveying smoothly all that is voiced or signed. Misses more than is acceptable, pauses too often; demonstrates jerkiness and lags too far behind. May fingerspell too much, use conceptually incorrect signs, or demonstrates distracting mannerisms. Not at all ready to interpret.

**Level 2**: BELOW AVERAGE PERFORMANCE
This person may demonstrate ability to facilitate communication on a basic level but unable to complete task according to generally accepted interpreting standards; may do well in some parts, then do poorly in other areas. Exhibits weakness, i.e.: too much deletion, too much fingerspelling, and use of conceptually incorrect signs. May demonstrate reasonably good ability in voice to sign interpreting in straight English interpreting situations but fare poorly in sign to voice situations where reliance on ASL may be necessary. Might be of some assistance in a simple one-on-one situation where only manually coded English would be required.

**Level 3**: AVERAGE PERFORMANCE
This person demonstrates good interpreting abilities; skill shown is acceptable in meeting generally accepted interpreter standards. Occasional words, or phrases may be deleted in order to keep

up with speaker or signer, but the expressed concept is accurate. Performance is generally accurate and consistently so; and someone you would feel reasonably comfortable with in most interpreting situations.

**Level 4**: ABOVE AVERAGE PERFORMANCE
This person demonstrates above average skill in any given area. Performance is consistent and accurate. Fluency is smooth, with very little deletion, and the viewer has no questions as to the candidate's competency. Should be able to interpret and interpret well in any situation.

**Level 5**: SUPERIOR PERFORMANCE (IF NOT A NATIVE USER, THEN COULD ALMOST PASS FOR ONE) This person demonstrates excellent to outstanding ability in any given area. Performance is practically without flaw and this is the person you would go out of your way to seek to interpret for you.

While all three upper NAD certifications are recognized, in actual practice (job descriptions, various qualifications, etc.) NAD IV and NAD V are recognized as being in the same ballpark as having both a CI and CT or having the NIC. A person with only NAD III is characterized as demonstrating "the interpreting skill necessary for some situations." *Some* is the relevant word here. NAD III interpreters would not be considered ready for specialized interpreting venues requiring advanced level skills such as legal and medical, or even for many community jobs. The level III certification exists because NAD, representing Deaf consumers, felt that one thing lacking was a certification that recognized beginning level interpreters identified by members of the Deaf community able to handle some assignments vetted as appropriate by Deaf consumers. NAD III fills that void, but is not intended as approval of these interpreters for all situations.

**The Educational Interpreting Performance Assessment (EIPA).** The EIPA was developed as a means of assessing educational interpreters working in K-12 settings. There are five levels of skill. Like the NAD test, the first two levels are not really considered interpreter ready. There are some states that accept a 3.0 for working educational interpreters, but most states require a 3.5 or above. A study was done by EIPA to see what level on the EIPA was achieved by certified interpreters and they found that a level 4 or above was typically achieved by RID certified interpreters taking the EIPA test. Of course, this also depends upon familiarity with working in K-12 settings. The RID recognized passing the EIPA written test plus scoring at a 4 or above on the performance

test of the EIPA to satisfy the certification requirement for educational interpreting in K-12 settings. Until 2016, RID awarded the ED:K-12 certification to interpreters who could document these achievements on the EIPA. Educational interpreting is a specialized domain of interpreting, so every certified interpreter would not necessarily have the background and skills necessary to work in K-12 settings; nor would all interpreters with an ED:K-12 certification be qualified to work in community settings. In addition, the EIPA assesses an interpreter's ability to work with school age children, still in the process of academic development and language acquisition. The RID tests to date have not assessed the ability of interpreters for interpret for children.

Like educational interpreting, medical and legal interpreting require specialized experience and knowledge.

Medical interpreting has never had a specialized certification from RID. There is a written test through the International Medical Interpreters Association (IMIA). While IMIA has a commitment to developing a performance assessment for each language, they have only developed tests for a handful of languages thus far and are exploring ways to certify the other languages, either through tests or a portfolio system demonstrating competencies.

Recently, after analyzing feedback and market research data and in consultation with two nationally recognized psychometricians, the Certification Commission for Healthcare Interpreters (CCHI) has recognized the CoreCHI (Core Certification in Healthcare Interpreting) as on a par with core or generalist certification in other professions. Testing for this certification is now offered to all medical interpreters working between English and any other language, including ASL. The exam requires documentation of prior experience in general interpreting as well as language proficiency and tests medical interpreters on specific knowledge in the medical setting as well as:

> …critical thinking, ethical decision making and cultural responsiveness skills needed to perform the interpreter's duties in any healthcare setting.

> CoreChi certification also allows all hospitals, health systems, and healthcare providers to show their compliance with The Joint Commission's interpreter qualifications requirement and National CLAS Standard 7. (http://www.cchicertification.org/news/corechi-announcement).

**Specialization of Legal Interpreters.** Until 2016, RID offered a certification in legal interpreting, the *Specialist Certificate: Legal (SC:L)*. It is currently a retired certification because the testing materials had become outdated and because of fiscal concerns. RID has been working to assure that all the generalist certificates for Deaf and hearing interpreters are updated and available. However, there is a recognition among legal interpreters and the RID that some credentialing for legal interpreting is needed, and there is currently an RID Task Force exploring what a new credentialing would look like—an updated test, a portfolio of evidence of training, experience, and familiarity with the domain. Some states like Maine, had laws that required interpreters to have an SC: L to interpret in legal and quasi-legal situations. Some of these laws had to be adapted when the SC:L was retired. Other states have no certification requirement whatsoever.

Nonetheless, interpreting in the legal domain requires very specialized training and skill. Typically, interpreters don't move into this area before they have been working as a credentialed interpreter for at least five years, although Deaf interpreters often start sooner because of the limited supply.

**What does it mean to be a qualified interpreter?** Under federal law applying to sign language interpreters, a "qualified interpreter" must be effective, accurate, and impartial. While a qualified interpreter, under the law, need not be certified, one reliable way to assure quality is to rely upon certified interpreters, who have a specific documented level of skills and are bound ethically not to accept work for which they are not qualified. Even the most credentialed interpreter may not be qualified for some assignments. They may be unfamiliar with the content, they may have a conflict of interest (whether in their own eyes or in the view of others), or they may have a relationship with the consumer that could compromise their ability to remain impartial.

It is important to remember that part of being qualified as an interpreter is knowing when one is *not* an appropriate match for a given consumer or situation. Perhaps the most important duty of an interpreter is to inform consumers when interpreting is not working. A certified interpreter is expected to be conscientious and discriminating in the assignments that they accept, to know when they are or are not qualified to interpret, when to call in a team, when the situation requires a Deaf interpreter teaming with a

hearing interpreter, when the situation requires a legal interpreter, and a host of other decisions.

No two Deaf individuals sign alike. As with English speakers, there exist a variety of idiolects, ranging from dialects of formal ASL to an infinitely varying continuum of contact signing forms of English-influenced forms of ASL or ASL-influenced forms of spoken or written English. Because 90% of deaf individuals come from hearing, English speaking families, their exposure to both English and ASL can vary greatly, yielding the potential for many cases where deaf individuals command only a partially fossilized form of the target language in question. They may be native speakers of neither, and interpreters are experienced in finding the communication mode best suited to their production and comprehension skills.

Hearing service providers have greater and lesser degrees of familiarity in interacting with Deaf interlocutors. Professional interpreters (both hearing and Deaf) are skilled at facilitating these interactions and assuring that communication is indeed happening; and if it is not, calling in the appropriate interpreting resources needed.

Interpreters are also bound by a strict code of conduct that assures their professional behavior (demeanor, confidentiality, self-evaluation of ability to perform the interpreting task, etc.) in all interpreting situations. One important characteristic of a certified interpreter is the ability to determine when and if their skills are <u>not</u> up to the task and the professionalism to withdraw from the interpreting situation and calling in an individual or interpreter team with the appropriate background and skills.

**<u>Video Remote Interpreting (VRI)</u>**

Traditionally, ASL/English Interpreting has been provided face-to-face. However, with continuing development of internet technology, a remote form of interpreting has developed. Video Remote Interpreting (VRI) uses videoconferencing technology where one individual, typically the interpreter, is at a different location than the consumers. In contrast to Video Relay Services (VRS), which are highly controlled by the FCC and require that the hearing and Deaf consumers be at different sites, VRI frequently uses a

remote interpreter to facilitate communication between deaf and hearing consumers that may be at the same site.

It is useful to step back in time and review the technology out of which VRI arose. Our information here draws crucially on conversations with Douglas Newton, CSC, SC: L, former director of Pine Tree Interpreting Services, a non-profit referral agency in Maine. Maine has seen the early appearances of this technology and can see its applications in other rural areas as well. Mr. Newton had one of the earliest grants to set up and study the initial use of Video-based interpreting in Maine. This service was offered locally via the same interpreting pool that was serving Deaf individuals face-to-face.

Telemedicine has always paid special attention to the reliability and resolution of the video technology used with patients.



Notice in the picture to the left the size of the screen, the attention to lighting, the remotes that can move video angle and focus at both the local and remote site, the wheels that allow for "portability." The videoscreens used in telemedicine are large with high resolution. Maine uses dedicated double DSL lines that can send and receive data at a very rapid pace to avoid freezing and dropped signals. Over 30 years ago, when telemedicine was introduced as the remote link between doctors and patients, it was hospital and healthcare professionals that set the standards and best practices for remote communication. Those standards are not substantially different from what Deaf patients are expecting today when accessing communication with their doctors via remote means. Doctors addressed the need for quality equipment, training on that equipment, regular testing of the equipment to assure it was in working order, equal pay for doctors providing remote consultations, and the remaining need for contact (touch) on site.

The following link provides access to a news article by Barbara Kermode-Scott in the Canadian Family Physician, vol. 11, July 1995 that gives a feel for the issues at the time:



**Telemedicine is not all high tech:**
*Dr Rod Elford presented the Murray Stalker Lecture at CFPC's 37th national Annual Scientific Assembly in Quebec City.*

he suspects is the diagnosis, and dictate a note into the computer that will automatically order prescribed drugs from the pharmacy and make referrals to physiotherapists, dietitians, and so on.

But Elford's message was not all about amazing electronic possibilities. Despite sophisticated equipment and virtual reality, human contact is still essential. "We must consider what is important in health care, think about the ethics of these new methods of caring for our patients," he says. "High tech must be connected to high touch."

http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2146174/pdf/canfamphys00089-0131.pdf

The regulations regarding the bandwidth at which video signals are transmitted was set for medical and educational situations with needs for transmission and reception of high resolution signed language communication in mind. So, early on, even when remote access to medical care was directly between doctor and patient, great care was taken to assure the quality, both technologically and human, of those remote medical encounters. Part of this awareness is recognizing when remote communication is not working. A standard practice paper on VRI has been published by the National Registry of Interpreters for the Deaf (RID, Inc.):

http://www.rid.org/UserFiles/File/pdfs/Standard_Practice_Papers/VRI_SPP.pdf

This standard practice paper addresses a number of issues that are directly related to this case. RID defines VRI interpreting, distinguishes it from Video Relay Services (VRS) that are regulated by the FCC, and addresses the benefits and limitations of using VRI as a delivery system for the provision of interpreting services.

This paper characterizes successful VRI sessions as follows:

45

> Successful VRI sessions use qualified sign language interpreters who have linguistic competence, are experienced in settings for which they will work, and adhere to professional interpreting standards. Additionally, successful VRI sessions have shared understanding of the benefits and limitations of VRI, common elements of established meeting preparation protocols, training regarding equipment and videoconferencing protocols, effective environmental controls, and compatibility of technical set-up and connectivity.

We would also like to cite from this standard practice paper the following excerpt on the Benefits and Limitations of VRI:

> When used appropriately, VRI has several benefits such as "providing easier and faster access to quality services, and effective use of fiscal resources." [Lightfoot, 2006] VRI provides communication access for situations with an immediate need for interpreters. In addition, it meets interpreting demands when qualified on-site interpreters are not available, especially in rural areas where qualified interpreters are less accessible. VRI can reduce interpreting costs through fee structures and the elimination of travel and mileage costs.
>
> While providing a viable option for interpreting services, VRI is not a comprehensive replacement for onsite interpreting.  In order to assure that equal access is achieved, the decision to utilize VRI should be made with input from all participants. VRI may not be appropriate for:
> - Situations involving high interactivity, such as multiple participants with less structured turn-taking protocols.
> - Situations with complex dialogic exchange, such as abstract philosophical exchange or dialogue with veiled intentions or multiple meanings;
> - Situations involving communications of a sensitive nature
> - Situations involving individuals with a secondary disability (e.g., low vision) that impedes their ability to use the technology.
>
> In addition, Deaf interpreters are recommended for situations involving young children, foreign-born individuals, and those who have underdeveloped language or who use idiosyncratic language patterns.

VRI is not to be confused with VRS (Video Relay Services), which is controlled by the FCC and its use prohibited in settings where the Deaf consumer and the service providers are at the same site. Video Remote Interpreting involves contracting with a company that provides standard interpreting services (for a fee) but delivered remotely over a computer. The decision to use Video Remote Interpreting (VRI) versus calling in an on-site interpreter also requires discretion as to consumer and situation. VRI, while possible in many situations, is not one-size-fits-all. VRI interpreters are as ethically accountable as on-site interpreters in this regard. The final decision of whether remote versus on-site interpreting is effective in any given situation with any given consumer cannot be a

blanket business decision on the part of the institution. The consumers' perspective and the professional interpreters' perspective are critical components in such decisions.

When an on-site interpreter is brought in, that individual usually has a "check in period" to interact with the Deaf person and to understand the situation and that person's signing style before interpreting begins. This allows for a more accurate interpretation where both the interpreter and the Deaf consumer are on the same page. There is also the likelihood that that interpreter may work with the same client again. When using VRI, this "check in" is frequently skipped and there is often little to no time for the interpreter to become familiar with the Deaf consumer's signing style or their concerns. Furthermore, when a call is dropped the next interpreter to pick it up may be different and unfamiliar with what has gone before. VRI is not as bad as VRS, where such preparation time is prohibited and where any dropped call will result in a different interpreter.

The widespread use of VRI has been problematic for some Deaf consumers, especially when there are existing factors that interfere with the interpreting process. Obvious issues include technological interruptions such as firewalls, poor reception, blurred video, or disconnected calls. Others include the nature of the interaction; namely, one-to-one communication works better than group meetings or several individuals in a room, or even multiple individuals hearing and signing coming into meetings from remote sites. VRI interpretation can also be problematic with individuals who have vision loss, or with individuals whose signing is atypical or who need the specialized services of a Deaf interpreter (although some VRI companies have Deaf interpreters on staff). VRI is effective if used appropriately, with discretion, and with dependable technology and signal strength. The latter technological challenges have recently begun to be addressed more rigorously.

Using reliable technology with high resolution and appropriately sized screens, there can even be advantages to VRI at times, especially if an individual is in a very remote area where legally trained interpreters or Deaf interpreters are in short supply. Georgia currently has eleven (11) SC:L interpreters and four (4) CDIs to draw from across the state, but there are three hundred twenty four (324) SC:Ls and two hundred ten (210) CDIs nationwide. If arrangements can be made to have experienced legal interpreters and

Deaf/Hearing teams working over VRI, rural clients may well be better served. However, as Douglas Newton's studies revealed, there is also an advantage to having legal interpreters familiar with dialects within a state and the potential for the same team to work with someone on a regular basis. Local agencies providing VRI services can match clients better with local interpreters they know are a good match. One VRI method that has been successfully used in some areas is to place a Deaf interpreter on-site with a hearing team over VRI.

For high stakes situations, because of the effects that stress can have on comprehension, it would be advisable to have an on-site team. However, as we are experiencing at present in COVID-19 times, where face-to-face meetings may not be possible, or where masks and social distancing may be necessary (masks hide the face, where much of ASL grammar information is conveyed), the right match of a legal interpreting team to the Deaf individual over VRI may be the best option. One positive side effect of the pandemic is the fact that video technology as well as technological expertise among ASL/English interpreters has definitely made some serious progress.

A year ago (pre-COVID; and note that the clients here were requesting interpreting services Pre-COVID and continue to do so post-COVID), VRI interpreting (which was still in its infancy) was plagued by a host of issues that often made its use problematic. The **pool of interpreters** experienced with and willing to do VRI interpreting (as opposed to face-to-face interpreting) was small and VRI interpreters specialized for medical, legal and other specialties were few and far between.  The **equipment and infrastructure** on the user end for VRI interpreting was often old and outdated (small iPads or tablets with poor video processing cards, recycled laptops, and even smartphones with very small video screens), the internet sites were not using high speed processing, locations of the equipment could be in places where a video signal was poor, and in institutions firewalls designed to protect internet security often interfered with reception. As a result,  video reception on the user end became pixelated, frozen, and compromised. Frequently connections could not be established or were dropped. The equipment was present, but it was not in working order. The VRI systems were primarily designed for one-to-one rather than one-to-many conferencing, so if there were more than two people in the room, VRI interpreters would have a hard time seeing or hearing everyone involved and could not

indicate who was talking when. The end user may have had the equipment on hand, but the **training** on that equipment was often done quickly and, without repeated use, would quickly be forgotten. Or worse, turn over would be high and the person originally trained on the equipment would leave, and a new person would be at a loss in terms of how to use it. So, much time would be spent in futile attempts to set up the equipment and connect to the VRI service, and often the VRI device would be left in a room somewhere unused. *Maintenance* on the equipment was unreliable and sporadic, and often maintenance people would be unaware if they were dealing with an equipment problem or the lack of facility of the end user to set up and use the equipment. ***Deaf consumers*** who were becoming more familiar with remote interpreting in the context of Video Relay Services or direct videocalls to friends via their high speed Videophones at home would be used to a better signal than they were getting via VRI and would be less tolerant of bad resolution and dropped calls, yet no better equipped to get things up and running than the service provider would. The growing pains were great and there were ***rarely back-up systems*** in place if VRI failed such as a second working system, quick access to an on-site interpreter. Finally, having committed to a VRI system, there was often a ***one-size-fits all mentality*** that encouraged the use of VRI for every interpreting encounter. This will not work if the person is severely visually or cognitively impaired, has atypical signing or problems viewing a videoscreen, lying down, incapacitated, compromised by medication, among other factors. ***VRI always needs to be used with discretion.***

Even a year ago (pre-COVID), we would have projected that in perhaps five years the technology for VRI would catch up to the demands of ASL/English interpreting. However, the current expanded needs for videoconferencing for education, business, medicine, law, and industry for the hearing population in general have been a catalyst to advancing the needed technology and working around the firewalls that previously interfered with video signals. As a result, very recently the low incidence Deaf population has benefitted from a more universal need for communication at a distance. Distance conferencing has opened up the opportunity for numerous individuals at multiple sites to meet and for interpreters and even captioners to be brought in as one (or more) additional sites. It has been a very steep learning curve that is still in process, but interpreting problems in videoconferencing like how to pin both the speaker and the interpreters, how

interpreters can pin the speakers and Deaf consumers, how to make the interpreter larger so they can be seen, even with screen sharing, etc. are being solved step by step.

Temporarily, because of the demands placed on us by the pandemic, there have also been relaxations in FCC requirements regarding when VRS can be used to allow for Telemedicine to be used in conjunction with Video Relay Services and not just VRI. Regulations have been relaxed to allow for selected non-HIPAA compliant platforms like Zoom and others to be used in medical settings and other settings (including, but not limited to law enforcement settings) typically requiring special encryption. These are suspected to be reinstated once the crisis has subsided.

Beyond one-on-one routine probation meetings, legal proceedings like depositions and court can become very complicated when done remotely with remote interpreters. The more people in the meeting, the more difficult the arrangements and the more risk there is of a failure of technology. Interviews Dr. Shepard-Kegl has done with legal interpreters and Deaf/hearing teams reveal a steep learning curve, but definite progress is being made in solving some of the logistics of such proceedings. There are ways to pin the critical interpreter so that the Deaf consumer has clear visual access and many interpreting teams and consumers are using dual devices—one for the general meeting and one for the interpreter and Deaf consumer; and, for some, yet another between the members of interpreting team.

VRI, even in its current form, is still not one-size-fits-all. It does not work for all situations. It does not work for all individuals. It does not work in all situations for even the same individual. What works for someone in familiar settings and low stakes situations, may not work for the same person when they are in an unfamiliar setting and communicating about high stakes issues. Similarly, the same interpreter or interpreting team may also work in low stakes situations but not necessarily in high stakes situations. Under stress our ability to express ourselves can be compromised and our language comprehension drops. When our comprehension drops, the ability to process an incoming interpreter in 2D as opposed to 3D also decreases.

An on-site Deaf/hearing team may not be required for relatively routine probation meeting, but such a team may be required if more complex or emotionally charged topics are to be addressed. A Deaf/hearing team may not be needed in simple traffic court proceeding but may be critical when being charged with a felony or having a plea bargain agreement explained. In all these cases, a legal interpreter would still be needed.

**Should friends and family members interpret?**

Both language and professional ethics training are essential to meeting the communication needs of an individual as an interpreter. Bringing in "a signer" (someone who knows some ASL, or a friend or relative of the deaf individual) is *never* appropriate. A social acquaintance with conversational skills in ASL is neither trained nor qualified to facilitate communication between two or more parties.

Both the Code of Professional Conduct of the Registry of Interpreters for the Deaf that professional interpreters adhere to and all laws relating to interpreting specifically note that a qualified interpreter must not only be able to interpret effectively, but they must also be impartial. Friends and family are by definition not impartial. They have a stake in what transpires and can filter or even skew the message without service providers or consumers being aware of what is happening. Deaf parents wouldn't want their child interpreting for their own disciplinary meeting as school. A counselor would not want an abusive spouse interpreting for their partner. A doctor trying to preserve autonomy in making end of life decisions would not want family members with their own opinions about what to do interpreting for their loved ones. All of these situations, and in fact most encounters, can be compromised if the interpreter is not neutral.

The American Sign Language/English interpreting profession has strict codes of professional conduct that all interpreters are expected to adhere to as a guide to ethical behavior. These tenets are for the benefit of consumers, both deaf and hearing. People too close to a situation should not interpret. The guiding principles under the third tenet of the Code of Professional Conduct for interpreters developed by the National Registry of Interpreters for the Deaf (RID) and the National Association of the Deaf (NAD) speak to this issue:

51

3.0 Conduct:
Tenet: Interpreters conduct themselves in a manner appropriate to the interpreting situation.

Guiding Principle: Interpreters are expected to present themselves appropriately in demeanor and appearance. They avoid situations that result in conflicting roles or perceived or actual conflicts of interest.

Conflict of Interest in this same document is defined as follows:

Conflict of Interest:
"A conflict between the private interests (personal, financial, or professional) and the official or professional responsibilities of the interpreter, in a position of trust, whether actual or perceived, deriving from a particular interpreting situation."

Finally, the following interpreter behaviors are also listed under the tenet above and Tenet 2.0 regarding Professionalism:

Relevant Interpreter behaviors:

3.2 Decline assignments or withdraw from the interpreting profession when not competent due to physical, mental, or emotional factors.

3.3 Avoid performing dual or conflicting roles in interdisciplinary (e.g., educational or mental health teams) or other settings.

2.5 Refrain from providing counsel, advice, or personal opinions.

Link to the RID page on the Code of Professional Conduct: https://drive.google.com/file/d/0B-_HBAap35D1R1MwYk9hTUpuc3M/view

All of these tenets speak against family members taking on the role of interpreter. They are emotionally involved. They are serving in a dual role as interpreter and family support. They are prevented from offering their personal counseling, advice or opinions and at the same time are enabled to interject such opinions into the interpretation without being transparent.

Friends and family—even ones highly trained and credentialled in interpreting—are by definition still *not* impartial, and therefore unqualified. They have a vested interest in what transpires and are not bound by any code of professional conduct to remain neutral. They can, and often will, add or omit information, skewing the message. Imagine a close family

member required to convey a terminal diagnosis to a patient. If their role is to be there for support and a doctor says that there is no hope, do they interpret that as stated? When their support role would have them recommend a second opinion, deny the outcome and say, "The doctor could be wrong. There is always hope, and we will get through this," etc. Should a family member be denied that role for lack of a professional, qualified interpreter? If a patient is given a series of treatment options and the family member has a strong opinion on which choice should be made, are they the person to be interpreting these options to the patient and interpreting the patient's response to the doctor? And, on the flip side, should a fluently signing interpreter who has called in a domestic violence complaint against their spouse interpret for that family member when the police arrive; or even worse should an interpreter who is the abusive spouse interpret their partner's statement to the police? The obvious answer is, "No."

However, one might argue, the family member knows this person better than anyone else. There may be idiosyncratic things about the way the person communicates that they will pick up on, that an interpreter may not. There is a place for this kind of input in the interpreting process. It is called the "communication ally." Professional interpreters in situations where family members, friends, direct service providers, or others who may know an individual intimately is bound to use every means at their disposal to accurately convey message equivalent. If a friend or family member notices a misunderstanding on the part of an interpreter or knows a family sign that the interpreter would not be aware of, as a communication ally, they are welcome to share that information with the interpreter. But, the interpreter makes the ultimate determination of what the interpretation is and is solely responsible adhering to ethical standards in the interpreting assignment.

In summary, friends and family are inherently conflicted from serving as qualified interpreters. They are present in the role of family support and cannot serve in this role while also interpreting. Allowing/relying upon family members to interpret not only denies them their primary role as emotional support, it also opens the door to filtering information that they are uncomfortable sharing with their parents or adding information to the discussion that is their own advice or opinion. It also allows them to be privy to information that the Deaf individual may not feel comfortable sharing with them.

Children of Deaf Adults are put in a very uncomfortable position when professional interpreters are requested but not provided. Even when their skills are not up to the task or their role is compromised, they find it impossible to stand by and see their parents denied access. This is a form of coercion. For this reason, even when a child concedes to provide communication access as a last resort, this cannot be taken as willingness on the part of all participants to have that individual interpret.  Under no condition is falling back on the family to interpret when an interpreter is required an appropriate course of action.

## Methodology: Elicitation, Text Analysis (linguistic analysis, coding)

Every day, when Dr. Shepard-Kegl walks into an interpreting assignment she is making judgments about the language background and language needs of the consumers that she works with. She does this through interacting and conversing with them. This is an informal means of eliciting the data she needs to make decisions regarding her interpreting approach. What we are doing in this report is similar, but on a larger scale. We are gathering the information we need regarding the evaluated plaintiffs in this case that will allow us to offer an expert opinion on their background and communication in the context of our expertise in linguistics, interpreting, Deaf education, ASL, and Deaf culture.

The standard methodology used in the linguistic profession is elicitation and linguistic analysis, typically text analysis. The process is very much like the experimental method. A hypothesis is posed and data are elicited to help us to confirm or disconfirm the hypothesis. Standardized testing will not give us the individualized data that we need to inform our opinion. Deaf people are far too diverse and their language backgrounds are very heterogeneous. We need to look at each evaluated plaintiff in an individualized way, using a *single case study* methodology. The need for individualized assessment is noted by almost every researcher in the field of deafness, especially regarding reading abilities. Some of these opinions are addressed quite well.[5]

That is not to say that we do not at times make use of standard materials that have been developed to assess reading, interpreting proficiency, or ASL proficiency. We just do not apply them in a one-size fits all fashion. We have relied here upon pre-vetted grade-level vocabulary lists from research on basal readers, from screening assessments such as the *Flynt Cooter Reading Inventory* and the *San Diego Reading Screening.*

---

[5] Mounty, Judith and Martin, David S. (eds.) 2005. *Assessing Deaf Adults: Critical Issues in Testing and Evaluation.* Washington, D.C.:  Gallaudet University Press

## Individual Assessment: Brandon Cobb (male, 32)

### I. Linguistic/Cultural Profile

**I.1. Responses:** (also in ASL on video)

**I.1.a. Born deaf?**  He had a high fever at two years of age. However, his description of his fever looks very similar to meningitis. It is possible this is what he had; but, as is common, he was not informed of the name of this condition nor does he know what *meningitis* means.

**I.1.b. Deaf parents?** He has no deaf relatives. He has several half siblings, but no full siblings. All can hear. He grew up alone with his mother. No one in the family signed with him. His mom fingerspells and uses some signs. She has no proficiency in ASL. Communication at home was lacking.

**I.1.c. Attended residential school for the Deaf?** He started school at the Arizona School for the Deaf and Blind in Tucson and then moved to the Phoenix Day School for the Deaf. He is unsure of the age he attended these schools due to lack of communication with his family. He thinks he moved to Georgia around 10 years of age. He attended a mainstream school, then moved to the Atlanta Area School for the Deaf (AASD), and then to the Georgia School for the Deaf (GSD). He moved back and forth between those schools several times because of behavior problems. His last school was Central High School in Carrolton, GA, where he was expelled as well. He still received a diploma. Looking back, he realizes if he knew then what he knows now, he would have behaved better and stuck it out at the School for the Deaf,  where he could understand teachers as opposed to being mainstreamed with limited access to ASL.

**I.1.d. Tends to associate primarily with Deaf people?** Because of his history, Mr. Cobb avoids socializing with Deaf people. He has no driver's license because he was in prison. He is working to get his license now. He communicates with people through writing back and forth or teaching hearing co-workers very basic signs or fingerspelling.

56

**I.1.e. Is a member of Deaf clubs and organizations?** No. He is not a member of any Deaf clubs or organizations.

**I.1.f. Married a Deaf spouse?** No, he is not married and is not in a relationship.

**I.1.g. Typical Deaf occupation?** Currently, Mr. Cobb works at a restaurant/bar as a dishwasher and does general chores such as cleaning. He works six days a week, starting at 5 p.m. and works until closing (usually 3 a.m.). Prior to prison, he had a job that Vocational Rehabilitation found for him doing landscaping for a hospital. Between ages 13-15, he enjoyed physical labor, working at his mother's lodge. These are all typical Deaf occupations in the sense that one can perform one's everyday tasks without much need for communication via English on a daily basis.

**I.1.h. Awareness of dB loss?** He says he is fully deaf and does not know what decibel (dB) loss he has. He is profoundly deaf. He used hearing aids when he was younger, but he does not use them now. He had problems with the noise.

**I.2 Early Life Choices:** In terms of early life choices, the decisions made for Mr. Cobb, by his birth and his family's school choices, were mixed. While he attended Deaf schools and used sign language, his family did not sign. He was also put in some mainstream programs where some signed communication (not necessarily ASL) was used, so access to ASL was varied.

**I.3 Later Life Choices:** Mr. Cobb's later life choices indicate an individual with identification with Deaf Culture. He recognizes himself as a Deaf individual and prefers to use ASL as his primary form of communication. He also has some Deaf friends that he socializes with, but not many because of his criminal history.

## II. Individual's use of Interpreters

Mr. Cobb regularly requests interpreters for his appointments. He had interpreters in his mainstream high school after he got expelled from the Deaf schools. He states that he only had one interpreter who knew ASL while the others used Signed English, which he did

not understand. He hasn't been able to use interpreters for many other things. He mostly relies upon his mother for very rudimentary communication access.

Previously at court, Mr. Cobb reported that he had one interpreter that he didn't understand. He said that he had to interrupt the interpreter and to get clarification from his mom, and then that the interpreter left. There are a range of certified interpreters and transliterators, but not all are a match for someone who does not freely range between ASL and more English-influenced variants of signing. From our interactions with Mr. Cobb it is clear that he needs interpreters with strong ASL use. The best way to guarantee this is to provide a Deaf/Hearing team of interpreters to assure native level ASL is used with him.

Currently,  Mr. Cobb reports requesting a Deaf Interpreter and hearing interpreter team all the time. It is not clear whether this is a Certified Deaf Interpreter (CDI), or not based on how he referred to the Deaf Interpreter. It is a Deaf interpreter that he feels is comfortable with his signing. He reports needing a Deaf/Hearing team for interactions with the police, court, parole, doctor etc. A Deaf interpreter brings not only native-level signing to the interaction, but a Deaf interpreter also has more facility with catching other needs resulting from lack of familiarity with the setting, holes in fund of knowledge, etc.

### III. American Sign Language Proficiency

Based upon his auditory status and his cultural profile, Mr. Cobb's primary and preferred means of communication and the language in which he most reliably produces and comprehends information is expected to be ASL since he has indicated that he does not understand other signing forms other than ASL. In the next sections of the assessment we will seek to confirm or disconfirm this expectation following from his responses on the cultural profile.

### III.1 ASL Production (Grammar)

Mr. Cobb's language production was assessed using a variety of tasks as well as free-flowing background conversation between Mr. Cobb and the experts. ASL production elicited by the 1.5-minute Mr. Koumal cartoons also contributed to this analysis, but these

will be discussed in their own section. Mr. Cobb's ASL production demonstrates a near-native (but not native) proficiency in ASL grammar, and a solid command of ASL production. In his signing, he demonstrates verbs of motion and location, spatial morphology, reduplication, ASL forms of direct address, and classifier use, in addition to many other features. He uses facial grammar such as non-manual markings for yes/no and wh-questions, as well as for relative clauses and conditionals. He is fluent and comfortable while signing ASL.

### III.1.a. Verbs of Location (Topological Relations Task).

Mr. Cobb's word ordering on the Bowerman Task strongly favored Ground before Figure in his responses to the Topological Relations Task. Of the 25 stimuli presented, he produced 17 using the Ground before Figure order (68%). His production followed the ASL as opposed to English ordering. When he used the English-like order in Figure before Ground, the usage was not clear and showed hypercorrection of English which was not natural. When the Ground before Figure order was used, ASL was used to convey where the objects were instead of English and was much clearer.

### III.1.b. Background conversation.  In background conversation throughout the testing, Mr. Cobb used primarily ASL.  At times when the hearing interviewer intentionally shifted to a more PSE[6] (English influenced) signing,  he did not match her, but he occasionally did shift toward a form of signing he likely uses with hearing family members, where he strings together ASL words as isolated items rather than using the complex spatial inflection that he clearly has mastery of. With these exceptions, his use of ASL was very steady. When observed interacting with the hearing interviewer, he still tended to lean toward stronger ASL but at a slower pace. With the Deaf interviewer, his pacing was quicker.

---

[6] Pidgin Sign English (PSE) is an older name for what is currently referred to as "contact signing." It really isn't as basic as a pidgin, which occurs between two completely mutually unintelligible languages. This form of language (sometimes called and interlanguage) involves the use of language variation on a kind of sliding scale between full ASL and a range of signing that is influenced by English to varying degrees. In PSE, a signer might follow an English word order more and use less of the complex agreement and morphology characteristic of ASL. Deaf people who are more bilingual than Mr. Cobb can shift to using PSE at times when signing with hearing people who are not native in their ASL skills. There is no one "form" of PSE, it varies depending upon the interlocutors are and what their range of language use is.

**III.2 ASL Comprehension.**

Throughout the testing, he demonstrated consistent understanding of ASL with ease. If something signed was unclear, he would readily ask for clarification. Most of the issues he needed clarification with concerned content rather than signs themselves.

**III.2.a. Background Conversation.**

He understood background conversation very well. There was a lot being discussed and he was able to follow most of it with appropriate scaffolding[7] and clear ASL.

**III.2.b. Bird of a Different Feather (Bahan).**

Mr. Cobb was not already familiar with *Bird of a Different Feather*. In viewing, *Bird of a Different Feather*. He did understand the general story line. He did not recognize the allegory, but he was able to present the parallels between the storyline and the experience of a Deaf child growing up in a hearing family, after a lot of scaffolding by the interviewer. He struggled to watch the story and complained of fatigue and that the video was not clear.

When Dr. Rowley recognized that Mr. Cobb was fatigued and struggling to maintain attention, she recognized that he was more likely to follow and stay engaged if she broke the story into smaller pieces and discussed those as they went along, which she did. She realized that, as an adult with less immersion in the Deaf community and Deaf cultural events, Mr. Cobb was not accustomed to the genre of adult storytelling and that adjustments needed to be made. This is similar to what a CDI might do in similar circumstances and one reason we feel working with a CDI is beneficial for Mr. Cobb.

---

[7] By "scaffolding," we mean that information is presented with sufficient context to reinforce understanding. If a concept or point is just thrown out there, it may be understood by someone who already has a foundation of background knowledge to know where it is coming from. But, if a person does not, then we need to contextualize it so that the new information coming in builds upon what the person already knows. The metaphor is that just like in building a house, you build a scaffold for the construction worker to stand upon as they add new layers and new materials.

One thing that a CDI will do is to assess the extent to which the Deaf consumer is fully following the information and adjust accordingly. Perhaps what is being conveyed lacks context that the consumer may need, which the CDI fills in. Perhaps the information is coming in too quickly or the dialect of signing is less familiar to the consumer. The CDI would adjust for that. In the case of the *Bird of a Different Feather* story mentioned above, we believe that Mr. Cobb is not familiar with watching 20-minute long narratives in ASL. This is a specific genre in ASL that he has less experience with as an adult without strong immersion in the Deaf community currently. As a child in school, ASL stories would have been broken up into pieces and kids would look at pictures, etc. Since, the goal of the task was to assess comprehension of natively signed ASL and to see if he could recognize the allegory in this story, Dr. Rowley was simply adapting it to a form that would be more likely to test those issues. Had she not done so, he would have phased out portions of the narrative and been less responsive to the follow up questions we asked.

When the story was retold and expanded upon, Mr. Cobb was able to understand the story, but he did not have enough background knowledge to understand the whole story with ease. This involves more world knowledge and cultural Deaf knowledge than language as a factor. He is weak in those areas.

### III.2.b. DWI (Composed and signed by David Rivera).

Mr. Cobb had not seen *DWI* previously. He understood the classifier story with little difficulty. He recognized the productive forms involving Size and Shape Specifiers (SASSs): *sports car, cab of truck (grille), trailer of truck detaching (skidding), and bottle of liquor*. He recognized most of the object classifiers used: *spokes, speedometer, pedal to the metal, rabbit, rabbit in headlights, and rumble strip*. He got the handling classifiers: hands on chest (slow down), and the gurney being brought down the hill. There were many cinematographic perspective shifts throughout the story. He caught most of them. He caught that the car landed upside down, but he was not able to identify if the passengers were dead or alive. All of this comprehension depends upon being able to process the productive use of classifier constructions (depiction) in ASL.

As a follow up, there were two errors in this story. First, although the car landed upside down the ambulance people treated the car as if it was right side up. In the rabbit version

there was a vehicle classifier that signed it upward as well. Upside down the woman was incorrectly on the driver's side and the man on the passenger side. In addition, the ambulance drivers break the windows to access the driver and passengers, but the windows had already been shattered. He did not catch these errors. He recognized that the car was upside down, but he did not understand who the passengers were and whether or not they were actually switched. Again, he is also not used to watching stories and then being asked to do meta-analysis on the signing, like catching errors. This falls into the area of Cognitive Academic Language Proficiency (CALP), where he is weak. He watched for the content.

A version of this ASL text is available online at:

https://www.youtube.com/watch?v=Lie0EnyusgU

### III.3 BICS vs. CALP.

It is important when looking at language proficiency to distinguish between proficiency in Basic Interpersonal Communication Skills (BICS) and Cognitive Academic Language Proficiency (CALP).

### III.3.a. Basic Interpersonal Communication Skills (BICS).

Mr. Cobb has full mastery of BICS in ASL. In casual conversation, he is fluent and comprehends easily.

### III.3.b. Cognitive Academic Language Proficiency (CALP).

When language becomes more academic in nature or involves explanation of new unfamiliar information or tasks, he is not proficient at engaging in analysis, synthesis and evaluation using ASL. His analysis of the allegory in *Bird of a Different Feather* indicates a weakness in this area. His struggle with various topics also fits with our recognition of his limited use of academic language in ASL, unless scaffolding was used.

### Summary of ASL language proficiency.

Mr. Cobb was observed in both conversational ASL and elicited ASL samples. The conversational samples showed that his lexicon was largely ASL with a few English-like

signs in places, but he would not be considered an English-like signer at all. His ASL tendencies are very strong. One example of an English-like sign would be P̲ENNY. He signed it with a P handshape whereas many people sign with a 1 handshape. He also has errors in his lexicon such has using the sign for BEGIN instead of BECOME. His ability to discuss a variety of topics was largely limited by his command of CALP. The more academic or philosophical topics were challenging because of a lack of world knowledge and Deaf history; and the lexicon for that was also not plentiful. He indicated that he has seen the news and the interpreting related to Covid-19 has not been accessible for him. This goes back to his weak foundation in CALP. When pictures were clear, he was able to produce some clear classifier or depiction use although it was not as evident as regular vocabulary.

His morphology shows mastery of ASL and his use of syntax followed strong ASL order. He did not include a wide range of ASL syntax, he tended to stay within simple sentences, but he did show a command of questions, direct quotation, verb agreement, and topic marking. His use of time and sequence was sometimes not clear and required the listener to ask for clarification. He showed he could incorporate some depiction with role shifting. It was very sloppy but still visible to the native signer. His comprehension was dependent on the topics as well. He did not catch the meanings of all classifiers, only some which are typically used. Missing this did not seem to interfere with his overall comprehension of ASL. However, with topics that dealt with CALP more than BICS, he was often not able to understand and quickly gave up. His frustration level was high and immediately recognizable.

We also watched Mr. Cobb in a segment of a webcast on YouTube: HEARD Webinar on Mass Incarceration and COVID-19: https://www.facebook.com/watch/live/?v=605640566719277&ref=watch_permalink In the question and answer exchange in this webinar, Mr. Cobb was in his element and communicating about what he knows and he has experienced. In this setting, his strong mastery of ASL came through. He was articulate, comprehended all comments and questions, and responded with appropriate backchanneling. He came through as a fluent, articulate, adult signer with strong proficiency in ASL.

## IV. English Proficiency

Mr. Cobb signs ASL with near-native language proficiency, but in a more conversational than academic form. The remaining question is the extent to which English can or cannot serve alone as a communication alternative to ASL for him.

### IV.1. Spoken English Competency.

Mr. Cobb's speech is not intelligible.

### IV.1.a. Speech.

After signing and writing renditions of the two 1.5-minute Mr. Koumal cartoons, Mr. Cobb was asked to speak a rendition of each of the Koumal cartoons. He was not comfortable speaking, and he resisted a bit, but he did the task. For someone not comfortable with speaking, being forced to do so can feel demeaning. Yet, we do need samples of his speech to complete our analysis. His comfort level in these two languages/modalities is evident when comparing the videos of his signed narratives with his spoken narratives.

### IV.1.a.i. Speech Quality.

Mr. Cobb's speech samples appear below:

| *Mr. Koumal Flies like a Bird (spoken)*                 **Brandon Cobb** |
| --- |
| One guy to mountain again again saw *[only signed: bird]* can fly. Mmm. Fly but fail. Bird laugh hah. Can't fly. Lose hair.  Steal to again climb. Fly again. Finish *[only signed: walk]* bird. Bird, "Ha ha." *[only signed lost]* all hair. *[only signed: then saw]* bird *[only signed many many]* steal *some bird hair then]* make. Fail. <br><br> **Transcription of speech using the International Phonetic Alphabet (IPA):** /wʌ ga tu mãʊ̃. ɛ ɛ suw kĩ fay tʌ. mmmm. bɛ fɛ. ɪ læ: hɛ. kæ fɛ. lɛ hɛ. sɛ tu gɛ kɪ. fɪ ɛ̃. c bʊɪ. bʊ hɛ hɛ. ɔ ɛ. [click sound]. mɛy. fɛ./   [link to spoken sample] |

| *Mr. Koumal Battles his Conscience (spoken)*           **Brandon Cobb** |
| --- |
| One man walk to see homeless. *[He signed, "This is sick. I bothers me to voice." Dr. Shepard-Kegl responded, "Try your best please."]*  Saw man beg  penny one coin give. Woman give coin. Dollar fall fuw. Saw mmm [onomatopoeia: thinking] balloon, "house, and earth, plus negative plus. Give to cash. God happy. Okay, red foot to head. Devil pull, keep. Fight, fight, fight. Fight. Saw puw [onomatopoeia (steal)].  Finish, where? See care oooo [onomatopoeia (drive by)]. Finish. <br><br> **Transcription of speech using the IPA**: /wʌ mæ̃ wʊ tu siy hʌlə. *Started again:* suw mɛ bɛ pɛ: wʌ sɛy kʊ ɛʊ. wʌ gɪ kæ. dʊ fɔ fuw. tɔ mmm bʌʊw, wə kʊ, ə uw, pʌ nɛv pʌ. wɛ tʊ kæ. ga pɛɪ. kʊ. ɪɛ: fɛʔ ʊ ɛ. diy pɪ. k.. fʌfʌfʌ fʌ. sɔ puw kuw. Fuw, wɛ.  siy kɔ uw. fɪ./ [link to spoken sample] |

### IV.1.a.ii. Intelligibility.

Mr. Cobb's speech production is minimal and very difficult to understand.  He was unable to speak without concurrently signing. He had to concentrate to remember both to phonate sufficiently and to produce speech at all. Even with repeated viewing of the video with him signing as well as speaking, there were still stretches of the speech that Dr. Shepard-Kegl was not able to identify reliably.

Not a single word was pronounced in full. Final consonants and consonant clusters in syllable were consistently omitted. Initial consonant clusters were consistently simplified and often all initial consonants were omitted. Multisyllabic words were reduced to single syllables (e.g., *mountain* became the initial consonant and the first diphthong nasalized: /mãʊ̃/.

With lipreading (and repeated viewing) of his spoken English without reference to the signing, none of his speech could be understood. It is important to note that the evaluator of these data a certified oral transliterator[8] and is very familiar with Deaf speech. Mr. Cobb's extremely poor articulation would likely be impenetrable to a person unfamiliar with deaf speech, as well as to individuals very familiar with deaf speech.

Mr. Cobb frequently forgets to phonate and also often signs without speaking. When speaking, his grammar also follows the grammar of ASL more than that of English.

### IV.1.a.iii. Auditory monitoring alone.

With auditory monitoring alone, not a single word could be identified. Clips of his spoken renditions of both cartoons are provided at the end of the transcriptions above using a phonetic transcription of what could be heard.

In summary, Mr. Cobb's speech is not intelligible and cannot be used to share information.

---

[8] A certified oral transliterator hold the Oral Transliteration Certificate from RID  has met the training requirements and skills testing to certify their ability to mouth in clear English with adjustments for homophenous words the information from a hearing consumer to a Deaf consumer who relies upon lipreading and, which necessary, to voice back to the hearing consumer the speech that the Deaf person has produced.  Dr. Shepard-Kegl holds the OTC.

### IV.1.b. Lipreading

The other side of communicating through speech is using lipreading to receptively process the speech of others. The lipreading task involves two presentations of each stimulus (either a word or whole phrase or sentence). Each presentation was loud and very precise. If Dr. Shepard-Kegl felt Mr. Cobb was close, she sometimes repeated the item more than twice. Each word, phrase or sentence was enunciated clearly and loudly, allowing the best possible chance of being understood.

It must be reiterated that Mr. Cobb was tested under ideal conditions. The room was well-lit and devoid of background noise. We were directly facing each other one-on-one in close proximity over a Zoom screen. Items were repeated, and the stimuli were produced by a certified oral transliterator (OTC) trained to produce clear speech. Even the knowledge of the logistics in setting up such an environment would be beyond the knowledge set of his service providers.

We had several technological glitches in terms of the data being saved on Zoom. Unless in gallery mode, Zoom does not record anyone but the host. As a result, we tested Mr. Cobb several times. Repeated testing did not improve his performance in any way.

**IV.1.b.i. Words** Of the 17 words, Mr. Cobb correctly identified none (0%). At times he would copy Dr. Shepard-Kegl's mouth movements, but he had no idea what she was saying. He did make one guess that showed he was attempting to do some phonemic processing. Presented with *theory*, he responded *Thank you*. He was able to get the first consonant sound, a voiceless affricate, /θ/. He also caught the palatal glide /y/ at the end of the word. He produced two words, which suggests that he recognized that what was produced had two syllables: /θɪ-ɹɪy/. Finally, he may have caught that the first vowel was made in the front rather than the back of the mouth because the lips were not rounded, although the rounding on the r /ɹ/ could have obscured that. We suspect that once he got the /θ/ and the /y/, he went for one of the few words that he says he is able to lipread, *Thank you*. However, in a prior testing, when Dr. Shepard-Kegl presented him with several words he said he could lipread, he failed to get *Thank you*. He did get *I love you*.

**IV.1.b.ii. Sentences and Phrases** Of the 47 sentences and phrases, Mr. Cobb correctly identified only 1 (2%): *What's your name?* This is only negligibly better than his lipreading for words and this is one of the most routinized and frequent phrases one encounters.

| correct | incorrect | Stimulus (lipreading) | % correct | % incorrect |
|---------|-----------|-----------------------|-----------|-------------|
| 1 | 63 | 64 stimuli | 2% | 98% |
| 0 | 17 | 17 words | 0% | 100% |
| 1 | 46 | 47 phrases and sentences | 2% | 98% |

Most of the time Mr. Cobb could not even venture a guess. However, when he did it showed some phonemic awareness. For the number *forty two*, he responded *I love you* (three syllables, and the final vowel /uw/ were correct). He also caught the word *plan* in the sentence, *Do you have a retirement plan?*

### IV.1.c. Impact on communication
Of the total 64 stimuli, he got only one correct (2%).

In a well-lit environment face to face over Zoom, Mr. Cobb could lipread 2% of what was said; namely, one item. He is an extremely poor lipreader. This fits with his extremely poor speech skills.

Lipreading cannot serve Mr. Cobb as a means of communication access.

### IV.2. Written English Competency
Mr. Cobb's written English was tested by collecting written renditions of the two Koumal cartoons (*Mr. Koumal Flies like a* Bird and *Mr. Koumal Battles his Conscience*) and two wordless books by Mercer Mayer, *Frog, where are you?* and *Frog goes to Dinner*. We also included a sample of Mr. Cobb's Facebook posts that had been entered into evidence by the defendants at a preliminary injunction hearing (Exhibits 6-9). These written samples were analyzed for their grammatical accuracy, their influence from ASL, and for their argument structure distribution, which is an indication of their performance that can be

67

compared with native speakers of English, other Deaf ASL signers, other deaf writers of English, and individuals with a frank language disability, agrammatic aphasia.

### IV.2.a. Argument Structure Distribution: Data Collection

A full argument structure analysis is best with a minimum of 150 verbs and their related arguments. The data considered for this analysis were the written recountings of the two Koumal cartoons, two wordless books, and Facebook interchanges. Four recountings were collected during our testing. The fifth (Facebook interchanges; Exhibits 6-9) were provided to us by Mr. Cobb's lawyers. These were a court exhibits at a preliminary injunction hearing. An analysis was done on each of the narrative samples to see if there were any major differences, and then they were combined. Mr. Cobb produced a sample of 159 total utterances. The individual samples were sufficient to yield a reliable individual distribution. However, we will address the fact that the Facebook posts differ somewhat from the narrative samples collected during testing.

**Narrative Recounting** (combined): 159 verbs; 98 external arguments (62%); 59 non-copular unaccusatives (37%); and 2 copular constructions (1%). Based upon all narratives combined, Mr. Cobb appears to pattern most closely with Deaf ASL signers writing English. His percentage of non-copular unaccusatives was not parallel to hearing writers of English (typically 25%) and he had a much lower percentage of copular constructions (1% as opposed to 25%). A lower percentage of copular constructions would be typical of deaf writers of English in general (independent of whether they sign or not). He patterns like deaf writers of English in this regard as well.

In the following sections, each type of narrative is analyzed separately to see if the pattern is consistent throughout.

### IV.2.a.i. Movies.  n/a

### IV.2.a.ii. Nonverbal Cartoons.  Mr. Cobb recounted Mr. Koumal *Flies Like a Bird* and Mr. Koumal *Battles his Conscience*. This yielded a set of 50 utterances. 50 verbs; 29 external arguments (58%); 21 non-copular unaccusatives (42%); and 0 copular constructions (0%).

The content of the two Koumal cartoons during the testing are below:

| *Mr. Koumal Flies like a Bird (written)*                     Brandon Cobb |
|---|
| guy walk to mountain top. I saw bird can fly with wings. I try fly with wings. finally it, but failed wreck.  bird laughte at guy, Can't fly wing. BIrd have few lost hair guy made wings hair try again jump fly wing it again wreck.  bird again laugh at guy. bird lost all hair. guy made lot hair wing. again full wreck. guy see chickens lot. ateal chickens hair. again made full hair. again jump failed. |

| *Mr. Koumal Battles his Conscience (written)*                 Brandon Cobb |
|---|
| Guy take penny from his pocket give to homeless hat penny and women give to homeless penny too. Woman lost cash left. Guy saw cash left floor. He image how much gain $$ and earth move to where place. Guy change mind give to woman back cash and hug god. Guy half hell and angle fight over cash. Homeless saw it then steal cash. Guy half hell and angle lost mind. Homeless new car ride give to guy back penny. |

The argument structure distribution for the written Koumal stories most closely patterns with Deaf ASL signers writing English. There is a higher occurrence of non-copular unaccusatives in keeping with this group (42% as opposed to 25%). In addition, the occurrence of copular constructions is zero with deaf writers in general (0% as opposed to 25% for hearing writers of English).

## IV.2.a.iii Wordless Books

Mr. Cobb recounted the following wordless books: *Frog, where are you?* and *Frog Goes to Dinner*. He produced these recountings during the Zoom testing, as we observed, took photos, and texted them to us. His wordless book recountings yielded 91 utterances: 81 verbs; 48 external arguments (59%); 33 non-copular unaccusatives (41%); 0 copular constructions (0%). There were ten more utterances than verbs because Mr. Cobb produces quite a few copular constructions (e.g., X is Y) with zero verbs. Such constructions are very typical of ASL, but not English. The transcripts of his written recountings appear below:

| *Frog, where are you? (written)*                             Brandon Cobb |
|---|
| Mercer watch to frog and dog smell to frog.  Mercer and dog sleep.  frog try out of glass.  when Mercer and dog wake up and see frog was gone.  Mercer search for frog try find it.  dog smell in glass smell.  frog Ø not there.  Mercer yell where you go?  dog stuck with glass.  open window. dog fall outside from window.  Mercer at dog.  glass is broke.  dog lick to mercer's face.  they walk search yell.  tree with bee hive dog play with bee hive.  Mercer yell hole.  animal bite Mercer's nose.  dog pull on tree  bee hive fall on floor.  bees Ø angry.  Mèrce still search tree. Mercer fall to tree.  owl Ø angry.  dog run away from bees follow.  Owl pick on mercer.  Mercer stand on Rock. dog slow walk.  deer head stuck from Mercer.  deer run and dog run bark. deer stop Mercer fall and dog fall.  fall on water.  they see wood. water. Mercer shH and dog shh.  check back wood. they saw frog with another frog.  and frog's babys.  frog let one frog go with Mercer bye to frogs. dog Ø happy and Mercer Ø happy! |

| | |
|---|---|
| *Frog Goes to Dinner* | **Brandon Cobb** |

Mercer dress on mirror dog and turtle Ø sad.  Mercer soon leave.  bye.  frog jump mercer dress.  Bedroom family they read menu  Frog jump on sing.  frog jump sing's face.  broke drum.  they sing angry frog jump to food.  serive bring food.  Women see frog sit on food.  frog jump women scry.  frog jump in drink.  women angry at serive.  frog kiss men's nose.  serive try get to frog.  women Ø dizzy.  men hold to women dizzy.  serive hold up. door fire ext. merces see my frog.  Merce that Ø my frog.  Serive kick to merce family got o Ext of restxxxnt.  mercer Ø happy frog back with.  his parents and his's sister Ø mad at mercer  they said go to room.  mercer walk to his's room.  mercer and frog laugh.  dog and turtle dont know what goin on.

## IV.2.a.iv. Facebook Interchanges

We were also provided with a series of text messaging interchanges that were provided as evidence of his English use by Defendants at a preliminary injunction hearing (Exhibits 6-9). The images of those Facebook pages are included as an attachment, but the transcribed text of just Mr. Cobb's side of the conversation appears below:

---

4/15/19: I have p3 is videophone for interpreter. I call us and on Interpreter talk u too. Can I call ur number XXXXX rigth?

5/13/19: OK.

7/26/19: Hello michelle. My name is  brandon cobb and I Ø deaf. My mom help me pay $25 jpay last Tuesday. Here Ø pic jpay. Thank you and have nice day.

7/26/19: Hello michelle. It Ø me brandon cobb and I Ø deaf. Last Friday pay to jpay $50. I send you pic for jpay.
*[He sends image of confirmation of payment]*
Have nice day.
8/1/19: what u mean?
U mean I come u parole office on tmw?
No ride for me
Oh ok.
Did you get my text 2nd pic $50 jpay last friday
Welcome and have a nice day
9/9/19: Hey Michelle. Can I ask u. Can I work bar for washdishera and clean bathroom too. Start work 5pm to 2am off. Ø That ok?

---

Mr. Cobb's English in his text messaging posts differs from his narrative recountings. First, they do show awareness of shortcuts common to texting like using "u" for *you*. His communication is very routine and formulaic. Interchanges are limited. We see the same phrasing used over and over. He is usually generating the topic of message. When the topic of the message is generated by the parole officer, he asks for clarification and it takes him a while to understand. He is using strategies like assuming from context rather than using syntax. For example, the officer asks him, "Why are you reporting tomorrow?," and

he appears to not understand and responds with, "What you mean?" Then she changes her wording and asks, "Are you reporting tomorrow?" He clarifies, seeing if he understands her and says, "U mean I come parole office on tomorrow?" She re-asks, "Do you plan to? I need to know because I won't be in the office." He still thinks he is being asked to report and responds with, "No ride for me." She responds with, "You don't have to come. I won't be here." He appears to finally get the message and responds, "Oh ok." Then he asks about a payment he made that he has asked about several times in almost the same way. Almost every interchange ends with *Thank you* or *Welcome* and *have (a) nice day*.  His text is very simple and formulaic: *My name is Brandon Cobb; I deaf; Thank you and have nice day*.  Notably, the only place where we see him use the copular verb *is* is in these canned formulaic posts.

Mr. Cobb's Facebook posts yielded a set of 30 utterances. 28 verbs; 21 external arguments (75%); 5 non-copular unaccusatives (18%); and 2 copular constructions (7%). This argument structure distribution does not quite pattern like the others. First, while there is still a much smaller percentage of copular verbs than a hearing person would produce (7% as opposed to 25%), we don't see overt copular verbs like those we see in his other narratives. Also, we see a lower percentage of non-copular unaccusative constructions—only 18% in comparison with 41% for his other narratives. A hearing writer would produce about 25%. Finally, 75% of his utterances use external arguments, which indicate use of simple sentences following a subject-verb-object order. This high a percentage is indicative of reliance upon formulaic utterances. And this is exactly what we see in his posts. His use of English in these posts is limited to a set of repeated phrasings cobbled together to share and request a limited body of information. The most productive post is the last one, where he asks about a job he wants to take. Adding his Facebook to his other data doesn't change the pattern much, but they are not his more spontaneous writing style.

### IV.2.b. Argument Structure Distribution: Data Analysis

Mr. Cobb's argument structure distribution as a whole was then compared with those of four groups: typical hearing speakers of English, speakers with agrammatism, Deaf ASL signers writing English, and Deaf non-signing individuals writing English. We will report his percentages with and without the Facebook posts as follow:  X% / Y%, where X is the

data with the Facebook posts, and Y is the data without them. The resulting distributions in terms of comparison with these groups are the same.

**IV.2.b.i. Group 1: typical hearing speakers of English** In terms of his movie recounting, Mr. Cobb does not pattern with this group 59%/62% external arguments (typically for hearing writers it is only a little over 50%); and 41%/37% non-copular unaccusatives, considerably higher than typical speakers of English. And 1%/0% copular constructions drastically lower than the 25% for hearing speakers).

**IV.2.b.ii. Group 2: speakers with agrammatism producing English**. Mr. Cobb definitely does not pattern with individuals with a frank agrammatism or any kind of language disability. Individuals with agrammatism should have almost no non-copular unaccusatives and at least 25% copulars, likely more. He in contrast, has 41%/37% non-copular unaccusatives and 1%/0% copulars. The exact opposite pattern [**?**].

**IV.2.b.iii. Group 3: Deaf ASL signers writing English** Mr. Cobb does strongly pattern with this group, with a much higher percentage of non-copular unaccusatives and a negligible percentage of copular constructions.

**IV.2.b.iv.  Group 4: non-signing deaf individuals writing English.** Again, he also patterns with Deaf writers of English (independent of whether they sign or not) in producing little to no occurrences of the verb to be.

Overall, Mr. Cobb's argument structure distributions pattern with Deaf ASL signers writing English.

**IV.2.c.  Specifics of English grammar production.**
Argument structure distribution indicates a basic patterning that may or may not be influenced by ASL intrusions or by a language-based learning disability. It is not indicative of mastery of English grammar per se. Looking more closely at the grammar of one's actual writing can be informative. Full analysis of the grammar produced appears in the excel sheet called "English Grammar analysis," where every sentence produced contains multiple grammar errors.

**Lexicon:** Mr. Cobb's vocabulary is limited.  He frequently substitutes one word for another (*walk* for *climb*, *wreck* for *crashed* into, *hair* for *feathers*, *cash* for *stack of bills*, *hell* for *devil*, *ride* for *drive*, *glass* for *jar*, *with* for *attached to*, *wood* for *log*, *dress* for *jacket*, *sing* for *musician*, *begin* for *become*, *sit* for *hide*, *gain* for *earn* or *accrue*, *give* for *drop*, *pull* for *push*, *floor* for *ground*, etc.). He also produces circumlocutions to get his meaning across (*kick to go to exit* for *kicked them out*; *deer head stuck from Mercer* for *caught Mercer in its antlers*; *dog run away from bees follow* for *the bees chased after the dog*; *fly with wings* for *flapping my arms*, *how much gain $$* for *the interest he would accrue from investing the money*; *earth move to* for *travel around the world*; *new car ride* for *drove by in his new car*; *try get to* ("try grab to himself") for *try to catch*; *see frog sit on food* for *saw the frog hiding in her salad* etc.).  Other times he would use a single word to stand in for a whole phrase: *wreck* for *crashed to the ground*; *half* for *split in half*; *dress* for *get dressed*; *wing* for *flap his wings*; etc.

He also has many instances of the misuse of prepositions: omissions, additions, and substitutions of one for another. Prepositions are omitted (often in cases where the locative or directional meaning  would be part of the ASL verb): *jump Ø* for *jump off*; *jump Ø sing's face* for *jumped into the musician's face*; *frog jump Ø Mercer dress* for *the frog jumped into Mercer's pocket*; *guy saw cash left floor* for *the guy saw the stack of bills that were left on the ground*; etc.  In other instances,  in an attempt at hypercorrection, he adds prepositions to English words that already have locative meanings (*smell to* for *smell*; *smell in* for *smell something in*; *give to* for *give*; *give to back* for *give back*; *lick to* for *lick*; etc.). ASL distinguishes *smell* (intransitive) as in "experience a smell" and *smell* (transitive) as in "sniff at", and the latter meaning incorporates the locative movement of "to" into the verb. English allows the following syntactic alternation, one sentence using a preposition and the other not: *The man gave <u>the book to the woman</u>* versus *The man gave the woman the books*. ASL allows only the second option that incorporates the directional preposition into the verb rather than using a prepositional phrase. This recognition that the ASL verb means "give-to" is often reflected in Mr. Cobb's writing of *give to* rather than just *give*.

Mr. Cobb's prepositions are also highly interchangeable: *to* for *from*; *Mercer fall to tree for Mercer fell from the tree* (to the ground); *to* for *around (earth <u>to</u> move)*, with *for* in (and also *on* (*tree <u>with</u> beehive*, "the beehive is on the tree"; the ASL sign WITH indicates two things in

contact with each other); etc. We also see *to* for *into* (*fall <u>to</u> water* for *fell into the pond*) or *onto* , *watch to* for *look at*, etc.

Finally, in ASL the locative and directional meanings that are expressed in English using prepositions, are expressed in ASL as verbs.  As a result, Mr. Cobb produces many sentences where the English "preposition" is actually serving as the verb: *frog try <u>out</u> of glass* ("to get out of"); *Mercer <u>at</u> dog* ("to be next to"); *deer head stuck <u>from</u> Mercer* ("the deer's antlers caught Mercer and <u>moved him off</u> of the rock"). He also uses noun forms in place of verbs, such as *image* for *imagined* (*He image how much gain $$); half* for *split in half* (*Guy half hell and angle fight over cash* "The man split in two with his devil (good) side and angel (bad) side fighting over what to do with the money." And, he used adjectives in place of nouns, such as *homeless* for *homeless person*.

**Morphology:** Mr. Cobb has a limited command of English morphology. Most verbs are not marked for tense. Occasionally, however, we see irregular forms with tense marking like *was, went, lost, made, broke*, etc. This indicates that he is not regularly applying a morphological rule (like adding -ed) to indicate past, but that he has in some cases learned a separate lexical item for these forms. In addition, he exhibited a form of tense marking that does not come from ASL, but it is fairly common among deaf writers with a limited command of English, both signers and non-signers. It is often discussed as a common feature of "Deaf English" and involves the use of a form of *have* or *be* in combination with a verb to indicate past tense: Previously, we discussed the fact that such deaf writers use *was killed* (e.g., *Bill was killed John*) to indicate the past ("Bill killed John") as opposed to the passive, where it is actually *John* that did the killing (*Bill was killed by John*). Mr. Cobb's misunderstanding of *I <u>was pulled</u> from the hole* as "I pulled something from the hole" in the Flynt Cooter Sentence Screening indicates this is his analysis of these forms. Use of *have* and *be* are actually conspicuously absent in Mr. Cobb's narrative recountings. The word is only occurs twice in his Facebook posts in very routinized uses. The one time we see *have*, it is in a compound tense marker: *Bird <u>have</u> few <u>lost</u> hair* ("The bird lost a few feathers.") The absence of *have* and *be* as auxiliary verbs, the use of null subject (no pronoun in subject position ([e]), and the lack of to be forms in linking verb (copular constructions; X <u>is</u> Y) are all typological features of what have been termed "Null Subject" languages. ASL is such a language; English is not.

Mr. Cobb's lack of mastery of the passive, as was seen in the reading task, combined with his use of these Deaf English compound past tense forms attests to his limited mastery of English morphology.

We also see issues with his marking of number (e.g., using women for woman; not adding or inconsistently adding -s/-es for plural marking on nouns (e.g., *frog kiss <u>men</u>'s nose*), misuse of possessives *my* for *his*, *his's* for *his*), *give to homelessø hat penny* for *dropped a penny into the homeless person's cap*; lack of marking of progressive forms with *ing* that mark continuous action (the only one seen is *goin on*, which looks like a learned alternative for *happening*), etc.

**Syntax:** There are many ways in which Mr. Cobb's sentence grammar (syntax) in his writing diverges from English syntax. There is a conspicuous absence of determiners (use of *a, an, the*) which are the indicators of noun phrases. His word order sometimes reflects the ASL ordering of Ground before Figure as opposed the robust English ordering of Figure before Ground (*give to homeless hat*[ground] *penny*[figure]; *women give to homeless*[ground] *penny*[figure] *too*; Bedroom[ground] family[figure] for the family[figure] was in the bedroom[ground]; etc. Quantifiers frequently follow rather than precede nouns: *guy see <u>chickens lot</u>*. The ordering of noun phrases in ditransitive constructions (verbs requiring two objects like *give*) follows the required ASL order (*women give to homeless penny*) rather than the required English order, *the woman gave the penny to the homeless person.* There is also a conspicuous dearth of adjective phrases. The only one we saw was *new car*. And, notably, there was very little use of pronouns. Showing co-reference between an antecedent noun phrase and as subsequent pronoun referring back to it required considerable syntactic ability to do. One needs to know not only when *he, her, she, it they, them, we, us*, etc. are used (subject position and object position), but also what the plural forms are, and the syntactic domain in which one can use these pronouns, and the syntactic domain in which one must use the reflexive pronouns *himself, herself, themselves* or it means someone else. So, *John hurt himself* means "John got hurt", but *John hurt him* means "someone else got hurt." Mr. Cobb does not have the syntactic mastery to pull this off reliably, if he relies on ASL, the rules are different. ASL, like Korean, but definitely not like English, can use SELF to refer back to a person other than John in an

intimate way and in different points in the discourse to refer back to John in a way that English cannot do.

Mr. Cobb makes frequent use of direct quotation for things that people say or things that people think to themselves. However, instead of using the English convention of an introductory phrase like "The man said, . . ." followed by a change from third person (*she, he, they*) to first person (*I, we*), he instead uses the ASL grammar rules for such quotations. ASL can, but does not require, such a lead in phrase, but it does involve a shift of the body from the narrator position and a breaking of eyegaze with the addressee combined with the change from third person to first person. While writing English or speaking English, Mr. Cobb assumes these non-manual markers of direct quotation and simply changes the person marking from *he* to *me*. While immediately recognizable to a signer of ASL, such forms are foreign to English users. When indicating what a person is thinking, he does have a lead in, but again instead of something like "John thought to himself, 'I could accrue a lot of wealth by investing this money or I might travel the world,'" Mr. Cobb used his English version of the ASL lead in to such musings.

In ASL, one can point to the person that they will quote (optional), and then roleshift to that position and break eyegaze as mentioned above. But then, the signer produces a sign glossed (labeled) as THINK^BUBBLE which is like the thought bubble seen in comic strips. In his writing Mr. Cobb uses the word *image* for this: *He image how much gain $$ and earth move to where place.* Interestingly, in his spoken English we actually heard him say *balloon* for this: *Saw mmm [onomatopoeia: thinking] balloon, "house, and earth, plus negative plus."* ASL is able to not only quote what a person is saying or thinking, but also what a person is doing (constructed action as opposed to constructed dialogue). And for this ASL construction, the person role shifts, breaks eyegaze, and signs the action in the first person. Mr. Cobb frequently uses such ASL grammar in both his writing and his speech. Consider the beginning of his written rendition of *Mr. Koumal Flies like a Bird*:

*guy walk to mountain top.* Narrator: "The man climbed to the top of the mountain."
*I saw bird can fly with wings.* Quote the action from the point of view of the man:
        "I am seeing the bird."
        Quote what he says to himself:
        "I can flap my arms and fly."

| *I try fly with wings* | Quote the action from the point of view of the man: "I am trying to fly by flapping my wings." |

There is no way to faithfully translate this into English. It must be restructured as not involving all the quotation: "The man climbed to the top of a mountain and saw a bird. He thought to himself, 'I can flap my arms and fly.' So, he tried to do so." Someone with no knowledge of ASL grammar however would more likely understand this as the narrator stating that a man climbed a mountain and then the narrator saw a bird up there as well and thought that he (the narrator) could do the same. So, he tried to flap his arms and fly.

In summary, Mr. Cobb's grammar use in English is comparable to second-language learners of English who have only partially developed English grammar. Such individuals are fluent in their first language, but they have very little fluency in their second language. They have learned just enough to "get by." Grosjean (1979)[9] characterized such second language users as having a fossilized grammar of English that uses some formulaic conventions for ordering, often just strings together words without syntactic arrangement, and often is actually driven by the grammar of their first language. In Mr. Cobb's case this first language would be ASL.

**Summary:** We conclude that Mr. Cobb is such a second language user with only a fossilized grammar of English. It is important to note that while Mr. Cobb has little in the way of English grammar competency, he is near-native in his fluency in ASL. Furthermore, he uses the grammar of ASL to structure his English writing. Basically, Mr. Cobb is using the words he has in English to write ASL. Given this, a fluent signer of ASL (with sufficient context) may be able to decode Mr. Cobb's writing via knowledge of ASL grammar and recover much of what he is trying to say, but someone with no knowledge of ASL grammar trying to read his English will either be stymied by it, or worse, will misunderstand it in serious ways. For this reason, written English cannot reliably serve as a means of communication access for Mr. Cobb to share information he needs to share (via writing) or as we will see below to receive information he needs to have via reading.

---

[9] Grosjean, F. (1979) *Life with Two Languages.* Cambridge, MA: Harvard University Press.

**IV.2.d. Reading**

Based upon our assessment, Mr. Cobb can read at a second-grade level at best, but not above. His vocabulary is weak, and his struggle with reading is exacerbated by not having much command of the morphology and syntax of English. There is a transition in reading ability that occurs at about a fourth-grade level, where a person transitions from "learning to read" to "reading to learn." Making that transition requires not only vocabulary but also sufficient command of the syntax of English to be able to decode and comprehend sentences that convey information that is new or unexpected. In the background discussion, we talked about someone without proficiency but with recognition of some of the words in a sentence (such as those underlined below) being able to guess the meaning of the sentence *The dog bit the mailman* or even *The mailman was bitten by the dog* by relying upon their knowledge of the world without recourse to English grammar. But without recourse to grammar, the same person would assume the *same meaning* for the sentence, *The dog was bitten by the mailman* (namely that "the dog bit the mailman"). To understand that the sentence means "the mailman bit the dog," a reader must rely upon more than guessing and expectations based on world knowledge. When the literature talks about many Deaf readers plateauing at a fourth-grade reading level, what is really being said is that they are not using syntax to decode sentences. Cobb has not made that transition. His reading is fossilized at a stage where he is not yet "reading to learn."

**IV.2.d.i.  Flynt-Cooter Reading Inventory**

The Flynt Cooter Reading inventory is administered in three steps.

- First, we ask the individuals to look at a list of three sentences at each level and to circle any words they do not know.

- Second, we ask them to read each of the sentences at each level (1-9). We further check for understanding if the sentences are just coded word for word or if it is not clear from the response that they understood the meaning. For example, sentence 1 under Level 3, *The forest was something to see,* has a figurative meaning. We check to be sure they aren't just giving the literal meaning, like "there was something to see in the forest." Sentence 3 under Level 2 is a passive form. In some Deaf English *was pulled* is used to convey the past tense rather than the passive. We ask, "Who pulled" and "Who was in the hole?"

At times we draw a picture and ask them, "Which one is you?" We also look for additional unknown words that were not circled. If an individual who is Deaf misses either the figurative or the passive reading, it is marked as incorrect, but reading at that level is not ruled out. Deaf individuals can have less exposure to figurative language and the passive construction is really something mastered at the fourth-grade level. We delved deeper into their reading level at the next step.

- Third, we present the person with a set of graded reading passages associated with each level. We typically start at or just above anywhere they got all three sentences correct on the sentence screening, with the exception of allowing for issues with the two sentences mentioned above. Based upon their performance on the sentence screening, we present a reading passage vetted as indicative of that level of reading. Depending upon performance at that reading level, we move up and down from there.

**Flynt Cooter Sentences (levels 1-9).**

Mr. Cobb's performance on the sentence screening is documented below, with notes regarding the items he missed. A "1" indicated successful reading of the sentence and a "0" indicates an unsuccessful response. While he didn't get the passive at Level 2, we still counted that level as indicative of where to start the passages.

| | | |
|---|---|---|
| **FORM A: Level 1  You Cannot Fly** | | |
| 1.  He wanted to fly. | 1 | |
| 2.  The family got together. | 1 | |
| 3.  The boy was jumping. | 1 | |
| | | |
| **FORM A: Level 2  The Pig and the Snake** | | |
| 1.  I was walking fast to town. | 1 | |
| 2.  He  cried about going home. | 1 | |
| 3.  I was pulled out of the hole. | 0 | did not get the passive |
| | | |
| **FORM A: Level 3  The Big Bad Wolf** | | |
| 1.  The forest was something to see. | 0 | see something in the forest |
| 2.  I was enjoying sleeping when my Mom called. | 0 | called- used wrong sign (named) |
| 3.  I had to go to bed early last night. | 0 | had to |
| | | |
| **FORM A: Level 4  New Clothes** | | |
| 1.  I dislike being the youngest. | 0 | bring=being |
| 2.  I'm always getting into trouble. | 1 | |
| 3.  They insisted on watching the show daily. | 0 | insisted, daily |
| | | |
| **FORM A: Level 5 Hot Shoes** | | |
| 1.  Athletic shoes come in all kinds of colors. | 1 | |
| 2.  Serious players manage to practice a lot. | 0 | manage=assistant |
| 3.  A cheap pair of shoes doesn't last very long. | 0 | pair |
| | | |
| **FORM A: Level 6  Mountain Fire** | | |

| | | |
|---|---|---|
| 1. He was searching for the evidence. | 0 | evidence |
| 2. He realized the rock formations were too high. | 0 | realize; formations=form |
| 3. The conservationist hoped to reforest the mountain. | 0 | conservationist, reforest |
| **FORM A: Level 7 The Canoe Trip** | | |
| 1. Unfortunately, she was confused about the next activity. | 0 | unfortunately |
| 2. The submerged rocks were dangerous. | 0 | submerged |
| 3. She disappeared around the bend at a rapid rate. | 0 | disappeared, bend, rapid |
| **FORM A: Level 8 The Eagle** | | |
| 1. Ascending the mountain was rigorous and hazardous. | 0 | ascending, rigorous, hazardous |
| 2. The cliff provided a panoramic view of the valley. | 0 | cliff, provided, panoramic, valley |
| 3. The incubation period lasted two weeks. | 0 | incubation period |
| **FORM A: Level 9  The Case of Angela Violet** | | |
| 1. The abduction made everyone suspicious. | 0 | abduction, suspicious |
| 2. The detective was besieged by the community. | 0 | detective, besieged, community |
| 3. Her pasty complexion made her look older. | 0 | complexion |

**Flynt Cooter Reading Passages 1-9**

Based upon a strict scoring of the Flynt Cooter sentence screening, Mr. Cobb would be expected to read solidly a 1st-grade level. However, since we make an exception for the passive sentence at this level, we started with the Level 2 (or second-grade) reading text and moved up and down from there. The number in parentheses after the title of the passage indicates the order in which we presented that passage. This is followed by a commentary on performance at that level.

### Level 1 You Cannot Fly (4)

Having started at Level 2 and progressing to Level 3 where he had some partial reading ability and Level 4 that was clearly above his ability, we returned to the Level 1 passage, which he was able to read and understand with ease.

### Level 2 The Pig and the Snake (1)

We started at this level. He read all the words and we feel understood the sentences fine up until the sentence *How can you bite me after I helped you out of the hole?* He was coding at this point and when we would ask questions, he would come back with verbatim answers. Our sense is that he got the gist, but he wasn't really processing the grammar construction. However, since he got the point, we will accept that he reads okay at this level--with some syntactic limitations that he seems able to work around to get at meaning.

**Level 3 The Big, Bad Wolf (2)**

He read the first few sentences okay, but vocabulary quickly took a toll (*chimney, poor, nightgown, woodcutter*) and phrases like *"freeze to death," "ran for his life,"* etc. were not fully understood. The combination of missing vocabulary, idiomatic phrases, and limited English syntax made his reading comprehension increasingly patchy, and in the end, comprehension was lacking. He also had problems making the connection to the children's story, *Little Red Riding Hood,* and that this passage was a twist on it. He could not tie in the last paragraph where the wolf's wife sarcastically says, "Just you wait, those humans will make up a story about how big and bad you were." He had problems with inference, and he was just coding sporadic words at that point. He cannot read reliably at a third-grade level.

**Level 4 New Clothes (3)**

Even though he did not pass Level 3, we tried the next level up to see if schema would help. He was immediately overwhelmed by the amount of text. He tried to read it on his own and said he could not understand it. We spent a little extra time encouraging him to try to fully read this text to allow us to establish a firm upper limit at which he could not read. He couldn't even get by the word *youngest* in the first sentence. He read *being* as *become* and *our* for *or*. He didn't know *television* (although he would have recognized TV), *hand-me-down, afford, replied, bought, cut back,* and *approached*. He didn't get the figurative meaning of *the idea hit him*. He understood little of this passage and read by coding word for word, but without comprehension of the sentences or text.

**Level 5 Hot Shoes n/a**
**Level 6 Mountain Fire n/a**
**Level 7 The Canoe Trip n/a**
**Level 8 The Eagle n/a**
**Level 9 The Case of Angela Violet n/a**

Mr. Cobb does read to himself rather than engaging in the "read aloud" activity. The latter often signals coding rather than reading for meaning. And he is able to quickly determine what he can read and what he cannot.

Based upon the sentence screening and performance on reading the Flynt-Cooter passages, we would place Mr. Cobb's reading level just barely second grade, but not above.  Second-grade reading does not come easy to him, but he can understand most of it.

**IV.2.d.ii. San Diego Screening.** To corroborate our assessment of reading level, we also analyzed Mr. Cobb's responses on a strictly vocabulary-based reading screening, *The San Diego Quick Assessment of Reading Ability*. This test is a reliable predictor of reading level based upon vocabulary alone, independent of grammar.

According to the San Diego Screening, Mr. Cobb would be expected to read independently only up through the 2nd-grade level, and with frustration above that level. He got zero items incorrect, however he only recognized a few words. He did not make any attempts to guess what he didn't know. Above the second-grade, however, he had numerous gaps.

Mr. Cobb's results for the San Diego Screening appear below:

| 1 | 9 | | 2 | 9 | | 3 | 3 | |
|---|---|---|---|---|---|---|---|---|
| road | 1 | | our | 1 | | city | 1 | |
| live | 1 | | please | 1 | | middle | 1 | |
| thank | 1 | | myself | 1 | | moment | 0 | |
| when | 1 | | town | 1 | | frightened | 0 | |
| bigger | 1 | | early | 1 | | exclaimed | 0 | |
| how | 1 | | send | 1 | | several | 0 | |
| always | 1 | | wide | 1 | | lonely | 0 | |
| night | 1 | | believe | 1 | | drew | 0 | |
| spring | 0 | | quietly | 0 | | since | 0 | |
| today | 1 | | carefully | 1 | | straight | 1 | |
| 4 | 2 | | 5 | 3 | | 6 | 1 | |
| decided | 1 | | successful | 1 | | bridge | 1 | |
| served | 0 | | business | 1 | | commercial | 0 | |
| amazed | 0 | | develop | 0 | | abolish | 0 | |
| silent | 0 | | considered | 0 | | trucker | 0 | |
| wrecked | 1 | | discussed | 0 | | apparatus | 0 | |
| improved | 0 | | behaved | 1 | | elementary | 0 | |
| certainly | 0 | | splendid | 0 | | comment | 0 | |
| entered | 0 | | acquainted | 0 | | necessity | 0 | |
| realized | 0 | | escaped | 0 | | gallery | 0 | |
| interrupted | 0 | | squirming | 0 | | relativity | 0 | |
| 7 | 0 | | 8 | 0 | | 9 | 0 | |

| amber | 0 | | capacious | 0 | | conscientious | 0 | |
| dominion | 0 | | limitation | 0 | | isolation | 0 | |
| sundry | 0 | | pretext | 0 | | molecule | 0 | |
| capillary | 0 | | intrigue | 0 | | ritual | 0 | |
| impetuous | 0 | | delusion | 0 | | momentous | 0 | |
| blight | 0 | | immaculate | 0 | | vulnerable | 0 | |
| wrest | 0 | | ascent | 0 | | kinship | 0 | |
| enumerate | 0 | | acrid | 0 | | conservatism | 0 | |
| daunted | 0 | | binocular | 0 | | jaunty | 0 | |
| condescend | 0 | | embankment | 0 | | inventive | 0 | |
| 10 | 0 | | 11 | 0 | | | | |
| zany | 0 | | galore | 0 | | | | |
| jerking | 0 | | rotunda | 0 | | | | |
| nausea | 0 | | capitalism | 0 | | | | |
| gratuitous | 0 | | amnesty | 0 | | | | |
| linear | 0 | | risible | 0 | | | | |
| inept | 0 | | exonerate | 0 | | | | |
| legality | 0 | | our | 0 | | | | |
| aspen | 0 | | luxuriate | 0 | | | | |
| prevaricate | 0 | | piebald | 0 | | | | |
| barometer | 0 | | crunch | 0 | | | | |

Overall, the rough reading screening, the sentences and excerpts from the Flynt Cooter indicate that Mr. Cobb reads independently, but with some effort, at a second-grade level.

**IV.2.d.iv. Reading behaviors.**   Mr. Cobb's reading activities consist of reading the headlines, but he prefers to watch in ASL instead. However, news like the *Daily Moth* is too advanced for him and not ASL-friendly enough. He uses Facebook, but this does not imply extensive reading. He looks at pictures, short comments, posted news. He watches television with closed captions and reads them but with many gaps. He recognizes that he does not understand many words, which also limits the benefits of closed captioning.

**IV.2.e. Vocabulary**

You cannot read, lipread, or write what you don't understand.  Since Mr. Cobb is an adult, we might also expect him to have acquired some specialized vocabulary that a child reader would not have. Therefore, it is important to look at some of the specialized vocabulary he might encounter as an adult. The following vocabulary lists present first a list of twelfth-grade words, typically acquired through reading. The next list is a mixture of medical and general vocabulary someone might encounter in a healthcare situation. The last list is comprised or words one might encounter in a law enforcement context.

The results of Mr. Cobb's vocabulary test appear below:

| correct | false + | category | incorrect | recognized | unrecognized | total | % correct | % incorrect |
|---|---|---|---|---|---|---|---|---|
| 0 | 0 | twelfth grade | 90 | 0 | 90 | 90 | 0% | 100% |
| 14 | 5 | hospital and general | 76 | 19 | 71 | 90 | 16% | 85% |
| 24 | 6 | police | 66 | 30 | 60 | 90 | 27% | 73% |
| 11 | 2 | employment | 79 | 13 | 77 | 90 | 12% | 88% |
| 49 | 13 | total | 311 | 62 | 298 | 360 | 14% | 86% |

### IV.2.e.i. Twelfth Grade (grade-level reading list)

Mr. Cobb got none of the 90 twelfth-grade vocabulary items correct (0%). He didn't even falsely recognize any. We can say in this case that he seemed to know what he didn't know reliably.

### IV.2.e.ii. Medical and General Vocabulary

He did better recognizing medical and general vocabulary. He got 14 of the 90 vocabulary items correct (16%). He thought he recognized 19 medical and general vocabulary (21%), but 5 of these were incorrect. He confused *admission to the hospital* with *ambulance, change the dressings* with *change the dress, consent* with *doesn't have,* and *follow up* with *follow* and *up*. So, 20% of the time when he thought a word was correctly recognized, it was incorrect. He was a little better at recognizing words in this category, but he was also less reliable at distinguishing words he knows and doesn't know.

### IV.2.e.iii. Law Enforcement Related Vocabulary

Mr. Cobb was able to identify 25 of the 90 law enforcement words correctly (27%): *abuse, accident, address, alcohol, arrest, assault, attorney, bail, charged with a crime, court, driver's license, fault, felony, found guilty, injury, license,* and *motor vehicle.* He thought he recognized 30 words (33%), but 6 of these were incorrect. He confused, *accident report* with *to report someone, booking* with a *book, DUI* with *drinking* but not the violation, *DWI* with *drugs* (although we suspect that he does know these and was just attributing one to drugs and the other to drinking and never specified it was a violation; it would only bring him from 27% to 30% however), *fact* with *agrees with you, where's the other party* with *party* as in a festive event, and he didn't know the word *impaired* in *hearing impaired.* Notably, he did not know words like *alleged, consent, dismissed, identification, incarcerate, remain silent,*

84

*sobriety, take into custody,* and *waive*. So again, 20% of the time, when he thought he recognized a law enforcement word, he was incorrect. If we count, DUI and DWI as close enough, then he got 30% correct and he was unreliable only 13% of the time.

He is better at recognizing words related to law enforcement and is similar in his ability to distinguish words he knows from words he doesn't know to what was seen in the medical vocabulary. He is still at best only getting 30% of the vocabulary in this domain.

### IV.2.e.iv. Employment Related Vocabulary

Although he works quite a bit, Mr. Cobb's employment consists mostly of odd jobs and blue-collar work, so he is not familiar with the full range of employment vocabulary. He was able to identify 11 of the 90 employment-related words correctly (12%): *bullying, clock in, fired, hired, IRS, overtime, bail, charged with a crime, court, driver's license, fault, felony, found guilty, injury, license,* and *motor vehicle*. He thought he recognized 13 words (14%), but 2 of these were incorrect. He confused, *breaks* with *break in* and *sick leave* with *if you are sick you leave*. So, 15% of the time, when he thought he recognized an employment-related word, he was incorrect.

Mr. Cobb has no 12th-grade vocabulary, which are words typically derived from reading, but he also tends not to assume he knows more words than he actually does.  This makes his knowledge of vocabulary at the 12th-grade level non-existent, but not unreliable. However, he does have some adult-acquired vocabulary in the specialized areas of medical, law enforcement, and employment, where he has some world knowledge.  His vocabulary is highest in the law enforcement domain 27-30%, but it is also the most unreliable in that domain, but only slightly more. The issue is that even 30% is a poor vocabulary. Also, acquiring specialized vocabulary as an adult does not impact reading level. Mr. Cobb's vocabulary in English is very limited and unable to support effective communication access.

### V. Narrative Production (ASL v. English written v. English spoken)

In this final section of the assessment, we compare the volume and articulateness of Mr. Cobb's production of three renditions of the same narrative in three different forms: signing in ASL, writing in English, and speaking in English.

## V.1. Narratives signed in ASL

Mr. Cobb's renditions of *Mr. Koumal Flies Like a Bird* and *Mr. Koumal Battles his Conscience* demonstrate strong competency in ASL grammar (see videos).

His signed narratives demonstrate ADJECTIVE fluency in ASL.

---

| *Mr. Koumal Flies like a Bird (signed)* | Brandon Cobb |
|---|---|

HCL:S(2h)-SWING-PICK+++[upward] ON MOUNTAIN. CL:B-EXTEND[upward on incline] CL:B#CL: ON++[upward] HCL:S(2h)-SWING-PICK+++[upward] CL:1[horizontal]#CL:X-TO-ON^TO+++[up] SUCCEED TOP HCL:S(2h)-SWING-PICK. SEE^IX[left] BIRD FLAP-WINGS(FLY)++ [†]SBP[koumal, head back and forth]LOOK-AT3p[left, bird]. [facial gesture: hm]. CURIOUS IF SUCCEED CL:B#CL:bentV-JUMP-OFF (FLAP-WINGS)FLY++. WRONG [IT WORK]neg TUMBLE+++ HIT. DREAM THEN THINK HOW.  SEE SEE CL:V-FALL UH..UH..f-u-r shoulder#CL:V-ON-FROM. NAME TRUE KNOW^NOT NAME. CL:V-FALL[floating, downward]. LOOK-AT[down, feather] 1pPICK-UP[feather] MAKE arm#CL:4-ON+++[along]. TRY FLAP-WINGS(FLY)++ CL:V-FALL^CL:1(2h)-TUMBLE++. EAGLE LAUGH+++++, CL:1(2h)-TUMBLE++[downward] CL:1(2h)-TUMBLE++[downward], [†††][headnod(Tag)].  MORE LOSE h-a-i-r FINISH TRY AGAIN MAKE FULL arm#HCL:lotus-PUT-ON[along] SBP-UPWARD(JUMP)^(FLAP-WINGS)FLY++. CL:1(2h)-TUMBLE++[downward] AGAIN. THEN [††][LAUGH BIRD LAUGH+++]. LOSE h-a-i-r FINISH [††][NAKED BEGIN FINISH.  MAKE AGAIN SBP-UPWARD(JUMP)^(FLAP-WINGS)FLY++. AGAIN CL:1(2h)-TUMBLE++[downward]. neg[SUCCEED]. s-o FIND BIRD MANY. DECIDE GATHER+++ TAKE3p[down, feathers] shoulder#HCL:S(2)-CARRY-ON+++. arms#HCL:lotus-PUT-ON[both]. FLAP-WINGS(FLY)++. SBP-DOWNWARD. [gesture: well] FAIL.

"He climbed up a mountain swinging a pickaxe. It was steep. He went upward swinging his pick until he succeeded in reaching the top. Throwing down his pick, he saw a bird flapping its wings and watched it moving back and forth. Hm, he thought, I am curious if I successfully jump off this peak and fly as well. He was wrong, it didn't work and he tumbled downward, finally hitting the ground. He dreamed about it and then thought about how.  He saw fur [feathers] falling from the bird's body (Comment: I really don't know the name for those.) and floating downward.  He looked down at the feathers, picked some up, and put them along his arms to make wings. He flapped his wings, fell, and again tumbled to the ground.  The eagle laughed  as (the man) tumbled downward, he did; and lost even more hair [feathers]. Filling his arms with feathers, the man jumped off and flapped his wings, but again tumbled to the ground.  Then the eagle laughed hysterically until it lost all of its hair [feathers] and became naked. Again the man made wings with them and again he jumped, flapped his wings, and tumbled to the ground. He didn't succeed. So, he found many birds and decided to gather up [their feathers], throw them over his shoulder, and carry them [back up the mountain]. He put them on both arms, flapped his wings again, and went down.  Well, he failed."


[†]Quantifier float: Shifts[back and forth] from verb to SBP; later his articulation of FINISH puts its movement on the preceding SBP
[††]ASL verb sandwich (simple verb-noun-more complex morphological form)
[†††] A deep head nod like this tends to mark a sentential Tag (e.g., The eagle laughed, he did.)

---

Note that it took a full six minutes to get Mr. Cobb to begin to produce his ASL rendition of *Mr. Koumal Battles his Conscience*. This was the first cartoon presented to him. In the end, Dr. Rowley got him started by giving him the beginning and then he took over the rest. For purposes of comparison of how prolific his ASL versus written narratives are, we will compare his renditions of *Mr. Koumal Flies like a Bird* (signed and written that were collected on another day when he was more rested and ready to engage in the task. However, even with having been started on *Mr. Koumal Battles his Conscience*, the difference in what he can convey via signing, writing, and speaking is clear.

<table>
<tr><td>

***Mr. Koumal Battles his Conscience (signed)***                           **Brandon Cobb**

RIGHT. rs:(koumal)1pGIVE-TO3p[left] rs(beggar): [1pHCL:T-handle cap"-HOLD-OUT-TO3p[right,woman]]. OTHER WOMAN rs:(woman): [1pGIVE-TO3p[beggar] PENNY RIGHT.] WOMAN LOSE c-a-s-h THOUSAND ON GROUND. s-o [MAN]topic SEE ON FLOOR. THINK^CL:C(2h)-BUBBLE-OPEN[gradually]. 1pWISH HOME KING HOUSE BEAUTIFUL KING. CHANGE, SECOND EARTH. CHANGE, POSITIVE++ NEGATIVE CHARGE MONEY. 1pGIVE-TO3p[right] TO IX[det, right] WOMAN MONEY  1p#back-TO3p[woman]. NEXT, GOD[left] shoulder#CL:H-ON POSS3p[right] START f-o-o-t TO h-e-a-d HALF RED DEVIL rs[devil][SELF 2pPULL-TO DON'T LET 2pGIVE-TO3p[right,woman]. 2pKEEP CLOSE. WHAT WANT SPEND.  UM.. START OTHER MAN rs(beggar):[SEE3p[money] STEAL3p[money]]. A[money]THUP rs(koumal):[[gesture: what's happened] CL:1#CL:1-TO-ON[reciprocal]. THEN BECOME SUSPICIOUS 1pSEE CL:3-[left]FROM-TO[rightward]. [beggar]#back HCL:T=>L-FLICK PENNY CL:B[palm]#CL-1-TO-ON. FINISH.

"Right. He gives something to a beggar holding out his cap. Another person, a woman, gives a penny to the man. Right? The woman loses a thousand dollars of cash that falls on the ground. So, the man sees it on the ground and thinks to himself, "I wish I had a royal mansion" Then his thoughts change to (traveling) the world. Then they change to seeing a list of monetary transactions, credits and debits. He considers giving the money back to the woman. Next, with God on one side and the devil on his shoulder, he is pulled apart starting from his feet and moving to his to his head. Half of him is now the red devil, who says, "Pull that money to yourself. Don't let anyone give it back. Keep it close. Spend it on what you want." But the other man (the beggar) sees the money on the ground and steals it.  It is gone in a flash. The man (Koumal) is wondering what happened. His good and evil sides rejoin. Then, he becomes suspicious as he sees a car drive by. The beggar flicks the penny back to him and it lands in the palm of his hand. That's it."

</td></tr>
</table>

Mr. Cobb's signed narratives are far more prolific than his written English narratives, conveying much more visual and spatial detail than any of his English narratives. His ability to express himself in both ASL and written English is very different. While his signing at times may be a bit sloppy, overall we see repeated evidence of mastery of ASL grammar and vocabulary. We have some concern that his extended lack of contact with the Deaf community and interaction primarily with hearing people and family members can have led to his producing a kind of hybrid ASL that at times just strings together signs

in a way that limited signers might be able to follow in a telegraphic way. This somewhat atypical signing style often happens with people who have been isolated from the language and the community for extended periods and who know they can only sign or gesture so much to get by, leaving the rest to shared context. We don't believe this was his signing style at baseline, but currently, while ASL is his best language for communication, his style can be a little vague and a little more difficult to unpack. This is one reason we feel a Deaf interpreter is necessary for any high stakes situations where he needs to fully understand and be understood.

Mr. Cobb's written renditions of the same Koumal narratives can be seen in section IV.2.a. and are copied here for comparison purposes.  Most of the grammatical issues were listed in section IV.2.c.

| *Mr. Koumal Flies like a Bird (written)*                    **Brandon Cobb** |
|---|
| guy walk to mountain top. I saw bird can fly with wings. I try fly with wings. finally it, but failed wreck.  bird laughte at guy, Can't fly wing. BIrd have few lost hair guy made wings hair try again jump fly wing it again wreck.  bird again laugh at guy. bird lost all hair. guy made lot hair wing. again full wreck. guy see chickens lot. ateal chickens hair. again made full hair. again jump failed. |

| *Mr. Koumal Battles his Conscience (written)*                  **Brandon Cobb** |
|---|
| Guy take penny from his pocket give to homeless hat penny and women give to homeless penny too. Woman lost cash left. Guy saw cash left floor. He image how much gain $$ and earth move to where place. Guy change mind give to woman back cash and hug god. Guy half hell and angle fight over cash. Homeless saw it then steal cash. Guy half hell and angle lost mind. Homeless new car ride give to guy back penny. |

As can be seen, his command of English is very limited and difficult to understand. Writing, except in the most rudimentary of interchanges, cannot serve his communication needs.

## V.3. Narratives in spoken English

Mr. Cobb was not comfortable nor used to speaking. He was actually upset at having to do so. For many Deaf people, including him, being forced to speak is embarrassing and felt to be demeaning. His spoken English is not only less grammatical than his written

English, it is also completely unintelligible. Cajoling individuals into speaking is often the most unpleasant part of the assessment for us.

 The discrepancy between Mr. Cobb's skill in any modality of English and his ability to communicate in ASL is vast. What is written below is Dr. Shepard-Kegl's transcription of what she believed to be his intended speech targets based upon lipreading and seeing concurrent signing. These spoken recountings are reproduced below from IV.1.a.i.

---

***Mr. Koumal Flies like a Bird (spoken)***          **Brandon Cobb**
One guy to mountain again again saw *[only signed: bird]* can fly. Mmm. Fly but fail. Bird laugh hah. Can't fly. Lose hair.  Steal to again climb. Fly again. Finish *[only signed: walk]* bird. Bird, "Ha ha." *[only signed lost]* all hair. *[only signed: then saw]* bird *[only signed many many]* steal *some bird hair then]* make. Fail.

**Transcription of speech:** /wʌ ga tu mãõ. ɛ ɛ suw kĩ fay tʌ. mmmm. bɛ fɛ. ɪ læ: hɛ. kæ fɛ. lɛ hɛ. sɛ tu gɛ kɪ. fɪ ɛ̃. c bʊɪ. bʊ hɛ hɛ. ɔ ɛ. [click sound]. mɛy. fɛ./ [link to spoken sample]

---

***Mr. Koumal Battles his Conscience (spoken)***        **Brandon Cobb**
One man walk to see homeless. *[He signed, "This is sick. I bothers me to voice."  Dr. Shepard-Kegl responded, "Try your best please."]*  Saw man beg  penny one coin give. Woman give coin. Dollar fall fuw. Saw mmm [onomatopoeia: thinking] balloon, "house, and earth, plus negative plus. Give to cash. God happy. Okay, red foot to head. Devil pull, keep. Fight, fight, fight. Fight. Saw puw [onomatopoeia (steal)].  Finish, where? See care oooo [onomatopoeia (drive by)]. Finish.

Transcription: /wʌ mæ̃ wʊ tu siy hʌlə. *Started again:* suw mɛ bɛ pɛ: wʌ sɛy kʊ ɛʊ. wʌ gɪ kæ. dʊ fɔ fuw. tɔ mmm bʌʊw, wə kʊ, ə uw, pʌ nɛv pʌ. wɛ tʊ kæ. ga pɛɪ. kʊ. ɪɛ: fɛʔ ʊ ɛ. diy pɪ. k.. fʌfʌfʌ fʌ. sɔ puw kuw. Fuw, wɛ.  siy kɔ uw. fɪ./

---

## V.4. The influence of English on ASL and vice versa

There is some English influence on Mr. Cobb's ASL, but it is usually the tendency to produce uninflected ASL verbs at times or strings of signs, rather than a grammar influence on ASL. Once in a while a conceptually inaccurate sign choice like the sign WORK (meaning "do a job") where it should be SUCCEED (meaning "it worked"). There is indeed an ASL influence on his written and spoken English. In fact, the grammar of ASL (including ordering) often drives his English production.

## V.5 Comparison of narrative production in English and ASL

In comparing the Koumal narratives in ASL and English, it is clear that Mr. Cobb is most comfortable with ASL signing. He is not proficient in written English. He is by no means a balanced bilingual in these two languages and modalities.

## Individual Assessment: Joseph Nettles (male, 52)

### I. Linguistic/Cultural Profile

**I.1. Responses:** (also in ASL on video)

**I.1.a. Born deaf?**  No, he was not born deaf. Meningitis is suspected; however, he says he became deaf from a fever at 2 ½ years old.

**I.1.b. Deaf parents?** No, his family is not deaf. He is the 6th of 8 children. There are other relatives who are deaf as well. He only knows one cousin but has not met the others.

**I.1.c. Attended residential school for the Deaf?** He started at Georgia School for the Deaf in Cave Springs at 4 years old then moved to Louisiana School for the Deaf in Baton Rouge at age 7 in 1974.

**I.1.d. Tends to associate primarily with Deaf people?** Due to his criminal record and probation conditions he has very limited socializing with Deaf or hearing people. If that was not an issue, he would prefer socializing with other Deaf people. For that reason, he tends to have superficial socialization with hearing people.

**I.1.e. Is a member of Deaf clubs and organizations?**  No.

**I.1.f. Married a Deaf spouse?** His current girlfriend is Hard of Hearing and his ex-wife is Deaf. They have 4 children together. All of the children are hearing but use some ASL. None are certified interpreters, and some are not fluent ASL signers.

**I.1.g. Typical Deaf occupation?** He worked as a machine operator out of high school, making glass for fluorescent light bulbs. He has had many job experiences since such as: Walmart, McDonalds, Applebees, Outback. He started as a janitor, then moved up to cook. He tends to communicate with other employees through gestures and some rudimentary, highly routine spoken phrases. New employees don't understand him but become used

to him later on, for very job-specific communication. He worked in manufacturing on an assembly line for Live Oak mobile homes, then left his job due to better pay at a shrimp factory. He worked as a big truck driver there. Since prison he has held a variety of different jobs.

**I.1.h. Awareness of dB loss?** He knows he is profoundly deaf but does not know what his hearing loss in terms of decibels (dB).

**I.2 Early Life Choices:**  In terms of early life choices, the decisions made for Mr. Nettles by birth and by his family's school choices were not mixed. He only had consistent access to sign language once he began attending the Georgia School for the Deaf. His family did not communicate with him in sign language while he was growing up. They only spoke or used gestures.

**I.3 Later Life Choices:** Mr. Nettles' later life choices indicate an individual with identification with deaf culture. He has relationships with people who use ASL and has grown up at a school for the Deaf and has used ASL most of his life. When he was in prison, he socialized with other people there who signed. This shows a strong affinity for communication in ASL. When questioned about his identity, he clearly showed his pride in being Deaf.

## II. Individual's use of Interpreters

Mr. Nettles reported to us that he was in prison in Georgia until 2011 and that he expects to be on probation until 2021. Many times, during his legal proceedings, Mr. Nettles reports not having been provided interpreters, and at other times interpreters were not provided in a timely manner. His daughters and mother were frequently recruited to interpret for him. He reports only having interpreters provided during his actual trial. While in prison, he reports never having had interpreters. There was one incarcerated person who could sign that the officers at times used as an "interpreter." However, Mr. Nettles was very uncomfortable having a fellow incarcerated person know the personal details about his life, his offense, and his probation that were discussed. Upon his release, Mr. Nettles reports that he also met with prison officers without an interpreter. They showed him a map and circled places on it. He didn't know what these referred to and

thought it was places he should go after prison. He did not understand the conditions of his release. His mother picked him up from the prison and officers talked with her and informed her where Mr. Nettles should report for probation within 72 hours of release. There was no interpreter at the probation office. Instead, probation said that they needed to have the court arrange for an interpreter to come to the probation office. Mr. Nettles reports that during this meeting, the probation officer handed him a large stack of papers that he could not read that he believed were likely his conditions for release and probation. The officer asked Mr. Nettles' mother to interpret the documents. She is not an interpreter, nor is she a fluent or capable signer. For fear that he would not be allowed to leave the probation office, he signed the papers without understanding them. Mr. Nettles reports that he could neither access the content of the documents, nor ask questions about them. He further reports that his mother could neither understand the documents nor answer his questions. He has been on probation for 9 years, with three different probation officers. In the first eight years, he was never provided an interpreter for any of the bimonthly visits with the probation officer. Mr. Nettles reported that inspections of his living area were done without any communication with him and that he was given lots of papers and documents to read, sign, and comply with. As discussed further below, Mr. Nettles' English is very limited, and written documents above a first- to second-grade level are not accessible to him without an interpreter.

Mr. Nettles informed us that there were also no interpreters provided for annual meetings at the county sheriff's office where he needed to sign more papers. The experts assume that such papers would apprise him of any changes in the rules or conditions on his probation. He reports that he didn't understand the papers, but still signed them for fear that he would be reincarcerated if he did not. As a certified interpreter, Dr. Shepard-Kegl frequently checks up on comprehension of papers that have been signed by Deaf individuals not in the presence of an interpreter. Such individuals often report, as does Mr. Nettles here, that they signed the papers for fear of being denied services or looking like they were not cooperating.

Mr. Nettles noted that in one meeting at the sheriff's office, his daughter was asked to interpret for him. During that meeting, the officer reacted to Mr. Nettles' signing and indicated that he felt it was threatening. Recall from our prior discussion that the ASL face

for *who, what, where, wh*-questions (wh-questions) is a facial expression often mistaken by hearing people as an angry facial expression. His animated signing and facial expressions could not have been understood by an officer as markers of grammar, and they were likely misunderstood by the officer as an expression of anger. Such misunderstandings are common. Professional interpreters would have done a cultural adjustment in this case both conveying a lack of anger in their intonation and via explanation that this is grammar on the face, not affect (emotion). Prisoners are often written up for aggressive communication when they are simply using ASL grammar.

Based on our interview, we ascertained that Mr. Nettles has been receiving VRI interpreting since 2019, but that he still struggles to understand many hearing interpreters and would benefit from a Certified Deaf Interpreter if an interpreter is needed or provided. He informed us that when he has received interpreting services, the information is still sometimes over his head, but he nods anyway even when he does not understand. This is the nodding behavior mentioned earlier, and there are many reasons why it can be happening: self-esteem issues, power imbalance, hesitance to criticize or correct someone, etc. The point is that if it is happening, it is an indication that while being provided an interpreter, it may not be the right match of an interpreter for his needs. No interpreter should accept nodding as an indication of comprehension. Probing for understanding with open ended questions as well as "teach back" ("so explain back to me to me what I just told you.") is standard practice. Deaf Interpreters are particularly attuned to such behaviors and are regularly probing for understanding. The fact that Mr. Nettles nods is one more reason why it would be prudent to use as CDI with him. It is important to remember that the interpreter is there for both interlocutors. Both need to effectively share information and to have it shared with them.

With the current pandemic, there have been many interpreters on TV along with governors and other prominent officials. When asked about understanding what was being signed on TV, Mr. Nettles admitted that he did not follow along too well. This is possibly for at least two reasons: the content being covered was above his level of understanding, or the interpreter was not using enough ASL and was more English directed. All of this supports the need for a Certified Deaf Interpreter in high-stakes situations like hospitalization, emergency room visits, explanations of prognosis and

treatment, arrests, non-routine probation meetings, meetings with therapists and social workers, depositions, court, etc. In less high-stakes situations, a strong ASL-signing interpreter who regularly probes for understanding can be used.

Mr. Nettles reported to us that he regularly requests interpreters for his medical appointments, hospitalizations, probation meetings, and for legal proceedings.

## III. American Sign Language Proficiency

Based upon his auditory status and his cultural profile, Mr. Nettles' primary and preferred means of communication, and the language in which he most reliably produces and comprehends information, is expected to be American Sign Language. The following assessments are designed to confirm or disconfirm that expectation based upon his answers in the cultural profile.

### III.1 ASL Production (Grammar)

Mr. Nettles' language production was assessed using a variety of tasks as well as free-flowing background conversation. ASL production elicited by the 1.5-minute Mr. Koumal cartoons also contributed to this analysis, but these will be discussed in their own section. Mr. Nettles' ASL production demonstrates a fluent proficiency in ASL grammar, and he has a competent command of ASL production. In his signing, he demonstrates verbs of motion and location, spatial morphology, aspectual morphology, reduplication, ASL forms of direct address, and complex classifier use, in addition to many other features. He uses facial grammar such as non-manual markings for yes/no and wh-questions, as well as for relative clauses and conditionals. He is fluent and comfortable while signing ASL.

### III.1.a. Verbs of Location (Topological Relations Task (Bowerman Task)).

In the Topological Relations Task, Mr. Nettles' word ordering strongly favored the Ground before Figure ordering of ASL as opposed to the Figure before Ground ordering of English. Of the 25 stimuli presented, he produced 16 using the Ground before Figure order (64%). His production mostly followed the ASL as opposed to English ordering. On the ones that he used Figure before Ground, he also added signs for English locative words (prepositions), such as when describing a line drawing of a yellow ball under a chair. He

signed UNDER BALL YELLOW WITH CHAIR. The use of English in this sentence and others was not clear and shows hypercorrection of English.  The English preposition *with* is the only one in English that allows the ordering of Ground before Figure: <u>a table</u> (Ground) with <u>a cup</u> (Figure) <u>on it</u> versus a cup (Figure) *is on* <u>a table</u> (Ground). Notice in the previous ASL sentence, Mr. Nettles sprinkles in the English word <u>with</u> as a form of hypercorrection, but he does not actually have command of the syntactic structure of the *with*-construction. With no awareness of ASL on the part of the receiver, the sequence would be more likely understood as "the chair was under the yellow ball."  When the Ground before Figure order was used, ASL grammar was consistently used to convey where the objects were in relation to each other, making his utterances easier to understand than the isolated strings of words he produced when he tried to use English.

**III.1.b. Background conversation.**  In background conversation throughout the testing, Mr. Nettles used primarily ASL. At times when the interviewers shifted to a more PSE[10] signing he would match that as best he could. While the hearing interviewer was talking, he tended to voice (not intelligibly) and sign in a more English order, while the deaf interviewer used ASL, he matched that effortlessly.

**III.2 ASL Comprehension.**
Throughout the testing, he demonstrated consistent understanding of ASL with ease. If something signed was unclear, he would readily ask for clarification. When content was more challenging, he asked for more clarification.

**III.2.a. Background Conversation.**
He understood our conversation throughout the assessment well. We took every opportunity to converse with him throughout the assessment. There was a lot being

---

[10] Pidgin Sign English (PSE) is an older name for what is currently referred to as "contact signing." It really isn't as basic as a pidgin, which occurs between two completely mutually unintelligible languages. This form of language (sometimes called and interlanguage) involves the use of language variation on a kind of sliding scale between full ASL and a range of signing that is influenced by English to varying degrees. In PSE, a signer might follow an English word order more and use less of the complex agreement and morphology characteristic of ASL. Deaf people who are more bilingual than Mr. Cobb can shift to using PSE at times when signing with hearing people who are not native in their ASL skills. There is no one "form" of PSE, it varies depending upon the interlocutors are and what their range of language use is.

discussed, and he could participate in all the topics addressed with appropriate scaffolding and clear ASL.

### III.2.b. Bird of a Different Feather (Bahan).

Mr. Nettles was not familiar with the *Bird of a Different Feather* composed in ASL and signed by Ben Bahan, a Deaf native signer of ASL. In viewing, *Bird of a Different Feather*, Mr. Nettles understood the general story line. He did recognize the allegory and was able to present the parallels between the bird storyline and the experience of a Deaf child growing up in a hearing family. While there were many opportunities to catch parallels between deaf experiences and the bird experiences in this story, he only caught a few. Some of the allegory requires a higher level of analytical knowledge, or what is referred to as CALP. He was not able to catch or discuss any of these more sophisticated analogies, which would have required more cultural background in ASL and a genre of communication (Academic ASL) that is learned and used in educational settings.

### III.2.b. DWI (Rivera).

Mr. Nettles had previously not seen the story *DWI* composed and signed by David Rivera. He understood the classifier story with ease. He recognized the productive forms involving Size and Shape Specifiers (SASSs): sports car, cab of truck; grille, trailer of truck detaching and skidding, and the bottle of liquor. He recognized the full range of object classifiers used: spokes, speedometer, pedal to the metal, trees going by, rabbit, rabbit in the headlights, woman's head against the window, man's head against the passenger window, man's head against the driver's window and man's head through the windshield. He got the handling classifiers: Woman's hands hitting man's chest, cigar and it smushing into the windshield. There were many cinematographic perspective shifts throughout the story. He caught them all. He caught that the car landed upside down. All of this comprehension depends upon being able to process the productive use of classifier constructions (depiction) in ASL.

As a follow up, there were two errors in this story. First, although the car landed upside down the ambulance people treated the car as if it was right side up. Upside down the woman was incorrectly on the driver's side and the man on the passenger side. In

addition, the ambulance drivers break the windows to access the driver and passenger, but the windows had already been shattered. He caught these errors.

### III.3 BICS vs. CALP.

It is important when looking at language proficiency to distinguish between proficiency in Basic Interpersonal Communication Skills (BICS) and Cognitive Academic Language Proficiency (CALP).

### III.3.a. Basic Interpersonal Communication Skills (BICS).

Mr. Nettles has full mastery of Basic Interpersonal Communication Skills (BICS) in ASL. In casual conversation, he is fluent and comprehends easily.

### III.3.b. Cognitive Academic Language Proficiency (CALP).

When language becomes more academic in nature or involves explanation of new unfamiliar information or tasks, he is not as proficient at engaging in analysis, synthesis and evaluation using ASL. His analysis of the allegory in *Bird of a Different Feather* testifies to some weakness in this area. Even though he was able to catch some of the allegory, others were harder. He may have some CALP, but his Academic ASL is not strong and he does better with more scaffolding.

### Summary of ASL language proficiency.

In summary, the factors in the cultural profile that would predict ASL fluency as well as a strong identification with Deaf culture were reliable predictors of Mr. Nettles' ASL production and comprehension. He has passable, but not strong, Cognitive Academic Language Proficiency (CALP) in ASL.[11] This is not surprising given the amount or academic training he has experienced in ASL, but limited education in a post-secondary setting.

### IV. English Proficiency

---

[11] CALP is discussed in detail in the background section of this report. Basically, concerns the ability to use language for synthesis, analysis, and evaluation. It is a level of language use learned in school, not just picked up through casual conversation as BICS (Basic Interpersonal Communication) skills are.

Mr. Nettles signs ASL with near-native fluency. The remaining question is the extent to which English can or cannot serve alone as a communication alternative to ASL for him.

## IV.1. Spoken English Competency.

Mr. Nettles' speech has very limited intelligibility.

## IV.1.a. Speech.

After signing and writing renditions of the two 1.5-minute Mr. Koumal cartoons, he was asked to speak a rendition of each of the Koumal cartoons. He was not comfortable speaking, but he did perform the task. His comfort level in these two languages/modalities is evident when comparing the videos of his signed narratives with his spoken narratives.

## IV.1.a.i. Speech Quality.

It is best to review Mr. Nettles' speech by listening to the speech samples included in the videos. Transcriptions of Mr. Nettles' speech samples appear below:

| **Mr. Koumal Battles his Conscience (spoken)**               **Joseph Nettles** |
|---|
| Same story that story? The man in pock(et) give to homeless the money. Other man give the money give money too. So, that man lost money. Then dream somehow fight devil angel. Then homeless got money. Then buy a car. Give the coin to man back. Fine, guess that right. I don't know. |

| **Mr. Koumal Flies like a Bird (spoken)**                    **Joseph Nettles** |
|---|
| A man dig mount(ain)...top. On ground think g ood (thumbs up)  feel. Look..(th)e(m)..saw bird...I can fly. Umph fall on ground. How..feather put in. I can fly. Fly, fall. Go other farm on chicken a lot. Try work fly. Mountain phhhht. Find lot of gold. Then put business store. What. Gold a lot. |

Mr. Nettles' speech production is very difficult to understand. He was not comfortable speaking, but he did do the task to the best of his ability. Listening to his spoken renditions of the two Koumal cartoons, especially without knowing their content immediately reveals that he cannot rely upon speech for communication.

## IV.1.a.ii. Intelligibility.

With rewatching many times and lipreading him as he recounted *Mr. Koumal Battles his Conscience*, Dr. Shepard-Kegl (who also was familiar with the story) was able to transcribe much of what he was saying, but not with complete reliability. In the rendition of *Mr.*

*Koumal Flies Like a Bird*, where he chose to sign while speaking, it was easier as a signer to recover the target words, but so much speech was omitted and replaced with signs that the spoken rendition of the story was completely unintelligible. Mr. Nettles is not comfortable speaking without signing, so unless the person he is speaking with also knows ASL, speech will be unintelligible to them.

 Some basic words and possibly a few routine phrases are recognizable for someone familiar with Deaf speech or very familiar with Mr. Nettles' speech (like a family member). His speech overall had a nasalized quality frequently seen in people with hearing loss. There is no auditory feedback letting him know that the velum at the back of the mouth has dropped so the sounds /b/ and /m/, /d/ and /n/, /g/ and /ng/ sound the same. Voiced and voiceless distinctions are also collapsed so /b/, /p/, and /m/; /t/, /d/, and /n/ fall together. In addition, all vowels have a nasal quality. The same lack of auditory feedback allows all the target locations of consonants produced to be imprecise, leading to a slurring of speech. In addition,  multiple syllables are often collapsed into one (e.g., *money* is sometimes pronounced "muh"; *other* is pronounced "the," and *angel* becomes "each"), and even more frequently syllables are added (e.g., *give* is pronounced "giv-uh," *homeless* is pronounced "ho-me-less"). Initial consonant clusters are often simplified (*story* becomes "tori") and at times omitted (e.g., *somehow* becomes "emaw"). Final consonant clusters are usually simplified and often omitted (e.g., *lost* becomes "law"; *pocket* becomes "pahk"). Final consonants are either omitted or a vowel is added after them (as in giv-uh). Even with repeated viewing and knowing the context, there were stretches of speech that Dr. Shepard-Kegl could not identify or could only guess at with a high degree of unreliability.

Confounding understanding Mr. Nettles' speech even further (as can be seen in his writing) is that he is by no means a native speaker of English. His word order is different, he uses English prepositions as if they are verbs, he omits pronouns as he should in ASL, but should not in English. See the analysis of his English grammar in the writing section, but consider the following example from the very beginning of his spoken rendition of *Mr. Koumal Battles his Conscience*. The context is that a man is about to climb a mountain. Mr. Nettles says "tuh mae in pahk." A hearing listener would likely assume he was trying to say, "The man was in the park." In ASL, *in* is a verb, much like *enter* in English. So,

99

following the grammar of ASL, Mr. Nettles says, "Man in pocket." In actuality, he is saying, "The man put his hand in his pocket." His speech is rife with such structures, and thus misunderstanding, even by the most proficient in understanding Deaf speech, is inevitable.

Except for the most routine communication and with an individual that has become familiar with his speech, spoken English is not a viable means of communication for Mr. Nettles.

### IV.1.a.iii. Auditory monitoring alone.
With auditory monitoring alone, Mr. Nettles' speech was almost completely unintelligible.

### IV.1.b. Lipreading
The other side of communicating through speech is using lipreading to receptively process the speech of others. The lipreading task involves two presentations of each stimulus (either a word or whole phrase or sentence).  Each presentation was loud and very precise. If Dr. Shepard-Kegl felt Mr. Nettles was close, she sometimes repeated the item more than twice. The Zoom camera was focused on her face and upper torso and she was well lit. Each phrase or sentence was enunciated clearly and loudly, allowing the best possible chance of being understood.

It must be reiterated that Mr. Nettles was tested under relatively ideal conditions. The room was well-lit and devoid of background noise. Although we were on Zoom, we were directly facing each other one-on-one. Items were repeated and the stimuli were produced by a certified oral transliterator (OTC) trained to produce clear speech. Even the knowledge of the logistics in setting up such an environment (in a face-to-face setting) would be beyond the knowledge set of law enforcement officials working with him.

**IV.1.b.i. Words** Of the 17 words, Mr. Nettles correctly identified 5 (29%). His incorrect responses demonstrated that he was doing his best to recognize the words. For example, for city he responded "T" and then "ten." "T" correctly identifies the second syllable. In his second guess, he got the initial consonant and the vowel, although made lower in the

mouth is a front vowel like the vowels in *city*. Front vowels in English spread the lips, while back vowels in English round the lips. He was using this information. For *chin*, he said *chicken*, getting the initial /ch/ sound, the high front vowel and the final nasal correct. And for split, he said please, missing the s in the initial consonant cluster but getting the pl and the frontness of the vowel. In addition, the final /s/ is made in the same place as /t/, but it in a continuant as opposed to a stop consonant. He does his best, but his best isn't good enough.

**IV.1.b.ii. Sentences and Phrases** Of the 47 sentences and phrases, Mr. Nettles correctly identified 15 (23%). This is his best performance, under ideal conditions. The sentences and phrases produced are both routine and highly expected and less expected. Mr. Nettles successful responses were limited to highly routine sentences like *What's your name?*, *What's your address?*, *What's your favorite movie?*, *Can you understand me?*, *What's your telephone number?*, *What's your social security number?*, *How long have you been working here?*, and *Do you have a TTY?* (routine for Deaf people). The only exception was *Have you ever had a transfusion*? He struggles with numbers. And, when presented with *You have the right to remain silent*, he responded "talk about dialysis; you have replace for dialysis."

A summary of his results appears in the following chart.

| correct | incorrect | Stimulus (lipreading) | % correct | % incorrect |
|---------|-----------|------------------------|-----------|-------------|
| 15 | 49 | 64 stimuli | 23% | 77% |
| 5 | 12 | 17 words | 29% | 71% |
| 10 | 37 | 47 phrases and sentences | 21% | 79% |

**IV.1.c. Impact on communication**

Of the total 64 stimuli, he got 15 correct (23%). His lipreading is a below average for the range of possible lipreaders and not sufficient to support communication via speech reading. The average is about 30%. In a well-lit environment while face to face, Mr. Nettles could lipread only 23% of what was said.

In a legal setting, even if Mr. Nettles were in a well-lit room, seated in front of his interlocutor, relaxed, and well-rested to avoid the loss of lipreading with fatigue, and even if the interlocutor were willing to repeat words and sentences several times and to probe for understanding, less than 30% of the message is the best he would be able to get. Mr. Nettles' lipreading is poor at baseline and will get cumulatively worse over the course of a conversation as misunderstanding builds. In high stakes situations that add stress to the mix it will degrade even further, not just for Mr. Nettles, but for any lipreader. Lipreading is not an option for Mr. Nettles in terms of access to communication.

### IV.2. Written English Competency

Mr. Nettles' written English was tested by collecting written renditions of the two Koumal cartoons ant two wordless books: *Mr. Koumal Flies like a Bird and Mr. Koumal Battles his conscience.* These written samples were analyzed for their grammatical accuracy, their influence from ASL, and for their argument structure distribution, which is an indication of their performance that can be compared with native speakers of English, other Deaf ASL signers, other deaf writers of English, and individuals with a frank language disability, agrammatic aphasia.

### IV.2.a. Argument Structure Distribution: Data Collection

A full argument structure analysis is best with a minimum of 150 verbs and their related arguments. The data considered for this analysis were the written recountings of the two Koumal cartoons and two wordless books. Two recountings were collected during testing. And two were produced between our testing sessions. An analysis was done on each of the narrative samples to see if there were any major differences, and then they were combined. Mr. Nettles produced a sample of 164 utterances. The individual samples were sufficient to yield a reliable argument structure distribution.

In the binder of testing materials, we included a set of materials that convey a set of stories and folktales completely through pictures. The goal of these materials is for the individual to find a story they already know, like *Little Red Riding Hood, The Boy Who Cried Wolf, The Pied Piper, Rip Van Winkle,* etc. and to use the prompts to help them remember and retell the story. We only use these materials if we cannot collect a large enough sample of data from the Koumal stories and wordless books mentioned above.

However, in addition to the samples described above, Mr. Nettles, on his own, also produced an additional recounting on his own based upon graphic prompts for the story of *Rip Van Winkle*. These graphic prompts are designed to prompt a person who already knows a story to recount it fully and are not meant to be used by someone unfamiliar with the underlying story. Since we already had a large enough of sample from Mr. Nettles' other four written recountings, and Mr. Nettles didn't actually know the Rip Van Winkle story prior to viewing the graphic prompts, we did not include his Rip Van Winkle sample in the argument structure analysis. We did use it in our more general examination of his grammar.

**Narrative Recounting** (combined): 164 verbs; 81 external arguments (49%); 77 non-copular unaccusatives (47%); and 6 copular constructions (4%). Based upon all narratives combined, Mr. Nettles appears to pattern most closely with ASL signers writing English. His percentage of non-copular unaccusatives was not parallel to hearing writers of English (typically 25%) and he had a much lower percentage of copular constructions (4% as opposed to 25%). A lower percentage of copular constructions would be typical of deaf writers of English in general (independent of whether they sign or not). He does also pattern like deaf writers of English.

In the following sections, each type of narrative is analyzed separately to see if the pattern is consistent throughout.

**IV.2.a.i. Movies.**  Mr. Nettles did not recount any movies. In lieu of movies, we had him write stories from two wordless books by Mercer Mayer. Included in our materials is a set of wordless prompts for familiar fairy tales. Without our asking, we wrote from the one associated with Rip Van Winkle. However, since we had a sufficient sample and he was not actually familiar with that story, we did not include it in the argument structure analysis.

| |
|---|
| **Rip Van Winkle (written)**                                         **Joseph Nettles**<br>The man and dog with pole  And He Look the yard and house.<br>The man talk with people about fish.  He sit on chair and people Listen what He say about this.<br>The man stop at women Farm.  the women strict talk to him about help something milk cow, cut wood with Axe And building roof Redo.<br>The man dream About women get yelling and Argue About a thing to do  So He think not to good idea. |

> He dream think about 2 different His opsion best for him to Easy get fish not Milk Cow.
> He look up the Little man with old Wood & Roll up Hill.  He was plan go to fish with pole but He Look up the man sort with wood barr
> The man help with push wood barr & Roll with short man Hill up.
> Finally ARRive on Ground yard a lot people short man Excite about wood Barr and the man shock it Look alot people short man.
> Then The man drink whine and 2 two Short man happy and drink winee hair with
> Then the man sit and Lay on tree, sleep All day and every a year become too Old and white hair with beard white
> Then the man wake up from 1775 until 1790 Then the man Walk up on yard think He feel about Women  The man walk with wood pike his hand.
> He dream again think about the house.
> He think about old house or Look up one good house  He was dream.  Other people Look up the old man.
> The man think about women on his dream and other men think about Grave it.  And people laugh what men talk about Grave it.  So The old man jump and joy drink beer with cup of beer and He was upset something about this.
> The old man sit talking about what happen accident from thunder with Short man people That how He became too fast old and White hair and The man List what His talking the story!

**IV.2.a.ii. Nonverbal Cartoons.**  Mr. Nettles recounted Mr. Koumal *Flies Like a Bird* and Mr. Koumal *Battles his Conscience*. This yielded a set of 30 utterances. 30 verbs; 18 external arguments (60%); 11 non-copular unaccusatives (37%); and 1 copular construction (3%).

The content of the two Koumal cartoons during the testing are presented below:

| **Mr. Koumal Battles his Conscience (written)**                      **Joseph Nettles** |
|---|
| The man was pocket tore up pocket with coin and give to homeless that man sidewalk sit so other men give to coin to homeless that man and that person men fall off his pocket a lot dollars so he dream about angel and devil over the money fight about his pocket fall on ground and homeless man took the dollars and buy the car give to coin to men |

| **Mr. Koumal Flies like a Bird (written)**                      **Joseph Nettles** |
|---|
| The man dig hills on mountain on top ground he is joy then saw the bird can fly and he think same he can fly fall on ground get bird feather see if he can fly but not work then other farm chicken feather all chickens the if he can fly again not work fall ground mountain break down found gold and he own store a lot gold |

The argument structure distribution for the written Koumal stories most closely patterns with Deaf ASL signers writing English. There is a higher occurrence of non-copular unaccusatives in keeping with that group (37% as opposed to 25%). In addition, the occurrence of copular constructions is low with deaf writers in general (3% as opposed to 25%).

**IV.2.a.iii Wordless Books**

Mr. Nettles recounted the following wordless books: *Frog, where are you?* and *Frog Goes to Dinner*. He produced these recountings on site during the testing but between sessions and send us photographs of his written work. His wordless book recountings yielded 134 utterances: 134 verbs; 63 external arguments (43%); 66 non-copular unaccusatives (49%); 5 copular constructions (4%). This almost produced sufficient data to perform an argument structure analysis for the Frog Stories on their own. However, the distribution for the Koumal cartoons and the Frog stories were similar enough to allow them to be combined. The transcripts of his written recountings of the Frog Stories appears below with paragraph marks indicating line breaks.

---

*Frog, Where are You? (written)*                                    Joseph Nettles

The boy LOOK the Frog on Glasses with Tank and dog LOOK Frog too His's bedroom.¶  The boy and dog Asleep on bedroom and the frog try Jump the tank¶  The boy shock frog gone and He with dog on bed¶  He LooK everywhere at his Room.  He try Find frog anything Hide But it's Not. The dog go in the Hole tank Dog Head.¶  He LooK the Window Call the frog and dog stuck with tank Glasses.¶  He Loo the dog fall on Ground.¶  He LooK mad at the dog and Broke Glasses Tank And the dog Lick the boy face.¶  He still LooK over Frog with dog And He call yelling for Frog.¶  The Forest All Wood and tree had hole and the bee the Case Hold the tree.¶  The boy call on ground hole and dog play with bee Case.¶  dog play push the tree  So bee get mad bite bog nose and the Animal Come out the hole Ground.¶  The boy LooK the tree hole and dog play with bee and the Case  Hold tree Fall it and bee alot chase with dog.¶  The dog Run from bee  Chase on them and The boy fall on Ground bec.  Owl come out the hole tree.¶  The Owl Chase the boy and Rock was hide and deer LooK Alike tree.¶  The boy stand with rock hold hand from AnK deer Also dog under Rock on Ground.¶  He Keep call LooK for Frog.¶  Deer Head it up  the boy shocK and dog wAs beside of Rock side¶  Deer Run with boy up with his deer Head and dog Run too¶  Dear Stop the boy and dog fall from hill ALSO bottom Lake Ground.¶  Both ya'll fall from hill and LaKe water so Deer LooK up to them¶  Both dog and boy in LaKe water get Wet.¶  The boy say hush the dog¶  Both Look at something from big old tree.¶  The boy and dog Look up two frog together and He was happy.¶  Both was shock it About frog had own baby frog¶  The Frog give to him one baby frog and He and dog WALK Off with baby Frog.¶

---

*Frog Goes to Dinner (written)*                                    Joseph Nettles

The boy look mirror His tie and Look everything good Clothes and dog, turtle and Frog Look up the boy. ¶. The boy's parent open the door.  Also the girl with parent get boy go Somewhere go but Before the bou get Coat When Frog Jump in his Coat pocket and dog and turtle stay his Room. ¶ His's parent and sister went to Resturant from Drives car to stop Restaurant. ¶Ya'll sit on table for order to Food List with men slip ticket what ya'll order and the Frog Jump 4 people song play music. ¶Frog was Lay the men His face  all men stop song music then Frog Keep Jump other men fell off Drum Broke cRush it ¶The men upset about Drum Broke and two men Laugh about Frog then the frog keep Jump to plate food on top the men hand high Top and other women and men Look up people mess it with Drum & stop song music.¶ So they man was Top plate hand High when frog Hide food put on table what women order for it and the women get fork to Eat SAW frog on Her food She Shock it. ¶ She was yelling on frog on table Her food and Chair fell it and Frog scaRe jump it to Glasses for wine where Frog in it and the men going to drink Glasses wine and other people Look up Frog go in Glasses wine.¶Several people talking about where Frog and they Look where is frog So the men sit on table with His's wife and both ya'll Look up Frog sit on Glasses wine.¶ One men try get frog on table and Resturant is mess everything on table on floor and Then men Hold His wife Look Alike pass out and other men Look up at Lady going pass out¶ Then men got it frog with His Hand go out the door And frog belong the boy they Reached with them and His's parent get mad and Look up the boy Also frog too

**IV.2.b. Argument Structure Distribution: Data Analysis**

Mr. Nettles' argument structure distribution as a whole was then compared with those of four groups: typical hearing speakers of English, speakers with agrammatism, Deaf ASL signers writing English, and Deaf non-signing individuals writing English.

**IV.2.b.i. Group 1: typical hearing speakers of English** In terms of his movie recounting, Mr. Nettles does not pattern with this group: 49% external arguments is parallel (typically it is a little over 50%);  47% non-copular unaccusatives (typically it is around 25%); and 4% copulars (typically it is around 25%).

**IV.2.b.ii. Group 2: speakers with agrammatism producing English**. Mr. Nettles definitely does not pattern with individuals with a frank agrammatism or any kind of language disability. Individuals with agrammatism should have almost no non-copular unaccusatives and at least 25% copulars, likely more. He in contrast, has 4% of copulars and 47% non-copular unaccusatives (where someone with agrammatism would have almost none).

**IV.2.b.iii. Group 3: Deaf ASL signers writing English** Mr. Nettles does pattern with this group. The Koumal narratives have a higher percentage of non-copular unaccusatives (47%), compared to the 25% expected in hearing speakers of English.

**IV.2.b.iv.  Group 4: non-signing deaf individuals writing English.** Again, he not only patterns like ASL signers writing English with a high occurrence of non-copular unaccusatives (47%). But he also patterns with this group in terms of his low occurrence of copular constructions (4%). Deaf writers tend to have little or none.

Overall, Mr. Nettles' argument structure distributions pattern with Deaf ASL signers writing English.

**IV.2.c.  Specifics of English grammar production.**

Argument structure distribution indicates a basic patterning that may or may not be influenced by ASL intrusions or by a language-based learning disability. It is not

indicative of mastery of English grammar per se. Looking more closely at the grammar of one's actual writing can be informative.

**Lexicon:** Mr. Nettles' vocabulary is limited. He made many lexical substitutions for words he didn't know: *dig* for *climb with a pickaxe*, *slip ticket* for *order pad* or *check*, *tank* for *jar*, *case* for *beehive*, *hold* for *is attached to*, *barr for barrel*, *cup* for *beer mug*, etc. Circumlocutions were frequent: *small man* for *dwarf*, *wood pike* for *cane* or *walking stick*, *top ground* for *peak* or *summit, food list for menu, if can* for *try*, etc. Other words are close but not quite accurate: *look alike* for *look like*, *rock* for *boulder*, *lake* for *pond, break down* for *collapse* or *crumble down*. Others are partial like *AnK* for *antler*. Others like *bowling, bowling pin*, lightning, etc. were avoided. Finally, his choice for English prepositions was erratic, frequently substituting *in* for *on*, *off* for *from*, *on* for *onto*, or using the wrong particle in verb particle constructions like *look up* for *look at*; *yelling* <u>on</u> for *yelling* <u>at</u>, and also *look up* Ø for *look up at*. Often prepositions were omitted. Other times extraneous prepositions were added (e.g., *what women order for it*  for *what the woman had ordered*). At times where and ASL sign would be used for two different English words, he would interchange them (e.g., *drink* <u>with</u> for *drink* <u>together</u>).

**Morphology:**  His marking of tense, and number was typically lacking or incorrect: tense: *go* for *went*, *get* for *got*, *sit* for *sat*, *laugh* for *laughed*, etc.; number: *parent* for *parents*, *men* was frequently used in place of *man* as well as *women* for *woman*. He also overgeneralized the possessive marker ('s) to possessive pronouns (e.g., his's).

While Mr. Nettles showed little evidence of mastery of English morphology, he did have an interesting construction in his English that was influenced by both his Southern dialect of English and a morphological process in ASL. It involved his use of the word *ya'll*:

> *<u>Ya'll</u> sit on table for order to Food List with men slip ticket*
> "<u>They all</u> sat down at the table with menus to order food from the waiter."

> *What ya'll order*
> "The waiter asked, 'What will <u>you all</u> be ordering?'"

> *So the men sit on table with His's wife and <u>both ya'll</u> Look up*
> "So, the man sat at the table with his wife and <u>the two of them</u> looked up."

> *Both ya'll fall from hill and LaKe water*
> "The two of them fell from the top of the hill into a pond."

Notice that only the second example uses *ya'll* in the way it would be used with a Southern accent—referring to second person (you) in an inclusive way (all of you). ASL has a pronoun and verb agreement marker that indicates "all of" as well. It can be marked on pronouns (you-two, we-two, they-two, you-plural, we-plural, they-plural—not "each of" (distributive), but all of (inclusive). Mr. Nettles in his English has clearly marked ya-ll as having this more extended use found in ASL. In fact, in general, as will be seen in next discussion of syntax, Mr. Nettle is basically writing English using ASL grammar.

**Syntax:**

Mr. Nettles produces ASL-driven English. He uses words from English, arranged as much as possible according to the grammar rules of ASL. Without prior knowledge of ASL grammar, it is very difficult to reliably understand his written English. Just a few of the many ASL features of Mr. Nettles' English are discussed below.

**Null Subjects.** Except in commands, English is a language that requires subject position to be filled, so much so that when a verb doesn't select for a subject the pleonastic (dummy) pronoun it is inserted to satisfy this requirement. *It is raining; It is five o-clock; It is time to leave.* ASL favors null subjects, in fact except in cases of emphasis, ASL avoids pronouns in subject position. When there is a previous topic in the discourse or agreement on the verb, ASL can leave both subject and object positions empty. This is a prevalent characteristic of Mr. Nettles' English.

> The man dig hills on mountain on top ground he is joy then Ø saw the bird can fly and he think same he can fly Ø fall on ground Ø get bird feather Ø see if he can fly but Ø not work

In terms of typological characteristics of languages, null subject languages like ASL have a set of characteristics that English does not share: null subjects, lack of pleonastic (dummy) pronouns that don't mean anything but fill positions requiring a subject to be present (e.g., *it rained, There is a cup on the table),* and a lack of auxiliary verbs (*was running, is walking*). The lack of these features or a misuse of them is characteristic of Mr. Nettles English throughout. Once in a while, we see an auxiliary, but rarely does it co-occur with a progressive -in form (e.g., *He was dream*). An auxiliary plus uninflected verb is a typical

way of forming the past tense in Deaf English as well, so *John was kissed Mary* would mean "John kissed Mary" and not "John was kissed by Mary."

**Ground Figure Ordering.** English consistently uses the ordering of Figure before Ground: e.g., the cup (figure) is on the table (ground). In the Topological Relations Task, Mr. Nettles favored this ordering 64% of the time. In narratives we frequently also see Ground before Figure or Ground preceding verbs with a null figure.

> *The boy look mirror His tie*
>                   G      F
> "The boy looked at his tie in the mirror.

> *The man was pocket tore up pocket with coin.*
>                 G                G           F
> "The coin tore a hole in the man's pocket."

> *that person men fall off his pocket a lot dollars.*
>        G                        F/G        F   (here man is figure and pocket is ground; then
>                                                  pocket is figure with dollars as ground)
> "A wad of bills fell from the man's pocket.

> *Finally ARRive on Ground yard a lot people*
>                        G              F
> "Finally, a lot of people arrived in the field."

In addition, Mr. Nettles' uses the word *it*, erratically in his English. It seems as if he knows English needs certain positions to be filled with a pronoun, but he has no idea where *it* actually goes.

> *So they man was Top plate hand High when frog Hide food put on table what women order for it and the women get fork to Eat SAW frog on Her food She Shock it.*
> "So the waiter who was carrying a tray held up high when the frog hid in the salad. When he served the woman the food she had ordered, she grabbed her fork to eat it, when she saw the frog in her food and she was startled."

> *She was yelling on frog on table Her food and Chair fell it and Frog scaRe jump it to Glasses for wine where Frog in it*
> "The woman was yelling about the frog in her food on the table in front of her and her chair fell backwards. The frog was scared and it jumped in another patron's wine glass."

> *then the frog keep Jump to plate food on top the men hand high Top and other women and men Look up people mess it with Drum & stop song music.*

> "Then, as the man and woman were distracted by the chaos with the broken drum and the music stopping, the frog jumped onto the tray the waiter was carrying."

109

[This example not only shows one of his sporadic uses of *it*.  It also shows a consistent use of the work *keep* to indicate *as* (something happening at the same time) and a reordering of the event to reflect chronological ordering—all of these are ASL influenced phenomena that he is trying to reflect in his English.]

*Then men got <u>it</u> frog with His hand go out the door*
"Then the waiter caught the frog with his hand and headed for the exit."

*the Case Hold tree Fall it and bee alot chase with dog.*
"The beehive attached to the tree fell and a swarm of bees chased after the dog."

*Deer Head <u>it</u> up*
"The deer raised its head"

*Both was shock <u>it</u> About frog had own baby frog*
"Both of them were shocked that the frog had its own babies."

*the man shock <u>it</u> Look alot people short man*
"The man (Rip Van Winkle) was surprised to see so many dwarves."

**Prepositions as verbs.** Locative and directional forms that serve as prepositions in English actually function as verbs in ASL. Sometimes, it is hard to tell if it is the absence of the copular verb to be or the use of a preposition as verb (e.g., *He <u>with</u> dog on bed*), but many other times it is clear that the preposition serves for him as a verb (e.g., *Deer Head it <u>up</u>*).

Reading through Mr. Nettles' written narratives reveals a very different word ordering in general from what would be grammatically required in English. In addition, he produced relatively long utterances in English that appear to convey complex forms like relative clauses and conditionals, but without the conventional ordering, function words ((determiners (*a, the, etc.*), complementizers (*that, which*, etc.), auxiliaries (forms of *have* and *to be*), etc., and punctuation) to signal such constructions, they are not able to be understood by English users unfamiliar with ASL grammar.

Overall, in summary, Mr. Nettles' writing uses what basic vocabulary he has or circumlocutions for vocabulary, but the grammar is strongly driven by ASL structure and not English structure. Mr. Nettles' grammar use in English is comparable to a second-language learner with only partial mastery of English grammar. In fact, Grosjean (1982)[12] would refer to this form of English in a bilingual as "fossilized," meaning that it is actually

---

[12] Grosjean, F. 1982. *Life with Two Languages*. Cambridge, MA: Harvard University Press.

very limited in terms of English grammar and more partially developed English vocabulary mapped on the grammar of his first language, ASL.

### IV.2.d. Reading

Based upon this initial screening, Mr. Nettles should be able to read at a 1st grade level. He definitely cannot read at a third-grade level. At the second-grade level, he missed the sentence with a passive: *I was pulled out of the hole*. However, passive is a construction typically mastered between the third- and fourth-grade level, so while incorrect, this alone did not rule out the possibility that he reads at a second-grade level. However, his inability to read the second-grade narrative completely ruled this out.

### IV.2.d.i.  Flynt-Cooter Reading Inventory

Based upon his Flynt Cooter Sentence Screening, Mr. Nettles should be able to read reliably at a 1st grade level.

### Flynt Cooter Sentences (levels 1-9).

Based upon the Flynt Cooter sentence screening, Mr. Nettles might be expected to read solidly a 2nd grade level. He definitely cannot read at a third-grade level. At the second-grade level, he missed the sentence with a passive: *I was pulled out of the hole*. However, the passive is a construction typically mastered between the third- and fourth-grade level, so while incorrect, for us, it does not rule out the possibility that he might be able to read at a second-grade level. However, his inability to reliably read the second-grade narrative ruled this out.

| | | |
|---|---|---|
| **FORM A: Level 1  You Cannot Fly** | | |
| 1.  He wanted to fly. | 1 | |
| 2.  The family got together. | 1 | |
| 3.  The boy was jumping. | 1 | |
| | | |
| **FORM A: Level 2  The Pig and the Snake** | | |
| 1.  I was walking fast to town. | 1 | |
| 2.  He  cried about going home. | 1 | |
| 3.  I was pulled out of the hole. | 0 | Did not get the passive |
| | | |
| **FORM A: Level 3  The Big Bad Wolf** | | |
| 1.  The forest was something to see. | 0 | Did not get figurative meaning |
| 2.  I was enjoying sleeping when my Mom called. | 0 | sleeping with mom |
| 3.  I had to go to bed early last night. | 0 | have to |

**FORM A: Level 4  New Clothes**
1.  I dislike being the youngest.                                0        begin for being
2.  I'm always getting into trouble.                             1
3.  They insisted on watching the show daily.                    0        insisted, daily, show-wrong meaning

**FORM A: Level 5 Hot Shoes**
1.  Athletic shoes come in all kinds of colors.                 1
2.  Serious players manage to practice a lot.                    1
3.  A cheap pair of shoes doesn't last very long.               0        last- wrong meaning

**FORM A: Level 6  Mountain Fire**
1.  He was searching for the evidence.                           1
2.  He realized the rock formations were too high.              0        formation=form
3.  The conservationist hoped to reforest the mountain.          0        conservationist=service

**FORM A: Level 7 The Canoe Trip**
1.  Unfortunately, she was confused about the next activity.     0        Unfortunately=unfunctional
2.  The submerged rocks were dangerous.                          0        submerged
3.  She disappeared around the bend at a rapid rate.            0        rapid

**FORM A: Level 8 The Eagle**
1.  Ascending the mountain was rigorous and hazardous.          0        ascending, rigorous, hazardous
2.  The cliff provided a panoramic view of the valley.          0        panoramic
3.  The incubation period lasted two weeks.                      0        incubation period

**FORM A: Level 9  The Case of Angela Violet**
1.  The abduction made everyone suspicious.                      0        abduction
2.  The detective was besieged by the community.                0        besieged= behind
3.  Her pasty complexion made her look older.                    0        pasty complexion

## Flynt Cooter Reading Passages 1-9

Since he got all the second-grade level but the passive on the screening sentences, we started reading the level 2 passage and moved up and down from there. Even though he did poorly at the third-grade level, we tried to fourth- and fifth-grade level to see if he might do better in topics where he had more schema. However, at the third-grade level and above his sentence structure and vocabulary were too limited.

> **Level 1 You Cannot Fly:** Read this 5th.  Misunderstood tried (tired) and arrived.

> **Level 2 The Pig and the Snake:** This level was read first. He read it fast and jumped to incorrect conclusions. Therefore, we had to walk him through it, and he understood more, but not fully. He has the vocabulary, but he cannot read reliably at a second-grade level.

> **Level 3 The Big, Bad Wolf**: Read this 2nd. Missed: *sudden, fast asleep, chimney* (chime), *woodcutter* (machine?), *nightgown* (night cover), *note on door, house in the woods* (made of wood). He lacks vocabulary at this level and cannot use sentence structure and context to determine the meaning of words he does not know.

**Level 4 New Clothes:** Read this 3rd. Missed: *being* (begin), *hand me down, responded* (recognize), *replied* (lied), *besides* (behind), *approach, fee, cut back* (discount), *younger* (youngest), *approached* (around).

**Level 5 Hot Shoes:** Read this 4th. Missed: *beebop, pump up* (jump up), *lace up, chuckled, is a matter of history* (doesn't matter history), *got to the point* (point at).

Based upon the sentence screening and performance on reading the Flynt-Cooter passages, we would place Mr. Nettles' reading level at first grade. He reads more reliably at a first-grade level. Even there though, he confused words like *tried* with *tired*, even when questioned about them.

**IV.2.d.ii. San Diego Screening.** To corroborate our assessment of reading level, we also analyzed Mr. Nettles' responses on a strictly vocabulary-based reading screening, *The San Diego Quick Assessment of Reading Ability*. This test is a reliable predictor of reading level based upon vocabulary alone. However, hearing readers for whom English is a first language, are assumed to have sentence level grammar and morphology in place, so their vocabulary performance better predicts reading level. Deaf readers with partially developed syntax can have more vocabulary, but they are hampered by a lack of syntactic mastery.

Recall from the background discussion, that the San Diego Screening identifies three reading levels: reads independently (0-1 errors); reads with supervision (2 errors), and reads with frustration (3 or more errors). According to the San Diego Screening, Mr. Nettles would be expected to read independently only up through the 2nd-grade level, and with frustration above that level. While this looks one grade level higher than his Flynt Cooter assessment, we must remember that he is not a native user of English and his grammar impacts reading. But, we can say that he has the vocabulary of a second-grade level reader.

At the lower levels (up to third grade), Mr. Nettles was able to ascertain when he was not sure what a word meant. His assumptions included misidentifying *acquainted* with *acquitted, trucker* with *truck,  comment* with *common sense, relativity* with *relative, dominion* with *dominoes, condescend* with a *lower scent, molecule* with *mole, jaunty* with *janitor, jerking* with *idiot (jerk), gratuitous* with *graduate, legality* with *lawyer's papers, barometer* with *car*

*meter (speedometer), capitalism* with *captain,* and *amnesty* with *anesthesia.* Above the 2nd-grade, however, he had numerous gaps and misunderstandings. He got many items incorrect, however he also made many educated guesses and actually did well on the fourth-grade level words.  However, he had already failed at the third-grade level.

Mr. Nettles' results for the San Diego Screening appear below:

| 1 | 10 | | 2 | 10 | | 3 | 8 | |
|---|---|---|---|---|---|---|---|---|
| road | 1 | | our | 1 | | city | 1 | |
| live | 1 | | please | 1 | | middle | 1 | |
| thank | 1 | | myself | 1 | | moment | 1 | |
| when | 1 | | town | 1 | | frightened | 0 | |
| bigger | 1 | | early | 1 | | exclaimed | 0 | |
| how | 1 | | send | 1 | | several | 1 | |
| always | 1 | | wide | 1 | | lonely | 1 | |
| night | 1 | | believe | 1 | | drew | 0 | |
| spring | 1 | | quietly | 1 | | since | 1 | |
| today | 1 | | carefully | 1 | | straight | 1 | |
| **4** | **9** | | **5** | **7** | | **6** | **4** | |
| decided | 1 | | successful | 1 | | bridge | 1 | |
| served | 1 | | business | 1 | | commercial | 1 | advertisement |
| amazed | 1 | | develop | 1 | | abolish | 0 | |
| silent | 1 | | considered | 1 | | trucker | 0 | truck |
| wrecked | 0 | | discussed | 1 | | apparatus | 0 | |
| improved | 1 | | behaved | 1 | | elementary | 0 | |
| certainly | 1 | | splendid | 0 | | comment | 0 | common sense |
| entered | 1 | | acquainted | 0 | acquitted | necessity | 0 | |
| realized | 1 | | escaped | 1 | | gallery | 1 | |
| interrupted | 1 | | squirming | 0 | | relativity | 0 | relative |
| **7** | **0** | | **8** | **0** | | **9** | **0** | |
| amber | 0 | | capacious | 0 | | conscientious | 0 | |
| dominion | 0 | dominoes | limitation | 0 | | isolation | 0 | |
| sundry | 0 | | pretext | 0 | | molecule | 0 | mole |
| capillary | 0 | | intrigue | 0 | | ritual | 0 | |
| impetuous | 0 | | delusion | 0 | | momentous | 0 | |
| blight | 0 | | immaculate | 0 | | vulnerable | 0 | |
| wrest | 0 | | ascent | 0 | | kinship | 0 | |
| enumerate | 0 | | acrid | 0 | | conservatism | 0 | |
| daunted | 0 | | binocular | 0 | | jaunty | 0 | janitor |
| condescend | 0 | Lower scent | embankment | 0 | | inventive | 0 | |
| **10** | **0** | | **11** | **0** | | | | |
| zany | 0 | | galore | 0 | | | | |
| jerking | 0 | idiot | rotunda | 0 | | | | |
| nausea | 0 | | capitalism | 0 | captain | | | |
| gratuitous | 0 | graduate | amnesty | 0 | anesthesia | | | |
| linear | 0 | | risible | 0 | | | | |

| inept | 0 | | exonerate | 0 | | | |
| legality | 0 | lawyer's papers | superannuate | 0 | | | |
| aspen | 0 | | luxuriate | 0 | | | |
| prevaricate | 0 | | piebald | 0 | | | |
| barometer | 0 | car meter | crunch | 0 | | | |

Considering Mr. Nettles' performance on the set of reading tasks, we conclude that he reads at a 1st-grade level, or slightly above with some vocabulary gaps. He is held back from reliably reading at higher levels by the combination of grade-level vocabulary and a lack of proficiency in English grammar. It is at a fourth-grade level that a child's acquisition of vocabulary and mastery of English grammar combine to allow them to read to learn as opposed to simply *learning to read*. Mr. Nettles is still at the learning to read stage. He is a very rudimentary reader of English.

**IV.2.d.iv. Reading behaviors.**   Mr. Nettles does not read anything except what is on his phone and he doesn't do that very well. He has a Fox News App on his phone that he tries to read, but he often feels overwhelmed because many words are not familiar to him. He watches television with closed captions, but again many words are not familiar, so he does not watch often.

As a result of his limited reading abilities, he is very isolated from information on current events. Dr. Shepard-Kegl sent him a link where he can watch a program on YouTube called *The Daily Moth*: https://www.dailymoth.com/blog.  This program, signed in ASL by a Deaf signer, presents a synopsis of major news events of the day (typically 3). Because of his lack of contact with the Deaf community, he was completely unaware of this program. He said it was exactly what he was looking for. Without ASL access, he cannot even reliably access the news of the day, let alone restrictions on probation or new information shared by his probation officer.

**IV.2.e. Vocabulary**

You cannot read, lipread, or write what you don't understand. Since Mr. Nettles is an adult, we might also expect him to have acquired some specialized vocabulary that a child reader would not have. Note that more specialized adult vocabulary does not indicate an

115

increased reading level. Therefore, it is important to look at some of the specialized vocabulary he might encounter as an adult.

The following vocabulary lists present a list of twelfth-grade words, typically acquired only through reading. The next list is a mixture of medical and general vocabulary someone might encounter in a healthcare situation. Another list is comprised of words one might encounter in a law enforcement context. And, the last list focuses on employment related terminology.

The results of Mr. Nettles' vocabulary test appear below:

| correct | false + | category | incorrect | recognized | unrecognized | total | % correct | % incorrect |
|---|---|---|---|---|---|---|---|---|
| 2 | 45 | twelfth grade | 88 | 47 | 43 | 90 | 2% | 98% |
| 60 | 19 | hospital and general | 30 | 79 | 11 | 90 | 67% | 33% |
| 44 | 30 | police | 46 | 74 | 16 | 90 | 49% | 51% |
| 57 | 22 | employment | 33 | 79 | 11 | 90 | 63% | 37% |
| 163 | 26 | total | 197 | 279 | 81 | 360 | 45% | 55% |

**IV.2.e.i. Twelfth Grade (grade-level reading list)**

Mr. Nettles got 2 of the 90 twelfth-grade vocabulary items correct (2%). He thought that he recognized 48 of the 90 twelfth-grade vocabulary items (54%), but 47 of these were incorrect. He confused *abduct* with *duct tape*, *ally* with *alloy*, *amorphous* with *acetaminophen*, *apathy* with *path*, *askance* with *ask*, *audacity* with *city*, *augment* with *argument*, *caustic* with *cause*, *correlate* with *correct/late*, *cultivate* with *culture/cult*, *defunct* with *function*, *denote* with *note*, *despot* with *spot*, *discreet* with *secret*, *facetious* with *face*, *fatigue* with *fainting*, *felicity* with *fantasy*, *figment* with *flesh*, *finesse* with *fine*, *homogenous* with *transsexual*, *impervious* with *impressed*, *inordinate* with *order*, *mortal* with *karate (Mortal Kombat)*, *nondescript* with *no writing*, *novice* with *no vice president*, *overt* with *over T*, *persevere* with *served*, *petulant* with *pet*, *pious* with *pigeon*, *ponderous* with *pond*, *protract* with *truck*, *recluse* with *use*, *regale* with *regular ale*, *relegate* with *gate*, *reticence* with *retire*, *scourge* with *encourage*, *senile* with *Nile Virus*, *sinuous* with *sin*, *sordid* with *did*, *stature* with *state*, *succulent* with *success*, *tantamount* with *amount*, *tenet* with *tetanus*, *topography* with *top* and *graphy*, *tractable* with *able*, *transitory*

with *story, turgid* with *grid, unwitting* with *not writing, usurp* with *syrup, vestige* with *vest, volatile* with *violation,* and *volition* with *violation.* One can see a pattern here. If he recognizes a part of a word, or the words are fairly similar, he thinks he knows it. So, 52% of the time when he thought a word was correctly recognized, it was incorrect. His command over vocabulary at the 12th-grade level is not only poor, it is also highly unreliable. He doesn't know what he doesn't know.

### IV.2.e.ii. Medical and General Vocabulary

Mr. Nettles did considerably better at recognizing medical and general vocabulary. He got 60 of the 90 vocabulary items correct (67%). He recognized 79 medical and general vocabulary (88%), but 19 of these were incorrect. He confused *actual* with *activity, acute* with *cute, anemia and anesthesia* with *asthma, beneficiary* with *benefits, caffeine* with *coffee for diet, colon* with *have cancer in intestine, consent* with *scent, deceased* with *discount, fluids* with *fluid in lungs, hospital administrator* with *in hospital, living will* with *will live/willing to live, mechanical diet* with *hospital food, laceration* with *lace, pulmonary* with *pump, refer to another physician* with *refer to physical, sedation* with *vaccine,* and *waiver* with *wave.* So, 24% of the time when he thought a word was correctly recognized, it was incorrect. He was much better at recognizing words, and also at distinguishing words he knows and doesn't know. Notably, he does not know words like *consent* and *waive*, which would be critical in establishing informed consent.

### IV.2.e.iii. Law Enforcement Related Vocabulary

Mr. Nettles was able to identify 44 of the 90 law enforcement words correctly (49%). He thought he recognized 74 words (82%), but 24 of these were incorrect. He confused *accident report* with *report an accident, accident scene* with *insurer come to check out, altercation* with *accident that happened, arraignment* with *agreement, assault* with *problem/trouble, booking* with *writing a book, breathalyzer* with *breathing, disoriented* with *very drunk, disturbing the peace* with *no more bothering/now peaceful, incarcerate* with *create, incident* with *dentist, insurance holder* with *hold your insurance, interrogation* with *ego, intoxicated* with *toxic, lewd behavior* with *behavior, liability* with *cheap payment, mandated reporter* with *report date, motor vehicle* with *check inside motor, operating motor vehicle* with *operating construction equipment, police report* with *reporting to police, remain silent* with *silent (doesn't know remain), resist* with *resign, restraining order* with *revoke, under the influence* with *bad advice, waive* with *wave* and *where*

*is the other party* with *other party (social).* So, again, 32% of the time, when he thought he recognized a law enforcement word, he was incorrect. He was slightly better in his ability to distinguish words he knows from words he doesn't know to what was seen in the medical vocabulary.

### IV.2.e.iv. Employment Related Vocabulary

Mr. Nettles was able to identify 57 of the 90 employment words correctly (63%). He thought he recognized 79 words (88%), but 22 of these were incorrect. He confused *collective agreement* with *collect/credit agree, collegiality* with *college, commendation* with *command, confidentiality* with *confidence, dependent* with *depend on you, dock your pay* with *increase, fixed term contract* with *termination, foreman* with *man who wears reflective vest, immediate supervisor* with *see supervisor immediately, IRA* with *IRS, minimum wage* with *how much you earn per hour, OSHA* with *insurance, probationary period* with *must have probation, promotion* with *work with me, quality control* with *operators control, roster* with *rotation, shop steward* with *send things to shop, strong work ethic* with *strong work (doesn't know ethic), take home pay* with *bring home extra money, withholding* with *how much in bank, work station* with *fire station,* and *worker's comp* with *working man.* So, again, 28% of the time, when he thought he recognized an employment word, he was incorrect. He is similar in his ability to distinguish words he knows from words he doesn't know to what was seen in the medical/law enforcement vocabulary.

Mr. Nettles has a negligible twelfth-grade vocabulary. These are vocabulary items typically learned via reading. Since Mr. Nettles reads at a first-grade level, this result is not surprising. However, when presented with unfamiliar words, he grossly overestimates his ability to understand them. He doesn't know what he doesn't know. While he only got two items correct, he identified an additional 45 items as recognized. Often such items contained a simpler word that he recognized. For example, he circled a<u>path</u>y thinking that it meant path; tract<u>able</u> with able; etc. This makes his knowledge of vocabulary at the 12th-grade level unreliable. However, he does have a larger and slightly more reliable vocabulary in areas where he has more world knowledge. However, without proficiency in sentence level grammar in English he is left unable to reliably understand those specialized words in the context of sentences.

## V. Narrative Production (ASL v. English written v. English spoken)

In this final section of the assessment, we compare the volume and articulateness of Mr. Nettles' production of three renditions of the same narrative in three different forms: signing in ASL, writing in English, and speaking in English.

## V.1. Narratives signed in ASL

Mr. Nettles' renditions of *Mr. Koumal Flies Like a Bird* and *Mr. Koumal Battles his Conscience* demonstrate strong competency in ASL grammar (see videos).

| Mr. Koumal Battles his Conscience (signed, version 1)  Joseph Nettles |
|---|
| MAN 1pGIVE-TO3p WHO SIT h-o-m-e-l-e-s-s BEG++. THAT SIT h-o-m-e-l-e-s-s  THEN MAN[left] rs(koumal left):1p[left]PUT-TO3p[right] MONEY SAME 1p[left])]PUT-TO3p[right] WHAT.  THEN POSS3p[right,woman=Ø] MONEY b-a-g bag#FROM-FALL-TO[down] WHAT. THEN FIGHT++ TWO BOTH, DEVIL WOMAN ANGEL WHAT THEN FEEL AGREE m-a-n CL:bentV#HOP[foward]/+++ heart#SASS:CLbabyC(2)-ON TO 3pDROP-TO[left, woman] MONEY TEN^THOUSAND HCL:claw(2)-CARRY-TO[left, woman]. DREAM TALK TO XXX(sign off video), IX-1p GUESS, WHAT FIGHT++ CL:1#CL1-WARD[reciprocal]. WHAT BOTH DEVIL MAN WOMAN ANGEL. IX[adv, down, money] MONEY IX3p[left] WHO h-o-m-e-l-e-s-s money#3p(beggar)GRAB MONEY ALL WHAT HCL:C(2)-DRIVE+++ CL:S#3p(beggar-HCL:FROM-TAKE^THROW-TO[right, koumal] MONEY 3p(beggar)HCL:THROW-TO[right, koumal] MAN. |
| A man gives (something) to a homeless person who is sitting on the ground begging.  Then the man (means woman) gives money to the same homeless person.  While she gives him (something), money falls from her bag. Then what happens? Both/two, a Devil and a female angel are fighting with each other. Then what? I feel they agree that the man, being goodhearted, goes to the woman and gives her (back) the money, carrying the wad of $10,000. He dreams of talking to XXX(God?) I guess.  Then what? The two parts of him stand off and fight again.  Then what happens? The devil man and the woman angel (are fighting) and the money is there on the ground. The man who is homeless grabs up all the money and drives (away). He takes money (a coin) from his hand and throws to the man. |

We felt he was more just listing the events than constructing a narrative, so we asked him to do it again in ASL telling the full story. The following story is more complete and more coherent.

| Mr. Koumal Battles his Conscience (signed, version 2)  Joseph Nettles |
|---|
| MAN pocket#HCL:lotus-REACH-INTO 3pPOSS p-o-c-k-e-t BREAK pocket#HCL:lotus-REACH-THROUGH h-o-l-e. pocket#HCL:lotus-PULL-OUT 3p(koumal)HCL:H-GIVE-TO(beggar) h-o-m-e-l-e-s-s. THEN OTHER MAN 3pGIVE-TO3p(beggar) IX3p(beggar). THAT MAN h-o-m-e-l-e-s-s SAME. THEN rs(beggar): HCL:T-HOLD-OUT(hat). WHAT. THEN pocket#CL:V-FROM-FALL-TO[down] p-o-c-k-e-t THAT MONEY WHAT MUCH MONEY IX-HCL:B[adv, left,down]. s-o NOW CL:1#CL:1-ON-FROM[reciprocal] DEVIL HALF TWO-OF-THEM[front] FIGHT+++ OVER ABOUT MONEY. WHAT. [right shift]DEVIL WANT. [left shift]WOMAN rs(woman): HCL:5(2)-NO++ FEEL WANT 1pGIVE-TO(man2)3p. WHAT MONEY RED POOR HAVE. MAYBE THAT MEAN THINK 3p(koumal)GIVE-TO3p(2nd man) WHAT. s-o #or MONEY 3p(i,j)POSS |

> MONEY -CL:B#HCL:lotus-IN KEEP. [pocket#CL:V-FROM-FALL-TO[down]]conditional
> pocket#HCL:lotus-PUT-BACK-IN. WHAT WRONG pocket#CL:V-FROM-FALL-TO[down]
> WHAT. s-o [gesture: "What are you doing to do?"] [GOD]topic WHAT MAN  DREAM  WHAT
> HALF heaven#CL:V-ASCEND-TO God#CL:V-WALK-UP-TO MAN 3pGIVE-TO3p[God] MAN d-
> o-n-a-t-e MONEY rs(God):HUG+++. WHAT. THEN THINK CL:1#CL:1-ON-FROM[reciprocal]
> IX3p FIGHT[reciprocal]++ BOTH DEVIL ANGRY MAN. WHAT. 1pGUESS WHAT s-o IX[adv,
> right,down] MONEY 3pTAKE-FROM[money] THAT FROM h-o-m-e-l-e-s-s. THEN HCL:C(2)-
> DRIVE+++ CL:S#3p(beggar-HCL:FROM-TAKE^THROW-TO[right, koumal]. WHAT THAT
> WHAT.
>
> What the man did was to reach into his pocket. He actually reached right through, creating a hole.
> He pulled a small flat object out (a coin) and gave it to a homeless person. Then another man gave
> money to that same homeless person. Then, as the homeless person sat there holding out his hat,
> money fell from the man's pocket. It was a lot of money just lying there on the ground. The man
> was torn between two mindsets.  His devil half wanted the money. His female side said, "No,
> leave it be. I feel I want to give the money back to that man—that poor red man who had the
> money. Maybe that means he thought he should give it back to the other man. After all, it was his
> money that he kept in his pocket. It fell out by accident. If it fell out, it should be put back. So,
> what does the man do?  He dreamt that half of him ascended to heaven, walked up to God and
> donated the money to him.  In return, God hugged him.  Then, the man was again of two minds
> and his devil side started to battle with his angry side. So, I guess that the money was stolen by the
> homeless person who then drove by and tossed a coin to the man.

Mr. Nettles' signed narratives are much more prolific and detailed than his written English narratives. They also convey much more visual and spatial detail than any of his English narratives. When comparing Mr. Nettles' signing to his written renditions of the same narratives, the disparity between the two is evident.

Mr. Nettles' written renditions of the same Koumal narratives can be seen in section IV.2.a. and are copied here for comparison purposes. Most of the grammatical issues were listed in section IV.2.c.

> **Mr. Koumal Battles his Conscience (written)**                    Joseph Nettles
> The man was pocket tore up pocket with coin and give to homeless that man sidewalk sit so other
> men give to coin to homeless that man and that person men fall off his pocket a lot dollars so he
> dream about angel and devil over the money fight about his pocket fall on ground and homeless
> man took the dollars and buy the car give to coin to men

> **Mr. Koumal Flies like a Bird (written)**                    Joseph Nettles
> The man dig hills on mountain on top ground he is joy then saw the bird can fly and he think
> same he can fly fall on ground get bird feather see if he can fly but not work then other farm
> chicken feather all chickens the if he can fly again not work fall ground mountain break down
> found gold and he own store a lot gold

## V.3. Narratives in spoken English

Mr. Nettles was not comfortable speaking, but he did provide a spoken sample. His spoken English is less prolific and even less grammatical than his written English

(especially when he signs concurrently or his signed ASL narrative). Both are far less prolific or grammatical than his ASL. His spoken recountings of the Koumal cartoons are reproduced below from IV.1.a.i.

| Mr. Koumal Battles his Conscience (spoken)                        Joseph Nettles |
|---|
| Same story that story? The man in pock(et) give to homeless the money. Other man give the money give money too. So, that man lost money. Then dream somehow fight devil angel. Then homeless got money. Then buy a car. Give the coin to man back. Fine, guess that right. I don't know. |

| Mr. Koumal Flies like a Bird (spoken)                        Joseph Nettles |
|---|
| A man dig mount(ain)...top. On ground think good (thumbs up)  feel. Look..(th)e(m)..saw bird...I can fly. Umph fall on ground. How..feather put in. I can fly. Fly, fall. Go other farm on chicken a lot. Try work fly. Mountain phhhht. Find lot of gold. Then put business store. What. Gold a lot. |

## V.4. The influence of English on ASL and vice versa

There is little English influence on Mr. Nettles' ASL, but there is strong influence of ASL on his written English, enough to say that his English is strongly driven by the grammar and discourse conventions of ASL.

## V.5 Comparison of narrative production in English and ASL

In comparing the Koumal narratives in ASL and English, it is clear that Mr. Nettles is most comfortable with ASL signing. He is far less proficient in English. He is not a balanced bilingual in these two languages and modalities. In fact, ASL can serve his communication needs easily. The only limitation concerns fund of knowledge and more academic forms of discourse. Except in the most rudimentary encounters, English in any modality via speech, writing, or lipreading, cannot provide him communication access. Required to rely upon English he is juvenilized both by his imprecise speech and his limited mastery of grammar and vocabulary. He does not present as the intelligent adult he is. He is also unable to access and comprehend the English around him, leading to frustration on his part and on the part of individuals attempting to communicate with him in any substantive way. In contrast, via American Sign Language, he presents as the mature and competent adult that he is.

**Conclusions and Expert Opinions:**

**Summary of Conclusions based upon our Assessment: Brandon Cobb**

**Etiology:**

Mr. Cobb became deaf at age two from what he reports to be a "high fever."  The description sounds like meningitis, although the exact nature of his illness was never shared with him by his mother. This lack of access to medical history is common in families that do not sign and even has a name: Dinner Table Syndrome. [13]

**Cultural Affiliation:**

Mr. Cobb's cultural affiliation is mixed. He became deaf at an early age, but his family could all hear and did not sign with him, other than home gestures. His early education in schools for the Deaf speaks to an early Deaf identity and exposure to ASL and Deaf culture. His later life choices do not show a strong affiliation with the Deaf community as a cultural haven, but he does have a strong Deaf identity and uses ASL as his primary language.

**English:** Having been raised in the U.S., Mr. Cobb has had a minimal exposure and education related to English, but there is no modality of English (speech, lipreading, reading, or writing) that serve as an adequate means of access to communication for him.

**Speech.** Some Deaf people can speak but choose not to. This is not the case for Mr. Cobb. He does not have mastery of the articulatory mechanics that are used to produce speech. He was very uncomfortable being asked to speak and could not produce a spoken message in the absence of also signing. Not a single word was pronounced in full. Final consonants and consonant clusters in syllables were consistently omitted. Initial consonant clusters were consistently simplified and often all initial consonants were

---

[13] Meek, D. 2020. Dinner Table Syndrome: A Phenomenological Study of Deaf Individuals' Experiences with Inaccessible Communication. In *the Qualitative Report*, vol. 25, no. 6, pp. 1676-1694.

omitted. Multisyllabic words were reduced to single syllables. Mr. Cobb's discomfort with being required to use speech is understandable. His speech is ineffective and his using speech presents him as a juvenile, less competent, and less articulate person than we see in his adult, fluent, and articulate use of ASL. To require the use of speech for him is demeaning. Mr. Cobb's speech is unintelligible, even to individuals familiar with Deaf speech. While a family member may learn to recognize some of his spoken words or phrases when combined with gesture; even at home, speech could not have served for substantive communicative access or even casual conversation.

**Lipreading.** Not surprisingly given his problems with speech, Mr. Cobb's lipreading is negligible. He recognized none of the 17 isolated words with which he was presented and only one of the 47 words and phrases (*What's your name*?). His attempts showed attempts at phonemic processing, but he doesn't have enough mastery to recognize even the most basic information on the mouth. He listed, at one point, the words he could lipread: *Thank you, I love you*. However, when these were added among the lipreading stimuli, he even missed *thank you* and caught *I love you*. He cannot "make do" with basic lipreading.

**Reading.** Based upon the sentence screening and performance on reading the Flynt-Cooter passages, Mr. Cobb reads just barely at a second-grade level, but not above. Second-grade reading does not come easily to him, but he can understand most of it. He is still at the stage of "learning to read" rather than "reading to learn." The heart of this is that he does not use syntax to decode sentence. He is working primarily from a basic subject verb object sense of order and guesses at meaning based upon plausibility. On a positive note, Mr. Cobb does read silently to himself rather than reading aloud, which often signals coding rather than reading for meaning. He is also quick to determine what he can read and what he cannot. We pushed our assessment beyond his self-identification to really determine where his reading falls, but in general he was accurate in his reporting of where he struggled. Mr. Cobb is not a reader. He uses Facebook to find the latest news and skims the internet for news information. Rather than read the news, he prefers to watch signed news on Facebook, and occasionally *The Daily Moth*, a vlog on YouTube. However, even though that is signed, he struggles because the signing is too English-influenced and requires a lot of CALP to understand. He struggles reading captions on the TV.

**Vocabulary.**

Based upon The San Diego Screening, a vocabulary test with words vetted for grade level that is predictive of reading level (for individuals who are native users of English), Mr. Cobb should be able to read independently (without need for help) at a second-grade level but with frustration above that level, but this must be qualified by the fact that he doesn't have the command of English syntax that a hearing second-grader, already a native speaker of English, would have.

Adults, in their world experience, also acquire specialized vocabulary in certain domains. This vocabulary may well involve words that a second grader would not know. However, you still have the same base vocabulary and syntactic competence so knowing more words in this case does not change your reading level. We looked at Mr. Cobb's reliable recognition of domain-related vocabulary in four areas (listed here with the percent of words recognized): twelfth-grade words (words typically acquired through reading) 0%); medical mixed with some general vocabulary (16%); law enforcement vocabulary (27%); and employment-related vocabulary (12%). Mr. Cobb's adult acquired vocabulary is low across the board, though it is slightly higher in the law enforcement area than in others. His employment vocabulary is lowest, but this fits with the fact that his jobs tend to be blue collar work and not the type of jobs that would involve things like *HR, sick leave, overtime*, etc.

**Writing.**

Mr. Cobb's written English competency was analyzed in two ways: argument structure analysis and grammaticality.

***Argument Structure Distribution.*** The purpose of an analysis of Mr. Cobb's argument structure distribution is to rule out any patterns that might suggest that the individual has a frank aphasia or other organically based syntactic deficit that would account for any problems with written language. Mr. Cobb does not have agrammatism. In contrast with the grammatical constructions that individuals with agrammatism cannot produce, he produces the same constructions in an overabundance. Furthermore, his English writing patterns most strongly with the argument structure patterns of Deaf ASL signers writing

English and also with the English writing of Deaf people in general (whether they sign or not) in terms of a lack of use of copular constructions (sentences with linking verbs like is (e.g., X is a Y). This argument structure profile is independent of whether an individual has impeccable grammar in English or whether the grammar errors are rampant.

***Grammaticality.*** To get a sense of how much Mr. Cobb's English conformed to the grammatical rules of English, we took the same written data and analyzed it sentence by sentence for grammatical errors at the word level (lexicon), word formational level (morphology; how person, tense, number, aspect, and agreement are marked), and at the sentence level. Errors were seen at all levels of the linguistic organization of Mr. Cobb's English. He had insufficient vocabulary, rarely and inconsistently applied English morphological rules, and when he did still made errors. His syntax was also highly ungrammatical. He substituted words for others, used circumlocutions, freely omitted prepositions or exchanged them with one another, rarely produced the English articles (*a, an, the*); frequently omitted or erred in marking of person, tense, aspect, and number. He even made errors like substituting *women* for *woman* and *men* for *man*. He produced longer strings of words but there was no conformity to English word order or marking of constructions like questions, relative clauses, conditionals, direct speech, etc. If any grammatical structure was to be seen, it was coming from ASL grammar. He makes all the errors of a very beginning second-language learner of English who relies on his first language to configure what vocabulary he has into sentences. His errors occur in every sentence and throughout all levels of English grammar. He has a fossilized development of English grammar, minimal grammatical competency in English and reliance on ordering strategies and ASL-driven grammar.

**Basic Interpersonal Communication Skills (BICS):**

Mr. Cobb's communication in English is limited at even the basic conversational level. His only vehicle for conveying English is reading and writing, where he functions at best at a beginning second-grade level. His reading exceeds his writing because the grammar is done for him, but he is still relying upon limited word knowledge and expectations based upon world knowledge rather than grammar to read or write.

**Cognitive Academic Language Proficiency (CALP):**

Mr. Cobb does not exhibit language that has been established through education that can tackle and analyze new concepts and unexpected ideas. He struggles with synthesis, analysis and evaluation in general, which is indicative of a weak education. But, in contrast with ASL, he cannot even be scaffolded via English grammar to acquire new knowledge. He has no Cognitive Academic Language Proficiency in English.

**American Sign Language:**

Mr. Cobb's primary and preferred language is American Sign Language. While he is from a hearing family and currently has less contact with the Deaf Community, he did have early exposure to ASL, and this exposure is evident in the language production and language comprehension we observed. His language can probably be best compared with that of a high school freshman who comes to high school with native fluency in English, but upon encountering poetry and literary analysis for the first time finds it odd and pedantic. Mr. Cobb understands his language, ASL, and converses with ease and full comprehension. However, challenged with the task of using more academic language to analyze, synthesize, and evaluate the more refined genres of ASL via language discourse, he is not in his area of expertise and language comfort. His education has not prepared him for that.

*Production*: Mr. Cobb's sign articulation is accurate, but at times it can lack the crispness and precise articulation used in careful, elaborated signing. He often exhibits the sloppiness and informality of a teenager, yet the grammar is complex and intact. He was at times hard to code, not because of grammatical error, but because of the imprecision of his articulation. However, his precision of articulation varied based upon his engagement with the subject matter being discussed. We saw him at his best on a webinar segment where he was discussing his prison experiences. There his signs were crisp and precise, his eye gaze, turn taking, and backchanneling were native-like and his energy was high. Nonetheless, even when articulation was lax, his ASL grammar was consistent. Acceptable native-like fluency can range from proficient, to articulate, to eloquent in ASL. Mr. Cobb falls into the proficient category; which, while not making him an accomplished storyteller or orator, definitely recognizes his baseline efficiency and proficiency in the language. He can express any concept or point he wishes to convey in this language.

Our assessment reveals strong fluency in ASL in terms of grammar as well as discourse organization. His lexicon is strong. There are words in his sign vocabulary that are articulated as initialized signs that are more typical of signs learned in a school context, but these are not prevalent. They are also likely indicative of an arrested development in his ASL style after leaving school. After he left school his contact with the Deaf community lessened and he has had less opportunity to develop and adapt to a more adult register of ASL, hanging onto some of the school-based initialized signing used in his youth. He does not strive to develop skills that will entertain his Deaf peers with engaging story telling or his academic prowess.

Mr. Cobb is in his element when engaging in conversation in ASL *(BICS)*. His ability to use more academic ASL forms *(CALP)* for analysis, synthesis, and evaluation is limited by educational factors, not language competency. Again, he can hold his own in any conversation, comprehending fully and with ease. He is comfortable with the genre of conversation and inquiry. He has basic skills in the narrative genre. He can construct and tell a story, but he hasn't mastered the genre of storytelling as an art form. He can engage in basic expository language (explaining how to do things), but he is not a master of explanation. He can make a basic persuasive argument, but he is by no means a debater. Language for him has a utilitarian purpose.

*Comprehension*: Mr. Cobb's comprehension of ASL is solid. In the genre of face-to-face conversation, he excels. He gets the basic information conveyed in narrative, but, like the high school freshman encountering poetry for the first time, only with some scaffolding can he delve into the deeper meaning or structural organization of a narrative. When he watched *Bird of a Different Feather*, he watched it for the basic storyline, but quickly his interest waned. Like the Englishman who reads *Gulliver's Travels* as a somewhat interesting children's story, it takes some scaffolding to get him to recognize the story as a satire on the British politics of the time. Only when the pieces of the story were repeated in more palatable chunks and he was scaffolded to look for the parallels with growing up deaf in a hearing family was he able to build a sense that the story was actually allegorical. In contrast, he watched a classifier story, *DWI*, in ASL told through the very productive formation and most complex narrative style in ASL with the engagement and attention

127

with which someone would watch an adventure movie. He missed some artful play with signs and a few classifiers were not fully understood, but he followed the story with ease. Again, his comprehension of ASL is solid. It is his familiarity with various narrative and academic genres of ASL that is weak, because he has not acquired that academic language, which is learned in school and from very articulate Deaf teachers.

**Expert Opinion:  Brandon Cobb**

**We have been asked to opine on the following questions:**

While there may be a weighting at time in terms of who is best suited to the analysis of assessment material (e.g., Dr. Shepard-Kegl can hear and is therefore best suited to code and assess data presented or received via sound, and Dr. Rowley is a native Deaf signer and a core member of the Deaf community and thereby most appropriate to assess issues pertaining to ASL, Deaf culture, and Deaf education) both of us are indeed experts in the range of areas covered in our assessments and our responses in terms of our expert opinion should be viewed as being in consensus on all matters of opinion, offering them both individually and as a team.

**In what situations (if any) are sign language interpreters necessary for communication between Mr. Cobb and a person who cannot communicate fluently in ASL?**

Based upon our assessment of Mr. Cobb and the conclusions we reached in that assessment, it is our expert opinion that in any substantive interactions where Mr. Cobb must access and share information with service providers (including, but not limited to, law enforcement officials, probation officers, medical personnel, and counselors) who *cannot* fluently communicate with him in ASL directly, a professional, qualified ASL/English interpreter is required.

**Which type?**

Based upon our assessment of Mr. Cobb and the conclusions we reached in that assessment, it is our expert opinion that in relatively benign and routine interactions, or interactions where the stakes are not high and the interaction is not stressful or emotionally charged, and in which Mr. Cobb had a reasonable fund of knowledge in the subject matter at hand, he would require the services of a competent and qualified

interpreter (or interpreter team) who can consistently interpret between ASL and English. Such an interpreter needs to be able to maintain consistent interpretation into ASL and not fall back on more English-influenced variants of signing and needs to be sensitive to regularly probing for understanding as well as for gaps in the fund of knowledge Mr. Cobb brings to the situation. In our expert opinion as a team consisting of an experienced and credentialled ASL interpreter and an expert on ASL from the vantage point of a Deaf native signer, Mr. Cobb is best served by an interpreter or interpreter team that can provide native-level interpretation into both the source language and the target language of each communication interchange.

**In what situations (if any) does this person require Deaf Interpreters?**

Based upon our assessment of Mr. Cobb and the conclusions we reached in that assessment, it is our expert opinion that he would always be *best* served by a Deaf/hearing team or a Deaf ASL signing service provider because this would provide both native level language input and shared membership in a community of Deaf individuals who share life experiences in having navigated their world visually and as a deaf person. However, we have been asked to delineate those situations (if any) in which Mr. Cobb would *require* the services of a Deaf interpreter. The factors that we feel play a role in our decision in this regard are fund of knowledge, language proficiency, the need for CALP to access and assess the information, and the extent to which the communication that must be shared and accessed have important consequences (are high stakes) for Mr. Cobb. In our expert opinion, in any high stakes encounter where the risk of misinterpretation is high and the consequences of that to Mr. Cobb could be detrimental,  the services of a team consisting of a Deaf interpreter and a hearing interpreter are required. Mr. Cobb lacks the fund of knowledge to function knowledgeably in the legal domain, the academic level language skills in ASL to unpack the information received in a way that he can evaluate and assess it in sufficient depth and detail to make autonomous and informed decisions regarding his case, the native-level proficiency and sensitivity to culturally-based styles of behavior and discourse that will make both conveyance of the content of information and the cultural brokering necessary to convey that information in a culturally familiar and appropriate way that will minimize stress and anxiety stemming from cultural clashes that could compromise trust and understanding. In terms of interchanges relating to probation we would argue that a Deaf/hearing team would not be required at every

meeting, but such teams would be required in any annual meetings where conditions of probation are reviewed or altered or any probation meeting where significant events have occurred that may need to be processed or resolved. Otherwise, based upon the results of our assessment of Mr. Cobb, in our expert opinion, more routine probation meetings regarding familiar topics would require only a competent and qualified interpreter (or interpreter team) with legal specialization, who can consistently interpret between ASL and English and are sensitive to probing regularly for understanding.

**In what situations (if any) is relying on the person speaking and getting information by speechreading appropriate/reliable?**

Based upon our assessment of Mr. Cobb's speech and speech reading and the conclusions we reached in that assessment, it is our expert opinion that there is no situation of any consequence in which Mr. Cobb can reliably express or receive information via speech and speechreading.

**In what situations (if any) is relying on writing notes back and forth reliable for effective communication?**

In our expert opinion, for any situation in which a hearing individual is given the benefit of using the spontaneous communication allowed by speaking back and forth with a service provider, for a Deaf person to have equal access a similar spontaneous mode of communication needs to be provided. The litmus test would be to consider whether a hearing person required to write back and forth in these situations to assure equal access, would be comfortable with the accommodation.  Because writing back and forth is effortful, time consuming, and in some cases not as reliable as speaking, all participants would be at a disadvantage. The service provider, pressed for time, will undoubtedly curtail the amount of information passed back and forth, the consumer, hearing or Deaf, will be shortchanged the same communication experience that would be had without passing notes. We have never seen the passing of notes to result in an equal exchange of information as would happen via spontaneous speech or signing. However, a second factor needs to be considered and that is the competency in the language being written or read.

Based upon our assessment of Mr. Cobb's reading and writing and the conclusions we reached in that assessment, it is our expert opinion that his proficiency in writing English and in reading English is insufficient to support writing notes back and forth. He reads at a beginning second-grade level and his writing is even less reliable and effective than his reading. This level of English competency is insufficient for him to engage in any substantive interchange in this manner.

**In what situations would "teach-back" or another method to ensure comprehension be necessary? (put another way, any insight into whether the person is susceptible to "deaf nod" even if they don't fully understand).**

Based upon our assessment of Mr. Cobb's communication and the conclusions we reached in that assessment, it is our expert opinion that when his fund of knowledge is lacking in a given area and when processing the information requires a degree of CALP, Mr. Cobb becomes easily frustrated and less able to effectively communicate. When this happens, he will first resist doing the task or simply give up. However, if cajoled or encouraged to continue, he will indeed engage in some nodding, just to get the task over with.

Our first comment on this issue comes from things discussed previously in our general background section. In our experience, with both Deaf and hearing people, all of us have our breaking points where we realize that continuing to ask for clarification, straining to understand information that is new and unfamiliar, communicating in a second language, and making efforts to get people to slow down or re-explain are unlikely to yield understanding, may result in frustration aimed at us, or are just not worth the effort, we all "nod." In our expert opinion and based upon our familiarity with many Deaf individuals and their behavior, Deaf individuals in general, in situations where they lack sufficient access to communication as a result of not having an interpreter, or just because of their own limitations using a language, will "nod" for this reason. In this regard, Deaf people and people who can hear are really behaving alike. It is just that Deaf people, who have experienced over their lifetimes a repeated lack of communication access and ineffective communication with people they cannot hear, have a lower threshold at which they will "nod." Nodding is often a very welcomed behavior. The Deaf person can hasten

the end of the interchange; and the hearing person can feel comfortable in the delusion that they are being understood and will proceed through the conversation. Teach-back is a valuable tool that doctors use with discretion when assuring that the information to be conveyed is placed at a premium. When getting out the door is placed at a premium, teach-back is not likely to be used.

Here we offer our expert opinion as experts on Deaf culture and communication. There is a second use of *nodding* in ASL. This use is a cultural and linguistic expression of politeness and attention. And this use of nodding is different from nodding in the hearing population in the U.S. It also has a different meaning than nodding in English and this is a place where cultural confusion often occurs. We are reiterating discussion from our general background as well. In ASL people nod to say, I am attending to you. It is not a sign of agreement or understanding. The indication of understanding involves a Y-handshape, a fist with the pinkie and thumb extended. This means I get it. Nodding without this backchanneling signal is not seen as understanding and the Deaf person will invariably repeat the information. For hearing people, a similar signal of attending is maintaining eye gaze. We can sometimes listen but not look at a person. Often, however, we will find the person repeating the information over and over, assuming we have not attended to it. Children are especially prone to reacting in this way.

For both these reasons, systematic probing for understanding, one effective means of which is "teach-back," is an essential tool in the interpreter's communication arsenal. So, in response, in our expert opinion, Mr. Cobb is prone to nodding. His threshold is a bit higher than some. He will likely shut down first, but when fund of knowledge is low and demand for academic kinds of language use and reasoning occur, he will indeed nod.

**Summary of Conclusions based upon our Assessment: Joseph Nettles**

**Etiology:**

Mr. Nettles reports becoming deaf at age two and a half from what he reports to be a "high fever." He was not able to offer more details about the exact nature of this illness.

Meningitis is suspected. This lack of access to detailed medical history is common in families that do not sign.[14]

**Cultural Affiliation:**

Mr. Nettles identifies as culturally Deaf. His early education at the Georgia School for the Deaf (age 4) and later the Louisiana School for the Deaf (1974-77) speak to his having a Deaf identity and early exposure to ASL and Deaf culture. His later life choices (former wife was Deaf and current girlfriend is Hard of Hearing) also show identification with the Deaf community, but at present because of probation restrictions he has little interaction with that community. If that were not an issue, he reports that he prefers to socialize with Deaf people. He has a strong Deaf identity and, as is confirmed by our assessment, ASL is his primary language.

**English:**  Having been raised in the U.S., Mr. Nettles has had limited exposure to English in his education. However, he is not proficient in English. There is, in fact, no modality of English (speech, lipreading, reading, or writing) that serves as an adequate means of access to communication for him. In addition to a poor foundation in English, Mr. Nettles is unreliable in distinguishing what he knows from what he does not know. He will often assume he recognizes a word if he recognizes part of it;  e.g. confusing *apathy* with *path*, *abduct* with *duct tape*, *askance* with *ask*, etc.

**Speech.** Mr. Nettles' speech has very limited intelligibility. Listening to his spoken renditions of the two Koumal cartoons, especially without knowing their content, immediately reveals that he cannot rely upon speech for communication. Only with re-watching many times and lipreading him as he recounted *Mr. Koumal Battles his Conscience*, was Dr. Shepard-Kegl (who also was familiar with the story) able to transcribe much of what he was saying, but not with complete reliability. In the rendition of *Mr. Koumal Flies Like a Bird*, where he chose to sign while speaking, it was easier as a signer to recover the target words, but so much speech was omitted and replaced with signs that

---

[14] Meek, D. 2020. Dinner Table Syndrome: A Phenomenological Study of Deaf Individuals' Experiences with Inaccessible Communication. In *The Qualitative Report*, vol. 25, no. 6, pp. 1676-1694.

the spoken rendition of the story was completely unintelligible. If required to try to communicate via speech, Mr. Nettles would tend to accompany his speech with signing. Some basic words and possibly a few routine phrases are recognizable for someone familiar with Deaf speech or very familiar with Mr. Nettles' speech (like a family member). His speech overall had a nasalized quality frequently seen in people with hearing loss. Confounding understanding of Mr. Nettles' speech even further (as can be seen in his writing) is that he is by no means a native speaker of English. His word order is different, he uses English prepositions as if they are verbs, and he omits pronouns (as he should in ASL but should not in English). Speech cannot serve as a means of communication for him.

**Lipreading.** Mr. Nettles' lipreading is also poor, He was able to recognize 15 of the 64 items presented (23%). He recognized 5 of the 17 isolated words he was presented with (29%) and 10 of the 47 words and phrases (21%). Most were very common and routinized word and phrases: *What's your name?, What's your address?, What's your telephone number?, How long have you been working here? How old is your son? What's your favorite movie?,* and *Can you understand me*? His responses indicated attempts at phonemic processing: <u>force</u> <u>you</u> for <u>forty</u>-<u>two</u>; <u>read</u> <u>please</u> for green beads (*d, n,* and *s* are made in a similar place in the mouth). He often produced responses that shared the first sound with the items spoken, or shared features of front versus back vowels. The problem is that getting close does not actually get you closer to the meaning. For example, he saw *Are you aware of your rights*? as *Have you been arrested*; and *You have the right to remain silent* as *you have replace for dialysis.* He caught many similar sounds, but came nowhere near the meaning of the item produced. His most surprising correct response was *Have you ever had a transfusion?* Despite trying hard, Mr. Nettles is quite below average among deaf people in lipreading (and, as noted in the main report, even the most skilled lipreaders still get only about 80%. He cannot reliably use lipreading as a means of accessing communication except perhaps quite sporadically recognizing highly contextualized and routinize phrases.

**Reading.** Mr. Nettles' reading is extremely weak. Based upon vocabulary alone (The San Diego Screening) he might have been expected to read solidly at a second-grade level. But, a second-grade vocabulary in the absence of a second-grade mastery of sentence grammar (syntax) does not allow reliable reading at that level. Mr. Nettles' performance on reading

passages at various grade levels revealed an inability to read fully reliably at even a first-grade level. However, give his vocabulary and ability to get the overall gist at the first-grade level, we would place his reading there. He has the vocabulary of a second grader, perhaps even a bit higher, just not the grammar competency to match it. He even got quite a few words at the fourth-grade level. It is his limited understanding of English syntax that impacts his reading most.

Mr. Nettles doesn't read anything except what is on his phone, and he doesn't do that very well. He feels isolated from information. Dr. Shepard-Kegl sent him a link where he can watch a program on YouTube called *The Daily Moth*: (https://www.dailymoth.com/blog). This program, signed in ASL by a Deaf signer, presents a synopsis of major news events of the day (typically 3). Because of his lack of contact with the Deaf community, he was completely unaware of this program. He said it was exactly what he was looking for. Without ASL access, he cannot even reliably access the news of the day, let alone complex content (like restrictions on probation), or new information shared with him in printed form. Reading orientation manuals or even letters is not an option for Mr. Nettles. Passing notes is not reliable except in the simplest, most routine exchanges of information and only when geared to a first-grade reader. Mr. Nettles cannot read to amass new information. He is frozen at the very beginning stage of "learning to read" and has an insufficient foundation in reading to allow him to "read to learn."

**Vocabulary.** Mr. Nettles does have a second-grade vocabulary and a smattering of words above that, even some fourth-grade verbs. But, as mentioned, his limitations in English syntax limit his reading ability.

However, adults, via their world experience, also acquire specialized vocabulary in certain domains. This vocabulary may well involve words that a second grader and above would not know. However, specialized vocabulary does not change the base vocabulary and syntactic competence, so knowing more words in this case does not change your reading level. We looked at Mr. Nettles' reliable recognition of domain-related vocabulary in four areas (listed here with the percent of words recognized): twelfth-grade words (words typically acquired through reading) (2%); medical mixed with some general vocabulary

(67%); law enforcement vocabulary (49%); and employment-related vocabulary (63%). Mr. Nettles' adult-acquired vocabulary indicates a person who does not read as an adult (only 2% of the words typically acquired through reading), but it is notable that he has acquired a reasonable number of vocabulary items in all his other domains of experience. Surprisingly, his vocabulary in the area of law enforcement is lower than the others, suggesting a reduced fund of knowledge in this area. One cannot, however, get by in any of these domains on vocabulary alone. Knowing vocabulary words without accompanying syntax may allow Mr. Nettles to understand, for instance, the topic of a document written at a higher reading level, but he would not be able to understand through reading what the document said *about* that topic -- instructions, prohibitions, warnings, conditions, etc.

**Writing.**
Mr. Nettles' written English competency was looked at in two ways: argument structure analysis and grammaticality.

*Argument Structure Distribution.* The purpose of an analysis of an individual's argument structure distribution is to look for any patterns that might suggest that the individual has a frank aphasia or other organically based syntactic deficit that would account for any problems with written language. Mr. Nettles does not have agrammatism. In contrast with the grammatical constructions that individuals with agrammatism cannot produce, he produces the same constructions in an overabundance (47%, where individuals with agrammatism would produce few to none and hearing writers of English would produce about 25%). Furthermore, his English writing patterns most strongly with the argument structure patterns of Deaf ASL signers writing English and also with the English writing of Deaf people in general (whether they sign or not) in terms of a reduced number of copular constructions (sentence with linking verbs like is (e.g., X is a Y)). This argument structure profile is independent of whether an individual has impeccable grammar in English or whether the grammar errors are rampant.

*Grammaticality.* To get a sense of how much Mr. Nettles' writing conformed to the grammatical rules of English, we took the same written data used for the argument structure analysis and analyzed it sentence by sentence for grammatical errors at the word

level (lexicon), word formational level (morphology; how person, tense, number, aspect, and agreement are marked), and at the sentence level. Grammatical errors were seen at all levels of the linguistic organization of Mr. Nettles' English. He uses what vocabulary he has but often needs to substitute simpler words and to use circumlocutions for lack of the vocabulary items he needs, and frequently omits or errs in marking of person, tense, aspect, and number. His syntax is also highly ungrammatical. He freely omits prepositions, exchanges them with one another, or uses them as verbs. He rarely produces the English articles (*a, an, the*). He produces longer strings of words, but word order or marking of constructions like questions, relative clauses, conditionals, direct speech, etc. is absent. One can see in his writing attempts to convey questions, relative clauses, topic marking and other syntactically organized information, but he does not have command of the functional level of English grammar (the glue that indicates the syntactic arrangement of words in sentences, such as determiners (*a, an, the*), morphological markers of tense, number and agreement, auxiliary verbs (forms of *to be* and *to have*), and complementizers that indicate one sentence to be subordinate to another (*that, which,* infinitive-*to*, etc.) If any grammatical structure is to be seen, it is coming from ASL grammar. He makes all the errors of a very beginning second-language learner of English who relies on his first language to configure what vocabulary he has into sentences. He has a fossilized development of English grammar, minimal grammatical competency in English and reliance on ordering strategies and grammar coming from his knowledge of ASL.

***Basic Interpersonal Communication Skills (BICS):*** Mr. Nettles' communication in English is limited at even the basic conversational level. His only means for attempting to convey English is reading and writing, where he functions at best at first-grade level. He tries very hard to express himself, but just does not have the English foundation to convey in writing messages of any level of complexity that are understandable to an English user who is not also familiar with the grammatical organization of ASL.

***Cognitive Academic Language Proficiency (CALP):*** Use of CALP in a second language tends not to exceed the proficiency seen in a person's first language and Mr. Nettles' CALP is present, but weak, in ASL. His ability to communicate in English for the purposes of analysis, synthesis, or evaluation is limited by his lack of basic English language

proficiency and his limited educational experience in English. While able to be scaffolded to acquire new knowledge via ASL, this option is not available to him in English.

**American Sign Language:**

Mr. Nettles' primary and preferred language is American Sign Language. While he is from a hearing family and currently has less contact with the Deaf community, he has had early exposure to ASL, and this exposure is evident in the language production and language comprehension we observed.

*Production*: Mr. Nettles' sign articulation is clear and accurate. His vocabulary is at an adult level. His proficiency in word formation and sentence grammar is strong, approaching the fluency of a native signer.

*Comprehension*: Mr. Nettles' comprehension of ASL is also strong. He understood background conversation with ease and performed well on understanding both the more traditional narrative *Bird of a Different Feather* and the grammatically challenging classifier story, *DWI*. He has a passable, but not strong, CALP in ASL. This speaks to weaknesses in his education as opposed to issues with language fluency. For example, he fully understood *Bird of a Different Feather* as one would understand a children's story. He struggled when he needed to approach that story at a more analytical level to unpack the evidence that it was actually an allegory. He caught the fact that the experiences of the straight-beaked bird in a curved beak family were similar to the experiences of a deaf child in a hearing family, but he was not able to comprehensively construct the argumentation for that.

In summary, Mr. Nettles is a strong signer of ASL with adult level fluency and competency in that language. Via ASL, he can communicate and have communicated to him all he needs. His English, which lags far behind his ASL, is fossilized and cannot serve his needs for communication access. In addition, while highly fluent in ASL, Mr. Nettles has a low fund of knowledge in many areas and lack of a strong foundation in the ASL learned from Deaf adults in a secondary and post-secondary academic environment. As a result, he needs support and scaffolding when introduced to new or unfamiliar information or when he is trying to function in a setting unfamiliar to him.

**Expert Opinion:  Joseph Nettles**

**We have been asked to opine on the following questions:**

While there may be a weighting at times in terms of who is best suited to conduct the analysis of assessment material (e.g., Dr. Shepard-Kegl can hear and is therefore best suited to code and assess data presented or received via sound, and Dr. Rowley is a native Deaf signer and a core member of the Deaf community and thereby most appropriate to assess issues pertaining to ASL, Deaf culture, and Deaf education; or the two working in conjunction as a linguist and ASL specialist in signed language assessment) both of us are indeed experts in the range of areas covered in our assessments and our responses in terms of our expert opinion should be viewed as being in consensus on all matters of opinion, offering them both individually and as a team.

**In what situations (if any) are sign language interpreters required for communication between Mr. Nettles and a person who cannot communicate fluently in ASL?**

Based upon our assessment of Mr. Nettles and the conclusions we reached in that assessment, it is our expert opinion that in any substantive interactions where Mr. Nettles must access and share information with service providers (including, but not limited to, law enforcement officials, probation officers, medical personnel, and counselors) who *cannot* fluently communicate with him in ASL directly, the accommodation of a professional, qualified ASL/English interpreter is required.

Based upon our assessment of Mr. Nettles and the conclusions we reached in that assessment concerning his limited ability to access and share information via English, both because of his sensory hearing loss and by virtue of his being a second-language user of English with only minimal mastery of its vocabulary and grammar, it is our expert opinion that there are *no* ideal situations where information could be accurately and effectively shared via English in a manner that would afford him access equivalent to that of a hearing individual who is a fluent user of English; nor would such access even remotely approximate the level of access that would be afforded by interpretation of that information into and from ASL. Since ASL is the only language that Mr. Nettles understands and expresses with little to no errors in production or breakdowns in

comprehension, it is our expert opinion that he can receive equal access *only* via interpretation provided by a highly fluent ASL interpreter.

**Which type?**

Based upon our assessment of Mr. Nettles and the conclusions we reached in that assessment, it is our expert opinion that in relatively benign and routine interactions, or interactions where the stakes are not high and the interaction is not stressful or emotionally charged, and in which Mr. Nettles has a reasonable fund of knowledge in the subject matter at hand, he would require the services of a competent and qualified interpreter (or interpreter team) who can consistently interpret between ASL and English. Such an interpreter needs to be able to maintain consistent interpretation into ASL and not fall back on more English-influenced variants of signing and needs to be sensitive to regularly probing for understanding as well as for gaps in the fund of knowledge that Mr. Nettles brings to the situation. In our expert opinion as a team consisting of an experienced and credentialled ASL interpreter and an expert on ASL from the vantage point of a Deaf native signer, Mr. Nettles is best served by an interpreter or interpreter team that can provide native-level interpretation into both the source language and the target language of each communication interchange.

**In what situations (if any) are Deaf Interpreters required?**

Based upon our assessment of Mr. Nettles and the conclusions we reached in that assessment, it is our expert opinion that he would always be *best* served by a Deaf/hearing team or a Deaf ASL signing service provider because this would provide both native level language input and shared membership in a community of Deaf individuals who share life experiences in having navigated their world visually and as a deaf person. However, we have been asked to delineate those situations (if any) involving Mr. Nettles where the services of a Deaf interpreter would be *required*. The factors that we feel play a role in our decision in this regard are fund of knowledge, language proficiency, the need for CALP to access and assess the information, and the extent to which the communication that must be shared and accessed has important consequences (is high stakes) for Mr. Nettles. For this reason, and focusing upon the issues at hand regarding probation and legal proceedings, we feel that the services of a team consisting of a Deaf interpreter and a hearing are required in any high stakes situation where there is a risk of misinterpretation

that could have detrimental consequences for Mr. Nettles. Mr. Nettles lacks the fund of knowledge to function knowledgeably in the legal domain. His academic level language skills in ASL to unpack the information received in a way that he can evaluate and assess it in sufficient depth and detail to make autonomous and informed decisions regarding his case are present, but weak. The native-level proficiency and sensitivity to culturally-based styles of behavior and discourse afforded by access to a qualified Deaf Interpreter will make possible both conveyance of the content of information and the cultural brokering needed to convey that information in a culturally familiar and appropriate way that will minimize stress and anxiety stemming from cultural clashes that could compromise trust and understanding. In terms of interchanges relating to probation, we would argue that a Deaf/hearing team would not be required at every meeting once an understanding of the objectives and protocol for such meetings is established, but such teams should be provided in annual meetings where conditions of probation are reviewed or altered or any probation meeting where significant events have occurred that may need to be processed or resolved. Otherwise, based upon the results of our assessment of Mr. Nettles, in our expert opinion, more routine probation meetings regarding familiar topics would require only a competent and qualified interpreter (or interpreter team) with legal specialization, who can consistently interpret between ASL and English and is sensitive to probing regularly for understanding.

**In what situations (if any) is relying on the person speaking and getting information by speechreading appropriate/reliable?**

Based upon our assessment of Mr. Nettles' speech and speech reading and the conclusions we reached in that assessment, it is our expert opinion that there is no situation of any consequence in which Mr. Nettles can reliably express or receive information via speech and speechreading.

**In what situations (if any) is relying on writing notes back and forth reliable for effective communication?**

In our expert opinion, for any situation in which a hearing individual is given the benefit of using the spontaneous communication allowed by speaking back and forth with a service provider, for a Deaf person to have equal access, a similar spontaneous mode of communication needs to be provided. If a hearing person were required to write back and

forth in these situations to assure equal access, would they be comfortable with the accommodation?  Because writing back and forth is effortful, time consuming, and in some cases not as reliable as speaking, all participants would be at a disadvantage. The service provider, pressed for time, will undoubtedly curtail the amount of information passed back and forth, the consumer, hearing or Deaf, will be shortchanged the same communication experience that would be had without passing notes. We have never seen the passing of notes to result in an equal exchange of information as would happen via spontaneous speech or signing. However, a second factor needs to be considered and that is the competency in the language being written or read.

Based upon our assessment of Mr. Nettles' reading and writing and the conclusions we reached in that assessment, it is our expert opinion that his proficiency in writing English and in reading English is insufficient to support writing notes back and forth during any substantive interchanges. He reads at a beginning second-grade level and his writing is even less reliable and effective than his reading. This level of English competency is insufficient for him to engage in any substantive interchange in this manner.

In low key situations, however, such as asking  "where is the bathroom" or  "I need screws" at the Home Depot, or "Big Mac Meal with fries and Coke" at McDonalds, it would be okay to write back and forth because of the low level of risk associated with those situations. The dialogue is short and usually not interactive and it doesn't lead to harm to the Deaf person. Anything else where the value of the information is more significant or there is inherent risk of harm to the Deaf person, to write back and forth with Mr. Nettles would be problematic and risk much confusion and misunderstanding. In our expert opinion, relying on written communication would not allow Mr. Nettles to communicate information fully.

**In what situations would "teach-back" or another method to ensure comprehension be necessary? (put another way, any insight into whether the person is susceptible to "deaf nod" even if they don't fully understand).**

Based upon our assessment of Mr. Nettles' communication and the conclusions we reached in that assessment, it is our expert opinion that when his fund of knowledge is

lacking in a given area and when processing the information requires a degree of CALP, Mr. Nettles needs support to effectively communicate. When such communication support is lacking, he will engage in "nodding." From our interviews with Mr. Nettles it quickly became clear that being viewed as cooperating with authorities and complying with whatever is required of him to remain in compliance with conditions of his probation takes priority over his demand for communication access. For example, it is clear to us from our discussion with Mr. Nettles, that he would not refuse to sign any paper handed to him by an authority in the probation system, even when he didn't understand that paper, for fear of being seen as noncompliant and being reincarcerated. With this level of perception of a power imbalance (whether real or imagined) and his willingness to do anything to keep in compliance, there is a great need for any authority figure interacting with him to remain appraised of his level of understanding and not to take nodding or expression of willingness to comply as an indication of understanding. Teach-back is an effective tool for probing for understanding and, in our expert opinion, would offer an effective means of both assuring Mr. Nettles' understanding and for building his trust in the probation process and reinforcing in him his right to understand and to express to others when he is not understanding.

The behavior of "nodding" needs to be unpacked and seen from several vantage points. Our first comment on the issue of nodding comes from things discussed in our general background section. In our experience, with both Deaf and hearing people, all of us have our breaking points where we realize that continuing to ask for clarification, straining to understand information that is new and unfamiliar, communicating in a second language, and making efforts to get people to slow down or re-explain are unlikely to yield understanding, may result in frustration aimed at us, or are just not worth the effort, we all "nod." In our expert opinion and based upon our familiarity with many Deaf individuals and their behavior, Deaf individuals in general, in situations where they lack sufficient access to communication as a result of not having an interpreter, or just because of their own limitations using a language, will "nod" for this reason. In this regard, Deaf people and people who can hear are really behaving alike. It is just that Deaf people, who have experienced over their lifetimes a repeated lack of communication access and ineffective communication with people they cannot hear, have a lower threshold at which they will begin to "nod." It is a sign of resignation to the fact that efforts to gain

communication access have failed and are likely to continue to fail. Nodding is often a very welcomed behavior. The Deaf person can hasten the end of the interchange; and the hearing person can feel comfortable in the delusion that they are being understood and will proceed through the conversation. Teach-back is a valuable tool that service providers (particularly those in the medical profession) use with discretion when assuring that the information to be conveyed is placed at a premium, in cases of assuring informed consent, for example. However, when a priority is placed on time and when getting out the door is placed at a premium, teach-back is not likely to be used and understanding is not likely to be verified.

Here we offer our expert opinion as experts on Deaf culture and communication. There is a second use of *nodding* in ASL. This use is a cultural and linguistic expression of politeness and attention. And this use of nodding is different from nodding in the hearing population in the U.S. It also has a different meaning from nodding in our wider hearing culture and this is a place where cultural confusion often occurs. We are reiterating discussion from our general background as well. In ASL people nod to say, "I am attending to you." It is not a sign of agreement or understanding. The indication of understanding involves a concurrent signing of Y-handshape, a fist with the pinkie and thumb extended. This means, "Oh, I see." It is even glossed with the ASL acronym for this phrase (O-I-C, which if read aloud sound like *Oh, I see.*) Nodding without this backchanneling signal is not seen as understanding within Deaf culture, and the Deaf person will invariably repeat the information in the absence of the manual backchanneling mentioned above. For hearing people, a similar signal of attending is maintaining eye gaze. We can sometimes listen but not look at a person. Often, however, we will find the person repeating the information over and over, assuming we have not attended to it. Children are especially prone to reacting in this way.

For all of these reasons, systematic probing for understanding, one effective means of which is "teach-back," is an essential tool in the interpreter's communication arsenal. So, in our expert opinion, Mr. Nettles is definitely prone to "nodding" as an indication of compliance, as a response to resignation that understanding is not going to happen no matter how much he asks for clarification, and as a cultural factor of how he as a Deaf person signals his attention to the person communicating with him. For Mr. Nettles,

144

probing to verify understanding is an important component in communicating with him and teach-back is an effective means of doing so. Therefore, in our expert opinion based upon our assessment and interactions with him as part of that assessment, the accommodation of an interpreter or interpreter team skilled at not only communicating with him in native-level ASL, but also adept at probing for understanding and sharing with service providers when such understanding is not happening, are essential to maintaining effective communication access for him.

**Overall opinion.**

Based upon our assessments of the two Deaf individuals in this case and our collective knowledge of American Sign Language, Deaf culture, and the accommodation of ASL/English interpreting, it is our joint opinion that both Mr. Cobb and Mr. Nettles have insufficient mastery of English in any modality to allow them to access information in a probation setting (particularly in meetings that are not low stakes or routine in nature) and in legal proceedings without the accommodation of an ASL/English interpreter or interpreting team. To be effective, such interpreters must be capable of consistently conveying information to these individuals in a native level of ASL without falling back upon English-influenced forms of the language the evaluated plaintiffs are not likely to understand. Furthermore, it is our expert opinion that to be effective, such interpreters must also be committed to not only providing interpretation, but to probing for understanding at regular intervals over the course of their interpretations. Based upon the results of our assessment of these two plaintiffs and our knowledge of the range of interpreting resources available to draw from, it is our expert opinion that when either plaintiff participates in the high stakes interactions, the appropriate accommodation to provide would be a team of a qualified Deaf and hearing interpreter trained and specialized in legal interpreting.

Dr. Judy Shepard-Kegl
Dated: August 11, 2020

Dr. Amy June Rowley
Dated: August 11, 2020

## Appendix A: Background on Components of the Evaluation

**I. Linguistic/Cultural Profile:**

In research on Deaf individuals, we generally begin with the following cultural profile, which indicates what the likelihood is that a deaf individual will use ASL as their primary and preferred means of communication. The more positive responses to the questions below (except for the last), the more likely that the individual in question will be culturally Deaf; and, as culturally Deaf, will have ASL as their primary and preferred means of communication. Being culturally Deaf means that a person is most comfortable in the company of other Deaf people, uses ASL, and views oneself as a member of a cultural minority rather than as a member of the dominant hearing culture with a pathological deficit—deafness.  For more background, see the material discussing cultural Deafness In the Introductory section of this report.

Being born Deaf of Deaf parents is a major (but not definitive) factor in predicting ASL as one's primary and preferred language. However, individuals falling into this category are also the most likely to have strongly mastered English writing and literacy skills. This latter correlation is attributed to the fact that such individuals have had a language (in this case ASL) from birth and, therefore, their English acquisition is building upon a strong first-language base.

Attending a residential school for the Deaf is another major factor because this maximizes exposure at an early age to strong ASL language models and to Deaf culture. Beyond these additional factors indicative of individuals who are likely to be culturally Deaf are the group they choose for social interaction, membership in Deaf organizations, marriage or significant relationships to a Deaf partner, and choice of an occupation that would require little use of English on a day to day basis and would also attract other Deaf people.  These are attitudinal indicators Deaf identity and cultural affiliation.

To better appreciate a greater feeling of affinity with Deaf peers, the chosen social community of many Deaf people, as opposed to their own families in which they may

feel foreign, we recommend reading, *A Journey into the Deaf World*, by Harlan Lane, Robert Hoffmeister, and Ben Bahan (San Diego: Dawn Sign Press, 1996).

The Linguistic/Cultural Profile was initially used in research labs at the Salk Institute in San Diego, CA and the Center for Molecular and Behavioral Neuroscience at Rutgers, The State University of New Jersey. It was developed as a way to independently predict a person's cultural identity as a member of Deaf Culture and the likelihood that American Sign Language was premorbidly (before any stroke or degenerative brain disease) the individual's primary and preferred language. Those labs were working with Deaf individuals who had had aphasia (language loss) or a motoric impact on their ability to produce and receive language as the result of an acute event like a stroke or a degenerative process such as Parkinson's disease. The individual would come to us as a research subject after diagnosis, and we needed an independent way to determine that the premorbid signing was indeed ASL.

### I. 1. Culturally Deaf Responses

| | |
|---|---:|
| **Name:  NAME** | **Cultural Profile** |
| 1. **Prelingually deaf?**  yes | |
| 2.  **Deaf parents?**  yes | |
| 3. **Attended residential school for the Deaf?**  yes | |
| 4. **Tends to associate primarily with Deaf people**? yes | |
| 5. **Is a member of Deaf clubs and organizations**? yes | |
| 6. **Married a Deaf spouse or has a Deaf partner**? yes | |
| 7. **Traditional Deaf occupation**? yes | |
| 8. **Knowledge of decibel loss?**  no | |

A culturally Deaf identity is indicated by *yes* answers to all but the last question above. A final indicator of cultural identity, number (8) on the profile, is whether an individual knows their dB loss (the decibel level at which they can hear). The culturally Deaf indicator is a *no* answer to this question.

### I.2 Early Life Choices

The first three questions in the cultural profile address choices made for a deaf individual early in life, either by the etiology of their becoming deaf, whether there were other Deaf people in the home signing as they grew up, or the educational decisions made for them, typically by their parents. These are choices that influence a person's identity with Deaf

culture and their early exposure to ASL. However, they result from decisions over which the deaf individual had little or no control.

**I.3 Later Life Choices**

The last questions in the cultural profile address choices made by the individual later in life and offer evidence regarding their personal cultural identification as adults. Affirmative answers are suggestive of identification with Deaf culture. Identification with Deaf culture is indicative of a person's identity as a Deaf person, of their seeking out the community of others who are also Deaf and sharing their language and cultural values. But most relevant here, it is predictive of a preference for American Sign Language as one's primary and preferred language.

**II. Use of interpreters**

The evaluated plaintiffs are questioned about those situations in which they would request interpreters as well as when they have used interpreters. This gives us a sense of those encounters the individual views as low stakes versus high stakes communication encounters as well as their experience in requesting and using of interpreters.

**III. American Sign Language proficiency.**

To understand whether an evaluated plaintiff can use an interpreter if one were provided, and to understand what the target language interpretation should be, we need to elicit information that informs our sense of the that individual's proficiency in American Sign Language. We focus on three aspects of ASL competence: ASL production, ASL comprehension, and we also determine whether ASL serves primarily the basic interpersonal communication needs of the evaluated plaintiff, or whether they also have the capacity to use ASL at a more sophisticated level to access information in academic and other learning spheres. For more information about Academic ASL see the ASL in Academics Series available on-line from the Office of Bilingual Teaching and Learning at Gallaudet University, which can be viewed at the following website: http://www.gallaudet.edu/office_of_bilingual_teaching_and_learning/academic_asl/a sl_in_academics.html

### III.1 ASL Production (Grammar)

It is standard practice in language assessments to pick out certain grammatical competencies that are indicative of grammar mastery as a whole. Exhaustive testing of every single component of ASL grammar would be highly inefficient, cumbersome, and redundant. The practice of tapping into a subset of features that are predictive of the language as a whole has been followed in the *ASL Developmental Checklist* developed by Dr. Judith Mounty when she was at Educational Testing Services.[15] Dr. Shepard-Kegl served as the linguistic consultant to Dr. Mounty as she developed this checklist and the training materials for using it. This practice was also followed by Supalla and Newport in their development of a *Test Battery for American Sign Language Morphology and Syntax.*[16] This and other ASL assessments are reviewed in Haug (2009).[17]

While never published, the *Test Battery for American Sign Language Morphology and Syntax* has been used and adapted for many research projects and the peer-reviewed articles published in conjunction with them. Dr. Shepard-Kegl was trained by Supalla and Newport to administer this test battery and was given permission to use it in her linguistic research. Before using components of the test battery in expert witness cases, she used portions of it in her neurolinguistic research on control subjects and individuals with Parkinson's disease and aphasia under grants from the National Institutes of Health (NIH), as well as the population study she conducted under a National Science Foundation (NSF) grant to study the emergence of a signed language in Nicaragua.

In her own research and teaching on the linguistics of American Sign Language, Dr. Shepard-Kegl has identified several grammatical features of ASL that distinguish it in very salient ways from the grammar of English, including Figure and Ground constructions and the use of classifiers in verbs of motion and location. In both cases, the word order and grammatical rules of ASL are very distinct from English. The following

---

[15] Mounty, J. (1994). *Signed Language Development Checklist.* Princeton, NJ: Educational Testing Service.
[16] Supalla, T., Newport, E., Singleton, J., Supalla, S., Coulter, G., & Metlay, D. (unpublished). *The Test Battery for American Sign Language Morphology and Syntax.*
http://cbpr.georgetown.edu/researchlabs/slrl/projectsandresearch/psychoneurolinguistics/asltestbattery)
[17] Haug, Tobias.  2009. Review of Sign Language Assessment Instruments. In Baker, A. and Woll, B. (eds.), *Sign Language Acquisition*, vol. xi, pp. 51-85.

two tasks both tap into Figure/Ground relations, one in the context of locative verbs using classifiers and the next in the context of motion verbs using classifiers.

### III.1.a. Verbs of Location (Bowerman, Topological Relations Task)

To look at grammar production, evaluated plaintiffs are presented with a series of line drawings from the *Topological Relations Task* developed by Melissa Bowerman. These drawings depict numerous locative relations between items (a cup on a table, an apple in a bowl, a book on a shelf, etc.).





TABLE CUP-ON          BOWL APPLE-IN          SHELF BOOK-ON (ASL)
ground figure          ground figure          ground figure

The cup is on the table.   The apple is in the bowl.   The book is on the shelf. (English)
figure          ground    figure          ground     figure          ground

In ASL, each stimulus elicits a response that uses classifiers, figure/ground relations, and locative verbs. The constructions elicited are the hallmarks of ASL grammar use.

In American Sign Language, the expected ordering is Ground before Figure as indicated in figure above. In English, the exact opposite ordering, Figure before Ground, is expected. In ASL, the spatial relation (e.g., on, in, behind, etc.) forms the core of the verb; whereas in English this spatial relation is typically expressed using a preposition. Finally, the English expression of these relations is expressed using full noun phrases as the arguments. In ASL, full noun phrases can be expressed, but the critical spatial relation is expressed by a complex verb of location that first expresses the location as well as some abstract or physical characteristic of the object that serves as a Ground (e.g., CL:B (flat surface) AT location a—"a flat surface is located at position a." This pre-verb is cliticized (attached) to the beginning of a second verb of location that expresses the Figure and its topological relation: So, the ASL examples above would be more precisely transcribed as

150

the following, where the "#" indicates the Ground (e.g., table, bowl, etc.) being attached to the beginning of locative verb comprised of the figure (e.g., cup, apple, book. etc.) incorporated into a locative verb (e.g., on, in, etc.).  Remember that in ASL *on, in, at, under, to, from*, etc. function as verbs, not prepositions (as they would be in English).

FLAT-SURFACE#CLYLINDER-ON

table               cup              be on

The cup is on the table.

CYLINDER#SPHERE-IN

bowl          apple      be in

The apple is in the bowl.

FLAT-SURFACE#FLAT-SURFACE-BE-ON

table               book                be-on

The book is on the table.

The Topological Relations Task was originally designed by Melissa Bowerman at the Max Planck Institute to elicit expressions of spatial relations from young children. It was developed further by Bowerman and Pedersen to elicit spatial relations for crosslinguistic comparison, the purpose we are using it for here. These stimuli have been used in linguistic fieldwork world-wide.[18]

Recently, for purposes of streamlining these assessments, the items on the Topological Relations Task have been winnowed down to a set of 20 out of the original 52 that have been shown to consistently yield Ground/Figure or Figure/Ground ordering.

### III.1.b. Verbs of Motion Production (VMPA, from the Supalla, et al. Test Battery)

---

[18] Bowerman, M. and Pederson, E. (1992) Topological relations picture series. In S.C. Levinson (Ed.), *Space Stimuli kit*. Nijmegen: Max Planck Institute for Psycholinguistics. (http://hdl.handle.net/11858/00-001M-0000-0011-5614-1).

The *Verbs of Motion Production Task, Version A* (VMPA) from the *Test Battery of American Sign Language Morphology and Syntax* is parallel to the *Topological Relations Task*, except that it focuses on verbs of motion rather than verbs of location. Like the Topological Relations Task, each stimulus elicits a response that uses classifiers, figure/ground relations, and locative verbs. Similarly, the motion verb constructions elicited in this task are also among the hallmarks of ASL grammar use. We tend to only use this second task if an individual's grammar is very limited or if they have trouble understanding line drawings.

A language like English has a relatively fixed vocabulary supplemented by word formation rules that change words to indicate differences in tense, number and aspect or rules that derive nouns from verbs (e.g., ride+er changes the verb *ride* to the noun *rider*); or verbs from adjectives (e.g., red+en changes the adjective *red* to the *verb* redden. A language like ASL or Navajo is distinctively different. Rather than a large lexicon of pre-formed frozen signs, ASL has a very productive word formation morphology that is constantly creating words anew. Verbs of motion and location and classifiers use the very productive word formation morphology in ASL to construct words on the fly. Some of these words end up conventionalized and in a vocabulary that can be listed, but even those tend to have a transparent internal organization that reflects the word formation process. Like Greenlandic Eskimo, ASL has verbs that are really sentential in nature. They include a basic action as well as all the nominal arguments involved and the roles they play (source, goal, agent, etc.). Like sentences, which allow an infinite set to be produced, the ASL lexicon has that same richness.

Verbs of motion and location and the classifiers that they contain allow ASL to produce spatially precise and three-dimensionally descriptive verbs that are able to serve the demands of the very visually oriented and attuned signers that use this language. They are a challenge for non-native interpreters to master, but mastery of this component of the grammar is critical.

Medical terminology is rife with words that are comprised of complex morphology. Consider the longest word in the English language:

> *Pneumonultramicroscopicsilicovolcanoconiosis* which is the medical term for black lung.  Much information is packed into this term:

*pneumon*- relating to the lungs

*ultra*- extremely

*microscopic*-so small you need a microscope to see them

*silico*-a naturally occurring mineral in rock and soil (silica)

*volcano*- from volcanos

*coni*-a cone-shaped area of the right ventricle from which the pulmonary artery emerges

*osis*- disease

The word tells us that this is a lung disease, particularly affecting the cone-shaped area of the right ventricle of the heart that is caused by the inhalation of microscopically fine silica dust particles typically found in volcanos.

English is happy with *black lung* and if you know what *black lung* means you are fine. However, compound English word *black lung* does not translate into ASL in any way that makes sense.  ASL uses something more like the latinate system of word formation that medical terminology uses.

Word formation rules that create verbs of motion and location. Nominalizations of those verbs create another set of constructions in ASL called size and shape specifiers (SASSs) that sculpt the shape of objects in space allow ASL to visually create message equivalent forms in ASL for critical medical terms. The CATIE Center at St. Catherine's University in Minnesota offers trainings nation-wide, DVD trainings on medical terminology and the discussion of medical systems such as the cardiovascular system, the gastrointestinal system among others. These training share in common a focus on using understanding and using verbs of motion/location and classifiers to convey these concepts.[19]

The ASL production stimuli used on our assessment elicit evidence of the extent to which evaluated plaintiffs use these aspects of ASL grammar and would comprehend them with ease.

---

[19] The following is a link to the CATIE Center Training Site:
(http://minerva.stkate.edu/offices/academic/interpreting.nsf/pages/medicalinterpreting)

### III.2. ASL Comprehension

In addition to predicting comprehension from the grammar used in producing ASL, our assessment also includes other ways of determining comprehension of ASL and also familiarity with more pidginized or contact forms of ASL that incorporate features of English. Exploration of the comprehension of different forms of signing is threaded through the background conversation that occurs throughout the testing. A more specific assessment of ASL comprehension is done using a videotape of two ASL stories, signed in ASL by the accomplished Deaf storytellers that composed them.

### III.2.a. Background Conversation

Testing begins with a background conversation where we elicit information that informs the cultural profile. During this initial portion of the testing, we try to maintain a more ASL use of signing. As we move into more of the English oriented paper and pencil tasks, we weave in and out of different forms of signing to see not only what is understood and what isn't, but the evaluated plaintiff's comfort with receiving these other forms of signing. In another part of the assessment, we used a range of signing varying between ASL and more English-influenced variants of ASL.

### III.2.b. *Bird of a Different Feather* (signed by Ben Bahan)

In addition to ASL used in background conversation, we also include a comprehension task involving the signing of a 20-minute story, *Bird of a Different Feather,* composed in ASL by a native signer, Ben Bahan, who is a renowned storyteller.[20]

This is an allegorical tale about a straight-beaked bird born into a family of curved-beak eagles. The story examines the family's response to this "different" family member with many experiences that mirror the experiences of a deaf child growing up "different" in a hearing family.

---

[20] Supalla, S. and Bahan, B. (1994). *ASL Literature Series,* Teacher's Edition.  San Diego, CA: Dawn Sign Press. [Workbook and DVD]

In this story about a family of eagles, the parents give birth to four eaglets, one of whom differs by having a straight as opposed to a curved beak. This difference is perceived to be a serious deficit and the parents spend much time trying to rectify it, calling in doctors, faith healers, and shamans; sending the eaglet to a special school designed to make it like other eagles and finally opting for surgery.

The story parallels the experience of deaf children in many hearing families and the goal of this exercise is to tap into the individual's comprehension of ASL as well as their ability to recognize the parallels with Deaf culture. We tend to show the story chapter by chapter through the part that mirrors the family's decision to pursue surgery (for a deaf child this would be a cochlear implant) to make the bird more like them. Evaluated plaintiffs are asked to view the story in ASL and to answer questions about it. We look for both consistent comprehension, awareness of Deaf culture, and ability to recognize and argue for it being allegorical. Exploring the extent to which one can recognize and talk about how this story is allegorical indicates the individual's capacities with respect to Cognitive Academic Language Proficiency (CALP) in ASL. CALP will be addressed in Section III.3).

### III.2.c. A Classifier Story (DWI by David Rivera)

In some cases, where comprehension of classifiers is a focus, we will also have evaluated plaintiffs view a classifier story in ASL by a Deaf storyteller named David Rivera. Classifier stories make a point of using only the productive set of classifiers, SASSs, and motion/location verbs and avoiding any lexically frozen signs. To understand them, the individual must have command of the most productive word formation rules in ASL grammar.

*DWI* was a story that David Rivera signed at a competition called *Deaf Idol* in New York City (September 13, 2008) and qualified him for the finals of that competition. This ASL text by Rivera can be viewed at: http://www.youtube.com/watch?v=ueTrYy7OA4g. It relates in graphic detail the story of the events leading up to and following a car crash involving a drunk driver.

The two videos used for comprehension represent different uses of ASL. The first is an allegory created in a pretty creative and articulate, but fairly standard form of ASL. The

second is a classifier story that maximizes the use of the most productive part of ASL grammar and word formation. While they harken back to a traditional form of face-to-face storytelling (called Visual Vernacular), classifier stories of the sort used here are also more indicative of more modern forms of ASL storytelling and performance.

We follow up our discussion of these two stories by asking which type of story the individual felt was easier to comprehend, or if there was no difference. The response often reveals comfort with narrative genre in ASL and exposure to different kinds of artistic and cultural uses of the language.

We follow that question with a presentation of three short utterances, each of which would mean "I have two pictures in my room. Before they were together. Now they are apart." This juxtaposition of three forms was taken from a presentation by Charlotte Baker-Shenk, an ASL linguist. One is presented in Manually Coded English. One is presented in Pidgin Sign English (Contact Signing). And another is presented in ASL. The evaluated plaintiff is asked to choose the form(s) they prefer.

### III.3. BICS vs. CALP

When looking at language competency, it is important to look at the functional abilities a given individual has, particularly when looking at a second language. In the case of Deaf individuals who come to ASL late, this is also an area that needs to be examined. In 1979 Jim Cummins introduced two terms that describe the functionality of an individual's grammar: Basic Interpersonal Communication Skills (BICS) and Cognitive Academic Language Proficiency (CALP).

### III.3.a. Basic Interpersonal Communication Skills (BICS)

BICS is needed to socialize, and the more one socializes the more fluency in BICS is attained. It is not taught. It is acquired through exposure and interaction. As long as you aren't in school, going to court, seeing a doctor, or in any situation where you have to glean information in a low context and highly cognitively demanding situation, BICS will do.

### III.3.b. Cognitive Academic Language Proficiency (CALP)

CALP is needed to succeed in learning environments, to take tests and to have unfamiliar cognitively demanding information transmitted in low context situations. CALP is needed for metalinguistic and metacognitive awareness and learning.

Cummins' work focused upon bilingual immigrants learning a second language, but the distinction applies to Deaf language users as well. The notion of fluency in a language can be misleading. Within two years of language exposure most hearing immigrant children demonstrate fluency in communicating with their peers in social contexts. Teachers also tend to view them as fluent users of the language, yet in classes, tests, and cognitively demanding situations that move beyond the everyday social interactions one engages in, apparently fluent individuals with BICS do not perform on a par with their academic peers. Cummins discovered that despite the fact that teachers noted that peer-appropriate conversational fluency in English developed rapidly (within about 2 years), "a period of 5-7 years was required, on average, for immigrant students to approach grade norms in academic aspects of English." In other words, while BICS developed in two years, CALP took 5-7 years to develop.

This is the pattern for individuals who are learning language and can also hear it spoken around them continually. Deaf individuals do not necessarily follow this same trajectory, even in their first language. A Deaf child of Deaf parents who is exposed to ASL (a first language from birth) and who attends a school for the Deaf where the teaching is in ASL and peers use ASL would be expected to develop CALP in ASL in parallel with the development of CALP in English by hearing peers. With CALP in place in their first language (ASL), these individuals may follow a similar trajectory as hearing immigrants in terms of developing CALP in a second language, namely English. Although Deaf students are not getting the same constant auditory exposure to English that hearing peers get, the better Deaf readers and writers tend to come from this group of Deaf children with Deaf, ASL-signing, parents.

A deaf child with hearing parents may enter school without any fluency in ASL or English. Those that enter a residential Deaf school like the one described above are then entering school as an immigrant child might. They would be expected to have fluent BICS in two years and catch up to their native ASL signing peers within 5-7 years.

However, the language exposure experiences of deaf children are extremely diverse. Some children come from hearing families who do not sign and attend mainstream schools where they are expected to access their education via interpreters. They may be the only deaf student in the school without any native signing language models, and the skills of interpreters can vary greatly. While they may do well, there is also the possibility that coming to school without ASL and only having exposure to ASL in the classroom and not socially, we may see BICS seriously delayed and CALP may never be developed. If CALP is seriously delayed or not present in the first language, we can expect repercussions in learning a second language, English. For this reason, it is important to look at both the Basic Interpersonal Skills (BICS) and the Cognitive Academic Language Proficiency (CALP) of each evaluated plaintiff.[21]

A short explanation of BICS and CALP by Cummins appears on-line at http://iteachilearn.org/cummins/bicscalp.html. Our assessment of BICs uses all the background conversation. We use the recognition of *Bird of a Different Feather* as an allegory and the individual's ability to argue for parallels to get a sense of their CALP.

## IV. English Proficiency

To form an opinion about the English proficiency of an evaluated plaintiff, various aspects of English production and comprehension need to be looked at: speech, lipreading, writing, reading, and vocabulary. We will address these different areas separately, but they do interact. For example, you cannot lipread a vocabulary item you are unfamiliar with. Also, reading and vocabulary knowledge are so intertwined that most reading assessments are really relying primarily on vocabulary level with an assumption that the mastery of grammar at the level of word formation and syntax is already mastered. Such assessments are based upon hearing users of English, who but for reading and writing, have already acquired English before entering school.

## IV.I. Spoken English Competency

---

[21] Cummins, J. (1979) Cognitive/academic language proficiency, linguistic interdependence, the optimum age question and some other matters. *Working Papers on Bilingualism*, No. 19, 121-129.

We elicit a sample of spoken English using two 1.5-minute, nonverbal Czech cartoons: *Mr. Koumal Flies like a Bird* and *Mr. Koumal Battles his Conscience*. The evaluated plaintiff views the cartoon as many times as is needed (typically 2) and is asked to recount the story three ways: signed, written, and spoken. The content of the cartoons appears in Section V. on Narrative Production near the end of this Appendix. The spoken version is used for the analysis of speech.

### IV.1.a. Speech Skills

Spoken English Competency is assessed in three ways: for quality, intelligibility and for the impact that it has on communication.

### IV.1.a.i. Speech Quality

The assessment of speech quality is made by observing a number of features. Does the evaluated plaintiff produce recognizable syllables? If the word is multisyllabic, can each distinct syllable be discerned? Are the vowels in each syllable recognizable as the intended target articulation? Are the consonants clearly articulated and can they be recognized? Are the onsets and offsets of the syllable produced and recognizable? Are consonant clusters reduced or omitted? Are voiced versus voiceless distinctions made? Is the amplitude (loudness) of the speech controlled? And, finally is prosody (intonation) maintained while speaking or is the production more halting and staccato?

### IV.1.a.ii. Intelligibility

The intelligibility of speech is looked at in two ways, with and without visual cues. Remember that we know the content of the passage, so we have an advantage in terms of recognizing speech produced that individuals unfamiliar with the text would likely miss. At times we will play the speech for someone unfamiliar with the text to get a sense of what it would be like to understand without context. In addition, Dr. Shepard-Kegl, who assesses this component of the testing, is a certified Oral Transliterator (OTC) and is proficient lipreader familiar with Deaf speech. So, her assessment gives an advantage to the speaker.

### IV.1.a.ii.1. Auditory monitoring alone

Dr. Shepard-Kegl listens to the spoken sample and determines a rough percentage of what she can recognize without lipreading the evaluated plaintiff. This is most indicative of what an individual unfamiliar with Deaf speech and not trained or experienced in lipreading would experience.

### IV.1.a.ii.2. Lipreading and auditory monitoring

Dr. Shepard-Kegl then looks at the signer while monitoring the speech to see to what extent lipreading aids her understanding. In addition, she carefully transcribes the spoken narrative to the best of her ability stopping and rewinding the tape, and attending to any signing that may be concurrent with the speech, etc.

### IV.1.b. Lipreading

Lipreading is a very labor intensive and difficult task.  Even strong lipreaders tire quickly, and with fatigue ability to lipread declines.  Many words look alike (are homophenous). Every mouth shape has at least three different sounds associated with it.[22]

If one looks in a mirror the words in each of the rows below look identical:

| PAN | MAD | BAT |
|-----|-----|-----|
| NAP | DAM | TAB |

The following video link by Rachel Kohl gives the hearing viewer a sense of what the lipreading experience is like: https://https://www.youtube.com/watch?v=n1jLkYyODsc

**Lipreading Task.** The stimuli for the lipreading task include within them words and sentences taken from a list of words taken from the Wide Range Achievement Test (WRAT) as well as sentences and phrases taken from lipreading assessment used by the Central Institute for the Deaf (CID), but the list is expanded to include additional highly

---

[22] Nitchie, E.P. (1916). The use of homophenous words. *The Volta Review*, 18, pp. 85-93. Berger, K.W. (1972). Visemes and homophenous words. *Teacher of the Deaf*, 70, pp. 396-399.

Erber, N.P. (1974). Visual Perception of Speech by Deaf Children: Recent developments and continuing needs. *Journal of Speech and Hearing Disorders*, 39, pp. 283-287.

expected stimuli, low expected stimuli, and some phrases and sentences expected to be encountered in employment, medical, and law enforcement contexts. The lipreading task involves two presentations of each stimulus (either a word or whole phrase or sentence). Each presentation is loud and very precise. There are 64 lipreading stimuli in all:  17 single words and 47 phrases of varying length. It is important to note that only 30% of members of the deaf population have enough residual hearing and other capacities to allow them to be successful lipreaders. Having had speech training is no assurance of success. Ambiguity and guessing are inherent in this system, where most of the articulatory distinctions are hidden within the mouth (vibration of the larynx, dropping of the velum, laxing of the pharynx, etc.).

Note that the lipreading conditions under which these stimuli are presented are ideal. The room is well-lit and quiet. The examples are repeated, sometimes more than twice, face to face and in close proximity by a certified oral transliterator trained to produce clear speech. The goal is to capture the deaf individual's best lipreading under the best conditions. Such ideal conditions cannot be replicated in most of the evaluated plaintiff's interactions by hearing service providers.

As a result of the need to do testing at a distance because of COVID-19 restrictions, lipreading assessment is currently being done virtually face-to-face using Zoom. This allowed for both clear presentation and the ability to repeat or not as the evaluated plaintiff's responses dictate. We have done the lipreading assessment at a distance in previous cases as well and the results are parallel. There is the added advantage that both the stimuli and the responses are available in the Zoom recording.

### IV.1.b.i. Words

The single words are all words a Deaf evaluated plaintiff would typically be expected to know (*milk, city, in, tree, animal, himself, between, chin, split, form, crazy, stretch, theory, contagious, grieve, toughen,* and *aboard*).

### IV.1.b.ii. Sentences and Phrases

The words and phrases were constructed to feature several different characteristics: highly routinized expressions that a deaf lipreader would encounter frequently (e.g., *What's your*

161

*address*?; *What time did you show up for work this morning*?); sentences that are infrequent (e.g., *I like to visit the zoo; The circle is a round drawing*); numbers alone (42, 1996) and numbers in context (e.g., *President Kennedy was shot in 1963*); sentences that might be encountered in a medical or law enforcement context (e.g., *Do you have a living will?; You have the right to remain silent);* and a few phrases that are known to be homphenous (look alike) on the lips (e.g., *green beads, red beans*). There is also a case near the end of an unfamiliar vocabulary item that one might be able to lipread, but which may not be on one's repertoire (*We found a nodule.*)  The full list of items appears below:

1. The cat has fur.
2. Bob can run fast.
3. His arm hurt.
4. The train was crowded.
5. If you shout, he'll hear you.
6. Put down the correct answer.
7. The circle is a round drawing.
8. Heaven surrounds the earth.
9. Parents educate their children.
10. The material was expensive.
11. The house was in ruin after the fire.
12. Can you understand me?
13. What's your name?
14. How many children do you have?
15. What's your address?
16. Can you tell me your social security number?
17. What's your telephone number?
18. Do you have a tty?
19. I like to visit the zoo.
20. The dress is now in fashion.
21. I believe you are right.
22. My suggestion was followed.
23. What time did you show up for work this morning?
24.  How long have you been working here?
25. When's the last time you met Fred?
26. What's your mother's maiden name?
27. Do you have a living will?
28. What is your retirement plan?
29. President Kennedy was shot in 1963.
30. My family lives in (name of city),
but I have a cousin that lives in (name of city or county).
31. What's your favorite movie?
32. seven
33. 42
34. 1996
35. When did you graduate from high school?
36. Have you ever had a transfusion?

37. Do you own your house?
38. How old is your son?
39. red beans
40. green beads
41. Are you aware of your rights?
42. You have the right to remain silent.
43. You will need to have chemotherapy.
44. You have an appointment for the twenty-first.
45. We will need to reschedule you for the eighteenth.
46. We found a nodule.
47. Your test was positive.

When a person has extreme difficulty with this task, we will also present very common items like their name, *thank you*, *I love you*, etc.; telling them we are saying numbers and asking them to identify which ones; or in extreme cases where an individual may have cognitive limitations, presenting a word and having the individual choosing items from a set of four pictures.

### IV.1.c. Impact on communication

Finally, we look at the impact on communication. How comfortable is the Deaf evaluated plaintiff using speech? Does the speech have characteristics that might juvenilize the evaluated plaintiff in the minds of others? Does the evaluated plaintiff limit speech to words that can be pronounced or does the evaluated plaintiff struggle with speech result in putting out less information? This last point will be examined later in Section V. on Narrative Production.

### IV.2. Written English Competency

We looked at two aspects of the evaluated plaintiffs' writing: argument structure distribution and grammaticality. The argument structure distribution tells us whether they potentially have an organically-based language deficit like agrammatism that affects the use of language and it also compares the profile of the evaluated plaintiff's English writing to three groups: hearing speakers; Deaf ASL signers; and Deaf people in general (whether they sign or not).

This argument structure profile one exhibits is independent of whether an individual has impeccable grammar in English or whether grammar errors are rampant. We then do a subsequent analysis looking at the actual grammatical or ungrammatical aspects of the

evaluated plaintiff's word choice (lexicon), word formation (morphology) and sentence grammar (syntax).

### IV.2.a. Argument Structure Distribution: Data Collection

The evaluated plaintiff's skills in written English are tested by eliciting sample written narratives generating at least 150 clauses with their verbs and associated noun phrase arguments. Several means of elicitation are used.

### IV.2.a.i. Movie Recountings

The evaluated plaintiff is asked to recount a movie or something they recently experienced. This format replicates prior studies of agrammatic aphasics conducted by Myrna Schwartz, Elinor Saffran, and Rita Berndt. (See reference below: Berndt, et al. (2000).) Dr. Shepard-Kegl was trained in this procedure by Myrna Schwartz and continued to use the elicitation of such narratives in her own research on agrammatism as well as in these assessments. An argument structure analysis requires 150 verbs and their arguments to be elicited. Movie recounting is only used when we cannot collect sufficient written data via the remaining forms of elicitation. For virtual elicitation, we have added additional wordless books to increase the written samples produced.

### IV.2.a.ii. Nonverbal Cartoons

As a check on consistency for the narrative task done on-site versus at home, two shorter narratives are always elicited during testing and are also analyzed separately for their argument structure distribution. In this way, the same narrative is also collected from every evaluated plaintiff assessed, well over 200 to date. Collection of a sample during testing was done to control for any reliance on captioning to generate the written narratives, or reliance on other resources for help with writing such as dictionaries, spell checkers, or friends and family members. For the past few years, we have been eliciting written narratives at home or off-line using the Frog Stories instead of movies.

Along similar lines, Berndt, et al. elicited the same *Cinderella* narrative from each of their subjects. These Cinderella narratives were elicited by viewing a picture book of the Cinderella story as a memory aid.[23]

However, many Deaf individuals don't have the same experience with English stories that hearing individuals have. Instead, we chose to use two 1.5-minute Czech cartoons to elicit the written narratives on site: *Mr. Koumal Flies Like a Bird* and *Mr. Koumal Battles his Conscience.* Parallel with the elicitation of the speech sample mentioned earlier, Evaluated plaintiffs can watch the short video as much as they like (typically twice) and then write their rendition of the story. The next elicitation task involving wordless books is even more parallel to the *Cinderella* narratives, but it lacks the continuity and spontaneity we see when the whole cartoon is watched and then the story is told. So, we now use both.

### IV.2.a.iii Wordless Books

With evaluated plaintiffs who have memory problems, we introduced the use of several wordless books by Mercer Mayer, typically *Frog, where are you?* and *Frog Goes to Dinner*. The Frog Stories have been used by a variety of researchers cross-linguistically to elicit narrative data (Berman and Slobin, 1994). Over the past two years, we have begun to use them even with individuals evaluated who do not have memory problems because they elicit more data.[24]

There is also a large database of transcribed data from these elicited narratives in many spoken languages available on-line: https://childes.talkbank.org/access/Frogs/

---

[23] Berndt R, Wayland S, Rochon E, Saffran E, Schwartz M. *Quantitative production analysis: A training manual for the analysis of aphasic sentence production*. Hove, UK: Psychology Press; 2000.)

[24] Berman, R. and D. Slobin. (1994). Relating Events in Narrative: A Crosslinguistic Developmental Study. Hillsdale, NJ: Laurence Erlbaum.

We also have access to completely graphic and wordless memory aids for a variety of stories and folktales ranging from *Little Red Riding Hood*, to aids in recalling the movie *Harriet* (about the life of Harriet Tubman), to stories from the *Odyssey*. These graphic memory aids have been created by Nicaraguan Sign Languages, Inc. for the training of Deaf teachers in storytelling. We rely upon these when the evaluated plaintiff is familiar with any of them and we need to elicit a larger sample. For virtual testing, we have the potential to supplement the two Frog stories with a series of wordless graphic novels that we have created to prod the memory of an individual who already knows a story via pictures as they relate it. These are used when we feel we need more data than the Koumal cartoons or Frog stories produce. Individuals can choose from the stories they recognize: *Don Quixote, Little Red Riding Hood, Rip van Winkle, The Boy Who Cried Wolf, The Girl with the Green Neckband*, etc.

### IV.2.b. Argument Structure Distribution: Data Analysis

The written English narratives are retyped into an Excel file and each verb produced is isolated and coded with respect to the number and type of noun phrase arguments it requires as well as whether all those arguments were expressed. This coding assumes that there are three possible arguments: external, direct, and indirect. These three types of arguments fill the subject, direct object, and indirect object positions relative to the verb at a lexical level of representation before any syntactic operations have applied.

Once the argument structure distribution for the evaluated plaintiff is determined, it is compared with the argument structure distributions of four distinct groups of writers of English: 1. typical hearing speaker of English; 2. individuals with a particular form of aphasia called agrammatism, which impacts their ability to perform syntactic operations; 3. Deaf signers of ASL writing English; and 4. Deaf non-signers writing English.

### IV.2.b.i. Group 1: typical hearing speakers of English

Research on hearing individuals writing English has revealed that just slightly over 50% of the constructions produced tend to be those requiring an external argument. The remaining two types of unaccusative constructions tend to be divided evenly between

copular constructions and other unaccusatives. For comparison purposes, we can imagine an idealized pie chart of the following sort:



### IV.2.b.ii. Group 2: speakers with agrammatism producing English[25]

The second group consists of individuals with a form of aphasia that directly impacts their ability to perform syntactic operations. These are typically called agrammatic aphasics. These individuals produce those constructions that adhere most closely to the arrangement of noun phrases and verb that is specified in the lexicon before any syntactic rearrangements would occur. In English these would be the constructions that have external arguments. In case of agrammatism, the non-copular unaccusatives, which require overt syntactic movement are absent. In addition, there are many uncodable utterances. And, the category copulars, which are transparent in their ordering expands to cover the missing unaccusatives with simple circumlocutions. The argument structure distribution for individuals with agrammatism appears below:

---

[25] Kegl, J. 1995. "Levels of Representation and Units of Access Relevant to Agrammatism." *Brain and Language,* 50, 151-200.



If an evaluated plaintiff has a syntactic deficit we would expect this sort of patterning. A syntactic deficit tied to a learning disability or acquired aphasia is different from lack of syntactic mastery resulting from language deprivation or incomplete mastery of a given language.

### IV.2.b.iii. Group 3: Deaf ASL signers writing English[26]

In contrast with the avoidance of unaccusative constructions in agrammatic aphasics, Deaf users of English whose primary and preferred language is ASL tend to have an expanded use of the category of non-copular unaccusatives. This may be attributable to the rich use of verbs of motion and location in ASL, which tend to be non-copular unaccusatives. The occurrence of copular constructions is also very reduced. So, Deaf ASL-signing individuals writing English produce a preponderance of the unaccusative constructions that require syntactic operations to be well-formed and are harder for English speaking

---

[26] Kegl, J. and H. Poizner. 1997. "Crosslinguistic/ Crossmodal Syntactic Consequences of Left-Hemisphere Damage: Evidence from an Aphasic Signer and his Identical Twin." *Aphasiology*, vol. 11, no. 1, pp. 1-37
    Kegl, J., Baynes, K., Brentari, D. and Poizner, H. 1996. "Landau-Kleffner Syndrome: Modality Independence of Linguistic Competence." *Society for Neuroscience 26th Annual Meeting: Abstracts. Part 1*, pg. 184.)

individuals with agrammatism to produce. And, they also produce fewer copular constructions, the easiest construction for individuals with agrammatism to produce.



### IV.2.b.iv. Group 4: non-signing deaf individuals writing English

The reduction in the use of copular constructions seen with Deaf ASL-signers is not limited to that group. Copular constructions typically involve contraction of the unstressed *is* onto another element in the sentence. The low acoustic salience of these copulars may account for their reduced occurrence in the English of Deaf ASL signers. Support for this comes from the fact that this generalization holds not only for signing Deaf individuals, but for deaf individuals who adhere to an oral philosophy of communication as well (deaf non-signers). This means that the absence of copular constructions is characteristic of the English of both signing and non-signing deaf individuals. The inconsistent use or omission of copulars was also noted in Berent (1996).[27]

An argument structure analysis requires a certain level of English competency. In cases, where an evaluated plaintiff's writing is extremely limited, to the point where they cannot

---

[27] Berent, G. (1996). The acquisition of English syntax by deaf learners.   In Ritchie, W. and Bhatia, T. (eds.), Handbook of Second Language Acquisition. San Diego, CA: Academic Press.

reasonably produce a 150-verb corpus of data, and argument structure analysis is not done.

### IV.2.c. Specifics of English grammar production

The results discussed above are based upon the argument structure patterns exhibited by an individual, but a person can have a limited mastery of English but still show the ability to produce the full range of argument structures. Examination of argument structure distribution addresses the question of whether an individual writer's capacities for language at the level of syntax are intact as well whether the pattern of argument structure distribution resembles that of hearing individuals native in English, Deaf individuals writing English, or Deaf individuals with ASL as a primary and preferred language. They are not indicative of the individual's mastery of aspects of English-specific grammar rules. A person can have a limited mastery of English but still show the ability to produce the full range of argument structures.

The same narrative data elicited for the argument structure distribution analysis can be examined from the point of view of grammaticality to get a sense of how proficient an individual is in following the grammatical rules of English.  In this section of the assessment, examples are drawn from the narrative sample to give a feel for the kinds of errors one would encounter in reading the evaluated plaintiffs' narratives. Where relevant, errors that are related to the use of ASL as a first language will be noted. A deaf person's English writing is often awkward to a non-ASL signer, but it can be clear to one familiar with ASL grammar.

The data will be divided into various types, corresponding to the various levels of linguistic structure: lexical (errors in word choice or word category (noun, verb, adjective, etc.), morphological (errors in the application of morphological rules like the marking of person, number and tense or any word formation rules), syntactic (errors at the level of the sentence regarding the formation of questions, relative clauses, passives, etc.), and semantic (errors related to meaning).

### IV.2.d Reading

It is important to remember here our prior discussion of how learning to read is a different experience for learners who can hear and already have the language in place and those who do not.

Presentation of sentences and passages that are designed to be at specific grade-levels is still the standard for reading assessments. The methodology used throughout is to present the evaluated plaintiff with pre-vetted materials independently determined to be at specific grade levels. Our interpretation of performance on those grade-level materials is complemented by our syntactic analysis of the materials and knowledge of Deaf readers. The results we come up with are always at or above the level the individual would be determined to be at in a stricter application of the assessment.

There are no standardized reading instruments that can adequately assess Deaf readers of English because of the highly varying degrees of exposure to English they may experience. Many reading inventories, even the *Flynt Cooter Reading Inventory* used here are inadequate as a standardized reading test for Deaf individuals. When grade-level sentences and passages are used there are still confounds like the use of figurative language that will cause Deaf students problems. Educators and psychometricians agree that the best assessment for Deaf readers is individualized rather than standardized. But this isn't feasible in large populations. It is possible in a single case study such as the one being used here. The approach we take is a mixture of the two. We use the standard practice of selecting pre-vetted grade-level sentences and reading passages for testing, but we also bring to the task awareness of factors like figurative language and differences in incidental exposure to vocabulary and syntactic constructions.

In most assessments of reading, vocabulary level is coupled with reading level. This is most evident in the San Diego Screening that will be discussed below. In fact, almost all reading tests are at heart vocabulary tests. Yet the critical benchmark between a third- to fourth-grade reading level and above that level that is invariably attributed to a sizeable portion of Deaf readers has little to do with vocabulary. It concerns whether an individual can use syntax for reading comprehension.

The classic case is mastery of the passive voice. Consider the sentence *The dog bit the mailman*. We use our syntactic knowledge that English is a Subject-Verb-Object (SVO)

language to determine that *the dog* is the subject/agent and *the mailman* is the object/patient. However, we also just know from world experience that dogs tend to bite mailmen, and not vice versa. It is possible to understand the sentence without resorting to any syntactic analysis. The same thing is true for the following passive sentence: *The mailman was bitten by the dog*. One doesn't need to resort to syntactic processing to get the right understanding of that sentence. But, now consider another passive: *The dog was bitten by the mailman*. To understand that the meaning of this sentence runs counter to our expectations, we must understand that it is a passive. The divide between the level at which a large number of deaf readers plateau and beyond is the point at which syntactic mastery impacts reading. This is also the point at which reading is no longer a skill to master. It becomes a viable tool to allow one to access to the rest of one's education and to information that is unknown and unexpected. Without syntactic processing, Cognitive Academic Language Proficiency (CALP) is unattainable.

For Deaf people reading at a fourth-grade level or below, passive morphology poses a problem. Many have reanalyzed the passive morphology *was VERB+ed/-en* as an alternate past tense ending. In fact, they regularly use it in their writing as in *The dog was bitten the mailman*, meaning "The dog bit the mailman." Or, more commonly with the –ed ending as in *Mary was killed John*, meaning "Mary killed John." The ability to do a linguistically based single case study analysis that connects an individual's production with issues of comprehension reveals much more than pooled results yielded by standardized tests. This is our reason for taking the approach that we do.

Numerous studies have addressed the reading and English grammar levels of Deaf individuals. The following sources place the average reading level of Deaf individuals at

a 3-4th grade reading level.[28] Only 10% of the deaf population is reported to have above an 8th grade reading level.[29]

The following is an excerpt from a book by Peter Paul on this matter:

> ...it is well documented that most students with severe to profound hearing impairment do not read as well as their hearing counterparts upon graduation (Allen, 1986; CADS, 1991; King & Quigley, 1985; Quigley & Paul, 1989). The recent findings on the SATs are similar to those reported for the unadapted versions of achievement tests in the early 1900s (e.g., see research review in Quigley& Paul, 1986). Two general findings can be stated. One, the results consistently reveal that average 18- to 19-year-old students with hearing impairment are reading no better than average 9- 10-year-old students with typical hearing. Two, the results show an annual growth rate of only 0.3 grade level per year with a leveling off or plateau occurring at the third- or fourth-grade reading level. There is also some agreement that these general achievement batteries might be overestimating the reading ability of students with hearing impairment (Davey, LaSasso, & Macready, 1983; Moores, 1987). Thus, the true reading achievement levels of most students in special-education programs may be even lower than the levels reported.[30]

The evaluated plaintiffs' reading was looked at through various lenses that work together to offer insight into the individualized reading abilities that inform our expert opinion. These methods all shared the standard presentation of vetted grade-level reading

---

[28] Institute for Child Behavior and Development. [Analyzing reading materials commonly used with deaf students in the above study, found that many deaf students were not able to process the very reading material from which they were supposed to be learning]

Conrad, R. (1977). The reading ability to deaf school leavers. British Journal of Educational Psychology, 47, 138-148. [Reports that about half of all 18-year-old deaf students read at or below fourth-grade level]

Trybus, R. and Karchmer, M. (1977). School achievement scores of hearing impaired children: National data on achievement status and growth patterns. American Annals of the Deaf, 122, 62-69. [similar findings to Conrad's]

[29] Berent, G. P. (1993). Improvements in the English Syntax of Deaf College Students. Annals of the Deaf, 138(1), 55-61. [excellent overview of the literature]
Quigley, S.P. and King, C.M. (1980). Syntactic performance of hearing impaired and normal hearing individuals. Applied Psycholinguistics, 1, 329-356.
[The 18-year-old students who participated in these studies (begun in 1973) performed at significantly lower levels than the 8-year-old hearing participants on all structures investigated.]
Quigley, S.P., Wilbur, R. B., Power, D. J., Montanelli, D.S. , and Steinkamp, M. (1976). Syntactic structures in the language of Deaf children. Urbana, IL:
[30] Paul, Peter V. 1998. Literacy and Deafness: The Development of Reading, Writing, and Literate Thought. Boston: Allyn and Bacon, p. 23.

materials and was accompanied by our syntactic analysis of those stimuli, except in the case of the San Diego Screening, which uses only words.

### IV.2.d.i. Flynt-Cooter Reading Inventory

The Flynt-Cooter Reading Inventory is what is referred to as an informal reading inventory designed for teachers looking for levels of materials or basal readers to work on with their students.  (Basal readers are highly planned, vocabulary-controlled readers designed for specific grade levels.)  The Flynt Cooter Reading Inventory provides two sets of grade-level reading materials ranging from pre-school to 9th grade. There are two forms, A and B.  We use materials from Form A, unless it is a re-testing.   This inventory is often recommended for working with diverse students and students in special education.

To pin down the reading level more precisely, we present evaluated plaintiffs with a series of graded reading passages taken from the *Flynt-Cooter Reading Inventory*.[31]  This reading inventory presents a set of three sentences at each grade level to screen for reading ability. Based on performance with the screening sentences, the individual is then presented with a reading passage at one or more of the targeted grade levels to better determine the reading level.

The test materials are the same as those in the 2007 edition. Since we prefer to have the same materials for all evaluated plaintiffs, we have chosen not to upgrade to the most recent version of this inventory. However, examination of the new materials reveals that they are relatively unchanged.

Prior to picking grade-level passages for reading, the evaluated plaintiff is typically presented with all of the sentences from Form A Levels 1 (first grade) through 9 (ninth grade). The one exception is if reading proves so frustrating at levels 1-3, and the person is shutting down, we skip the remainder. The reason for going beyond the standard cut-off of any level where one is missed is that deaf readers vary greatly in their exposure to

---

[31] Flynt, E. Sutton. and Cooter, Jr., Robert B.  1998.  *Flynt-Cooter Reading Inventory for the Classroom* (Third Edition).  Upper Saddle River, NJ:  Merrill.

English and do not follow the standard patterns found among readers of English. They must be looked at individually.

Three sentences are presented at each grade level. The evaluated plaintiff is asked to indicate any vocabulary they didn't know and then to read each of the sentences at each level and tell us what they mean. Technically, getting all the sentences correct up to some grade level would determine the grade-level text that would be first presented, but there are idiosyncrasies in many deaf individual's development of English. So, using the grade-level sentences and passages as a guide, we are more flexible in our assessment of performance on these materials. Most of the deaf consumers we test will score higher on these materials in terms of grade level than they would on the stricter criteria used in testing with hearing individuals.

The grade-level sentences are presented below with annotations concerning points that we are flexible with.

**FORM A: Level 1**
1. He wanted to fly.
2. The family got together.
3. The boy was jumping.

**FORM A: Level 2**
1. I was walking fast to town.
2. She cried about going home.
3. I was pulled out of the hole.   [This is a passive.  We would note it, but would not rule out this level or above if it were missed.

**FORM A: Level 3**
1. The forest was something to see  [figurative, but often an issue with deaf readers]
2. I was enjoying sleeping when my Mom called.
3. I had to go to bed early last night.

**FORM A: Level 4**
1. I dislike being the youngest.
2. I'm always getting into trouble.
3. They insisted on watching the show daily.

**FORM A: Level 5**
1. Athletic shoes come in all kinds of colors.
2. Serious players manage to practice a lot.
3. A cheap pair of shoes doesn't last very long.

**FORM A: Level 6**
1. He was searching for the evidence.
2. He realized the rock formations were too high.
3. The conservationist hoped to reforest the mountain.

**FORM A: Level 7**
1. Unfortunately, she was confused about the next activity.
2. The submerged rocks were dangerous.
3. He disappeared around the bend at a rapid rate.

**FORM A: Level 8**
1. Ascending the mountain was rigorous and hazardous.
2. The cliff provided a panoramic view of the valley.
3. The incubation period lasted two weeks.

**FORM A: Level 9**
1. The abduction made everyone suspicious.
2. The detective was besieged by the community.
3. Her pasty complexion made her look older.

Based upon performance on these sentences, we then present the appropriate grade-level text from Flynt Cooter, Form A for the evaluated plaintiff to read. We present that text and at least one above and below until it can be determined which level the evaluated plaintiff most comfortably reads at.

## IV.2.d.ii. San Diego Screening

One final screening test serves to corroborate our assessment of reading level. The *San Diego Quick Reading Assessment* is a quick screening based upon selected vocabulary alone that determines the reading level at which one would be expected to read independently (missing one or fewer words); to read well with educational supervision (missing two), to read with frustration (missing three or more).

We noted earlier that at the heart of all reading assessments is grade-level vocabulary. This test takes this idea to the extreme and presents only vocabulary. Surprisingly, it does almost as well as the other assessments in terms of predicting reading level, for hearing first language users of English. However, it can score too high when the is not a native user of English and their grammar very limited. Limited grammar reduces the reading level.

However, it doesn't give the added information that seeing the evaluated plaintiff read or examining the results of the Flynt Cooter materials can offer. The stimuli for the San Diego Screening are presented below. The numbers in each box indicate the grade level.

| 1 | 2 | 3 |
|---|---|---|

| road | our | city |
|------|-----|------|
| live | please | middle |
| thank | myself | moment |
| when | town | frightened |
| bigger | early | exclaimed |
| how | send | several |
| always | wide | lonely |
| night | believe | drew |
| spring | quietly | since |
| today | carefully | straight |
| **4** | **5** | **6** |
| decided | successful | bridge |
| served | business | commercial |
| amazed | develop | abolish |
| silent | considered | trucker |
| wrecked | discussed | apparatus |
| improved | behaved | elementary |
| certainly | splendid | comment |
| entered | acquainted | necessity |
| realized | escaped | gallery |
| interrupted | squirming | relativity |
| **7** | **8** | **9** |
| | | |
| amber | capacious | conscientious |
| dominion | limitation | isolation |
| sundry | pretext | molecule |
| capillary | intrigue | ritual |
| impetuous | delusion | momentous |
| blight | immaculate | vulnerable |
| wrest | ascent | kinship |
| | | |
| enumerate | acrid | conservatism |
| daunted | binocular | jaunty |
| condescend | embankment | inventive |
| **10** | **11** | |
| zany | galore | |
| jerking | rotunda | |
| nausea | capitalism | |
| gratuitous | amnesty | |
| linear | risible | |
| inept | exonerate | |
| | | |
| legality | superannuate | |
| aspen | luxuriate | |
| prevaricate | piebald | |
| barometer | crunch | |

**IV.2.d.iii. Reading behaviors**

Finally, we ask about reading behaviors. What magazines, books, or newspapers does the evaluated plaintiff read? Are they comfortable with the captioning on TV? We also look at behaviors while reading such as reading silently or "reading aloud," a rather perverse linking of sign to word and fingerspelling unknown words that can take a person through a text without actually processing the content of the material. This type of reading is often detrimental to the task at hand.

### IV.2.e. Vocabulary

Processes such as lipreading, reading, writing, and speaking English are inextricably intertwined with knowledge of vocabulary. You can neither read nor lipread words that you are unfamiliar with.

To assess vocabulary skills, the evaluated plaintiff was presented with a list of vocabulary items at the twelfth-grade level, and then terminology typically encountered in medical, law enforcement, as well as everyday contexts and was asked to circle all words recognized.

Later in the testing we return to the lists. The evaluated plaintiff is asked to demonstrate familiarity with each of the circled words. The evaluated plaintiff doesn't need to know the exact definition, but is only required to demonstrate familiarity, by giving a synonym, a related word, or using the word in a sentence.

As can be seen, vocabulary skills have been tapped into at various points already in the reading tasks. The goal in this portion of the assessment is to get a sense of familiarity with words in the medical and law enforcement contexts, two of the areas our linguistic work typically deals with. These words are not chosen for each evaluated plaintiff. They have been used with all evaluated plaintiffs (over 150) tested to date, giving us an overall sense of how a wide range of Deaf individuals will perform.

As mentioned earlier, vocabulary level and reading level are typically coupled. However, when working with adults, their work and life experiences can give them special pockets of familiarity with vocabulary that may not be expected in generalized test materials. In

addition, as mentioned before, Deaf individuals have less access to incidental exposure to English in context than hearing individuals with the same reading levels because they cannot hear the language going on around them at all times.

A second function of this vocabulary task is to pick up on the extent to which an individual who thinks they know a word may actually be mistaken. Do evaluated plaintiffs know what they don't know? How reliable is their sense of understanding what they read?

### IV.2.e.i. Twelfth Grade (grade-level reading list)

The test begins with a vetted list of 90 words at the twelfth-grade level. This is a list of words taken from lists developed for basal readers. Dr. Shepard-Kegl used it in a study with George Miller on fourth graders use of dictionaries that challenged the value of the exercise of looking up an unfamiliar word in a dictionary and using it in a sentence. For example, the child looks up the word *erode* and gets the definition "eats out, eats away," and then produces the sentence *My mother is a terrible cook so my family erodes a lot*.

The list of twelfth-grade words is designed to be unfamiliar to most evaluated plaintiffs or to have some words like *bid, shift,* or *degree* that have multiple senses only one or some of which are known. We have eliminated most of the multiple sense items recently because they proved difficult to assess. The primary purpose of the twelfth-grade list is to assure that evaluated plaintiffs do indicate words that are unfamiliar both here and later in the specialized vocabulary lists. In addition, false identifications reveal the extent to which a person can rely upon their sense of understanding of vocabulary. Poor readers and the those with the weakest vocabularies will often identify more of the 12th-grade words as familiar confusing *sinuous* with *sinus, accrue* with *accurate,* or *campaign* with *champagne* with much confidence.  In the healthcare context the confuse *anemia* with *enema, living will* with *will live* or *starve* with *survive*.

The twelfth-grade word list appears below:

| | | | |
|---|---|---|---|
| abduct | expedient | precedent | vestige |
| accrue | exude | preeminent | volatile |
| adamant | facetious | protract | volition |
| affiliate | fatigue | recluse | |
| ally | felicity | regale | |
| amorphous | figment | relegate | |
| apathy | finesse | relevant | |
| askance | foray | reparation | |
| aspersion | homogeneous | replete | |
| astute | impervious | repudiate | |
| audacity | impetuous | reticence | |
| augment | infamy | salient | |
| campaign | inordinate | scourge | |
| caustic | intrepid | senile | |
| cede | lucrative | sinuous | |
| censure | meticulous | sordid | |
| chaste | mortal | stature | |
| citation | nebulous | stoic | |
| coerce | nondescript | succulent | |
| concomitant | novice | sully | |
| contrive | obviate | tantamount | |
| correlate | opulent | tenacious | |
| cultivate | overt | tenet | |
| defunct | panacea | topography | |
| denote | persevere | tractable | |
| despot | petulant | transitory | |
| discreet | pious | turgid | |
| disdainful | poignant | unwitting | |
| erode | ponderous | usurp | |

Because the purpose of this vocabulary task is more familiarity of words in a given domain, the medical and law enforcement words are not from any vetted lists.

## IV.2.e.ii. Medical and General Vocabulary

The following is the list of 90 items in the medical and general vocabulary list presented to evaluated plaintiffs. The words looked at here are common medical vocabulary that would be used among laymen and not specialized medical terminology that is more specific like *metastatic melanoma*. As with the twelfth-grade words they are asked to circle the ones they recognize and then we come back to the circled words later and they demonstrate familiarity. Some critical items are addressed even if uncircled including words like *consent* and *waiver*. Phrases like *change the dressings* are probed to see if there is actual understanding. Some evaluated plaintiffs will circle this phrase as familiar and then presented with the written discharge instruction: *You can go home from the hospital today but don't change the dressings for three days* will understand it as "don't change your clothes for three days."

| | | | |
|---|---|---|---|
| accommodate | consent | incision | laceration |
| accurate | coronary | infection | prescription |
| acid reflux | dead | inflammation | pulmonary |
| action | deceased | inform | refer to another |
| actual | defibrillator | insurance | physician |
| acute | dehydration | interpreter | refuse |
| addiction | diabetes | living will | release form |
| admission to the | discoloration | malignancy | risk |
| hospital | discomfort | mammogram | schedule |
| advise | doctor | mechanical diet | sedation |
| ailment | employment | medication | palliative care |
| anemia | enema | milk products | starve |
| anesthesia | evaluate | modified program of | strenuous activity |
| antibiotic | comfort care | activity | subscription |
| appendix | fluids | muscle | survive |
| appointment | follow up | nurse | thigh |
| beneficiary | hallucination | oozing | transfer |
| cafeteria | heart attack | operation | transportation |
| caffeine | hepatitis | oxygen | urination |
| cancellation | hernia | palpate | waiver |
| change the dressings | high blood pressure | passed away | wound |
| closed | HIV positive | perforation | |
| colon | hospital administrator | pneumonia | |
| confer | incident | postpone | |

## IV.2.e.iii. Law Enforcement Related Vocabulary

Below are the words from the law enforcement list.  The procedure is the same as discussed above. In this case, one phrase consistently probed further is *other party.* The evaluated plaintiff is told that a police officer goes up to a car that has clearly been in an accident and writes the following question: *I see you have been in an accident. Where is the other party?* The goal of probing is to see if they can get the meaning "other person(s) involved."

| | | | |
|---|---|---|---|
| abuse | detain | liability | remain silent |
| accident | dismissed | license | resist |
| accident report | disoriented | mandated reporter | responsible |
| accident scene | disturbing the peace | Miranda rights | restraining order |
| address | driver's license | motor vehicle | retain |
| alcohol | evaluation | moving violation | revoked |
| alleged | evidence | neglect | sentenced |
| altercation | fact | offense | signature |
| anything you say will | fault | officer | sobriety |
| be held against you | felony | operating a motor | speedometer |
| arraignment | fined | vehicle | squad car |
| arrest | found guilty | parole | take into custody |
| assault | headquarters | patrol | ticket |
| attorney | hearing impaired | plead | under the influence |
| bail | identification | police | verdict |
| booking | incarcerate | police report | waive |
| breathalizer | incident | posted speed | where is the other |
| charged with a crime | indicted | precinct | party |
| citation | injury | previous violations | misdemeanor |
| consent | innocent | psychiatric | sheriff |
| contact | insurance holder | psychological | plaintiff |
| court | interrogation | refrain from | |
| D.U.I | intoxicated | registration | |
| D.W.I. | lewd behavior | released | |

## IV.2.e.iv. Employment-related Vocabulary

Below are the words from the employment word list. The procedure is the same as discussed above. These words include those that would be encountered in jobs for companies that would have hiring procedures, performance reviews, work policies and grievance procedures.

| | | | |
|---|---|---|---|
| absences | EEOC | minimum wage | strike |
| accommodation | efficiency | OSHA | strong work ethic |
| accrued | emergency action plan | overtime | supervisor |
| assembly | employee | parental leave | suspension |
| assessment | excused absence | pay stubs | take home pay |
| bid | exit routes | payslip | tardiness |
| breaks | fired | personnel | taxable income |
| bullying | fixed-term contract | policy manual | termination |
| CEO | forman | precautions | time sheet |
| clock in | gross income | probationary period | under the table |
| code of conduct | harrassment | promotion | unemployment |
| collective agreements | health benefits | put on notice | union |
| collegiality | hire | quality control | unpaid leave |
| commendation | hourly rate | raise | unprofessional conduct |
| confidentiality | human relations | restricted area | Vocational |
| deliverables | immediate supervisor | resume | Rehabilitation (VR) |
| dependants | investment | roster | wage |
| disability insurance | IRA | safety training | withholding |
| disciplinary | IRS | shop steward | work station |
| discrimination | job performance | sick leave | workman's |
| dock your pay | lay off | spousal benefits | compensation |
| drug screening | leave of absence | SSDI | workplace injuries |
| duties | manager | staff | write you up |

## V. Narrative Production (ASL v. English written v. English spoken)

The last component of our evaluation is done to compare how comfortable and how prolific an evaluated plaintiff will be expressing the same information in ASL, written English, and spoken English. The material elicited here is also used in the ASL assessment, English writing assessment, including the argument structure studies, and the assessment of spoken English. It also has the benefit of offering a concise set of data that can be used for examples of the evaluated plaintiff's use of ASL signing, English writing, and speech.

The data in this task are elicited using two 1.5-minute nonverbal cartoons: *Mr. Koumal Flies like a Bird* and *Mr. Koumal Battles his Conscience*. These two cartoons were chosen from among about 100 different cartoons in the series because of their ability to elicit specific aspects of ASL grammar including classifiers and verbs of motion and location, verb agreement, spatial agreement, quantification, aspectual morphology (temporal and distributional) and role shift.

The Koumal cartoons (of which there are many) have a history of use as stimuli for the study of the writing of Deaf students. The National Technical Institute for the Deaf started

using them in 1972 to elicit one component of a communication profile for entering college students.[32]

In 1975 Betsy MacDonald and Joan Forman, both at NTID, began using the Koumal cartoons to elicit linguistic data on ASL. It was their work that led Dr. Shepard-Kegl to use these materials.  NTID stopped using the Koumal cartoons in the early 2000s.

## V.1 Narratives Signed in ASL

To assess ASL narrative production, the evaluated plaintiff is asked to watch two 1.5-minute non-verbal cartoons (as many times as necessary) and to recount the story in ASL.[33]

Versions of these same cartoon recountings are also collected in spoken and written English, allowing for comparison in terms of fluency across English and ASL.  The results of this narrative production task were complemented by reviewing the evaluated plaintiff's ASL production in the background questioning and conversation. The basic content of each cartoon appears in the double-lined boxes below:

> ***Mr. Koumal Flies Like a Bird*** is about a man who climbs a mountain with a pick-axe, and seeing a bird flying about, decides he wants to do the same thing.  He tries to fly and fails. The bird sees him and laughs, causing some feathers to fall off.  Mr. Koumal puts them on his arms, tries again, and fails.  The bird, laughing even harder, loses all its feathers.  Koumal gathers them up and puts even more on, tries, and again fails, falling into a chicken coop.  At night takes feathers from all the birds in the coop, which he leaves completely naked looking up at him, puts them all over his body, creating heavy, elaborate wings, and tries again.  He swoops a few times and crashes into the side of the mountain, which collapses upon him.  As he crawls out of the rubble, he gets an idea.  He decides to use the feathers to make Indian headdresses and sell them to children for money.

---

[32] Johnson, D.D. (1975) "Communication Characteristics of NTID Students. "In *Journal of the Academy of Rehabilitative Audiology*, vol. 8, pp. 17-32.

Crandall, C. (1975) "Assessment of Reading and Writing Skills in an Adult Deaf Population." In *Journal of the Academy of Rehabilitative Audiology*, vol. 8, pp. 64-69.

Johnson, D. and Kadunc, N. (1980). "Usefulness of the NTID Communication Profile for evaluating Deaf Secondary-level Students." American Annals of the Deaf, vol. 125, no. 3, pp. 337-349.

[33] Studio Animovaného Filmu. 1969. *Mr. Koumal Flies like a Bird*. Bratri v Triku, Prague.

Studio Animovaného Filmu. 1971. *Mr. Koumal Battles his Conscience.* Bratri v Triku, Prague.

> In ***Mr. Koumal Battles his Conscience***, Mr. Koumal is standing outside of a restaurant and sees a beggar.  He feels generous and drops a coin into the beggar's hat.  A rich woman comes up and does the same, but in so doing, a large bundle of money falls unnoticed from her purse.  Mr. Koumal sees it fall and battles with himself (in the form of a devil and angel taking control of him) over whether to take the money and have cars, riches, and world travel; or to return the money and be hugged by St. Peter as he enters the gates of heaven.  While his good and evil side battle things out, the beggar sneaks in and steals the money.  In the end, Mr. Koumal stands outside the restaurant with his pockets empty and his hand extended.  The beggar drives by in a huge car and tosses him a coin, which lands in the palm of his hand.

The evaluated plaintiff's signed rendition of the non-verbal cartoon can be seen on the video accompanying the assessment. A gloss does not do justice to the ASL sentences produced because much of the spatial grammar and non-manuals that form the basis for our evaluation were not transcribed. They are accessible via the raw data, which have been provided.

### V.2. Narratives Written in English

The evaluated plaintiff is also asked to write a version of the cartoon in English. This written narrative is transcribed and analyzed for argument structure distribution, ASL grammatical features, content and fluency.

### V.3. Narratives Spoken in English

The spoken version of the same cartoon was also collected. It is best viewed on the accompanying videotape. Dr. Shepard-Kegl also transcribes what she can understand of the speech using additional cues from both lipreading and, when present, concurrent signing. This represents the best comprehension possible utilizing visual input for both lipreading and concurrent signing.

### V.4. The influence of English on ASL and vice versa

Using the material elicited as a whole as well as the Koumal narratives, we examine the extent to which the evaluated plaintiff's English narratives show influence from ASL as well as whether the ASL narrative shows influence from English. Because of the emphasis on English in a school environment, testing can sometimes influence the signer to use school signs or

attempt to use more English-like constructions. Most evaluated plaintiffs are most at ease and least "test aware" when signing the Koumal narratives, so their ASL is more natural.

### V.5. Comparison of narrative production in English versus ASL

evaluated plaintiffs generally have some fluency in both English and ASL. As a final activity, we compare the Koumal narratives produced in ASL, written English and spoken English on the basis of comfort, fluency, intelligibility, and grammatical accuracy. In addition, we note how prolific they are in each mode. This gives a sense of what language and communication mode is best suited to the evaluated plaintiff.

# Appendix B: Curriculum vitae

**Name: Judy Anne Shepard-<u>Kegl</u>  (Curriculum Vitae: August 2020)**

Current Position:   Professor of Linguistics (tenured), Director of the Signed Language Research Laboratory, Coordinator of the ASL/English Interpreting Concentration of the Linguistics Major, Linguistics Department, University of Southern Maine.

Date of Birth: June 20, 1953           (Evergreen Park, Illinois)

| | | | |
|---|---|---|---|
| Address: | Linguistics Department | Lab: | Signed Language Research Lab |
| | University of Southern Maine | | 410 Science Building, Wing A |
| | 96 Falmouth Street (P.O. 9300) | | Portland, ME 04104-9300 |
| | Portland, Maine 04104-9300 [mailing address] | | |
| Home: | 52 Whitney Farms Road | Office: | Linguistics Department |
| | North Yarmouth, ME 04097 | | 310 Science Building, Wing A |
| | | | Portland, ME 04104-9300 |

Phone:   Home:      (207)   400-0493      (v/txt/FT)                                                        CELL:   (207) 400-0493
            Lab:        (207)   780-4582      (voice)        VP:    (207)   766-7097      Email: kegl@maine.edu
            Office:     (207)   400-0493      (voice)

Webpage: http://usm.maine.edu/linguistics/judy-shepard-kegl
NSF Science Nugget: https://www.nsf.gov/news/special_reports/linguistics/examples.jsp [This site was developed by NSF to showcase our NSF-funded research.]

Educational Background:

| | | |
|---|---|---|
| B.A.  1975 | | Brown University Field: Anthropology (Magna Cum Laude) |
| M.A.  1975 | | Brown University Field: Linguistics |
| | | Thesis: *Some Observations on Bilingualism: A Look at Data from Slovene-English Bilinguals* (Advisor: William O. Beeman) |
| Ph.D. 1985 | | Massachusetts Institute of Technology Field: Linguistics Dissertation: *Locative Relations in American Sign Language Word Formation, Syntax and Discourse* (Co-chairpersons: Noam Chomsky, James Higginbotham, Wayne O'Neil and John Ross) |
| PostDoc 1990-92 | | Center for Molecular and Behavioral Neuroscience, Rutgers University (Senior Postdoctoral Fellow in Neuroscience) |
| Certificate 2002-03 | | Legal Interpreting Training Program, Front Range Community College |
| Certificate, 2003-04 | | Master Mentor, Northeastern University |
| QMHI | | Mental Health Interpreter Training (August, 2018; Practicum January, 2019 Exam passed January 2019) |

Interpreting/ASL Qualifications:
Registry of Interpreters for the Deaf:  Interpretation Certificate (**IC;** 1978); Transliteration Certificate (**TC**; 1978); Comprehensive Skills Certificate (**CSC**; 1980); Oral Transliteration Certificate (**OTC**; 2001); Specialist Certificate: Legal (**SC:L**, 2004); Certificate of Interpretation (**CI**, 2006), Certificate of Transliteration (**CT**, 2007); Educational Interpreting K-12 (**ED: K-12**, 2007); National Interpreter Certification-Master Level (**NIC Master**; 2008); National Association of the Deaf-Level-IV (**NAD-IV**); Core Certification from the Certification Commission for Health Care Interpreters (**Core-CHI**; 2015); Board of Evaluation of Interpreters, TX (**BEI-Master,** 2017);  State of Alabama Department of Mental Health (**QMHI** (Qualified Mental Health Interpreter), 2019); New Hampshire State Screening (1976); Massachusetts Office of Deafness Screening (1976); Sign Communication Proficiency Rating: Advanced Plus; American Sign Language Assessment (hi 4). Legal Approved: (Maine 2004; Massachusetts 2005; New Hampshire).  Educational Interpreter Performance Assessment (**EIPA**): Written Test (passed, 2005);

Elementary American Sign Language (ASL; 4.5/5); Secondary ASL (4.5/5); Elementary Pidgin Sign English (PSE, 4.5/ 5); Secondary PSE (4.6/5); Elementary Manually Coded English (MCE; 4.2/5); Secondary MCE (4.1/5).

Currently also licensed in Maine (#093, until June 2019) and New Hampshire (until September, 2020). Completed a one year, distance education training course through Front Range Community College, DO-IT Center, for training as a distance specialist in interpreter education (January 2003; refresher January 2006)

**Fellowships and Awards (since 1975):**
1975 Harvey A. Baker Fellowship (Brown University, grant toward graduate education at the
      university of my choice)
1975 Samuel T. Arnold Fellowship (alternate) (Brown University, grant supporting travel abroad to do
      independent research)
1977 Collimore-Rogers Fellowship (M.I.T., one year tuition and living stipend, awarded yearly to one
      female graduate student)
1980 Fellowships to attend the 1980 and 1981 Seminar on Slovene Language, Literature and Culture
      (University of Ljubljana, Yugoslavia; travel stipend awarded by the Slovene National
      Benefit Society)
1991 Fellowship to attend the 1991 James S. McDonnell Summer Institute in Cognitive Neuroscience
      (Topic: Emotion and Attention), Dartmouth College (July 1-12)
1993 Fellowship to attend the James S. McDonnell Summer Institute and Conference, Lake Tahoe,
      California.(June 27-July 16)
1995 Gift from Merrill Lynch, Inc. to Rutgers University to support research on the transition from
      homesign to signed language. Research Project: "Critical Period For Signed
      Language Acquisition" Judy Kegl, Principal Investigator. ($4000)
1999 Admitted to the Lyons Township High School Hall of Fame for research on neurolinguistics,
      ASL syntax, and the emergence of a signed language in Nicaragua.  (LTHS, Class of
      1971)
2007 Award from Maine Registry of Interpreters for the Deaf, Outstanding Contribution to the
      Interpreting Community (May 20)
2009 Special Commendation Award for contribution to the Deaf Community, Maine Deaf Community,
      Maine Deaf Culture Week, Hall of Flags, State House. (September 24)
2010 Betsy Reifman Award, Maine Registry of Interpreters for the Deaf.   (April, 2010)
      (http://www.mainerid.org/betsy-reifman-leadership-award/)
2010 Region I RID Career Achievement Award, Region I conference, Albany, NY (August 15, 2010)
2013 The Honor Society of Phi Kappa Phi, founded to recognize and encourage superior scholarship in all academic
      disciplines. Faculty invitation.  (April, 2013)
2015 Service Award. Faculty Senate. University of Southern Maine.

**Grant Support:** (currently active grants indicated in ***bold italics***)
1979         Grant from the **Mellon Foundation** to develop courses in Anthropology and
             Linguistics at Hampshire College; Course Developed: "Language, Culture and Politics"
             (with Mark Feinstein and Leonard Glick)
l980         Grant from **New England Telephone** with matching funds from **AT&T** to furnish
             and equip an American Sign Language Laboratory and set up a regular summer
             institute at Hampshire College for the study of American Sign Language Linguistics
             $50,000
1981-83      **NIH.** (NS14923), National Institute of Neurological Disorders and Stroke, Processing Units in
             American Sign Language of the Deaf. Northeastern University. (Co-P.I., with Harlan Lane and
             Francois Grosjean) $92,080
1983         **Biomedical Sciences Grant** #9460 (#RR07142, Dept. of Health and Human Services,
             Beginnings and Endings of Signs. (with Kerry Green) $2000
1985-        **Biomedical Sciences Grant**, Northeastern University. Research on the

| | |
|---|---|
| 86 | Perception, Memory and Semantics of ASL. (with Mordechai Rimor and Dana Ginsberg)$1500 |
| 1985- | **RSDF** (Research and Development Fund Grant), Northeastern University. |
| 86 | Acquisition of American Sign Language in a Bilingual Environment. $2365 |
| 1984- | Also had partial involvement in a multi-user computer grant, a |
| 86 | grant to purchase an eye tracker and video equipment, biomedical sciences grant to purchase a spectrograph. (all funded) |
| 1987 | **LSA** Travel Grant to Attend AILA Conference in Sydney Australia. $700. |
| 1989 | **NSF** (NSF#89-50-990) Equipment Grant for "Swarthmore Phonetics Laboratory" (Co-P.I., with Donna Jo Napoli) $27,000 **NCSA** Computer Access Grant #12582 from the National Center for Supercomputing Applications 6 hours of supercomputer time, plus 2 hours for students sponsored in subprojects **Sloan Foundation Fund.** For course development: Linguistics 45: Phonetics and Phonology $5000 **Joel Dean Fund.** Summer Research Support. Swarthmore College (Nicaraguan Sign Language Research) $2000 **Faculty Research Support.** Swarthmore College. $1400. **Curricular Development Fund.** Swarthmore College. Psychology/Linguistics 60: Concepts, Word Meaning, and Development (with Debby Kemler-Nelson) $1750 |
| 1990- | **NSF.** (NSF#BNS-9000407) The Structured Use of Space and Movement In a Visual Language, $100,000/year (Co-P.I. with Howard Poizner, P.I.) |
| 1991 | **NIH-NIDCD.** (NIH# DC 01664) The Neural Basis of American Sign Language. (funded 5 yrs. (7/92-6/97) Annual Costs -$100,021 (Co-investigator with Howard Poizner, P.I.) |
| 1992 | **NSF.** (NSF#BNS-9000407) The Structured Use of Space and Movement in a Visual Manual Language (1989-1992; renewal funded for (12/92-11/95), co-P.I., with Howard Poizner) **NIH-NIDCD/NINDS** (**NIH#DC01656**) (First Award; funded for 5 yrs (9/92-8/97; annual budget $100,000; no cost ext. to 1998) Access to Argument Structure in Agrammatism. (P.I.) |
| 1994 | **NSF.** (#**SBR-9410562**) (11/94-10/97). The Architecture of Functional Categories in American Sign Language. ($350,000 over three years; Rutgers subcontract-$164,518; Co-P.I., with Carol Neidle (Boston University) and Otmar Foelsche (Dartmouth College)) http://web.bu.edu/ASLLRP/talks.html |
| 1995 | **NSF.** (#**IRI-9528985**; **IRIS & CDA; CISE Directorate and ARPA**). (10/1/94-8/31/99; no cost extension to 10/31/99) Signstream: A Multimedia Tool For Language Research. Project Director, with Carol Neidle (Boston University), P.I.. Total Costs $748,000; Rutgers Subcontract-$91,000 (Kegl, P.D.). **NSF**. (**NSF#SBR-9513762**) The Structured Use of Space and Movement in a Visual Manual Language (8/1/96-7/31/99) (P.I) Total costs $384,874. 1997 **Merrill Lynch**. "Language Assessment in Deaf Adults and Children with Atypical Exposure to ASL," $5000. |
| 1998 | **NSF.** (#**SBR-9729065**) (4/98-3/01). The Architecture of Functional Categories in American Sign Language. ($350,000 over three years divided between Rutgers and Boston University) (P.I., with Carol Neidle, Co--P.I.; collaborative grant). Total Costs: $350,000. Rutgers Component: $140,000 *Maine Department of Education.* (11/98-6/30) American Sign Language (ASL) English Interpreting (approximately $133,000 annually over 5 years) Co-P.I., with Wayne Cowart, P.I.) |
| 1999 | **NSF**. (**NSF#SBR-9996330**) The Emergence of a Sign Language in Nicaragua (8/1/99-7/31/00) (P.I Total costs $384,874. [transferred from Rutgers to USM]. *NSF.* (#*SBR-9996297*) (4/99-3/01). The Architecture of Functional Categories in American Sign Language. $140,000 [transferred from Rutgers to USM] |
| 2002 | *Maine Department of Education.* (**9/2002-8/2012**) Funding to place 9 working educational interpreters from Maine into a three year, distance education program through the DO-IT Center, Front Range Community College. (2 Cohorts funded, six educational interpreters each.) Currently funded to work with these two cohorts plus 5 additional educational interpreters toward credentialing; to under go accreditation by CCIE, and to develop a Master's program in Educational Interpreting. |
| **2003** | Subcontract. *U.S. Department of Education* (grant awarded to Brenda Schick and Kevin William (9/03-10/03) "Development of a Cued Speech module for the Educational Interpreter |

Performance Assessment" Co-PI with Jeanne Krause, University of South Florida)

**2016**   **Penobscot Foundation for Developmental Disabilities.** Grant to *Independence without Fear* (Maine SSP

Program). Administered by The Iris Network. $15,000.

**2018**   **Penobscot Foundation for Developmental Disabilities.** Bridge Grant to *Independence without Fear*

to purchase Humanity Referral System and cover operations of the program from March-May. $1000
.   Administered by USM Community Fund.  Grant for $5000 to covering interim program operations to
August, 2018.

Research Interests (**bolding** indicates current research involvement): **Neurolinguistics**: Aphasia, Sign aphasia, Effects of motor disorders on signing, fMRI studies of grammatical and affective facial expression. Phonology: Autosegmental Phonology, SPE phonology, metrical phonology, Three-dimensional phonology, feature geometry **Syntax:** Transformational Grammar, Relational Grammar, **Government-Binding Theory; argument structure;** Psychology / Psycholinguistics: general background, lexical organization and memory, language development, **on-line sentence processing in interpretation**, **language deprivation**; **Cognitive Science:** general background with a focus on Natural Language Processing, dictionaries as linguistic databases, and connectionism; **Linguistics of American Sign Language**: Syntax, phonology, morphology, phonetics, semantics, discourse and narrative structure;  Slovenian: Phonology (segmental, syllable structure and accent); code switching Other Sign Languages: **Idioma de Señas de Nicaragua, French Sign Language**, Sign Language on Martha's Vineyard, Warlpiri Sign Language, Plains Indian Sign Language**,** Taiwan Sign Language, Brazilian Sign Language (LIBRAS), **Peruvian Sign Language. Comparative linguistics: American Sign Language and Algonquian Languages (polysynthetic languages);** Sociolinguistics: Conditions on Code Switching; **Pidgins and Creoles. Anthropology:** Folklore, Slovene Folklore and Superstition, **Ethnography**, Archaeology (Industrial Age), **Field Methods** and Anthropological Linguistics, **Linguistic Fieldwork (Nicaragua, Peru). Interpreting:** Processing for simultaneous and consecutive interpreting, pedagogical methods in interpreter training; **The Integrated Model of Interpreting and Process Mediation** for mentoring Interpreters.

Language Interests: **Conversant in**: American Sign Language, Spanish, Nicaraguan Sign Language, Peruvian Sign Language, German, *Slovenian, and *Serbo-Croatian (*limited conversational skills). **Read:** German, Spanish, Slovenian, Serbo-Croatian, limited reading knowledge of Russian and French. **Structure Courses in:** Old English, Middle English and Old Icelandic; Warlpiri, Turkish, and Mandarin Chinese. **Field Methods Courses:** Ngamambo, Kikuyu, American Sign Language, Idioma de Señas de Nicaragua, Langue de Signe Francais, Langue de Signe Quebecois, Taiwan Sign Language. Limited Work in: Warlpiri Sign Language, Plains Indian Sign Language. Recent language study: Abenaki, an Algonquian language of Maine (2 courses).

**Interpreting:** American Sign Language, English; also trained in specialty areas of oral transliteration, Deaf-Blind interpreting, legal interpreting and medical interpreting. Specialized in Postsecondary Education (Linguistics, Psychology, Neuroscience), Conference Interpreting, Legal, and Medical Interpreting.

**Employment:**

| | |
|---|---|
| 1974-75 | Research Asst. to Prof. W.O. Beeman, Anthropology, Brown University |
| 1975 | Research Asst. to Prof. George Lakoff. Summer Meetings of the Mathematical and Social Sciences Board (MSSB), University of California at Berkeley |
| 1975-78 | Research Assistant, Research Lab of Electronics, M.I.T. |

| | |
|---|---|
| 1976-77 | Research Assistant to Prof. Roger Brown, Harvard University |
| 1976-78 | ASL/English Interpreter (Massachusetts Rehabilitation Commission); state certification |
| 1977-81 | Asst. Professor of Linguistics, School of Language and Communication, Hampshire College, Amherst, Mass. |
| 1978 | Sign Language Instructor. School of Social Work, Smith College |
| 1978-pres. | Professional freelance ASL/English Interpreter |
| 1980 | Research Associate in the Psychology Dept., Northeastern |
| 1981-87 | Asst. Professor of Psychology, Psychology Dept., Northeastern |
| 1986-87 | Visiting Asst. Professor of Psychology, Princeton University |
| 1987 | Visiting Asst. Prof., Linguistics, Univ. of Pennsylvania (1 course) |
| 1987-88 | Lecturer (Asst. Prof. Level), Psychology and Linguistics, Princeton |
| 1988-90 | Associate Professor of Linguistics and Psychology, Swarthmore College |
| 1990-92 | Senior Postdoctoral Fellow, Cognitive Neuroscience Laboratory, Center for Molecular and Behavioral Neuroscience, Rutgers University, Newark Research |
| 1992-98 | Assistant Research Professor of Neuroscience, Center for Molecular and Behavioral Neuroscience, Rutgers University, Newark |
| 1998-2001 | Associate Professor of Linguistics, Linguistics Program, University of Southern Maine, Portland, ME |
| 1999-pres | Expert Witness and Language Consultant, Linguistic Consulting Services (ADA cases (medical, educational, law enforcement, employment), competency, etc.) New Jersey, New York, Maine, Minnesota, California, Florida, Massachusetts, Minnesota, Arizona, Connecticut, Oregon, Louisiana, Wisconsin, Illinois and Georgia. (colleagues: Amy June Rowley, Romy Spitz, Anne Marie Baer, Betty Colonomos, Eileen Forestal) Professor of Linguistics (tenured), Linguistics Department, University of Southern Maine, Portland, ME. |

| | |
|---|---|
| 2001-pres | **University Affiliations:** |

| 1997-2007 | City University of New York Adjunct member of the doctoral faculty of the Graduate School and University Center's Ph.D. Program in Speech and Hearing Sciences, Language Sciences | supervision of doctoral thesis by Elizabeth Galletta: *On-line Sentence Processing of Agreement in American Sign Language (ASL)* (not continued) |
|---|---|---|
| 2003-2011 | The Union Institute and University Field Faculty Advisor | Brian Edward Cerney PhD, 2004, *Relayed Interpretation from English to American Sign Language via a Hearing and a Deaf Interpreter* Alysse Rasmussen, Ph.D. (resigned) Brooke Macnamara, M.A, *Interpreter Cognitive Aptitudes* (2008) |
| 2005 | University of the Basque Country Visiting Professor of Linguistics | Summer course: *Contrastive Analysis of Signed and Spoken Languages* |
| 2005-2008 | The University of Texas at Arlington Special Member of the Graduate Faculty Department of Linguistics and TESOL | Traci Weast, Ph.D. (2008), *How the face works in American Sign Language* |
| 2006-2016 | The University of Northern Colorado College of Education and Behavioral Science; Adjunct faculty member. | Facilitator for Legal Interpreter Certificate Program; Course: INTR 480 *Introduction to the American Legal System* (Spring 2006); INTR 483-900 Internship: Skills Development in Legal Interpreting (Spring 2013) |
| 2012-2014 | The University of Northern Florida, Adjunct faculty member | Graduate courses in interpreting: INT 6277 Expansion and |

| | | Compression, INT 6435 Mental Health Interpreting |
|---|---|---|

Teaching Experience:

1976    **Massachusetts Institute of Technology**
        **Position: Graduate student**
        I.A.P. Course: Field Methods in American Sign Language


1978-81 **Hampshire College, School of Language and Communication**
        **Position: Assistant Professor of Language and Communication**
        LC 195 American Sign Language and Its Structure (Fall 1978, 1979, 1980)
        LC 171 Language, Culture and Society (Fall 1978)
        LC 109 Animal Communication (Spring 1979)
        LC 295 Controversial Issues in ASL Linguistics (Spring 1979)
        LC 295 Psycholinguistics of ASL (Spring 1980)
        LC 226 Theory of Language: Phonology part of course (Fall 1980)
        LC 331 Integrative Seminar: Language in Context (Fall 1980)


1979    **Smith College, School of Social Work**
        **Position: Visiting Instructor**
        Intermediate American Sign Language (co-taught with Linda Carroll Harris, R.S.C.)


1983    **Boston University**
        **Position: Adjunct Assistant Professor of Deaf Studies**
        The Structure of American Sign Language (co-taught with Robert Hoffmeister and James Gee)


1980-86 **Northeastern University, Department of Psychology**
        **Position: Assistant Professor of Psychology**
        19.990 Special Topics in Psychology: Unsolved Problems in ASL Linguistics (Winter 1980)
        19.154   Linguistics of American Sign Language (Winter 1981, PSY1363 Fall 1981, Spring
                    1983, Winter 1985, Fall 1985)
        19.235   Animal Communication (Spring 1981, Fall 1982, Fall 1985 (with Harlan Lane))
        19.930   Graduate Seminar in ASL Linguistics (Fall 1981)
        19.930   The Structure of ASL (grad. course) (Winter and Spring 1983)
        19.931   Special Topics in ASL Linguistics: The Locative Hypothesis and Spatial Notions in
                    Language (Winter and Spring 1983)
        19.182   Neurolinguistics/Language and the Brain (Winter 1982, Winter 1983, Spring 1986)
        19.152   Phonetics and Phonology (Spring 1982, Spring 1986)
        no num.  Informal Seminar on Language Acquisition (Northeastern University and Boston

191

University, Winter and Spring 1982)
19.817    Graduate Proseminar in Language and Cognition (Fall 1982)
PSY1263   Child Language (Spring 1985)
PSY1112   Foundations of Psychology 2 (Spring 1985, Winter 1986)
PSY1663   Seminar in Linguistics (Fall 1985)
ENG1118 Introduction to Linguistics (Winter 1985)
ASL1401 American Sign Language Literature (Winter 1984,1985) [with Marie Jean Philip]

Computer Courses: XYWRITE (seminars for Northeastern faculty and staff, word processing, Winter 1986, Spring 1986)

**1986-88     Universidad Centroamericana, Managua, Nicaragua (summer)**
**Position: Visiting Professor of Linguistics**
Linguistics Institute: Structure of Nicaraguan Sign Language (Field Methods) Sponsored by: Lingüistas Pro Nicaragua, July, 1986)
Nicaraguan Sign Language for Vocational Teachers (Instituto Nicaragüense de Seguridad Social y Bienestar; Centro Ocupacional para Discapacitados (Nicaraguan Institute of Social Security and Benefits, Occupational Center for the Handicapped); in conjunction with fieldwork conducted at the school aimed at the development of dictionary and Grammar of Lengua de Signos Nicaragüense

**1987-88     Princeton University, Linguistics Program and Psychology Dept.**
**Position: Assistant Professor of Linguistics and Psychology (visiting first year)**
LING531 Advanced Phonology Seminar (Fall 1986)
LING302 Introduction to Syntax (Spring 1987)
LING301 Phonetics and Phonology (Fall 1987)
LING213 Introduction to Linguistics (Fall 1987)
PSY309 Psychology of Language (Spring 1987, 1988)

1987     **University of Pennsylvania, Department of Linguistics**
**Position: Visiting Assistant Professor of Linguistics**
LING 242 Linguistics of American Sign Language (graduate) (Fall 1987)

**1988-90     Swarthmore College, Departments of Linguistics and Psychology**
**Position: Associate Professor of Linguistics and Psychology**
Ling 1 Introduction to Linguistics (Fall 1988)
Psych 1 Introduction to Psychology (Attachment: "Language and Thought when the System Breaks Down") (Fall, Spring 1988)
Psych 34/Ling 34 Psychology of Language (Spring 1989)
Ling 41 Linguistics of American Sign Language (Spring 1989)
Psych/Ling 60 Concepts, Word Meaning and Development (Fall 1989)
Psych/Ling 107 Psycholinguistics Seminar (Fall 1989)
Psych 6 Critical Issues in Cognitive Science (Fall 1989)
Ling 40/Phil 40 Semantics (Fall 1989)
Ling 45 Phonetics and Phonology (Spring 1990)

1994-pres  **Position: President of Nicaraguan Sign Language Projects, Inc.**

Coordinated a week long intensive immersion program in Bluefields, Nicaragua for Deaf home signers and their families to establish their first contact with a formal signed language, Nicaraguan Sign Language. Sponsored by Los Pipitos, Bluefields. (with James Shepard-Kegl, Gene Mirus, three Deaf representatives of Associación Nacional de Sordos de Nicaragua (ANSNIC), and an ISN/Spanish interpreter). December 31-January 7, 1995.

Visiting professor. (July 17-August 26) Escuelita de Bluefields, Bluefields, Nicaragua. Intensive Summer Sign Language program for Deaf homesigners and their families. June 23-August 30, 1995; Summer 1996 , July-August 1997.

Coordinator and co-teacher: Sign Immersion Workshop, Condega, Nicaragua. December 15-20, 1998. (Part of Hurricane Mitch Relief: two Deaf instructors, 27 deaf students (home signers), their parents and siblings. Sponsored by Los Pipitos, Condega.

1990-1991   **Rutgers University, Center for Molecular and Behavioral Neuroscience**
**Position: Senior Postdoctoral Fellow (1990-91)**
**Position: Research Assistant Professor of Neuroscience (1991-98**)
Foundations of Neuroscience: Cognition and Language Component (Spring 1992-1998)

1998-pres.   **University of Southern Maine. (linguistics, ASL structure, interpreting)**
**Position: Associate Professor of Linguistics (1998-2001; sabbatical 2005-06)**
**Full Tenured Professor of Linguistics (2001-present)**
LIN 105 Contrastive Analysis: American Sign Language and English (Fall 2013, 2014, 2015; 2017-2020)
EYE 124 The Birth of a Language in Nicaragua (Fall 2009)
LIN 112E Analyzing Language: The Emergence of a Signed Language in Nicaragua (Fall 2007, 2008)
LIN 112 Interdisciplinary Perspectives on the Birth of a Language (Spring 2014, 2015, Sum 2016; Fall 2016, 2017-2019; Spring 2020)
LIN 185J Language, Mind and Society (Spring 1999; Fall 1999) with Dana McDaniel and Wayne Cowart
LIN 299 Language and the Brain (Spring 1999)
LIN 310 Signs of Language in the Brain (Fall 1999; Spring 2000; Fall 2002; Fall 2003; Fall 2004; Fall 2018, with Romy Spitz; Spring 2020)
LIN 232 Introduction to Educational Interpreting (Fall 1999-ITV course; Spring 2000-ITV course; Spring 2001-ITV course; summer 2001-immersion course)
LIN 305 Contrastive Analysis: ASL and English (Fall 1999; Spring 2000 –ITV course with Jimmy Challis Gore; Fall 2001; Fall 2002; Fall 2003; Spring 2004; Spring 2005; Fall 2006; Spring 2008 (on-line); Spring 2009 (face to face and on-line); Spring 2010; Spring 2011 (face-to-face and on-line)
LIN 310 Signs of Language in the Brain (Fall 2018 (with Romy Spitz); Spring 2020)
LIN 315 Field Methods (Spring 2000 [Idioma de Señas de Nicaragua], Spring 2002) [Idioma de Señas de Nicaragua]; Spring 2004)
LIN 231/331/425 Interpreting Immersion Summer Session (Coordinated program and co-taught courses with James Lipsky, CDI-P and Mary Jane Olson Summer 2000; summer 2001; supervised a similar interpreter immersion in Bangor March-April 2001 with Jane Hecker-Cain CSC, CI,CT and James Lipsky, CDI-P); summer 2002 (with Lipsky and Olson; summer 2003 (with Olson)
LIN 236 Not Yet Ready for Prime Time Interpreting (2012-present)
LIN 321 Advanced American Sign Language I: Literature (Spring 2000 with Roxanne Baker)
ASL 301 American Sign Language Literature in ASL  (Spring 2009 with Regan Thibodeau) Spring 2012)
ASL 302 American Sign Language Linguistics in ASL (Fall 2010, Spring 2011, 2013; 2015)
ASL 416 American Sign Language Linguistics in ASL (2018)
LIN 599 American Sign Language Linguistics in ASL for ASL Teachers (Spring 2016)
LIN 332 Consecutive Interpreting and Deaf/Hearing Teams (Fall 2000 with Lois Morin; Spring 2002; Spring, 2003 with Guillaume Chastel; Fall 2012 with Stacey Bsullak; Fall 2017 with Regan Thibodeau)
LIN 333 Interpreting: Source Language English (Spring 2009 with Ann Swope)

LIN 334 Interpreting: Source Language English (Fall 2000; Spring 2002; Spring 2003; Spring 2004; Spring 2005; Fall 2008 to 2019)

LIN 336 Observational Internship (2012-2020)

LIN 425 Advanced ASL Syntax (Spring 2001)

LIN 425 Preparation for the RID Written Exam (Fall 2001; Spring 2002; Fall 2003; Spring 2004; Spring 2008 (on-line); Spring 2011)

LIN 425 Foundations of Interpreting I (Spring 2008, Fall 2008 with Betty Colonomos)

LIN 425 Foundations of Interpreting II (Spring 2008, with Betty Colonomos)

LIN 299 Remedial ASL (Summer 2002) with Guillaume Chastel

LIN 335 Advanced Interpreting: Source Language ASL (Summer 2001; Summer 2004; Summer 2005; Fall 2006; Fall 2007; Spring 2008)

LIN 399 Advanced Interpreting Lab: Source Language ASL (Spring, 2003)

LIN 399 Not Yet Ready for Prime Time Interpreting Program (Spring, 2010; Spring 2011; Spring 2015; Fall 2016)

LIN 411 Practicum 1 (2001-2012; 2013 (supervision); Spring 2014)

LIN 412 Practicum 2 (2001-2003, 2006 2009-2012; 2013; Spring 2014)

LIN 413 Supervised Mentoring (Fall 2002, 2003; 2004)

LIN 415 ASL Literature in ASL (Spring 2018)

LIN 499 Supervised Interpreting (2001, 2002, 2003; 2004)

LIN 422 A Cognitive Perspective on Syntax (Spring 2010-2017 with Wayne Cowart and Dana McDaniel)

LIN 434 Research Practicum (Spring 2010-present; 2018 with Regan Thibodeau)

LIN 435 Advanced Interpreting + practicum/research (Spring 2010-2015; 2017-2019)

LIN 436 Advanced Interpreting and practicum II (Spring 2012-2020)

LIN 425 Deaf-Blind Interpreting and Service Support Professional Immersion (Summer 2010)

LIN 425 Deaf-Blind Interpreting (Summer 2012)

LIN 425 Sighted Guide (SSP) Technique and Deaf Blind Interpreting Summer 2012; Summer 2013)

LIN 425 Sighted Guide Technique (Summer 2012, (supervision; instructors Roger Poulin and Veronica Lepore), Fall 2013; Summer 2013)

LIN 425 Medical Interpreting I, The Essential Piece (Summer 2013; Fall 2014; Summer 2016; Spring 2017; Summer, 2018; Fall 2018; Fall 2019 with Meryl Troop)

LIN 425 Medical Interpreting II, Medical Terminology (Spring 2015; Summer 2016, 2017; Spring 2018, 2019, with Meryl Troop)

LIN 425 Service Learning: Preparation for the Deaf Blind Retreat, Seabeck, WA (Summer 2013, 2014, 2015)

LIN 499 Seminar in Syntax: Wh-Movement (Spring, 2018; with Sandra Wood, Dana McDaniel, and Jeanne Heil)

LIN 423 Seminar in Syntax: Pronouns (Spring, 2019; with Sandra Wood, Dana McDaniel, and Jeanne Heil)

EPB 500 Mentoring I: Guided Self-Assessment (2004-present)

EPB 501 Mentoring II: Talking about the work for seasoned interpreters (2004-present)

EPB 502 Mentoring III: Continued Process Mediation (2004-present)

Plus numerous internships and independent studies.

1999-2004   Governor Baxter School for the Deaf, Outreach Center. Faculty member ASL

2000-pres.   Freelance Interpreter (specializing in medical and legal)
Pine Tree Society Interpreting Services
Certified Interpreting

2006-pres.   Contract Medical Interpreter, through Certified Interpreting (Maine Medical Center and affiliated sites; one day per week)

Immersion weekend (Summer 1999; 2000; 2001; 2002; Winter 2004)

2006-2008,   University of Northern Colorado, Adjunct Faculty, Legal Interpreter Certificate Program

2013         INTR 480 Overview of Interpreting in the American Legal System (Section Facilitator)

(Summer
2006);  Skills Course (Mentor) (Spring 2007); !NTR 483/900 Internship: Skills Development
Legal
(graduate level, Spring 2013)

2011-2012   Governor Baxter School for the Deaf.  One-year course for faculty and staff.  How ASL and
English Differ.

**Teaching supervision:** Supervise all ASL (until 2002) and interpreting related courses at the University.

**Research supervision: Postdoctoral fellow** : Dr. Romy Spitz (Cognitive development in home signers
and late learners; 1998-2000); **Research Assistant:** Helen Stickney (Linguistics of Nicaraguan Sign
Language; 2000-2001).

**Doctoral dissertation work**: Mary Jack (research supervisor/committee chairperson, Ph.D. dissertation:
Arguments Structure and Circumlocution in Aphasic Subjects--Psychology Department, Rutgers 1997-
1998); Elizabeth Galletta (research supervisor/committee member, Ph.D. dissertation: On-line sentence
processing in ASL -CUNY Graduate Center and University Center's Ph.D. Program in Speech and Hearing
Sciences, New York, NY 1996-1999); Alysse Rasmussen (The Union Institute and University, 2008-2011),
*Proficiency level differences between adult hearing mono- and bilinguals after one year of study of ASL.*

**Doctoral dissertations completed:** Psychology Dissertations (Committee member): Mordechai Rimor
(completed 1983); Kerry Green (completed 1984); Charles Rosenberg (completed 1987); Walter Charles
(completed 1988). Linguistics dissertations: Deborah Aarons (committee member, Ph.D dissertation
(completed 1994): Aspects of the syntax of American Sign Language—Linguistics Program, Boston
University; Ann Senghas (research supervisor/committee member, Ph.D. dissertation (completed 1995):
Children's Contribution to the Birth of a Language—MIT, Dept. of Brain and Cognitive Sciences; Benjamin
Bahan (committee member Ph. D. dissertation (completed 1996): Non-manual realization of agreement in
American Sign Language—Linguistics Program, Boston University; Dawn MacLaughlin (committee
member, Ph.D. dissertation (completed 1997): The Structure of Determiner Phrases in American Sign
Language--Linguistics Program, Boston University; Ruth Grossman (Research supervisor/committee
member, Ph.D. dissertation completed April 2001), A Behavioral, Coding, and Neuroimaging Analysis of
Facial Expression in Deaf and Hearing Signers of American Sign Language—Boston University, University
Professors Program; Brian Cerney, Ph.D., Deaf/Hearing Team Interpreting, (committee member, The
Union Institute (2004); Traci Weast, Univ. of Texas at Arlington (2008), *Questions in American Sign
Language: A quantitative analysis of  raised and lowered eyebrows.*

**Master's work completed:**  Brooke Macnamara, (Vermont College of Union Institute and
University, 2007). *Aptitudes predictive of successful outcomes for the training of ASL/English Interpreters.*

**Graduate student advising**: Michael Patterson (CMBN)--evolution and neurological correlates of
language; Martha Tyrone (CMBN)--Fingerspelling in signers with Parkinson's disease; Helen
Stickney (USM)—syntax of Nicaraguan Sign Language, and above.

**Undergraduate interns**: Silvana Mastrolia (argument structure and bilingual aphasia); Dani
Nightingale (aphasia); Rebecca Damon (ASL acquisition); Allison Faunce (neurolinguistics); Sarah
Eberhardt (William's Syndrome); Jeremy Federman (Landau-Kleffner Syndrome); Saamanta Serna,
Corinna Dauber  (Nicaraguan Sign Language, fieldwork at Escuelita de Bluefields. Bluefields,
Nicaragua); Shannon McHale (Peruvian Sign Language and American Sign Language research);
Polly Lawson (Peruvian Sign Language)


Professional Activities:
**Consulting:**

| | |
|---|---|
| 1976-77 | Boston Regional Language Committee (language curriculum for Deaf children; Newton North High School Deaf program) |
| 1976-78 | Linguistics consultant to Prof. Roger Brown, Psychology Dept., Harvard University (ASL Research) |
| 1979-80 | Linguistics consultant to Prof. Harlan Lane, Psychology Dept., Northeastern University (ASL Research) |
| 1980 | Linguistics consultant to the ASL Laboratory at the Salk Institute, La Jolla California (ASL Research; one week) |
| 1981-85 | Linguistics consultant to Charlotte Reed and Nathanial Durlach, M.I.T. (Research on tactile communication in speech and signing of Deaf-Blind signers) |
| 1980-84 | Member of the Advisory Committee for the Deafness Communication/Interpreter  Training Program, Northern Essex Community College, Haverhill, MA |
| 1982-85 | Affiliated faculty member in the Deaf Studies Masters Program in the School of Education at  Boston University |
| 1988-90 | Consultant to Bell Communications Research--participating in research and development activities in the field of Artificial Intelligence Consultant to the Cognitive Science Laboratory, Princeton University--continuation of research with Prof. George Miller on Lexical Memory |
| 1990-92 | Consultant to Judith Orasanu, Army Research Department(1990-91), NASA (1991-92). Research on discourse interaction/problem resolution in two person flight crews. |
| 1990-91 | Consultant/Expert Witness to Public Defender (NJ); Language Skills Assessment |
| 1991-92 | Consultant to Judith Mounty, Sign Assessment, Inc.--checklist for ASL development. |
| 1987-95. | Major Linguistic Consultant to Equinox Films, concerning the production of four films on language (3 currently airing on PBS) The Human Language Series: *Part One: Discovering the Human Language: "Colorless Green Ideas"* *Part Two: Acquiring the Human Language: "Playing the Language Game"* *Part Three: The Human Language Evolves: "With and Without Words"* |
| 1992-94 | Consultant to Educational Testing Services, Princeton (sign language assessment and videodisc technology) |
| 1993-94 | Resource advisor to the Public Advocate's Office and to the State Department of Mental Health and Hospitals with regard to the development of means to evaluate and provide adequate services to Deaf individuals entering the mental health system |
| 1994-pres. | Language evaluator, Individual Educational Plan (for home signers, late-learners, and fluent signers of ASL); school districts in New Jersey, Pennsylvania, and Maine. 1995-pres. Language assessment of Deaf adults in the context of legal proceedings (expert witness)—approximately 125 cases to date (New Jersey State Prosecutor's Office, Superior Court of Monmouth County; Clara R. Smit, Attorney at Law, NJ and FL; Dierdre Smith, Attorney at Law; Judith Plano, Attorney at Law, ME; James Moore, Assistant District Attorney, U.S. Dept. of Justice, Roderick McPherson, Minnesota Disability Law Center) |
| 1998-pres | Local Test Administrator for the Registry of Interpreters for the Deaf, and Regional Test  Site Coordinator 2002-pres Local Test Administrator for the Educational Interpreting Performance Assessment |
| 2003-2005 | Consultant to Dr. Brenda Schick and Kevin Williams for development of the Cued Speech module of the Educational Interpreter Performance Assessment (with Dr. Jean Krause)-module completed 2005 |
| 2003-2007 | Consultant to Dr. Sudeep Sarkar, University of Southern Florida for research on stereo processing of multi-channel ASL sentences in development of an interactive ASL information kiosk for use at airports (NIH grant; with Brenda Schertz) |
| 2004-2007 | CIT representative to the Commission for Intercollegiate Education for development and implementation of an accreditation system for Interpreter Training Program in the U.S. and Canada, and appointment of the first independent Board of Commissioners (transition appointment) |
| 2008-pres | CCIE, rater |
| 2010-2014 | Commissioner, Collegiate Commission on Interpreter Education (CCIE); Secretary 2012-2014) |

2006-pres   Member of the Advisory Board of the National Cued Speech Association
2005-2006   Member of committee developing a Medical Interpreting Curriculum for spoken and signed language interpreters in Maine (USM, UNE, Catholic Charities, Maine Medical Center, Office of Immigrant and Multicultural Services, LANA (Language Access for New Americans, AHEC (Area Health Education Center), etc.
2010-pres   Founding member of Independence Without Fear, Maine's Support Service Provider Project, The Iris Network, Portland, ME.  Approved Support Service Provider 2010-present. SSP/DB Interpreting Evaluator 2012-pres.)
2011-2015   Volunteer SSP and Deaf Blind Interpreter, Deaf Blind Retreat, Seabeck, WA.
2017   Consulting Expert for the Certificate in Healthcare Interpreting Written Test

**Reviewing:**
**Editorial Board:** *Discourse Processes (1987-1991), Behavioral and Brain Sciences, Psycholoquy* (linguistics, psycholinguistics, sign language)
**Granting Agencies:** National Science Foundation, NIH--National Institute of Neurological Disorders and Stroke (grant evaluator, site visitor, ad hoc representative to Evaluation Committee B); National Institute on Deafness and Other Communication Disorders (grant evaluator--small grants; review panel; site visitor for Center Grants), American Association of University Women (pre-doctoral fellowships);Australian Research Council, Department of Employment, Education and Training, Large Research Grants Program; Engineering and Research Council Grants (England); Research and Scholarship Development Fund (Northeastern); The Wellcome Trust (England); Scientific Research Foundation (China).
**Journals:** *Cognition, Computational Linguistics, Journal of Speech and Hearing Disorders, Natural Language and Linguistic Theory, Journal of Phonetics, Language, International Journal of Sign Language Research, Restorative Neurology and Neuroscience, Phonology Yearbook, Journal of Pragmatics, Brain and Language, Journal of Cognitive Neuroscience, Current Anthropology, Journal of Linguistics, Neuropsychologia, Brain and Cognition, Journal of Interpreting.*
**Publishers:** McGraw Hill, MIT Press, Harper and Row, National Textbook Company, Oxford University Press, Cambridge University Press
**Conferences:** BU Language Development Conference, North Eastern Linguistic Society, MIT Student Conference in Linguistics, Theoretical Issues in Sign Language Research, TENNET (Theoretical and Experimental Neuropsychology), Evolution of Language Conference, West Coast Conference on Formal Linguistics (WCCFL), Linguistic Society of America
**Conference Organizing:** 1977 Coordinator of the Seventh Annual Meeting of the North Eastern Linguistics Society, Cambridge, MA 1978 Coordinator of the M.I.T. Symposium on Sign Language Linguistics, Cambridge, MA 1979 Local arrangements committee for the winter meetings of the Linguistic Society of America, Boston, MA 1981-82 Symposium on American Sign Language sponsored by the Sign Language Programs, Northeastern University, Boston, MA (May, 1982). 1986-87 Conference on Linguistics in the Undergraduate Curriculum, Princeton University, March 1987. 1996-pres. Program Committee, TENNET (Theoretical and Experimental Neuropsychology) conference, Montreal 1999-2000 Advisor to the program committee for the 2000 annual meeting of the Linguistic Society of America; *Beyond the Standards*, Advanced Interpreter Training and Standards for Legal Interpreters (2007-2008: Nov. 9-11, Jan. 26-27, March 28-30, May 30-June 1, co-organizer with Denise Martinez)

**Current Membership in Professional Organizations:** Linguistics Society of America, American Psychological Society, Academy of Aphasia, Society for Neuroscience, Cognitive Neuroscience Society, International Society for Women in Cognitive Neuroscience, American Association for the Advancement of Science, National Registry of Interpreters for the Deaf, Maine Registry of Interpreters for the Deaf, American Sign Language Teachers Association, National Association of the Deaf, Conference of Interpreter Trainers, Mano a Mano (Trilingual Interpreters); NAOBI (National Alliance of Black Interpreter, WASLI (World Association of Sign Language Interpreters); Member NCIHC (National Council on Interpreting in Health Care); Member IMIA (International Medical Interpreters Association), Collegiate Commission on Interpreter Education (2006-present;

SSR evaluator; site visitor).

**Positions held:**
**Interpreting**--Vice President of the Massachusetts Registry of Interpreters for the Deaf (1981-82) and Chairperson of the Interpreter Evaluation Committee (1981-83), Local Test Administrator (1999-pres.), Coordinator of Regional Testing Supersite for the National Testing System of RID (2000-pres.); NJ Registry of Interpreters for the Deaf (1992-93; Chairperson of ByLaws Committee, 1994-96); Region I Representative to the Council of Interpreter Trainers; member of the professional standards committee (2002-2003); Chairperson of the Standards Committee (2003-2004); CIT-CCIE Committee on Collegiate Interpreter Education Work Group (for development of national accreditation for interpreter training programs) (2004-2006); CCIE Commission on Collegiate Interpreter Education (2008-2014;  SSR rater and site visitor); Maine Registry of Interpreters for the Deaf (President elect May 2010-2012).
**Linguistics**--appointed 1993-2000 by the Executive Committee of the Linguistics Society of America to be on the Advisory Committee on Social and Political Concerns; Member at Large, Section Z for the American Association for the Advancement of Science (AAAS), elected 2003-2008)
**Neuropsychology**--TENNET (Theoretical and Experimental Neuropsychology Conference, program committee (appointed 1996); Academy of Aphasia, membership committee (appointed 1994-1997)


**Administration:**

| | |
|---|---|
| 1974-75 | Brown University Student Representative to the Linguistics Department |
| 1976-77 | Massachusetts Institute of Technology Student Representative to the Linguistics Department |
| 1978-81 | Hampshire College |

1978-79 Five College Linguistics Committee (Hampshire College Rep.),
        Educational Studies Committee, Academic Advisor
1979-80 Five College Linguistics Committee, Educational Studies
        Committee, Academic
        Advisor, Chairperson of Linguistics Position Search
        Committee, College Senate
1980-81 Five College Linguistics Committee, Academic Advisor,
        College Senate, Affiliated
        Faculty in Cognitive Science Program, U Mass, Amherst

| | |
|---|---|
| 1981-85 | Northeastern University |
| 1981-82 | College Council, Linguistics Program Committee, Undergraduate Advisor (Psychology), Graduate Admissions Committee (Psychology), Chairperson of Cognitive Psychology Position Search Committee |
| 1982-83 | College Council, Linguistics Program Committee, Director of the Undergraduate Linguistics Program, Undergraduate Linguistics Advisor, Undergraduate Curriculum Committee (Psychology), Academic Advisor (psychology) |
| 1983-84 | Graduate Admissions Committee (Psychology), Linguistics Program Committee, Academic Advisor (Psychology)1984-85 Coordinator of the Psychology Colloquium Series, Linguistics Program Committee 1985-86 Linguistics Program Committee, Undergraduate Curriculum Committee (psychology), College Honors Committee (elected position) |

1987-88 Princeton University
        1987-88 Cognitive Science Committee, Linguistics Program Committee

1988-90 Swarthmore College 1988-90 Linguistics Program Committee 1989-90 Academic Advisor (linguistics), Director of Phonetics Laboratory and American Sign Language Laboratory, Linguistics Search Committee, Developmental Psychology Search Committee, Computer Science Search Committee

1986-pres. Nicaraguan Sign Language Projects, Inc.  Director of Project, President of the Board of Trustees. Supervision of Postdoctoral Fellow: Dr. Romy Spitz (Cognitive development in Nicaraguan home signers; University of Southern Maine, 1998-2000). Research Supervisor: Ann Senghas (1990-pres.; Doctoral dissertation, M.I.T., 1995); Richard Senghas (1991-pres.; Master's Thesis, anthropology, (1992); Doctoral Dissertation, Anthropology, Univ. of Rochester, expected 1997); Jane D'Alonzo (Senior Thesis, Linguistics; 1989); Cynthia Norman (Senior Thesis, Northeastern Univ.; 1988); Independent Studies: Ute Fischer, Princeton Univ. (1987); Josep Fontana, Megan Moser, linguistics, Univ. of Pennsylvania (1988); Katharine Hind, anthropology, Univ. of Edinburg (1988); Gayla Iwata, linguistics (1989-90), Alice Turk, Princeton Univ. (1989); Gene Mirus, anthropology, Univ. of Texas, Austin (1994-95); Gary Morgan, linguistics, Univ. of Bristol, UK (1995), Jill Morford, psychology, McGill University, CA (1995), Darline Clark, Deaf Action Committee for SignWriting (1996); Rodolfo Celis, linguistics,University of Chicago (1996); Jennifer Doscher, The Learning Studio (1996); Janice Vasquez, linguistics, California State University at Dominguez Hills (1996-1997; Master's Thesis, English (TESL), "Literacy in Nicaraguan Sign Language: Assessing Word Recognition Skills at Escuelita de Bluefields (1997) ).

**1998-pres. University of Southern Maine**

1998-pres.  Director, Signed Language Research Laboratory and Coordinator of the ASL/English Interpreting Track of Linguistics major, Academic Advisor to students in the ASL/English Interpreting Track; Practicum and Internship Supervisor for placements of advanced interpreting students

1999-2003;  Curriculum Review Committee, College of Arts and Sciences
2007-2011.

2005-2006  USM representative to interagency committee to develop a Medical Interpreting Program for signed and spoken language interpreters in Maine

2010-2011  Faculty Senate, Proxy for Peter Aicher, College of Arts and Science

2011-2017  Faculty Senate, School of Science, Technology and Health (CSTH)

2011-2013  Faculty Ambassador, Center for Educational Technology

2019-pres  Patient Safety Committee

2019-pres  Committee on Medical Simulations with School of Nursing

**Service to the State of Maine (legislative appointments):**

1999-2002 Member of the Maine Educational Assessment Advisory Committee

2000-2003 Member of the Needs Assessment Team for the Governor Baxter School for the Deaf

2010-pres USM representative to the Organizing Committee for Independence without Fear (Service Support Provider Program for Deaf-Blind and dual sensory impaired individuals in Maine in collaboration with The Division of the Deaf , Hard of Hearing and Late Deafened; The Division of the Blind and Visually Impaired, The Iris Network, and the Helen Keller National Center.

2011-pres Commissioner, Division of the Deaf, Hard of Hearing and Late Deafened (Dept. of Labor)

**Service to the Community:**

1998-2001 Member of the Deaf Advocates Group (DAG) in the capacity of a service provider in interpreter training

2001-pres. Member of the Deaf Resources Group (DRG) in the capacity of a service provide in interpreter training

2003-pres. Member of the Legal Interpreting Committee (Maine)

2010-2012  President, Maine Registry of Interpreters for the Deaf; 2012-pres. Chair of the Professional Development Committee)

**National Service:**
1999-2020   Supersite director for RID and EIPA Testing; RID LTA
2006-pres   Rater/Site Visitor for CCIE Accreditation (have not has assignments since 2014)
2010-2014   Commissioner, Collegiate Commission on Interpreter Education
2020-pres   Member, Registry Interpreters for the Deaf SC:L Task Force (to determine new credentialing for Legal Interpreters.

**International Service:**
1995-pres. Coordination and funding of educational programs for Deaf individuals in Nicaragua
2009-2020   Advisor to Congressman Urtecho (to 2009), Peru and to programs supporting Deaf Peruvian Signers in Peru

<u>**Publications:**</u>

**Articles in Refereed Journals (32)**

1.   Kegl, J.A. and N. Chinchor. 1975. A Frame analysis of American Sign Language. *American Journal of Computational Linguistics*, Microfiche 35. pp. 84-96.

2.   Gee, J. and J.A. Kegl. 1982. Semantic Perspicuity and the Locative Hypothesis: Implications for Acquisition. *Journal of Education*, vol.164, no. 2, pp. 185-209.

3.   Gee, J. and J.A. Kegl. 1983. Narrative/Story Structure, Pausing and American Sign Language. *Discourse Processes*, vol. 6, pp. 243-258.

4.   Rimor, M., J.A. Kegl, T. Schermer and H. Lane. 1984. "Natural Phonetic Processes Underlie Historical Change and Register Variation in American Sign Language." *Sign Language Studies*, vol. 43, pp. 97-119.

5.   Atkins, B., J. Kegl and B. Levin. 1988. Anatomy of a Verb Entry: From Linguistic Theory to Lexicographic Practice. *International Journal of Lexicography*, vol. 1.1. pp. 84-125. [Reprinted in. Zampolli, A., N. Calzolari, and M. Palmer (eds.) (1994) *Current Issues in Computational Linguistics: In Honor of Donald Walker*. Special issue of *Linguistica Computazionale*, vol. 9., no. 10, pp. 237-266.

6.   Miller, G. A., C. Fellbaum, J. Kegl and K. Miller. (1988) WORDNET: An Electronic Lexical Reference System Based on Theories of Lexical Memory. *Revue Quebecoise de Linguistique*, vol. 17, no. 2, pp. 181-211. [Also appears as Cognitive Science Technical Report 11, Cognitive Science Laboratory, Princeton University.]

7.   Poizner, H. and J. Kegl. (1992). The Neural Basis of Language and Motor Behavior: Perspectives from American Sign Language. *Aphasiology*, vol. 6, pp. 219-256.

8.   Aarons, D., B. Bahan, J. Kegl, and C. Neidle. (1992) Clausal Structure and a Tier for Grammatical Marking in American Sign Language. *Nordic Journal of Linguistics,* vol. 15, no. 2, pp. 103-142.

9.   Brentari, D., H. Poizner, and J. Kegl. 1995. Aphasia and Parkinsonian Signing: Differences in Phonological Disruption, *Brain and Language,* vol. 48, no. 1, 69-105.

10.   Kegl, J. 1995. Levels of Representation and Units of Access Relevant to Agrammatism. *Brain and Language,* 50, 151-200.

11.   Loew, R., J. Kegl, and H. Poizner. 1995. Flattening of Distinctions in a Parkinsonian Signer.

*Aphasiology.* 9(4), pp. 381-396.

12.   Shepard-Kegl, J., C. Neidle, and J. Kegl. 1995. Legal Ramifications of an Incorrect Analysis of Tense in ASL. *Journal of Interpretation*, vol. 7, no. 1, pp. 53-70. (Special Issue on the Bilingual/Bimodal Courtroom)

13.   Kegl, J., Neidle, C., MacLaughlin, D., Hoza, J., and Bahan, B. 1996. The Case for Grammar, Order, and Position in ASL: A Reply to Bouchard and Dubuisson. *Sign Language Studies*, vol. 90, no. 1, pp. 1-23.

14.   Kegl, J. and H. Poizner. 1997. Crosslinguistic/Crossmodal Syntactic Consequences of Left-Hemisphere Damage: Evidence from an Aphasic Signer and his Identical Twin. *Aphasiology*, vol. 11, no. 1, pp. 1-37.

15.   Loew, R., J. Kegl, and H. Poizner. 1997. Fractionation of the Components of Roleplay in a Right-Lesioned Signer. *Aphasiology*, vol. 11, no. 3., 263-281.

16.   Kegl, J. and H. Poizner. 1998. Shifting the Burden to the Interlocutor: Compensation for Pragmatic Deficits in Signers with Parkinson's Disease, *Journal of Neurolinguistics*, vol. 11, nos. 1/2, pp. 137-152.

17.   Neidle, C., B. Bahan, D. MacLaughlin, R.G. Lee, and J. Kegl 1998. Realizations of Syntactic Agreement in American Sign Language: Similarities between the Clause and the Noun Phrase. *Studia Linguistica*. vol. 52, no. 3, pp. 191-226.

18.   Baynes, K., Kegl, J., Brentari, D., Kussmaul, C. and Poizner, H. 1998. Chronic Auditory Agnosia Following Landau-Kleffner Syndrome: A 23 Year Outcome Study. *Brain and Language*, vol. 63, 381-425.

19.   Bahan, B., J. Kegl, R.G. Lee, D. MacLaughlin, and C. Neidle. 2000. The Licensing of Null Arguments in American Sign Language. *Linguistic Inquiry*, pp. 1-27.

20.   Tyrone, M., Kegl, J. and Poizner, H. 1999. Deficits in Coordination in Deaf Signers with Parkinson's Disease. *Neuropsychologia*, vol. 37, no. 11, 1271-1284.

21.   Kegl, J. , Cohen, H., and Poizner, H. 1999. Articulatory Consequences of Parkinson's Disease: Perspectives from Two Modalities. In Cohen, H. and Kegl, J. (eds.), Special Issue on Subcortical Mechanisms in Language and Cognition, *Brain and Cognition*, vol. 40, no. 2, 355-386. .

22.   Neidle, C., D. MacLaughlin, R.G. Lee, B. Bahan, and J. Kegl 1999. Wh-Questions in ASL: A Case for Rightward Movement. *Language*. 74, pp. 819-831.

23.   Spitz, R.V. and Kegl, J. (accepted with revisions). Memory and Visuospatial Analysis with and without Language: Lessons from Homesigners in Nicaragua. *Neuropsychologia*. Decided not to resubmit and are preparing the manuscript for submission to the Journal of the International Neuropsychological Society (JINS)

24.   Kegl, J. 2003.  Pronominalization in American Sign Language.  *Sign language and linguistics* vol, 6, no. 2, pp. 245-265.

25.   Kegl, J. 2004.  Relational grammar and American Sign Language: Author's Preface. Sign language and linguistics vol. 7, no. 2,  p. 129.

26.     Kegl, J. 2004.  Relational grammar and American Sign Language. In: *Sign language and linguistics* vol. 7, no. 2, pp. 131-170.

27.     Kegl, Judy: ASL Syntax: research in progress and proposed research: Author's Preface. In: *Sign language and linguistics* 7: 2 (2004) - pp. 171-172.

28.     Kegl, Judy: ASL Syntax: Research in progress and proposed research. In: *Sign language and linguistics* 7: 2 (2004) - pp. 173-206.

29.     Grossman, R. B. and Kegl, J. 2006. To Capture a Face:  A Novel Technique for the Analysis and Quantification of Facial Expressions in American Sign Language. *Sign Language Studies*, vol. 6. no. 3, pp. 273-305.

30.     Grossman, R.B., and Kegl, J. (2007) Moving Faces: Categorization of Dynamic Facial Expressions in American Sign Language by Deaf and Hearing Subjects. *Journal of Nonverbal Behavior*, vol. 31., no. 1, pp. 23-38.

31.     Krause, J., Kegl, J., and Schick, B. (2008) Toward Extending the Educational Interpreter Performance Assessment to Cued Speech. *Journal of Deaf Studies and Deaf Education*, vol. 13, no. 3, pp. 432-450.

32.     Morgan, G. and Kegl, J. (2006) Nicaraguan Sign Language and Theory of Mind: The Issue of Critical Periods and Abilities. *Journal of Child Psychology and Psychiatry*, vol. 47, no. 8, pp. 811-819.

33.     Macnamara, B., Moore, A.B., Kegl, J, and Conway, A.R.A. (2011). Domain-general cognitive abilities and interpreter skill production. In Schlesinger, M. and Pöchhacker, F. (eds.). *Interpreting: International Journal of Research and Practice in Interpreting*, vol. 13, no. 1.

**Edited journal issues refereed (1):**
34.     Cohen, H. and Kegl, J. 1999. The Contribution of Subcortical Structures in Cognition and Language. In Cohen, H. and Kegl, J. (eds.), Special Issue on Subcortical Mechanisms in Language and Cognition, *Brain and Cognition,* vol. 40, no. 2, pp. 287-288.

35.     Turner, G and Kegl, J. (eds.). 1995. Special Issue on the Bilingual/Bimodal Courtroom, *Journal of Interpretation*, vol. 7, no. 1.


**Published Abstracts and Short Papers refereed (10)**

In journals:

35.     Kegl, J. and H. Poizner. 1991. The Interplay Between Linguistic and Spatial Processing in a Right-Lesioned Signer. *Journal of Clinical and Experimental Neuropsychology*, 13, 38-39.

36.     Carrithers, C., M. Jack, and J. Kegl. 1995. Access to Argument Structure in Agrammatism: Evidence from On-Line Tasks, *Brain and Cognition*, 28, July-August.

37.     Kegl, J. and M. Jack. 1995. The Resilience of Copular Constructions in Aphasic Speech,*Language and Cognition*, 28, July-August

38.     Kegl, J., R. Gilmore, E. Fennell, D. Bowers, H. Poizner, and K. Heilman. (in press) Wada Testing of a Deaf, Left-handed, ASL Signer Reveals Right Dominance for Language. *Journal of the International Neuropsychological Society*.

39.     Kegl, J. 1995. Levels of Representation and Units of Access Relevant to Agrammatism. *Brain and Cognition,* 28 (1), June. [abstract]

40.     Baynes, K, Brentari, D. and Kegl, J. 1995. Chronic Language Impairment Following Landau-Kleffner Syndrome: A Case Study. In *Journal of the International Neuropsychological Society,* volume 1, no. 2, pg. 152. [abstract]

41.     Kegl, J. 1995. Three-place predicates in aphasic narrative production. *Brain and Language,* vol. 51, no. 1, October 1995, pp. 122-124. . [abstract]

42.     Kegl, J. Gilmore, R.L., Leonard,C. , Bowers, D. Fennell, E. Roper, S.N. , Trowbridge, P., Poizner, H. and Heilman, K.M. (in press) Wada and Functional Cortical Mapping of a Deaf Signer of ASL, Right Dominant for Signed and Spoken Language. *International Journal of Neuroscience.* [abstract]

43.     Kegl, J., R. Gilmore, C. Leonard, D. Bowers, E. Fennell, S.N. Roper, P. Trowbridge, H. Poizner, and K. M. Heilman. 1996. Lateralization and Intrahemispheric Localization Studies of a Familially Left-handed, Deaf, Epileptic Signer of American Sign Language, *Brain and Cognition, 32,* (2) 96, 335-338. [short paper]

44.     Kegl, J., K. Baynes, D. Brentari, and H. Poizner. 1996. Landau-Kleffner Syndrome: Modality Independence of Linguistic Competence. *Society for Neuroscience 26th Annual Meeting: Abstracts. Part 1,* pg. 184.

45.     Kegl, J. and Poizner, H. 1998. Losing Face: Differential Breakdown in the Production of Facial Expressions Society for Neuroscience, Session 160.9 Basal Ganglia: Clinical Disorders and Models. *Society for Neuroscience 28th Annual Meeting: Abstracts. Part 1.*

**Invited Journal Articles (5):**

46.     Kegl, J. 1994. Conference Report: Linguistic Society of America Meeting, January 6-9, 1994. *Signpost.* vol.7, no. 1, Spring, pp. 62-66.

47.     Kegl, J. 1994. The Nicaraguan Sign Language Project: An Overview. *Signpost.* vol.7, no. 1, Spring, pp. 24-31.

48.     Senghas, R., and J. Kegl. 1994a. Social Considerations in the Emergence of Idioma de Signos Nicaragüense (Nicaraguan Sign Language). *Signpost.* vol.7, no. 1, Spring, pp. 40-46.

49.     Senghas, R., and J. Kegl. 1994b. Soziale Gesichtspunkte bei der Herausbildung der Nicaraguanishen Gebärdensprache. *Das Zeichen,* no. 29, September, pp. 288-293. [German translation of Senghas and Kegl (1994a)]

50.     Kegl, J., McKinley, F. and Reynolds, D. 2005. The Role of Deaf interpreters: Lessons from the past and a vision for the future. *Interpres*. vol. 18, no. 4, pp. 16-18.

**Books (3)**

51.     Kegl, J. A. (1985) *Locative Relations in American Sign Language Word Formation, Syntax, and Discourse*. MIT Working Papers in Linguistics, Cambridge, MA.

52.     Neidle, C., Kegl, J., MacLaughlin, D., Bahan, B., and Lee, R.G. 2000. *The Syntax of American Sign Language: Functional Categories and Hierarchical Structure*. Cambridge, MA: The MIT Press.

53.     Shepard-Kegl, J. M. , Vega, B. J., and Kegl, J. *Nicaraguan Sign Language Handbook*.  (2013; revised 2014; Second Edition 2017); Third Edition 2018.  North Yarmouth, ME: Nicaraguan Sign Language Projects, Inc.

**Edited volumes (3):**

53.     Kegl, J., D. Nash and A. Zaenen (eds.) 1977. *Proceedings of the Seventh Annual Meeting of the North Eastern Linguistics Society*. Cambridge, Mass.: North Eastern Linguistics Society.

54.     Freidin, R, J. Kegl, and K. Miller (eds.) 1988. *Linguistics in the Undergraduate Curriculum*, CSL Report 17, Cognitive Science Laboratory, Princeton University, Princeton, NJ.

**55.**     Napoli, D.J. and J. A. Kegl (eds.) 1991. *Bridges between Psychology and Linguistics: A Swarthmore Festschrift for Lila Gleitman*. Hillsdale, NJ: Lawrence Erlbaum Associates.


**Articles in Edited Volumes (30)**

56.     Chinchor, N., J. Forman, F. Grosjean, M. Hajjar, J. Kegl, E. Lentz and R. Wilbur. 1976. Sign Language Research and Linguistic Universals. In *University of Massachusetts Occasional Papers in Linguistics*. Amherst, MA: Graduate Linguistic Student Association, pp. 70-94.

57.     Kegl, J.A. 1986. "Clitics in American Sign Language." In H. Borer, ed., *The Syntax of Pronominal Clitics*. New York: Academic Press, pp. 285-309.

58.     Kegl, J.A. and J. White Eagle. 1986. "Plains Indian Sign Language." In S.P. Parker, ed., *Gallaudet Encyclopedia of Deaf People and Deafness.* New York: McGraw Hill Book Company, pp. 97-100.

59.     Kegl, J.A. 1987. "Coreference Relations in American Sign Language." In B. Lust, ed., *Studies in the Acquisition of Anaphora: Applying the Constraints, Volume 2,* pp. 135-170. Dordrecht: D. Reidel Company.

60.     Kegl, J. A. 1988. "Extending a Linguistics Curriculum without Overextending the Faculty." In Freidin, R, J. Kegl, and K. Miller, eds., *Linguistics in the Undergraduate Curriculum*, CSL Report, Cognitive Science Laboratory, Princeton University, Princeton, NJ, pp. 95-106.

61.     Kegl, J. 1989 "The Boundary between Word Knowledge and World Knowledge." Y. Wilks, ed., *Theoretical Issues in Natural Language Processing.* Hillsdale, NJ: Lawrence Erlbaum, pp. 22-27.

62.     Kegl, J. 1990. "Predicate Argument Structure and Verb Class Organization in the ASL Lexicon." In C. Lucas, ed., *Theoretical Issues in ASL Linguistics*. Washington, D. C.: Gallaudet University Press, pp. 149-175.

63.     Poizner, H. and J. Kegl. 1993. Neural Disorders of the Linguistic Use of Space and Movement. In Tallal, P., Galaburda, A.M., Llinas, R., and von Euler, C. (Eds.), *Temporal Information Processing in the Nervous System: Special Reference to Dyslexia and Dysphasia.* Series: Annals of the New York Academy of Sciences. New York: The New York Academy of Sciences, vol. 682, pp. 192-213.

64.     Aarons, D., B. Bahan, J. Kegl, and C. Neidle. 1995. Lexical Tense Markers in American Sign Language. In Emmorey, K. and J. Reilly (Eds.) *Language Gesture and Space*. Hillside, NJ: Lawrence Erlbaum Assoc., pp. 225-254.

65.     Kegl, J. 1995. Language and the Brain: For Interpreters. In Wilcox, P., Bybee, J. and Wilcox, S., (eds.), *Linguistic Training of Signed Language Interpreters Manual*. Department of Linguistics, The University of New Mexico, Albuquerque, pp. 11-18.

66.     Kegl, J.A. 1995. Machine-Readable Dictionaries and Education. In D. Walker, A. Zampolli and N. Calzolari, (eds.), *Automating the Lexicon: Research and Practice in a Multilingual Environment*. Oxford: Oxford University Press, pp. 249-284.

67.     Shepard-Kegl, J. A. 1997. Prólogo. In Lopez Gomez, J.J., Peréz Castellon, A. M., Rivera Rostrán, J. M., and Baltodano Baltodano, J.F., (eds.), *Diccionario del Idioma de Señas de Nicaragua*. Managua: Asociación Nacional se Sordos de Nicaragua (ANSNIC), pp. ix-xi.

68.     Neidle, C., J. Kegl, B. Bahan, D. Aarons, and D. MacLaughlin. 1997. Rightward Wh-Movement in American Sign Language. In Beerman, H., Le Blanc, D., and D. Van Riemsdijk , (eds.), *Rightward Movement*. Philadelphia, PA: John Benjamins, pp. 247-278.

69.     Kegl, J. and H. Poizner. 1998. Shifting the Burden to the Interlocutor: Compensation for Pragmatic Deficits in Signers with Parkinson's Disease. In Paradis, M., (ed*.), Pragmatics in Neurogenic Communication Disorders*. Oxford, Pergamon Press, pp. 137-152.

70.     Kegl, J., A. Senghas, and M. Coppola. 1999. Creation through Contact: Sign Language Emergence and Sign Language Change in Nicaragua. In M. DeGraff, ed., *Language Contact and Language Change: The Intersection of Language Acquisition, Creole Genesis, and Diachronic Syntax*. Cambridge, MA: MIT Press, pp. 179-237.

71.     Morford, J. P. & Kegl, J. 2000. Gestural precursors of linguistic constructs: How input shapes the form of language. In D. McNeill (Ed.), *Language and Gesture*. Cambridge: Cambridge University Press, pp. 358-387.

72.     Poizner, H., Brentari, D., Tyrone, M. and Kegl, J. 2000. The Structure of Language as Motor Behavior: Clues from Signers with Parkinson's Disease. In K. Emmorey and H. Lane, (eds.), *The Signs of Language Revisited: An Anthology in Honor of Ursula Bellugi and Edward Klima*. Mahwah, NJ: Erlbaum Publishers, pp.509-532.

73.     Kegl, J. 2002. Language Emergence in a Language-Ready Brain: Acquisition Issues. In Morgan, G. and Woll, B., *Language Acquisition in Signed Languages*. Cambridge University Press, pp. 207-254.

74.     Kegl, J. 2004.  Language Emergence in a Language-Ready Brain: Acquisition Issues. In Jenkins, Lyle, (ed), *Biolinguistics and the Evolution of Language*. John Benjamins.

75.     Kegl, J. (2006). ¿Qué es el Idioma de Señas de Nicaragua?  [What is Nicaraguan Sign Language?] In A. Senghas and D. Roman, (Eds.), *La Comunidad Sorda de Nicaragua y su Idioma: Lo que hemos Aprendido de ellos*. [The Nicaraguan Deaf Community and its Language: What we have learned from them.]  London/Managua: Leonard Cheshire International.

76.     Kegl, J. (2008) The Case of Signed Languages in the Context of Pidgin and Creole Studies.  In Singler, J. and Kouwenberg, S., (eds.), *The Handbook of Pidgin and Creole Studies*.  London:  Blackwell, pp. 491-511.

77.     Kegl, J. (in press). Pronominalization in American Sign Language. In Massone, M.I., (ed.), Gramatica de la Lengua de Señas [title tentative]. Buenos Aires: Edicial, S.A. [published in Spanish, not sure of status]

78.    Krause, J.C., Schick, B., Kegl, J.A. (2010) A version of the Educational Interpreter Performance Assessment for Cued Speech transliterators: Prospects and significance. In C.J. LaSasso, K.L. Crain, J. Leybaert (Eds.), *Cued Speech and Cued Language Development of Deaf Students*. San Diego, CA: Plural Publishing, Inc., pp. 531-552.

79.    Macnamara, B., Moore, A.B., Kegl, J, and Conway, A.R.A. (2014) *Domain-general cognitive abilities and interpreter skill production.* In Schlesinger, M. and Pöchhacker, F. (eds.), *Aptitude for Interpreting.* Benjamins Current Topics Series.   Amsterdam: John Benjamins Publishing.

80.    Kegl, J. (2018) Sign Language Acquisition: Input. In Fernández, E. M. Cairns, H. S., eds. *Handbook of Psycholinguistics.* Hoboken, NJ: Wiley-Blackwell, pp, 674-704.

81.    Spitz, R. and Kegl, J. (2018) Enhancing Communication Skills in Persons with Severe Language Deprivation: Lesson learned from the rise of a signing community in Nicaragua.  In Glickman, N. (eds.), *Language Deprivation and Mental Health Care*. New York: Routledge.

**Encyclopedia entries (4)**

82.    Kegl, J.  2005. Goodglass, Harold (1920-2002) In *Encyclopedia of Language and Linguistics*, vol. 7, Jankowsky, K. (ed.), Biographies. 2nd Ed., ed. Keith Brown. Oxford: Elsevier, pp. 103-104.

83.    Kegl, J.  2005. Partee, Barbara H.  (b. 1940) In *Encyclopedia of Language and Linguistics*, vol. 7, Jankowsky, K. (ed.), Biographies. 2nd Ed., ed. Keith Brown. Oxford: Elsevier, 209-210.

84.    Kegl, J.  2005. Hale, Kenneth L. (1934-2001) In *Encyclopedia of Language and Linguistics*, vol. 7, Jankowsky, K. (ed.), Biographies. 2nd Ed., ed. Keith Brown. Oxford: Elsevier, 192-193.

85.    Kegl, J.  2005. Hahn, Adelaide E.  (1893-1967) In *Encyclopedia of Language and Linguistics*, vol. 7, Jankowsky, K. (ed.), Biographies. 2nd Ed., ed. Keith Brown. Oxford: Elsevier, p. 191.

86.    Kegl, J. (in press, 2021) Language Emergence. In Stanlaw, James, et al., eds. *The International Encyclopedia of Linguistic Anthropology*. 3 vols. Malden, MA: Wiley-Blackwell.

87.    Kegl, J. (in press, 2021) Unique Features of Human Language. In Stanlaw, James, et al., eds. *The International Encyclopedia of Linguistic Anthropology*. 3 vols. Malden, MA: Wiley-Blackwell.

**Articles in Conference Proceedings (13)**

88.    Kegl, J.A. and R. Wilbur. 1976. "When Does Structure Stop and Style Begin? Syntax, Morphology and Phonology vs. Stylistic Variation in American Sign Language." In Mufwene, Walker and Steever, eds.. *Papers from the Twelfth Regional Meeting of the Chicago Linguistics Society*. Chicago, Illinois: University of Chicago Press, pp. 376-396.

89.    Gee, J. and J.A. Kegl. 1982. "Semantic Perspicuity and the Locative Hypothesis." In Macaulay, et al., eds. *Proceedings of the Eighth Annual Meeting of the Berkeley Linguistics Society*. Berkeley, California, pp. 335-353.

90.    Kegl, J.A. 1985. "Causative Marking and the Construal of Agency in American Sign Language." In I.W. Eilfort, P.D. Kroeber and K.L. Peterson, eds.. *CLS 21, Part 2: Papers from the Parasession on Causatives and Agentivity*. Chicago, Illinois: Chicago Linguistic Society, pp. 120-137.

91.    Kegl, J. and S. Schley. 1986. "When Is a Classifier No Longer a Classifier?" In N. Nikiforidou, M. Van Clay, M. Niepokuj and D. Feder, eds., *Proceedings of the Twelfth Annual Meeting of the Berkeley Linguistic Society*, Berkeley, Calif.: Berkeley Linguistics Society, pp. 425-441.

92.     Atkins, B.T., J. Kegl and B. Levin. 1986. "Explicit and Implicit Information in Dictionaries."
        In *Advances in Lexicology*, Proceedings of the Second Conference of the Center for the New
        OED, University of Waterloo, Waterloo, Ontario, November 9-11. [Revised versions appear
        as Cognitive Science Technical Report 5, Cognitive Science Laboratory, Princeton University
        and Lexicon Project Working Papers 12, Center for Cognitive Science, MIT.]

93.     Kegl, J. 1987. "The Boundary Between World Knowledge and Word Knowledge." In Y. Wilks,
        *TINLAP3: Position Papers* (Theoretical Issues in Natural Language Processing-3). Morristown,
        NJ: Association for Computational Linguistics, pp. 28-33. [Also distributed as part of the
        series Memoranda in Computer and Cognitive Science, Computing Research Laboratory,
        New Mexico State University, Las Cruces, NM].

94.     Hanson, S.J. and J. Kegl. 1987. "PARSNIP: A Connectionist Network that Learns Natural
        Language Grammar from Natural Language Sentences." *Program of the Ninth Annual Meeting
        of the Cognitive Science Society*, Hillsdale, N.J.: Lawrence A. Erlbaum Associates, Inc. [Also a
        Technical Report at Bell Communications Research, Morristown, NJ.]

95.     Kegl, J. and C. Fellbaum. 1988. "Non-Canonical Argument Identification." H. Borer. ed.
        *Proceedings of the Seventh West Coast Conference on Formal Linguistics* [WCCFL VII],
        University of California at Irvine, pp. 187-202. [Also appears as CSL Report 25, Cognitive
        Science Laboratory, Princeton Univ.]

96.     Kegl, J. and C. Fellbaum. (1989). "An Analysis of Obligatory Adjuncts: Evidence from the
        Class of Measure Verbs." In *Proceedings of ESCOL '88* (Fifth Eastern States Conference on
        Linguistics), Ohio State University, Columbus, OH

97.     Kegl, J. and G. Iwata. 1989. Lenguaje de Signos Nicaragüense: A Pidgin Sheds Light on the
        "Creole?" ASL. In Carlson, R., S. DeLancey, S. Gildea, D. Payne, and A. Saxena, (eds.).
        *Proceedings of the Fourth Meetings of the Pacific Linguistics Conference*. Eugene, Oregon:
        Department of Linguistics, University of Oregon, pp. 266-294.

98.     Fellbaum, C. and Kegl, J. 1990. Taxonomic Structures and Cross-Category Linking in
        the Lexicon. In *Proceedings of ESCOL '89* (Sixth Eastern States Conference on
        Linguistics), Ohio State University, Columbus, OH.

99.     Miller, G. A., C. Fellbaum, J. Kegl and K. Miller. 1991. The Princeton Lexicon Project: A
        Report on WordNet. In T. Magay. ed., *BUDALEX '88 Proceedings*. Papers from the 3rd
        International Congress on Lexicography in Budapest, 4-9 September 1988. Tubingen:
        Niemeyer.

100.    Aarons, D., B. Bahan, J. Kegl, and C. Neidle. 1994. Subjects and Agreement in American Sign
        Language. In Ahlgren, I., B. Bergman, and M. Brennan, *Selected Proceedings of the Fifth
        International Symposium on Sign Language Research*. Durham, UK: International Sign
        Linguistics Association, pp. 13-28.

101.    Kegl, J. 1995. The Manifestation and Grammatical Analysis of Clitics in American Sign
        Language. In Dainora, A., Hemphill, R., Luka, B. and Need, B., and Parmigan, S. , (eds.),
        *Proceedings of the Thirty-First Annual Meeting of the Chicago Linguistics Society: Parasession on
        Clitics*. Chicago: Chicago Linguistic Society, pp. 140-167.

102.    Bahan, B., J. Kegl, D. MacLaughlin, and C. Neidle. 1995. Convergent Evidence for the
        Structure of Determiner Phrases in American Sign Language. In L. Gabriele, D.
        Hardison and R. Westmoreland (eds), FLSM VI, *Proceedings of the Sixth Annual Meeting
        of the Formal Linguistics Society of Mid-America, Volume Two*. Bloomington, IN: Indiana

University Linguistics Club Publications, 1-12.

103. Kegl, J. and J. McWhorter. 1997. Perspectives on an emerging language. *Proceedings of the Stanford Child Language Research Forum*. Palo Alto: Center for the Study of Language and Information, pp. 15-36.

104. Kegl, J. 2000. Is it soup yet? Or, When is it Language? In the *Proceedings of the Child Language Seminar* 1999. City University, London.


Technical Reports —lists only reports that have not appeared elsewhere (5)

105. Freidin, R, J. Kegl, and K. Miller, eds. 1988. *Linguistics in the Undergraduate Curriculum, CSL Report 17*, Cognitive Science Laboratory, Princeton University, Princeton, NJ.

106. Gross, D., J. Kegl, P. Gildea, and G. A. Miller. 1989. *A Coded Corpus and Commentary on Children's Dictionary Strategies. CSL Report 39*, Cognitive Science Laboratory, Princeton University, Princeton, NJ.

107. Lee, R.G., C. Neidle, D. MacLaughlin, B. Bahan, and J. Kegl (1997) Role Shift in ASL: A Syntactic Look at Direct Speech. In C. Neidle, D. MacLaughlin, and R.G. Lee (eds), *Syntactic Structure and Discourse Function: An Examination of Two Constructions in American Sign Language*. American Sign Language Linguistic Research Project Report No. 4, Boston University, Boston, MA. May 1997, 24-45.

108. Hoza, J., C. Neidle, D. MacLaughlin, J. Kegl, and B. Bahan (1997) A Unified Syntactic Account of Rhetorical Questions in American Sign Language. In C. Neidle, D. MacLaughlin, and R.G. Lee (eds), *Syntactic Structure and Discourse Function: An Examination of Two Constructions in American Sign Language*. American Sign Language Linguistic Research Project Report No. 4, Boston University, Boston, MA. May 1997, 1-23.

109. Neidle, C., MacLaughlin, D., Bahan, B., Lee, R., Kegl, J. (1997). *The SignStream™ Project*. Report No. 5. American Sign Language Research Project, Boston, MA.

110. Jean Krause, Judy Shepard-Kegl, and Brenda Schick (2006). *Educational Interpreter Performance Assessment - Cued Speech Pilot Test Training Manual*. EIPA Diagnostic Center, Boys Town National Research Hospital, Omaha, NE.

**Newsletter Articles (5)**

111. Shepard-Kegl, J. 1992. The National ASL Literature Conference: What an Experience. *NJRID Mediator: The Newsletter of the New Jersey Registry of Interpreters for the Deaf.* April issue. New Jersey Registry of Interpreters for the Deaf, Trenton, NJ. p. 10.

112. Kegl, J., H. Poizner, and T. Fuller. 1993. What Interpreters Should Know about Signers with Brain Damage. *NJRID Mediator: The Newsletter of the New Jersey Registry of Interpreters for the Deaf.* Spring issue. New Jersey Registry of Interpreters for the Deaf, Trenton, NJ.

113. Kegl, J. 1994. Research Focus: Language and Its Modalities of Expression. *International Society for Women in Neuroscience Newsletter*. Spring Issue, March.

114. Nolin, M. and Kegl, J.  2006. IMPORTANT Information for Educational Interpreters! *Issues @ Hand*, February, 2006, p. 11.

**Articles in the media about my research (sampling):**

Oettel, K. Kegl Preserves Nicaraguan Sign Language in 1st Dictionary, *Phoenix Features*. February 9, 1990.

Radetsky, P. Silence, Signs, and Wonder. *Discover*. August 1, 1994. [See page 68.]
(http://magazines.enews.com/magazines/discover/magtxt/gopher/1994/080194.6)

Purcell, J. Signing on in Nicaragua. *The Princeton Packet*, Lifestyle Section. May 19, 1995.

Marvin, Holly. 'Signing in Nicaragua': Bluefields Project Special Report, *Princeton Packet*, Lifestyle Section, vol. 211, no.72, September 8, 1995, pp. 1, 15A-17A, 22A.

Project Studies Birth of New Language, *Silent News*, July , 1995, pg. 10.

Brooks, Clark. A Language of Their Own, *San Diego Union Tribune*, Sunday Currents Section, March 17, 1996, pp. D1-D2.

Horgan, John. A Sign Is Born. *Scientific American*, vol. 273, no. 6, December, 1995, pp. 18-19.

Short, Lorraine. The Lab Report. *Hearing Health*, vol. 12, no.2., March-April, 1996, pg. 35.

Short, Lorraine. The Lab Report Update.... *Hearing Health*, vol. 12, no. 6., March-April, 1996, pg. 35.

Bär, Nora. Cómo nace el lenguaje. *La Nacion*, Science Section, February 17, 1996, pg. 8.

Glovin, Bill. In the Hands of Child. *Rutgers Magazine*, vol. 75, no. 1, Spring, 1996, pp. 24-31,44.

Fischer, Carol. Planning a Special Summer, Summit Independent Press, vol. 33, no. 28, April 3, 1996, pp. 1-2.

Kesterton, Michael. Social Studies: A Daily Miscellany of Information--A new language. *The Globe and Mail*, Facts and Arguments Section, Friday, August 9, 1996. [Canadian]

Matthews, Robert. Handmade by children: a new language--Innate Signs. *The Sunday Telegraph*, July 21, 1996.[British]

Howe, Michele. Signs of Empowerment. *Star Ledger*. Feature Article: Today Section. March 10, 1997, pp. 31-32.

Anda, Rune. En språkforskers spennende studium i Nicaragua. *Døves Tidsskrift*, vol. 16, 1997, pp. 11-14.

Glovin, Bill. Portrait: Talking Hands. *Brown Alumni Monthly Magazine*. March/April 1998, pp.46-47. (http://cgi-user.brown.edu/Administration/Brown_Alumni_Magazine/98/3-98/features/portrait.html)

Brownlee, Shannon. Cover Story: The Mystery of Language. U.S. News and World Report, June 15, 1998, vol. 124, no. 23, pp. 48-55.

Garber, Andrew. Maine/New England: Feature Article (Section B). Linguist to help fill deaf pupils' need. Maine Sunday Telegram, December 6, 1998, pp. 1B, 16B.

Bernstein, Charlie. Signing lab opens opportunities for deaf. *The Free Press*, vol. 31, Issue 9, November 1, 1999.

Osborne, Lawrence. A New Language is Born. *New York Times Sunday Magazine* , Section 6, October 24, 1999.

Breuer, Hubertus. Sprachwissenschaft: Linguistischer Urknall. *Der Spiegel*, Nr. 3, January 17, 2000, pp. 180182.

Rose, Marcy. 2003. After years of giving couple gets something in return. *Deaf Today*. (February 20, 2003).
http://www.deaftoday.com/news/archives/001629.html

Perez Solis, R.  2005. Reportaje Especial:  Hablando con Señas. [Special Report: They are speaking with signs] *La Prensa*. (January 16).  Also shorter electronic version available at: http://www-ni.laprensa.com.ni/cgi-bin/print.pl?id=nacionales-20050116-01

Kennedy, Sara. 2005.  Deaf Children in Nicaragua Teach Scientists about Language. Hands and Voices. http://www.handsandvoices.org/articles/misc/V8-2_nicaragua.htm

Hay varias lenguas de signos igual de complejas que las orales. [Interview with Judy Kegl" There are varias signed languages equal in complexity with spoken languages]  *Minoría Sorda*, May 31, 2005 [Correo digital de Alava, Basque Country, Spain.] (http://www.minoriasorda.com/modules.php?name=News&new_topic=9&pagenum=25), etc.

Rosenheck, Dan. 2018. Language: Signs and Wonders. The Economist. 1843 Magazine. (February/March). https://www.1843magazine.com/features/signs-and-wonders

**Radio and Television Programs:**

Warner, Justin. 1996. Science Update: The Birth of a Language in Nicaragua. *America in the Morning*. American Association for the Advancement of Science. (Radio interview with Dr. Judy Kegl, distributed to affiliates of the Mutual Broadcasting System, February, 1996. [radio]

Riley, Terry (director). 1996. The Birth of a Language: Programmes One and Two. *See, Hear*. British Broadcasting System. (Bryn Brooks, Terry Riley, directors). [TV]http://www.bbc.co.uk/education/progs/specneeds2.html

Bunting, Judith (director). "Silent Children, New Language." Horizon. British Broadcasting System. [TV] http://www.bbc.co.uk/horizon/96-97/silent.html (Also recently shown on the Discovery Channel)

Anna, Lorenzo (journalist), Borelli, C. (producer). "ISN: Birth of a Language" Superquark (RAI-channel 1). Spring 1998.

Channel 8 News, Portland. Wednesday, February 2, 5.p.m. [on the interpreting program at USM] Klein, Janet. [producer] *Birth of a Language*. Sixty Minutes II. April, 2000.

Nicolasen, Michelle. Human Evolution. Part 7 of an 8 part series on evolution will highlight our work on the emergence of Nicaraguan Sign Language. *Evolution: The Mind's Big Bang.* Nova. WGBH Boston Video. First aired September 28, 2000.

Ampie, Carlos. (in preparation) Nicaraguan Sign Language. *Esta Semana*. [A weekly TV news magazine in Nicaragua.]

Heebner, M. (under negociation) Made for TV Movie on the Nicaraguan Sign Language Research Project.

Mundt, T. *The Todd Mundt Show*, National Public Radio. Taped December 13, 2001.

Portland News, WMTW. Update on Interpreting Program and work in Nicaragua. March, 17, 2003.

Nicolasen, Michelle.  Human Evolution.  Part of an 8 part series on evolution will highlight our work on the emergence of Nicaraguan Sign Language.  *Nova*.  Aired January 2001. A five minute web documentary was also created: http://www.pbs.org/wgbh/evolution/library/07/2/l_072_04.html

Ampie, Carlos.  2005.  January.  Nicaraguan Sign Language.  *Esta Semana*. Interviewed by Carlos Mantica. January, 2005. Nicaraguan Sign Language. Interview. *Buenas Dias!, Nicaragua*. Canal Seis. Managua, Nicaragua.

Lanchin, Michael, Witness History, BBC World Service. *Nicaraguan's Deaf Children Invented a New Sign Language*. Film: https://www.bbc.co.uk/news/av/stories-51372265/how-nicaragua-s-deaf-children-invented-a-new-sign-language; Radio:  https://www.bbc.co.uk/programmes/w3csyx5h. February 6, 2020.

**Papers Presented (220):**

1975     A Frame Analysis of American Sign Language. Presented at the Thirteenth Annual Meeting of the Association for Computational Linguistics, Cambridge, Mass. (with N. Chinchor)

1976     Some Current Work on the Phonology and Syntax of ASL. Presented at the University of Massachusetts at Amherst, Linguistics Department. March. (with N. Chinchor)

         When does Structure Stop and Style Begin? Syntax, Morphology and Phonology in American Sign Language. Presented at the Twelfth Annual Meeting of the Chicago Linguistics Society. April. (with R. Wilbur)

         Sign Language Research and Linguistic Universals. Presented at the Summer Meeting of the Linguistics Society of America. Oswego, New York. August. (with N. Chinchor, J. Forman, F. Grosjean, M. Hajjar, E. Lentz and R. Wilbur)

         ASL Pronouns and Conditions on Their Use. Presented at the Summer Meeting of the Linguistics Society of America, Oswego, New York. August. (with E. Lentz and M. Philip)

1978     How Does a Linguist Study the Syntax of American Sign Language? Presented at Hampshire College, lecture for job interview. March.

         ASL Agreement. Presented at the M.I.T. Symposium on Sign Language Linguistics, M.I.T.. May.

1979     Classifiers and Verb Stems in ASL. Presented at the NATO Advanced Study Institute. Conference on Recent Developments in Language and Cognition: Sign Language Research (Session on Morphology). Audiologopedic Research Group, University of Copenhagen, Copenhagen, Denmark. August 21-29.

         Locative and Directional Verbs In ASL: Their Agreement. Presented at the NATO Advanced Study Institute. Conference on Recent Developments in Language and Cognition: Sign Language Research (Session on Morphology). Audiologopedic Research Group, University of Copenhagen, Copenhagen, Denmark. August 21-29.

1980     Series of Lectures on Research in Progress (5 lectures). Presented at the Salk Institute, American Sign Language Laboratory. La Jolla, California. January.

         The Structure of the ASL Verb. Presented at Northeastern University, Psychology Department Colloquium Series (lecture for job interview). February.

1981     Mind and Hand. Presented at M.I.T., January Term Lecture Series sponsored by the Language and Mind Program.

Sequential Phonology and Lexical Access Questions in American Sign Language. Presented to Seminar on Lexical Access, M.I.T.. February.

Sequential ASL Phonology: Infixation, Stress Subordination and Word Formation. Presented to the Research Lab of Electronics, Speech Group Lab Meeting, M.I.T.. February.

What Constitutes a Sign Event?: The Interactions of Movements and Locations in ASL Phonology and Morphology. Presented to the Language Work Group, First International Conference on Event Perception, University of Connecticut at Storrs. June.

Narrative/Story Structure, Pausing and ASL. Presentation at NWAVE X (New Ways of Analyzing Variation, Etc.), Tenth Annual Meeting, Philadelphia. October. (with James Gee)

1982     Semantic Perspicuity and the Locative Hypothesis. Presentation at the Eighth Annual Meeting of the Berkeley Linguistics Society. Berkeley, Calif. February. (with James Gee)

ASL Morphology: Implications for Acquisition. Presentation at the Boston University Colloquium Series. May. (with James Gee.)

The Role of Linguistics in ASL Teaching and Research. Workshop on the Language and Culture of Deaf Americans, Symposium on American Sign Language. Northeastern University. May.

A Linguistic and Stylistic Analysis of Narratives in ASL. Workshop on the Literature and Poetry Created by Deaf Artists, Symposium on American Sign Language. Northeastern University, May. (with James Gee and Bonnie Hughes)

1983     Semantic Perspicuity in ASL: Some Implications for Acquisition and Education. Presented to the Research Center on Education and Human Development, Gallaudet College. Washington, D.C.. March. (with James Gee)

Narrative and Discourse Structure in ASL. Presented in Gallaudet College Lecture Series. Washington, D.C.. March. (with James Gee)

Semantic Perspicuity and the Locative Hypothesis: Discussion of the Gee and Kegl paper by Ken Hale with a response by Kegl. Cognitive Science Seminar Series, Center for Cognitive Science, M.I.T.. April.

Semantic Perspicuity and the Locative Hypothesis. Presented at the Psychology Colloquium Series. Northeastern University. May.

ASL Structure: Towards a Theory of Abstract Case. Invited Paper. Eighth Annual Boston University Conference on Language Development. October. (with J. Gee)

Historical Change in the Laboratory: The Interaction between Phonetic Reduction, Stylistic Variation and Language Acquisition. Presented at the Eighth Annual Boston University Conference on Language Development. October. (with H. Lane, M. Rimor and T. Schermer)

Stylistic Variation vs. Historical Change in American Sign Language. Presented at NWAVE XI (New Ways of Analyzing Variation, Etc.), Eleventh Annual Meeting, Montreal. November. (with H. Lane and M. Rimor)

1984    An Independent Linking Account of Affrication, Gemination and Merger in English and Slovene. Presentation to the Research Lab of Electronics, Speech Group Lab Meeting, M.I.T..

1985    What's on the Tiers. Presented at the Lecture Series on Nonlinear Phonology for Non-Linguists. Research Lab of Electronics, M.I.T.. January.

Empty Categories in American Sign Language. Presentation at the Conference on the Nature of Empty Categories. M.I.T.. January.

The Acquisition of Locative Relations in American Sign Language. Presentation to the New England Child Language Association (NECLA). Northeastern University. February.

Session on Semantic Roles. Eastern Psychological Association Meetings. Session Chair. March.

Causative Marking and the Construal of Agency in American Sign Language. Presentation to the Twenty-First Annual Meeting of the Chicago Linguistics Society, Parasession on Causatives and Agentivity, University of Chicago. April.

The Mental Organization of Verbs: Invariant and Variant Aspects. Presentation at NWAVE XIV, Georgetown University, Oct. 25, 1985. (with M. Rimor and H. Lane)

An Empirical Inquiry Into the Semantic Organization of the Mental Lexicon of English Verbs: The Case from American Sign Language. Presented at the Tenth Annual Boston University Conference on Language Development, Oct. 27, 1985. (with M. Rimor and H. Lane)

Evidence in Favor of Independent Linking. Presented at the Linguistic Society of America Winter Meeting, Seattle, Dec. 28, 1985.

Formal Properties of ASL Word Formation. Presented at the Linguistic Society of America Winter Meeting, Dec. 28, 1985. (with Ward Farrington)

1986    Multi-Dimensional Structures in English Phonetics and Phonology. Eastern Michigan University, Job Talk. February 5.

Opaque Clitics: Differences Between L1 and L2 Signers. University of Texas at Austin, Job Talk. February 10.

ASL Word Formation. Program in Linguistics Colloquium Series, Princeton University. February 13.

When Is Classifier No Longer a Classifier? Presented at the Twelfth Annual Meeting of the Berkeley Linguistics Society, Berkeley, Calif.. February 16.

The Acquisition of American Sign Language by Second Generation Deaf Signers. Linguistics Colloquium Series, Syracuse University. February 28.

Lexical Conceptual Structures in American Sign Language. Lexicon Seminar, Center for Cognitive Science, M.I.T.. March 6.

Characteristics of Literary Narrative in American Sign Language. Presented to the NTIDNoontime Lecture Series, National Technical Institute of the Deaf, Rochester. March 14.

Recursive Structure in the ASL Lexicon. Presented to the Department of Linguistics, State University of New York at Stonybrook. March 18.

Sub-lexical Structure in American Sign Language: Morphemes or Phonemes? Swarthmore College, Job Talk. March 19.

The Role of Sub-Lexical Structure in Recreolization. Presented at the 18th Annual Stanford Child Language Research Forum, Stanford University. April 6.

Commentary on a Paper on the Acquisition of American Sign Language by Laura Pettito. Cognitive Science Colloquium Series, M.I.T. (Additional commentator Virginia Valian) May 6.

Presentation and Commentary on "Teaching: The Use of Existing Machine-readable dictionaries in Education and the Design of More Appropriate Ones for the Future" by Tom McArthur. Presented at the Workshop on Automating the Lexicon, Grosseto, Italy. May 21.
Opaque Clitics. Presented at the Conference on Theoretical Issues in American Sign Language, University of Rochester. June 14.

Implicit and Explicit Information: What's in the Dictionary and What's in the User? Presentation to the Harvard University Cognitive Science Society, October 26.

Explicit and Implicit Information in Dictionaries. Presented at the Second Conference of the Centre for the New OED, University of Waterloo, Waterloo, Ontario, November 10. (with B. Atkins and B. Levin)

Perceptual Ambiguity: Implications for the Representation of Phonological Features. Presented in the Cognitive Lunch Series, Psychology Department, Princeton University, December 2.

Nicaraguan Sign Language: A Progess Report. Presented at the Winter Meeting of the Linguistic Society of America, New York, December 30.

1987    Boundary Between Word Knowledge and World Knowledge. Position paper presented in the panel on words and world representation at TINLAP3 (Conference on Theoretical Issues in Natural Language Processing). New Mexico State University, Las Cruces, NM, January 7-9.

Teaching Undergraduate Linguistics: Lab/Independent Study Oriented Approaches. Conference on Linguistics in the Undergraduate Curriculum, Princeton University, March 8-9.

Lexical Regularities: Implications for Dictionary Entries. Instituto di Computazionale, Pisa, Italy, March 17. (with B. Levin and S. Atkins)

Issues in the GB Lexicon. Workshop on the Polytheoretical Lexicon, Pisa, Italy, March 19. (with B. Levin).

A GB Entry for the Verb Bake. Workshop on the Polytheoretical Lexicon, Pisa, Italy, March 20. (with B. Levin and B. Atkins).

A Peek at our Past: Parallels and Divergences in the Historical Development of Nicaraguan Sign Language and American Sign Language. Hamilton College, Clinton, NY, April 29.

Machine-Readable Dictionaries and Education. Educational Testing Services, Princeton, NJ, May 27.

PARSNIP: A Connectionist Network that Learns Natural Language Grammar from Natural Language Sentences. Presented at the Ninth Annual Meeting of the Cognitive Science Society, University of Seattle, WA, July. [also presented at Bellcore Teleconference, June 4; and numerous other presentations]

Hidden Information in the Dictionary. Presented in the Lexicon Workshop at the Linguistics Society of America Linguistics Institute. Stanford California, July.

Possible Passives and Predicate Argument Structure. Presented at the Symposium on Lexical Semantics (sponsored by IREX). Stanford, CA, August 1-2.

Verb: Transitive/Intransitive. 8th World Congress on Applied Linguistics (AILA), Sydney, Australia, August 16-21. (with B. Levin)

Potential Uses of On-Line Dictionaries in Language Teaching. AILA Scientific Commission on Applied Computational Linguistics. Theme: The Use of the Computer in Teaching Language, Linguistics and the Humanities. Sydney, Australia, August 16-21.

AILA Scientific Commission on Lexicography and Lexicology. Topic: Dictionary Projects and Analysis of the Lexicon. Convenor of session. Sydney, Australia, August 16-21.

Current Research on ASL Linguistics. Department of Speech and Audiology, Syracuse University.

The Geometry of Linguistic Features: The Need for 3-D Graphics Systems in Phonological Research. Presented at Princeton University, Human Information Processing Group, December 10.

1988   Non-Canonical Argument Structure. WCCFL VII (West Coast Conference on Formal Linguistics, University of California at Irvine, February 27. (with Christiane Fellbaum) [alternate for GLOW (Generative Linguists of the Old World); Budapest, Hungary, March 29-31.]

Word Organization in the Lexicon. Swarthmore College, Psychology and Linguistics Departments. March 1.

Internal Structure in the American Sign Language Lexicon. Presented to the Cornell University Psycholinguistics Circle, Cornell University. March 3.

Properties of Measure Verbs. Lexicon Seminar, MIT, Cambridge, MA. March 9. (with C. Fellbaum)

Lenguaje de Signos Nicaraguense: Fieldwork Problems and Research Questions. Presented to the Linguistics Colloquium Series, University of Pennsylvania. April 7.

The Interface between Lexical Semantics and Syntactic Projection. Workshop on Theoretical and Computational Issues in Lexical Semantics. Brandeis University, April 21-24.

Argument Structure Typology and Verb Agreement Patterns. Alternate for presentation at the Parasession on Agreement at the 24th Annual Meeting of the Chicago Linguistics Society, University of Chicago. April 28-30.

The Importance of Research on Sign Languages to the Study of Linguistic Theory. University Lecture Series, University of Massachusetts, Amherst. May 5.

A Predicate Argument Typology of Sentential Complement Verbs. Paper presented at the Workshop on Sentential Complements, Center for Cognitive Science, MIT, Cambridge, MA. May 6. (with Beth Levin)

Argument Structure Typology and Verb Class Organization in the ASL Lexicon. Second International Conference of Theoretical Issues in Sign Language Linguistics. Gallaudet University. May 21.

Taxonomic Hierarchies in the Verb Lexicon. BUDALEX '88, EURALEX 3rd International Congress, Budapest, Hungary. September 4-9. (with Christiane Fellbaum)

The Princeton Lexicon Project: A Report on WordNet. BUDALEX '88, EURALEX 3rd International Congress, Budapest, Hungary. September 4-9. (with George Miller, Christiane Fellbaum, and Katherine Miller).

Accomodation to Parametric Choice (Slovenian). Presented at the symposium on "Languages in Contact" at the XII International Congress of Anthropological and Ethnological Sciences (ICAES). Zagreb, Yugoslavia, July 23-24.

An Analysis of Obligatory Adjuncts: Evidence from the Class of Measure Verbs. ESCOL '88 (Fifth Eastern States Conference on Linguistics), University of Pennsylvania. September 30-October 2.

A Typology of Predicate Argument Structures in ASL: A Focus on Psych-Verbs, Unaccusatives, and Unergatives. CUNY Graduate Center. November 17.

1989   Lenguaje de Signos Nicaraguense: A Pidgin Sheds Light on the "Creole?" ASL. Fourth Annual Pacific Linguistics Conference, University of Oregon. May 19. (with Gayla Iwata)

Taxonomic Structure and Object Deletion in the English Verbal System. Presented at ESCOL '89 (Sixth Eastern States Conference on Linguistics) University of Delaware, October 6-8.

1990   Faculty Panel Discussion on "Academia and Social Responsibility." Sponsored by the Volunteer Program as a part of Social Action Week. Swarthmore College. February 17.

Nicaragua: A Personal Perspective. Faculty Seminar on Central America, Swarthmore College. February 22.

The Interplay between Linguistic and Spatial Processing in a Right-Lesioned Signer. Rutgers University Graduate Student and Postdoctoral Mini-Symposium. October 19. (with H. Poizner)

La Comunidad de Sordos de Nicaragua y su Lenguaje de Signos. Encuentro Latinamericano y del Caribe de Educadores de Sordos. (Trans: The Deaf Community in Nicaragua and their Signed Language) Univeristy de los Andes, Merida, Venezuela. November 12-17, 1990. (with Miriam Hebé Lopez A.)

1991   Cross-Linguistic Comparison via the Elicitation of Controlled Narratives. The Annual Meeting of the Linguistic Society of America. Chicago, Illinois. January 6. (with Annie Senghas)

The Interplay between Linguistic and Spatial Processing in a Right-Lesioned Signer. Annual Meeting of the International Neuropsychological Society. San Antonio, TX. February 15. (with Howard Poizner, poster)

The Brain Organization of Deaf and Hearing Signers of American Sign Language: Evidence from studies of Aphasia and Parkinson's Disease. Cognitive Science Colloquium Series, University of Illinois at Champaign-Urbana. March 4.

Series of workshops on ASL: Details of American Sign Language Syntax (April 5, 9:30-12); Coding American Sign Language Data on Deaf Children (April 5, 2-5:30); Workshop on Argument Structure in American Sign Language (April 6,9-4:30). MOV/LOC Notation and Rules of ASL Word Formation (April 12, 9-1). Boston University School of Education/Deaf Studies Program. Boston, April 5-6, 12.

The Interplay between Spatial Processing in a Right-Lesioned Signer of American Sign Language. Colloquium Series: Seminar in Psychobiology, Institute of Animal Behavior, Rutgers University. April 24.

The Brain Organization of Deaf and Hearing Signers of American Sign Language: Evidence from Right and Left Lesioned Signers. Cognitive Science Colloquium Series, Northwestern University. April 30.

Language from a Child's Eye View. Workshop Series. Marie F. Katzenbach School for the Deaf. September 9. (with Vicki Joy Sullivan)

The Current Status of Sign Language Research on the Organization of the Brain. Institute for Animal Behavior, Seminar Series. Rutgers University. September 11.

Language and Its Modalities of Expression. *Connections from Neuroscience to Cognition: A Joint Research Symposium of the Rutgers University Center for Molecular and Behavioral Neuroscience and the Rutgers University Center for Cognitive Science.* Rutgers University, Newark. December 12.

1992    Linguistic-Specific Processing Deficits in a Left-Lesioned Signer *Aging and the Quality of Life.* Sponsored by the Christopher Columbus Medical Sciences Committee of the National Institutes of Health. Washington, D.C., February 11. (with Howard Poizner and Ruth Loew, poster)

Argument Structure is Predictive of Production and Comprehension Deficits in Aphasia. Presented at the CUNY Sentence Processing Conference, New York. May. (with Mary Jack, poster)

Subjects and Agreement in American Sign Language. Presented at the Fifth International Symposium on Sign Language Research. International Sign Linguistics Association. Salamanca, Spain. May. (with Debra Aarons, and Carol Neidle)

Tense and Agreement in ASL. Presented at the *1992 Theoretical Issues in Sign Language Research* Conference. San Diego, CA. July. (with Debra Aarons, Benjamin Bahan, and Carol Neidle, poster)

Argument Structure Profiles of Aphasic vs. Non-Aphasic Narrative Production. *Boston University Conference on Language Development.* Boston. October 25. (with Mary Jack)

Flattening of Distinctions Constrains Parkinsonian Signing. Boston University Conference on Language Development. Boston. October 25. (with Ruth Loew and Howard Poizner)

Sign Communication Proficiency among Students. Invited Workshop, The 11th Annual Language Coordinator's Workshop: Sign Communication: Contexts, Proficiency and Assessment, The Pennsylvania School for the Deaf, Philadelphia November 5. (with Judy Mounty)

Argument Structure Analysis of Aphasic Production and Comprehension. Neuropsychology Laboratory, Moss Rehabilitation Hospital, Philadelphia, PA. December 15. (With Mary Jack)

1993    Preservation of Syntactic Distinctions in a Moderate to Severe Parkinsonian Signer. Presented at the Sixth Annual CUNY Sentence Processing Conference. University of Massachusetts at Amherst, March 18-20. (with Howard Poizner).

Access to Argument Structure in Agrammatism: Evidence for On-Line Tasks. Presented at the Sixth Annual CUNY Sentence Processing Conference. University of Massachusetts at Amherst, March 18-20. (with Caroline Carrithers and Mary Jack)

Access to Argument Structure in Agrammatism: Evidence from On-Line Tasks. Presented at the Fourth Annual Conference in Theoretical and Experimental Neuropsychology (TENNET IV). University of Quebec at Montreal, Montreal, Quebec. May 12-14. (with Caroline Carrithers and Mary Jack)

The Resilience of Copular Constructions in Aphasic Speech. Presented at the Fourth Annual Conference in Theoretical and Experimental Neuropsychology (TENNET IV). University of Quebec at Montreal, Montreal, Quebec. May 12-14. (with Mary Jack)

Reunión sobre los lenguajes de signos nicaragüenses. Invited workshop. Ministry of Education, Managua, Nicaragua. August 2-3. (with Ann Senghas and Richard Senghas)

The Birth of a Language: The Case of Idioma de Signos Nicaragüense (Nicaraguan Sign Language). Presented at II Congresso Latino-Americano de Bilingualismo (Lingua Oral/ Lingua de Sinais) para Surdos. Federal University of Rio de Janeiro, Rio de Janiero, Brazil. September 13. [Special Invited Lecture]

Syntax for Sign Languages. Syntactic Methodology and Issues in Sign Language Research. Short Course taught at II Congresso Latino-Americano de Bilingualismo (Lingua Oral/ Lingua de Sinais) para Surdos. Federal University of Rio de Janeiro, Rio de Janiero, Brazil. September 12-17. [Invited Course]

The Effects of Aphasia and Parkinson's Disease on Sign Language.. Presented at II Congresso Latino-Americano de Bilingualismo (Lingua Oral/ Lingua de Sinais) para Surdos. Federal University of Rio de Janeiro, Rio de Janiero, Brazil. September 15.

The Distribution of Argument Structure Patterns in Aphasic Narrative Production. Presented at the 31st Annual Meeting of the Academy of Aphasia. Tucson, Arizona. October 25. (poster)

The Role of Language Acquisition Processes in the Emergence of a New Sign Language. Presented at Designs of Nature: The Sixth Annual Graduate and Postdoctoral Minisymposium, Rutgers University, Newark. November 19. (with Ann Senghas and Richard J. Senghas)

The Architecture of Functional Categories in ASL. Linguistics Colloquium Series, Syracuse University. December 10. (with Carol Neidle)

1994    Components of Role Play: Evidence from Deficits in a Right Hemisphere Damaged Signer. Presented at the Boston University Conference on Language Development. Boston, MA. January. (Ruth Loew , Judy Kegl, and Howard Poizner)

The Phonetics of Contraction in American Sign Language. Presented at the Winter Meeting of the Linguistics Society of America. Boston, MA. January. (Judy Kegl and Howard Poizner)

Sign Language Emergence and Sign Language Change: Children's contribution to the birth of a language. Presented at the Winter Meeting of the Linguistics Society of America. Boston, MA. January. (with Ann Senghas, Richard J. Senghas, and Marie Coppola; poster)

Evidence for an Innate Language Capacity: The Birth of Idioma de Signos Nicaragüense (Nicaraguan Sign Language). Invited Lecture. Cognitive Colloquium Series, Psychology Department, Rutgers University. January 24.

Psychological Verb Constructions in American Sign Language. Invited Speaker. Washington Area Generative Syntax Group (WAGS). Georgetown University, Washington, D.C. January 28.

Wada Testing of a Deaf, Left-handed, ASL Signer Reveals Right Dominance for Language. Presented at the International Neuropsychological Society, Twenty-second Annual Meeting. Cincinnati, OH. February 2-5. February. (with Robin L. Gilmore, Eileen B. Fennell, Dawn Bowers, Howard Poizner, and Kenneth Heilman)

The Birth of Idioma de Signos Nicaragüense (Nicaraguan Sign Language): Evidence for Both Innate Capacity and the Role of Community. Invited speaker. Language Origins Workshop, University of Chicago. February 28.

Legal Ramifications of an Incorrect Analysis of Tense in ASL. Presented at the Annual Meeting of the American Association for Applied Linguistics as part of a special colloquium *The Bilingual, Bimodal Courtroom* coordinated by Graham H. Turner. Baltimore, MD. March 8. (with James Shepard-Kegl and Carol Neidle)

Characterizing Deep Linguistic Deficits and Decoupling them from the Impingement of other Cognitive Impairments. Innaugural Conference of the Cognitive Neuroscience Society. San Francisco. March 27-29. (with Caroline Carrithers; poster)

Functional Cortical Mapping of a Left-handed, Deaf Signer of ASL, Right Dominant for Signed and Spoken Language. Innaugural Conference of the Cognitive Neuroscience Society. San Francisco. March 27-29. (Robin Gilmore, Judy Kegl, Christiana Leonard, Dawn Bowers, Steven Roper, Eileen Fennell, Howard Poizner, and Kenneth Heilman; poster)

Spared Spatial Grammar in a Right-Lesioned Signer with Severely Disrupted Perception of natural Spatial Frames of Reference. Innaugural Conference of the Cognitive Neuroscience Society. San Francisco. March 27-29. (Judy Kegl, Robert Hoffmeister and Howard Poizner; poster)

Issues of Language Localization and Hand Dominance in a Deaf, familially left-handed, Signer of American Sign Language. Presentation to the Cognitive Neuroscience Seminar Series, University of California at Davis. March 31.

Preservation of Syntactic Information in the Lexicon. Invited Lecture. Colloquium Series, Speech and Hearing Sciences Department, CUNY Graduate Center. April 14.

Advances in Linguistics: Semantics. Tutorial. Conference on *Linguistics, Cognitive Science, & Childhood Language Disorders*. sponsored by the Program in Speech and Hearing Sciences, Graduate School and University Center, City University of New York. (Approved for CEU bythe American Speech-Language-Hearing Association; Judy Kegl and Christiane Fellbaum) April 20.

Wada and Functional Cortical Mapping of a Deaf Signer of ASL, Right Dominant for Signed and Spoken Language. Presented at the New York Neuropsychology Group Fifteenth Annual Conference: "Neuropsychology and Epilepsy: Insights for and from a Special Focus." New York. April 24. (Judy Kegl, Robin L. Gilmore, Christiana Leonard, Dawn Bowers, Eileen Fennell, Steven N. Roper, Patricia Trowbridge, Howard Poizner, and Kenneth M. Heilman; poster)

The Architecture of Functional Categories in ASL. Invited lecture, Linguistics Colloquium Series, Harvard University. May 2. (Carol Neidle, Judy Kegl, and Benjamin Bahan)

Levels of Representation and Units of Access Relevant to Agrammatism. Invited speaker, Special Symposium on Agrammatism (Organizer, Victoria Fromkin). TENNET Conference (Theoretical and Experimental Neuropsychology). Montreal. May 29.

Crucial Ingredients for the birth of a language: Innate language capacity plus Community [A case study of the emergence of Idioma de Signos Nicaraguense]. Invited colloquium. Université du Quebec á Montreal. June 2.

Introduction to syntax for sign language teachers. Workshop presented at the Fourth New York Statewide Conference for Teachers of American Sign Language. New York, NY. June 4. (Ben

Bahan, Judy Kegl, and Carol Neidle)

The Spread of Grammatical Facial Expressions and Evidence of the Structure of the Sentence in ASL. Workshop presented at the Fourth New York Statewide Conference for Teachers of American Sign Language. New York, NY. June 4. (Ben Bahan, Judy Kegl, and Carol Neidle) Creation through Contact: The Development of a Nicaraguan Deaf Community and the Nativization of its Language. Presented at the 2nd International Conference on Deaf History. Hamburg, Germany. October 1-4.

Rightward Wh-Movement in American Sign Language. Presented at the Conference on Righward Movement. Tilburg, Germany. October 6-8. (Carol Neidle, Judy Kegl, Benjamin Bahan, Debra Aarons).

Processing of Non-linguistic Auditory Stimuli in Landau-Kleffner Syndrome: A Case Study. Poster presented at The 128th Meeting of the Acoustical Society of America, Austin, TX. November 30. (Clifton Kussmaul, Kathleen Baynes, and Judy Kegl)

1995    Chronic Language Impairment Following Landau-Kleffner Syndrome: A Case Study. Presented at the Twenty-Third Annual Meeting of The International Neuropsychological Society. Seattle, WA. February 8-11. (Kathleen Baynes, Judy Kegl, Howard Poizner, and Diane Brentari)

The Manifestation and Grammatical Analysis of Clitics in American Sign Language. Invited speaker for the Parasession on Clitics at The Thirty-First Annual Meeting of the Chicago Linguistics Society, Chicago, IL. April 20-22.

Articulatory Consequences of Parkinson's Disease: Perspectives from Two Modalities. Presented at the TENNET Conference (Theoretical and Experimental Neuropsychology). Invited Session on Subcortical Issues in Language and Cognition. Montreal. May . (Judy Kegl and Henri Cohen)

Convergent Evidence for the Structure of Determiner Phrases in American Sign Language. Submitted for presentation at the Formal Linguistics Society of the Midwest (FLSM) Conference. Bloomington, IN. May 20. (Benjamin Bahan, Judy Kegl, Dawn MacLaughlin, and Carol Neidle).

Overt Realization of Syntactic Features in American Sign Language, Syntax Seminar, University of Trondheim Linguistics Department, Trondheim, Norway, May 30. (Neidle, C., MacLaughlin, D., Kegl, J., Bahan, B., and Aarons, D.)

Studies of Aphasia in American Sign Language: Points for Comparison and Contrast. Invited participation and presentation in the *Comparative Aphasiology Conference*. Organizer: Lise Menn. June 28-July 6.

Gestural Precursors of Linguistic Constructs. Invited presentation at conference on *Gestures Compared Cross-Linguistically*. Organizers David McNeill and Adam Kendon. Albuquerque, NM, July 8. (with Jill Morford)

The Deaf Community in Nicaragua and their Signed Language. Presentation at the 1995 Linguistics institute, Albuquerque, NM. July 11. (Judy Kegl, Ann Senghas, Marie Coppola, and Jill Morford)

Nicaragua Report: Escuelita de Bluefields--Education and Social Services in the Nicaragua of the 1990s. The Princeton Arts Center, Princeton, NJ. Sponsored by the Princeton-Granada Sister Cities Committee. October 15. (Judy Kegl and James Shepard-Kegl)

Three-place Predicates in Aphasic Narrative Production. Academy of Aphasia. San Diego, CA.

November 6.

Critical Periods in the Acquisition of Language. Invited speaker. Parents for Deaf Awareness Colloquium series. Union County College. Union, NJ. November 29.

1996    El cambio lingüistico, la lengua de señas y la comunidad de los sordos en Nicaragua. [Language change, sign language and the Deaf community in Nicaragua] Taller pre-Congreso. III Congreso Latinoamericano de educacion bilingüe para los sordos. Merida, Venezuela. February 6.

Lingüistica de la lengua de señas. Mesas de discusión. Coordinator: Dra. Lourdes Pietrosemoli. III Congreso Latinoamericano de educacion bilingüe para los sordos. Merida, Venezuela. February 7-8.

Politics and Power Structure in the Deaf Community in Nicaragua. III Congreso Latinoamericano de educacion bilingüe para los sordos. Merida, Venezuela. February 8.

Contacto de la lengua de señas con señas caseras en Nicaragua. [Contact between sign language and home sign in Nicaragua] III Congreso Latinoamericano de educacion bilingüe para los sordos. Merida, Venezuela. February 9.

Research on Signed Language Development and the Brain. Invited Speaker. Administrator's Roundtable Meeting, Marie H. Katzenbach School for the Deaf, West Trenton, NJ. March 6. (Romy Spitz, Patricia Trowbridge, and Judy Kegl)

Brentari, D., K. Baynes, J. Kegl, C. Kussmaul, and H. Poizner. 1996. Impoverished Lexicon with Normal Argument Structure Distribution: Evidence for a Link between Phonology and Lexicon. Cognitive Neuroscience Society: the third meeting (abstract book). Davis, CA: Cognitive Neuroscience Society, pg. 81. March 21.

Perspectives on an emerging language: creolization and critical periods. 28th Annual Child Language Research Forum. Invited workshop. Stanford University, April 12. (Judy Kegl and John McWhorter)

Grammatical characteristics of Nicaraguan Sign Language. Invited speaker. Sign LanguageColloquium Series. University of California at Berkeley, Berkeley, CA. April 16.

Sign Language and Deaf Children in Nicaragua, K-3rd grade classes, Cesar Chavez School, San Francisco, CA, April 17, 1996.

Bluefields Escuelita: What your Interpreter does on her summer vacation. Presbyterian Church of Lawrenceville, Lawrenceville, NJ. April 21. (James Shepard-Kegl and Judy Kegl)

A Language is Born in Nicaragua. Invited speaker. Northwest Jersey Association of the Deaf. May 10.

Non-Manual Correlates of Syntactic Agreement in American Sign Language, University of Iceland, Reykjavik, May 23, 1996, with C. Neidle, D. MacLaughlin, and B. Bahan.

Non-Manual Realization of Agreement in American Sign Language, University of Durham, England, May 28, 1996 (C. Neidle, D. MacLaughlin, B. Bahan, and J. Kegl)

SignStream: A Multimedia Database for Sign Language Research, City University, London, England, May 29, 1996, with D. MacLaughlin, C. Neidle, and B. Bahan, and J. Kegl).

SignStream: Access to Primary Data in the Context of Sign Language Transcription and Analysis,

University of Bristol, England, May 30, 1996, (B. Bahan, D. MacLaughlin, and C. Neidle, J. Kegl)

Lateralization and Intrahemispheric Localization Studies of a Familially Left-handed, Deaf, Epileptic Signer of American Sign Language. *TENNET VI I* (Theoretical & Experimental Neuropsychology /Neuropsychologie Experimentale & Theorique). Special Session on Signed Language and the Brain. August 15. [Invited organizer of session, plenary talk, poster]

Alienation as an Impetus for Social Cohesion: What if Everyone Here Really did Speak Sign Language? SS11: Special Session: "Societal Structures and the Lives of Languages: The Sociolinguistics of Signed Languages" Cardiff, UK. September 6-7. [invited presenter]

Grammaticization in a newly emerging signed language in Nicaragua. Poster presented at *TISLR V*, Fifth International Conference on Theoretical Issues in Sign Language Research. Montreal, Sept 19-22. (Jill Morford and Judy Kegl)

Non-manual grammatical marking as evidence for hierarchical relations in American Sign Language. Poster presented at *TISLR V*, Fifth International Conference on Theoretical Issues in Sign Language Research. Montreal, Sept 19-22. (Carol Neidle, Judy Kegl, Benjamin Bahan, Dawn MacLaughlin & Robert Lee)

Landau-Kleffner Syndome: Modality Independence of Linguistic Competence. Poster presenter at the Society for Neuroscience 26th Annual Meeting. Washington, D.C. November 16. (Judy Kegl, Kathleen Baynes, Diane Brentari, and Howard Poizner)

1997     Documenting the Emergence of Language: Issues of Critical Period, Critical Mass, and Innate Language Capacity. Coalition for National Science Funding. Washington, D.C. April 30. [Research Representative of the Linguistic Society of America; showcases the results of NSF-sponsored research] (Judy Kegl and James Shepard-Kegl)

Pragmatic Communication Disorders in Signing and Speaking Subjects with Parkinson's Disease. June. (Judy Kegl)

Workshop for Interpreters of Idioma de Señas de Nicaragua. Asociación Nacional de Sordos de Nicaragua. Managua, Nicaragua. July (8-12). (Judy Kegl)

Workshop for Teachers of the Deaf. Ministerio de Educacion. Managua, Nicaragua. August 27. (Judy Kegl)

The Birth of a Language and the Establishment of a School with only Deaf Faculty in Nicaragua. Pennsylvania School for the Deaf, Philadelphia. October 27. (Judy Kegl, Enrique Javier Marley Ellis, and Anselmo Alvarado Aleman Agustin)

Parkinson's Disease and Aphasia: Effects on Signed Language. Department of Psychology Colloquium Series. Gallaudet University. November 14. (Judy Kegl)

Fractionation of Grammatical Processes that Recruit both Right-and Left-hemisphere Capacities. Carnegie Mellon Psychology Colloquium Series, Carnegie Mellon University. November 19. (Judy Kegl)

Research on Nicaraguan Sign Language. Psychology Department Brown Bag Lunch Colloquium. Department of Psychology, Carnegie Mellon University. November 20. (Judy Kegl)

1998     Inter-articulator Coordination is Impaired in Deaf Parkinsonian Signers. Presented at the  Annual Meeting of the Linguistic Society of America. Session on Psycholinguistics. New York.  January

11. (Martha Tyrone, Judy Kegl and Howard Poizner)

Documenting the Emergence of Language: Issues of Critical Period, Critical Mass, and Innate Language Capacity. Invited colloquium speaker. University College London. March 8.

Language Emergence in a Language-Ready Brain. Invited Speaker. 2nd International Conference on *The Evolution of Language.* The University of East London, London. April 9.

The Role of Non-Manual Marking in Defining Syntactic Domains in ASL. Colloquium. University of Southern Maine. April 16. (Judy Kegl)

The Neural Substrates of Signed Language Processing: Evidence from Brain-Damaged Signers. University of Southern Maine. April 20. (Judy Kegl)

Language Emergence in a Language-Ready Brain. Cognitive Science Program. University of Southwestern Louisiana. Layfayette, LA. June 2. (Judy Kegl)

Facing the Facts: Using Facial Expressions, Eye Gaze and Other Non-Manual Signals to Appropriately Package Interpreted Text. Workshop presented at the Maine Registry of Interpreters for the Deaf. Augusta. September 11-13.

Losing Face: Differential Breakdown in the Production of Facial Expressions. Poster. 1998 Annual Meeting for the Society for Neuroscience, Session 160.9 Basal Ganglia: Clinical Disorders and Models. Los Angeles, CA. November 11. (Judy Kegl and Howard Poizner) [poster, Q-33]Attribution of Verb Agreement, Argument Structure, and Case Marking to Older Nicaraguan Home Signers is Unwarranted. Presented at the Boston University Conference on Language Development. November 6. (Judy Kegl, Gary Morgan, Romy Spitz, and Jim Kyle)

Categorization of ASL Question Faces by Hearing Non-Signers. *TISLR VI,* The Sixth International Conference on Theoretical Issues in Sign Language Research, Session 29: Gesture/Sign Relations and Discourse Analysis. Gallaudet University, Washington, D.C., November 15. (Ruth Bergida and Judy Kegl)

Interpreting. Two day workshop. Asociacion Nacional de Sordos de Nicaragua (ANSNIC). Managua, Nicaragua. December 28-29.

1999    Birth of a Language. Mental Health, Mental Retardation and Substance Abuse Annual Conference. Waterville, ME. March 12. ((Judy Kegl and Romy Spitz)

Establishing language skills in individuals for who the door the language acquisition has closed . Mental Health, Mental Retardation and Substance Abuse Annual Conference. Waterville, ME. March 12. (Judy Kegl and Romy Spitz)

Categorization of American Sign Language Question Faces by Hearing Non-Signers. Cognitive Neuroscience Society Meeting, Washington, D.C. April 11-13. (Ruth Bergida and Judy Kegl)

Working with Visual/Gestural Signers. New Jersey Network for Deaf Services. East Brunswick, NJ. May 7.

Memory with and without Language. *TENNET X* (Theoretical & Experimental Neuropsychology /Neuropsychologie Experimentale & Theorique). Special Session on Memory with and without Language. [Invited organizer of session] June 17-19.

Memory with and without language: A longitudinal study of home signers and late learners.

*TENNET X* (Theoretical & Experimental Neuropsychology /Neuropsychologie Experimentale & Theorique). Special Session on Memory with and without Language. Plenary talk. (Romy Spitz and Judy Kegl) June 17-19.

When is it language? Keynote address to the British Linguistics Association Meeting. London, Sept. 2.

SignStream and Signwriting as systems for documenting child language data in signed languages. European Sign Foundation Committee meeting. London. September 4.

Emergence of a Deaf Community in Nicaragua. Keynote lecture, Governor's Tea. Blaine House, Augusta, ME. September 14.

Cognitive Consequences for Critical Periods of Language Acquisition. Maine Medical Center, Dana Center. Portland, ME. September 16. (with Romy Spitz)

Emergence of a Signed Language in Nicaragua. Invited lecture. Deaf Culture Festival. Governor Baxter School for the Deaf. Mackworth Island, ME. September 18.

2000    The Emergence of a Signed Language and Deaf Community in Nicaragua. Gallaudet University, March. (with Ivonne Elena Vega Obando and Barney Josüe Vega Aburto) [invited lunchtime lecture]. May 18.

Linguistic characteristics of a newly emerged language. . Gallaudet University, March. (with Ivonne Elena Vega Obando and Barney Josüe Vega Aburto) [evening symposium] (with Ivonne Elena Vega Obando, Barney Josüe Vega Aburto and James Shepard-Kegl). May 18.

Losing Face: Effects of Left and Right Hemisphere Strokes and Parkinson's Disease on Facial Grammar and Affect Marking in ASL. Invited colloquium. Cognitive Neuroscience Laboratory, Universite du Quebec a Montreal. May 20.

A Cross-linguistic comparison of classifier constructions in American Sign Language, Nicaraguan Sign Language, British Sign Language and French Sign Language. NSF Sponsored conference on Cross-linguistic comparison of classifier constructions. San Diego, CA. April 4-5.

Workshop: Cross-linguistic investigations of sign languages: Can similarities and differences be detected without appropriate tools for representing analyzed texts? July 25. (with Elena Pizzuto, Sherman Wilcox, Terry Janzen, Thomas Hanke, and James Shepard-Kegl). [workshop presentation]

Then and Now: Lexical Change in Idioma de Señas de Nicaragua (Nicaraguan Sign Language)(1987-2000). 7th International Conference on Theoretical Issues in Sign Language Research. Amsterdam, The Netherlands. July 26. (with Ivonne Elena Vega Obando and James Shepard-Kegl) [poster]

Lip pointing in Idioma de Señas de Nicaragua (Nicaraguan Sign Language). 7th International Conference on Theoretical Issues in Sign Language Research. Amsterdam, The Netherlands. July 27. (with Ivonne Elena Vega Obando and Enrique Javier Marley Ellis) [presentation]

Language Emergence in a Language-Ready Brain. Mini-Symposium on the Emergence of New Languages. Symposium on "Explaining Humans." The Salk Institute for Biological Studies. La Jolla, CA. November 17-19.

2001   Language Emergence in a Language-Ready Brain. Invited lecture. Stroudwater Associates, Portland, ME. January 12.

Language-Emergence in a Language-Ready Brain. Collquium speaker. Linguistics Department Colloquium series. University of New Hampshire. January 19.

Language Emergence in a Language-Ready Brain. Topical Lecture [invited]. American Association for the Advancement of Science. Annual Meeting, San Francisco, CA. February 16.

The Emergence of Nicaraguan Sign Language. Special Invited Conference on Language Acquisition. National Endowment for the Humanities. Univ. of Tulsa, Tulsa, OK. April 4-5.

Language Emergence in a Language-Ready Brain: "What do you mean?" [Invited Lecture] The Provost's Summer Writing Seminar, The Stone House, University of Southern Maine. April 14, 2001. [with James Shepard-Kegl]

2002   Relative Clauses in Nicaraguan Sign Language. Linguistics Society of America Meeting, San Francisco, CA. January 3-6.  (with Helen Sitckney)

Serial Verbs in an Emergent Language. Key note Address, Linguistic Association of Great Britain (LAGB) Meeting. London, England. April 8-11.

2003   Aspects of Language Predisposition that persist beyond Critical Period. Seminar in Cognitive Neuroscience, Universite du Quebec a Montreal. March 6, 2003.

Aspects of Language Acquisition that are not Critical Period Bound: From the perspective of Pidgins and Creoles. Graduate class in Pidgins and Creoles, M.I.T., Cambridge, MA. March 10.

Quantifiers and Scope in ASL and ISN. Semantics of Underrepresented Languages of the Americas (SULA) Conference. Vancouver, CA. March 16, 2003. (with Brenda Schertz)

Syntactic Categories: With a focus on the Syntax of American Sign Language. Summer School in Cognitive Neuroscience, Montreal. June 30-July 11.

Sign Acquisition. Linguistics Institute, Summer Course. Michigan State University, July 21-August 8. (3 weeks)

Why are there so few Idioms in American Sign Language. Conference on Idioms and Collocations, Berlin, Germany. September 18-19.

Language predispositions that persist beyond critical periods for language acquisition. Invited colloquium. Center for Cognitive Science, Johns Hopkins University. October 16.

2004   Language Emergence in a Language-Ready Brain. Invited Plenary Speaker. Annual Meeting of the Linguistic Society of America. Boston, Jan 8-11.

Language Emergence in a Language-Ready Brain: The Spontaneous Creation of a Signed Language by Nicaraguan Deaf Children. Invited Speaker for University-wide Colloquium, The Annual Freeman Lecture. The University of Massachusetts at Amherst. February 19, 2004.

Serial Verbs in Nicaraguan Sign Language: Are there? Linguistics Colloquium Series, University of Massachusetts at Amherst. Invited speaker. February 20, 2004.

ASL Linguistics for Educational Interpreters III. Educational Interpreter Regional Mentorship

Project. University of the Holy Cross, Worcester, MA. March 27-28, 2004.

Sign Acquisition for Educational Interpreters. Educational Interpreter Regional Mentorship Project. University of the Holy Cross, Worcester, MA. May 1-2, 2004.
Non-manuals in American Sign Language Syntax: Special problems for sign recognition. Department of Computer Science, University of Southern Florida. May 18, 2004.

Signed Language Literacy in Bluefields Nicaragua: The emergence of a language and its writing system. Temple, Brookline, MA. May 22, 2004. (with James Shepard-Kegl)

Mentoring Through Process Mediation: Practice and Theory or Getting in the Zone. Workshop Presentation, Conference of Interpreter Trainers Annual Convention, Washington, D.C. October 1, 2004. (with Lianne Moccia, Kate Eifler, Cass Harvey, Jennifer Raney, Anna Perna, Margaret Haberman, Cindy Herbst, Michael Labadie, Joan Wattman, Trish Yachimski, Amy Williamson-Loga, and Marina McIntire)

ASL Syntax. Workshop. Illinois Registry of Interpreters for the Deaf Annual Conference. Invited Presenter, October 22, 2004.

Look Ma No Hands!: The role of non-manual markers in ASL grammar. Workshop. Illinois Registry of Interpreters for the Deaf Annual Conference. Invited Presenter, October 23, 2004.

2005   Kegl, J. Population Study of the Emergence of ISN: 1986-2005.  La Pérgola Roundtable: An interdisciplinary workshop on research related to deafness in Nicaragua.  Granada, Nicaragua, January 4. [Invited speaker]

The Bluefields Escuelita Project: Literacy, World-Knowledge, and Language proficiency. La Pérgola Roundtable: An interdisciplinary workshop on research related to deafness in Nicaragua. January 5. (with James Shepard-Kegl) [Invited speaker]

The world is watching: History of the Deaf community and Deaf education in Nicaragua, 1946-present. Biblioteca Roberto Incer Barquero del Banco Central, Managua, Nicaragua, January 11.  (with Ann Senghas, Marie Coppola, Mollie Flaherty, Laura Polich, Jennie Pyers. Richard J. Senghas) [Invited speaker]

The Nicaraguan Deaf community and its language: A history for educators, policymakers and public service providers, Centro Cultural Nicaraguense-Norteamericano, Managua, Nicaragua, January 13. (with Ann Senghas, Marie Coppola, Mollie Flaherty, Laura Polich, Jennie Pyers. Richard J. Senghas) [Invited speaker]

The Emergence of Verb Agreement: Introduction to the Session and Discussant for the papers presented. The Analysis of Verb Agreement in Sign Languages. Workshop. Linguistics Society of America 2005 Institute. August 6. [Invited speaker]

Linguistic Society of America Virtual Museum Project: Video Making Workshop. Linguistic Society of America Linguistics Institute, M.I.T., Cambridge, MA. July 22-July 31, 2005. (with Janet Fodor, Sharon Klein, and Sean Hendricks). [refereed workshop

2006   Language Emergence (and Non-Emergence) in a Language-Ready Brain.  Session: Emergence and Development of Signed Languages. Revolutions in Sign Language Studies: Linguistics, Literature, Literacy.  Gallaudet University, Washington, D.C. March 22. [Invited speaker]

Sign Language as a Research Tool for Exploring Brain Function. Graduate Colloquium. Center For Cognitive Science. University of Minnesota, Minneapolis Campus. April 13. [Invited speaker]

Language Emergence in a Language-Ready Brain. Linguistics Colloquium. Linguistics Department. University of Minnesota, Minneapolis Campus. April 14. [Invited speaker]

Preparing for the Written EIPA.  Focus Group for Educational Interpreters. Portland High School. May 2. [Invited speaker]

Language Emergence in a Language-Ready Brain: Evolution Issues.  *The Cradle of Language Conference*. The University of Stellenbosch and the Netherlands Institute for Advanced Study. Stellenbosch, South Africa.  November 7-10. [Invited speaker, refereed]

2007    Metalinguistic Awareness as a Bridge to Late Language Learning and Second Language Learning: Language learning by Deaf Nicaraguans. *International Symposium on Language Teaching and Learning*. University of Toronto. January 25-27.

We give up too soon!:  How to open the window to language and communication when it is already painted shut. *Next Steps Conference*.  Worcester, MA. November 9.  [invited speaker]

Beyond the Standards. Courtroom training for experienced legal interpreters.  Instructors: Carla <athers, Esq., CSC; Betty Colonomos, MCSC; and Jan DeLap, CDI. Suffolk Law School, Boston, MA. Series of 4 weekend trainings. (Organizer of series with Denise Martinez)

Foundations of Interpreting I and II. Teaching Assistant. Chicago, IL. (with Betty Colonomos)

2008    Tricking the Brain into Learning a Language that isn't There:  The Case of Nicaraguan Sign  Language. Saul O. Sidore Lecture Series.  *Inside Deaf Culture: A Visual View of the World.* University of New Hampshire, Manchester.  February 29. [invited speaker]

Foundations I of Interpreting I.  Teaching Assistant. Gorham, ME (with Betty Colonomos)

Model-based Curriculum Design for Interpreter Education Programs: A Case Study.  2008 Conference of Interpreter Trainers Conference.  *Putting the Pieces Together:  A Collaboartive Approach to Educational Excellence.* October 24. [Refereed, poster] (with Betty Colonomos)

Four Instincts that Lead us to Language.  Colloquium Series. University of Massachusetts, Boston. November 5. [invited speaker]

The Very Basics of Mentoring: Par1 1, Where we start. MeRID, Maine Medical Center, the Dana Conference Center. October 5.

Model-Based Curriculum Design for Interpreter Education Programs: A Case Study. 2008 Conference of Interpreter Trainers Conference. San Juan, Puerto Rico. October 24.

2009    The Very Basics of Mentoring: Part 2, Finding the Zone.  MeRID, Maine Medical Center, the Dana Conference Center. February 24 [invited presenter]

Foundations of the Interpreting Process II. University of Southern Maine, Portland, ME. Teaching assistant [with Betty Colonomos]. March 6-7.

The Grammar of the Accident: Part II—Story Breakdown. [with David Rivera] April 18.

Language Emergence in a Language Ready Brain. Bates College. Psychology Colloquium Series. May 13. [invited speaker]

2010 The Wild Child (L'Enfant Sauvage) with Judy Kegl, Professor of Linguistics University of Southern Maine.  Science on Screen Series.  Co-sponsored by Museum of Science, Boston and *New Scientist Magazine*.  The Coolidge Corner Theater.  [Invited Pre-Talk before viewing the film.] January 18. (http://www.coolidge.org/science/)

   Foundations of the Interpreting Process III. Portland, ME Teaching assistant [with Betty Colonomos]. March 26-28.

   Preparation for the Educational Interpreter Performance Assessment.  Northeast Deaf and Hard of Hearing Services. Concord, NH. [day long workshop] April 3.

   Language Created by a Language-Ready Brain: Evidence for Universal Grammar.Invited Plenary Presentation, *Preserving the Future: Sustainability of Language, Culture, and Nature* (April 15-17, 2010). Vigdís Finnbogadóttir Institute of Foreign Languages at the University of Iceland, Reykjavík.  April 16. (http://vefir.hi.is/vigdisconference2010/?page_id=36)

   Deaf Culture is not the Same Worldwide. Invited presentation to the Icelandic Deaf Association (Felag heyrnarlausra)**.** Reykjavik, Iceland. April 19.

   Foundations of the Interpreting Process IV. University of Southern Maine, Portland, ME. Teaching assistant [with Betty Colonomos]. September 24-26.

   Everything you always wanted to know about precautions for interpreters working in medical settings. Bangor, ME.  October 25. (with Stacey Bsullak)

   We Know What We Teach, What Did They Learn? *Conference of Interpreter Trainers,* San Antonio, TX. (with Rico Peterson, Betsy Winston, Christine Monikowski, Jack Hoza and Laurence Hayes. October 27-30.

   Attempts at expressing verb agreement in older Nicaraguan home signers: limits on the system? In Panel Discussion: The conventionalization of talking about space with space. *Fourth Conference of the International Society for Gesture Studies.* European University Viadrina, Frankfurt, Germany.  July 25-30. (with Gary Morgan)

   Porqué es importante aprender temprano la lengua de señas para niños sordos? II Conferencia Nacional de Educacion para Personas Sordas.  Lima, Peru. November 11.

2011 Preparation for Taking the National Interpreter Certification Written Test. Workshop. University of Southern Maine. April 3.

   Preparation for taking the Educational Interpreter Performance Assessment Written Test.  KEWL ASL. Somerville, ME. May 8.

   Questions relating ASL and AAC.  Think Tank for the Intersection of Linguistic Research and Augmentative and Alternative Communication (AAC). University of Pittsburgh.  Session on Language and Modality. Aug. 9.

   Deaf-Blind Immersion and Support Service Provider Training: A Unique Approach. Association for Education and Rehabilitation of the Blind and Visually Impaired (AER) Regional Conference. Samoset Resort, Rockport, ME.  November 3.  (with John McMahon and Patty Sarchi)

2012 Navigating the Minefield: Isolations and precautions for Medical Interpreters.  University of Southern Maine, January 5. (with Stacey Bsullak)

Look Ma, No Hands!  Non-manual Markers in ASL Syntax. Linguistics Colloquium. University of Pittsburg. February 29.

Panel Discussion—Practitioner's Point of View. Institute for Legal Interpreting.  Institute for Legal Interpreting, Westminster, CO. April 11. (with Sharon Neuman-Solow (chair), Margaret Cobb, Rafael Trevino, Rob Cruz, and Linda Lamitola)

Panel Discussion on Research Findings and Implications for Practice. Institute for Legal Interpreting. Institute for Legal Interpreting, Westminster, CO. April 14. (Chair, with Jemina Napier, Risa Shaw, Len Roberson, Tracy Clark, and Jimmy Beldon)

When Medical Interpreting becomes Legal.  Medical Interpreting Roundtable.  University of Southern Maine.  April 26. (with Douglas Newton and Stacey Bsullak)

Four Instincts that lead us to language.  Conference on Core Knowledge, Language, and Culture. Lorentz Center. University of Leiden, The Netherlands.  June 1.

Interpreting Goold Assessments: Language Changes in the Aging Brain. 24th Annual Deaf, Hard of Hearing and Late-Deafened Conference. Colby College, Waterville, ME.  June 29.

2013    Legal Interpreting Study Group.  Weekly meetings. January-June 2013.

Face, Pace, Space: The Economy of ASL. Workshop, University of Southern Maine. (Fundraiser for the USM trip to Seabeck.) July 1, 2013.

Building a Legacy: Interpreter Education Program Accreditation. Registry of Interpreters for the Deaf, Annual Meeting, Indianapolis, IN. August 9.

2015    The Role of Deaf Actors in the Silent Film Era.  *Maine Deaf Film Festival*. University of Southern Maine, Portland, ME. May 2.

Tapping into what happens as we interpret:  A review of the on-line processing literature and a proposal for international cooperation. *World Association of Sign Language Interpreters (WASLI) Conference: Human Rights: Where to interpreters fit in?* Istanbul, Turkey.  July 22-25. (Poster presentation with Esther Lee Samia, Dana McDaniel, Patty Moers-Patterson, and Amy Williamson)

Legal Interpreting Courtroom Procedure Series I: Correcting the Record. (9-hour workshop). Pine Tree Society Interpreting Services,  Scarborough, ME.  July 14; August 4 and August 11. http://en.anthropo.umontreal.ca/fileadmin/Documents/FAS/EN_Anthropolgie/Documents/5-Departement/Programme_pr%C3%A9liminaire_version_longue.pdf
Legal Interpreting Courtroom Procedure Series II: Witness Testimony. (9-hour workshop). Pine Tree Society Interpreting Services, Scarborough, ME. October 9, 12, and 24.

Legal Interpreting Courtroom Procedure Series III:  Legal Texts (Miranda Warning, Jury Instructions, Voir Dire). December 15.

2016    Legal Interpreting Courtroom Procedure Series V: Interpreting for a Deaf Witness (3 hour workshop) University of Southern Maine, Portland, ME February 11.

2017    Applicatives in Sign Language Syntax. Princeton University, Princeton, NJ. September 20.

Morphosyntax in Algonquian and ASL: Insights from Comparison. 49th Algonquian Conference. University of Montreal, Montreal, Canada. October 29. (Presentation with Conor Quinn)

2018        Language Emergence. Seminar on Language Evolution. Princeton University, Princeton, NJ. February 19.

                Role Prominence in American Sign Language and the Proximate/Obviative Contrast in Algonquian Languages. GLOW 41 Conference (Generative Linguists of the Old World). Workshop: Sign Language Syntax and Linguistic Theory. Research Institute for Linguistics of the Hungarian Academy of Sciences, Budapest, Hungary. April 14.  (Presentation with Conor Quinn)

                Rule Governed Variation in Elicited Narratives in Peruvian Sign Language (LSP).  Poster. Thinking Matters. April 20. (with Polly Lawson and Kyle Warnock)

                Face and ASL. Colloquium. Concordia University. Montreal, CA. December 7.

2019        A Three Course Series on Medical Interpreting with an Emphasis on Training Peer Professionals. Association of Medical Professionals with Hearing Loss Annual Meeting, Baltimore, MD. (Poster Presentation with Meryl Troop, Rachelle Mendola, and Tristen Downey) June 1, 2019

                Enhancing Communication Skills in Persons with Severe Language Deprivation: Lessons learned from the rise of a signing community in Nicaragua. Symposium. University College London. Department of Cognitive, Perceptual and Brain Sciences, Deafness, Cognition and Language Research Centre. June 19. (with Romy Spitz)

                Language Deprivation: Meeting the person where they are. Mental Health Interpreter Training: Alumni Session 3: Alabama Department of Mental Health and ADARA. Troy University, Montgomery, AL. August 5. (Workshop with Romy Spitz)

                Language Deprivation: A pathway to habilitation.  Second Annual Summit for Speech-Language Pathologists using American Sign Language. Conference for SLPs using ASL.  Bordentown, NJ. November 1. (with Romy Spitz)

2020        Endpoints in Communication Development: The surprising case of Late Bloomers. American Deafness and Rehabilitation Association (ADARA) Breakout conference: CHAMP! Creating Standards of Excellence for Deaf Mental Health and Related. Boston-Natick, MA. May 4-7.  (with Romy Spitz)

                Language Deprivation: Meeting the person where they are. Mental Health Interpreter Training: Alumni Session: Alabama Department of Mental Health and ADARA. Troy University, Montgomery, AL. August 13, 2020. (with Romy Spitz)

**References (from among):**
**Overall**:

*Kenneth Hale, Department of Linguistics and Philosophy, 20D-219, MIT, 77 Massachusetts Avenue, Cambridge, MA 02139 (linguistics, field work)-deceased September, 2001. (deceased, letter available)

*Gene Searchinger, Equinox Films, 200 W. 72nd Street, New York, NY (Filmmaker for "The Human Language" Series) (deceased, letter available)

**Current Colleagues:**

Wayne Cowart, Chair. Department of Linguistics, University of Southern Maine, P.O. Box 9300, Portland, ME 04104-9300 (retired)

Dana McDaniel, Department of Linguistics, University of Southern Maine, P.O. Box 9300, Portland, ME 04104-9300

Romy Spitz, Signed Language Research Laboratory, University of Southern Maine, 5360 Calle Vista, San Diego, CA 92109; romyspitz@hotmail.com.

**Linguistics:**

Noam Chomsky, Department of Linguistics and Philosophy, 20D-219, MIT, 77 Massachusetts Avenue, Cambridge, MA 02139 (linguistics, syntax)

*Morris Halle, Department of Linguistics and Philosophy, 20D-219, MIT, 77 Massachusetts Avenue, Cambridge, MA 02139 (linguistics, phonology) [retired, deceased, letter available]

Donna Jo Napoli. Linguistics Program, Papazian Hall, Swarthmore College, Swarthmore, PA. (linguistics)

Wayne O'Neil, Department of Linguistics and Philosophy, 20D-219, MIT, 77 Massachusetts Avenue, Cambridge, MA 02139 (linguistics)

Beth Levin, Department of Linguistics, Stanford University. Margaret Jacks Hall, Building 460 Stanford University, Stanford, CA 94305-2150

Christiane Fellbaum, Department of Psychology, Green Hall, Princeton University, Princeton, NJ 08544.

**Neuroscience:**

Kathleen Baynes, Center for Neuroscience (#1273), University of California, Davis, CA 95616-8768 (neuropsychology/neurolinguistics) [Currently retired in Maine]

Henri Cohen, Université du Quebec á Montreal, Dept. of Psychology and Research in Neuroscience, P.O. Box 8888, Station A, Montreal, Quebec H3C 3P8, Canada (neuropsychology, neuroscience)

Howard Poizner, Cognitive Neuroscience Laboratory, Center for Molecular and Behavioral Neuroscience, Aidekman Research Center, 197 University Avenue, Newark, NJ 07102. (cognitive neuroscience)

Paula Tallal, Director. Center for Molecular and Behavioral Neuroscience, Aidekman Research Center, 197 University Avenue, Newark, NJ 07102. (language, neuroscience)

**Psychology/Cognitive Science:**

Stephen J. Hanson, Psychology Department, Rutgers, The State University of New Jersey. Newark, NJ 07102. (psychology, cognitive science)

*George A. Miller. Department of Psychology, Green Hall, Princeton University, Princeton, NJ 08544. (psycholinguistics, cognitive science; now deceased)

Gary Morgan, Department of Language and Communication Science, City University, Northampton Square, London EC1V OHB, UK. (psychology)

Bencie Woll, Deafness, Cognition, and Language Research Centre, Human Communication Science, University College London, 46 Gordon Square, London, WC1N 0PD UK.

**Interpreting:**

Betty Colonomos, Bilingual Mediation Center, 9012A 51st Avenue, College Park, MD 20740. (also for teaching and mentoring)

Victor Vigna, Certified Interpreting, The Sign Language Network, P.O. Box 6500, Brunswick, ME 04011.

Douglas Newton, Pine Tree Society Interpreting Services, Nonesuch River Plaza, 51 U.S. Route 1, Suite G, Scarborough, ME 04074. (also for legal interpreting)

# Amy June Rowley

Professor, American Sign Language
Department of Modern Languages and Literatures
California State University East Bay

## 25800 Carlos Bee Boulevard
Hayward, CA 94542-3038

e-mail: amyjune.rowley@csueastbay.edu        VP:  (510)314-8151

## Curriculum Vitae

Education
**Ph.D. in Urban Education, Focus in Second Language Acquisition,** University of Wisconsin-Milwaukee, Milwaukee, WI.  2014. Dissertation: American Sign Language Advanced Studies Programs: Implementation Procedures and Identifying Empowering Practices.

**American Sign Language Specialist Certification**, Western Maryland College, Westminster, MD.  2001

**M.S. in Deaf Education**, Western Maryland College, Westminster, MD. 2000

**B.A. in Biology**, Gallaudet University, Washington, DC. 1996

Proficiency Level
ASLPI- 5        American Sign Language Proficiency Interview (ASLPI), top score earned (equivalent to Native speaker of the language).

Employment

2018 to present, California State University East Bay
**Professor**, Department of Modern Languages and Literatures.
- Coordinate Sign Language Minor
- Schedule and staff ASL courses each semester (approximately 10-12 courses per year)
- Advise minors and students in ASL courses

- Faculty Sponsor, Student Advocates for Deaf Awareness
- Modify curricula and course structure for existing courses

2018 to present, Linguistic Consulting Services collaboration on assessments and expert witness work with Dr. Judy Shepard-Kegl

2016 to present, Berkeley City College
**Adjunct Professor**, ASL Department

2015 to present, **Educational Consultant** for California Department of Rehabilitation- tutor Deaf graduate students in CBEST, CSET, Deaf Education, Counseling and Teaching ASL programs.

2011 to 2018, California State University East Bay
**Associate Professor**, Department of Modern Languages and Literatures.

2015 to present, American Sign Language Teachers Association Chairperson, Evaluation System
- Revamp ASLTA Evaluation System
- Coordinate Evaluation assessment development
- Coordinate trainings for evaluators
- Coordinate assessments for candidates

2014 Spring, California State University East Bay
**Interim Department Chair**, Department of Modern Languages and Literatures.

2007 to 2011.  California State University East Bay.
**Assistant Professor,** Department of Modern Languages and Literatures.

1999 to 2007.  University of Wisconsin - Milwaukee.
**Associate Clinical Professor and Coordinator, American Sign Language Programs,** Department of Exceptional Education.
- Oversee operations for five ASL related Programs-
  - Undergraduate Major in ASL Studies
  - Undergraduate Minor in ASL Studies
  - Undergraduate Major in Teaching ASL as a Foreign Language
  - Undergraduate Minor in Teaching ASL as a Foreign Language
  - Post-Baccalaureate Certification in Teaching ASL as a Foreign Language
- Granted indefinite appointment (Teaching Academic Staff equivalent of tenure) Spring 2005

233

- Schedule and staff ASL related courses (average of 25 courses per semester)
- Develop new curricula and modify existing curricula for ASL Programs

1997 to 2000        Mount Mary College, Milwaukee, Wisconsin
**American Sign Language Instructor,** Department of Foreign Languages.
- Taught each semester, either ASL 1 or ASL 2.

1996- present **Expert Witness** work and consulting in cases involving educational placement and ADA related issues in education and law enforcement

**Select Innovations at other institutions and in the Community**
- Developed distance education ASL Course.
  - Made CD of signed vocabulary covered in ASL 1 and these learning objects were uploaded onto a server and accessible for all students via Internet access.
  - The course was taught using a variety of Distance Learning techniques including chat features, videoconferencing and Blackboard web services.
- Developed new programs of studies for ASL related fields.
  - Added ASL Studies Major
  - Added ASL Studies Minor
  - Added Teaching ASL as a Foreign Language Programs
    - As a post baccalaureate certification
    - As an undergraduate major
    - As an undergraduate minor
  - Added new skills courses: Classifiers, and Fingerspelling and Numbers
  - Added new knowledge courses: ASL Literature, Deaf History and Resources and Instruction in ASL
  - Helped recruit faculty for ASL Studies Program
- Core member of University of Wisconsin Milwaukee Racioethnicity Workgroup Committee.
  - Conducted research and survey of UWM Internal climate for faculty.
  - Reported findings and made recommendations to Chancellor of University and Board of Regents.
- Revamped ASL Weekend Program.
  - Worked with WisRID and Wisconsin ASLTA to offer annual immersion weekend experience for ASL language learners.

- o Added Deaf Mentor program for ASL students with beginning skill levels.
- o Built strong repertoire of presentations and workshops for more advanced signers.
- o Added more workshops for deaf people to create more incentive for deaf people to participate and create more immersion opportunities for ASL learners.

**Courses taught at CSUEB**

Spring 2020
    On Sabbatical Leave
Fall 2019
    MLL 131-01 *ASL 1*
    MLL 211-02 *Multicultural Cinema*
    MLL 231-01 *Intermediate ASL 1*
    MLL 431-01 *ASL Linguistics*
Spring 2019
    MLL 232-01 *ASL 4*
    MLL 479-01 *Issues in Modern World Languages and Literature*
    MLL 211-01 *Multicultural Cinema*
    MLL 211-02 *Multicultural Cinema*
Fall 2018
    MLL 131-01 *ASL 1*
    MLL 131-03 *ASL 1*
    MLL 231-01 *Intermediate ASL 1*
Spring 2018
    MLL 1901-01 *Beginning Sign Language 1*
    MLL 1903-01 *Beginning Sign Language 3*
    MLL 1903-02 *Beginning Sign Language 3*
Winter 2018
    MLL 1005-01 *Viewing Diversity*
    MLL 1902-05 *Beginning Sign Language 2*
    MLL 2903-01 *Intermediate Sign Language 3*
Fall 2017
    MLL 1901-01 *Beginning Sign Language 1*
    MLL 1901-02 *Beginning Sign Language 1*
    MLL 2901-01 *Intermediate Sign Language 1*
 Spring 2017
    MLL 1901-01 *Beginning Sign Language 1*
    MLL 1903-01 *Beginning Sign Language 3*
    MLL 2903-01 *Intermediate Sign Language 3*

Winter 2017
    MLL 1005-01 *Viewing Diversity*
    MLL 1902-02 *Beginning Sign Language 2*
    MLL 3903-01 *Special Topics: American Sign Language*
Fall 2016
    MLL 1901-03 *Beginning Sign Language 1*
    MLL 2901-01 *Intermediate Sign Language 1*
    MLL 3902-01 *Deaf Culture*
Spring 2016
    MLL 1903-01 *Beginning Sign Language 3*
    MLL 1903-03 *Beginning Sign Language 3*
    MLL 2903-01 *Intermediate Sign Language 3*
Winter 2016
    MLL 1902-04 *Beginning Sign Language 2*
    MLL 2902-01 *Intermediate Sign Language 1*
    One course release for quarter to semester conversion duties.
Fall 2015
    MLL 1901-04 *Beginning Sign Language 1*
    MLL 1901-05 *Beginning Sign Language 1*
    MLL 2901-01 *Intermediate Sign Language*
Spring 2015
    MLL 1903-01 *Beginning Sign Language 3*
    MLL 1903-02 *Beginning Sign Language 3*
    MLL 2903-01 *Intermediate Sign Language 3*
Winter 2015
    MLL 1005-01 *Viewing Diversity*
    MLL 2902-01 *Intermediate Sign Language 2*
    MLL 3903-01 *Special Topics: American Sign Language*
Fall 2014
    MLL 1901-05 *Beginning Sign Language 1*
    MLL 2901-01 *Intermediate Sign Language 1*
    MLL 3902-01 *Deaf Culture*
Spring 2014
    Two Course Release for Department Chair duties
    MLL 2903-01 *Intermediate Sign Language 3*
Winter 2014
    MLL 1005-01 *Viewing Diversity*
    MLL 1902-01 *Beginning Sign Language 2*
    MLL 2902-01 *Intermediate Sign Language 2*
Fall 2013
    MLL 1901-02 *Beginning Sign Language 1*
    MLL 1901-03 *Beginning Sign Language 1*
    MLL 2901-01 *Intermediate Sign Language 1*
Spring 2013
    MLL 1901-03 *Beginning Sign Language 3*

   MLL 2903-01 *Intermediate Sign Language 3*
   MLL 3903-01 *Special Topics: American Sign Language*
Winter 2013
   MLL 1005-01 *Viewing Diversity*
   MLL 1903-01 *Beginning Sign Language 3*
   MLL 2902-01 *Intermediate Sign Language 2*
Fall 2012
   MLL 1901-01 *Beginning Sign Language 1*
   MLL 2901-01 *Intermediate Sign Language 1*
   MLL 3902-01 *Deaf Culture*
Spring  2012
   On Sabbatical Leave
Winter  2012
   MLL 1005-01 *Viewing Diversity*
   MLL 1903-01 *Beginning Sign Language 3*
   MLL 1903-02 *Beginning Sign Language 3*
Fall 2011
   MLL 1901-01 *Beginning Sign Language 1*
   MLL 1901-02 *Beginning Sign Language 1*
   MLL 2901-01 *Intermediate Sign Language 1*
Spring 2011
   MLL 1903-01 *Beginning Sign Language 3*
   MLL 1903-02 *Beginning Sign Language 3*
   MLL 2903-01 *Intermediate Sign Language 3*
Winter 2011
   MLL 1902-01 *Beginning Sign Language 2*
   MLL 2902-01 *Intermediate Sign Language 2*
   MLL 3903-01 *Special Topics: American Sign Language*
Fall 2010
   MLL 1901-01 *Beginning Sign Language 1*
   MLL 2901-01 *Intermediate Sign Language 1*
   MLL 3902-01 *Deaf Culture*
Spring 2010
   MLL 1903-01 *Beginning Sign Language 3*
   MLL 1903-02 *Beginning Sign Language 3*
   MLL 2903-01 *Intermediate Sign Language 3*
Winter 2010
   MLL 1902-01 *Beginning Sign Language 2*
   MLL 1902-02 *Beginning Sign Language 2*
   MLL 2902-01 *Intermediate Sign Language 2*
*Fall 2009*
   MLL 1901-01 *Beginning Sign Language 1*
   MLL 1901-02 *Beginning Sign Language 1*
   MLL 2901-01 *Intermediate Sign Language 1*
Spring 2009

                MLL 1903-01 *Beginning Sign Language 3*
                MLL 1903-02 *Beginning Sign Language 3*
                MLL 2903-01 *Intermediate Sign Language 3*
Winter 2009
                MLL 1902-03 *Beginning Sign Language 2*
                MLL 2902-01 *Intermediate Sign Language 2*
                MLL 3903-01 *Special Topics: Sign Language*
Fall 2008
                MLL 1901-01 *Beginning Sign Language 1*
                MLL 2901-01 *Intermediate Sign Language 1*
                MLL 3902-01 *Deaf Culture*
Spring 2008
                MLL 1903-01 *Beginning Sign Language 3*
                MLL 2903-01 *Intermediate Sign Language 3*
Winter 2008
                MLL 1902-01 *Beginning Sign Language 2*
                MLL 1902-02 *Beginning Sign Language 2*
                MLL 2902-01 *Intermediate Sign Language 2*
Fall 2007
                MLL 1901-02 *Beginning Sign Language 1*
                MLL 1901-03 *Beginning Sign Language 1*
                MLL 2901-01 *Intermediate Sign Language 1*

**Publications**

Rowley, A.J. (2018/19). Address: Special Education Law: Past Present and Future. New York Law School Law Review. 63*(1).* 21-27.

Rowley, A. J. (2018). Educational Interpreting from Deaf Eyes. In T.K. Holcomb, D. Smith (Eds.), *Deaf eyes on interpreting* (174-186). Washington, DC: GUPress.

Woods, D. R., Taylor, S., Austin, D., Beck, J., Chung, K., Couch, S., Davis, E.M., Fauth, B., Geron, K., Ireland, D. K., Kupers, E., Massey, M., Rowley, A.J., Stein, J., & Weiss, J. (August 2015). Building an Inclusive, Accessible and Responsive Campus at California State University East Bay, 2010-2015. Perspectives on Communication Disorders and Sciences in Culturally and Linguistically Diverse Populations. 22. 44-63.

Rowley, A.J., Kovacs-Houlihan, M. (2014) Bridging the Gap Between ASL and Interpreter Education Programs. In D. Hunt, S. Hafer (Eds.), Proceedings of Conference of Interpreter Trainers: 2014 CIT Conference- Our roots: The essence of our future (218-229).

Rowley, A. J. (2014)  American Sign Language Advanced Studies Programs: Implementation Procedures and Identifying Empowering Practices (Doctoral dissertation). Retrieved from http://dc.uwm.edu/etd/641

Rowley, A. J., Eckert, R.C. (2014) Commentary- Audism: A theory and practice of audiocentric privilege. Deaf Studies Digital Journal , 4. Retrieved from http://dsdj.gallaudet.edu

Eckert, R.C., & Rowley, A. J., (2013). Audism: A theory and practice of audiocentric privilege. Humanity and Society.  37(2) 101-130.

Rowley, A. J. (2010). Three decades of the Rowley case: A personal perspective. Proceedings of 27th Annual Pacific Northwest Institute on Special Education and the Law (pp.93-107).  Yakima: Washington.

Rowley, A. J. (2008). Rowley revisited: A personal narrative. *Journal of Law & Education*, *37*, 3, 311-328.

Rowley, A. J., Multra-Kraft, C. & Dyce, M. (2008).  Addressing the standards: Forming meaningful relationships between interpreters, interpreting students and deaf people. In L. Roberson &  S. Shaw (Eds.), *Proceedings of Conference of Interpreter Trainers : Vol . 17.  Putting the pieces together: A collaborative approach to educational excellence* (pp. 71-89).  San Juan: PR.

Rowley, A. J. (2008). 25 years later: Board of education vs. Rowley- a look at the past and looking towards the future. In M. Kolvitz (Ed.) Proceedings of PEPNet 2008 Conference. Knoxville: University of Tennessee Press.


## Translations

National Catholic Office for the Deaf- Religious Sign Project
Prayers translated for the Catholic Mass:
- Our Father (Pater Noster)
- Lamb of God (Agnus Dei)
- Holy, Holy, Holy (Sanctus)
- Lord, I'm not worthy (Domine non sum dignus)
- Nicene Creed (Credo)
- Gloria
- Confiteor
- Suscipiat
- Kyrie
- Basic Dialogue
- Preface Dialogue

- Dismissal Rite
- Opening to Scripture Readings
- Memorial Acclamations

## Presentations at workshops, seminars and institutes

March 2019 **Keynote Presenter** "After Endrew F- Observations by Amy June Rowley 30 Years After Her Own Case Made History in the United States Supreme Court". Special Education Law and Leadership Conference, Minneapolis, Minnesota.

June 2018 **Plenary Presenter** "Mainstreamed and Special Education Litigation". American Society for Deaf Children Conference, Salt Lake City, Utah.

March 2018 **Keynote Presenter** "The Rowley decision after Endrew". New York Law School's Symposium for Special Education: Special Education Law: Past, Present and Future.  New York City, New York.

June 2017 **Forum Presenter** "American Sign Language Teachers Association Evaluation System". ASLTA Conference, Salt Lake City, Utah.

March 2017 **Workshop Presenter** "Educators as Advocates and Allies". Special Education Law and Leadership Conference, Minneapolis, Minnesota.

March 2017 **Keynote Presenter** "Rowley Revisited: Denial of Human Rights". Special Education Law and Leadership Conference, Minneapolis, Minnesota.

January 2017 **Workshop Presenter** "Educators as Advocates and Allies". ECET$_2$ California Deaf education, Los Angeles, California.

October 2016 **Workshop Presenter** "Difficult Decisions While Working Towards Social Justice for Deaf and Interpreting Communities". Conference of Interpreter Trainers, Lexington, Kentucky.

June 2016 **Workshop Presenter** "A Look at Empowering Traits of an ASL Curriculum". University of Southern Maine, Portland, Maine.

May 2016 **Workshop Presenter** "Gatekeeping between ASL Students and the Deaf Community". Bay Area ASLTA, Hayward, California.

April 2016 **Panelist in Arts and Humanities**, Northern California Forum for Diversity in Graduate Education.

June 2015 **Keynote Presenter** "Gatekeeping between ASL Students and the Deaf Community". American Sign Language Teachers Association Conference, Minneapolis, Minnesota.

October 2014 **Workshop Presenter** "Bridging the Gap Between ASL and Interpreter Education Programs". Conference of Interpreter Trainers, Portland, Oregon.

March 2014 **Workshop Presenter** "Looking at 30 Years of Rowley: Implications for the Future". Daviess County Public Schools, Owensboro, Kentucky.

March 2014 **Workshop Presenter** "Deaf Education: A Ton of Choices". Daviess County Public Schools, Owensboro, Kentucky.

July 2013 **Workshop Presenter** "Prospecting the Meaning of ASL Education". ASLTA 7th Biennial National Professional Development Conference.

Charlotte, North Carolina.

January 2013 **Workshop Presenter** "Religious Sign Language Project
Presentation". National Catholic Office for the Deaf Conference.
Phoenix, Arizona.

July 2011 **Keynote Presenter** "Rowley and growing up as a Poster Child".
Midwest Conference on Deaf Education. Sioux Falls, South Dakota.

June 2011 **Workshop Presenter** "Audism: A Theory and Practice of
Audiocentric Privilege". American Sign Language Teachers Association
Conference. Seattle, Washington.

June 2011 **Keynote Presenter** "A Deaf Child Growing Up". Wyoming
Department of Early Intervention Conference. Cheyenne, Wyoming.

October 2010 **Ralph E. Julnes Memorial Keynote Presenter** "Three Decades of
the Rowley Case: A Personal Perspective". 27th Annual Pacific
Northwest Institute on Special Education and the Law. Yakima, Washington

September 2009 **Workshop Presenter** "Translating Catholic Readings and Prayers
into American Sign Language". Minicongress 2009- Diocese of Orange.
Orange, CA.

March 2009 **Keynote Presenter** "Looking Up at the Big Picture: What Children Can
Tell Us". 2009 Special Education Law and Mediation National Training
Conference. Los Angeles, CA.

November 2008 **Keynote Presente**r "A Deaf Child's Personal Perspective".
Nebraska/Kansas Regional Special Education Law Conference, Omaha, NE.

October 2008 **Workshop Presenter** "Addressing the Standards: Forming
Meaningful Relationships between Interpreters, Interpreting Students and
Deaf People". Conference of Interpreter Trainers, San Juan, Puerto Rico.

September 2008 **Keynote Presenter** "Looking Back at a Historical Event: Setting an
Agenda for the Future". 2008 Alaska State Special Education Directors'
Conference, Anchorage, AK.

August 2008 **Keynote Presenter** "Using What We Know From Historical Events to
Pave the Way for the Future". Utah Institute on Special Education Law and
Practice, Ogden, UT.

June 2008 **Keynote Presenter** "Free and Appropriate Public Education under IDEA-
Policy and Legal Issues". 9Th Annual Utah Education Law & Policy Institute,
Provo, UT.

June 2008 **Keynote Presenter** "A Journey Through Different Educational
Environments". 15th Annual Intermountain Special Study Institute on
Deafness, Pocatello, ID.

April 2008 **Plenary Presenter** "25 Years Later: Board of Education vs. Rowley: A
Look at the Past and Looking Towards the Future". PEPNet 2008,
Columbus, OH.

March 2008 **Workshop Presenter** "A Journey Through Different Educational
Environments". The 2008 Cal-Ed Conference, San Ramon, CA.

January 2008 **Post-Conference Presenter** "The Lord's Prayer As You've Never Seen It Before". Co-presented with National Catholic Office for the Deaf Pastoral Week Conference, New Orleans, LA.

November 2007 **Keynote Presenter** "Amy June Rowley", Education Law Association, San Diego, CA

October 2007 **Keynote Presenter** "Making Education Work for Every Child" National Association of State Directors of Special Education Phoenix, AZ

June 2007 **Workshop Presenter** "Practical Approaches to Preventing problem Behaviors: Communication and Sensory Integration Strategies" Waukesha, WI.

January 2006 **Workshop Presenter** "Working with the Deaf Mentor Rubrics" for Deaf Mentor Project, Brookfield, WI.

January 2005 **Workshop Presenter** "Linguistics of ASL for Deaf Mentors" and "ASL Development in Young Deaf Children" for Deaf Mentor Project, Wisconsin Dells, WI.

February 2005 **Workshop Series** Co-presented with Gina Kuemmel "ASL and the Scripture Series" Milwaukee, WI.

March 2005 **Workshop Presenter** "ASL Development and Deaf Mentor Rubrics" for Deaf Mentor Project, Jefferson, WI.

May 2005 **Workshop Presenter** "Linguistics of American Sign Language and how to apply to ASL Teaching", Minnesota ASLTA, St. Paul, MN.

November 2005 **Conference Presenter** "Professional Development Activities for Our State Chapter: Our Annual ASL Weekend Event" American Sign Language Teachers Association, Las Vegas, NV.

August 2004 **Workshop Presenter** "ASL Countdown" for Illinois RID  Chicago, IL.

August 2004 **Workshop Presenter** "ASL Countdown" for Illinois RID Jacksonville, IL.

April 2004 **Workshop Series** Part 4 Co-presented with Gina Kuemmel "Liturgy and ASL in Mass" Milwaukee, WI.

February 2004 **Workshop Series** Part 3 Co-presented with Gina Kuemmel "Liturgy and ASL in Mass" Milwaukee, WI.

November 2003 **Workshop Series** Part 2 Co-presented with Gina Kuemmel "Liturgy and ASL in Mass" Milwaukee, WI.

October 2003 **Workshop Presenter** "Semantics of ASL".  Wisconsin ASLTA. Madison, WI.

September 2003 **Workgroup Facilitator** "Domestic Violence and Abuse" Wisconsin Center for Independent Living Grant. Milwaukee, WI.

August 2003 **Workshop Presenter** "ASL Classifiers:  How to Incorporate into Everyday Interpreting" Professional Interpreting Enterprise Workshop. Greenfield, WI.

May 2003 **Workshop Series** Part 1 Co-presented with Gina Kuemmel "Liturgy and ASL in Mass" Milwaukee, WI.

April 2003 **Conference Presenter** "The Right Stuff: How to Deal With Common and Uncommon Problems of New ASL Students".  National American Sign Language Teachers Association Conference.  Indianapolis, IN.

March 2003 **Workshop Presenter** "What Works and Doesn't Work in Interpreting Situations from a Deaf Perspective" Minnesota Registry of Interpreters for the Deaf Mid-Year Conference. Minnetonka, MN

October 2002 **Conference Presenter** "The Difference Between Teaching Credit and Non-Credit ASL Courses".  Wisconsin Registry of Interpreters for the Deaf Conference. Fontana, WI.

July 2002 **Conference Presenter** "Teaching ASL at a Distance".  National Association of the Deaf Conference/American Sign Language Teachers Conference.  Washington, DC.

May 2002 **Conference Presenter** "American Sign Language Linguistics".  ASL Weekend.  Rosholt, WI.

April 2002 **Panelist.** "Deaf Students in Charter Education Systems"  Wisconsin Charter Schools Association. Appleton, WI.

November 2001 **Conference Presenter** "New Ideas and Approaches in American Sign Language Teaching".  Wisconsin Association of Foreign Language Teachers Conference.  Appleton, WI.

October 2001 **Guest Presenter** "Involving the Deaf Community in Distance Teaching and Learning".  Governor's Wisconsin Education and Technology Conference. Green Bay, WI.

October 2001 **Keynote Presenter** "A Case About Amy". Iowa Special Education Law Conference.    Ames, Iowa.

September 2001 **Deaf Awareness Week Presenter** "Unique Lives" - UW-Milwaukee. Milwaukee, WI.

July 2001 **Keynote Presenter** "Children in Special Education Litigation".  8th Annual Special Education Institute. Wausau, WI.

May 2001 **Conference Presenter** "Classifiers- A Vital Component of American Sign Language".  ASL Weekend. Rosholt, WI.

May 2001 **Conference Presenter** "Gestures".  ASL Weekend. Rosholt, WI.

January 2001 **Panelist.** Sound and Fury Preview.  Center for the Deaf and Hard of Hearing. Brookfield, WI

October 2000 **Conference Presenter** "American Sign Language Linguistics" Wisconsin Network– Promoting Quality Education for Deaf and Hard of Hearing Children Fall Conference. Chippewa Falls, WI.

September 2000 **Guest Homilist** "An Introduction to Deaf Culture" Deaf Awareness Week, Inc. St. Peter's Episcopal Church. Mountain Lakes, New Jersey.

August 2000 **Keynote Presenter.** "Everything You Wanted to Know About Rowley v. Hendrick Hudson School District and More…" Michigan Association of Administrators in Special Education.    Thompsonville, MI.

October 1999 **Keynote Presenter** "My Personal Experience as a Child in Special Education Litigation" Fall Conference of Special Education Directors. Columbia, SC.

April 1999 **Keynote Presenter** "An Educational Journey" 20th National Institute of Legal Issues on Educating Individuals with Disabilities.   San Francisco, CA.

June 1998 **Keynote Presenter** "Children in Special Education Litigation" The
    Institute on Legal and Educational Issues. Madison, WI.
May 1998 **Panelist.** "Parent Forum: A Parent's Perspective on Quality Education"
    Tampa, FL.
September 1996 **Workshop Presenter** "What is Deaf Culture and How to Work
    With It?" Wisconsin Association on Alcohol, Drug and Disability
    Convention. Milwaukee, WI.

## Awards, Honors and Certificates

2016        **Provost's Award for Outstanding Contributor to Community
            Engagement,** California State University East Bay- Week of

Scholarship.

2015        **Alan R. "ALB" Barwiolek Distinguished Service Award,**
            American Sign Language Teachers Association
2010        **Ralph E. Julnes Memorial Distinguished Lecturer Award,** Pacific

Northwest Institute on Special Education and the Law

2005    **IADES 2005 Fellowship Award,** International Alumnae of Delta Epsilon Sorority for

Doctoral Research

2002    **Professional Level Certification** American Sign Language Teacher's Association (attaining

highest level in the field on a national standard).

1999    **Appreciation of Service Award,** Wisconsin Association of the Deaf

1997        **Certificate Training on Deaf-Blindness,** Northern Illinois University
1994        **Biomaterials Fellowship,** National Science Foundation/Engineering
            Research Center for Emerging Cardiovascular Technologies -

### Current Affiliations/Memberships

- **Chair**- Evaluations and Certifications: American Sign Language Teachers
  Association
- **Secretary**- Parodi Charitable Trust (Bay Area Deaf Community)
- **Editorial Board** – International Journal of Interpreter Education
- **Member-** Department of Modern Languages and Literatures, California State
  University East Bay

- **Professional Certified Member**- American Sign Language Teachers Association.
- **Lifetime Member**- Gallaudet University Alumni Association.
- **Member**- National Association of the Deaf.
- **Member**- Telecommunication Devices for the Deaf Inc (TDI, Inc.)

## Appendix C: Cases each of the experts has presented testimony at in deposition and/or trial over the last four years.

**Expert Witness: Dr. Judy Anne Shepard-Kegl (testimony)**

- Dr. Shepard-Kegl has worked as an expert since 1990 including in Maine, New Jersey, New York, Florida, Massachusetts, Minnesota, Arizona, Connecticut, Oregon, Louisiana, California, Wisconsin, Illinois, and Georgia. She has never advertised as an expert. She has testified at trial on eight occasions, testified at other court-related proceedings twice, been deposed 31 times since 2014, and prepared 150 expert reports since 2014. She has testified in the last five years in the following cases:

- Depositions:
  - *Labouliere v. Our Lady of the Lake Found, et al.*, Case No. 16-cv-00785 (M.D. La) - 9/10/19
  - *Ward v. Our Lady of the Lake Hosp., Inc.*, Case No. 18-cv-00454 (M.D. La) - 9/10/19
  - *King v. Our Lady of the Lake Hosp., Inc.*, Case No. 17-cv-00530 (M.D. La) - 9/10/19
  - *Francois v. Our Lady of the Lake Found.*, Case No. 17-cv-00393 (M.D. La) - 9/10/19
  - *Reynolds-Sherwood v. Dignity Health*, Case No. 18-cv-00255 (D. Az.) - 4/5/19
  - *Francois v. General Health System*, Case No. 17-cv-00522 (M.D. La.) - 2/20/19
  - *Ward v. Baton Rouge General Hospital*, Case No. 18-cv-00451 (M.D. La.) - 2/20/2019
  - *Rosario v. St. Tammary Parish Hosp.*, Case No. 18-cv-01701 (E.D. La.) - 1/21/19
  - *Bustos v. Dignity Health*, Case No. 17-cv-02882 (D. Az.) - 12/10/18
  - *Davis v. Riverside Healthcare Sys., LP*, Case No. 17-cv-01062 (C.D.C.A.) - 11/12/18
  - *Giterman v. Pocono Med. Ctr. & Whitestone Care Cetr.*, Case No. 16-cv-00402 (M.D. Pa.) - 7/13/18
  - *Roman-Rodriguez v. Beth Abraham Cetr. for Rehab. & Nursing*, Case No. 17-cv- 01348 (S.D.N.Y.) - 7/13/18
  - *Vardon v. FCA US LLC*, Case No. 16-cv-11807 (E.D.M.I.) - 6/26/18
  - *Negron v. Trinitas Reg'l Med. Ctr.*, et al., Case No. 15-05822 (D.N.J.) - 5/31/18
  - *Aquila v. Plantation Mgmt. Co. et al.*, Case No. 18-cv-05306 (E.D. La.) - 3/7/18
  - *Jeuch v. Children's Hosp. & Health Sys., et al.*, Case No. 15-cv-01482 (E.D. Wis.) - 1/9/2018
  - *Berry-Mayes v. NYC Health & Hospitals Corp.*, Case No. 14-cv-09891 (S.D.N.Y.) - 11/22/17
  - *Sottile v. Watermark Ret. Communities, Inc., et al.*, Case No. 15-cv-02584 (D. Az.) - 9/14/2017
  - *Hall v. Tri-City Healthcare Dist.*, Case No. 16-cv-01693 (S.D.C.A.) - 8/22/2017

- *Prusak et al. v. Dignity Health*, Case No. 16-cv-01171 (D. Az.) - 7/31/17
- *Bate v. Delmar Gardens North, Inc., et al.*, Case No. 15-cv-00783 (E.D. Mo.) - 5/11/17
- *Puerner & Flanagan v. Mt. Sinai Hosp., et al.*, Case No. 15-cv-09715 (S.D.N.Y.) - 3/30/17
- *Sunderland v. Bethesda Hosp.*, Case No. 16-cv-10980 (11th Cir.) - 12/14/2016
- *Gordon v. NYC*, Case No. 15-09716 (S.D.N.Y.) - 11/10/2016
- *Cadoret v. Sikorsky Aircraft Corp.*, Case No. 15-cv-01377 (D. Conn.) - 10/20/16
- *Tauscher v. Phoenix Board of Realtors Inc.*, Case No. 15-cv-00125 (D. Az.) - 8/21/2016
- *Durand et al. v. Fairview Health Servs.*, Case No. 15-cv-02102 (D. Minn.) - 8/11/2016
- *Weinrib v. Winthrop Univ. Hosp., et al.*, Case No. 14-cv-00953 (E.D.N.Y.) - 6/24/2016
- *Bushoven v. Chilton Hospital*, Case No. 14-cv-08007 (D.N.J.) - 5/13/16
- *Viera & Gosselin v. NYC, et al.*, Case No. 15-cv-05430 (S.D.N.Y.) - 4/15/2016
- *Saunders & Branden v. Mayo Clinic*, Case No. 13-cv-1972 (D. Minn.) - 10/1/2015

- Trials:
  - *Updike v. Multnomah Cty.*, Case No. 13-cv-01619 (D. Or.) - 9/25/19
  - *VanVorst, et al. v. Lutheran Med. Ctr.*, Case No. 15-cv-01667 (E.D.N.Y.) - 8/21/2019
  - *Cobb, et al. v. GDCS, et al.*, Case No. 19-cv-03285 (N.D. Ga) - 9/12/19
  - *Giterman v. Pocono Med. Ctr., et al.*, Case No. 16-cv-00402 (M.D. Pa.) - 4/26/19
  - *Arce v. Louisiana State, et al.*, Case No. 14-cv-14003 (E.D. La.) - 12/11/17
  - *Bates v. Delmar Gardens North, Inc., et al.*, Case No. 15-cv-00783 (E.D. Mo.) - 11/27/17

**Expert Witness: Dr. Amy June Rowley**

Dr. Rowley has worked on assessments and evaluations over the past five years, but she has not testified in court.  Dr. Shepard-Kegl testified on their joint work in court in:
- *Updike v. Multnomah Cty.*, Case No. 13-cv-01619 (D. Or.) - 9/25/19

When she was living in Wisconsin over ten years ago, she testified in a variety of cases related to educational placement, discrimination and access to interpreters in education, arrest, incarceration, and trial contexts.

Trial/Deposition
Expert Witness for the law firm of Quarles and Brady for *Neshkoro School District v. Parents* (Witness for the school district)
Expert Witness for Deaf Plaintiff v. Milwaukee County Corrections

Trial:
Expert Witness for Deaf Plaintiff v. Milwaukee County Corrections
Expert Witness for Deaf Plaintiff v. State of Wisconsin

Expert Witness for Deaf Plaintiff v. Waukesha County (no interpreter at trial)
Expert Witness for Parents v. Milwaukee School District
Expert Witness for Quarles and Brady v. Menomonee Falls School District