Erin Moriarty Harrelson, Ph.D.
1335 East Capitol St., SE
Washington, DC 20003
(202) 215-1037 (text)
erin.moriarty.harrelson@gallaudet.edu

**Report:** Expert Analysis of Communication in Post-Carceral Settings

**Analysis conducted for:** American Civil Liberties Union, American Civil Liberties Union of Georgia, National Association of the Deaf, Disability Rights Education and Defense Fund, and Arnold & Porter Kaye Scholer LLP

**Date of Submission:** November 2, 2020

**Expert:** Dr. Erin Moriarty Harrelson, Ph.D.
Assistant Professor, Gallaudet University
Honorary Research Fellow, Heriot-Watt University, Edinburgh, UK

| | |
|---|---|
| 2000 | B.A., Smith College, Northampton, MA |
| 2009 | M.A., Communication in Contemporary Society, Johns Hopkins University, Baltimore, MD |
| 2016 | M.A., Anthropology, American University, Washington, DC |
| 2017 | Ph.D., Anthropology, American University, Washington, DC |
| 2017-2019 | Postdoctoral Studies, Heriot-Watt University, Edinburgh, UK |

1

TABLE OF CONTENTS

Objectives …………………………………………………………………...…3

Expert Qualifications ……………………………………………………...…3

Introduction ……………………………………………………………….....5

Description of Method …………………………………………………….....12

Case Studies

     Case 1 …………………………………………………………………14
     Case 2 …………………………………………………………………17
     Case 3 …………………………………………………………………19
     Case 4 …………………………………………………………………20
     Case 5 …………………………………………………………………22
     Case 6…………………………………………………………………26
     Case 7…………………………………………………………………28
     Case 8…………………………………………………………………30
     Case 9…………………………………………………………………31
     Case 10…………………………………………………………….……33
     Case 11…………………………………………………………………38
     Case 12…………………………………………………………….....39

Conclusion ……………………………………………………………….....40

References …………………………………………………………………42

Appendix A ………………………………………………………………...43

Appendix B………………………………………………………………....44

## Objectives

The objective of this report is to evaluate the effectiveness of the communication that took place during probation or parole meetings (which are referred to hereafter as probation meetings for simplicity) for 12 individuals who are deaf or hard of hearing in Georgia.

This report includes the following: 1. An analysis of the semiotic resources—defined here as the actions, materials and artifacts, such as smartphones, pieces of mail, and/or computers, that people have in their repertoire and deploy for communicative purposes—in encounters between 12 deaf or hard of hearing people and their supervising officers; 2. A description of any communication-based services provided by the officers; 3. An evaluation of the effectiveness of the multimodal semiotic resources used, and 4. A comparison of the semiotic resources observed on the videos with case notes regarding communication preferences or needed accommodations to determine whether the officers accurately identified the deaf people's communication needs; and 5. A summary of each individual's communicative preferences, verified during conversations over the videophone or from explicit identification in the relevant case notes.

My expert opinion is based on review of video recordings, case notes, and conversations with the deaf or hard of hearing individuals themselves. I was not present at these meetings; however, I was given access to body camera recordings made of the interactions that took place at these meetings. My assessment concerns the semiotic resources that are used as tools for communication within these interactions and the effectiveness of these tools, as well as the communicative needs of these individuals in legal and law enforcement contexts.

As a general introduction, I will define and discuss semiotic resources, the factors that may shape the semiotic resources available to deaf individuals, and the effectiveness of these semiotic resources. I will also describe some of the issues involved with specific communicative practices that deaf or hard of hearing people are forced to resort to, such as lipreading and the practice of including friends and family members in meetings like those that occur in the probation/parole setting, that often result in the mistaken impression that family members and friends are capable of assisting with communication.

## Expert Qualifications

I have been retained in this case to offer my expertise on communication taking place in the context of encounters with supervising officers at probation meetings in the office and in the field. I offer my opinion as a linguistic anthropologist working in the field of applied linguistics. Applied linguistics includes the study of language use, multilingualism, language assessment, language policy, and second language acquisition.

I also offer expertise based on my lived experiences as a deaf person from a hearing family that primarily used Signing Exact English ("SEE") (which is signing based on English grammar, unlike American Sign Language), lipreading, and homesign to communicate. Different family members in my life had different communicative repertoires: my father, who never went to college, has difficulties with reading and writing because of undiagnosed learning disabilities, so we primarily

3

communicated in homesign; whereas my mother learned SEE after I was diagnosed as deaf at 6 months. Because my deafness was diagnosed before the critical period for language acquisition, I was taught sign language at home and in school. As a result, my reading and writing abilities are exceptional for a person of my background; however, my experience as a deaf person is uncommon, as I will discuss more in the introduction to this report.

As a part of my scholarship and research, I have studied deaf individuals' languaging practices in Cambodia, Indonesia, the United Kingdom, and the United States. Some of this research involved the study of the strategies that deaf people use to make themselves understood during communication without a shared language, either because they were from different countries and used different national sign languages or because they did not have exposure to a signed (or spoken) language.

My native languages are English and American Sign Language. I have professional competency in British Sign Language and Cambodian Sign Language. I did my bachelor's level work in anthropology and art history at Smith College. I conducted my master's level work on communication in contemporary society at Johns Hopkins University and doctoral work in anthropology at American University, with a dissertation focused on deaf languaging practices in Cambodia, the development of Cambodian Sign Language documentation projects and language ideologies in post-conflict Cambodia. In 2014-2015, I was a member of the inaugural cohort of the Fulbright-National Geographic Storytelling Fellowship, which sends U.S. citizens abroad to engage in an academic year of digital storytelling projects on globally significant themes. My Fulbright-National Geographic project explored the emergence of a deaf community in post-Khmer Rouge Cambodia.

My dissertation was based on 18 non-consecutive months over four years of fieldwork in Cambodia with non-governmental organizations working with deaf people. As a part of my research, I accompanied NGO workers on their forays into remote parts of Cambodia to find deaf people in order to enroll them in adult education and job training programs in Phnom Penh, Kampong Cham, or Kampot. As a part of this work, we rode motorcycles to rural villages in Cambodia, looking for isolated deaf people. Often, we would arrive in a remote village to find that there was a deaf person living there who had never been to school nor had they learned Cambodian Sign Language (or any other sign language). I participated in and observed interviews with these deaf people conducted by the NGO field staff using a combination of photographs, drawing, gestures, and pantomime (because the deaf people were not literate in Khmer or English). In many cases, the field staff would have to rely on the deaf person's family members or neighbors to collect information about the deaf person.

From May 2017 to August 2019, I conducted postdoctoral research at Heriot-Watt University in Edinburgh as a fellow with the European Research Council-funded project, "Deaf mobilities across international borders: Visualising intersectionality and translanguaging" (shortened to MobileDeaf). The MobileDeaf research project used two key concepts in our work: the first of which is intersectionality, which focuses on how being deaf intersects with race, ethnicity, nationality, gender, sexual orientation, age, educational level, religion, and so on. This framework enabled us to focus on how differences in power and resources (such as access to education, as well as written and signed languages) lead to inequality and oppression while also investigating

4

contexts of opportunity and empowerment for deaf people. The second concept, translanguaging, examined how deaf people make use of diverse linguistic resources, which are always multimodal. This can include the use of different sign languages, gestures, writing and fingerspelling in different languages and scripts, mouthing (forming words on the mouth without the use of voice), speech, drawing, and pointing.

With these frameworks, we investigated the ways in which deaf people used diverse communicative resources in their interactions with deaf and hearing interlocutors. Our approach included an emphasis on visual methods, including photographs and videos created by participants and researchers. As a part of our research project, I directed an ethnographic film on deaf languaging practices in the context of multilingual and cross-cultural encounters in Indonesia, to be released in late 2020. The themes in this film were developed after an analysis of video-recorded data collected during fieldwork in Indonesia. To make this film, I conducted participant-observation with deaf people in Indonesia, recording their communicative practices as they went about everyday life, engaging in quotidian communication, such as ordering food at restaurants, bartering at the market, and so forth.

Currently, I am a faculty member in the Deaf Studies department at Gallaudet University, teaching courses on sensory studies, research methods, and cultural theory. I continue to engage in linguistic and cultural research in signed languages and deaf communities. I have served as a consultant on international development projects in Cambodia and for academic and non-profit program reviews. I am an internationally recognized authority on deaf languaging practices, as well as language ideologies, power, and privilege. I have presented at national and international conferences on the analysis of communicative repertoires, the use of film and video in research, and the languaging practices of people without a shared language. I have published on deaf translanguaging practices, language ideologies, and on the use of film and video for the analysis of communication strategies in encounters between people from different national and linguistic backgrounds. I am often asked to act as a peer reviewer for academic work in applied linguistics, translanguaging, and deaf communicative practices.

## Introduction

Deaf people come from diverse backgrounds and have diverse lived experiences. This report focuses on deaf people in the context of the United States. In the United States, there are an estimated 28 million people who are medically deaf, meaning that they have partial or complete hearing loss. Within this population, there is a range of linguistic resources and modalities used in communication. Some people are born profoundly deaf (i.e., prelingually deaf) and use American Sign Language ("ASL") for everyday communication. Others become deaf at a later age because of an accident or illness, or experience hearing loss as a result of aging. The diversity of the lived experiences of deaf people means that there is a variety of multimodal strategies that deaf people use as a part of their everyday communicative practices.

The experiences of deaf people who became deaf later in life are very different from the experiences of prelingually deaf people. It is important to note that researchers in deaf education and deaf psychology have noted that prelingually deaf people share a number of common

experiences such as social isolation, a lack of access to education, and minimal communication with their families due to language barriers.

In the United States, ASL is widely used as the primary language of deaf people, as well as hearing people who are a part of the Deaf community. ASL is a natural language, just as English or Spanish are natural languages. As with spoken languages, signed languages display phonetic, phonemic, syllabic, morphological, syntactic, discourse, and pragmatic levels of organization as expected of natural languages. ASL is a visual-gestural language with its own syntax and grammatical structure. ASL does not have a vocal or written component. Many deaf people in the United States learn written English as a second language. Many people assume that ASL is a direct translation of the English language, but ASL has its own unique syntax, structure, and cultural context. As in spoken languages, there is variation in ASL, such as the variety of ASL used by Black signers, which has its own unique linguistic features (McCaskill et al., 2011).

Deaf people in the United States may self-identify in a multitude of ways depending on a number of factors including the cause and degree of hearing loss, age of onset, educational background, communication methods, and lived experiences. Some, but not all, deaf people identify as "Deaf," meaning they consider themselves as members of a cultural and linguistic minority group; however, not all deaf people identify as members of this cultural-linguistic minority group. Some deaf people may identify as hard of hearing and do not interact with other deaf people. Others might identify as DeafBlind or as DeafDisabled. In the interests of brevity, this report will use "deaf" to refer to all deaf people, including those who consider themselves to be members of a Deaf community, as well as those who do not.

## Communication Modalities and Understanding

In the United States, deaf people as a group are characterized by different levels of language proficiency in ASL and English. For example, some deaf people are fluent in both ASL and written English, others may know little ASL and have difficulties with reading. Language proficiency levels may vary because of differential access to spoken, written, and signed languages. Some deaf people are not native users of either English or ASL because of systemic and structural barriers, leading to dysfluency in ASL and English (Glickman and Hall, 2019).

Over 90 percent of deaf children are born into non-signing hearing families; and if the deaf child is born into a signing environment, it does not necessarily mean that they are exposed to fluent language models for either ASL or English. Less than 8 percent of deaf children have daily access to sign language in the home environment (Hall et al., 2017). A child's first (approximate) five years of life is a critical time for brain development and the establishment of first-language fluency. A consistent lack of unhindered access to a natural language during the neurocritical period of language acquisition may lead to a set of symptoms in adulthood known as language deprivation syndrome. Symptoms of language deprivation syndrome include language dysfluency (lack of fluency in a primary language), general knowledge gaps about the world, disruptions in thinking, mood, and/or behavior, and general academic and literacy delays.

An important contributing factor to language deprivation for deaf people is a consistent lack of exposure to resources for passive learning and accumulative knowledge, such as listening to the

radio, reading newspapers, or overhearing conversations in the household (Hall et al., 2017). Early immersive exposure to a natural language is crucial to the neurocognitive and linguistic development of any child. For most deaf children, access to a signed language fulfills this vital need since unhindered access to a spoken language is not possible. Indeed, many deaf children who receive high-quality spoken language interventions nonetheless do not achieve age-appropriate linguistic fluency because they do not have access to a signed language. Lack of optimal language exposure can lead to delays in cognitive development.

As a result of language deprivation, there are a large number of deaf people who have significantly impaired or dysfluent language skills in both ASL and English (Glickman and Hall, 2019). Language deprivation results in difficulty understanding legal language or specialized terminology in the criminal justice system. Evidence suggests that language deprivation, not hearing loss, is the underlying cause of poor educational and linguistic outcomes among deaf people.

The importance of early accessible communication with family members and peers can be seen in the "dinner table syndrome"—the chronic experience of observing spoken conversations between other family members and not understanding what is being said. This is often experienced by deaf children from non-signing families. Lack of accessible communication with peers and family members is a factor that affects social skills and causes mental health issues later in life.

A lack of access to language development can lead to delays not only in academic learning and socioemotional development but also in the development of more fundamental social cognition skills. This has consequences that can lead to antisocial behavior such as drug use or a lack of understanding of societal expectations, such as the necessity of following rules or laws.

### Lipreading and speaking

There is a misconception that spoken languages are easily accessible for deaf people through the use of lipreading. Lipreading, also known as speechreading, is a technique of accessing spoken language by watching movements of the lips, face, and tongue. Lipreading involves context, familiarity with the spoken language being used, and residual hearing if there is any; however, at best, 30% of what is said is understandable on the lips. Most speech sounds are not visible on the mouth. In American spoken English, there are several words and phrases that look the same on the lips, such as in "olive juice" or "elephant shoes" and "I love you." Many speech sounds look the same on the lips, such as "p" and "b," "t" and "d," "f" and "ph" and so on.

Even in optimal circumstances, the most skilled lipreaders do not fully access the message solely from lip movements. In reality, skilled lipreaders are guessing what is being said by relying on facial expressions, body language, gestures, and a familiarity with the context in which the communication is taking place. Familarity with certain patterns in commonplace interactions allows the deaf person to guess what will be said next, but misunderstandings or assumptions are common.

Not only is lipreading mostly guesswork based on contextual clues, many deaf people receive intensive speech training in childhood and have been strongly encouraged to use their voices to speak, regardless of the clarity of their speech. Linguistic anthropologists working with deaf

children observed that deaf children often vocalize as a sort of performance marker. In other words, deaf children make vocal noises simply to satisfy an external demand (from a parent, teacher, or therapist) for such noises without any specific content.

Research-based evidence shows that relying solely on spoken language acquisition via hearing loss technology, such as hearing aids or cochlear implants, increases the risk of deaf children experiencing poor language acquisition and the associated developmental consequences. Nevertheless, deaf children are still encouraged to use their speech because of predominant teaching ideologies in deaf education. As a result, many deaf adults continue to use their speech, not realizing that it is difficult to understand, because they have recieved positive encouragement throughout their lives.

Unclear speech can lead to assumptions and misunderstandings during communication. Most interactions involving deaf speech and lipreading are only partially understood by the speaker and lipreader, which can have serious consequences in legal and medical settings. Researchers working with deaf people in the criminal legal system have shown that there is a high rate of functional illiteracy among deaf people who are in prison. For example, a study of deaf people in the Texas prison system showed that the average reading grade level for deaf violent offenders was grade 3.5, which is well below the 4.5–5.5 reading level of the average deaf person upon leaving school at age 18 and the grade 7.4 average educational attainment of hearing people (Miller et al., 2005).

### Nodding

When people communicate, the parties involved exchange signals to show continued engagement in the communicative encounter, such as nodding or making noise, such as "uh-uh". This is known as backchanneling. In deaf languaging behavior, nodding does not necessarily mean understanding, or agreement, rather head nodding simply indicates that the deaf person is paying attention.

Communicating in a language that is not one's primary language or preferred modality is hard work for second- or third-language users. Communicating in a second or third language often involves the use of non-verbal communicative resources, such as nodding of the head, to keep the communication going or as a sign of politeness. People who learn a second language or have conversed with a second language user have had the experience of nodding or being nodded to as a gesture to continue, often with the hope that more resources or information is forthcoming to assist in understanding. Participants in communicative encounters involving partial or incomplete understanding may not feel comfortable interrupting the flow of communication to ask for clarification, so they nod to demonstrate continued attention. Nodding is also used to hurry along communication that the participant might not be attending to or fully understand. Nodding is the equivalent of the use of sounds, such as "Mmm-hmm. Unh huh, yes." by speakers of spoken language.

In encounters where speaking and lipreading are the primary modalities for communication, a deaf person will often nod to hurry along the communication towards a quick conclusion because they do not understand. As the non-understanding deaf person nods to bring the conversation to an end, the hearing person interprets this nodding as a sign of comprehension. The commonplace belief

that deaf people are proficent lipreaders, combined with nodding behavior on the part of the deaf person, leads to an overestimation of the effectiveness of lipreading and spoken language use in communication. This results in the belief that sign language interpreters are not necessary, when in reality, many communicative encounters involving lipreading are failed encounters resulting in partial or non-comprehension on the part of the deaf person.

### Family members assisting

A common element in communicative encounters between deaf people and service providers is the use of hearing family members (or friends) to assist with communication. This happens because the family member knows information about the deaf person that the service provider wants; and, it is often easier for the service provider to communicate with the hearing family member than the deaf person themselves because they can hear and speak. Involving family members in these encounters to "assist" with communication—even when they are fluent in both English and ASL—is highly problematic for various reasons, including a loss of privacy, the withholding of agency for the deaf person, and lack of neutrality for the family member, especially when it is a high-stakes situation. Family members are not impartial observers or neutral parties in these encounters.

In the context of probation meetings, relying upon family members for communication involves the sharing of sensitive information about an offense or about the deaf person's private life or circumstances. Sharing the conditions of probation and parole can violate the confidentiality of the deaf person. During probation meetings, the family member becomes privy to information that the deaf person may not have wanted to share with them. To avoid sharing private information with family members (that may have been willingly shared with the officer if they were meeting with an interpreter), the deaf person might hold back information or not answer truthfully, which can lead to a violation of their probation. For example, deaf people might not truthfully answer personal questions regarding drug use or other high-risk behavior because a parent is there, "helping" with communication.

Asking a family member (or other hearing people in close proximity, such as a housemate) to "assist" with communication not only violates the deaf person's privacy, it also leads to their disempowerment. Disempowerment of the deaf person occurs when the service provider starts addressing the family member directly, cutting the deaf person out of the communcation. Involving external parties in these communicative encounters is risky because the family member or housemate might have their own agenda; they have power to shape the communication (either for the deaf person's benefit or detriment). "Speaking" for the deaf person allows the family member an opportunity to skew information to their own personal agenda as they communicate for the deaf person. The deaf person is not able to participate in the meeting as an autonomous adult, with the privacy that they are entitled to.

In summary, even where they have fluency in both English and ASL, which is most often not the case, friends and family are inherently conflicted from serving as qualified interpreters. They are present in the role of family support and cannot serve in this role while also interpreting. Allowing or relying upon family members or friends to interpret not only denies those family members and friends their primary role as emotional support, it also opens the door to the deaf individual's

filtering of information that they are uncomfortable sharing with their parents or having family members or friends add information to the discussion that is their own advice or opinion.

## *Homesign*

In many instances, the family members who participate in meetings with service providers to "interpret," use something that is known as "homesign." Homesign is developed by deaf people who do not have access to a formal linguistic model for a national sign language, such as ASL. Homesign is an idiosyncratic gestural communication system, often invented spontaneously by a deaf child who lacks accessible linguistic input.

Homesign typically develops among deaf children who are not exposed to a sign language by their hearing parents. Homesign is common among deaf children in hearing families, as approximately 75% of hearing parents do not sign, and instead communicate with their deaf children using gestures, speaking, and lipreading. This occurs either because of social deprivation or as a result of an ideological adherence to the "oral" philosophy in deaf education, which forbids deaf children to use sign language with the goal of encouraging speech and use of residual hearing.

Homesigns have some properties of a community sign language, but studies show that the parents and siblings of homesigners typically show poor comprehension of homesign production (Carrigan and Coppola 2017). Homesign is not a reliable or effective way to communicate complex information, especially that of a legal nature (Morford and Hanel-Faulhaber, 2011). This is another of the many reasons why family members should not be involved in meetings with a deaf person, as the communication that is taking place is most likely not as effective as the service provider believes.

## *Written communication*

Writing is a common strategy for communication between deaf people and people who do not sign; however, for many deaf people, English is not their primary or preferred language. This modality might offer an immediate solution for people who are able to read and understand written English, but it is not the most accessible or effective way to communicate with all deaf people. There are varying levels of fluency in written English among deaf people and printed information is not equally accessible for all. Written English is not accessible for some deaf people because it is their second language and also because of the educational barriers they may have faced.

## High-stakes situations: Abbreivated communication and nodding cooperatively

Encounters between deaf people and their probation officers can involve high stakes for the deaf person. These situations can be fraught, as unsuccessful communication has the potential to incur negative consequences for the deaf participant, especially if they are not perceived to be cooperative. Sometimes, as discussed above, deaf people will nod and pretend to understand what is being said in order to avoid confrontation or negative reactions, such as feelings of frustration on the part of the hearing person because they are not being understood. The fear of confrontation or seeming uncooperative might lead to abbreviated communication by the deaf person.

Studies of communication with deaf people in healthcare settings have shown that deaf people frequently abandon efforts to try to explain themselves in situations where interpreters are not provided when they realize that they are not being understood (Lieu et al., 2007). The aforementioned study also shows that deaf people are less likely to ask for more information and their encounters tend to be more abbreviated. Similar studies have shown that deaf people often feel as if they are burdensome if they ask too many questions and take up too much of a service provider's time; findings show that a common refrain among deaf participants is, "I just answer yes to everything they say."

Research has shown that deaf people are often anxious that repeated requests for clarification during a failing communication encounter, persistent requests for ASL interpreters, or a refusal to communicate without an ASL interpreter will result in negative consequences for them during an encounter with a service provider. In situations where they perceive a power imbalance, deaf people often feel they cannot persist in advocating for their communication needs for fear of disruption of the services they need. For example, the refusal to participate in a meeting with their probation officer without an ASL interpreter could be perceived as uncooperativeness, leading to a return to prison or some other adverse consequence.

**In summary**

Some deaf communicative practices are particularly focused on accommodating people who can hear and use spoken language, and these communicative practices are often misunderstood. There are some aspects particular to deaf languaging practices that have an entirely different meaning for people who use spoken languages, such as nodding or vocalizing. Also, spoken languages are not easily used or understood by people with no hearing or limited hearing, and the written form of a spoken language is only accessible to people who are literate in that language.

While the dynamics of individual communicative interactions vary, deaf people use a broad range of semiotic resources, defined here as actions, materials, and artifacts used for communicative purposes. Some examples include linguistic features and modalities such as signing, gesturing, speaking, mouthing, writing (in the air, on paper, on hands or arms), typing (on mobile phones, on calculators, on computers), fingerspelling in signed languages, and pointing.

Translanguaging researchers working in applied linguistics have argued that human communication transcends bounded languages. Bounded languages are defined here as the conceptualization of languages as having rigid boundaries that do not include multimodal communication. A focus on language as multimodal and flexible suggests that the communicative encounter should be analyzed in its totality and meaning that a person's utterances (or signing) cannot be divorced from their spatial context or the person's lived experiences. People arrive at a particular place (physical and metaphorical), with very specific communicative repertoires that include the linguistic and semiotic resources they acquired (or did not acquire) throughout their individual life trajectories.

Put simply, not every person has the same communicative repertoire, meaning that a deaf person who was born profoundly deaf into a non-signing, Khmer-speaking family living in rural Cambodia where there are no schools for the deaf may not have acquired the same linguistic

11

resources as a deaf person born into a signing family in Frederick, Maryland, where there is a large deaf community and a well-funded school for the deaf. These people have different resources and modalities for communication that are based on their lived experiences. They may have learned to combine different configurations of communicative resources that are particular to their cultural knowledges and locations. For example, deaf people living in a remote, rural village in Indonesia, where I conducted seven months of fieldwork, point to their heads above the temple with their index fingers and make a twisting motion with their hand to sign *kopi*, which means coffee in Indonesian. They point to their hair, which is black, like the color of coffee. In another example, deaf villagers point to their teeth, when they are talking about something (or someone) that is white.

In other words, communication is assembled in situ with collaboration with others with a shared cultural knowledge and referential points; these configurations of communicative resources only make sense in specific spaces among people with a shared point of reference. This kind of communication is successful when people have a shared cultural understanding of the meaning of these particular combinations of resources. However, that is not necessarily the case in many of the case studies described below, especially because some deaf languaging practices have a different meaning for people who do not sign, such as nodding or gestures, as I will discuss. Moreover, it is not possible to fully know—without performing a communication assessment—an individual's fluency in a communication modality or their communication preference based on what the individual uses during a brief interaction, such as might occur during a first meeting with a probation officer (such as were depicted in the videos). The individual's use of a particular modality in the context of such brief interactions does not necessarily enable the layperson interacting with the deaf person to have a full understanding of their level of fluency in that modality; however, I am able to make expert assessments based on my analysis of the videos, which I reviewed multiple times, as well as my education, research credentials, and lived experience as a deaf person.

## Description of Methodology

The methodology used in this report included the review of body camera videos captured by officers during their meetings with deaf clients. The legal team that retained me for this report provided me with videos of 12 individuals meeting with their probation officers. In totality, I viewed 22 videos; in most cases, there were at least two representative videos, but some cases had three or only one.

Two videos for each individual was sufficient to gain insight into their communicative repertoires. These interactions are scripted interactions that follow a predicable progression of questions and answers, such as formulaic questions by probation officers about drug use, leaving the state, contact with victims, and so on. The patterned format of these interactions makes it possible for deaf people to mimic understanding or appropriate responses because they have learned from earlier interactions. The number of interactions to form conclusions was sufficient because people do not often deviate from previously learned communicative behavior and also because of the scripted nature of these interactions.

I reviewed each of these videos in its entirety, documenting the strategies and modalities used by both the deaf person and their probation officer in the communicative encounter. As I reviewed the videos, I analyzed the semiotic resources that I observed in the video. Semiotic resources are defined as the actions, materials, and artifacts we use for communicative purposes, such as facial expressions and gestures, or pen and paper, or a computer. I then examined the interactions between the deaf people and their probation officers; as well as related case notes produced by these probation officers.

Some of the descriptions in individual case studies are more detailed than others. This is because the videos vary in length from three minutes to thirty minutes. Some videos are of two people laboriously writing back and forth on a notepad for thirty minutes, meaning that this was a less complex interaction to analyze. Another example of a less complex video is of a probation meeting that takes place in a parking lot and does not show the entirety of the interaction because of the location of the body camera. During this video, the officer and deaf person simply took turns writing on a notepad by a car and the video bounced from the notepad, to the hood of the car or the trees. Other transcripts are longer because of the number of communicative resources (and people) involved.

For some videos, I reviewed a brief transcript of the audio in the video and worked with a certified ASL interpreter to ensure that I did not miss any utterances or background noise that may have affected the interaction. The following section outlines the individual case videos and the communication modes and intent shown in the interaction. With knowledge based on my observations of deaf languaging practices and lived experiences as a deaf person, I determined the intent behind the deployment of certain communicative strategies, such as the deaf person cupping their ear to signal that communication is breaking down. As a deaf person who also relies on lipreading for communication in certain situations, I am familiar with the ways in which there can be delayed understanding as a deaf person's brain sifts through various possibilities that would make sense in that specific communicative context. For example, a deaf lipreader could catch most of the words in a sentence but lose one or two words that are key to understanding the overall message, so the brain engages in a process much like filling in the blanks in Mad Libs stories. In Mad Libs books, each page has a short story where key words have been replaced with blank spaces. In this way, I am able to determine the intent behind the strategies that people use to achieve mutual understanding. Also, I documented any observed communication services provided by the officer and conducted a brief analysis of related case notes.

As I viewed the videos, I transcribed my observations of people's behavior, their facial expressions, and their use of objects or gestures to communicate. I tracked the various modalities deployed during the interaction, such as the use of a smartphone to type a message in text, paper and pen, lipreading, pointing, head shaking, ASL signing, ASL facial or body grammar, body language, and so on. I described what I saw people doing, as well as what they communicated. In some instances, I provided an explanation of things that might not be obvious to a person who was not familiar with deaf languaging practices or discourse analysis.

I had the following questions in mind as I reviewed the videos:

1.  What modalities did each person use?

2. What was the intent of using this particular modality?
3. Was there a communication breakdown?
4. What happened before and after this breakdown?
5. What was the response to this breakdown?

These questions guided my transcription process: after I documented in English words what I saw in the videos, I then reviewed the transcripts for themes, recurring patterns, and inconsistences. I acknowledge that there are some limitations because I was not present at the meetings, nor have I met most of the people in the case studies; however, my knowledge of deaf languaging practices and previous research that shows the consistency of communicative strategies in different circumstances allows me to form expert opinions with confidence and to draw on the sample provided to me by the legal team to form my determinations.

## Case 1: Barnett, Ashley

### 1.1 Communication modes used and intent

The first video I reviewed for this case was a body-cam video dated August 7, 2019 of a meeting between Ashley and an officer. This meeting took place in an office setting and involves communication between four parties: Ashley, a probation officer, and two men who are Ashley's family members. Ashley's family members were present for the duration of the meeting and they attempted to assist with communication by using homesigns and often bypassed Ashley, providing detailed responses to the officer's questions without communicating the question to Ashley or soliciting any input from her. Ashley's father often answered the officer's questions without signing them to her, circumventing her and providing his own answers to the officer's questions.

The communicative encounter shown in this video was highly complex because of the number of interactants and the diversity of semiotic and linguistic resources involved. Between them, the four interactants used gestures, body language, eye gaze, pointing, homesign, and some signs in ASL as they attempted to communicate. Throughout this encounter, Ashley primarily used ASL to communicate. Her father used a combination of recognizable signs in ASL, homesigns, and gestures to try to communicate with Ashley.

Within the first minute of this video, we see a man, later identified as Ashley's father, make a series of quick gestures that do not clearly mean anything as there is no obvious iconicity; in other words, these gestures do not show a clear correspondence between form, as in how the gesture appears, and its meaning. As her father gestures, Ashley does not show any signs of comprehension, nor does she nod to encourage him to explain further. As her father speaks, Ashley looks from her father to the officer with wide eyes and a small, tight-lipped smile, indicating discomfort or nervousness.

At 0:33 seconds, I observed the officer's hand sliding a typewritten sheet of paper across the counter. Ashley touched it with the tips of her fingers, eyes downwards, then looks up, and back at her father who gestured at her. Ashley did not read the text on the paper; she averted her gaze from the officer as her eyes flickered and squinted. Ashley looked up at her father, and raised her

hand with the index finger up, which could be the beginning of the sign for "What'd they say?" or "Say what?" Her hand then slowly drifted downwards as her father gestured to her.

This was only one of several examples in this video of communication breakdowns. The following is a brief description of another communication breakdown I observed in this video:

1:00 The father rubbed his fingers together in a gesture that is commonly understood to mean MONEY then signed in ASL "Where?" He then gestured again, MONEY, and made an underhand throwing motion. It looks like he is asking Ashley where she spent her money. Ashley looked at her father with a blank expression and did not respond or behave as if she understood.

1:01 Ashley continued to stare blankly at her father and did not respond with nodding or agreement. He then fingerspelled in unclear ASL, A-S-?-X-G; and then signed "Where?" He then gestured MONEY again with sharp, forceful movements.

The repetition and forceful movements indicated that Ashley's father realized that Ashley did not understand him, so he repeated himself with more emphasis in an effort to try to make her understand him better.

1:07 Ashley then nodded, and then copied her father's signing with her eyebrows raised.

The raised eyebrows suggest that Ashley did not understand what was being communicated and was merely copying what her father had just signed. This copying is either a strategy of stalling to give herself time to piece together what her father was trying to communicate or a way of trying to understand what he is attempting to sign by signing it to herself (similar to how people who can hear sometimes read things out loud to themselves when they do not fully understand a text).

Ashley then signed "mine?" with raised eyebrows, which denotes a question in ASL grammar. This suggests that she was prompting her father to continue explaining as she processed the communication.

1:08 As Ashley and her father struggled to make understanding happen, another man (who seems to be Ashley's uncle) leaned over to point at the paper as Ashley made the handshape for "b," as she looked at her father and mouthed "bank?"

Among some homesigners, fingerspelling the first letter of a word as the word is uttered (or mouthed) is a means of supporting lipreading or speaking. For example, if a homesigner thought that her father might not understand the ASL sign for bank or her speech, she would make the handshape for the letter 'b' to help him understand her meaning.

1:10 Ashley asked in ASL, "Take money, for what?" with a furrowed brow, which signals non-understanding

As this effortful communication progressed, it was clear that Ashley did not understand her father. The communication breakdown I described above is one of several examples throughout the video.

I provided this description as a brief, illustrative example but this is not the only time in the encounter where communication broke down. In this brief, ten-second encounter, I observed the use of lipreading, gestures, home sign, speech, physical objects (e.g., the paper with text on it) and pointing, which are various strategies used by deaf people and their interlocutors to try to communicate.

The second video, dated March 7, 2018, shows an interaction between Ashley and an officer in a small room where they are both seated at a table, separated by a plexiglass window. The officer and Ashley are communicating primarily by writing on paper. In some instances, Ashley instinctively defaults to ASL in her responses to the officer, which suggests that ASL is the client's default and preferred communication modality.

## 1.2 Communication methods used by officers

In the video, dated March 7, 2018, the communication methods that the officer used involved writing on paper. During this meeting, the officer communicated with Ashley by writing.

At the beginning of the meeting in the video dated August 7, 2019, the officer provided a sheet of paper with a list of typed questions.

## 1.3 Comparison of observed communication modes in video with case notes

According to the case note dated October 2, 2019, the officer communicated with Ashley by writing on pieces of paper. Ashley was also given a sheet with prepared questions. The case note is a lengthy description of this interaction and at one point, Ashley stated that she preferred to communicate by writing. After the officer explained that her next appointment would need to be set up with an interpreter, Ashley said, "Yes ok, finally said something about an interpreter...Thank you." This case note indicates that Ashley's preference is to work with ASL interpreters, but she may not have felt as if she could request an ASL interpreter for her access, given that she is an individual on probation interacting with an authority figure.

The case notes dated June 16, 2020, states, "…she is hearing impaired and her main form of communication is through sign language. (We were able to complete her initial assessment through written communication)." This is concerning because other case notes in Ashley's file indicated that she has difficulties with the English language, as discussed below.

The communication modes observed in both videos included the use of text (as in a sheet of paper with questions typed out on it in the first video, as well as a conversation conducted in writing in the second video); however, the case notes indicate that text-based communication is problematic for Ashley. The most recent case note, dated July 8, 2020, noted that Ashley's mother had communicated her concerns about Ashley's ability to understand written English. In this case note, the officer wrote, "Ms. Ledbetter requested for her daughter to have a dictionary because she does not recognize all of the words in the English language."

This case note is additional evidence that text-based communicative resources, such as the provision of a sheet with questions prepared in advance, as seen in the first video, or writing, as in

the second video, is not the best method for communicating with Ashley and the officers were aware of this but did not provide an ASL interpreter.

There are also several case notes that mention miscommunications because of the lack of an interpreter at meetings (see case notes dated July 8, 2011; November 21, 2011; January 22, 2016; and February 8, 2018 for representative examples). The case note dated February 8, 2018 stated that Ashley's mother texted Ashley's probation officer after Ashley failed to report to the office for a meeting. The note states that the officer replied with, "'the subject was supposed to report to this officer this morning.'  Ms. Ledbetter stated subject did not understand and what was required of her to do since there was no Interpreter. Ms. Ledbetter added that the subject only mentioned that she had to report to this officer on the First Wednesday's [sic] of each month. This officer notified Ms. Ledbetter that the subject was order 4 instructions and that was one of them [sic]. Ms. Ledbettter [sic] again stated that the subject needed an interpreter in order to understand the simple instructions."

Throughout the case notes, there are multiple references to Ashley not being able to meet the conditions of her parole (such as attending programs) because she did not have an ASL interpreter (see the case notes dated August 4, 2015; October 28, 2016; January 14, 2016; January 22, 2016).

**1.4 Ashley's communication preference**

Based upon my assessment of these videos and the conclusions I reached in that assessment, it is my expert opinion that in any substantive interactions where Ashley must access and share information with service providers (including, but not limited to, law enforcement officials, probation officers, medical personnel, and counselors) who *cannot* fluently communicate with her in ASL directly, the accommodation of a professional, qualified ASL/English interpreter is required.

Attempts to contact Ashley to verify her communication preference were unsuccessful, as she is currently incarcerated. However, it is my expert opinion, based on evidence in the case notes and analysis of both videos that Ashley's preferred method of communication is ASL but in both videos, she was not able to use her preferred form of communication. Instead, the officers communicated with her in writing and gave her a prepared list of questions for her to read and respond to. The officers also relied on family members as communication support, however, their communication was inaccurate, as I have described above, and there were several misunderstandings and communication breakdowns throughout the first video.

## Case 2: Blackmon, Jerry

**2.1 Communication modes used and intent**

The first video I reviewed, dated April 8, 2019, is of an interaction between Jerry and a probation officer that takes place primarily in writing. The officer is seated behind a plexiglass barrier with an open laptop. This video is approximately 30 minutes long and while watching it, I observed what seemed to be a slow and laborious process as Jerry and the officer communicated by writing

17

on a sheet of paper. This sheet of paper seems to be a list of pre-typed questions that Jerry is answering in writing.

At one point in the video, Jerry is signing in ASL to his mobile phone, but it is not clear what he is signing because he is looking down and the signs he used were not identifiable from the body camera's vantage point. The officer knocked on the window to get Jerry's attention and gestures at him to put away his phone. Jerry then signs in ASL, "Hold on, wait" to his phone and then looks towards the officer, who taps on the table to direct his attention to something on the table. It is not clear if she is pointing to the paper in general or a specific question on the paper, as her computer is blocking the view.

The second video I reviewed, dated November 12, 2019, is similar to the first video in that it was a long, drawn-out meeting conducted entirely in writing. The second video shows an interaction between Jerry and an officer that unfolds over approximately 38 minutes. Jerry and the officer were writing back and forth most of this interaction, but they also used gestures and some lipreading to communicate. At some points, Jerry used objects, such as a piece of mail, to illustrate a point that he was trying to convey to the officer.

## 2.2 Communication methods used by officers

Both videos show that the officer provided a list of typed questions on a piece of paper for Jerry to read and respond to. Other communication-based methods that I observed the officer using in the video included the use of gestures and attention-getting behavior, such as waving her arm to get Jerry's attention.

## 2.3 Comparison of observed communication modes in video with case notes

The case notes dated April 29, 2020 states, "On this day, text message was sent to the defendant asking his permission to use the Languageline Interpreter Services to include needed device. The defendant declined these resources stating, that "He told me (OFC Jackson) once our communication is great, I don't have no problem at all."

The videos show that communication between Jerry and the officer involves long, drawn-out process that would be much more effective if there was an ASL interpreter involved. It should also be noted that Jerry seems distressed throughout both encounters, holding his head in his hands and looking down at the table, shaking his head.

My conversation with Jerry, described below, contradicts what was written in the case notes dated April 29, 2020. The video also shows that communication was not necessarily unproblematic.

## 2.4 Jerry's communication preference

After several attempts, I reached Jerry and we had a conversation about his communication preferences. I asked Jerry questions about his primary communication modality and he told me that an ASL interpreter is the best way for him to communicate with service providers. He stated that without an ASL interpreter, communication is a long, drawn-out process that he finds

upsetting. He has had encounters with some police officers who know some signs in ASL, but this is not ideal because their signing is not fully understandable. Jerry explained that he has asked the department five to eight times, in his recollection, for an ASL interpreter but his requests were ignored. He has also been in several situations where he had to reschedule appointments because his requests for an ASL interpreter were ignored. He said, "The police ignore me when I ask for accommodations; they wouldn't give me paper and pen or let me use a TTY."

Note: A TTY is a telephone typewriter device that enables deaf people to make phone calls. A TTY consists of a telephone handset, a modem and a printer, which enables typewritten messages to be sent to another TTY on a telephone line. TTYs are not fully accessible for deaf people because competency in written English is required to use a TTY.

## Case 3: Brown, Nicholas

### 3.1 Communication modes used and intent

This video dated June 3, 2019 shows a meeting between Nicholas Brown and his probation officer that takes place in a parking lot. The primary communication modes used in this encounter consisted of writing back and forth on a notepad, body language (such as nodding affirmatively), gestures, and pointing.

### 3.2 Communication methods used by officers

The officer used a pen and paper to communicate with Nicholas and they communicated in this way throughout the video. I did not observe any other communicative modalities in this video.

### 3.3 Comparison of observed communication modes in video with case notes

A review of the case notes shows that the first note, dated May 22, 2019, stated that the client was deaf and needed an ASL-English interpreter. The case note dated June 3, 2019 states that the client was given "an intake packet with a note advising that he read and fill out the packet entirely and write any questions on the back of the last page."

In the video, Nicholas did not write any questions on the packet and seems to have communicated with the officer in writing and in gestures, as well as nodding to show affirmation.

The case note dated June 12, 2019 states that "The offender was repeatedly instructed orally and by written statements to not leave the state of GA without permission first. Offender had nodded his head in aggreeance [sic] to each direct order telling him not to leave the state of GA without permission." This case note suggests that the officer relied on speaking, with the assumption that Nicholas could lipread well enough to understand them.

### 3.4 Nicholas' communication preference

My attempts to reach Nicholas to verify his communication preferences were unsuccessful. However, my review of the case notes suggest that Nicholas' primary communication modality is most likely ASL, based on the case note dated May 22, 2019, which states that Nicholas needs an ASL interpreter. However, I need more information to reach an expert conclusion.

## Case 4: Clark, Casey

**4.1 Communication modes used and intent**

The video dated September 27, 2018 shows that Casey used speech with gestures to communicate with the officer; for example, he points to his ear to indicate that he is deaf. The use of co-speech gestures is a common way of attempting to support understanding during communication. The first 30 seconds in this video shows a communication failure; the video shows Casey in a waiting room, seen through a plexiglass window, from the officer's bodycam. Casey approaches the window and is using his speech to try to communicate but the officer does not understand him, and Casey makes a small grimace when he realizes that the officer is not understanding his speech. The officer has a sheaf of papers in her hands and collects a pen, then gestures for Casey to walk through the door into a hallway. In the hallway, the officer provided Casey with paper and pen, which he then uses, pressing the paper to the wall to support it as he writes while standing in the hall. Later in the video, Casey and the officer moved to a conference room where they communicate using a combination of writing, speaking, and gestures. A close observation of Casey's face as he speaks shows that he seems to be straining and speech does not come naturally for him. Casey seems to be relying on gestures to try to facilitate understanding of his speech.

During this interaction, Casey also used the objects that he brought (e.g. letters he received) to try to support communication. He opened the mail and showed it to the officer, asking questions. At one point during this interaction, he also attempted to teach the officer the ASL signs for, "How are you?"

At the 8:53 mark of the video, Casey signed in ASL, "I am sorry…I did not bring an interpreter, but I tried my best!" This suggests that he may have felt as if he was coerced. By making this comment, Casey is making a point that he was trying his best to communicate in a suboptimal situation with the resources that he had available–that is, by using his speech, gestures, and objects to try to make himself understood.

The video dated November 20, 2018 begins with the officer walking with an open laptop, then entering a conference room, then setting down the laptop. The officer then went to get Casey from the waiting room; the video then showed a series of interactions between Casey and a probation officer in a hallway setting. Casey has written a long note on paper clipped to a clipboard. As soon as Casey entered the hallway, he handed the clipboard to the officer. As the officer read his note, Casey spoke to the officer, using his voice to communicate. He also gestured and pointed during this communication. In this interaction, Casey and the officer primarily relied on lipreading and speaking as communication tools. At the 2:45 mark, Casey angled his head, as if he was trying to hear better. This action shows that there is some sort of ambiguity; in other words, Casey's body language indicated that he is missing some information and making an effort to piece together what is being communicated.

In the video dated July 29, 2019, at the 1:07 mark, Casey angled his head as if to hear better, which indicated that he did not fully catch what one of the officers said. As the officer continued speaking, Casey put his hand to his ear, as if cupping his ear, which indicates that the communication was not smooth and that he missed some auditory/visual information. Casey cupped his ear again at the 2:09 mark, showing that he missed information. At the 2:46 mark, Casey again cupped his ear as he looked at the second officer in the background. After Casey cupped his ear, the officer with the bodycam used gestures, as if trying to make Casey understand something, meaning that they both knew that this communicative interaction was breaking down. There are a few more instances where Casey angled his head as if to try to hear better, notably at the 5:20 mark, where the interaction is coming to an end and the officer had just given a thumbs up, as if he thought Casey understood the communication.

## 4.2 Communication methods used by officers

The video dated September 27, 2018 showed that the officer provided paper and pen to Casey to help with communication. She also brought him into a different room with a table where they could write more comfortably. In this video, they primarily relied on lipreading and speaking as communication tools; it is important to note that at the end of this video, Casey commented that there was no interpreter present, but he tried his best to communicate.

The video dated November 20, 2018 shows that the officer and Casey communicated by speaking, lipreading, writing, gestures, and pointing.

In the video dated July 29, 2019, Casey and two officers communicated by writing notes and speaking. In this video, the primary method was speaking with co-speech gestures.

## 4.3 Comparison of observed communication modes in video with case notes

From the very beginning, Casey self-advocated for an ASL interpreter for his communication needs. The first case note in his file, dated July 24, 2018, stated the following:

> received a phone call from subject with the use of an interpreter. Inquiring about intake and the subject [sic] inability to hear and the requirement of an interpreter during intake. Subject is legal deaf [sic]. I was given the name of an interpreter that the subject used during court and the name and number of the agency (Enterpretek of Atlanta). It [sic] then advised that the Subject would be contacted as soon as arrangements could be made.

It does not seem that the probation staff were consistent in providing the interpreters that Casey requested. The case notes dated July 29, 2019 states, "Defendant is deaf, however due to the uncertainty of when the defendant may be released, no interpreter was at the Office. CSO Grimm was able to communicate with defendant with the help of a friend he brought, as well as writing things down."

In another note, dated February 1, 2019, the officer noted that Casey stated that English was not his first language and that ASL was his first language. This case note indicates that Casey asked the officer for a sign language interpreter for his appointments. In this case note on the telephone call they had, the officer wrote, "Spoke with Def through interpreter. Def would NOT be forward about what he wanted. Basically was telling ACCSO he would NOT report without an interpreter. Stated that English was not his first language. Asked what was his first language, he said American Sign Language. Kept saying per the ADA it was illegal to have him report without providing him an interpreter. Told him I would contact Grimm and have him get back with him today."

Over two years of the case notes that I reviewed, it seems that Casey was only provided with interpreters on four occasions. Many of the contact reports are from phone calls that he made to the office through video relay services, which suggests that Casey used this system as often as possible to achieve optimal communication with the officers. It is my expert opinion that Casey made much use of the video relay service because this was a way of securing ASL interpretation in order to have clear communication.

**4.4 Casey's communication preference**

I interviewed Casey to verify his communication preference. He explained that he uses his speech because he has no choice; Casey thinks that the officers assume that he is hearing because he speaks. Casey explained that he cannot understand the officers without an ASL interpreter, but they do not provide one on a consistent basis, so he is forced to resort to speaking and he told me that he does not fully understand officers when they speak to him, so communication is one-way. Casey also explained that Video Remote Interpreting ("VRI") services are not ideal because it is not as easy to work with an interpreter on a screen as it is to work with an ASL interpreter who is in the same room.

Based on my conversation with Casey and the case notes, especially the note dated February 1, 2019, it is my expert opinion that ASL is Casey's first preference for communication and that he needs an ASL interpreter. My assessment of these videos and my conversation with Casey led me the conclusion that in any substantive interactions where Casey must access and share information with service providers (including, but not limited to, law enforcement officials, probation officers, medical personnel, and counselors) who *cannot* fluently communicate with him in ASL directly, the accommodation of a professional, qualified ASL/English interpreter is required.

## Case 5: Cohen, Gabriel

**5.1 Communication modes used and intent**

The first video I reviewed, dated July 25, 2019, showed an officer approaching Gabriel, who is walking down some steps to meet him. Within the first five seconds of the video, the first observable communication is Gabriel pointing to his left ear and speaking, "I am deaf." The officer gestured to him and asked him if he could talk. Gabriel responded by nodding and pointing at his lips, as he says, "I read lips." The interaction in this video is a series of questions that Gabriel answered verbally with one-word responses, as in "Yes" or "No."

The following is a brief transcript of this interaction that shows the areas where a communication breakdown occurred and the repair strategies undertaken, such as typing on a smartphone. At one point (0:25 on the video), Gabriel angled his head as if he was trying to hear better and this is a communicative cue that the officer should repeat himself. This is one example of how this particular communication mode (e.g. relying on lipreading and speaking) is not a successful strategy for communication with Gabriel. There are other examples of Gabriel not fully understanding the officer in the video and at one point, Gabriel asks the officer to type his questions on his mobile phone, suggesting a communication breakdown.

     PO: Gabriel Cohen. You doin' alright?

     GC: I'm deaf.

This response, "I'm deaf" does not answer the question the officer asked, nor does the following response, "I can read lips" to the officer's question about Gabriel's ability to speak.

     PO: Can you talk though?

     GC: I read lips.

     PO: But can you talk to me?

     GC: I can talk to you (sounds like "tell you").

     PO: Um, any contact with law enforcement?

     GC: (Shakes head no.)

     PO: No. Drug, alcohol use?

     GC: (Shakes head no.)

     PO: No. Uh, contact with the victim in your case?

     GC: (Appears that he is saying "What?" but it is inaudible.)

     PO: Contact with the victim

The officer's repetition of the question here indicates that Gabriel did not understand the officer the first time.

     GC: (Shakes head no.)

     PO: Ok. Do you have any questions?

     GC: Everything is good. (Difficult to understand his speech.)

PO: Good? Where were you on Sunday at like 2:00AM?

GC: (Appears that he said  "Huh?" but hard to hear his speech.)

PO: Er, where were you Tuesday at 2:00AM

Here, there is a communication breakdown that most likely occurred because this was a non-standard question and a deviation from the standard questions probation officers tend to ask during their visits. Here, we see an example of the failure of the predictive communication strategies that deaf individuals rely on for smooth interactions.

The officer repeated himself and there is a pause that makes it seem as if Gabriel was a beat or two behind in the rhythm of the interaction. This is common in situations where a deaf lipreader did not fully understand what was being said and is continuing the interactions with the hope that the next utterance(s) will provide the additional clues that they need to fully piece together the message.

In the next phase of this interaction, Gabriel asked the officer to use his smartphone to type out their communication because using the lipreading and speaking modalities was not successful for communication. The following interaction shows that even with typing there were some misunderstandings, as Gabriel's speech was not clear and the officer said, "Huh?"

GC: Can we text now?

PO: Yeah.

TYPING

PO: Do you want me to send it to you? Or do you just want to read it?

GC: I was at my friend's house. My phone was off. (Unintelligible)

PO: Ok.

GC: You (Unintelligible) for now.

TYPING

PO: Huh?

TYPING

PO: Uh. Let's see. For now.

TYPING

GC: That's fine.

PO: You good? Have a good one.

During this interaction, Gabriel and the officer communicated with speaking and lipreading, then when that communication method failed, the officer resorted to using a mobile phone to type to Gabriel, who responded verbally. On several occasions, Gabriel used gestures to try to help the officer understand him after there was a communication breakdown. As the officer still did not understand, Gabriel then resorted to using his mobile phone to type to the officer.

The second video that I reviewed, dated January 27, 2020, showed a different interaction taking place in Gabriel's home. During this particular interaction, the officer and Gabriel are joined in the kitchen by an elderly woman, Miss Patricia, who is Gabriel's roommate. Miss Patricia brought a notebook and pen to the kitchen, suggesting that the officer communicate with Gabriel that way. During this meeting, Miss Patricia is answering the officer's questions without communicating them to Gabriel. After the officer asked to see Gabriel's living space, Miss Patricia guided the officer towards Gabriel's bedroom, waving at Gabriel to follow. She entered Gabriel's bedroom, explaining to the officer that "this is where he sleeps, and his bathroom is over there." For the duration of this interaction, Gabriel is passively following Miss Patricia and the officer, with a blank expression on his face.

The video then showed the officer walking through the apartment towards a dimly lit bedroom, where Gabriel and the officer communicated through speaking and lipreading. Gabriel's roommate is also present in the bedroom and at a few points, she spoke to the officer from behind Gabriel, meaning that he could not see what she was saying.

At the end of the visit, all three people are in the kitchen (Gabriel, the officer, and Miss Patricia, his roommate) and it is here that a critical communication breakdown occurs with potentially damaging misinformation. At the beginning of this visit, Miss Patricia had told the officer that Gabriel was on disability after she asked him if he was working and it seems that Gabriel missed this interaction as he did not respond or interject; however, at the end of the visit, Gabriel told the officer that he was working at the Kroger Center and that he had his employee jacket, which is a contradiction to Miss Patricia's statement that he was on disability.

## 5.2 Communication methods used by officers

In the video dated July 25, 2019, after a communication breakdown, the officer accommodated Gabriel's request for an alternative communication modality by typing on his mobile phone. There were however still some communication breakdowns.

The video dated January 27, 2020 showed that the officer and Gabriel communicated through speech and lipreading. During the second interaction, it is not clear if Gabriel actually understood everything, as he was nodding a lot. The excessive nodding suggests that he was anxious for this encounter to be finished.

### 5.3 Comparison of observed communication modes in video with case notes

In the case notes related to the video dated January 27, 2020, the officer wrote, "Successful field visit conducted on this date to ███████████████ Sandy Springs, Ga ████ @6:56AM. The deft [sic] acknowledged via head shakes that he has not had contact with law enforcement, drugs, alcohol, and minors. The deft is able to read lips but this Officer wrote out all questions asked. The deft's roommate was present during the visit but was not of much assistance due to not knowing sign language."

The juxtaposition between the officer's note about the roommate being "not of much assistance due to not knowing sign language" and her assertation that Gabriel is able to read lips is interesting to note because it suggests an acknowledgement that the tools used during this encounter, e.g. lipreading, speaking, and writing, were not optimal for Gabriel. The officer's note of Gabriel's roommate's presence and her inability to "help" is an implicit recognition that the use of sign language as a tool to support communication would have been more beneficial in her interaction with Gabriel.

The case notes claimed that Gabriel is "fine" with communicating via smartphone, rather than through an ASL interpreter; however, the interactions observed on the two videos show that the interactions are hurried, almost perfunctory encounters with a series of misunderstandings and wrong information provided by Gabriel's roommate.

### 5.4 Gabriel's communication preference

My attempts to contact Gabriel to verify his communication preferences were unsuccessful. My analysis of the video and case notes show that Gabriel was not able to use his preferred communication modality, which is ASL. Also, the involvement of his roommate to "assist" with communication resulted in the wrong information being given to the officer, which could have jeopardized the conditions of Gabriel's supervision. It is my expert opinion that Gabriel requires an ASL interpreter for successful communication and the use of other modalities results in misunderstandings and wrong information being conveyed to the officer.

## Case 6: Daniel, Arin

### 6.1 Communication modes used and intent

This video, dated December 31, 2019, showed an interaction between the officer, Arin, and another woman, as seen through a plexiglass window inside of a building. The woman who accompanied Arin is her mother and seemed to be doing most of the communicating, writing down information on paper and speaking to the officer. Arin does not intervene or speak for herself and is a bystander during most of the interaction in this video.

The second video, dated March 6, 2020, is a bodycam video of an interaction that took place inside a small room. The officer was seated at a desk and Arin was seated in a chair across from her, as a woman (the same one present in the first video) stood behind her. In this video, Arin and the

officer communicated using a combination of lipreading, speech, writing, pointing, and gestures. I also observed the woman answering questions and speaking for Arin.

## 6.2 Communication methods used by officers

I did not observe any special effort made by the officers to adjust their communication for Arin's deafness.

## 6.3 Comparison of observed communication modes in video with case notes

The case notes stated that Arin is deaf and that she wears a hearing aid. The notes also stated that Arin reads lips. From the case notes, there seems to be a pattern of other people, such as her mother and brother taking over communication for Arin (e.g. accompanying her to meetings, taking telephone calls, and so forth). Examples of these notes are outlined below:

A case note dated January 4, 2019 stated, "Offender reported to office on this date with her boyfriend. Offender has hearing loss and needs assistance with hearing."

On April 14, 2019, according to the case note, "Offender stated she has to read CSO lips to understanding what CSO is saying. Offender wears a hearing aid but also reads lips."

In a case note dated July 10, 2019, the officer wrote, "Offender spoke with CSO by reading CSO lips. Offender denied any alcohol or drug usage or contact with law enforcement. Offender last payment was made in May. Offender stated she is paying Alabama RS fees monthly. Offender provided updated address on this date. Offender currently receives SSI monthly disability check of about $780 a month. CSO spoke with the offender mother sitting in the lobby who stated the offender is doing well with no issues."

On October 1, 2019, the officer wrote, "Offender is hard if [sic] hearing and had a difficult time speaking with her."

On March 6, 2020, the officer wrote, "^ reported in as directed. ^ declined the VRI services. ^ signed the necessary paperwork and it has been uploaded into portal and shared with Darrell Smith. ^ uses her mother to communicate. Case expires in June."

These case notes all show that Arin is not an active participant in her own case. She relied on family members and lipreading in her meetings. These case notes are all perfunctory and these interactions seem to be at a bare minimum, meaning that there is no way to know if Arin fully understood the information that was being communicated.

There was one attempt to offer VRI services noted in the file, however, it is important to be mindful that in general, the provision of VRI often means a delay in services, as the client (Arin or any other deaf person, such as a patient at a doctor's office) has to wait for the machine to boot up, the video interpreter to become available, and the service provider to be there at the same time. The time delay often means that the deaf person would rather "go it alone" to get the meeting over

with, especially if it was a routine meeting with predictable formulated questions that do not deviate from script.

### 6.4 Arin's communication preference

Arin is no longer on probation and I was unsuccessful in connecting with her to verify her communication preferences. However, based upon my assessment of these videos and the conclusions I reached from that assessment, the communication taking place through speaking and lipreading is not ideal for Arin. The presence of Arin's family members or friends for communication support at these meetings suggests that successful communication with Arin requires tools beyond lipreading and speaking.

## Case 7: Kines, Kerry

### 7.1 Communication modes used and intent

The first video, dated October 21, 2019, showed an officer standing in a room with medical equipment standing over Kerry, who is struggling to write on a piece of paper as the officer with the bodycam walks in. The officer read what Kerry wrote, then handcuffed him with his hands behind his back. In general, deaf people should be handcuffed with their hands in front of them because handcuffing deaf people with their arms behind their backs makes it especially difficult for deaf people to communicate, especially in ASL.

### 7.2 Communication methods used by officers

The video dated October 21, 2019 (13:41) showed that the officer communicated verbally to Kerry and provided writing material. Kerry was put into handcuffs with his hands behind his back, severely limiting the resources he can resort to for communication. Kerry is seated quietly with his hands cuffed behind his back for most of the video, until the very end when the officer communicates with him by tapping on his shoulder and gesturing at him. This video also shows the officer using a notepad and writing to communicate with Kerry; however, several case notes noted that Kerry struggles with reading.

I reviewed another video, also dated October 21, 2019 (20:44) that showed an officer attempting to visit Kerry at home. The very beginning of the video shows the officer in a car, writing questions on paper clipped to a board. The officer then approaches the building, enters, and goes to Kerry's door. The officer repeatedly knocks on the door, which does not make sense because Kerry would not have been able to hear the knocking and answer the door.

After some length of time, the door opened, and the officer showed Kerry a clipboard with handwritten questions. Kerry peers at the paper with scrunched up eyebrows, which is ASL grammar for questions (or questioning), which suggests that he did not understand what was written on the paper. In the video, I observed Kerry slowly reading what was written on the paper. The slowness of Kerry's reading suggests that he was struggling to understand what it meant. After slowly scanning the text, Kerry then pointed off towards the front of the building with a confused

expression on his face. This gesture does not seem to fit into this interaction, which suggests that Kerry did not completely understand the officer.

### 7.3 Comparison of observed communication modes in video with case notes

The case note dated November 21, 2018 is especially concerning when compared with the communication occurring on the video; the officer wrote, "When I went to Floyd County Jail I ask [sic] Sgt Mccain if she could help me with this offender since he was deaf and since she knows sign language she was so kind to help me to complete his intake orientation, offender stated he couldn't read lips and could not read good."

This note highlights the challenge that a deaf person who cannot read lips or read very well faces. A deaf person who cannot read is not able to understand written legal documents, parole instructions, or similar types of communication. The other case notes state that certain programs for people on parole would not accept Kerry because he was deaf and functionally illiterate, making it more difficult for him to participate in rehabilitative services or progress with his probation requirements.

Further analysis of the case notes flagged multiple situations where the officer stated that they gave Kerry instructions in writing or used other modes of communication that did not include ASL. After those occasions, Kerry was re-arrested for minor violations of parole, such as not reporting to the office, or following instructions, most likely because he did not understand them.

Some of these notes claim that Kerry "understood" because he gave a thumbs-up gesture or nodded in agreement. As I discussed in the introduction, studies show that deaf people often rush through stressful situations because they are afraid of being viewed as burdensome and because they want to be perceived as agreeable/cooperative.

Kerry's uncertain, wavering motion was not a resounding thumbs-up signal, as one normally sees in interactions where people have clearly understood and are agreeably indicating understanding or compliance. Positive thumbs-up signals that are affirmation of understanding and agreement are comprised of stronger, more firm gestures with clear handshapes higher up on the torso, closer to the shoulders and face. These kinds of thumbs-up signals are also typically made with a smile or enthusiastic nodding of the head. In this particular demonstration, Kerry did not confidently give a thumbs up to the officer; rather, it was a small, tentative gesture which suggests that he did not fully understand the situation.

In the case note for this particular visit, the officer wrote:

> On 10/21/2019 CSO made an unannounced field visit at the offender's girlfriend's residence attempting to see the girlfriend. After CSO completed the interaction with the offender's girlfriend, CSO called CC Gross reguarding [sic] the offender and him having a probation warrant. After discussion with CC Gross I instructed the offender through pen and paper that he is to report to the DSC office today. The offender gave a thumbs up stating an understanding and this CSO pointed back on the paper to the word 'today.' The offender gave another thumbs up.

The description in the case notes from October 21, 2019 does not match the interaction on the video. There was not an affirmative response from Kerry that indicated understanding. In fact, Kerry seemed confused and his response to the officer was to point off into the distance, which might mean that he recognized certain words on the paper but not their exact meaning. In other words, Kerry understood the word for a location, pointed off in the general direction to show he knew where it was, but this does not mean that he fully grasped that he was expected to report there on a specific day and time. The "thumbs-up" that the officer referred to were barely visible on the video and not a convincing demonstration of understanding because it was a small, brief gesture, barely visible on the video; however, Kerry did report to the supervision office on that date so he understood that much but the video does not show that it was a strong affirmation of understanding.

### 7.4 Kerry's communication preference

I was not able to contact Kerry to verify his communication preferences because he is currently incarcerated. Based on my analysis of the video dated October 21, 2019, I concluded that he is most likely an ASL user or a homesigner, because there is a person in the background (at the 3:04 mark) who is signing to him as he gets up to answer the door. The signs themselves are not clearly identifiable due to the angle of the camera and the quality of the video, but I am confident from the way that the person in the background uses her or his hands that Kerry's semiotic repertoire includes signing of some kind.

As I reviewed the videos, I observed multiple situations where it was clear that Kerry had difficulties communicating with written notes and lipreading. The case note dated November 21, 2018 showed that the officer believed that sign language was the best tool to communicate with Kerry. A review of the case notes shows that the tools used by different officers to communicate with Kerry were inconsistent. My analysis of the material related to Kerry's case suggest that he often was not given information in an appropriate format and this hindered his understanding, which could have jeopardized compliance with the officer's instructions or the conditions of his parole. It is my expert opinion that English is not accessible for Kerry and a communication assessment needs to be conducted to determine the best tools for communication with him.

## Case 8: McCorkle, Vernon

### 8.1 Communication modes used and intent

The video dated December 30, 2019, showed the officer communicating with Vernon by speaking. Vernon is using his speech to communicate with the officer, and his mother is also involved in the conversation with the officer. Vernon's mother is seated on a couch about eight feet away from where Vernon is standing, and it seems as if she is sometimes speaking while Vernon's eye gaze is directed at the officer, so it is not clear if he was aware of or understood what she said. At one point in the video, he adjusts his hearing aid, which could indicate that he was not fully understanding the interaction and the adjustment of his hearing aid was an attempt to address that.

The video, dated June 2, 2020, shows an interaction between the officer and Vernon. The officer is holding up a mobile phone and Vernon is signing to the phone. The officer is using an app on his mobile phone to communicate with Vernon. In this video, Vernon is signing in SEE to the mobile phone. The phone screen is very small. In the video, Vernon bent down at the knees and peered closely at the screen that the officer was holding. This indicates that it might have been difficult for him to see or understand the interpreter because of the size of the screen. The majority of this interaction in the video took place using this app and the officer was not visible for most of it.

## 8.2 Communication methods used by officers

The video dated December 30, 2019 shows that the officer relied on Vernon's speech and his mother to answer questions. In general, the officer communicated with Vernon through lip reading and speaking. Vernon's mother was observed on the video answering questions on his behalf. I did not observe her signing to him or assisting him with his communication with the officer.

In the video dated June 2,2020, the officer provided a phone with an application that allowed Vernon to communicate with him using a remote ASL interpreter. This seems to have been more successful for Vernon than reliance on lipreading or his mother to communicate, as Vernon remarked to the officer that he liked using the application.

## 8.3 Comparison of observed communication modes in video with case notes

In the case notes, officers made references to the ways that Vernon's mother speaks over him or for him. His mother often answers questions for him during his meetings with the officer. This makes it difficult for Vernon to engage in conversations with his officer.

Other case notes show that Vernon seems to prefer to use ASL, as he expressed that he liked using the interpreter app (as seen in in the first video) and the officer made a note of that.

## 8.4 Vernon's communication preference

I was not able to reach Vernon to verify his communication preference; however, based on the limited information I saw in the videos and case notes, I believe that an ASL interpreter is likely the best communicative tool for Vernon. This opinion is based on his comment to the officer that he liked using the app that allowed him to work with a remote ASL interpreter and the frequent intervention of his mother in one of the videos. Thus, it is my expert opinion that in any substantive interactions where Vernon must access and share information with service providers (including, but not limited to, law enforcement officials, probation officers, medical personnel, and counselors) who *cannot* fluently communicate with him in ASL directly, the accommodation of a professional, qualified ASL/English interpreter is strongly suggested.

# Case 9: Melton, Joseph

## 9.1 Communication modes used and intent

The first video, dated December 18, 2019, showed Joseph sitting in an office. In this brief interaction, he spoke and used gestures to communicate with the officer. He also used nodding as a form of communication.

The second video, dated December 3, 2019, is a dark video that shows the officer getting out of his vehicle and walking up to a trailer at night. The trailer is lit up with Christmas lights and Joseph is outside, putting up Christmas lights, but it is too dark to see clearly what is happening. The officer enters the trailer and a woman emerges from a bedroom, speaking to the officer. He checks a shelf then goes back outside to speak with Joseph. This interaction is entirely spoken, and Joseph is also using co-speech gestures. The setting is in darkness, which would make lip-reading very challenging for a deaf person.

Based on my review of the videos (viewed twice, the first time by myself then again with an ASL-English interpreter), there are several instances of a communication breakdown. The video shows that much of what Joseph says is difficult to understand. Other examples of communication breakdowns are evidenced in the following excerpt from one of the videos:

| | |
|---|---|
| Probation Officer | You're gettin' all in the festivities, ain'tcha? |
| Joseph Melton | Sorry? |
| Probation Officer | I said you're gettin' in the festive mood, huh? |
| Joseph Melton | (laughs) |

Joseph's utterance, "Sorry?" is a common prompt for the other party to repeat themselves. After the officer repeats his question, Joseph laughs. Laughter is a common strategy used by deaf people when they do not entirely understand the intent or the question itself. This is an example of how an unanticipated word, such as "festivities" could cause a communication breakdown because this deviates from the common script for this type of exchange.

## 9.2 Communication methods used by officers

In both videos, the officers communicate with Joseph verbally and there were no observable adjustments that can be attributed to their awareness of his deafness.

## 9.3 Comparison of observed communication modes in video with case notes

In a case note dated February 4, 2008, the case worker noted that this was Joseph's first incarceration and that he did not know why he was incarcerated. This case note stated, "He completed the 9th grade and doesn't want a GED. Worked as a roofer for 5 months; painter - 5 years. Claims no mental health or substance abuse history. He was raised by his mother and maintains contact with his family. This is his first incarceration and says he doesn't know what brought him to prison." Other case notes reinforce that Joseph did not seem to understand that a recent law had been passed with the implication that he would have to stay in prison longer.

There is over a decade of notes that essentially say the same thing: Joseph has difficulties hearing and speaking. These case notes also had some remarks, such as the one from April 3, 2018 in which the officer wrote, "I'm unsure if he understood my question."

According to a case note dated August 8, 2019, Dr. Deitchman administered a test to determine if Joseph could read and at what level. According to this note, Dr. Deitchman reported the following:

> He is rather difficult to understand since even when he knows a word his pronunciation is poor. He does seem to hear and understand some things, and when he does, his responses can be quick and his meaning clear. Using the Slosson Oral Reading Test- Revised, where the person reads from a long list of words which increase in difficulty, he seemed to be able to understand most of the preschool words, and some of the first and second grade words. My scoring was very liberal, in that I gave him credit if the word he said sounded anything like the written word, so this may be a generous scoring. Given his raw score of 45 out of 200 words, his maximum reading is somewhere between the first and second grade level. Why he can't read better, and whether he had the opportunity for specialized teaching, I can't say. He probably should have gone to a school for the deaf, and maybe he did. Anyway, most psychological testing requires a third to sixth grade reading level as a minimum. He was not capable of reading well enough to take the EyeDetect.

Information about Dr. Deitchman's qualifications were not available in the case notes and a Google search with the key words "Dr. Deitchman + Georgia" returned with several possibilities so I was unable to determine this assessor's qualifications. However, this report matches the pattern I identified in the notes regarding Joseph's case of the failure to determine and provide appropriate services in modalities accessible to Joseph.

### 9.4 Joseph's communication preference

Based upon my assessment of these videos and the conclusions I reached from that assessment, it is my expert opinion that a communication assessment is necessary to determine the best way to communicate with Joseph. It is inconclusive from the video whether Joseph is an ASL user or if would benefit from having an ASL interpreter. I strongly recommend a communication assessment to determine the best communication tool for Joseph.

## Case 10: Myers, Terrika

### 10.1 Communication modes used and intent

In the first video, dated November 21, 2017, Terrika met with an officer in an office. Throughout the video, they use different modes and tools, such as gestures, smartphone, speech, and some ASL. This interaction shows that despite their efforts to use different strategies for communication, such as writing, ASL, pointing, and miming, there are a number of misunderstandings related to a charger for the smartphone. At the 0:46 mark, there is a major communication breakdown about a smartphone.

Below is a transcript of this interaction:

0:38    Probation Officer (PO) points at his smartphone, points at it again, Terrika Myers (TM) then holds up his own smartphone, then starts putting it into his pocket. PO gestures for him to hand it over, then starts tapping on his own smartphone

0:46    TM puts the phone on the desk, gestures to himself by touching his chest, as if he is starting to say something, then points at his phone and fingerspells "S-F" as he vocalizes. As PO taps at his smartphone, TM waves at PO to get his attention, signs in ASL "My phone number?" but the PO is not looking at him

0:53    TM tries to get PO's attention with a small flapping movement of his hand

0:55    PO tells TM to wait with an index finger gesture as he taps at his smartphone

1:04    PO calls up a list of phone numbers and turns his smartphone to show TM, who leans forward to look and starts signing the number in ASL, then signs in ASL, "Yes"

2:40    PO gestures at TM, points and mimes something about a phone charger

2:45    TM does not understand, and raises his eyebrows, PO gestures him to hand over the phone

2:50    TM unplugs the phone and hands it over

2:56    TM signs "phone?" in ASL

3:10    TM is holding the phone in his hand; PO takes it from him

3:20    TM asks for paper and pen

3:30    PO gives TM paper and pen; TM starts writing

3:47    PO takes a piece of paper for himself and also starts writing on his own paper

4:05    TM finishes writing and waits for PO to finish writing

4:17    PO turns paper around so TM can read; TM starts reading and signs to himself as he reads. He is signing what the PO has written.

Terrika's signing as he reads to himself suggests that he is not a fluent reader; the behavior of signing to himself as he reads suggests that Terrika is using ASL as a bridge to understand written English.

4:21    TM signs in ASL "Sure, yeah" and tries to turn on his phone, then gestures to PO for a battery charger

4:26    PO holds up battery charger then puts it back down

4:27    PO starts writing on the paper

4:32    TM signs to himself in ASL as he reads what PO is writing, "Do you need [two (?) or see (?)]"

4:42    TM shakes his head and signs in ASL "No, inside is one," then touches his smartphone

Terrika's signing of "inside is one" is ASL grammar; his consistent use of ASL to respond to the officer's questions in English suggests that he is not fully bilingual or comfortable with English.

4:43    PO gestures "one"

4:44    TM points at what he has written and then to the phone, tapping on the phone to make a point and slightly nods

4:50    PO starts writing again, as TM reads

4:57    TM nods affirmatively and signs in ASL, "OK. OK"

5:00    PO starts writing again

5:09    TM nods and points to the paper

5:12    TM continues nodding and signs in ASL, "Yes" as PO continues writing

5:25    TM picks up a pen, takes off its cap and waits, reading upside down what PO is writing

5:34    PO turns the paper around; TM starts writing on his own paper

5:42    TM finishes writing, lifts pen from paper and looks at PO, who turns his own paper around and starts writing again

5:54    TM signs "Yes" then gestures/signs "No, I don't toke (smoke pot)!", with a forceful shake of his head, then gestures forcefully, as if waving it away from his body

6:30    TM starts writing again as PO types on computer

7:15    PO starts writing at the same time TM is writing. PO writes, "When was the last time you left the state?"

7:30    TM shakes his head and gestures down/here in ASL (using his index finger pointed downwards), which means, "I stay here"

35

7:45   PO writes, "Why would someone say…." then pauses and searches for something on the computer. TM reads the paper upside down, signing to himself in ASL, "Why would someone say…?" with a puzzled expression

7:50   PO gestures with his index finger for TM to wait, then starts writing again

8:05   TM signs to himself in ASL as he reads, "Why would someone say that (...unclear...)," then shakes his head, signing emotionally in ASL, "No, No, No, No, NEVER!"

Terrika seems to be close to tears, signing again in ASL, NEVER!

The text on paper is visible in the video and it says, "Why would someone say you been to Oklahoma?"

At the mark in the video, when the officer wrote "Why would someone say…" then searches for something on the computer. I observed that Terrika read the paper upside down, signing to himself in ASL, "Why would someone say…?" with a puzzled expression. Terrika signing to himself as he reads the officer's handwriting is a sign that he is not a fluent reader, and that he is again using ASL as a bridge to understand written English.

8:19   TM is writing, nodding his head for emphasis and seems very upset. He is moving his mouth as he writes out his words

8:33   CSO starts writing; TM is still writing on his own paper

CSO turns paper towards TM, who reads what he just wrote. TM then taps on his own paper to call CSO's attention to what he just wrote. He shakes his head and taps on the desk near CSO's paper, as if to repeat his point and emphasize what he has just written, then gestures to himself.

8:39   TM starts writing again; CSO is also writing on his own paper

8:49   TM turns his own paper towards CSO and uses his finger to underline what he just wrote and looks at CSO intensely for emphasis

8:57   PO takes out his phone; TM looks off into space, as if he is thinking; he then picks up a brown bottle that is on the desk, points to it, signs "sick" in ASL and mimes vomiting, shakes his head, gestures as if he is hot, motions to his head and stomach in a gesture that means "sick," points to his nose, which is stuffed with white tissue in both nostrils. He then taps his forehead with both hands, indicating that his head hurts

9:07   PO starts writing again. As the PO writes, TM seems upset and distressed, as if he is not being understood despite his efforts to communicate

9:20   PO finishes writing and turns the paper towards TM who nods and signs in ASL, "OK" but he is still visibly distressed with a despairing expression on his face

9:35   PO is scrolling through a phone as TM waits, but it is not clear what the PO is looking for

9:47   PO puts aside the phone and makes a thumbs up gesture to TM, who nods with a distressed expression on his face

9:58   TM picks up a pen, seems to be thinking; he is hesitating with the pen in his hand

10:03  TM puts the pen to paper, then pauses to look over at what PO is doing

10:22  TM watches PO as he writes, then as he reads what the PO wrote, he started to gesture, "No, No" as he shakes his head, and then continues shaking his head for several seconds

10:45  PO writes and shows TM the paper; TM signs in ASL, "soon" and PO gestures with a pinched handshape, which tends to mean "small," "soon," or "short" and TM nods

There are twenty more minutes in this video after the ten minutes of interaction that I transcribed but this is a sufficient demonstration of the various communication breakdowns that can occur, even when several modalities are used. Throughout the video, the officer uses writing to communicate to Terrika, who often will sign back to the officer in ASL or use gestures. In this interaction, which is over 30 minutes long, there are quite a few examples of Terrika using ASL to respond to the officer, who does not understand ASL. Terrika defaults to ASL because it is his language and therefore, the most comfortable mode of communication, and he uses it as a bridge to help himself read/understand English.

## 10.2 Communication methods used by officers

The officer attempted to communicate with Terrika by using a mobile phone to type, but this resulted in a communication breakdown, so he resorted to writing. The officer used pen and paper, as well as gestures throughout this communication; however, there were several breakdowns, which appear in the transcription in 10.1.

## 10.3 Comparison of observed communication modes in video with case notes

A case note dated March 13, 2017 states that Terrika is "hearing impaired" and needs an ASL interpreter. For several meetings in the office, Terrika had an ASL interpreter with him. The case notes in general show an awareness that an ASL interpreter is necessary for effective communication with Terrika; a case note dated March 14, 2019 states that Terrika can only read lips "some of the time."

The case notes for the video date November 21, 2017 do not mention any of the communication breakdowns observed in the video. The accounting in the case notes is of a straightforward interaction where the officer asks questions, Terrika answers the questions, and so on. The early case notes mention that Terrika is deaf and uses ASL and has had an ASL interpreter at previous appointments.

**10.4 Terrika's communication preference**

I was not able to successfully contact Terrika to verify his communication preference. However, based upon my assessment of these videos and the conclusions I reached from that assessment, it is my expert opinion that in any substantive interactions where Terrika must access and share information with service providers (including, but not limited to, law enforcement officials, probation officers, medical personnel, and counselors) who *cannot* fluently communicate with him in ASL directly, the accommodation of a professional, qualified ASL/English interpreter is required.

# Case 11: Phillips, Courtney

**11.1 Communication modes used and intent**

The first video dated October 21, 2019 is of a meeting taking place in an office environment. Courtney is with his mother, who is trying to assist him with communication by slowly fingerspelling words. Her fingerspelling is very slow and not crisp, meaning that it is difficult to understand. For a hearing person, the equivalent would be a person slowly enunciating a sentence letter by letter, as in "I.L.I.V.E.I.N.C.O.N.N.E.C.T.I.C.U.T.A.N.D.I.L.I.K.E.F.A.L.L."

Courtney's mother does not use any observable ASL signs during this encounter. She is fingerspelling English words for him, and this is not interpreting from English to ASL. This interaction involved the use of speech, gestures and fingerspelling, as well as text on paper (e.g. official forms). Courtney is communicating with his mother and the officers using gestures and body language.

The second video, dated March 20, 2019, shows an encounter between the officer and Courtney outside what seems to be his residence. During this interaction, Courtney's mother is fingerspelling the officer's questions and Courtney answers the questions with gestures, head shakes, and body language. His mother also speaks for him, answering the questions without fingerspelling or signing the questions to Courtney.

**11.2 Communication methods used by officers**

The officers did not provide accommodations, as this whole meeting was conducted in fingerspelling, gestures, and speech.

**11.3 Comparison of observed communication modes in video with case notes**

The case notes all noted that Courtney is deaf or hearing impaired. Most of the meetings are conducted either through writing or with a third party signing for Courtney, such as Courtney's girlfriend's mother.

## 11.4 Courtney's communication preference

It was not possible to interview Courtney directly to verify his communication preference; however, it is my expert opinion, based on the case notes and my analysis of the video, Courtney's preferred communication modality is ASL. Based upon my assessment of these videos and the conclusions I reached from that assessment, it is my expert opinion that in any substantive interactions where Courtney must access and share information with service providers (including, but not limited to, law enforcement officials, probation officers, medical personnel, and counselors) who *cannot* fluently communicate with him in ASL directly, a professional, qualified ASL/English interpreter is required.

# Case 12: Wooden, Jonah

## 12.1 Communication modes used and intent

This bodycam video, dated October 29, 2018, is of an interaction at a residence. After a conversation with a child at the front door, and then with two adult women, the officer was led to the back of the residence where a brief interaction occurred with Jonah, the officer, and Jonah's girlfriend that involved speaking, lipreading and some signing in very minimal sign language.

## 12.2 Communication methods used by officers

In the video, the officer spoke to Jonah's girlfriend and her mother at some length before going around to the back of the house to speak to Jonah himself. Jonah's participation in this interaction was minimal and the officer communicated with him by speaking.

## 12.3 Comparison of observed communication modes in video with case notes

In the case notes, the officer noted, "Subject was outside mowing the yard. CSO Parker spoke with subject with the assistance of his girlfriend as subject is severely hearing impaired. Subject provided a check stub as verification of employment and the phone number for his girlfriend, Ashley, was provided." This case notes and the video show that communication with Jonah was not direct, nor was it completely independent. The officer relied on Jonah's girlfriend to help him communicate with him.

## 12.4 Jonah's communication preference

I was not able to reach Jonah to interview him about his communication preferences. Based upon my assessment of this video and the case notes, it is not possible to draw a conclusion about the best tools for effective communication with Jonah. More information is needed to reach a conclusion regarding Jonah's communication preferences, but it is clear that Jonah's

communication relied on his family members' "assistance" instead of communication aids provided by his officer.

## Conclusion

In each of the 12 case studies, there was a communication breakdown or some sort of difficulty— such as reliance on another person for communication that rendered the deaf person unable to participate fully. Some of these communicative interactions seem straightforward but this is only if the observer is not familiar with some of the languaging practices particular to deaf people, such as nodding to signify that they are paying attention during an interaction.

As I discussed in the introduction, nodding, as used by deaf people in communication, does not necessarily mean that they understand what is happening in the interaction. It may be that they want the encounter with their probation officer to be over as quickly as possible, so they pretend to understand what is being said. Nodding is also a way of showing cooperation, which is exceedingly important in interactions with authority figures, such as police officers or probation officers.

Deaf people may selectively rely on lipreading and speech if they feel they have no other options— as they often do in situations where they are disempowered or wish to not challenge authority figures. However, this does not mean they will fully understand the hearing person through lipreading, as lipreading is mostly guesswork because only 30% of the English language is visible on the lips. Two or more modes of communication, such as lipreading, writing, or speaking, may be a part of the semiotic resources in a deaf person's communicative repertoire, but they are not equally effective, as evidenced in many of these case studies where breakdowns were observed when these modalities were used.

Language and professional ethics training are essential to meeting the communication needs of an individual as an interpreter. Bringing in "a signer" (someone who knows some ASL, or a friend or relative of the deaf individual) is never appropriate because of the inability to accurately assess their neutrality or skill in ASL. A social acquaintance with conversational skills in ASL is neither trained nor qualified to facilitate communication between two or more parties in any setting, especially in high-stakes settings involving legal consequences for the deaf party.

A comparison of the case notes to the videos shows that the perceptions of the officers involved are often not in alignment with the actual communication observed nor are they in alignment with the perceived effectiveness of the communication modalities used. There was at least one instance of a communication breakdown in every case, such as when Joseph Melton laughed, when nothing funny has been said, in response to a question, or when Gabriel Cohen responded, "I am deaf," when he was asked if he could read lips. It seems that the officers, as reflected by their conduct in these videos, may not have the knowledge or expertise needed to assess the communication needs of deaf people, nor the effectiveness of the communication during their meetings.

Other examples of problematic communications include the distress visible on the faces and in the behavior of Nicholas Brown and Terrika Myers during their meetings with their probation officers, as well as in the second video of Ashley Barnett as she weeps while writing notes to the officer.

The affective power and trauma of failed communication has had an impact on each individual in this report. Confusion, blankness, distress, helplessness, frustration, and anger were all expressed, either as noted by the officer in their case notes or if it was not clear to the officer, it was visible to me as I watched the faces of the people in the video. Officers often ignored or failed to see signs of a lack of comprehension, even those that should be clear to the untrained eye.

A first step toward improving communications with a deaf person is to be familiar with the various forms of communication he or she uses in daily life, which is possible with an initial communication assessment for the deaf individual starting supervision. This means that the service provider will have an understanding that even if the deaf person attempts to communicate with lipreading or their own speech, those might not be the most effective modalities for them to use. An initial communication assessment and subsequent selection of the most effective communication method would ensure that the deaf person is provided with the most effective means of communicating with and understanding the probation officer.

In review, the frequency of communicative breakdowns shows that the parole officers did not often successfully meet these individuals' communication needs. In my expert opinion, based on my review of the videos and notes in each of the 12 case studies, these individuals did not have communication support and there appears to be a lack of knowledge of how to respond to the communication needs of diverse deaf people on the part of the officers. In some of the cases, critical information related to requirements for compliance to the conditions of parole and instructions, such as the instruction to appear at the probation office at a certain time on a certain day, was not sufficiently clear, which could have resulted in the violation of probation rules for some of the deaf individuals in this report, leading to a return to carceral settings.

As seen in these 12 representative cases, deaf people are a diverse group with specific, individual needs and abilities in communication. For this reason, it is highly recommended to conduct an initial communication assessment for each deaf person entering probation to ensure that each deaf person has the tools they need for successful communication and understanding of the conditions of their probation. Service providers, such as doctors or probation officers, should always ask their clients, in advance of their visit, about their preferences for communication, with the awareness that some deaf people may not feel comfortable requesting ASL interpreters because they do not want to be a burden or appear to be uncooperative. It is their responsibility to make their communications and interactions accessible, such as providing a qualified sign language interpreter or comparable alternative services.


/s/ Erin Moriarty Harrelson
Dr. Erin Moriarty Harrelson
Dated: November 2, 2020

# References

Carrigan, E. M., & Coppola, M. (2017). Successful communication does not drive language development: Evidence from adult homesign. Cognition, 158, 10–27.

Hall, W.C., Levin, L.L. & Anderson, M.L. (2017). Language deprivation syndrome: a possible neurodevelopmental disorder with sociocultural origins. Social Psychiatry and Psychiatric Epidemiology, 52, 761–776.

Glickman, N. S., & Hall, W. C. (Eds.). (2018). Language deprivation and deaf mental health. New York City: Routledge.

Lieu, C. C. H., Sadler, G. R., Fullerton, J. T., & Stohlmann, P. D. (2007). Communication strategies for nurses interacting with patients who are deaf. Dermatology Nursing, 19(6), 541.

McCaskill, C., Lucas, C., Bayley, R., & Hill, J. (2011). The hidden treasure of Black ASL: Its history and structure. Washington, DC: Gallaudet University Press.

Miller, K.R., McCay V., & Capella, M.E. (2005). Violent Offenders in a Deaf Prison Population, The Journal of Deaf Studies and Deaf Education, 10(4): 417–425, https://doi-org.proxyga.wrlc.org/10.1093/deafed/eni039

Morford, J.P. and Hänel-Faulhaber, B. (2011), Homesigners as Late Learners: Connecting the Dots from Delayed Acquisition in Childhood to Sign Language Processing in Adulthood. Language and Linguistics Compass, 5: 525-537. doi:10.1111/j.1749-818X.2011.00296.x

**Appendix A**
**List of Videos**

| Case | Individual | Date of video | Video name |
|------|-----------|---------------|------------|
| Case 1 | Barnett, Ashley | 2018-03-07 | BARNETT,_ASHLEY_(FO).mp4 |
|  |  | 2019-08-07 | Barnett-moss_Ashley.mp4 |
|  |  |  |  |
| Case 2 | Blackmon, Jerry | 2019-04-08 | Blackmon_jerry.mp4 |
|  |  | 2019-11-12 | Blackmon,_Jerry-2.mp4 |
|  |  |  |  |
| Case 3 | Brown, Nicholas | 2019-06-03 | Brown,_Nicholas_Jerome.mp4 |
|  |  |  |  |
| Case 4 | Clark, Casey | 2018-11-20 | CLARK,_CASEY (1).mp4 |
|  |  | 2018-9-27 | CLARK,_CASEY (2).MP4 |
|  |  | 2019-07-29 | CLARK,_CASEY.mp4 |
|  |  |  |  |
| Case 5 | Cohn, Gabriel | 2019-07-25 | Cohen,_Gabriel-2.mp4 |
|  |  | 2020-01-27 | Cohen,_Gabriel-3.mp4 |
|  |  |  |  |
| Case 6 | Daniel, Arin | 2019-12-31 | Arin_Daniel.mp4 |
|  |  | 2020-03-06 | Daniel-5.mp4 |
|  |  |  |  |
| Case 7 | Kines, Kerry | 2019-10-21 | Kerry_Kines-2.mp4 |
|  |  | 2019-10-21 | Kerry_Kines.mp4 |
|  |  |  |  |
| Case 8 | McCorkle, Vernon | 2019-12-30 | McCorkle,_Vernon-5.mp4 |
|  |  | 2020-06-02 | MCCORKLE,_VERNON_GENE-3.MP4 |
|  |  |  |  |
| Case 9 | Melton, Joseph | 2019-12-18 | Melton,_Joseph-2.mp4 |
|  |  | 2019-12-03 | Melton,_Joseph-3.mp4 |
|  |  |  |  |
| Case 10 | Myers, Terrika | 2017-11-21 | Myers.mp4 |
|  |  | 2018-01-02 | Terrika_Myers.mp4 |
|  |  |  |  |
| Case 11 | Phillips, Courtney | 2019-03-20 | Phillips,_Courtney-4.mp4 |
|  |  | 2019-10-21 | Phillip's,_Courtney-4.mp4 |
|  |  |  |  |
| Case 12 | Wooden, Jonah | 2018-10-29 | Wooden.mp4 |

**Appendix B**

Erin Moriarty Harrelson, Ph.D.
Assistant Professor, Deaf Studies Department
Gallaudet University, Washington, DC
erin.moriarty.harrelson@gallaudet.edu

## AREAS OF SPECIALIZATION

Applied linguistics; anthropology of Southeast Asia; Cambodia; Indonesia; Deaf Studies; NGOs; globalization and development; humanitarianism; mobilities; tourism; translanguaging; qualitative research methodologies; ethnographic filmmaking; video analysis; visual methodologies; sign language documentation and standardization projects.

## EDUCATION

| | |
|---|---|
| May 2017 | American University, Washington, DC<br>Doctor of Philosophy, Anthropology<br>Dissertation Title: *Regimes of Mobilities: Deaf Development, NGOs and Deaf Tourism in Cambodia* |
| May 2016 | American University, Washington, DC<br>Master of Arts, Anthropology<br>Received Distinction, Fourth Comprehensive |
| May 2009 | Johns Hopkins University, Baltimore, MD<br>Master of Arts, Communication in Contemporary Society<br>Thesis Title: *Protesting Presidents: The Struggle for Citizenship at Gallaudet University* |
| May 2000 | Smith College, Northampton, MA<br>Bachelor of Arts, Art History and Anthropology |

*Certificates:*

| | |
|---|---|
| June 2017 | The F4F Summer School, Manchester, UK<br>Certificate in Filmmaking for Fieldwork |

## PUBLICATIONS

*Peer Reviewed Publications*

2020    Moriarty, Erin. Filmmaking in a Linguistic Ethnography of Deaf Tourist Encounters. Sign Language Studies 20(4): 561-701.

2020    Moriarty, Erin. "Sign to me, not the children": Ideologies of language contamination at a deaf tourist site in Bali." Language & Communication: 195-203.

2019    De Meulder, Maartje, Annelies Kusters, Erin Moriarty, and Joseph J. Murray. 2019. "Describe, Don't Prescribe. The Practice and Politics of Translanguaging in the Context of Deaf Signers." Journal of Multilingual and Multicultural Development 2(2): 1–15.

2019    Moriarty Harrelson, Erin. Deaf People With "No Language": Mobility and Flexible
        Accumulation in Languaging Practices of Deaf People in Cambodia, *Applied Linguistics
        Review, 10*(1), 55-72.

### Book Chapters

2020    Signed language standardization projects in Cambodia. *In* Annelies Kusters, Erin Moriarty,
        Kristin Snoddon, and Mara Green, eds. Sign Language Ideologies in Practice. Boston/Berlin: De
        Gruyter Mouton Press.

2017    Moriarty Harrelson, Erin. Authenticating Ownership: Claims to Local Deaf Ontologies in the
        Global South. *In* Annelies Kusters, Maartje De Meulder and Dai O'Brien, eds. Innovations in
        Deaf Studies: The Role of Deaf Scholars. Oxford, UK: Oxford University Press.

2015    Moriarty Harrelson, Erin. SAME-SAME but Different: Tourism and the Deaf Global Circuit in
        Cambodia. *In* Michele Friedner and Annelies Kusters, eds. "It's a Small World": Inquiries into
        International Deaf Spaces. Washington, DC: Gallaudet University Press.

### Book Reviews

2020    Moriarty, Erin. Variation in Indonesian Sign Language: A Typological and Sociolinguistic
        Analysis, by Nick Palfreyman. Sign Language Studies 20 (2): 355-358.

2017    Moriarty Harrelson, Erin. Signing and Belonging in Nepal by Erika Hoffmann-Dilloway. Sign
        Language Studies 17 (3): 399-402. https://muse.jhu.edu/ (accessed February 19, 2018).

### Edited Volumes

2020    Annelies Kusters, Mara Green, Erin Moriarty, and Kristin Snoddon, eds. Sign Language
        Ideologies in Practice. Boston/Berlin: De Gruyter Mouton Press.

### Encyclopedia Entries

2015    Moriarty Harrelson, Erin. Asia, South Eastern, Deaf Community." *In* Patrick Boudreault and
        Genie Gertz, eds. The Deaf Studies Encyclopedia. Sage Publications.

### Invited Contributions

2015    Letter from a Friend. *In* The Urns: Nothing is Permanent. Phnom Penh, Cambodia: Sleuk Rith
        Institute (SRI).

## FUNDING

### Extramural

2015        IADES Fellowship
            Awarded: $1,000

2014        Fulbright-National Geographic Digital Storytelling Fellowship
            Awarded: $50,000

| 2013 | Wenner Gren Foundation Dissertation Award (Finalist) |
| 2012 | Fulbright U.S. Student Program (Finalist) |

*Intramural*

| 2014 | American University Doctoral Student Research Award<br>Awarded: $5,000 |

## FELLOWSHIPS

***Fulbright-National Geographic Digital Storytelling Fellow 2014-2015**, Phnom Penh, Cambodia*
Conducted ethnographic fieldwork in Cambodia documenting the lives of deaf people as they interacted with non-governmental organizations and international development projects. Used qualitative methods such as interviews, focus groups and participant-observation, as well as visual methodologies such as film, photography, and drawing. Presented research findings to representatives from the Cambodia Ministry of Education, including the Minister of Education, H.E. Hang Chuon Naron at the National Forum on Inclusive Education, "Research on Inclusive Education in Cambodia: Results and Opportunities." Worked closely with U. S. Embassy Phnom Penh Public Affairs Section on media. Participated in 25+ discussions/meetings with visitors from the State Department, as well as stakeholders from various in-country non-governmental organizations. Worked with NGOs and government to influence policy for people with disabilities through strategic engagement with decision-makers in government. Presented findings to educators and interpreters at NGOs. Articulated project objectives and goals for NGO staff, government officials and villagers. Wrote regularly for a dedicated blog hosted on the *National Geographic* website. Used digital media tools/platforms to share observations and personal narratives with global audiences.

## PRESENTATIONS

*Peer Reviewed Presentations*

| July 2019 | *Intersectionality in Deaf Studies: Insights from the study of international deaf mobilities* (with Annelies Kusters and Sanchayeeta Iyer)<br>XVIII World Congress of the World Federation of the Deaf |
| May 2019 | *Researchers as mixologists: Selecting suitable ethnographic research methods* (with Annelies Kusters and Sanchayeeta Iyer)<br>Deaf Academics Conference 2019, Reykjavík, Iceland |
| May 2019 | *Deaf academic knowledge production: Chronicles of a deaf research team* (with Annelies Kusters and Sanchayeeta Iyer)<br>Deaf Academics Conference 2019, Reykjavík, Iceland |
| November 2018 | *Sign language ideologies and Deaf Studies: The importance of focusing on practice* (with Annelies Kusters)<br>2018 Deaf Studies Conference, Gallaudet University, Washington, DC |
| November 2018 | *To film or not to film: Doing ethnographic film in the field of Deaf Studies* (with Annelies Kusters)<br>2018 Deaf Studies Conference, Gallaudet University, Washington, DC |

| | |
|---|---|
| August 2017 | *Politics of knowledge, representation, and power*<br>Deaf Academics Conference, Copenhagen, Denmark |
| June 2017 | *Authenticating ownership: Claims to deaf ontologies in the Global South*<br>Deaf Studies Conference, Heriot-Watt University, Edinburgh, UK |
| June 2016 | *Signed language ideologies: hierarchies in the everyday languaging practices of deaf Cambodians*<br>Symposium: Translanguaging and repertoires across signed and spoken languages: Insights from linguistic ethnographies in (super)diverse contexts. Max Planck Institute for the Study of Ethnic and Religious Diversity, Gottingen, Germany |
| March 2014 | *Sign Language Work as international development: The Cambodian context*<br>SL²Hub-DC Conference, Gallaudet University, Washington, DC |
| November 2013 | *"Cambodia deaf await words of their own": Compassionate sovereignties in the development of Cambodian Sign Language*<br>The Moral Economies of Suffering and Humanitarian Compassion<br>The Future of NGO Studies Conference, Chicago, IL |
| February 2013 | *deaf people as symbols of neoliberal 'good governance' and competing prescriptions for citizenship claims*<br>Corporeal Ambiguities: Queering Inclusion<br>Lavender Languages and Linguistics Conference, American University, Washington, DC |
| October 2010 | *Protesting presidents: The struggle for citizenship at Gallaudet University*<br>Advancing Social Justice in Times of Crisis<br>The 6th Annual Public Anthropology Conference, American University, Washington, DC |

### Organized Peer Reviewed Sessions

| | |
|---|---|
| September 2018 | Session organizer and moderator<br>*Sign language Ideologies and non-conventionalized communication: Language convergence, documentation, and naming*<br>British Association of Applied Linguistics, York St. John University, York, UK |
| February 2013 | Session organizer and moderator<br>*Corporeal Ambiguities: Queering inclusion*<br>Lavender Languages Conference, American University, Washington, DC |

### Selected Invited Presentations

| | |
|---|---|
| November 2019 | *#Deaftravel: An ethnography of deaf tourist mobilities.*<br>Philadelphia: University of Pennsylvania, ASL Lecture Series |
| June 2019 | *Shifting positionalities in linguistic ethnographies of sign languages and everyday deaf languaging practices*<br>Linguistic Ethnography Forum, University of South England, Bristol |

| | |
|---|---|
| December 2017 | *Natural vs. artificial: Signed language standardization in Cambodia*<br>Radboud University, Nijmegen, the Netherlands |
| November 2017 | *Sign language ideologies in practice: An introduction*<br>(co-presentation with Dr. Annelies Kusters)<br>InCoLaS meeting, 2-3 Nov 2017, KU Leuven, Belgium |
| | *Natural sign languages as an ideological construct: The Cambodian case*<br>InCoLaS meeting, 2-3 Nov 2017, KU Leuven, Belgium<br>Discussant: Jan Blommaert (Tilburg University) |
| December 2016 | *Hiring people with disabilities in international development*<br>Panel, United Nations Development Programme, New York, NY |
| September 2016 | *Deaf Global Circuit: Tourism in Cambodia*<br>Guest lecturer, Deaf Studies, Gallaudet University, Washington, DC |
| May 2016 | *Establishing boundaries: Claims to authority and knowledge*<br>Panel, Washington Association of Professional Anthropologists, Washington, DC |
| March 2016 | *Stakeholder analysis*<br>Guest lecturer, IDMA Program, Gallaudet University, Washington, DC |
| December 2014 | *Implications of inclusive education for deaf children in Cambodia*<br>National Forum on Inclusive Education, Phnom Penh, Cambodia |

## EMPLOYMENT HISTORY

Gallaudet University, Washington, DC
*Assistant Professor, ASL and Deaf Studies,* 8/2019 to Present

Heriot-Watt University, Edinburgh, UK
*Research Fellow, MobileDeaf Project,* 5/2017-8/2019

Gallaudet University, Washington, DC
*Lead Researcher, Program Review, International Development Master of Arts Program,* 6/2016 to 9/2016

National Institute of Allergy and Infectious Diseases (NIAID), Rockville, MD
*Ethics Specialist,* 10/2012 to 5/2017, (National Geographic-Fulbright Fellow, August 2014-July 2015)

Gallaudet University, Washington, DC
*Development Officer,* 9/2005 to 10/2012, (except 2007-2008)
*Coordinator of Presidential Communications and Media Relations,* 2007-2008

Telecommunications for the Deaf, Inc., Silver Springs, MD
*Public Relations and Resource Development Officer*, 6/2005 to 9/2005

American School for the Deaf, West Hartford, CT
*Public Information Officer/Community Relations Associate*, 9/2004 to 6/2005

Communication Service for the Deaf (CSD), Sioux Falls, South Dakota
*Director of Development and Public Relations*, 3/2002 to 8/2004

Deaf Access Services, Inc. Frederick, Maryland (merged with CSD in 2002)
*Executive Director*, 10/2001 to 3/2002

SmartBrief, Washington, DC
*Consumer Group Editor*, 8/2000 to 10/2001

**UNIVERSITY SERVICE**
- Member, Diversity of People and Ideas Work Group, Gallaudet University, May to September 2007
- Member, Staff Advisory Council, Gallaudet University, June 2008 to June 2009

**COMMUNITY SERVICE**
- Vice President, Discovering Deaf Worlds, April 2016-April 2018
- Board Member, Discovering Deaf Worlds, April 2015-April 2018
- Chair, Board of Directors, Deaf Abused Women's Network (DAWN), 2009-2013
- Docent, Smith College Museum of Art, Northampton, Massachusetts
- Docent, Museum of Tolerance, Los Angeles, California

**LANGUAGES**
- American Sign Language
- English
- Cambodian Sign Language (Professional proficiency)
- British Sign Language (Professional proficiency)
- International Sign