# Exhibit Q

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION


BRANDON COBB, et al., etc.,

      Plaintiffs,


                    CIVIL ACTION FILE
vs.                  NO.:  1:19-cv-03285-WMR


GEORGIA DEPARTMENT OF
COMMUNITY SUPERVISION, et al.,
etc.,

      Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~

REMOTE VIDEOTAPED DEPOSITION OF
JOSEPH NETTLES
Volume I


April 21, 2021
10:23 a.m.


(All attendees appeared remotely via
videoconferencing and/or teleconferencing.)




Teresa A. Vaughan, CCR-B-2033



Page 2

1                      APPEARANCES OF COUNSEL

2

3       On behalf of the Plaintiffs:

4            BRITTANY SHRADER, Esquire
             National Association of the Deaf Law and
5            Advocacy Center
             8630 Fenton Street
6            Suite 820
             Silver Spring, Maryland 20910
7            301-587-1788
             brittany.shrader@nad.org
8

9
             MARGARET GIRARD, Esquire
10           Arnold & Porter Kaye Scholer, LLP
             601 Massachusetts Avenue, NW
11           Washington, DC 20001
             202-942-5000
12           margaret.girard@arnoldporter.com

13

14           WEST RESENDES, Esquire
             American Civil Liberties Union Foundation
15           of Georgia, Inc.
             39 Drumm Street
16           San Francisco, California 94111
             415-343-0781
17 wresendes@aclu.org
18
             TALILA A. LEWIS, Esquire
19           PO Box 1160
             Washington, DC 20013
20           540-786-1325
             talila.a.lewis@gmail.com
21

22

23

24

25



```
1              CONTINUATION OF APPEARANCES

2

3    On behalf of the Defendants:

4         GEORGE M. WEAVER, Special Assistant
          Attorney General
5         Hollberg & Weaver, LLP
          6185 Mountain Brook Way
6         Sandy Springs, Georgia 30328
          404-760-1116
7         404-760-1136
          gweaver@hw-law.com
8

9

10   Videographer:

11        Tony Wicks

12

13   Interpreters:

14        Jana Owen, ASL
          Emily Walker, ASL
15        Branton Stewart, CDI
          John Maucere, CDI
16        Andrea Smith
          Amy Peterson
17

18

19

20

21

22

23

24

25
```



Page 4

1                    INDEX OF EXAMINATION

2   WITNESS:  JOSEPH NETTLES

3   EXAMINATION                                        PAGE

4   By MR. WEAVER                                        6

5

6                         - - - -

7

8           INDEX TO PREVIOUSLY MARKED EXHIBITS

9   Defendant's
      Exhibit          Description           Page
10
    Exhibit D-6    Exhibit to Karen Pelz       49
11                 Strauss' Deposition

12  Exhibit D-26   Exhibit to Karen Pelz       68
                   Strauss' Deposition
13
    Exhibit D-34   Text Messages and          21
14                 Photographs

15  Exhibit D-35   Text Messages              30

16  Exhibit D-77   Report from                15
                   Dr. Shepard-Kegl and
17                 Dr. Rowley

18

19       (Previously Marked Exhibits 6, 26, 34, 35, and 77
    were retained by George M. Weaver, Esquire.)
20

21                        - - - -

22

23

24

25

1     Remote Videotaped Deposition of JOSEPH NETTLES

2                    April 21, 2021

3          THE VIDEOGRAPHER:  We are now on the

4     record.  Today's date is April 21st, 2021.  And

5     the time is approximately 10:23.  This will be

6     the remote videotaped deposition of Joseph

7     Nettles.  Would the attorneys please state

8     their names and who they represent.

9          MS. SHRADER:  Brittany Shrader from the

10    National Association of the Deaf, on behalf of

11    Mr. Nettles and the other plaintiffs in this

12    matter.

13         MR. WEAVER:  George Weaver, as a Special

14    Assistant Attorney General for the state of

15    Georgia, representing the defendants in the

16    case.

17         THE VIDEOGRAPHER:  And will the court

18    reporter please swear in the first pair of

19    interpreters, followed by the second pair of

20    interpreters, followed by the witness.

21         (Whereupon, the interpreters were duly

22    sworn by the court reporter.)

23    JOSEPH NETTLES, having been first duly sworn, was

24    examined and testified as follows:

25         THE VIDEOGRAPHER:  You may proceed,



Page 6

1      Counsel.

2      EXAMINATION

3      BY-MR. WEAVER:

4      **Q.   Okay.  Mr. Nettles, my name is George**

5      **Weaver.  I represent the defendants in the case.**

6      A.   Uh-huh (affirmative).

7      **Q.   Did you meet with anybody to prepare for**

8      **your deposition, either in person or remotely?**

9           INTERPRETER WALKER:  The interpreter needs

10     to clarify a sign for him.  He's not familiar

11     with the sign of -- that we're using for

12     "Zoom."  And so the interpreter's clarifying

13     that sign for Mr. Nettles.

14          So now he's presenting the question.

15          THE WITNESS:  I need to rephrase the

16     question please, Mr. Weaver.

17          MR. WEAVER:  Okay.  You want me to

18     rephrase?

19          INTERPRETER WALKER:  Yes, please.

20          MR. WEAVER:  Oh, okay.

21     **Q.   (By Mr. Weaver)  I am an attorney**

22     **representing the defendants.  It's not really a**

23     **question.**

24     A.   Okay.  I understand that.  I see you.

25     **Q.   Okay.  All right.  And I guess the next**



Page 20

1   already have a close relationship with, and we

2   already have kind of an understanding on how to

3   communicate.  But say if I got a text from a company

4   like Georgia Power, I would have no idea -- I look

5   at that text, and I have no idea what it says.  So

6   if I have a close relationship with a person, and

7   they understand my style, then I can text with them

8   and communicate with them.  Like with my lawyer or

9   other people that I know well, then the sentences

10  are simple, basic sentences, and I can kind of

11  communicate.

12          But I often get really frustrated with

13  text and not being able to understand.  So I request

14  often Facetime, so that I can use sign to

15  communicate with the person if they know sign.  And

16  that's -- that's much more understandable for me,

17  than in written English.

18      **Q.   Okay.  And Facetime is a video**

19  **communication, correct?**

20      A.   Yes.

21      **Q.   Okay.  And when you're doing Facetime, I**

22  **take it you are signing, and the person that you're**

23  **communicating with is signing back to you; is that**

24  **right?**

25      A.   Yeah.  I use Facetime for direct



1  communication with other people who can sign.  And

2  so the two of us can communicate, chat about things

3  with direct communication.  And then for calling

4  people who don't know sign language, and that I need

5  to communicate with them, I have something called a

6  "videophone."  And I use that.  The videophone

7  connects you to an interpreter, who then can

8  interpret for the hearing person, and interpret for

9  me to the hearing person, so that we can communicate

10  that way.  So it's a visual communication.

11      Q.    Okay.

12          MR. WEAVER:  Let's take a short break,

13      five minutes, or ten, if you want, and then

14      come back.

15          THE VIDEOGRAPHER:  Going off the record at

16      11:24.

17          (Thereupon, a recess was taken.)

18          THE VIDEOGRAPHER:  Going back on the

19      record at 11:47.

20          (Defendant's Exhibit D-34 was previously

21      marked for identification.)

22      Q.    (By Mr. Weaver)  Okay, Mr. Nettles, I'm

23  going to show you a previously marked exhibit.  It's

24  No. 34, which contains various text messages and

25  photographs.  So I know there's an issue about



1    the -- when we screen share, that maybe the signs

2    can't be seen.  So let me scroll through this, and

3    then I can take it down and ask questions.

4            INTERPRETER OWEN:  One moment, please,

5        before you start scrolling.

6            MR. WEAVER:  Okay.

7            INTERPRETER OWEN:  Would you stop sharing,

8        and we'll explain that while he can still see

9        the interpreters, and then you can start to

10       share the video?

11           MR. WEAVER:  Okay.

12           INTERPRETER OWEN:  Thank you.  We'll

13       explain that now.

14       Mr. Nettles is saying, great, Mr. Weaver.

15       So I understand that while those pictures are

16       displayed, you won't ask any questions.  And

17       then once you've shown me all the pictures,

18       you'll stop sharing your screen, and then

19       proceed with the questions.  If that's the

20       case, that will work for me.

21           MR. WEAVER:  Okay.  That's what I'm going

22       to try to do.

23           THE WITNESS:  Okay.  In that case, I'm

24       ready for you to share your screen.

25       Q.  (By Mr. Weaver)  Mr. Nettles, what I

Page 23

1    showed you when I was screen sharing, Exhibit 34,

2    are these text messages and pictures that were

3    exchanged between you and your supervision officer,

4    Caleb Worley?

5            INTERPRETER OWEN:  For the interpreters,

6        can you spell Mr. Worley's last name?

7            MR. WEAVER:  W-O-R-L-E-Y.

8            THE WITNESS:  Right.  So -- so that's

9        true.  The text messages were between me and

10       Caleb on my phone.  But here's the thing,

11       throughout that whole week, I spent with my

12       son.  So like I'd be in the car driving, and

13       he'd have my phone.  We spent the whole week

14       together because he was on dialysis.  But -- so

15       I would sign often, and he would have the phone

16       and do the typing of what I was signing and

17       wanted to have him to type to Caleb.

18           INTERPRETER OWEN:  The witness is adding

19       additional testimony.

20           THE WITNESS:  I'll also say that when --

21       there were times when my parole officer would

22       text me, and I would show it -- show my screen

23       to my son, just to make sure that I was

24       understanding what the intent was of that

25       text -- those kind of text messages, also.

1    Q.   (By Mr. Weaver)  What's your son's name,

2  and how old is he?

3    A.   My son's name is Eddie.  And what was the

4  last part of your question?

5    Q.   How old is he?

6    A.   So my son, Eddie Nettles, is -- let me

7  see -- he's 22, I believe.  I could be wrong in

8  that, but I'm pretty sure he's 22 now.  He was like

9  19, 20, 21, during that time of these texts.  But

10  now he's elsewhere.

11    Q.   The text that I showed you, Mr. Nettles,

12  had dates from June to November, but they didn't

13  state the year.  Do you know what year those texts

14  occurred?

15    A.   So those texts were from last year with my

16  son.  And that's when -- like I would text if I was

17  working overtime or pulling a double, or anything.

18  That's when I was texting him, and I -- yeah.

19    Q.   Okay.  The exhibit that I showed you, 34,

20  was from Mr. Worley's deposition, taken in February

21  of 2020.  So it appears to me the texts were before

22  February 2020.  Do you know if that's true?

23    A.   Well, I couldn't tell you any more

24  specifically.  I don't remember exactly when it was.

25  Last year sometime.  It's impossible for me to say



1    when.

2        **Q.   Okay.  So what I showed you, on the**

3    **left-hand side, were some text messages.  And some**

4    **of the messages have the letter "S."  And on the**

5    **right-hand side, there were messages from another**

6    **party.  Is it correct to say that the messages in**

7    **Exhibit 34, that have the letter "S," on the**

8    **left-hand side, that those were from your phone?**

9        A.   So I thought you primarily wanted me to be

10   looking at those pictures, so I didn't notice that

11   in particular.  I'm not entirely sure of the "S"

12   you're referring to.  I -- I don't know.

13           INTERPRETER OWEN:  The interpreters are

14       going to switch now.  One moment.

15           INTERPRETER WALKER:  We're ready.

16       **Q.   (By Mr. Cobb)  All right.  Let me show**

17   **them to you again.  And this time, if you would take**

18   **a look at the text messages on the left, with the**

19   **letter "S," versus the ones on the right.  And then**

20   **I'll ask you some questions about that.**

21       A.   Great, okay.  So the interpreters will

22   stop interpreting, and there'll be no talking until

23   we get back to full screen.  That works.

24       **Q.   Okay.  My question is, the text messages**

25   **on the left side that have the letter "S" -- I think**



1   he's definitely better than me, so I've asked him to

2   help with writing English sentences before.

3      **Q.   Okay.  And is it your testimony that all**

4   **of those text messages in Exhibit 34, from your**

5   **phone, were typed or written by Eddie, after you**

6   **signed your message to him?**

7           MS. SHRADER:  I'm just going to object, to

8           the extent that he knows.  He can respond.

9           He's already testified that he can't read

10          English.

11          THE WITNESS:  So first of all, I took an

12          oath that I would tell the truth.  So yes, I'm

13          testifying here by -- with the truth.  I'm

14          telling you that those messages, my son texted

15          them.  Understand my son was with me every day

16          for three years.  He's on dialysis on Monday,

17          Wednesdays, Fridays.  So I would take him to

18          dialysis and stay with him.

19          And then after dialysis was done, he would

20          go with me to work, and he would sit in the

21          car.  If it was summertime, he would have the

22          AC on; in the wintertime, he might turn on the

23          heat so he was more comfortable.  Because

24          dialysis is rough on your body, and sometimes

25          afterwards you don't do well.

1          So he was with me all the time, every day

2     for three years.  So yes, he's the one that did

3     the text messages.  And is that clear?  Am I --

4     do we need to repeat this again?  I think I've

5     answered that.  Is that clear?

6     **Q.   (By Mr. Weaver)  Well, you're still not**

7  **answering my question.   My question was, did he type**

8  **or --**

9          INTERPRETER OWEN:  One moment for the

10    interpreters.

11         MR. WEAVER:  I haven't finished the

12    question.

13         INTERPRETER OWEN:  Yes, sir.

14         INTERPRETER WALKER:  Apparently there was

15    an error with the interpreter, so if you'll

16    hold one second, we'll clarify what the error

17    was.

18         INTERPRETER OWEN:  Correction for the

19    record.  Instead of, "I stayed with him at

20    dialysis," the witness' testimony was, I

21    dropped him off and picked him up after

22    dialysis appointment.

23         Thank you, Counsel.  Go on.

24    **Q.   (By Mr. Weaver)  Let me just move on to a**

25  **different question.  So let me show you another**



1  exhibit that was previously marked.  Then I'll ask

2  you some questions about it.

3          INTERPRETER OWEN:  We're ready.

4          (Defendant's Exhibit D-35 was previously

5      marked for identification.)

6      Q.   (By Mr. Weaver)  So this is another

7  exhibit previously marked.  It's Exhibit 35.  The

8  last one was 34.  So these are more text messages.

9          INTERPRETER WALKER:  The interpreter is

10     catching up with the number of the exhibits.

11     But your -- you can ask your question now.

12         MR. WEAVER:  Okay.

13     Q.   (By Mr. Weaver)  So I just shared

14  Exhibit 35, previously marked.  It also has a number

15  of text messages.  And is it correct, again, that

16  the messages on the left side, with the letter "S,"

17  were sent from your phone -- your cell phone?

18     A.   Yes.

19     Q.   All right.  So the Exhibit 35 I just

20  showed you, had a message that your son had been in

21  the hospital for two weeks.  So while he was in the

22  hospital, the messages that were sent from your

23  phone were prepared or typed by you, correct?

24     A.   Yes.  Those were messages I composed.  But

25  sometimes I still -- this time relied on my daughter



1  to help.  On occasion, if I wasn't clear about what

2  the message needed to say or what the message was

3  saying to me, I would ask my daughter to help with

4  those text massages.

5          INTERPRETER WALKER:  The interpreters are

6      going to switch.

7          INTERPRETER OWEN:  Go ahead.

8      **Q.   (By Mr. Weaver)  Now, it looks like a**

9  **number of these messages, both in Exhibits 35 and**

10 **34, were sent from a job site, where you were**

11 **working; is that right?**

12     A.   Mr. Weaver, I'm not entirely sure.  The

13 question isn't really clear.  I'd have to see them

14 again.  Because I couldn't tell you if -- you know,

15 which ones were from home, or from the hospital, or

16 from work.  I'm sorry, it's not entirely clear to

17 me.

18     **Q.   All right.  Instead of taking the time to**

19 **try to figure that out, let me ask you this:  What's**

20 **your daughter's name?**

21     A.   Can you tell me why you need to know her

22 name?

23     **Q.   I'm sorry.  You have to answer the**

24 **question.  That's not a privileged piece of**

25 **information.  You brought her up, and so I'm asking**



Page 32

1  you for her name.

2      A.   All right.  Her name is Laura Nettles.

3  And I'll tell ya, she also has health issues.  She

4  has, what they call, "spina bifida," which is a

5  problem that means she uses a wheelchair,

6  Mr. Weaver.  So there you have it.

7      Q.   Okay.

8          MS. SHRADER:  Mr. Weaver, would it be good

9      for a lunch break now?  Would this be a good

10     time?

11         MR. WEAVER:  I'm sorry, could -- one more

12     time?

13         MS. SHRADER:  I'm sorry.  I was just

14     asking if now would maybe be a good time for a

15     lunch break?

16         MR. WEAVER:  Well, let me just finish the

17     questions about the daughter, and then we can,

18     okay?

19     Q.   (By Mr. Weaver)  So it is your testimony

20  that your daughter, Lorina -- I think I got that --

21  is it Lorina -- she also did some ASL interpreting

22  for you; is that right?

23         MS. SHRADER:  I'm just going to object as

24     to form.  He didn't mention "interpreting."

25     But he can answer.



Page 33

```
 1            THE WITNESS:  No.  That's Laura,
 2       L-A-U-R-A, is my daughter's name.  And -- well,
 3       so the thing about her and her medical issue,
 4       is she has a shunt to drain fluid from her
 5       brain, due to a malfunction.  And so I mean,
 6       she's the one who's cared for me through seven
 7       years.  She's fantastic.  But her sign language
 8       skills are not altogether top notch.
 9            Like she can sign and we understand each
10       other well enough.  I mean, sometimes we might
11       write notes back and forth.  But her signing
12       isn't all of that.  That's about all I can say.
13       Q.   (By Mr. Weaver)  Okay.  I may have another
14  question about that later.  But we can go ahead and
15  take our lunch break now.
16            THE VIDEOGRAPHER:  All right.  Going off
17       the record at 12:41.
18            (Thereupon, a recess was taken.)
19            THE VIDEOGRAPHER:  Going back on the
20       record at 1:34.
21       Q.   (By Mr. Weaver)  Okay.  Next question.
22  Mr. Nettles, have you ever communicated by written
23  notes in English?
24       A.   Yes.
25       Q.   Okay.  And I think you mentioned that
```



1  you've written notes with your mother and your

2  daughter in English; is that correct?

3      A.   Well, with my mother, yes.  With my

4  daughter, not paper and pen, but we're more likely

5  to text.

6      Q.   Okay.  Have you ever exchanged written

7  notes with your officer -- probation officer,

8  Mr. Worley?

9      A.   I believe so.  Although, as I remember,

10  there are times it didn't always work.  Sometimes I

11  would have to write something again because he

12  didn't understand it the first time.  And, you know,

13  I could usually kind of make myself understood, but

14  it was never really comfortable, that I felt like I

15  could communicate well with him that way.

16      Q.   And has Mr. Worley, Caleb Worley, been

17  your probation officer -- or community supervision

18  officer, the entire time you've been on probation?

19      A.   No.  I've had three different folks.

20          INTERPRETER OWEN:  The witness is asking

21      to clarify.

22          THE WITNESS:  No.  I've had three

23      different folks.  When I first got out in 2011,

24      I was with a guy whose name I don't remember,

25      until he retired.  Now, he relied a lot on my

Page 35

1      mom as a go-between, kind of.  So our

2      communication wasn't -- didn't hardly exist.

3           And then the second person I was assigned

4      to was while I was in Waycross.  And that

5      guy -- I also don't know his name -- but he had

6      glasses.  He relied a lot on my family.  So he

7      would reach out to my girlfriend, who's hard of

8      hearing, or my kids.  Sometimes VRI, which

9      really didn't do much good.  He didn't really

10     use interpreters.

11          And then once I moved to Hoboken, they

12     switched me.  And I'm with Mr. Worley, who also

13     I don't have good communication with.  I mean,

14     text is about it.  I've complained that I don't

15     understand him very well.  I don't think he

16     understands me.  And so he has been willing to

17     do VRI, but it's not working for me.

18     **Q.   (By Mr. Weaver)  So you mentioned VRI with**

19     **Mr. Worley.  Mr. Worley uses VRI on his laptop or**

20     **Chromebook, right?**

21          A.   Right.  He uses VRI, but I don't know what

22     kind of device.  I've never looked to see what kind

23     of device he uses.

24     **Q.   Well, it's a laptop, right?**

25          A.   Yes.


Elizabeth Gallo
COURT REPORTING, LLC

Page 36

1      **Q.   Okay.  And so Mr. Worley uses his laptop**

2   **to communicate over VRI when he comes to your home,**

3   **right?**

4      A.   Well, after months, and months, and months

5   of him coming to my house without any kind of

6   interpreter, where, you know, he'd check in on me,

7   ask questions about the job, or whatever he does, it

8   was so frustrating.  Because it wasn't much of any

9   communication at all.  And finally he started where

10  he'd set up his laptop on my counter when he comes.

11  And then you have to turn the laptop back and forth

12  to one of us or the other to see it.

13          But even with VRI, the connection is fuzzy

14  or the interpreter's not a good match for me.  It's

15  to the point where sometimes I just smile and nod.

16  I'm like, Okay, okay.  But to be honest, I don't

17  really understand everything that they say.  VRI is

18  not the best solution for me.

19          MR. WEAVER:  Okay.  Objection.

20      Nonresponsive.

21      **Q.   (By Mr. Weaver)  My question was, did**

22  **Mr. Worley -- has Mr. Worley used VRI on visits to**

23  **your home?  I think you said yes; is that right?**

24          MS. SHRADER:  The question was whether he

25          used it for communication.  And his answer was



Page 37

1    responsive, in terms of communication.

2        MR. WEAVER:  Okay.  You and I disagree.

3        THE WITNESS:  After years, and years, and

4    years of asking, and asking, and asking through

5    three different parole officers, when they

6    hardly ever provided any kind of accommodation,

7    no interpreters or nothing, I asked, and asked,

8    and asked.  Right.  Last year they finally

9    started providing VRI.  But I tell ya, it's the

10   law.  They should have been doing it all along.

11   I was asking for better access and better

12   communication.  And so sure, finally I get

13   something with Worley.  But it's not what I

14   need.

15       What I need for my communication access is

16   to have a CDI.  And, in fact, let me add to

17   that.  I need the interpreters on site with the

18   parole officer when he comes to me.  Because I

19   need to not only understand him, he needs to

20   understand me, too.  And having a CDI, that's a

21   certified deaf interpreter, on site with me, is

22   the best way I'm going to be able to understand

23   and be understood.

24       So that's what "access" means to me.

25   That's what I've been asking for.  And so the

Page 38

```
 1        answer to your question is, yes, finally they

 2        have provided VRI, but that doesn't do it for

 3        me.

 4        Q.   (By Mr. Weaver)  In your Declaration that

 5   you filed in this case, back in July of 2019, when

 6   the lawsuit was filed, with your name on it as

 7   plaintiff, you did not ask for a CDI, or a certified

 8   deaf interpreter, in order to communicate with your

 9   probation officer, correct?

10        MS. SHRADER:  Objection as to form.  He

11        can answer.

12        Emily, you're on mute.

13        THE WITNESS:  You're right, it wasn't in

14        the lawsuit.  Because at that time, I wasn't

15        familiar with that term, "CDI."  Since then

16        I've become more familiar with the term.  And

17        understand, that's what I've been doing all

18        along, is having another deaf person to

19        intercede in -- when I didn't understand the

20        communication.

21        And I now know that that's better for me.

22   To have effective communication is to have a

23   CDI, so that I could have a better future and a

24   better possibility of a better life.

25        Q.   (By Mr. Weaver)  So is it correct to say,
```



Page 83

```
 1                    DISCLOSURE OF NO CONTRACT

 2

 3        I, Teresa A. Vaughan, do hereby disclose pursuant
      to Article 10.B of the Rules and Regulations of the
 4    Board of Court Reporting of the Judicial Council of
      Georgia that Elizabeth Gallo Court Reporting, LLC was
 5    contacted by the party taking the deposition to
      provide court reporting services for this deposition
 6    and there is no contract that is prohibited by
      O.C.G.A. 15-14-37(a) and (b) or Article 7.C of the
 7    Rules and Regulations of the Board for the taking of
      this deposition.
 8
           There is no contract to provide court reporting
 9    services between Elizabeth Gallo Court Reporting, LLC
      or any person with whom Elizabeth Gallo Court
10    Reporting, LLC has a principal and agency
      relationship, nor any attorney at law in this action,
11    party to this action, party having a financial
      interest in this action, or agent for an attorney at
12    law in this action, party to this action, or party
      having a financial interest in this action.  Any and
13    all financial arrangements beyond our usual and
      customary rates have been disclosed and offered to all
14    parties.

15

16    This 10th day of May, 2021

17

18

19

20    _____

21        Teresa A. Vaughan, CCR-B-2033

22     ELIZABETH GALLO COURT REPORTING, LLC

23

24

25
```

