# Exhibit R

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

BRANDON COBB, et al., etc.,
  Plaintiffs,

                         CIVIL ACTION FILE
        v.               NO. 1:19-cv-03285-WMR

GEORGIA DEPARTMENT OF
COMMUNITY SUPERVISION, et al.,
etc.,
  Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~

REMOTE VIDEOTAPED DEPOSITION OF
MARY ANN HILL
VOLUME I

August 10, 2021
10:33 a.m.

(All parties attended remotely via
videoconferencing and/or teleconferencing.)

Amelia Bradley, CCR 5100-8905-8215-5264



```
 1                APPEARANCES OF COUNSEL

 2   On behalf of the Plaintiffs:

 3            BRITTANY SHRADER, Esquire
             National Association of the Deaf Law
 4           and Advocacy Center
             Suite 820
 5           8630 Fenton Street
             Silver Spring, Maryland 20910
 6           brittany.shrader@nad.org

 7            CLAUDIA CENTER, Esquire
             Disability Rights Education and Defense
 8           Fund
             Suite 210
 9           3075 Adeline Street
             Berkeley, California 94703
10           (510) 644-2555
             ccenter@dredf.org
11

12   On behalf of the Defendants:

13            GEORGE M. WEAVER, Esquire
             Hollberg & Weaver, LLP
14           6185 Mountain Brook Way
             Sandy Springs, Georgia 30328
15           (404) 760-1116
             (404) 760-1136 (facsimile)
16           gweaver@hw-law.com

17   Also Present:

18           Jana Owen, ASL Interpreter
             Denise Kahler, ASL Interpreter
19           James Winn, ASL Interpreter, Intern
             Amy Peterson, ACLU
20           Andrea Smith, ACLU
             Nichola Schmitz, CDI
21           Marina Epstein, CDI
             Matt Bosley, Videographer
22           Shannon Hilliard

23

24

25
```



1                    INDEX TO EXAMINATIONS

2   WITNESS:  MARY ANN HILL

3   EXAMINATION                               PAGE

4   By Mr. Weaver                                5

5                        ---

6                    INDEX TO EXHIBITS

7   EXHIBIT            DESCRIPTION            PAGE

8    113          Handwritten Notes            75

9    122             Photograph                77

10   121           Text Messages               80

11   109           Text Messages               82

12

13        (Original Exhibits 113, 122, 121, and

     109 were attached to the original transcript.)
14

15

16

17

18

19

20

21

22

23

24

25

Page 4

```
 1              REMOTE VIDEOTAPED DEPOSITION OF

 2                   MARY ANN HILL

 3                   August 10, 2021

 4         THE VIDEOGRAPHER:  We are on the record.

 5  Today's date is August 10th, 2021, and the time

 6  is approximately 10:33 a.m.  This will be the

 7  remote videotaped deposition of Mary Hill.  Will

 8  the attorneys present please state their names,

 9  and who they represent?

10         MR. WEAVER:  George Weaver, for

11  Defendants, and the Georgia Attorney General's

12  office.

13         MS. SHRADER:  Brittany Shrader,

14  representing the Plaintiffs in this case, from

15  the National Association of the Deaf.

16         THE INTERPRETER:  One moment for the

17  interpreters.  Go ahead.

18         Claudia Center, with Disability Rights

19  Education and Defense Fund, representing

20  Plaintiffs.

21         THE VIDEOGRAPHER:  And will the court

22  reporter please swear in the interpreters

23  followed by the witness?

24         THE INTERPRETER:  One moment, please.

25  Go ahead.
```



Page 5

```
 1   (Whereupon, the interpreters were duly sworn.)

 2          THE INTERPRETER:  Just doing a little

 3   check in to make sure that Nichola and Mary are

 4   able to see each other and clearly communicate.

 5   They both nodded in the affirmative.

 6          THE VIDEOGRAPHER:  Counsel, you may

 7   proceed.

 8                   MARY ANN HILL,

 9   having been first duly sworn, was examined and

10   testified as follows:

11                   EXAMINATION

12   BY MR. WEAVER:

13     Q    Ms. Hill, my name is George Weaver.  I'm

14   an attorney in Atlanta, representing the

15   Defendants in this case.  I'm here on behalf of

16   the Georgia Attorney General's office.

17     A    Okay.

18     Q    If at any time you don't understand a

19   question I'm asking you through the interpreters,

20   will you agree to let us know that you don't

21   understand?

22     A    Okay, I will.

23     Q    All right.  Now, before this deposition

24   today, did you meet with your attorneys to

25   prepare for the deposition?
```



Page 8

1  The interpreters are going to make a switch.

2           MS. SHRADER:  Mr. Weaver, just for

3  clarity, the event that Ms. Hill's discussing

4  happened -- also happened in November, just

5  November of 2020.  So if we can just make sure

6  that there's clarity in terms of -- with the

7  interpretation, the focus not being necessarily

8  on November but also on the year.

9           MR. WEAVER:  I've said that, Brittany.

10  But, yeah, it was November.  It was the same

11  month but different years.

12           MS. SHRADER:  Yes.

13           MR. WEAVER:  Yeah.

14           THE INTERPRETER:  The interpreters are

15  ready.

16  BY MR. WEAVER:

17       Q   **Okay.  Ms. Hill, I'm trying to ask you**

18  **about when you were sentenced by the Court in the**

19  **original case against you and Jimmy Don Hill, who**

20  **I think was your husband at one time.  That**

21  **sentencing happened in November of 2019.  Do you**

22  **recall that?**

23           THE INTERPRETER:  For the interpreter --

24  interpreters' clarification, that was Jimmy,

25  middle name Don, last name Hill; is that correct?

 1          MR. WEAVER:  Yes.

 2          THE INTERPRETER:  Thank you.

 3          THE WITNESS:  Yeah.  But the paperwork

 4  wasn't clear.  I didn't understand it.

 5  BY MR. WEAVER:

 6     **Q    Okay.  Well, let me show you a couple of**

 7  **pages from that record.**

 8          THE INTERPRETER:  One moment for the

 9  interpreters.  Go ahead.

10  BY MR. WEAVER:

11     **Q    So what I'm showing you now is the**

12  **document --**

13          THE INTERPRETER:  For the interpreters,

14  it's rather a challenge to interpret and look at

15  a document at the same time.  Is it --

16          MR. WEAVER:  Okay.  I remember from the

17  other deposition, so let me -- let me show the

18  document, then I'll take it down, and then ask

19  questions.  Okay?

20          THE INTERPRETER:  Great.  Thank you.

21  BY MR. WEAVER:

22     **Q    Ms. Hill, I just showed a document on**

23  **the screen from the criminal case against you and**

24  **Jimmy Don Hill, and it was the indictment, I**

25  **think, in May of 2018, and then it shows a**



1  sentence on November 5 of 2019 by Judge Phillip

2  Smith.  Do you recall that event, the sentencing?

3      A    Yes, I remember now.

4      Q    Okay.  And then shortly after that

5  sentencing date, you went to the Forsyth office

6  of the probation service, also Department of

7  Community Supervision and had a meeting with

8  Ms. Hilliard, correct?

9      A    Yes, I did.

10      Q    And was there an interpreter there at

11  that time, an ASL interpreter?

12      A    No.  They had a laptop, but there were

13  technological problems.

14      Q    So a laptop was used with Ms. -- I think

15  her name is Shannon Hilliard -- at the intake

16  meeting, and the laptop was on an ASL interpreter

17  who was in a different location; is that right?

18          MS. SHRADER:  Objection.  Compound

19  question.  You can answer.

20          THE INTERPRETER:  The interpreter has

21  asked to repeat the question, please.

22          MR. WEAVER:  You're asking me to repeat

23  it?

24          THE INTERPRETER:  Yes, sir.

25          MR. WEAVER:  Okay.



Page 11

1  BY MR. WEAVER:

2     **Q     If I understand your testimony,**

3  **Ms. Hill, you're saying that at the intake**

4  **meeting at the probation office, a laptop was**

5  **used, and there was a remote ASL interpreter you**

6  **could see on the laptop; is that right?**

7     A     She tried that, but there were technical

8  problems like lag.  The signal just wasn't strong

9  enough in that area, I guess.

10    **Q     Well, if there was a problem in the**

11 **signal at the intake meeting with Ms. Hilliard,**

12 **did the ASL interpreter repeat the communication**

13 **so that you could understand?**

14          MS. SHRADER:  Objection as to form.  She

15 can answer.

16          THE WITNESS:  No.  The image was too

17 jumbly, and there was too much lag.  So finally

18 she just told me to read this piece of paper,

19 which I did not understand.

20 BY MR. WEAVER:

21    **Q     Did Ms. Hilliard read any documents to**

22 **you at this intake meeting in December of 2019?**

23    A     Well, she was talking, but I didn't

24 understand it.  I kept pointing to the screen and

25 showing her, Look, it's frozen.  So I couldn't



1  follow anything she was saying, and finally she

2  just told me to take these papers home with me to

3  read them.

4      **Q     So did you take them home?**

5      A     Yes, I did.  But I didn't understand the

6  language on there.

7      **Q     When you took them home, did you read**

8  **them to yourself or have somebody read them to**

9  **you?**

10      A     I sure did.  I tried reading the papers,

11  and then I used Google so I could look up some of

12  those words.

13      **Q     Okay.  Did you eventually understand and**

14  **sign the documents?**

15          MS. SHRADER:  Objection.  Compound

16  question.  She can answer.

17          THE WITNESS:  No.

18  BY MR. WEAVER:

19      **Q     Did you sign the documents?**

20      A     Yeah.  I had no choice because -- I

21  didn't understand them, but I signed them.

22      **Q     So let me see if I understand what**

23  **happened.  You went to the probation office, met**

24  **with Ms. Hilliard, you took documents home, and**

25  **then you took them back to the office on a**


Elizabeth Gallo
COURT REPORTING, LLC

1  **different date; is that right?**

2         THE INTERPRETER:  The interpreter is

3  clarifying a term the witness used.

4         THE WITNESS:  Well, what happened was, I

5  brought the papers back, and it wasn't

6  Ms. Hilliard.  It was another person, Nero, in

7  the probation office, and basically I ended up

8  just having to sign them.  I explained I couldn't

9  see the interpreter on the laptop, and I don't

10 understand these, but basically they just had me

11 sign them anyway.

12 BY MR. WEAVER:

13     **Q    Did you sign the documents after you**

14 **went back and met with Ms. Nero?**

15     A    That's right.  I was in the office when

16 I signed the papers.

17     **Q    Okay.  Was -- was there a remote**

18 **interpreter used at that time?**

19     A    So it was the same.  I mean, the laptop

20 couldn't get a clear connection, and I told them

21 I would rather have a live interpreter, you know,

22 a deaf certified interpreter, or a hearing

23 interpreter, but on-site because we spent all our

24 time waiting for that thing to connect or waiting

25 for the picture to clear up.  That area is just


Elizabeth Gallo
COURT REPORTING, LLC

1  no good for Wi-Fi service or whatever they had.

2  It -- it didn't work.

3      **Q      So if I understand correctly, Ms. Nero,**

4  **Kim Nero, also used the remote interpreter, or**

5  **VRI, when you went back to sign the documents,**

6  **correct?**

7      A     Yep.  She tried several times to get it

8  to work.  I tried repeatedly to try to understand

9  what the interpreter might be saying through that

10  fuzzy picture.  It's so bad it looked kind of

11  like a picture puzzle with all the colors and

12  everything on that screen.

13     **Q      Like a what kind of puzzle?**

14         THE INTERPRETER:  A picture puzzle.

15  BY MR. WEAVER:

16     **Q      A picture puzzle, okay.  And we'll come**

17  **back to your -- the intake process in a minute,**

18  **and also some more about your criminal -- your**

19  **appearance in the -- in the court.  But my**

20  **understanding is that VRI has been used with you**

21  **by probation officers or community supervision**

22  **officers on other occasions besides the two that**

23  **you've mentioned so far, correct?**

24     A     I mean, it wasn't used successfully

25  really.  It didn't work.



Page 15

1    Q     Well, let's talk about that.

2          THE INTERPRETER:  One moment for the

3    interpreters.  Go ahead.

4    BY MR. WEAVER:

5    Q     So the Defendant, the Georgia Department

6    of Community Supervision, has produced to your

7    attorneys in this case videos of -- body cam

8    videos of three meetings that you had with

9    probation officers.  Are you aware of that?

10         THE INTERPRETER:  Mr. Weaver, could you

11   please repeat your question for the interpreters,

12   please?

13   BY MR. WEAVER:

14   Q     The Defendants in this case have

15   produced to your attorneys videos of three

16   meetings that --

17         THE INTERPRETER:  We're having -- I'm

18   sorry, Mr. Weaver.  We seem to be having a little

19   bit of technical difficulties.  Ms. Hill cannot

20   see one the interpreters.  Okay.  We're all set

21   now.  Thank you.

22   BY MR. WEAVER:

23   Q     Okay.  The Defendants in this lawsuit

24   that you're a part of have produced three

25   videotapes, recordings of three meetings that you



1  **had with probation officers.  Are you aware of**

2  **that?**

3           MS. SHRADER:  Mr. Weaver, just

4  clarification for the interpreters.  Mr. Weaver

5  represents the Defendant, and I represent

6  Ms. Hill.  So Mr. Weaver's question was that the

7  attorney for the Defendant, Mr. Weaver, gave

8  those videos to -- to myself, to the lawyers

9  representing Ms. Hill.

10          THE INTERPRETER:  The interpreters are

11  getting a little clarification.  Please hold on a

12  second.  We're going to continue the

13  interpretation to -- to Ms. Hill.

14          THE WITNESS:  Yes, I'm aware there are

15  three videotapes.

16  BY MR. WEAVER:

17     **Q    Well, those videotapes, which range from**

18  **17 to 22 minutes in length, don't show any**

19  **freezing or interruption in the Wi-Fi signal.**

20  **Are you aware of that?**

21          MS. SHRADER:  Objection as to form.

22  Mischaracterizes the evidence.

23          MR. WEAVER:  Brittany, what freezing are

24  you talking about?

25          MS. SHRADER:  Mr. Weaver, I would ask



1 where in these videos do you see, clearly, the --

2 the entirety of the interpretation on the video?

3          MR. WEAVER:  Well, you don't know --

4          MS. SHRADER:  You can see the back of

5 the laptop.

6          MR. WEAVER:  You're misstating -- you're

7 misstating the record, Brittany.  Please quit

8 interfering in the deposition.  Let me --

9          MS. SHRADER:  I --

10          MR. WEAVER:  -- start -- let me start

11 over.

12          MS. SHRADER:  The fact that you asked

13 for the basis --

14          MR. WEAVER:  Let me start over.

15          THE INTERPRETER:  The interpreters are

16 ready.

17 BY MR. WEAVER:

**18     Q     There's no indication in any of the**

**19 three videos from you or anybody else that**

**20 there's any interference in the signal for the**

**21 remote interpreter.  Are you aware of that?**

22          MS. SHRADER:  Same objection.  You may

23 answer.

24          THE WITNESS:  So -- seriously, I'm

25 telling you that every time we had these VRI



Page 18

1  instances, they were very pixilated.  The

2  Internet connection was lost frequently over and

3  over again, and then Zoom meetings, there was no

4  interpreter present.  So I couldn't understand

5  any of those interactions.

6  BY MR. WEAVER:

7      **Q     In none of those three videos that were**

8  **produced to your attorneys, did you say or**

9  **communicate through sign language that the signal**

10 **was lost, the picture was pixilated, or you**

11 **couldn't understand what was being communicated,**

12 **correct?**

13          MS. SHRADER:  Objection as to form.

14 Mischaracterizes the evidence again.  You may

15 answer.

16          THE WITNESS:  Yes.  My probation officer

17 was aware that there was not a clear connection,

18 and I wasn't able to understand the interpreter

19 by means of VRI.  I gestured to the probation

20 officer and shook my head in a negative manner

21 indicating that it's not working and that I'm not

22 understanding what's happening on the screen.

23 BY MR. WEAVER:

24     **Q     To which probation officer did you**

25 **communicate that?**



Page 19

1      A    I actually indicated it to all four

2   probation officers; Ms. Hilliard; Ms. Nero; last

3   name Roper; and another individual, black woman,

4   whom I don't remember her name.  So -- so they

5   are very well aware that there was a problem with

6   the Internet.

7           MR. WEAVER:  Let me object to your last

8   statement.  It's speculative and nonresponsive.

9   BY MR. WEAVER:

10      Q    So are you saying that you communicated

11   all of this during these meetings with the

12   probation officers?

13           THE INTERPRETER:  We were just

14   interpreting that objection, Mr. Weaver, and

15   we're still doing so.  So we'd ask that you

16   repeat that question in one moment; that last

17   one.  Okay.  Could you please repeat that most --

18   the most recent question for the interpreters?

19           MR. WEAVER:  Sure.

20   BY MR. WEAVER:

21      Q    So what you just stated, that you told

22   all of the officers, probation officers, that you

23   didn't understand, that VRI was not working, that

24   you told all of them, that -- was it during those

25   meetings with the probation officers in which you



Page 20

1  communicated that?

2      A    I communicated those things when we were

3  present in the meeting.

4      Q    Okay.  Now, you say you could not

5  understand what was being communicated in these

6  meetings, because of technical problems with the

7  VRI; is that -- is that what you're saying?

8      A    Yes, that's what I'm saying, that I

9  communicated to them that there were technical

10 problems and that the image was freezing up.

11     Q    So just to be clear on this record, the

12 reason you could not understand or communicate

13 effectively in these meetings with the probation

14 officers or community supervision officers is

15 because of technical issues with the VRI,

16 correct?

17          MS. SHRADER:  Objection as to form.  She

18 can answer.

19          THE WITNESS:  Yes, because of the

20 Internet issue, yes.

21 BY MR. WEAVER:

22     Q    Let me go back and ask you a few

23 questions about your sentencing.

24          THE INTERPRETER:  Mr. Weaver, before you

25 do so, we're going to make an interpreter switch.



Page 21

1   Just hold on one second, please.

2            MR. WEAVER:  All right.

3            MS. SHRADER:  Mr. Weaver, would it be a

4   good time to take a quick, like, five-minute

5   break?

6            MR. WEAVER:  Sure, that's fine.

7            MS. SHRADER:  Thanks.

8            THE VIDEOGRAPHER:  We're going off the

9   record.  The time is approximately 11:31.

10   (Deposition in recess, 11:31 a.m. to 11:47 a.m.)

11           THE VIDEOGRAPHER:  We are back on

12  record.  The time is approximately 11:47.

13  BY MR. WEAVER:

14      **Q    Ms. Hill, when you were sentenced in**

15  **Forsyth County Superior Court November 5th of**

16  **2019, is it correct to say that you pled guilty?**

17  **You did not have a trial; is that correct?**

18           THE INTERPRETER:  Mr. Weaver, for the

19  interpreter, the question was:  In Forsyth

20  Supreme Court -- can you repeat the end of the

21  question, please?

22  BY MR. WEAVER:

23      **Q    You pled guilty and did not have a**

24  **trial, correct?**

25      A    Yes, because I was not happy with the



1  interpreters.

2  **Q     The interpreters you had in court, were**

3  **they live ASL interpreters as opposed to remote**

4  **interpreters?**

5  A     They were live there in court.

6  **Q     Okay.  And was a CDI, or Certified Deaf**

7  **Interpreter, there?**

8  A     No.  I didn't know about deaf

9  interpreting services at that point.

10  **Q     Okay.  When did you first learn about**

11  **deaf interpreters or deaf interpreting service?**

12  A     A few months ago was the first time I

13  came across having a deaf interpreter, and I have

14  to say it made a -- quite an impression and a big

15  difference for me.  I wish I had known about that

16  earlier.  It really made a difference.

17  **Q     So you said "a few months ago."  That**

18  **would be sometime this year, 2021; is that**

19  **correct?**

20  A     Yes, that's right.  Just this year,

21  2021.

22  **Q     Okay.  And did you learn about that**

23  **through your attorneys that are representing you**

24  **in this case?**

25              MS. SHRADER:  And I would just object to



Page 23

1  the extent that the question calls for any

2  conversation with counsel.  Mary, you don't have

3  to talk about any substance of communication you

4  had with your lawyers.

5         THE WITNESS:  Yes, and that's why I say

6  it was so impressive.  I was able to understand

7  them so much better.  I could understand their

8  signing so much better than otherwise.  It was

9  really clear and easy for me to understand.

10 BY MR. WEAVER:

11   **Q    Before meeting the attorneys that you**

12 **have in this case, sometime earlier this year,**

13 **2021, had you ever had a Certified Deaf**

14 **Interpreter, or deaf interpreter at all, to**

15 **assist in you -- in your communications?**

16   A    Unfortunately, no.  I'd never heard of

17 or seen any deaf interpreter or understood what

18 Certified Deaf Interpreters were until then.  I

19 really wish I would have known earlier.

20   **Q    And I think I've got this right.  You**

21 **just turned 41.  Your birthday is July 4th of**

22 **1980; is that right?**

23   A    Yes, that's my birthday.

24   **Q    Okay.  So you -- you just turned 41; is**

25 **that correct?**



Page 24

```
 1      A     Yes, I'm 41.
 2      Q     All right.  So the first 40 years of
 3  your life, you never had a Certified Deaf
 4  Interpreter or a deaf interpreter, correct?
 5      A     No, I never did.  All this time, I just
 6  had my usual one, hearing interpreter, and
 7  actually, she's retired now.
 8      Q     And who is that?  Who are you talking
 9  about?
10            THE INTERPRETER:  The interpreter needs
11  to clarify the witness.  Thank you.
12            THE WITNESS:  Right, that's Mrs. Ivy.
13  She's been my interpreter since I was three years
14  old, and, in fact, she's kind of like my mother.
15  BY MR. WEAVER:
16      Q     And what's her first name?
17      A     Okay.  It's -- let me remember how to
18  spell it right.  P-H- -- Phyllis with two Ls.
19      Q     Okay.  And where does she live?
20            THE INTERPRETER:  The interpreter is
21  clarifying of the witness to make sure that the
22  name of the town is spelled correctly.
23            THE WITNESS:  She's in Ringgold,
24  Georgia.  That's the town where I grew up.
25                         ---
```



Page 25

1  BY MR. WEAVER:

2     **Q     Okay.  So back to your criminal**

3  **sentencing.  You say there were interpreters**

4  **there.  How many interpreters were there?**

5     A     I don't know.

6     **Q     Was there more than one?**

7          THE INTERPRETER:  The interpreters are

8  attempting to clarify the witness.  The

9  interpreters need clarification, Mr. Weaver.  The

10  criminal sentencing you're referring to, are you

11  talking about one particular proceeding or a

12  series of proceedings?

13          MR. WEAVER:  Well, I showed the document

14  earlier.  On November 5 of 2019, Ms. Hill was

15  sentenced in Forsyth County Superior Court, so

16  I'm talking about that proceeding.

17          THE INTERPRETER:  November 5th.  Thank

18  you, sir.

19          THE WITNESS:  It was one interpreter.

20  BY MR. WEAVER:

21     **Q     Okay.  So you were sentenced on several**

22  **counts of cruelty to children; is that correct?**

23     A     Yes.

24     **Q     Okay.  And the crimes involved your**

25  **daughters; is that right?**



Page 77

1           MR. WEAVER:  Okay.  All right.

2           MR. WEAVER:  I did it, really, show her

3      the other document to refresh her memory, not for

4      any other purpose, frankly.

5           (Whereupon, Exhibit No. 122 was marked

6      for identification.)

7      BY MR. WEAVER:

8      **Q    So I just showed you this.  It looks**

9      **like a copy of a photograph of some prescription**

10     **medication to you, and I think you mentioned**

11     **earlier today that you sent, by email, a picture**

12     **of your prescriptions, and this involved you**

13     **being hospitalized; is that what you said?**

14     A    That what you just showed, is what I

15     emailed.

16     **Q    Okay.  All right.  And do you remember**

17     **when you sent the email and to whom you sent it?**

18     A    So I sent it to Roper, and when I sent

19     it -- I'm trying to remember -- it was af- --

20     just after I had surgery.  It was pretty recent,

21     but when -- not too -- not too long after

22     surgery.

23     **Q    Did you include any kind of text with**

24     **your email or just the picture of the**

25     **prescription containers?**



Page 78

1      A    I texted that photo to Roper to let him
2  know that I was in the hospital, and hopefully
3  that was okay that I did that.
4      **Q    Well, my questions was:  Did you include**
5  **any text message with your photo?  And by the**
6  **way, was it a text message, or was it an email?**
7      A    So I remember that I -- actually I sent
8  an email of that picture to Hilliard, and then
9  later I also texted it, the picture, to Roper and
10  I did contain some lines of text, something to
11  the effect of, like, "Is this medication okay?"
12     **Q    Do you still have a copy of the email**
13  **that you sent?**
14          THE INTERPRETER:  Interpreters are going
15  to switch.  The witness is concerned about the
16  charge the laptop holds and needs to take care of
17  plugging in the device.  Okay, it's plugged in
18  now.  The interpreter -- the interpreter would
19  ask that counsel repeat the question as we've
20  kind of lost track in the interim.
21          MR. WEAVER:  Okay.
22  BY MR. WEAVER:
23     **Q    Do you still have a copy of the email**
24  **that you sent with the copy of the photograph of**
25  **your pres- -- prescription containers?**



Page 79

1      A     No, but I'll look again tonight.

2   Honestly though, I'm not the best with

3   technology, so I'll do my best.

4      **Q     Okay.  Thank you.**

5           MR. WEAVER:  And, Brittany, if there are

6   any emails or text messages that we don't have,

7   we'd like to get those.

8           MS. SHRADER:  Yes.  Mary will send them

9   to me, and then we'll send them over to you,

10  George.

11          MR. WEAVER:  Okay.  All right.  Well,

12  let me just cover one more thing and then I think

13  we'll stop today.  I'm sure that we're all tired.

14  BY MR. WEAVER:

15     **Q     But let me ask about some text messages**

16  **that we do have and ask you to take a look at**

17  **those.  And these have also been previously**

18  **marked, so let me put them on the screen.  Just a**

19  **moment.**

20     A     Well, that's better.

21     **Q     Okay.  What I showed you, Ms. Hill, is**

22  **four pages of text messages.  The first two pages**

23  **are marked as Deposition Exhibit 121.  And just**

24  **so we're clear, I think the Bates numbers are**

25  **D-010992 and 993.  Then the -- the other two**



1  pages of text messages are marked as a different

2  deposition exhibit number, and these are Exhibit

3  109, and these are bates numbered D-010994 and

4  995.  And all that I said is just for the record.

5      So the first two pages -- and there's

6  duplication here -- they are text messages from

7  August of 2020, and the first one says, "I am

8  sorry to not responding you back.  My result's

9  negative.  It's Mary Littlejohn Hill.  So right

10  now, I on way to work.  I am going to try at

11  Goodwill to see if they accept community service

12  to catch up.  I am frustrated with anywhere to

13  accept community service.  And the response is:

14  "Great news and okay."

15      So let me ask you this:  Is this an e- -- are

16  these text messages from you to Shannon Hilliard,

17  and then back from Shannon Hilliard to you, in

18  August of 2020?

19      (Whereupon, Exhibit No. 121 was marked for

20  identification.)

21          THE INTERPRETER:  One moment for the

22  interpreter.

23          THE WITNESS:  Exactly.  That's a perfect

24  example of the miscommunication.  I was telling

25  her I was frustrated at not being able to find



Page 81

1  somebody to accept me for community service

2  hours, and here her response is, "Good news,

3  okay."  She clearly didn't understand me.  I was

4  trying to say, I'm frustrated, and she thinks

5  it's good news.  And I felt like, what?  I mean,

6  it's gotten even harder during pandemic.  So her

7  response just did not match my comments at all.

8  Clearly it wasn't a good communication.

9  BY MR. WEAVER:

**10      Q    Well, maybe she was saying it's good**

**11  news or great news that you're trying to complete**

**12  your community service.  Do you think that's what**

**13  she was saying?**

14          MS. SHRADER:  Objection.  Calls for

15  speculation.  She can answer.

16          THE WITNESS:  I -- I couldn't say, but I

17  can tell you that my frustration that I was

18  trying to communicate to her, she didn't seem to

19  pick up on.  So again, the communication was not

20  effective.

21          MR. WEAVER:  Object to your answer.

22  It's nonresponsive.

23  BY MR. WEAVER:

**24      Q    The other set of text messages -- which**

**25  is previously marked Deposition Exhibit**



Page 82

**1   109 -- these messages were between you and**

**2   officer Adam Roper, correct?**

3        (Whereupon, Mr. Weaver referred to Exhibit

4   No. 109.)

5        A    Yes.

6   BY MR. WEAVER:

**7        Q    Okay.  And it looks like officer Roper**

**8   is telling you to report Monday at 10 a.m., and**

**9   this is October of 2020, and you're responding**

**10  that you're okay to meet in person or online.**

**11  And Mr. Roper says that -- that he wants to meet**

**12  you in person, and that he'll be using with you**

**13  an interpreter; is that correct?**

14       A    Well, see, here again, he didn't really

15  understand me entirely.  My intent was to ask him

16  whether the interpreter would be in the office or

17  whether the interpreter would be on the screen in

18  a VRI -- with VRI services and he didn't

19  understand me; he didn't understand my question.

20  He thought I was talking about whether I should

21  come into the office, and I wanted to communicate

22  that I preferred the interpreter to be in the

23  office over VRI services.

**24       Q    Okay.**

25       A    But that word "report" is not a word



Page 83

1  that I know by the way.

2      **Q     All right.  And you brought up in these**

3  **text messages with Mr. Roper, Exhibit 109, that**

4  **you were -- wanted to do more community service**

5  **to complete your community service, I -- I**

6  **assume; is that correct?**

7      A     Yes, that is absolutely right.  I

8  want -- wanted to get this taken care of so that

9  I can move onto other needs.

10          THE INTERPRETER:  One moment for the

11  interpreting team, please.  The interpreters are

12  going to clarify.  One moment.

13          The interpretation should have been,

14  "Absolutely right.  I wanted to get that taken

15  care of and complete my community service

16  obligations, because I need to move on and take

17  care of other obligations in my own life such as

18  my mother-in-law who's suffering with

19  Alzheimer's, and my father-in-law really needs me

20  available to help take care of her.  So you're

21  exactly right.  I wanted to finish up with those

22  obligations."

23          One moment.  The interpreters are going

24  to switch.  Interpreters are ready.

25                      ---



Page 86

1                              CERTIFICATE

2

3    STATE OF GEORGIA:

4    COUNTY OF DEKALB:

5

6        I hereby certify that the foregoing

7    transcript was reported, as stated in the

8    caption, and the questions and answers thereto

9    were reduced to typewriting under my direction;

10   that the foregoing pages represent a true,

11   complete, and correct transcript of the

12   evidence given upon said deposition, and I

13   further certify that I am not of kin or counsel

14   to the parties in the case; am not in the

15   employ of counsel for any of said parties; nor

16   am I in any way interested in the result of

17   said case.

18

19

20   _____
                                                5100-8905-8215-5264
     Amelia Bradley
21   Certified Court Reporter
     5100-8905-8215-5264
22

23

24

25



Page 87

1                    DISCLOSURE OF NO CONTRACT

2

3        I, Amelia Bradley, Certified Court
     Reporter, do hereby disclose, pursuant to Article
4    10.B. of the Rules and Regulations of the Board
     of Court Reporting of the Judicial Council of
5    Georgia, that I am a Georgia Certified Court
     Reporter; I was contacted by the party taking the
6    deposition to provide court reporting services
     for this deposition; I will not be taking this
7    deposition under any contract that is prohibited
     by O.C.G.A. 15-14-37(a) and (b) or Article 7.C.
8    of the Rules and Regulations of the Board; and I
     am not disqualified for a relationship of
9    interest under O.C.G.A. 9-11-28(c).

10

          There is no contract to provide services
11   between myself or any person with whom I have a
     principal and agency relationship, nor any
12   attorney at law in this action, party to this
     action, or party having a financial interest in
13   this action.  Any and all financial arrangements
     beyond my usual and customary rates have been
14   disclosed and offered to all parties.

15       This 3rd day of September, 2021.

16

17

18

19

     _____
20   Amelia Bradley
     Certified Court Reporter
21   5100-8905-8215-5264

22

23

24

25

