# Exhibit Y

## Addendum to Expert Report of Drs. Judy Shepard-Kegl and Amy June Rowley

We submit the following addendum to our report dated August 11, 2020 and supplemented on September 14, 2020 to both address a typo in our original report and to submit our evaluation of and conclusions as to the newly named plaintiff Mary Ann Hill.

During the deposition of Dr. Amy June Rowley on May 21, 2021, we became aware of a typo that exists on page 134 of the August 11, 2020 report. The second to last line of the Lipreading Assessment in the submitted report reads ". . . even the most skilled lipreaders still get only about 80%.". The 80% figure is a typo that should read 30% (see reference to the main report which indicates at page 17 that "The average deaf lipreader will catch approximately 30% of what is on the mouth (and typically that speech is predictable and highly routinized, like *What's your name? What's your address?*, etc.)."). With this typo corrected, the Lipreading Section should read as follows:

> **Lipreading.** Mr. Nettles' lipreading is also poor. He was able to recognize 15 of the 64 items presented (23%). He recognized 5 of the 17 isolated words he was presented with (29%) and 10 of the 47 words and phrases (21%). Most were very common and routinized word and phrases: *What's your name?*, *What's your address?*, *What's your telephone number?*, *How long have you been working here?*, *How old is your son?*, *What's your favorite movie?*, and *Can you understand me?* His responses indicated attempts at phonemic processing: *force you* for *forty-two*; *read please* for *green beads* (*d*, *n*, and *s* are made in a similar place in the mouth). He often produced responses that shared the first sound with the items spoken, or shared features of front versus back vowels. The problem is that getting close does not actually get you closer to the meaning. For example, he saw *Are you aware of your rights?* as *Have you been arrested?*; and *You have the right to remain silent* as *you have replace for dialysis*. He caught many similar sounds, but came nowhere near the meaning of the item produced. His most surprising correct response was *Have you ever had a transfusion?* Despite trying hard, Mr. Nettles is quite below average among deaf people in lipreading (and, as noted in the main report, even the most skilled lipreaders still get only about 30%). He cannot

> reliably use lipreading as a means of accessing communication except perhaps quite sporadically recognizing highly contextualized and routinize phrases.

For convenience, we have attached a replacement page 134 (see the next page of this submission), which should be substituted for page 134 in the report dated August 11, 2020.

Dr. Judy Shepard-Kegl
Dated: July 20, 2021

Dr. Amy June Rowley
Dated: July 20, 2021

the spoken rendition of the story was completely unintelligible. If required to try to communicate via speech, Mr. Nettles would tend to accompany his speech with signing. Some basic words and possibly a few routine phrases are recognizable for someone familiar with Deaf speech or very familiar with Mr. Nettles' speech (like a family member). His speech overall had a nasalized quality frequently seen in people with hearing loss. Confounding understanding of Mr. Nettles' speech even further (as can be seen in his writing) is that he is by no means a native speaker of English. His word order is different, he uses English prepositions as if they are verbs, and he omits pronouns (as he should in ASL but should not in English). Speech cannot serve as a means of communication for him.

**Lipreading.** Mr. Nettles' lipreading is also poor. He was able to recognize 15 of the 64 items presented (23%). He recognized 5 of the 17 isolated words he was presented with (29%) and 10 of the 47 words and phrases (21%). Most were very common and routinized word and phrases: *What's your name?*, *What's your address?*, *What's your telephone number?*, *How long have you been working here?*, *How old is your son?*, *What's your favorite movie?*, and *Can you understand me?* His responses indicated attempts at phonemic processing: *force you* for *forty-two*; *read please* for *green beads* (*d*, *n*, and *s* are made in a similar place in the mouth). He often produced responses that shared the first sound with the items spoken, or shared features of front versus back vowels. The problem is that getting close does not actually get you closer to the meaning. For example, he saw *Are you aware of your rights?* as *Have you been arrested?*; and *You have the right to remain silent* as *you have replace for dialysis*. He caught many similar sounds, but came nowhere near the meaning of the item produced. His most surprising correct response was *Have you ever had a transfusion?* Despite trying hard, Mr. Nettles is quite below average among deaf people in lipreading (and, as noted in the main report, even the most skilled lipreaders still get only about 30%). He cannot reliably use lipreading as a means of accessing communication except perhaps quite sporadically recognizing highly contextualized and routinize phrases.

**Reading.** Mr. Nettles' reading is extremely weak. Based upon vocabulary alone (The San Diego Screening) he might have been expected to read solidly at a second-grade level. But, a second-grade vocabulary in the absence of a second-grade mastery of sentence grammar (syntax) does not allow reliable reading at that level. Mr. Nettles' performance on reading

## Individual Assessment: Mary Ann Hill (female, 40)

**Testing dates:** May 19, 2021- June 9, 2021 (receipt of last writing sample)

**Submitted:** July 16, 2021

### I. Linguistic/Cultural Profile

**I.1. Responses:** (also in ASL on video)

**I.1.a. Born deaf?** Yes, she was born deaf. In addition, she has Usher Syndrome, a syndrome in which being born deaf co-occurs with retinitis pigmentosa (gradually developing tunnel vision). There are varying types, but she does not have a diagnosis of which type. It is likely Usher Syndrome 1, but her loss of visions started earlier than usual, noticeable by age 7, when classmates and school staff noticed her having problems with night vision, tripping over things.

**I.1.b. Deaf parents?** No, she is the only deaf person in her family. Her father and mother use home gestures. She has two full brothers and three half-brothers, one with Down Syndrome. Her brothers use fingerspelling and home gestures with her. The brother with Down Syndrome knows a little signing, but not ASL as reported by Ms. Hill. Often children with Down Syndrome are taught a variety of single signs as part of their communication training.

**I.1.c. Attended residential school for the Deaf?** No, she grew up in Ringgold, GA and was educated in mainstream, public schools. She had the same interpreter throughout elementary and secondary school (Mrs. Ivey). She attended Battlefield Elementary school for two and a half years, where there was one other Deaf child. She was held back in first grade because her reading was behind. She then moved to Ringgold Elementary School because there were three other Deaf students there and they could have a Deaf class. By high school, there were five Deaf students there. She was in a deaf group primarily for English and reading, and she was mainstreamed for other classes. She graduated high school in 2000 and got a special education diploma. When asked for clarification on what the diploma represented, she said it was to show she attended school, which is likely a certificate of attendance rather than a diploma. She also attended Coosa Valley Technical College for two years hoping to study data entry. However, to do so, she needed to get her GED. She tried three times to take a GED class and exam, but there were no interpreters for these classes, so she failed the exams. She

never got her GED and left Coosa Valley Technical College after two years. She has no further education.

**I.1.d. Tends to associate primarily with Deaf people?** Yes. Ms. Hill reports that 90% of her friends are Deaf.

**I.1.e. Is a member of Deaf clubs and organizations?** No, she is not a member of any Deaf clubs or organizations, but she does attend Deaf events such as Deaf Expo and Deaf Night Out.

**I.1.f. Married a Deaf spouse (or has had a long- term relationship with a Deaf partner)** Yes. Her first husband (2002-2009) was Deaf. He died in 2009 and they had four children together, all girls (oldest 19, 17, twins 14). They all sign. Her youngest daughter (a twin) also has Usher Syndrome. Her second husband is also Deaf. They married in 2012 and have no children. He was also educated in mainstream schools, but he has a sister (Wendy) who is Deaf. Ms. Hill reported that he signs ASL fluently. He got his GED in 2008.

**I.1.g. Typical Deaf occupation?** Yes. Her jobs since high school have all been in food service or cleaning. She has worked for McDonald's for the last seven years.

**I.1.h. Awareness of dB loss?** No. She does not know her dB loss. She is profoundly deaf. She can hear sirens, car horns beeping, but no speech. When she was younger she had hearing aids that helped some with speech, but not now. She has had no hearing aids since age 15. She tried last to get hearing aids last year, but was unable to get them.

**I.2 Early Life Choices:** In terms of early life choices, the decisions made for Ms. Hill by birth and by family school choices were mixed. She was born deaf into a family that could hear and didn't sign. She did not attend a residential school for the Deaf but was mainstreamed in public schools with at least several Deaf children so that there could be a small program. She had an interpreter throughout her elementary and secondary education. Early life choices speak to the possibility of a Deaf identity and exposure to signing, but not necessarily native level communication.

**I.3 Later Life Choices:** In terms of later life choices, the decisions made by Ms. Hill speak to identity as a Deaf person and affiliation with the Deaf community. Most of her friends are

Deaf and she attends Deaf events. However, while both of her husbands were Deaf, both had mainstream education. Her second husband has a Deaf sister and signs ASL fluently. Evidence of her early identification with the Deaf community and ASL is the fact that her four children, although raised by the grandparents after her husband's death, all sign. Her jobs have all been jobs that don't require the use of English on a daily basis. All of these speak to a Deaf identity, but not necessarily a strong identification with Deaf culture. Therefore, while we expect her to sign, we do not have strong expectations that that signing will conform to fluent ASL.

**II. Individual's use of Interpreters**

She had interpreters for her children's births and when communicating with lawyers. She requests interpreters for doctor's visits, but she is not always provided with interpreters. Her husband often helps her with written English, particularly in reading captions, as does her mother-in-law. Her husband helps with work forms. He also sometimes serves as a sighted guide for her. She doesn't understand interpreters if they sign too fast or "use the new ASL." She really needs interpreters that accommodate to her signing style and background.

As a person with Usher Syndrome, it is not clear that Ms. Hill has ever learned to advocate for the use of an interpreter—to request things like a slower speed of signing, clothing colors, lighting, distance, etc. It is also not clear that she has ever had any orientation and mobility training. She had the same educational interpreter from the age of three through high school. The interpreter "helped" her a lot, which she welcomed. However, such a relationship did not foster her own living skills or autonomy.

As a child when she would go to the doctor, her mother would basically take over all the interactions with the doctor, leaving her out of the loop. She reports that as a child her family was poor and didn't attend to her healthcare with regard to her hearing, her sight, or dental care. She also has many of the characteristics of a deaf child in a hearing family in terms of being left out of the loop, and those gaps in fund of knowledge were not being filled in by peers or other individuals in a Deaf community around her. This lack of reliable access to communication within the family (both substantive and informal) can have consequences for one's fund of knowledge in general. We don't realize how much information is picked up, not in school, but in casual conversation around the dinner table or at family gatherings. There

is a situation called "Dinner Table Syndrome" which is common in families that do not sign.[1] But similar gaps in fund of knowledge in legal venues and even in basic living skills can also be attributed to being left out of the loop. Having Usher Syndrome compounds the issue of having people do things for you as opposed to with you and leads to even less of a fostering of independence.

As a consequence of many factors, Ms. Hill has a lower-than-average fund of knowledge in many domains, including legal venues. In addition, when provided with interpreters, she is only now learning how to indicate when those accommodations are not matching her needs. The few times in prison that she did have an interpreter, the interpreter was rushed or inattentive to matching her signing needs and she didn't glean as much from the interpreted interactions as people may have assumed she did. In court, she had difficulties explaining to and via the interpreter that the lighting and placement of interpreters in the courtroom was causing problems with her vision and was interfering with her comprehension of questions and information. She not only needs interpreters; she needs interpreters familiar with signing with signers whose base communication system is not standard ASL, with signers who have low vision, and with signers who have more limited fund of knowledge than your average Deaf signer.

**III.1 ASL Production (Grammar)** Ms. Hill's language production was assessed using a variety of tasks as well as free-flowing background conversation. ASL production elicited by the 1.5-minute Mr. Koumal cartoons also contributed to this analysis, but these will be discussed in their own section. Ms. Hill's production demonstrates a minimal proficiency in ASL grammar and she has a modest command of ASL production. In her signing, she was able to demonstrate location, spatial morphology, ASL forms of direct address, and classifier use with a lot of prompting. She can use facial grammar such as non-manual markings for yes/no and wh-question. However, ASL is not her typical means of signing. She is more attuned to producing initialized signs favoring a more English signing order. This mode of signing is called Pidgin Sign English (PSE) (or more recently called "contact signing" and is

1 Meek, D. 2020. Dinner Table Syndrome: A Phenomenological Study of Deaf Individuals' Experiences with Inaccessible Communication. In *The Qualitative Report*, vol. 25, no. 6, pp. 1676-1694.

not a language in and of itself. It is a manual interlanguage between ASL and English, drawing features from each, but falling short of the fully grammatical expression of either. Like a pidgin, it is highly variable from signer to signer and even from sentence to sentence within a single signer's communication. While it includes English in its name, the use of this contact language does not imply any level of mastery of English. Fluent ASL signers may use PSE when signing with hearing individuals they assume are not proficient in ASL. Used by a Deaf person as the sole means of signing, the use of PSE is also indicative of non-native mastery of ASL, often as the result of insufficient exposure to fluent ASL language models growing up or exposure to signing only in the context of educational interpreters with limited fluency. Ms. Hill seemed more halting and disfluent while signing ASL as opposed to PSE.

**III.1.b. Background conversation.** In background conversation throughout the testing, Ms. Hill used primarily PSE. At times when the interviewer shifted to a more PSE signing, she matched her. However, when the interviewer tried for more ASL, Ms. Hill's signing dropped artificial signs that are not usually present in ASL which made her signing look less English-based. However, she still persisted in using English order and initialized signing. In addition, when the topic was very descriptive and not easily expressed in a more English fashion, Ms. Hill would codeswitch to ASL and demonstrated proficiency in signing, although not favoring much use of complex verbs or motion and location or facial grammar. Ms. Hill was able to follow conversation in both ASL and PSE (provided the signing was slow and deliberate), but she tended to lean toward PSE production.

**III.2 ASL Comprehension.** Throughout the testing, she demonstrated consistent understanding of ASL. If something signed was unclear, she usually showed an expression of confusion which prompted the interviewer to repeat herself. When ASL was used, the interviewer tried to elicit ASL production in return and there was some halting there. ASL comprehension is stronger for Ms. Hill than is her ability to sign fully grammatical ASL. Her signing is more a blending of ASL and PSE.

**III.2.b. Bird of a Different Feather (Bahan).**

Ms. Hill was not already familiar with *Bird of a Different Feather*. In viewing, *Bird of a Different Feather*, she understood the general story line. She did recognize allegory and was able to

present the parallels between the story line and the experience of a Deaf child growing up in a hearing family. The speed of the storyteller in *Bird of a Different Feather* was easy for her to understand and she was able to understand the story as a whole. The story is rich with many metaphorical details that parallel the Deaf experience along with the experience of the main character in the story. When shown the story, the storyteller makes several connections and it was not until after several different situations and prompting from the interviewer, Ms. Hill realized the connection. She was able to follow the literal story itself. She did not recognize the play on "signs" the storyteller presented such as AG Beak Association as opposed to AG Bell Association. We use allusions to historical Deaf events to get a sense of an individual's knowledge of Deaf history and Deaf culture. We also use this allegorical text in ASL to determine Ms. Hill's ability to use her Cognitive Academic Language Proficiency to connect her personal experience with things that she learns and to make arguments for the parallels. While she was successful in noticing the parallel, she struggles to make the case for this text as an allegory. This indicates that her Cognitive Academic Language Proficiency (CALP) in ASL is weak. Her academic struggles and lack of communication growing up attest to this as well.

**III.2.b. DWI (Rivera).** Ms. Hill had not seen DWI previously. She understood much of the classifier story. She did not recognize the productive forms involving Size and Shape Specifiers (SASSs): such as the sports car (she got the car) or the truck (thought it was a house). She recognized some but not the full range of object classifiers used. She got the trees going by, the description of the woman, the rabbit, the rabbit in the headlights, the woman's head hitting the window, the man's head hitting the driver's window and the windshield. She did not get the spokes on the wheels of the sportscar, the speedometer, pedal to the metal, sleeveless dress, high heels and rumble strip (thought it was the car hitting the rabbit). She didn't get the two-handed classifier for rabbit, the truck description, cigar hitting window, air brake (thought it was a smokestack), truck trailer detaching and skidding, or the driver's head hitting the passenger window. She got the handling classifiers: the woman hitting the man to slow down and the bottle of liquor. There were many cinematographic perspective shifts throughout the story. She typically did not catch these. These seemed to be more challenging for her. She caught that the car landed upside down. All of this comprehension depends upon being able to process the productive use of classifier constructions (depiction) in ASL.

As a follow up, there were two errors in this story. First, although the car landed upside down, the ambulance people treated the car as if it was right side up. In this version there was a vehicle classifier that has the car oriented upward as well. Upside down, the woman was incorrectly on the driver's side and the man on the passenger side. In addition, the ambulance drivers broke the windows to access the driver and passengers, but the windows had already been shattered. She did not catch these errors.

She understood the story in a general way, but she missed the whole episode with the truck and missed many details because she was unfamiliar with classifiers. She claimed she understood a lot and enjoyed the story thoroughly. She may think she understands more than she really does due to her strong PSE background. However, on the ASL spectrum, this type of story is definitely an extreme opposite of what she may be used to, yet she shows that she can enjoy and understand some.

**III.3.a. Basic Interpersonal Communication Skills (BICS).**

Ms. Hill has mastery of Basic Interpersonal Communication Skills (BICS) in ASL/PSE. In casual conversation, she is capable of discussing a wide range of topics provided the communication mode is mostly in PSE. The more ASL is used, the more challenging it is for her to grasp the whole conversation.

**III.3.b. Cognitive Academic Language Proficiency (CALP).**

When language becomes more academic in nature or involves explanation of new unfamiliar information or tasks, she is not as proficient at engaging in analysis, synthesis and evaluation using ASL. Although her analysis of the allegory in *Bird of a Different Feather* shows that she was able to decipher the deeper meaning of this story, obtaining this level of understanding required a lot of support.

**Summary of ASL language proficiency.** In summary, the factors in the cultural profile that would predict ASL fluency as well as a strong identification with Deaf culture were reliable predictors of Ms. Hill's ASL production and comprehension. She has a somewhat limited command over Cognitive Academic Language Proficiency (CALP) in ASL. This is not surprising given how little academic training she has experienced in academic ASL as it

would be signed by fluent Deaf signers. Her struggles with getting complete information in ASL or making connections based upon Deaf history or culture alerts us to her somewhat peripheral involvement with the Deaf, ASL-signing community, despite her strong identification as a Deaf person.

Her receptive skills are far superior to her production skills. There are numerous formational signing errors as well as grammatical errors. The grammatical errors are usually attributable to shifts between ASL and PSE.

More will be discussed about her English capabilities below. It is important to recognize that the lack of native-like ASL proficiency and an English-influenced form of signing is not necessarily an indication of an individual's English competency. Most frequently, this signing style is an indication that the deaf person's access to education was via a hearing interpreter who is not a native signer of ASL. In Ms. Hill's case, her entire elementary and secondary education was accessed through the same interpreter.

**IV. English Proficiency**

Ms. Hill signs an English-influenced form of ASL, but codeshifts depending upon whether the person she is signing with is hearing or Deaf. Still, her ASL, even signing with a Deaf person is not native or near-native. However, the signed communication that she does use serves her needs. As long as her interpreters probe for understanding and adapt to her signing style she can access information via interpretation. The remaining question is the extent to which English can or cannot serve alone as a communication alternative to ASL for her. It is important to note that while Ms. Hill's signing shows influence from English, this does not indicate that her base language is English or that she can rely upon English reading, writing, lipreading, or speech as a means of communication access. The English influence comes from the fact that throughout her education, her language input and model was from one single, hearing, non-native signing interpreter, who was likely using more school signs with her and was relying upon an English word order and using less of the productive and rich grammar of ASL. It does not mean that Ms. Hill was receiving "English on the hands" in any way that would have shared reliable access to English grammar for her. Her English competencies need to be assessed separately.

**IV.1. Spoken English Competency.**

Ms. Hill's speech is not very intelligible.

**IV.1.a. Speech.**

After signing and writing renditions of the two 1.5-minute Mr. Koumal cartoons, Ms. Hill was asked to speak a rendition of each of the Koumal cartoons. She could not speak without concurrently signing and at times signs were produced without speech--at times whole clauses. This typically happened when the signing was more visual and descriptive or didn't translate easily into English. For example, there is a sign called THINK^BUBBLE that means to imaging something happening (see it in your mind). It is like the image in a cartoon where dots lead up to an insert of something imagined.



The opening of the thought bubble and its closing involved only signs, not anything spoken. She was reminded to keep voicing. In the last sentence, she says *truck* and then she makes a sign that indicates closing of the thought bubble.

**IV.1.a.i. Speech Quality.**

Ms. Hill's speech samples appear below:

| ***Mr. Koumal Flies like a Bird (spoken)*** **Mary Ann Hill** |
|---|
| The man climb the mountain and saw eagle. Eagle fly. May be get feather from eagle. So..[JSK encourage her to be sure to use her voice] I sorry sorry. And man try fly. But, man fly fall. Do again. Climb top. Get all from eagle feather...feather. Try fly but not. Fall pffft. On mountain fall XXXXX. And man [gestures wavers back and forth]. XXXX man to store. Sell egg. Give to little boy. Give to egg to man. That it. |

| ***Mr. Koumal Battles his Conscience (spoken)*** **Mary Ann Hill** |
|---|
| A man walk. Saw money ten thousand. No no no no no. Man look for money look in pocket. Saw don't know whatever it is. XXXX XXXX Walk he walk saw ten thousand. And, he saw devil his body. He fight. And, man angel man. And saw money run to angel woman. King Jesus hug finish. Saw divide. |

Still devil. Saw that alligator take ten thousand. Angel man saw notice that money gone. Pocket look look look. Truck throw in man hand

Note: Gray means mouthed with no sound.

Ms. Hill's speech is imprecise and incomplete. She often pronounces the beginning consonant and vowel of a word and doesn't complete it, even when multisyllabic (e.g. /maU/ for *mountain*). At times she fails to phonate so we can see the word on her mouth, but not hear it. In addition, there are phrases, even clauses sometimes that are presented only in sign language, or that are signed and then repeated with voicing. When she does speak her consonant targets are imprecise and the speech often sounds slurred. Vowel targets are also imprecise and isolated words are often pronounced without any running intonation in the sentence. There are unintelligible words or strings of words that are unintelligible.

The transcription above is Dr. Shepard-Kegl's best guess at what was being said. It is worth viewing the video to see how truly difficult Ms. Hill's speech is to understand.

**IV.1.a.ii. Intelligibility.**

Ms. Hill's speech production is unintelligible to anyone not highly familiar with her voice, and even then intelligibility is dependent upon what is expected or recognizing a concurrent sign. With repeated viewing as well as knowing the story, Dr. Shepard-Kegl could still not transcribe it with full reliability.

With lipreading (and repeated viewing) 60% of the speech could be reliably understood. It is important to note that the evaluator of these data is very familiar with deaf speech. Ms. Hill's articulation would be impenetrable to a person unfamiliar with deaf speech.

**IV.1.a.iii. Auditory monitoring alone**.

With auditory monitoring alone, Ms. Hill's speech was completely unintelligible, even with knowledge of the storyline.

Speech cannot serve Ms. Hill's communicative needs except in the most routine interactions like saying hello, etc..

**IV.1.b. Lipreading**

The other side of communicating through speech is using lipreading to receptively process the speech of others. The lipreading task involves two presentations of each stimulus (either a word or whole phrase or sentence). Each presentation was loud and very precise. If Dr. Shepard-Kegl felt Ms. Hill was close, she would sometimes repeat the item more than twice. For some words, Dr. Shepard-Kegl adds facial gesturing suggestive of the context (rolling her eyes for *crazy*, a very sad expressions accompanying *grieve*. Both the word and utterance stimuli include both highly frequent and routine items as well as infrequent and less expected items. We were on Zoom with Ms. Hill viewing Dr. Shepard-Kegl's face full screen. In the video we see Ms. Hill full screen, her view was of Dr. Shepard-Kegl. Each word, phrase or sentence was enunciated clearly and loudly, allowing the best possible chance of being understood.

It must be reiterated that Ms. Hill was tested under ideal conditions. The room was well-lit and devoid of background noise. We were directly facing each other one-on-one over a Zoom screen. Items were repeated and the stimuli were produced by a certified oral transliterator (OTC) trained to produce clear speech. Even the knowledge of the logistics involved in setting up such an environment would be beyond the individuals interacting with her.

**IV.1.b.i. Words** Of the 17 words, Ms. Hill correctly identified 4 (24%): *himself*, *form*, *theory*, and *grieve*. While she didn't actually get many correct, her guesses showed clear attempts at phonemic processing. The errors are not something she could "fake" without a lot of linguistic knowledge. For example, for the word *milk*, she guessed *Bill*. Her guess got the initial place of articulation, the vowel, and the liquid (/l/) correct, but not the final consonant. Another example is that she guessed *strange* for the word *stretch*. She got the first consonant cluster *str* correct, got that the vowel was front in the mouth and unrounded, missing only the fact that it was a diphthong, and she got the voiced (dʒ, e.g., the initial and final sound in *judge*) as opposed to the unvoiced ( tʃ, e.g., the initial and final sound in *church*) version of the final consonant. She would need to be a linguist to intentionally make these errors.

**IV.1.b.ii. Sentences and Phrases** Of the 47 sentences and phrases, Ms. Hill correctly identified 13 (28%). All of the items she recognized were highly routine: *Can you understand me?; What's your name?; How many children do you have?; What's your address?; Do you have a TTY?; What*

*time did you show up for work this morning?; How long have you been working here?; What's your favorite movie?; seven; 1996; When did you graduate from high school?*. There was one instance where Dr. Shepard-Kegl did the two presentations and her response was incorrect. In offering a third and fourth try, Dr. Shepard-Kegl incorrectly said *mom* (Ms. Hill's response), instead of *Bob*. The scoring was based on the first two responses.

| correct | incorrect | Stimulus (lipreading) | % correct | % incorrect |
|---|---|---|---|---|
| 17 | 47 | 64 stimuli | 27% | 73% |
| 4 | 13 | 17 words | 24% | 76% |
| 13 | 34 | 47 phrases and sentences | 28% | 72% |

**IV.1.c. Impact on communication**

Of the total 64 stimuli, Ms. Hill got 17 correct (27%). Ms. Hill is a below average lipreader. Lipreading cannot serve her needs in any but the most basic and routine situations, and even then reliability is not strong. When new or unfamiliar content is being shared, she would be unable to access that information via lipreading.

**IV.2. Written English Competency**

Ms. Hill's written English was tested by collecting written renditions of the two Koumal cartoons and two Frog Stories. These written samples were analyzed for their grammatical accuracy, their influence from ASL, and for their argument structure distribution, which is an indication of their performance that can be compared with native speakers of English, other Deaf ASL signers, other deaf writers of English, and individuals with a frank language disability, agrammatic aphasia.

**IV.2.a. Argument Structure Distribution: Data Collection**

A full argument structure analysis is best with a minimum of 150 verbs and their related arguments. The data considered for this analysis were the written recountings of the two Koumal cartoons, two Frog stories. The Koumal cartoon recountings were collected during

our testing. The process for reviewing the wordless Frog Story books was reviewed in the testing time and she completed the writing between testings. All her written work was photographed and sent to us in a text. An analysis was done on each of the narrative samples to see if there were any major differences, and then they were combined. Ms. Hill produced a sample of 191 utterances, but six contained zero verbs. The Frog stories on their own were sufficient to yield a reliable individual distribution. The Koumal stories (44 utterances) were not. But they are the best indication of what Ms. Hill does in writing extemporaneously face to face. The argument structure distribution for all was similar, so they were combined. Individual distributions are discussed as well.

**Narrative Recounting** (combined): 191 utterances; 185 verbs; 103 external arguments (56%); 74 non-copular unaccusatives (40%); and 8 copular constructions (4%). It is notable that the copular constructions (*is, to be, are* (linking verbs)) did not occur in the samples collected during testing, only during the extended writing time and non-transient viewing of materials allowed at home. Based upon all narratives combined, Ms. Hill appears to pattern strongly with Deaf ASL signers writing English. Her percentage of non-copular unaccusatives was higher (43%) than that of hearing writers of English (typically 25%), and she had a much lower percentage of copular constructions (4% as opposed to 25%; actually 0% in the Koumal stories collected on site). A lower percentage of copular constructions would be typical of deaf writers of English in general (independent of whether they sign or not). She patterns in this regard like deaf writers of English.

In the following sections, each type of narrative is analyzed separately to see if the pattern is consistent throughout.

**IV.2.a.i. Movies.** n/a (A sufficient sample was collected with the Koumal and Frog Stories).

**IV.2.a.ii. Nonverbal Cartoons.** Ms. Hill recounted Mr. Koumal *Flies Like a Bird* and Mr. Koumal *Battles his Conscience*. This yielded a set of 44 utterances. 44 verbs; 28 external arguments (64%); 16 non-copular unaccusatives (36%); and 0 copular constructions (0%).

The recountings of the two Koumal cartoons during the testing session are presented below:

| ***Mr. Koumal Flies like a Bird (written)*** | **Mary Ann Hill** |
|---|---|

A man ~~dig~~ use his ax and ready to dig go up to mountains. He saw eagle fly around, He Was thinking to take it's feather and use feather on his arm to fly and failed, fell down on ground, He keep going up mountain and take feather both of his arm, Fly again, He fell down, hit the mountain, the mountain torn up down, He walked to store, He sand by and the kid gave him egg.

***Mr. Koumal Battles his Conscience (written)*** **Mary Ann Hill**

The man look for money in his pocket, got something on his hand, He walked and saw 10,000 on the ~~xx~~ sidewalk, saw the shadow evill in his Body, started fighting over 10,000, He dream of Buy castle, peace of world, saw The Lady that He gave her money, Walked to the Lady's servet to hug, so He saw the evil inside him fighting and saw 10,000 gone and He started looking for it. But He igored money, The Alligator Stole it, He walked away and ~~Xxxx~~ The truck man throw something Fly in his hand.

The argument structure distribution for Ms. Hill's written Koumal stories closely patterns with Deaf ASL signers writing English. There is a higher occurrence of non-copular unaccusatives (36%) in keeping with this group as well (36% as opposed to 25%). In addition, the occurrence of copular constructions is zero in keeping with deaf writers in general (0% typical of deaf writers as opposed to 25% for hearing writers of English).

### IV.2.a.iii Wordless Books

Ms. Hill recounted the following wordless books: *Frog, where are you?* and *Frog Goes to Dinner*. She was walked through the process for reviewing the book and writing the narratives during a testing session and then wrote them at home, photographed and emailed them to us. Her wordless book recountings yielded 151 utterances (sufficient for an argument structure analysis on their own): 151 verbs; 75 external arguments (50%); 68 non-copular unaccusatives (45%); 8 copular constructions (5%). The transcript of her written recounting appears below with paragraph marks indicating line breaks.

***Frog, Where are you? (written)*** **Mary Ann Hill**

The Boy watch his dog and frog is in the Bowl and in th bedroom. The Boy and dog ready to go bed. and The frog sneak out of the bowl. The Boy and dog woke up and saw the empty Jar. They got scared They been searching everywhere in the bedroom. The boy looked out of window. His dog inside the bowl couldn't get Out, He ~~do~~ barks at him. The dog fell out of window, He saw what happening. The glass jar broke and the dog licked his angry face. He's mad. The long pant ~~xx~~ not fix him but He wear it. He and the dog starting Holler everywhere outside. They saw the ~~b~~ nest bee and Forrest (Trees). The dog is trying to jump around nest. The boy look in hole on the ground. The boy got hurt by nose, The beaver came out looked at the boy. His Dog still bothers nest bee. His barking still and nest fell on the ground, The dog look at nest while The Boy look his Frog in the hole on the Tree. The Boy fell off by Tree and The Owl Flied away out of hole by ~~the~~ the tree and his dog ran by the bees are chasing to his dog. The Boy got mad at Owl and OWL sit down on brances and The Boy climb on the Rock and He started screaming for his dog name, and The dog got scared and crawled on the ground. and The Deer started moving his Head and The Boy got stuck on the Deer. The dog sniff around and The dog started scared Deer away Chase Deer for The Boy got scared to hold the Deer and The Deer stopped the end cliff so The Boy and Dog fell in the water it not deep. The deer Laughed at them. The Dog climbed Cover the Boy's Head. The dog hate water so They got on the wood. Log, The Boy and

Dog saw the frog is with ~~An~~ another frog. They smiled. They saw The frogs childen came out, saying they Have a family. The Boy carried his frog and Dog wave to them. They look happy.

***Frog Goes to Dinner (written)*** **Mary Ann Hill**
His animals look at him. He ~~Xxxxxxx~~ is dressing up a fancy to go to go with his parents for dinner. The boy told the dog to be good behavior and babysit other animals. He picked up his coat and frog jumped in his pocket, and The dog and the turtle saw frog wave to them, The boy and his family left and closed the door. The family arrived Fancy Restaurant and his father gave a key to a man to do parking. They sit down and ready to order menu. Listen to music. The Frog gonna jump into Band group. and scared all of band people and that man fell in the drum with frog. They got up and checking each other to make sure they're okay. There's a Man waitess tray on his hand so Frog jump on his tray with glass and Tray to provide Lady to salad and she
eat piece of salad and saw Frog on salad. She yelled and scared her and Frog jumped in wine glass in his parents. His dad saw Frog in his eyes with Glass. His mom shocked. People complain want Frog out of ~~Retu Re~~ Retaurant and His parents ~~xxxxx~~ got Upset, A man waitess carry his Frog Out, A Boy yelled at him, NO that my Frog, His parent told him to be Quiet. ~~XXXXXXXXXX~~ He ran to him to give his frog back, his parents with them. A waitess man told them to kick them out, they are mAd at him, Not talking to him until they get home.
He is holding his Frog. They told him to go straight to His bedroom. Dog and turtle look Sad to see his owner in Trouble. ~~They~~ His owner and Frog Laughs Floor and His dog and Turtle not happy and look at them laughing.

**IV.2.b. Argument Structure Distribution: Data Analysis**

Ms. Hill's argument structure distribution as a whole was then compared with those of four groups: typical hearing speakers of English, speakers with agrammatism, Deaf ASL signers writing English, and Deaf non-signing individuals writing English.

**IV.2.b.i. Group 1: typical hearing speakers of English.** In terms of her wordless book and cartoon recounting, Ms. Hill does not pattern with typical hearing writers of English except in terms of external arguments, which is expected. She definitely diverges in terms of the rest of the distribution: 56% external arguments (typically it is a little over 50%); 45% non-copular unaccusatives (typically it is around 25%); and 5% copulars (typically it is around 25%). Almost everyone, except for people with language deprivation or language disability hover a bit above 50% in terms of their external argument use. The latter cases exhibit a higher distribution in keeping with the fact that sentences with external arguments require little in the way of syntactic reordering and sentence level grammar rules.

**IV.2.b.ii. Group 2: speakers with agrammatism producing English**. Ms. Hill definitely does not pattern with individuals with a frank agrammatism or any kind of language disability. Her limited reading is the result of a limited education and lack of auditory access to English growing up. Individuals with agrammatism should have almost no non-copular unaccusatives and at least 25% copulars, likely much more. She in contrast, has a much higher

than typical occurrence of non-copular unaccusatives (40%) and a very low occurrence of copulars (4%).

**IV.2.b.iii. Group 3: Deaf ASL signers writing English.** Ms. Hill patterns strongly with this group which typically has a higher occurrence of non-copular unaccusatives (greater than 25%) and a much lower occurrence of copulars (typically much lower that 25%, frequently 0-5%).

**IV.2.b.iv. Group 4: non-signing deaf individuals writing English.** Again, in all of her narrative recountings, she had a low occurrence of copulars (0-5%). She was well below the typical 25% occurrence seen with hearing writers of English. Deaf writers tend to have little or none, independent of whether they sign ASL or not.

Overall, Ms. Hill's argument structure distributions consistently pattern with Deaf ASL signers writing English. She has no organic language disorder. However, there is evidence of a lack of exposure to both fluent users of English (because of her lack of an ability to hear them) and to fluent signers of ASL (because in the mainstream setting her language model was a single hearing interpreter who didn't have native ASL proficiency and there was a very small pool of peers signing ASL). This resulted in somewhat atypical, English-influenced signing, but does not constitute severe language deprivation that would interfere with language learning and cognitive development in general.

**IV.2.c. Specifics of English grammar production.**

Argument structure distribution indicates a basic patterning that may or may not be influenced by ASL intrusions or by a language-based learning disability. It is not indicative of mastery of English grammar per se. Grammar competency can be excellent or weak. Looking more closely at the grammar of one's actual writing can be informative.

- **Lexicon:** In general, Ms. Hill works within the vocabulary that she has. There are some lexical substitutions: e.g., *fix* for *fit*, *nest* for *hive*, *ax* for *pickaxe; s(t)and by* for *stood there*. Sometimes, the correct form is eventually accessed: e.g., *bowl* for *jar*, *wood* for *log*. She used a variety of circumlocutions (e.g., *waitress man* for *waiter*, *torn up down* for *crumbled down* or *collapsed*), truck man for truck driver (actually the beggar driving a luxury car).

Sometimes, she created compounds with extraneous items: e.g., *band group* for *band*, *be good behavior* for *behave*. There were also many instances where she couldn't access certain words, for example: *put* (substituted *use*), tossed (substituted *throw something fly*), and we suspect she assumed that there must be a verb for climbing using a pick and tried to use *dig*. As with many second-language learners of English, prepositions are mis-used, substituted for one another, added where they are not needed, or omitted (e.g., *A man ~~dig~~ use his ax and ready to dig go up to mountains; fell down on ground; something Fly in his hand; and Frog jumped in wine glass in his parents; The boy got hurt by nose; The Boy fell off by Tree); The family arrived ø Fancy Restaurant.*

**Morphology:**

- She produces numerous compounds but they are ill-formed: *peace of world* for *world peace*. Flipping the order of English compounds is common as a borrowing rule into ASL. In her signing, she also signed *Throne of Game* for *Game of Thrones*.
- Number agreement is frequently not marked or is marked incorrectly (e.g., *He Was thinking to take it's featherØ and use featherØ on his arm to fly; A man ~~dig~~ use his ax and ready to dig go up to mountains; Dog and turtle look Sad to see his owner).*
- Tense is frequently left unmarked (e.g., *use* for *used* or *uses; The truck man throw something*). There are also inconsistencies with agreement and successive tense marking (e.g., *The dog started scared Deer away*).
- English requires third person agreement with the subject of a sentence. This is often not marked: e.g., *He keepØ going up mountain*; *He dream of BuyØ castle.*
- Progressive aspect and gerundive (-ing) is frequently not marked (e.g., *He saw eagle fly around; He dream of BuyØ castle.*
- Auxiliaries and forms of the verb *to be* are frequently omitted, avoided, or misused *(His mom Ø shocked;* They *been searching everywhere in the bedroom; They got up and Ø checking each other to make sure they're okay).*

**Syntax (sentence level grammar):**

- **Determiners:** Determiners like *a, an,* and *the* are frequently absent (e.g., *The Boy watch his dog and Ø frog is in the Bowl and in the bedroom*). In addition, there is almost no occurrence of the indefinite forms (*a, an*).

- **Word order:** *They saw the ~~b~~ nest bee and Forrest (Trees)*—also shows lack of command over the possessive construction.
- **Null pronouns:** Omitting subject pronouns is allowable in ASL, but not in English. Ms. Hill produces numerous sentences with null subjects (*Ø got something on his hand; Ø Walked to the ladies servet to hug; etc*.)
- **Relative clauses:** Relative clauses in English are complex noun phrases that have a head (the noun phrase that is focused on, a complementizer (that) and the clause that the noun phrase was extracted from. In ASL, there is no complementizer and the noun phrase remains in place, just like in a declarative sentence. Ms. Hill's relative clause in English is a blend of the two: *Ø saw The Lady that He gave her money*). The *her* in the clause should be absent.
- **Quotations:** There is no punctuation for quotations (e.g., *A Boy yelled at him, NO that my Frog*).

Ms. Hill does not have a native level of competency in English. In fact, her writing is that of a second-language learner with a limited vocabulary and limited mastery of the morphology and syntax of English. However, while generally ungrammatical, she can construct sentences in English that can convey some information. What is noticeable in her written narratives is that while she can convey some information, there are many aspects of her writing that can be misunderstood. There are other aspects of her writing that are better understood by a person that also knows some ASL. What is most evident when we look at the message equivalence between what she *can* write and the content of the cartoons and wordless books that could have been conveyed is that Ms. Hill cannot write about everything she would want to convey. Her ability to express herself via written English is limited by her reduced English proficiency.

**IV.2.d. Reading**

Ms. Hill reads solidly and reliably at second-grade level. However, with some vocabulary gaps she has the syntax and ability to derive meaning from context to allow her to read at a third-grade level if she has sufficient schema in the subject area. Nonetheless, Ms. Hill's reading is below average, even compared to her deaf peers.

**IV.2.d.i. Flynt-Cooter Reading Inventory**

We presented the Flynt Cooter Reading Inventory in three parts. First, we asked Ms. Hill to circle the words she didn't know in the nine sets of sentences. Then we returned to this sheet and asked her to read each of the sentences from levels 1-9 checking on her comprehension of them. Finally, based upon performance on the sentence screening, we looked at her ability to read passages/short stories at reading levels above, at and sometimes below where she screened on the sentences.

**Flynt Cooter Sentences (levels 1-9).**

Ms. Hill's performance on the sentence screening appears below. On a strict scoring of the Flynt Cooter screening sentences, Ms. Hill would only be seen to read reliably at a second-grade level. However, because the exposure Deaf individuals have to figurative language is much less given their lack of access to such forms in the ambient language in use around them, on our scoring missing the sentence *The forest was something to see* would not rule out being able to read at a third-grade level. In addition, she got the passive, *I was pulled out of the hole*, which also suggests reading at least at a third- to fourth-grade level.

| **FORM A: Level 1 You Cannot Fly** | | |
|---|---|---|
| 1. He wanted to fly. | 1 | |
| 2. The family got together. | 1 | |
| 3. The boy was jumping. | 1 | |
| | | |
| **FORM A: Level 2 The Pig and the Snake** | | |
| 1. I was walking fast to town. | 1 | |
| 2. She cried about going home. | 1 | |
| 3. I was pulled out of the hole. | 1 | I was pulled out |
| | | |
| **FORM A: Level 3 The Big Bad Wolf** | | |
| 1. The forest was something to see. | 0 | figurative sense?? see something in the forest |
| 2. I was enjoying sleeping when my Mom called. | 1 | |
| 3. I had to go to bed early last night. | 1 | |
| | | |
| **FORM A: Level 4 New Clothes** | | |
| 1. I dislike being the youngest. | 1 | |
| 2. I'm always getting into trouble. | 1 | |
| 3. They insisted on watching the show daily. | 0 | insisted |
| | | |
| **FORM A: Level 5 Hot Shoes** | | |
| 1. Athletic shoes come in all kinds of colors. | 1 | |
| 2. Serious players manage to practice a lot. | 1 | |
| 3. A cheap pair of shoes doesn't last very long. | 1 | |

| | | |
|---|---|---|
| **FORM A: Level 6 Mountain Fire** | | |
| 1. He was searching for the evidence. | 1 | |
| 2. She realized the rock formations were too high. | 0 | recognized, formation |
| 3. The conservationist hoped to reforest the mountain. | 0 | conservationist |
| | | |
| **FORM A: Level 7 The Canoe Trip** | | |
| 1. Unfortunately, she was confused about the next activity. | 1 | |
| 2. The submerged rocks were dangerous. | 0 | submerged |
| 3. She disappeared around the bend at a rapid rate. | 0 | not make sense |
| | | |
| **FORM A: Level 8 The Eagle** | | |
| 1. Ascending the mountain was rigorous and hazardous. | 0 | ascending, rigorous, thinks hazardous means chemicals and dangerous to mix with |
| 2. The cliff provided a panoramic view of the valley. | 0 | paranoid (panoramic) |
| 3. The incubation period lasted two weeks. | 0 | incubation |
| | | |
| **FORM A: Level 9 The Case of Angela Violet** | | |
| 1. The abduction made everyone suspicious. | 0 | abduction |
| 2. The detective was besieged by the community. | 0 | besieged |
| 3. Her pasty complexion made her look older. | 0 | pasty complexion |

Ms. Hill did get the passive in the level 2 sentences. However, at the third-grade level, she missed the sentence *The forest was something to see*. She read the words, but she could not get the figurative meaning. At the fourth-grade level, vocabulary began to take a toll. She did not know the word *insisted*. However, at the fifth-grade level, she got them all, but did nor understand the meaning of the word *manage* in this context. She is familiar with the term *manager* but could not apply the assumed meaning of manage in this specific story context.

Based upon the sentence screening alone, we would predict that Ms. Hill would possibly read reliably at a third-grade level. So, we decided to start the passages at the fourth-grade level and move up and down from there. Comments on the passages she read appear below. The number in square brackets after then title indicates the order of presentation. It is actually easiest to read these in the order of presentation.

**Flynt Cooter Reading Passages 1-9**

**Level 1 You Cannot Fly n/a**

**Level 2 The Pig and the Snake [2]**
Having struggled with the third-grade passage, we returned to the second-grade passage. While she still produced an English-based form of signing, almost Manually Coded English, she did so fluently and frequently interjected more natural and productive ASL signing to clarify points. She read with ease and with full understanding at the second-grade level.

**Level 3 The Big, Bad Wolf [3]**
Rather than move beyond the fifth-grade level where her reading was not effective, we returned to the third-grade level, where she only missed the figurative language (e.g., *something to see*) on the screening sentences. She recognized that this story was related to *Little Red Riding Hood*. When asked if it was different, she said yes. But when asked questions like was the wolf in this story good or bad, she said bad. When it was emphasized that we were asking about this story as opposed to the one she learned about as a child, she said the same. Remember that the story she encountered as a child was interpreted for her. When asked what the wolf wanted to do, she said that he wanted to eat Little Red Riding Hood and her grandmother. At first she didn't understand the word *woodcutter* and *chimney*, but she eventually got them from context. However, while she read word by word, coding the text into signs (sometimes not conceptually accurate), she didn't really comprehend what she read in a way that would allow her to distinguish between this story and the story she learned as a child. She does not read effectively at the third-grade level. She knew most of the words, but was not processing the text in terms of the sentences.

**Level 4 New Clothes [1]**
At this level, she did read to herself and then chose to read "aloud" to us. By "read aloud" we mean that she produced a sign for word coding of the passage. She produced individual signs for each word, but frequently while the sign may be a gloss for some meaning of the word, her choice of sign for the meaning in the context of the narrative was conceptually incorrect. For example, she signed COOL (on the cold side) as opposed to *cool* as in "really neat." When reading *cut back on what we pay you*, she literally gave a sign CUT (as in cut with scissors), #back as in move to the back, followed by the preposition ON. What would be conceptually accurate would be a sign for REDUCE. She signed BEGIN for *being*, EYE for even (in the context of "even more" and BY SIDE for *besides*, among others. After she read the passage "aloud," we asked her to sign the story without reliance on the text. She signed the basic gist, but omitted signing words or concepts she didn't recognize. At level 4, she does not read solidly with full understanding, but she gets the general gist, while omitting nuance and detail.

**Level 5 Hot Shoes [2]**
Since she got all the sentences at the fifth-grade level, we tried this passage to see if perhaps schema might aid her in reading it. However, she could not read at this level at all. Most of what she did was simply fingerspell words. She started at first with just some words she didn't know: *guys, wore, model*, etc. But eventually she hit the wall and just started fingerspelling everything. Recall in the discussion of reading, that fingerspelling is equivalent to coding letter for letter without understanding the

meaning of words. She couldn't get the point of the brand names, frequently signed non conceptually accurate signs that were associated with other senses of the English word, like POINT (point to) for "get to the point." Etc. She cannot read at a fifth-grade level.

**Level 6 Mountain Fire n/a**

**Level 7 The Canoe Trip n/a**

**Level 8 The Eagle n/a**

**Level 9 The Case of Angela Violet n/a**

Based upon the sentence screening and performance on reading the Flynt-Cooter passages, we would place Ms. Hill's solid reading level at second-grade. However, she has quite a bit of sight word recognition. The problem is that above the second-grade level, she is not using sentence grammar to help her understand the passages. She is doing a lot of guessing. With some schema, she can read some material slightly above a second-grade level, but her comprehension would not be reliable.

**IV.2.d.ii. San Diego Screening.** To corroborate our assessment of reading level, we also analyzed Ms. Hill's responses on a strictly vocabulary-based reading screening, *The San Diego Quick Assessment of Reading Ability*. This test is a reliable predictor of reading level based upon vocabulary alone, independent of grammar, provided the individual is a native user of English. With someone like Ms. Hill, whose first and primary language is not English, vocabulary can slightly exceed reading level. Still, the San Diego Screening can help us to narrow in on her reading level.

According to the San Diego Screening, Ms. Hill would be expected to read independently only up through the 4th-grade level, and with frustration above that level. She got 7 items incorrect, confusing *realized* with *recognized*, *behaved* with *behead*, *splendid* with *Splenda*, *relativity* with *family (relative)*, *amber* with *as a name of a person*, *dominion* with *Domino's Pizza* and *sundry* with *sun dry*. Above the 4th-grade, however, she had numerous gaps and misunderstandings.

Ms. Hill's results for the San Diego Screening appear below:

| 1 | 10 | | 2 | 10 | | 3 | 9 | |
|---|---|---|---|---|---|---|---|---|
| road | 1 | | our | 1 | | city | 1 | |
| live | 1 | | please | 1 | | middle | 1 | |
| thank | 1 | | myself | 1 | | moment | 1 | |
| when | 1 | | town | 1 | | frightened | 1 | |
| bigger | 1 | | early | 1 | | exclaimed | 0 | |
| how | 1 | | send | 1 | | several | 1 | |
| always | 1 | | wide | 1 | | lonely | 1 | |
| night | 1 | | believe | 1 | | drew | 1 | |
| spring | 1 | | quietly | 1 | | since | 1 | |
| today | 1 | | carefully | 1 | | straight | 1 | |
| 4 | 9 | | 5 | 8 | | 6 | 10 | |
| decided | 1 | | successful | 1 | | bridge | 1 | |
| served | 1 | | business | 1 | | commercial | 1 | |
| amazed | 1 | | develop | 1 | | abolish | 0 | |
| silent | 1 | | considered | 1 | | trucker | 1 | |
| wrecked | 1 | | discussed | 1 | | apparatus | 0 | |
| improved | 1 | | behaved | 0 | behead | elementary | 1 | |
| certainly | 1 | | splendid | 0 | Splenda | comment | 1 | |
| entered | 1 | | acquainted | 1 | | necessity | 0 | |
| realized | 0 | recognized | escaped | 1 | | gallery | 1 | |
| interrupted | 1 | | squirming | 1 | | relativity | 0 | family |
| 7 | 0 | | 8 | 1 | | 9 | 1 | |
| amber | 0 | name | capacious | 0 | | conscientious | 0 | |
| dominion | 0 | Domino's pizza | limitation | 0 | | isolation | 1 | |
| sundry | 0 | sun dry | pretext | 0 | | molecule | 0 | |
| capillary | 0 | | intrigue | 0 | | ritual | 0 | |
| impetuous | 0 | | delusion | 0 | | momentous | 0 | |
| blight | 0 | | immaculate | 0 | | vulnerable | 0 | |
| wrest | 0 | | ascent | 0 | | kinship | 0 | |
| enumerate | 0 | | acrid | 0 | | conservatism | 0 | |
| daunted | 0 | | binocular | 1 | | jaunty | 0 | |
| condescend | 0 | | embankment | 0 | | inventive | 0 | |
| 10 | 2 | | 11 | 0 | | | | |
| zany | 0 | | galore | 0 | | | | |
| jerking | 0 | | rotunda | 0 | | | | |
| nausea | 1 | | capitalism | 0 | | | | |
| gratuitous | 0 | | amnesty | 0 | | | | |
| linear | 0 | | risible | 0 | | | | |
| inept | 0 | | exonerate | 0 | | | | |
| legality | 1 | | our | 0 | | | | |
| aspen | 0 | | luxuriate | 0 | | | | |
| prevaricate | 0 | | piebald | 0 | | | | |
| barometer | 0 | | crunch | 0 | | | | |

Overall, the rough reading screening, the sentences and excerpts from the Flynt Cooter indicate that Ms. Hill reads independently at a second-grade level. The results from the San

Diego Screening place her vocabulary up to a fourth-grade level with the ability to read with supervision at a fifth-grade level. These vocabulary results don't align with her performance reading texts vetted for these higher grade levels. She reads very little and has a low confidence in her reading abilities.

Considering her performance on the set of reading tasks, we would conclude that she reads solidly at a second-grade level, or slightly above with some vocabulary gaps.

**IV.2.d.iv. Reading behaviors.** Ms. Hill is not completely illiterate, but she does not read. She looks at magazines like *People*, but for the pictures only. Her favorite movies/TV programs are *True Blood, Fast and Furious*, and *Game of Thrones*, which can be watched for the action with limited need for understanding dialogue. When she watches movies/tv programs, they are closed captioned, but she doesn't understand the "big words." She said that her husband often explains to her what's going on, or she relies upon her mother-in-law. She never reads books. She finds looking at books overwhelming. She understands so little that she gets very confused. In school, she didn't really read either, she relied upon the interpreter. A second factor to consider is the fact that reading is compromised by her low vision as well. However, the impact of low vision is secondary to low reading ability in general.

**IV.2.e. Vocabulary**

You cannot read, lipread, or write what you don't understand. Since Ms. Hill is an adult, we might also expect her to have acquired some specialized vocabulary that a child reader would not have. Therefore, it is important to look at some of the specialized vocabulary she might encounter as an adult. The vocabulary lists in the Appendix present first a list of twelfth-grade words, typically acquired through reading. The next list is a mixture of medical and general vocabulary someone might encounter in a healthcare situation. The third list is comprised of words one might encounter in a law enforcement context. And the fourth list are words acquired in an employment context. The acquisition of specialized vocabulary as an adult does not indicate a higher reading level than was determined by the Flynt Cooter and the San Diego Screening. Any more specialized vocabulary is still read and produced with the same syntactic limitations noted previously.

The results of Ms. Hill's specialized vocabulary testing appear below:

| correct | false + | category | incorrect | recognized | unrecognized | total | % correct | % incorrect |
|---|---|---|---|---|---|---|---|---|
| 1 | 7 | twelfth grade | *89* | 7 | 83 | 90 | 1% | 99% |
| 51 | 10 | hospital and general | *39* | 61 | 39 | 90 | 57% | 43% |
| 48 | 15 | police | *42* | 63 | 42 | 90 | 53% | 47% |
| 41 | 13 | employment | *49* | 54 | 49 | 90 | 46% | 54% |
| 141 | 45 | total | *219* | 185 | 213 | 360 | 39% | 61% |

**IV.2.e.i. Twelfth Grade (grade-level reading list)**

Ms. Hill got 1 of the 90 twelfth-grade vocabulary items correct (1%). She thought she recognized 7 of the twelfth-grade vocabulary items (7%), but six of these were incorrect. So 86% of the time when she thought she knew something, she was incorrect. She correctly recognized *campaign*, but she confused *augment* with *argument*, *despot* with *deposit* (thought it was misspelled), *fatigue* with *fat inside*, *felicity* with *facility*, *mortal* with *special powers* (*immortal*), *panacea* with *pancreas*, and *tenet* with *tenant*. Her command over vocabulary at the 12th-grade level is poor, but for the most part, she knows what she doesn't know. She identified 92% of the items as things she did not recognize. Since Ms. Hill reports that she almost never reads, having a large vocabulary of items acquired primarily through reading would not be expected.

**IV.2.e.ii. Medical and General Vocabulary**

She did considerably better at recognizing medical and general vocabulary. She got 51 of the 90 vocabulary items correct (57%). She thought she recognized 61 of the medical and general vocabulary (68%), but 10 of these were incorrect. She confused *consent* with *contract/proxy*, *milk products* with *different kinds of milk*, *beneficiary* with *benefits*, *employment* with *employee*, *accommodate* with *enter (access?)*, *anemia* with *Alzheimer's*, *hospital administrator* with *hospital admission*, *living will* with *payment to life insurance*, *perforation* with *performance*, and *waiver* with *welfare*. So, 16% of the time when she thought a word was correctly recognized, it was incorrect. She was better at recognizing words in this domain, and also more reliable at distinguishing between words she knows and words she does not know.

**IV.2.e.iii. Law Enforcement Related Vocabulary**

Ms. Hill was able to identify 48 of the 90 law enforcement words correctly (53%). She thought she recognized 63 words (70%), but 15 of these were incorrect. She confused *arraignment* with *agreement, DWI* with *take class for drugs, dismissed* with *finish discussing, disturbing the peace* with *do not interrupt the peace group, insurance holder* with *something that hold insurance, liability* with *liberty, moving violation* with *broke parole by moving away, operating a motor vehicle* with *fix car, posted speed* with *postponed speed,* and *precinct* with *ready to go into court*, *psychiatric* with *counseling/therapist, remain silent* with *ready to be arrested (not allowed to talk), speedometer* with *radar meter (cop uses to catch speeders),* and *squad car* with *SWAT car.* So, again, only 24% of the time, when she thought she recognized a law enforcement word, she was incorrect. She is similar in her ability to distinguish words she knows from words she doesn't know to what was seen in the medical vocabulary.

**IV.2.e.iiv. Employment Related Vocabulary**

From the 90 employment words, Ms. Hill got 41 words correct (46%). Altogether, she thought that she recognized 54 words,13 of those words were not correct. She confused *CEO* with *owner, disciplinary* with *show good behavior, exit routes* with *end of road, pay slip* with *show that you pay for something (receipt), restricted area* with *an area that you have to follow rules in, roster* with *rooster, strike* with *time to close, take home pay* with *tips, taxable income* with *go to HR Block after get tax info, termination* with *to let you know something, timesheet* with *schedule, unemployment* with *Social Security,* and *workstation* with *work at a gas station.* Again, 24% of the time when she thought a word was correctly recognized, it was incorrect.

Ms. Hill clearly has some specialized vocabulary learned as an adult, however there are many words she thought she knew but did not. This means that, even when she has a word correct, she can never be sure. While she had almost no familiarity with words at the twelfth-grade level, she recognized that these words were out of her understanding. In that domain, she knows what she doesn't know. Regarding the other domains 61% of the time she did not know the word or got it wrong.

Ms. Hill has little vocabulary derived from reading, but she tends not to assume she knows more words than she actually does. However, she does have more vocabulary in areas where she has more world knowledge. Still, she hovers around knowing slightly more than half of the non-twelfth-grade words. Limited vocabulary and a reading level of about second-grade indicates that writing back and forth is not an option for substantive communication.

**V. Narrative Production** (ASL v. English written v. English spoken)

In this final section of the assessment, we compare the volume and articulateness of Ms. Hill's production of three renditions of the same narrative in three different forms: signing in ASL, writing in English, and speaking in English.

**V.1. Narratives signed in ASL**

Ms. Hill's renditions of *Mr. Koumal Flies Like a Bird* and *Mr. Koumal Battles his Conscience* demonstrate evidence of signing fluency and some competency in ASL, even though it isn't her default signing mode. She shows appropriate classifier choice, use of morphological modulations (reduplication) to indicate aspect, as well as appropriate agreement in all three verb agreement classes—plain, inflecting, and spatial. However, especially in her rendition of Mr. Koumal Battles his Conscience, she used a lot of verbs in more of an uninflected citation form and stuck more closely to PSE. She does not show a lot of facial grammar at the sentential or adverbial level, although she does use questions and, at times, topics. She makes some articulation errors in place and orientation that are not typical in native ASL signers. For example, in the Bird narrative below, although signing it correctly once, several times she signs EAGLE with the wrong place of articulation (high on the forehead as opposed to in front of the nose or low between the eyes, producing instead the sign for EGYPT. She also struggles signing the productive classifier verb of motion indicating the eagle landing on the top of the mountain, after several hesitations ending up with the small animal classifier having the orientation of palm sideward as opposed to palm downward. These are very non-native errors.

*Mr. Koumal Flies like a Bird (signed)* **Mary Ann Hill**
#ok IX[det] MAN]top USE PICKAXE]n 2pKNOW]y/n, a-x...e 1pGUESS. MAN HCL:X-SWING-PICK++ TO CL:claw-CLIMB+++ TO TOP. AND MAN SEE h-a-w... EGYPT. CL:B(2h)-FLAP-WINGS+++ AND IX[det] HE THINK^BUBBLE...#no++. THEN MAN TRY TO FLAP-WINGS"arms"(FLY)+++. CL:B#CL:bentV-FALL-TO+ON. THEN FLAP-WINGS(FLY)+++]n EAGLE 3p[eagle]LOOK-AT[down]3p[man] FINISH. CL:B#CL:bentV-FALL-TO+ON CL:B#CL:bentV-FALL-TO+ON ON TOP MOUNTAIN. THEN MAN CL:claw=>S-CLIMB+++ AGAIN. CL:B#CL:bentV=>V-STAND-ON. 3pLOOK-AT[up,left] THINK^BUBBLE 3pTRY TO 3pGET f-e-a-t-h-e-r FROM EGYPT. CL:5=>F-PICK[random][feathers]+++ shoulders#CL:lotus(2h)-PUT-ON TRY shoulders#CL:lotus(2h)-PUT-ON SBP-ON-FROM^CL:B(2h)FLAP-WINGS(FLY)++. 3pFAIL. CL:B#CL:bentV-FALL-TO+ON. CL:1#CL:S-HIT MOUNTAIN CL:claw[wiggle](2h)-CRUMBLE[down] FINISH. THEN HE TRY TO FULL ALL EGYPT ALL shoulders#CL:open8-ON]n NAKED s-k-i-n #off. THEN TRY AGAIN TO SBP-ON-FROM^CL:B(2h)FLAP-WINGS(FLY)[upward]+++, BUT NOT. CL:B#CL:bentV-FALL-TO+ON. 3p[eagle]LOOK-AT[down]3p[man] [shakes head-neg] FAIL FAIL FAIL. #so(2h) HE CL:3-WALK++... WHAT {gesture:hands on head "Oh, my! as if forgot]. AND HE GOT CL:3-WALK+++ TO STORE CL:1-SOMETHING SASS:large-rectangle CL:1-SOMETHING. IX[adv,down] 3pGIVE++ TO EGG CL:1-GO-TO^ CL:1-GO-TO. ONE EAGLE shoulders#CL:open8-ON]n

"Okay, the man uses a pickaxe... You know and a-x-e (I guess that's how you spell it). The man swings a pick and grapples to the top (of something). And the man saw a hawk..uh an eagle (signs EGYPT) flapping its wings. He imagines.. no not that...he tries to flap his arms and falls to the ground. Then the bird..the eagle looks down at him and shakes its head. The it lands [but she signs it falls sidewards onto]on the mountaintop. Then the man grapples up again. He stands on the top and looks up to his left and imagines trying to get feathers from the bird (Egypt). He picks the feathers from the air, puts them on his shoulders and jumps off, but he fails and falls to the ground. He crashes into the mountain and it crumbles to the ground. Then he tries to cover himself with all the feathers until the birds are naked--just bare skin. All the feathers are off. Then he tried to fly again, but he doesn't. He falls to the ground. The eagle looks at him failing again and again. So he walks..."Oh, ay! I forget".. Abd he walked to a store or somewhere with a storefront. He gives out something and individuals come up to him for one eagle feather."

*Mr. Koumal Battles his Conscience (signed)* **Mary Ann Hill**
A MAN LOOK-FOR POSS3p COIN++ IN POSS3p POCKET 3pFIND MONEY COIN CL:B#CL-1-POINT-TO 3pTAKE-DROP3p[right] THEN HE 3pSEE TEN THOUSAND DOLLAR 3pSEE[down left]. AND DEVIL 3pJUMP IN POSS3p BODY. 3pDIVIDE AND HE BOTH ANGEL AND DEVIL 3pCL:S(2h)-FIGHT[reciprocal]+++ +++++ OVER MONEY. ANGEL MAN 3pDREAM THINK^BUBBLE HEAVEN CL:bent1-RUN-TO+++. MONEY GIVE TO ANGEL. THEN 3p[angel]HCL-lotus-GIVE-TO3p[left] DOESN'T^MATTER KING QUOTES 3p[angel]HCL-lotus-GIVE-OUT-TO3p[left] 3pHUG+++ FINISH. CL:1[left, man]GO-TO[right[ #back[right] AND HE body#CL:open8-EXCITED 3pSEE WANT BUY c-a-s-t-l-e AND 3pSEE WORLD CL:V(2h)-PEACE AND HE THINK^BUBBLE-CLOSE. AND 3pNOTICE[down left] STILL IX[adv, down, left] [gesture:turn head away] CL:5(2h)-RESIST[right]. 3pIGNORE++. [gesture:turn head away] CL:5(2h)-RESIST[right] 3pCL:S(2h)-FIGHT[reciprocal]+++ 3pWALK 3pSEE 3p-NOTICE POSS3p BODY 3p-DIVIDE DEVIL AGAIN. 3pCL:S(2h)-FIGHT[reciprocal]+++ AGAIN. #so 3pSEE MAN 3pSEE ONE ALLIGATOR 3pSTEAL MONEY WHILE CL:V-TWO[adv] 3pCL:S(2h)-FIGHT[reciprocal]++ [AJR:clarifies sign MAH: responds ALLIGATOR CL:V[wg]TO[right] 3pTAKE]. AND MAN ANGEL 3p NOTICE IX[adv] ground#GONE. HCL:lotus-PICK-UP[lefthand]^HCL:lotus-PICK-UP[right hand][random]++ WHERE MONEY GO-TO[reduplicate]++ QUESTION. TRUCK CL:3[right-to left] 3p-HCL:S=>H-THROW-TO[right] MONEY. COIN CL:B#CL:1-TO+ON[left] [gesture: look at palm] O-I-C CL:B(palm)-AT[left] pocket#CL:B-TO-IN

"A man looked for his coins in his pocket. He found money. There was a coin in his hand and he dropped it (into something). Then he saw ten thousand dollars to his left on the ground. And the devil jumped into his body. He split into two and the devil and angel sides of him fought with each other over the money. The angel side of the man imagined himself running up to heaven and giving money to the angel. Then the angel side gave the money to... whatever "a king." The angel side gave him the money and the king hugged him. Then the man went back and was excited to see the money. He wanted to buy a castle and to see world peace. And then he stopped imagining and notices that the money was still there. He turned his head a way and tried to resist, but his two sides started to fight again. He walked along and. He noticed that his body split in two and the devil was back again. The two sides fought with each other again. So, the man saw...he saw one alligator come from the left and stole the money. And the man's angel side noticed that the money was gone. He tried to pick up things from the ground. He asked himself, "Where did the money go?" A truck drove by and someone threw money and a coin landed in the man's hand. The man looked at the money in his and an said, "Oh, I see," whereupon he put the coin into his pocket."

Ms. Hill's signed narratives are far more prolific and, despite some articulation errors and some English influence, are also far more grammatical than anything she produces in written English. They convey far more visual, affective, and spatial detail. Her ability to express herself in sign language versus written English is vastly different. Ms. Hill's written renditions of the same Koumal narratives can be seen in section IV.2.a. and are copied here for comparison purposes. Most of the grammatical issues were listed in section IV.2.c..

**V.3. Narratives in written English**

***Mr. Koumal Flies like a Bird (written)*** **Mary Ann Hill**
A man ~~dig~~ use his ax and ~~ready~~ ready to dig go up to mountains. He saw eagle fly around, He Was thinking to take it's feather and use feather on his arm to fly and failed, fell down on ground, He keep going up mountain and take feather both of his arm, Fly again, He fell down, hit the mountain, the mountain torn up down, He walked to store, He sand by and the kid gave him egg.

***Mr. Koumal Battles his Conscience (written)*** **Mary Ann Hill**
The man look for money in his pocket, got something on his hand, He walked and saw 10,000 on the ~~xx~~ sidewalk, saw the shadow evill in his Body, started fighting over 10,000, He dream of Buy castle, peace of world, saw The Lady that He gave her money, Walked to the Lady's servet to hug, so He saw the evil inside him fighting and saw 10,000 gone and He started looking for it. But He igored money, The Alligator Stole it, He walked away and ~~Xxxx~~ The truck man throw something Fly in his hand.

Notice how much less prolific these written recountings are than her ASL recountings. Also note how much less detail is expressed.

**V.3. Narratives in spoken English**

Ms. Hill was not comfortable speaking without concurrently signing. The added effort of speaking limits not only the intelligibility of her spoken narrative, but also affects its

organization and content. Her spoken English is much less grammatical than either her written English or her signed ASL narratives. In addition, while the spoken recountings appear to be as prolific as her written narratives in terms of sheer volume, this is deceptive. What we see is her speech riding on top of her signing and giving voice to some of it. Because her signing is more prolific, even though almost half of what she signs is not spoken, there appears to be more speech than writing. Look, however, at the grammar in both. She has what can be called sign driven speech and as a result the grammar follows ASL more than it follows English. Her speech which is far less intelligible even when transcribed, makes much less sense. These spoken recountings are reproduced below from IV.1.a.i..

***Mr. Koumal Flies like a Bird (spoken)*** **Mary Ann Hill**
The man climb the mountain and saw eagle. Eagle fly. May be get feather from eagle. So..[JSK encourage her to be sure to use her voice] I sorry sorry. And man try fly. But, man fly fall. Do again. Climb top. Get all from eagle feather...feather. Try fly but not. Fall pffft. On mountain fall XXXXX. And man [gestures wavers back and forth]. XXXX man to store. Sell egg. Give to little boy. Give to egg to man. That it.

***Mr. Koumal Battles his Conscience (spoken)*** **Mary Ann Hill**
A man walk. Saw money ten thousand. No no no no no. Man look for money look in pocket. Saw don't know whatever it is. XXXX XXXX Walk he walk saw ten thousand. And, he saw devil his body. He fight. And, man angel man. And saw money run to angel woman. King Jesus hug finish. Saw divide. Still devil. Saw that alligator take ten thousand. Angel man saw notice that money gone. Pocket look look look. Truck throw in man hand

**V.4. The influence of English on ASL and vice versa**

There is much English influence on Ms. Hill's ASL in terms of favoring English order, expressing things with strings of signs (isolating typology) instead of richly inflected and morphologically complex sentential verbs. Her preferred signing is Sign English (PSE) as opposed to ASL.

There is also quite a bit of ASL influence on her English (null pronouns, missing prepositions), especially on her spoken English. While it is difficult to understand her pronunciation, her speech is also made less intelligible by the fact that it often reflects ASL as opposed to English grammar.

Ms. Hill's signing is a clear blending of ASL and English features, which make it idiosyncratic to her, but understandable by an interpreter. In addition, she comprehends more ASL than she produces, so this is also accommodatable by an interpreter.

**V.5 Comparison of narrative production in English and ASL**

In comparing the Koumal narratives in ASL and English, it is clear that Ms. Hill is more comfortable signing ASL (with a preference for PSE). She is not very comfortable writing English, and she is unable to speak English intelligibly. She is definitely not a balanced bilingual in these two languages and modalities, nor is she a native speaker of either. She is however a fluent user of her brand of PSE, with a bit of influence from initialized vocabulary items drawn from Manually Coded English (MCE). MCE is an artificial manual coding of English into manual signs typically drawn from ASL but initialized with the first letter of the corresponding English word, e.g., the same sign may be produced in MCE with a T handshape for *team* or *tribe*, a G handshape for *group*, an A handshape for *association*, and an F handshape for *family*. MCE encompasses a number of artificial coding systems for English. They share a strategy of choosing the same sign for English words that sound the same, are spelled the same, or mean the same. The signs are also supplemented by a series of invented forms for various affixes in English (e.g., -ing, -s, -ed, etc.) as well as function words not expressed as over signs in ASL (e.g., forms of the verb *to be* (*is*, *was*, *are*, etc.), forms of the verb auxiliary verb *have*, and expletive pronouns like *it* and *there*. These coding systems can produce sequences of signs that are conceptually inaccurate and nonsensical in ASL, such as *rat* (the animal), *if* (the conditional form), *Y* (for the ending is *ratify*), a C handshape moving from top to bottom against a flat vertical palm for the -*ca* and the same contact a movement with the handshape N to indication -*tion* in -*cation*, yielding the semantically aberrant sequence of *RAT-IF-Y-CA-TION* for the English word *ratification.* A less semantically jarring form of MCE is Signed English, which follows a more English ordering, but doesn't substitute conceptually inaccurate signs that sound or are spelled the same.

Ms. Hill's signing inconsistently exhibits features of both PSE, MCE, and Signed English. However, she is also capable of codeswitching away from the artificial MCE sign choices when signing with ASL signers.

**Potential Pitfalls of a Mainstreamed Education**

Having now assessed Ms. Hill and having interviewed her regarding her education, we know well that there is one topic that must be addressed in this assessment that applies very specifically to Ms. Hill. For some individuals, for example Deaf children with Deaf parents who have a strong first language (ASL) established before entering school and have a Deaf cultural community beyond their school environment, a mainstreamed education may yield a positive result. However, this was not Ms. Hill's situation. With no language support at home and a lack of a fluent ASL model in school, Ms. Hill exemplifies what can happen when a Deaf child with no language-base at home is mainstreamed.

Most deaf students arrive at school linguistically deprived due to inadequate exposure to any language during the critical language period before 5 years old (Humphries, Kushalnagar, Mathur, Napoli, Padden, Rathmann & Smith, 2012).[2] This means when these deaf children arrive at school, they are already at a disadvantage. They have no access to language and if they are mainstreamed, they also have no access to their peers around them as well. As a deaf child growing up in a mainstream environment with the same interpreter throughout, that interpreter often serves as the only language model the deaf student has (Olivia & Lytle, 2014[3], Rowley, 2018[4]). A survey showed that the majority of working educational interpreters reports that most had waivers or other loopholes releasing them from any obligation to be certified or to meet necessary minimum requirements for signing proficiency. Only 38% were actually qualified to interpret according to their own state requirements (Schick, Williams &

[2] Humphries, T., Kushalnagar, P., Mathur, G., Napoli, D. J., Padden, C., Rathmann, C., & Smith, S. R. (2012b). Language acquisition for deaf children: Reducing the harms of zero tolerance to the use of alternative approaches. *Harm Reduction Journal*, 9(16), 16–24. doi:10.1186/1477-7517-9-16.

[3] Olivia, G., & Lytle, L.R., (2014) Turning the Tide: Making life better for deaf and hard of hearing schoolchildren, Washington, DC: Gallaudet University Press.

[4] Rowley, A. J. (2018). Educational Interpreting from Deaf Eyes. In T.K. Holcomb, D. Smith (Eds.), Deaf eyes on interpreting (174-186). Washington, DC: Gallaudet University Press.

Kuppermintz, 2006[5]). Many interpreters are deemed exempt from having to meet minimum state qualifications to interpret because they are hired to fill an emergency need that results in states bending their requirements by issuing temporary waivers or emergency certifications. Many of these interpreters don't meet minimum qualifications and stay in these positions as long as possible at the detriment to deaf children because the thought is that "something is better than nothing". So not only are the students ill prepared, their interpreters usually are as well. Rowley (2018) explains about the "two-fold deprivation" that deaf students in mainstream schools experience. The first deprivation is attributed to the fact that the IEP often requires use of an artificial method of communication (such as Manually Coded English) in lieu of a natural language. ASL and English are both examples of natural languages. This decision to use a communication modality that is not a natural language compounds the disadvantage to these students because not only did they miss the critical language period, they are also being exposed to an artificial signing system to try to mimic "English", examples include Pidgin Signed English (PSE), Manually Coded English (MCE), or Signed English, which is most likely what Ms. Hill was exposed to given her "English leaning signs."

Students who grow up with the same interpreter everyday learn to depend on their interpreter as a savior and usually their only friend. Olivia and Lytle (2014) interviewed many students who experienced similar upbringings to Ms. Hill, and they ended up viewing their interpreter as a person who did everything for them, taught them, guided them, mentored them etc., when in fact, the interpreter should be connecting the deaf student with their teacher and their peers (Rowley, 2018). The way Ms. Hill recounted her experiences with her interpreter follows this pattern as she explains reverently how she depended on her interpreter. This pattern indicates why Mary Ann Hill is unable to do things for herself. For instance, when asked about the legal situation she was in, she expressed her frustration with not knowing what is right and wrong legally. She also couldn't explain in depth what

[5] Schick, B., Williams, K., & Kuppermintz, H., (2006) Look Who is Being Left Behind: Educational Interpreters and Access to Education for Deaf and Hard-of-Hearing Students, *Journal of Deaf Studies and Deaf Education* 11, no. 1:12.

happened. She doesn't seem to have enough understanding in order to successfully navigate the legal or medical systems without support.

**Specific commentary on some of the written materials provided to Ms. Hill without the accommodation of a qualified signed language interpreter.**

**Review of written documents presented to Ms. Hill**

We were provided with the following documents by Ms. Hill's attorneys to assess, in the context of our interview and assessment of her English language proficiency, how well she would understand them if presented with the written text in the absence of an interpretation by a qualified ASL/English interpreter. Since these are documents that could result in revocation of her probation, we consider them to fall into the category of high stakes communication. In our discussions, Ms. Hill reported that she never realized that she had been informed that she had the right to a revocation hearing and in signing these forms that she had waived that right.

1. Georgia Department of Community Supervision, Drug and Alcohol Admission/Testing Form. (2/26/2020)
2. Superior Court of Forsyth County, Consent order (Indictment No. 19CR-0259-3; 11/05/2019-11/04/2024; signed November 3, 2020) [2 pages]

First, in looking at the first form, it appears that the parole officer (darker pen) filled in information like the GDC number (blue), the check marks and two dates in the upper section. The parole officer also seems to have indicated, using an asterisk, where Ms. Hill needed to put information or to sign. Based upon the handwriting, we believe that Ms. Hill wrote "two weeks ago. one time" and did sign her name. The question is whether she signed this form in full knowledge of what was typed on this page and the consequences of signing such a form.

We will address the linguistic complexity of the grammar subsequently. However, here, we present the substantive language in the forms provided (see attached) and how they fared on the following Readability Test Tool: https://www.webfx.com/tools/read-able/check.php.

We will focus on the most commonly used Flesch Kincaid Grade Level score, but we also provide a summary of a series of reliability test scores on each excerpt, including the Gunning Fog Score, the SMOG Index, the Coleman Liau Index, and the Automated Reliability Index. The Flesch Kincaid Grade Level Index uses the following formula: 0.39 x (words/sentences) + 11.8 x (syllables/words) - 15.5.

Each excerpt below is italicized and followed by the Flesch Kincaid Grade Level Score (in square brackets). In addition, below that the average of the scores on the range of readability tests is provided labeled as "Readability Test Tool Result."

**Excerpts from Document 1 (Georgia Department of Community Supervision, Drug and Alcohol Admission/Testing Form).**

*I also acknowledge that by signing this admission, my probation or parole sentence could be revoked or a lesser sanction imposed.* [Flesch Kincaid Grade Level: 12.2]

**Readability Test Tool Result:** Your page (directly input) has an average **grade level of about 13**. It should be easily understood by 18 to 19 year olds.

*I admit violating a special condition of my probation sentence or parole certificate, specifically using unlawful drugs or alcohol without a valid prescription or consent.* [Flesch Kincaid Grade Level: 19.2]

**Readability Test Tool Result:** Your page (directly input) has an average grade level of about 19. Ooh, that's probably a bit too complicated. Have you thought about using smaller words and shorter sentences?

**Excerpts from Document 2 (Superior Court of Forsyth County, Consent order)**

*There being no contest as to issues of fact or law, that the Defendant has violated the conditions of probation as ordered by this Court, the State and the Defendant tender the following agreement for the Court's consideration, approval and order.* [Flesch Kincaid Grade Level: 20]

**Readability Test Tool Result:** Your page (directly input) has an average **grade level of about 19**. Ooh, that's probably a bit too complicated. Have you thought about using smaller words and shorter sentences?

*There being sufficient evidence of Defendant's failure to comply with the terms of his/her probation, it is therefore ORDERED AND ADJUDGED that the probation provisions in said sentence be Modified and then be restored to Probation under the terms and conditions of his sentence in accordance with the law, and that all conditions continued or added herein are done pursuant to O.C.G.A 42-8-34-1 and therefore are Special Conditions. The Probationer shall submit to evaluations and testing related to rehabilitation and participate in and successfully complete rehabilitative programming, as directed by the Georgia Department of Corrections. Furthermore, the sentence shall be modified to serve 60 days in the Forsyth County Detention Center, with credit for time served. Time served shall be served day for day. The defendant shall be reinstated to active supervision with the following added special conditions: Report directly to the Cumming DCS office within 24 hours of release from custody. Added special condition, shall obtain a substance abuse evaluation within 30 days of release of custody and complete all recommended treatment and aftercare. All other terms and conditions of supervision shall remain in full force and effect.* [Flesch Kincaid Grade Level: 12.3]

**Test Readability Tool Result:** Your text has an average grade level of about 14. It should be easily understood by 19 to 20 year olds.

*By affixing my signature to this document I am acknowledging that I understand that I am entitled to a formal revocation hearing before the sentences Court and that I am entitled to legal representation at said hearing. I further understand that I have the right to be represented by an attorney at said hearing and if I cannot afford an attorney, one may be appointed to me at no cost. I understand that the purpose of the revocation hearing is to allow the Court to determine and adjudge whether of not the terms of probation have been violated.*

*I freely and willingly admit the alleged violations of my probation as outlined above, without duress, a hereby waive the right of hearing as provided for by the Criminal Code of Georgia. Additionally, I do hereby waive my right to have an attorney represent me unless my attorney has signed below. I, therefore, petition the Court to accept this consent.* [Flesch Kincaid Grade Level: 14]

**Test Readability Tool Result:** Your page (directly input) has an average grade level of about 14. It should be easily understood by 19 to 20 year olds.

**Excerpt 2 (Superior Court of Forsyth County, Consent order)**

*ORDER OF REVOCATION OF PROBATION BY CONSENT OF THE DEFENDANT*

*The above Consent Order, having been read and considered, is so allowed, and is now an ORDER of this Court.* [Flesch Kincaid Grade Level: 14.6]

**Test Readability Tool Result:** Your text has an average grade level of about 13. It should be easily understood by 18 to 19 year olds.

The readings required of Ms. Hill presented above are highly complex and well above her second- to third-grade reading level. They are also fraught with linguistic constructions and phrasing that are characteristic of a highly unfamiliar form of English, legalese. The excerpts range in complexity from the lowest encountered (the twelfth-grade level-12.0 to well above that (19.4, which is too convoluted and complicated for most readers). Recall that Ms. Hill reads at a second- to third-grade level at best. Her reading level and familiarity with legalese is so far below the level and register of materials presented in these documents as to make them completely unintelligible.

Much of the writing involves highly archaic forms such as *SO ORDERED, this the ___day of _____. 20___; I do hereby waive...; remain in full force and effect, there being no contest as to issues of fact or law, There being sufficient evidence of failure to..., etc.* There are numerous vocabulary items with which she is completely unfamiliar, such as *sanction, affixing, revocation, adjudge, duress, acknowledge, entitled, arrears, injurious, obtain, reinstated, pre-clear, accordance, pursuant, programming,* etc. Some of these were even documented as unknown or misunderstood in the vocabulary testing. For example, she did not recognize the word *waive* and confused *waiver*

with *welfare*. She also did not recognize the word *consent* in one list and confused it with *contract* or *person responsible* in another. She didn't know the word *admission* in the context of *admission to the hospital* and had no idea of its meaning in the sense of *admission of guilt*. She did not know the word *allege*. Then, there are even more confusing words that she knows one meaning for, but that meaning is irrelevant to the meaning in the context in these documents: *hearing* (as in meeting legal proceeding), *sentence* (as in punishment—she has a vague sense of this), *represent* (as in a lawyer represents you) , *determine* (as in decide), *code* (as in Criminal code), *further* (as in additional), *outlined* (as in made explicit), *condition* (as in requirement), *order* (as in Court order), *said* (as in *said sentence), provision* (as in a clause in a legal document), *continued* (as in postponed or even persisting)*, reinstated* (as in reinstated to active supervision), *rehabilitative* (not in the context of Voc Rehab*), release, report* (as in show up for), *no contest* (as in do not contest*), tender* (as in tender the following agreement), *consideration* (as in the Court's consideration), *submit* (as in submit to evaluation), *serve* (as in serve time), *terms* (as in requirements), etc. In terms of grammar there is a pervasive use of the passive voice, complex nominalizations characteristic of legalese (e.g., *supervision, sanction, provisions, consent* used as a noun, *approval*, etc.

In summary, written materials such as the two short documents discussed here are impenetrable to a reader with Ms. Hill's level of English. So, then we need to address why she would sign such documents if she did not understand them. First, we need to recognize that she asked for and did not receive an interpreter, which would be the only way she could comprehend these documents. We must recognize that she was in a position of powerlessness with respect to a law enforcement context in which someone put an asterisk next to a line and indicated where to sign. Many Deaf individuals unable to read such forms will sign, especially in a probation context, for fear that refusal to sign will be viewed as being argumentative or noncompliant. Without an interpreter, Ms. Hill's signature on such documents cannot be understood as informed consent. Her signature on such documents can also not constitute admission to anything since there was no option for her to explain or qualify her position even if she understood what she was admitting to. There was no opportunity for her to comprehend or explain why she was in violation of completing her community service obligations. There was no opportunity for her to expand upon or understand the consequences of having admitted to using THC two weeks prior or to be fully informed of the test results.

**Summary of Conclusions based upon our Assessment: Mary Ann Hill**

**Etiology:**

Ms. Hill was born deaf and her etiology of deafness seems to be genetic (a form of Usher Syndrome). There are no other Deaf members of her immediate family, but she does have a daughter with Usher Syndrome. Ms. Hill has had no orientation and mobility training related to her visions loss and is not aware of which type of Usher Syndrome she has.

**Cultural Affiliation and Language Preference:**

Ms. Hill has a Deaf identity and identifies as culturally Deaf, but she was educated in mainstream settings with only a handful of other Deaf children. She grew up signing, starting at age three, but her language model was an interpreter, and she was not signing ASL. Her first exposure to ASL was after she was married, particularly in her marriage to her second husband who has a Deaf sister. Nonetheless, she is a signer. Her later life choices have favored interaction with the Deaf community, and she does attend Deaf events like Deaf Expo and sometimes Deaf Night Out, but she is not a regular participant in Deaf clubs or organizations.

**English:** Ms. Hill has a second- to third-grade command of reading. Her writing lags a bit behind that. Her English clearly is that of a partial, second-language learner, rife with grammatical errors and influence from ASL.

**Speech.** Ms. Hill's speech is of limited intelligibility. She provided two speech samples recounting wordless cartoons that Dr. Shepard-Kegl, a certified oral transliterator, knew well; but she was unable to reliably understand or transcribe her speech, particularly when it was not accompanied by signing.

**Lipreading.** Ms. Hill's lipreading is limited as well. She gets at best a third of what is said to her, and that is in a quiet context with good lighting and much repetition. That one-third comprehension will gradually diminish as she accrues miscues and fatigues.

**Reading.** Ms. Hill's reading is her best modality of accessing English, but it is only at a second- to third-grade level. She falls below the average for Deaf readers. She does not read. At best she looks at pictures in magazines like *People* and watches movies with closed

captioning that she can only understand with the help of her husband and/or mother-in-law. She received her education via interpretation and not much reading was required of her.

**Vocabulary.** Ms. Hill does have a fourth-grade vocabulary and a smattering of words above that. In addition, she can recognize roughly 50% of words in specialized settings encountered as an adult (medical, law enforcement, and employment).

**Writing.** Ms. Hill's written English competency is also at about a second- to third-grade level. She shows no evidence of any organic reading disability and patterns most closely with Deaf ASL signers writing English. Her proficiency in English grammar and writing is limited and limits what she can write about.

**American Sign Language:**
Ms. Hill's primary and preferred language is the English-influenced form of contact signing called PSE, but she can comprehend ASL, even though she is less likely to produce it.

***Production***: Ms. Hill's sign articulation is errorful. Her ASL vocabulary is at an adult level, but the proficiency in word formation and sentence grammar in her language production does not approach the fluency or proficiency of a native signer.

***Comprehension***: Ms. Hill's comprehension of ASL is stronger than her production of ASL. She understood background conversation well and performed well on understanding both the more traditional narrative *Bird of a Different Feather* and the grammatically challenging classifier story, *DWI.*

In summary, Ms. Hill's primary and preferred form of communication is signed language, in particular PSE. Her English skills fall considerably behind her signing skills.

**Expert Opinion: Mary Ann Hill**

We have been asked to opine on the following questions:

**In what situations (if any) are sign language interpreters required for communication between Ms. Hill and a person who cannot communicate fluently in ASL?**

Based upon our assessment of Ms. Hill and the conclusions we reached in that assessment, it is our expert opinion that in any substantive interactions where Ms. Hill must access and share information with service providers (including, but not limited to, law enforcement officials, probation officers, medical personnel, and counselors) who *cannot* fluently communicate with her directly, a professional, qualified ASL/English interpreter is required.

Based upon our assessment of Ms. Hill and the conclusions we reached in that assessment concerning her limited ability to access and share information via English, both because of her sensory hearing loss and by virtue of her being a second-language user of English with at best a third-grade mastery of its vocabulary and grammar, it is our expert opinion that there are *no* ideal situations where information could be accurately and effectively shared via English in a manner that would afford her access equivalent to that of a hearing individual who is a fluent user of English; nor would such access even remotely approximate the level of access that would be afforded by interpretation of that information into signed language.

**Which type?**

Based upon our assessment of Ms. Hill and the conclusions we reached in that assessment, Ms. Hill would require the services of a competent and qualified interpreter (or interpreter team) who can adapt their communication along a spectrum of signing that ranges between ASL and Manually Coded English, but is not limited to either of those poles. She needs an interpreter (or interpreting team) that can match the needs of her blended ASL/PSE/MCE signing. This means that the interpreter has the competency to sign and understand all of these forms of signing and to adapt their signing to Ms. Hill's linguistic needs. In addition, because of her vision loss, she needs an interpreter aware of how to sign with a signer who has restricted vision (a reduced visual field) and who knows how to adapt the environment to make it conducive to signing with an individual with Usher Syndrome--sensitivity to lighting, size of the interpreter's signing space, speed of signing and the need to identify

individuals participating in group conversations and to provide information about the visual set up of the room. We do not know whether Ms. Hill's tunnel vision is progressive or not. It seems to be stabilized, but any interpreter should be sensitive to potential drops in her vision. Finally, for Ms. Hill, consistency of who is interpreting is important. While it is unreasonable to have a single dedicated interpreter working with her for all assignments, the pool of interpreters drawn from should be limited. It is difficult for her to adapt to a revolving door of interpreters.

**In what situations (if any) are Deaf Interpreters required?**

Based upon our assessment of Ms. Hill and the conclusions we reached in that assessment, it is our expert opinion that she would always be *best* served by a Deaf/hearing team or a Deaf ASL signing service provider because this would provide the highest likelihood of matching her communication and visual needs. Deaf interpreters are best equipped to adapt to a range of signing proficiencies and are also adept at dealing with fund of knowledge issues. In Ms. Hill's case, a qualified Deaf interpreter is not needed to keep the interpretation at a native-level of ASL. Rather the use of a Deaf interpreter serves to ensure that interpretation is adequately adapted to the communication needs of a somewhat atypical signer. In Ms. Hill's case, however, such a Deaf interpreter would need to have command of a range of signing that includes the use of PSE/MCE as well as ASL.

However, we have been asked to delineate those situations (if any) involving Ms. Hill where the services of a Deaf interpreter would be *required*. The factors that we feel play a role in our decision in this regard are fund of knowledge, language proficiency, the need for CALP to access and assess the information, and the extent to which the communication that must be shared and accessed has important consequences (is high stakes) for Ms. Hill. Focusing upon probation, we feel that the services of solid and qualified (vetted and certified) ASL/English interpreter (or interpreting team) with legal experience would be sufficient.

In any high stakes situations where stress levels are high, there will always be a risk of decreased language processing ability associated with stress. In such cases, misunderstanding or misinterpretation could have detrimental consequences for Ms. Hill or any Deaf participant. Signing range and sensitivity to culturally-based styles of behavior and discourse afforded by access to a qualified Deaf Interpreter in the team will better assure both effective

conveyance of the content of information and the cultural brokering needed to convey that information in a culturally familiar and appropriate way that will minimize stress and anxiety. In a courtroom setting, we would recommend a Deaf interpreter be present at Table for communication between Ms. Hill and her lawyer and to monitor her understanding of the Proceedings Interpreters. The purpose of the monitor would be to ensure that Ms. Hill is understanding all of the communication, not that the information is being expressed exclusively in ASL.

**In what situations (if any) is relying on the person speaking and getting information by speechreading appropriate/reliable?**

Based upon our assessment of Ms. Hill's speech and speech reading and the conclusions we reached in that assessment, it is our expert opinion that there is *no* content-rich situation, in which Ms. Hill can reliably express or receive information via speech and lipreading.

**In what situations (if any) is relying on writing notes back and forth reliable for effective communication?**

In our expert opinion, for any situation in which a hearing individual is given the benefit of using the spontaneous communication allowed by speaking back and forth with a service provider, for a Deaf person to have equal access, a similar spontaneous mode of communication needs to be provided. If a hearing person were required to write back and forth in these situations to assure equal access, would they be comfortable with the accommodation? We certainly would not be. Writing back and forth is effortful, time consuming, and in some cases not as reliable as speaking; all participants would be at a disadvantage. The service provider, pressed for time, will undoubtedly curtail the amount of information passed back and forth; the consumer, hearing or Deaf, will be shortchanged the same communication experience that would be had without passing notes. We have never seen the passing of notes to result in an equal exchange of information as would happen via spontaneous speech or signing. Ms. Hill has already shared experiences where an interpreter was rushed by hearing consumers wishing to speed up the interchange and the speed affected her ability to process with interpretation. Writing back and forth, even with native English skills would slow down the process even further. And lead to a curtailing of information shared and asked for.

However, a second factor also needs to be considered and that is the competency in the language being written or read. Based upon our assessment of Ms. Hill's reading and writing and the conclusions we reached in that assessment, it is our expert opinion that her proficiency in writing English and in reading English is insufficient to support writing notes back and forth during any substantive interchanges. She reads at a second- to third-grade level and her writing is less reliable and effective than her reading. This level of English competency is insufficient for her to engage in substantive interchange in this manner. It would be insufficient for any substantive conversations with (including, but not limited to) probation officers, law enforcement officials, prison staff, medical personnel, or counselors.

In low key situations, however, such as asking "Where is the bathroom" or "I need screws" at the Home Depot, or "Big Mac Meal with fries and Coke" at McDonalds, it would be okay to write back and forth because of the low level of risk associated with those situations. The dialogue is short and usually not interactive and it doesn't lead to harm to the Deaf person. For Ms. Hill to communicate about very basic things like setting up appointments, casual chit chat with family or friends, or shopping, passing notes could well suffice. However, in such situations, given her Usher Syndrome writing should be done large with a bold felt-tip pen. In anything else where the value of the information is more significant or there is inherent risk of harm to the Deaf person, to write back and forth with Ms. Hill would be problematic and risk confusion and misunderstanding. In our expert opinion, relying on written communication would not allow Ms. Hill to communicate fully the information she is capable of conveying via sign language.

**In what situations would "teach-back" or another method to ensure comprehension be necessary? (put another way, any insight into whether the person is susceptible to "deaf nod" even if they don't fully understand).**

The behavior of "nodding" needs to be unpacked and seen from several vantage points. Our first comment on the issue of nodding comes from things discussed in our general background section. In our experience, with both Deaf and hearing people, all of us have our breaking points where we realize that continuing to ask for clarification, straining to understand information that is new and unfamiliar, communicating in a second language, and making efforts to get people to slow down or re-explain are unlikely to yield

understanding, may result in frustration aimed at us, or are just not worth the effort, we all "nod." In our expert opinion and based upon our familiarity with many Deaf individuals and their behavior, Deaf individuals in general, in situations where they lack sufficient access to communication as a result of not having an interpreter, or just because of their own limitations using a language, will "nod" for this reason. In this regard, Deaf people and people who can hear are really behaving alike. It is just that Deaf people, who have experienced over their lifetimes a repeated lack of communication access and ineffective communication with people they cannot hear, have a lower threshold at which they will begin to "nod." It is a sign of resignation to the fact that efforts to gain communication access have failed and are likely to continue to fail. Nodding is often a very welcomed behavior. The Deaf person can hasten the end of the interchange; and the hearing person can feel comfortable in the delusion that they are being understood and will proceed through the conversation. Teach-back is a valuable tool that service providers (particularly those in the medical profession) use with discretion when assuring that the information to be conveyed is placed at a premium, in cases of assuring informed consent, for example. However, when a priority is placed on time and when getting out the door is placed at a premium, teach-back is not likely to be used and understanding is not likely to be verified.

Personally, in assessing Ms. Hill in a context where she has signing as access to communication, nodding was not an issue. What is more of an issue is fatigue. A Deaf individual with a vision loss will definitely fatigue more quickly and will be more likely to nod.

Here we offer our expert opinion as experts on Deaf culture and communication. There is a second use of *nodding* in ASL. This use is a cultural and linguistic expression of politeness and attention. This use of nodding is different from nodding in the hearing population in the U.S. It also has a different meaning from nodding in our wider hearing culture and this is a place where cultural confusion often occurs. We are reiterating discussion from our general background as well. In ASL people nod to say, "I am attending to you." It is not a sign of agreement or understanding. The indication of understanding involves a concurrent signing of Y-handshape, a fist with the pinkie and thumb extended. This means, "Oh, I see." It is even glossed with the ASL acronym for this phrase (O-I-C, which if read aloud sounds like *Oh, I see*.) Nodding without this backchanneling signal is not seen as understanding within

Deaf culture, and the Deaf person will invariably repeat the information in the absence of the manual backchanneling mentioned above. For hearing people, a similar signal of attending is maintaining eye gaze. We can sometimes listen but not look at a person. Often, however, we will find the person repeating the information over and over, assuming we have not attended to it. Children are especially prone to reacting in this way.

For all of these reasons, systematic probing for understanding, one effective means of which is "teach-back," is an essential tool in the interpreter's communication arsenal. So, in our expert opinion, Ms. Hill is less prone to "nodding" as an indication of compliance or as a response to resignation that understanding is not going to happen no matter how much she asks for clarification. In these situations, she is more likely to find processing to be a challenge and to fatigue more easily. For Ms. Hill, probing to verify understanding is an important component in communicating with her and teach-back is an effective means of doing so. Therefore, in our expert opinion based upon our assessment and interactions with Ms. Hill as part of that assessment, the accommodation of an interpreter or interpreter team skilled at not only communicating with her, but also adept at probing for understanding and sharing with service providers when such understanding is not happening, are essential to maintaining effective communication access for her.