# Exhibit AA

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

BRANDON COBB, et al., etc.,
  Plaintiffs,

                                   CIVIL ACTION FILE
              v.                   NO. 1:19-cv-03285-WMR

GEORGIA DEPARTMENT OF
COMMUNITY SUPERVISION, et al.,
etc.,
  Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~

REMOTE VIDEOTAPED DEPOSITION OF
MARY ANN HILL
VOLUME II

August 13, 2021
10:04 a.m.

(All parties appeared remotely via
videoconferencing and/or teleconferencing.)

Amelia Bradley, CCR 5100-8905-8215-5264



```
 1                  APPEARANCES OF COUNSEL

 2   On behalf of the Plaintiffs:

 3            BRITTANY SHRADER, Esquire
              National Association of the Deaf Law
 4            and Advocacy Center
              Suite 820
 5            8630 Fenton Street
              Silver Spring, Maryland 20910
 6            brittany.shrader@nad.org

 7            CLAUDIA CENTER, Esquire
              Disability Rights Education and
 8            Defense Fund
              Suite 210
 9            3075 Adeline Street
              Berkeley, California 94703
10            (510) 644-2555
              ccenter@dredf.org
11

12   On behalf of the Defendants:

13            GEORGE M. WEAVER, Esquire
              Hollberg & Weaver, LLP
14            6185 Mountain Brook Way
              Sandy Springs, Georgia 30328
15            (404) 760-1116
              (404) 760-1136 (facsimile)
16            gweaver@hw-law.com

17   Also Present:

18            Andrew Merideth, Videographer
              Jana Owen, ASL Interpreter
19            Marina Epstein, CDI
              Nichola Schmitz, CDI
20            Denise Kahler, ASL Interpreter
              Andrea Smith, ACLU
21            Amy Peterson, ACLU
              Brian Dimmick, ACLU
22            Talia Lewis, ACLU

23

24

25
```



Page 90

```
 1              INDEX TO EXAMINATIONS

 2   WITNESS:  MARY ANN HILL

 3   EXAMINATION                              PAGE

 4   By Mr. Weaver                            92

 5   EXAMINATION

 6   By Ms. Shrader                           165

 7                     ---

 8              INDEX TO EXHIBITS

 9   EXHIBIT          DESCRIPTION           PAGE

10    125        Employment Eligibility      134
                 Verification - USCIS
11               Form I-9

12
      126        Community Service Record    144
13
      127        Document - Bates D022665    179
14               to D022672

15
           (Original Exhibits 125 and 126 were
16
     attached to the original transcript.)
17
      (REPORTER'S NOTE:  Exhibit No. 127 was retained
18
     by counsel.)
19

20

21

22

23

24

25
```

Elizabeth Gallo
COURT REPORTING, LLC

```
 1            REMOTE VIDEOTAPED DEPOSITION OF

 2                   MARY ANN HILL

 3                  August 13, 2021

 4            THE VIDEOGRAPHER:  We're on the record.

 5   Today's date is August 13th, 2021, and the time

 6   is approximately 10:04 a.m.  This will be the

 7   videotaped deposition of Mary Hill.  Will the

 8   attorneys present please state their names and

 9   who they represent?

10            MS. SHRADER:  For Plaintiffs in this

11   case, Brittany Shrader, with the National

12   Association of the Deaf.

13            MR. WEAVER:  George Weaver, on behalf of

14   the Georgia Attorney General's office,

15   representing the Defendants.

16            MS. CENTER:  Claudia Center with

17   Disability Rights Education and Defense Fund,

18   representing Plaintiffs.

19            THE VIDEOGRAPHER:  Will the court

20   reporter please swear in the interpreters and the

21   witness?

22    (Whereupon, the interpreters were duly sworn.)

23      (Whereupon, the witness was duly sworn.)

24            MR. WEAVER:  Are we ready?

25            MS. SHRADER:  I am ready.
```



Page 92

1          MR. WEAVER:  Okay.

2                MARY ANN HILL,

3   having been first duly sworn, was examined and

4   testified as follows:

5                     EXAMINATION

6   BY MR. WEAVER:

**7      Q    Ms. Hill, again, this is George Weaver**

**8   on behalf of the Defendants.  And I'm going to**

**9   finish my questioning of you today.  And let me**

**10  say, at the beginning -- not really for you**

**11  but -- well, for you and your attorney, I didn't**

**12  say it last time but --**

13          MR. WEAVER:  This will be the

14  continuation of the deposition of Plaintiff Mary

15  Hill taken for all purposes permitted by the

16  Federal Rules of Civil Procedure.  Under those

17  rules, all objections except as to the form of

18  the question and the form of the answer, and

19  other matters which could be corrected here, are

20  reserved until time of trial or hearing.

21          Brittany, do you want to add anything to

22  that?

23          MS. SHRADER:  No, I agree with that.  Of

24  course, any objection to privilege is permissible

25  in a deposition.

**Elizabeth Gallo**
COURT REPORTING, LLC

Page 94

1          MR. WEAVER:  Okay.

2    BY MR. WEAVER:

3     **Q    All right.  Ms. Hill, I see that you're**

4    **back in the same hotel room you were in on**

5    **Tuesday, August 10th, 2021, earlier this week; is**

6    **that correct?**

7     A    Yes, that's right.  We're at the same

8    hotel.

9     **Q    I know on Tuesday, the 11th [sic],**

10   **earlier this week, there were some problems.  You**

11   **lost your signal, or Internet signal, a few**

12   **times.  So if that happens today, we'll just have**

13   **to deal with it.  As far as you know, are you**

14   **getting your signal from the same source that you**

15   **received on Tuesday?**

16    A    It's the same as last time.

17    **Q    What was that again?**

18    A    It's the same as last time.

19    **Q    Okay.  All right.  You do recall that**

20   **your -- you lost your Internet signal a few times**

21   **during the deposition on August the 11th,**

22   **correct?**

23    A    Yes.

24    **Q    Ms. Hill, do you have a driver's**

25   **license?**



Page 95

1    A    Yes.

**2    Q    And do you drive a vehicle?**

3         MS. SHRADER:  And, Mr. Weaver, I'm

4    sorry, I don't mean to interrupt you, but I did

5    just want to clarify something for you, for the

6    record in terms of the Internet connection where

7    Ms. Hill is.  I think I had told you last time

8    around that, at the outset, they had been using a

9    Hotspot connection for the Internet and that that

10   device lost power.  My understanding is that

11   after that device lost power last time, they then

12   connected to the hotel's WIFI which had

13   originally had issues, but then those issues were

14   resolved.  So today, Ms. Hill is now connected

15   again to the hotel's wireless connection and not

16   to that Hotspot device.  Since there were two

17   different connections last time, I wanted to make

18   sure that that was clear for -- for you and for

19   the record.

20        MR. WEAVER:  Okay.  All right.  Thank

21   you.

22   BY MR. WEAVER:

**23   Q    So I guess I need to repeat my question.**

**24   Do you drive a vehicle?**

25        A    Yes, I drive a car.



Page 96

1      Q     Okay.  And do you own the car yourself?

2      A     Yes, I do.

3      Q     And do you ever drive the car by

4   yourself; in other words, you're the only person

5   in the car?

6      A     Well, I do now.  It used to be when I

7   went out I'd be with my husband, but now I'm

8   alone.

9      Q     So typically, since your husband has

10  been in prison since, I think, the fall of 2019,

11  when you've been in -- in a car, you've been

12  driving by yourself; is -- is that correct?

13     A     Yes, that's right.

14     Q     Okay.  And for example, do you drive to

15  your job at McDonalds?

16     A     That's right, I do.

17     Q     Okay.  And do you ever drive to other

18  cities or states besides Cumming, Georgia?

19     A     I would be hesitant to do that.  I'm not

20  sure if that's acceptable according to my

21  probation.  I'm not entirely familiar, as you

22  know, with what's on that paper.  So I would have

23  to ask my probation officer if that would be

24  allowable.

25     Q     Okay.  Well, what is the most distant



Page 97

1 place to which you have driven since you went on

2 probation in the fall of 2019?

3          THE INTERPRETER:  The interpreter is

4 asking the witness for clarification.

5          THE WITNESS:  Well, once or twice I've

6 driven as far as Macon, Georgia, to visit my

7 husband.

8          THE INTERPRETER:  The interpreters are

9 going to switch now.

10          Interpreters are ready.

11 BY MR. WEAVER:

12     Q     Since your husband was incarcerated

13 beginning in the fall of 2019, and you've driven

14 to Macon to visit him to the prison there, when

15 you've done that, have you driven by yourself?

16     A     Yes, I drove alone, but it was

17 stressful.

18     Q     Before your husband was incarcerated, I

19 take it you drove more distant places; is that

20 correct?

21     A     My husband was the driver.  If we were

22 to go visit distant places, he would take me.

23     Q     Okay.  And when did you get -- first get

24 your driver's license, Ms. Hill?

25     A     About the year 2000.



Page 98

1            THE INTERPRETER:   Interpreters are
2  getting clarification from the witness.
3  Interpretation stands.   Thank you.
4  BY MR. WEAVER:
5       **Q    And what kind car do you own now and**
6  **drive?**
7       A    Mazda3.
8       **Q    Okay.   And do you own that car; is it**
9  **titled in your name?**
10      A    Yes.
11      **Q    All right.   And when you drive, and even**
12 **when you were riding with your husband in the**
13 **car, he's also deaf I understand, is it correct**
14 **to say that you're able to read and understand**
15 **highway and street signs?**
16           MS. SHRADER:   Objection as to form.   She
17 can answer.
18           THE WITNESS:   For when I drive, I use my
19 glasses and the -- I can understand the signs
20 more based on the colors of the signs rather than
21 the language, or the words used.   If it's a
22 simple word, then I may be able to understand it.
23 But most of the understanding comes from the
24 color of the signage.
25                        ---



1  and time out, the days that I was there doing the

2  cleaning.  Yeah.

3  BY MR. WEAVER:

4     **Q     And did you fill out that form and sign**

5  **it?**

6     A     Well, where it shows my name, yes.

7     **Q     Where it has the column about the**

8  **location of the community service like "DCS**

9  **office" and then it's got the time, did you fill**

10 **out those parts also?**

11          THE INTERPRETER:  The witness used a

12 term -- a sign that the interpreters were not

13 familiar with, and so the witness clarified.

14          The testimony is:  "No, only my name.

15 The other portions there would have been filled

16 out by my probation officer or kennel.  So the

17 only part I wrote was my name."

18 BY MR. WEAVER:

19    **Q     And I didn't understand the word kennel.**

20 **What does that mean?**

21    A     It's a place where they have animals

22 like cats and dogs, and they --

23    **Q     Oh, kennel.  Okay.**

24    A     -- take care of them, and people can

25 adopt them.  It's a no-kill place, though.

Page 146

1  They're really, you know, respectful of animals.

2     **Q    Okay.  All right.  I understand you're**

3  **saying kennel.  So for example, this document,**

4  **Exhibit 126, says on July 22nd, 2021, you worked**

5  **from 8:00 to 11:30 at HSFC, and it's got your**

6  **signature.  What is HSFC?**

7          THE INTERPRETER:  For the interpreter,

8  Mr. Weaver, was that HFFC or HFSC.

9          MR. WEAVER:  H as in Henry, S as in

10 Susan, F as in Frank, C as in Claudia.

11         THE WITNESS:  Well, let me see if I can

12 remember.  It's something like Forsyth Animal

13 Shelter [sic], no-kill, but, I mean, I'd never

14 had to know that acronym, those words.  I don't

15 know exactly what they are.

16 BY MR. WEAVER:

17    **Q    Okay.  So it looks like from this form,**

18 **Exhibit 126, you worked at that place at least**

19 **twice in July of this year, like, last month,**

20 **right?**

21    A    Right.  I did and will continue to do.

22    **Q    By the way, I think what that is Humane**

23 **Society of Forsyth County.  Does that sound**

24 **correct?**

25    A    That does seem right.



1     Q    All right.  And when you signed this
2  document, Exhibit 126, about your community
3  service hours, you understood what you were
4  signing, correct?
5     A    Yeah.  I -- right.  I know I signed it.
6  It means I did the job; I finished the cleaning.
7     Q    Okay.  All right.  On Tuesday,
8  August 10th, when we had the first session of
9  your deposition, I showed you some text messages
10  that you had with Shannon Hilliard and Mr. Roper.
11  Let me ask you this:  Do you frequently exchange
12  text messages with other people, not just them,
13  but other people also?
14          MS. SHRADER:  Object to the
15  characterization.  She can answer.
16          THE WITNESS:  Well, how do I explain it?
17  Yes, I have, but even if it's my best friend and
18  we've sent text messages back and forth, there
19  have been misunderstandings.
20          THE INTERPRETER:  The witness is
21  continuing with her testimony.
22          THE WITNESS:  Sometimes she's responded
23  back to say she didn't understand me, and there
24  are times when, you know, we can just laugh about
25  it, but if we're -- stick with the texting, then



Page 148

1  we have to figure out another word.  Like, it may

2  be one word that stumps us, or I can't think of a

3  English word to use for that.  So that's kind of

4  the way it goes.  You know, it's -- it's not

5  something you do a whole awful lot.

6           THE INTERPRETER:  One moment --

7  BY MR. WEAVER:

**8     Q    Well --**

9           THE INTERPRETER:  -- for the

10 interpreters to switch.

11           Interpreters are ready.

12 BY MR. WEAVER:

**13    Q    Well, is it correct to say that despite**

**14 some misunderstandings that you have been able to**

**15 communicate in a way that was satisfactory to you**

**16 with other people using text messages, correct?**

17    A    Well, just short.

**18    Q    So the answer is yes, but the messages**

**19 have been short; is that right?**

20    A    Well, yes, partly, sort of, yeah, but I

21 really prefer communicating face-to-face, and

22 then if there's some kind of misunderstanding,

23 then I can ask it right there in the moment.

24 Sometimes in texting I can't -- there's a

25 misunderstanding, so I may even say, you know,



1   let's connect through the videophone, then we can

2   talk that way and have clearer communication.

3       **Q     Okay.  In your first session of your**

4   **deposition on August the 10th this week, we**

5   **looked at four pages of text messages you had**

6   **with Ms. Hilliard and Mr. Roper.  Let me ask you**

7   **this:  Do you have a -- a record on your phone or**

8   **any other device of any additional text messages**

9   **with any employees of the Department of Community**

10  **Supervision?**

11      A     Well, unfortunately no.  I don't know

12  how to save -- I don't know how the technology

13  works and how to save messages, so no, and my old

14  phone, I -- was stolen, and -- I don't know.  I

15  never found it, and now I just have this new

16  phone, this iPhone 12.  So it doesn't contain any

17  saved messages.

18      **Q     In your social media posts, have you**

19  **ever commented on any political or current**

20  **events?**

21      A     Social media?  What do you mean?  Oh,

22  you mean, like, posting.  So I -- I post things

23  like pictures of animals and might type the word

24  "cute," or I like -- I post things that are from

25  my Betty Boop collection.  I like posting some

Page 150

1  things of that and also some pictures of myself.

2      Q    Okay.  On any social media platform that

3  you've used and -- in your answers to

4  interrogatories, you said you've used Facebook,

5  Snapchat, and Instagram.  Have you posted any

6  words about any political or current event?

7      A    I've never posted anything about

8  politics.  That's -- I'm not the type to do that.

9      Q    Okay.  Have you posted anything on any

10 social media platform or any blog site about the

11 Department of Community Supervision, any of its

12 employees, or this lawsuit that we're in today?

13     A    No.  I've never posted anything on

14 social media regarding this case or DCS or their

15 employees.  This case is -- no, that's personal.

16 I would never, you know, post anything like that.

17 That's ridiculous, no.

18     Q    In your answers to interrogatories, you

19 say that you used some other technology besides

20 Sorenson and videophone and FaceTime and Zoom.

21 You also say that you use something called

22 Translate, which is a speech-to-text app.  Tell

23 me how that works.

24             (Cell phone rings.)

25             MR. WEAVER:  Hold on.  Let me take a

Page 151

1  short break.

2          THE VIDEOGRAPHER:  Would we like to go

3  off the record real quick?

4          MS. SHRADER:  I think yes.

5          THE VIDEOGRAPHER:  Okay.  We're off the

6  record.  Time is 3:44.

7   (Deposition in recess, 3:44 p.m. to 4:01 p.m.)

8          THE VIDEOGRAPHER:  We are back on the

9  record.  Time is 4:01.

10          MR. WEAVER:  Okay.  I'm ready.  Okay.

11  Are we back on video record?  Okay.  Well, I had

12  to take that call.  I'm sorry.

13  BY MR. WEAVER:

**14      Q    But I had asked you before the last**

**15  break, what this Translate app is that you refer**

**16  to in your answers to interrogatories?**

17          THE INTERPRETER:  Now the interpreter

18  had a connection glitch and is now connected

19  again.  The interpreter Marina is frozen and --

20  rather her connection was frozen, and she's now

21  back.  She indicated that her laptop may be

22  heating up, but she would continue.

23          THE WITNESS:  I use that app for things

24  like -- if I'm at the drive-through, any auditory

25  information shows up on text, or if I'm talking


Elizabeth Gallo
COURT REPORTING, LLC

Page 160

1    six months?

2         THE INTERPRETER:  Before counsel asked

3    the question, the witness had gone on to say,

4    "I -- also I'm just not that great with

5    technology.  I guess I'm old-fashioned."  And in

6    response to the question, the witness said, "Yes,

7    that once."

8    BY MR. WEAVER:

9    **Q    When is the last time you used hearing**

10   **aids?**

11   A    That would be three or four years ago.

12   **Q    Okay.  And did they help you to hear**

13   **spoken English?**

14   A    No.  It is a myth to expect that hearing

15   aids would make a deaf person able to totally

16   understand spoken English.

17   **Q    But why did you use hearing aids three**

18   **years ago?**

19   A    Well, the audiologist told me that I

20   should use them to keep using that portion of my

21   brain, but it doesn't work that way.  Wow, you

22   got a lot of paper.  I see you're not giving up

23   on me.

24   **Q    I'm about to -- about finished.  So how**

25   **many Facebook accounts do you have or have you**



Page 161

1  **used?**

2      A     Just the one.

3      **Q     And the name you use is Mary Ann Hill;**

4  **is that right?**

5      A     Yeah, that's the name.  And the account

6  also has a couple of about informations filled in

7  there.

8      **Q     Okay.  And what is your Facebook**

9  **password?**

10         MS. SHRADER:  Objection to asking for

11  the witness' password.  She has a right to

12  privacy in terms of her password.  She does not

13  have to disclose that.

14         MR. WEAVER:  Oh, what is the privilege?

15         MS. SHRADER:  She has a right to

16  privacy.  It's a constitutional right.  She

17  doesn't have to give you her private password

18  information to any of her accounts.

19         MR. WEAVER:  Well, you don't know the

20  constitution very well.  There's no such right.

21         MS. SHRADER:  That right has been read

22  into the constitution by the Supreme Court

23  multiple times.

24         MR. WEAVER:  Well, the right of privacy

25  has -- has never been applied to a Facebook



Page 162

1  password, the right of privacy you're talking

2  about.

3          MS. SHRADER:  If you want to call the

4  Judge to ask if you can ask the witness for her

5  private password information to her various

6  accounts, I will get on the phone with you to

7  talk to the Judge.  I do not think that you are

8  permitted to ask for her password to her

9  accounts.

10          MR. WEAVER:  Well, you and I disagree

11  about a lot of things, including that.

12  BY MR. WEAVER:

13     **Q    Let me ask you this:  Do you agree that**

14  **a part of your probation is that you maintain**

15  **employment?**

16     A    I'm -- I'm -- I'm sorry.  A job?  What

17  is it you're asking?

18     **Q    You understand that as part of your**

19  **probation, a condition of your probation, you are**

20  **supposed to keep a job; is that correct?**

21     A    I mean, I'm not quite -- I mean, I'm

22  still going to keep my job regardless.  I need to

23  earn a living.  I need an income.  I don't know

24  that I've ever seen that in any paperwork from

25  them as a requirement, but, I mean, I'm -- I'm

Page 163

1  not going to give up my job.

2        THE INTERPRETER:  The interpreters are

3  going to switch.

4        Interpreters are ready.

5  BY MR. WEAVER:

6    **Q    Let me object to your last answer as**

7  **nonresponsive.  Do you understand that a**

8  **condition of your probation is that you keep a**

9  **job or stay employed?**

10        MS. SHRADER:  Objection.  Asked and

11  answered.  The witness just testified that she

12  had not seen that in any of the documentation and

13  was not aware that that was a rule, but that she

14  intended to maintain her employment.

15        MR. WEAVER:  Okay.  I object to your

16  coaching response and objection.  If you would

17  let the witness answer the question, that will be

18  great.

19        THE WITNESS:  Well, I know that, but

20  that doesn't really apply to me because I've

21  always had a job, and I continue to maintain a

22  job, so I don't plan on quitting my job any time.

23  I'm continuing to maintain employment.  Even

24  after probation is over, I'm going to -- still

25  going to continue to work.



1  BY MR. WEAVER:

2      **Q      Do you understand that another condition**

3  **of your probation is that if you move from where**

4  **you're living that you're supposed to notify your**

5  **probation officer?**

6      A      Well, no, I wasn't aware of that rule

7  because I don't really understand.  You know, I

8  can't really read, so I wasn't aware of that

9  rule, and that leads me to having other concerns.

10  Like, I think to myself, can I go on vacation; am

11  I allowed to do that; am I allowed to go out of

12  state?  I -- these are things I don't know,

13  because I don't understand all the rules.

14      **Q      Do you understand that it's a condition**

15  **of probation that you not consume alcoholic**

16  **beverages or use illegal drugs?**

17      A      The rule around alcohol and drugs, I --

18  I'm aware of that, but one thing I'm not clear on

19  is -- is, like, how -- how do you spell the word

20  in English?  P-R-E- -- you know, like, the

21  medicine that you would get if you go -- like, if

22  I went to the -- to the hospital, the emergency

23  room, and they needed to give me some medication,

24  am I allowed to take that medication, or do I

25  need to get approval from my probation officer



Page 165

1  first?  That kind of thing, I -- I'm not clear

2  about.  I'm not sure.

3      **Q    Do you understand that it -- it's a**

4  **condition of your probation that you not have a**

5  **gun?**

6      A    Yes, I know that.  I know I'm not

7  allowed to have a gun, and anyways, I hate guns.

8      **Q    All right.  That's all the questions I**

9  **have.  Thank you.**

10          MS. SHRADER:  I am going to have

11  questions for Ms. Hill, but before my

12  questioning, I'd like to please take a 15-minute

13  break.

14          MR. WEAVER:  Okay.

15          THE VIDEOGRAPHER:  We're off the record.

16  Time is 4:49.

17   (Deposition in recess, 4:49 p.m. to 5:15 p.m.)

18          THE VIDEOGRAPHER:  We are back on the

19  record.  Time is 5:15.

20                    EXAMINATION

21  BY MS. SHRADER:

22      **Q    Ms. Hill, earlier today you were**

23  **speaking with Mr. Weaver about the Translate app.**

24  **Do you remember that?**

25      A    Yes, I do.


Elizabeth Gallo
COURT REPORTING, LLC

Page 166

1      Q    How many times have you used the -- the
2  Translate app?

3      A    I think once, just that once.

4      Q    And is that one time the time that you
5  were describing when Mr. Weaver was asking you
6  questions?

7      A    Yes.

8      Q    And that one time when you used the
9  Translate app, did you find it to be an effective
10 means of communication for you?

11     A    No.  It was not effective, because it
12 would work by putting what people said to me into
13 the text on the screen, and if I didn't
14 understand the words they said to me, then it
15 wasn't going to help me communicate.

16     Q    And that Translate app, does it provide
17 a means for you to respond to the person?

18          MS. SHRADER:  Oh, and I'm sorry.
19 I'll -- I'll withdraw my question.  I see the
20 witness is trying to add testimony to her
21 previous response.

22          THE WITNESS:  I was just going to say
23 that sometimes the way the text is, or the
24 captions or whatever you call it, on that app,
25 sometimes it wasn't very good anyway, and the



1  words would get mixed up, and you couldn't tell

2  what it was saying anyway.

3  BY MS. SHRADER:

4      **Q     And, Mary, you've described the app as**

5  **something that takes what a person is speaking**

6  **and produces text.  Does the app have a way to**

7  **allow you to respond to the person who's speaking**

8  **to you?**

9      A    Well, no, I have to use gestures or my

10  facial expressions when I point to the screen to

11  say, what's that one mean or something like that.

12  Otherwise no, I guess really it's just an app for

13  hearing people in that sense.

14      **Q     Earlier today Mr. Weaver was asking you**

15  **questions about text messaging, and you talked,**

16  **for example, about text messaging your best**

17  **friend.  I'm curious, the people that you text**

18  **message with, are those hearing people or deaf**

19  **people typically?**

20      A    I'm definitely more comfortable texting

21  with deaf people, not really with hearing people.

22      **Q     Why?**

23      A    Well, with -- deaf people get me.  You

24  know, I get them.  I know what they're trying to

25  say.  They understand how I'm putting things in a



Page 170

1  that adjustment, but the witness is happy to go

2  forward.

3  BY MS. SHRADER:

4      **Q     Just for the record, Mary, I know you**

5  **were just asking one of the interpreters to**

6  **adjust their lighting, and you've agreed to go**

7  **forward.  So the record is clear, was it the**

8  **hearing interpreter or deaf interpreter whose**

9  **lighting needed to be adjusted?**

10     A     It was the hearing interpreter, Denise

11  Kahler.

12     **Q     And are you able to clearly see the deaf**

13  **interpreter?**

14     A     Yeah, no problem.  I can see her

15  clearly.

16     **Q     So, Mary, I'm going to go back to the**

17  **questions about being pulled over by the police.**

18  **How many times have you been pulled over by the**

19  **police?**

20     A     Two times.

21     **Q     And you described one of those times**

22  **today when Mr. Weaver was asking you questions,**

23  **as the officer wrote down on a piece of paper the**

24  **word "warning" and let you go, so I'd like to**

25  **talk about the second time that you were pulled**



Page 171

1  **over.  How did you and the police communicate**

2  **during that interaction?**

3      A     So that second incident, when I was

4  pulled over, I gestured to the police officer

5  that I was deaf, and then -- so he understood

6  that.  And then he gestured to me to get out of

7  the car and follow him to the front of the

8  vehicle where he pointed to the headlight and

9  then used the gesture across his throat to tell

10  me that it was -- the light was out, so we

11  communicated by means of gesturing and --

12          THE INTERPRETER:  The witness had more

13  to say.

14          THE WITNESS:  Another incident, I was --

15  I had been parked when the police officer came up

16  behind me, and I gestured to him that I was deaf

17  and explained that my daughter was wasn't

18  listening to me to put on her seat belt.  So the

19  police officer then went over and spoke to my

20  daughter telling her that she needed to put on

21  her seat belt.

22  BY MS. SHRADER:

23      **Q     And, Mary, you described just now for us**

24  **two incidents.**

25      A     Because my -- my daughter was failing to



Page 172

1  listen to me, I kept indicating to her, put on

2  your seat belt, put on your seat-belt, but she

3  didn't want to have it.

4     **Q    So, Mary, you just described to us two**

5  **incidents.  Was one of those the incident where**

6  **the officer wrote down "warning" or is that a**

7  **third incident?**

8         THE INTERPRETER:  Interpreter is going

9  to reinterpret the question for the witness.

10        THE WITNESS:  Yes, that's right.  The

11  warning was a separate incident where the police

12  officer gave me a warning and just let me go.

13  BY MS. SHRADER:

14     **Q    Mary, you mentioned before that you had**

15  **completed some of those job applications online.**

16  **I'm curious, did you complete them online in the**

17  **store or did you complete them online from your**

18  **home?**

19     A    At my father-in-law's office at home.

20     **Q    Now, Mary, I want to switch gears to**

21  **talk about your community service.  You mentioned**

22  **that you completed your community service in part**

23  **at the probation office; is that right?**

24        THE INTERPRETER:  The interpreters are

25  getting clarification as a team.  Now we'll -- we



1  will interpret the question.  Interpreters need a

2  moment to confer.  Interpreters are going to get

3  clarification from the witness.  She seems to

4  want to say something.

5          THE WITNESS:  So I met the probation

6  officer in the probation building.  We met in

7  the -- like, the cafeteria, or the lunchroom, and

8  he communicated with me by gestures, by pointing

9  to the board where they had a checklist of things

10  that needed to be completed, and we communicated

11  that way through gestures and through some visual

12  aids.  And on that board, it contained a list

13  of -- of rules of things that needed to be

14  completed.  One rule was like, for example, don't

15  leave the door closed, make sure that you leave

16  the door ajar.  I also explained to -- he -- he

17  gestured and indicated where it was that I needed

18  to do some vacuuming, things like that on the

19  board.

20  BY MS. SHRADER:

21      **Q    Okay.  I want to clarify several things,**

22  **Mary, that you just said.  First of all, did you**

23  **meet in the cafeteria or did you meet in the**

24  **conference room?**

25          THE INTERPRETER:  The interpreting team



Page 174

1  would ask the witness to please sit up or to use

2  both hands or to remove -- it's a little bit

3  challenging to understand her at times.

4            THE WITNESS:  In the cafeteria, yeah.

5  Yeah, they -- something -- the cafeteria, and the

6  VRI device that they use was not there.  And I

7  had to ask them repeatedly to -- through gestures

8  for them to gesture back to me by indicating

9  things on that list that I did not understand.  I

10  had to ask for repeated clarification.

11            THE INTERPRETER:  The interpreters are

12  going to switch.

13            The interpreters are ready.

14  BY MS. SHRADER:

15     **Q    That meeting that you're describing that**

16  **took place in the cafeteria, was that with your**

17  **probation officer or with another person who**

18  **worked in the probation office?**

19     A    It was only Hill- -- Chief -- Chief

20  Hilliard, who was the one who invited me to sit

21  down to talk about community services.

22     **Q    That board that you were talking about**

23  **that had things written on it, the things that**

24  **were written on that board, were they tasks you**

25  **were supposed to complete, or were they rules of**

Elizabeth Gallo
COURT REPORTING, LLC

Page 175

1    the probation office or both?

2         THE INTERPRETER:  The interpreter will

3    add the witness also mentioned that was conducted

4    with gestures.  And the interpreter will now ask

5    the question.

6         MS. SHRADER:  And I think I may have

7    asked an unclear question.  I'm going to

8    apologize, and I'm going to rephrase my question.

9    BY MS. SHRADER:

10       Q    Were -- what was written on that board?

11   Was it the cleaning tasks that I -- that you were

12   supposed to do, or was it rules concerning when

13   and how you were allowed to clean the probation

14   office?

15       A    Well, it was cleaning duties like wash

16   the dishes, mop, vacuum, clean the -- the

17   bathroom, like, the toilet, to, you know, clean

18   the furniture, things like that.

19       Q    Was there ever a time when anyone

20   explained to you -- let me change that question.

21   I'm sorry.  Was vacuuming one of the tasks that

22   you had on that list that you had to do as part

23   of your community service?

24       A    Yes.  But I did learn there are times

25   I'm not supposed to vacuum, because I thought,



1  okay, that door is open, I'll go in there and

2  vacuum, and all of a sudden they're like, "No,

3  no, no.  No vacuum in here."  I thought I was

4  supposed to vacuum everywhere but -- okay, one of

5  the things I learned was that the vacuum was

6  noisy.

7      **Q    How -- how did you learn that, that the**

8  **vacuum is noisy?**

9      A    Well, for me, it's more of a vibration.

10  Like, I can feel the motor and the handle of it.

11  I don't quite know how to explain it, but, you

12  know, the -- the machines, they vibrate.  So that

13  was my experience of it.

14      **Q    Did someone tell you the vacuum was**

15  **noisy?**

16      A    Yeah.  Yeah.  Yeah, I mean, they had

17  shown me the places to vacuum, and one of the

18  places was the conference room, and I thought I

19  was welcome to go in there and do vacuuming,

20  which was on the list, because the door was open

21  and -- but they were having a meeting in there

22  and, right, one of the men said, "No, no, no, no,

23  no.  Don't do that in here now.  We're having a

24  meeting."  So I realized, oh, okay.

25      **Q    Mary, do you feel that you have a**



Page 177

1  **understanding of the rules concerning when you**

2  **can and cannot vacuum various rooms in the**

3  **probation office?**

4       A     No.  I -- I tried to go by, like, is the

5  door open or closed with the idea that if it's

6  open, I should be able to go in there, but then

7  after that time, I've -- I'm always hesitant.

8  I'm not sure.  I mean, if the door is open, I

9  should be able to go in there, but if there's

10  somebody in there, they might be having a meeting

11  or they're talking or something, so I

12  shouldn't -- I never really know.

13            THE INTERPRETER:  The witness is going

14  on to add additional testimony.

15            THE WITNESS:  And just so you know, this

16  place has 11 offices throughout the first and

17  second floor.

18            MS. SHRADER:  I'm looking at the clock

19  and realizing we are at 6:00.  I have just a

20  couple more questions.  I understand if people

21  have a hard stop, please let me know, but if

22  you're willing to allow me a few more minutes for

23  a couple more questions, I would greatly

24  appreciate that.

25            THE INTERPRETER:  The interpreters are



Page 178

1  happy with a couple more minutes.

2       MS. SHRADER:  Yes, thank you.  I will

3  keep myself to that.

4  BY MS. SHRADER:

5     **Q    I want to ask you about the rules**

6  **surrounding your community service requirement.**

7  **How many hours of community service are you**

8  **required to complete as part of your probation to**

9  **your knowledge?**

10    A    I know that it was 40 hours to complete

11  the service.

12    **Q    Did Officer Hilliard, Chief Hilliard, or**

13  **any other probation officer ever explain to you**

14  **that there was a minimum hour requirement per**

15  **month that you had to complete?**

16    A    No, I wasn't aware of that.  I don't

17  think they told me.

18    **Q    Were you provided with any documents**

19  **explaining to you the rules about the number of**

20  **hours you had to complete including any minimum**

21  **number of hours to your knowledge?**

22    A    No, they didn't explain to me.  That's

23  why I kept on counting the hours.

24       THE INTERPRETER:  The interpreters are

25  ready to switch.


Elizabeth Gallo
COURT REPORTING, LLC

Page 179

 1          Interpreters are ready.

 2  BY MS. SHRADER:

 3      Q    Mary, I'm going to show you a document
 4  which I'm going to mark as Exhibit 127.   It is
 5  Bates stamped D022665 to D022672.   And the
 6  question I have for you about the document that
 7  I'm going to put on the screen is:   Have you ever
 8  seen it before?   Let me see if I can make it any
 9  bigger.   I'm going to take it down and see if I
10  can make it any larger.

11      Mary, I see you squinting.   I'm going to try
12  to see if I can make it bigger for you.

13      (Whereupon, Exhibit No. 127 was marked for
14  identification.)

15          MS. CENTER:   Do you want me to help?

16          MS. SHRADER:   Yes.   Claudia, if you have
17  it easily available for -- that'd be -- that'd be
18  great.

19          MS. CENTER:   I thought I did.   I'm just
20  going to really focus on the top.

21          THE WITNESS:   No, I -- I don't -- I
22  don't think I've seen that paper before.   No.

23          MS. SHRADER:   Nothing further.

24          MR. WEAVER:   I have no -- no further
25  questions.


Elizabeth Gallo
COURT REPORTING, LLC

Page 181

1                    CERTIFICATE

2

3  STATE OF GEORGIA:

4  COUNTY OF DEKALB:

5

6      I hereby certify that the foregoing

7  transcript was reported, as stated in the

8  caption, and the questions and answers thereto

9  were reduced to typewriting under my direction;

10  that the foregoing pages represent a true,

11  complete, and correct transcript of the

12  evidence given upon said deposition, and I

13  further certify that I am not of kin or counsel

14  to the parties in the case; am not in the

15  employ of counsel for any of said parties; nor

16  am I in any way interested in the result of

17  said case.

18

19

20  _____
    Amelia Bradley
21  Certified Court Reporter
    5100-8905-8215-5264
22

23

24

25



Page 182

1                    DISCLOSURE OF NO CONTRACT

2

3      I, Amelia Bradley, Certified Court
   Reporter, do hereby disclose, pursuant to Article
4  10.B. of the Rules and Regulations of the Board
   of Court Reporting of the Judicial Council of
5  Georgia, that I am a Georgia Certified Court
   Reporter; I was contacted by the party taking the
6  deposition to provide court reporting services
   for this deposition; I will not be taking this
7  deposition under any contract that is prohibited
   by O.C.G.A. 15-14-37(a) and (b) or Article 7.C.
8  of the Rules and Regulations of the Board; and I
   am not disqualified for a relationship of
9  interest under O.C.G.A. 9-11-28(c).

10

        There is no contract to provide services
11 between myself or any person with whom I have a
   principal and agency relationship, nor any
12 attorney at law in this action, party to this
   action, or party having a financial interest in
13 this action.  Any and all financial arrangements
   beyond my usual and customary rates have been
14 disclosed and offered to all parties.

15     This 3rd day of September, 2021.

16

17

18

19

20     _____
       Amelia Bradley
       Certified Court Reporter
21     5100-8905-8215-5264

22

23

24

25

