# Exhibit BB

1

2          UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF GEORGIA

3             ATLANTA DIVISION

4

5  BRANDON COBB, et al.,     )
                       )

6      Plaintiffs,      )
                       )   CIVIL ACTION NO.

7  vs.                )
                       )   1:19-cv-03285-WMR

8  GEORGIA DEPARTMENT OF    )
  COMMUNITY SUPERVISION,   )

9  et al.,             )
                       )

10     Defendants.      )
  _____)

11

12

13          DEPOSITION OF ADAM ROPER

14           APPEARING REMOTE FROM

15            CUMMING, GEORGIA

16

17        THURSDAY, AUGUST 5, 2021

18

19

20

21  Reported by:

22  Judith Leitz Moran, CCR, RPR, RSA

23  JOB NO.: 197749

24  APPEARING REMOTELY FROM ATLANTA, GEORGIA

25

1                    ADAM ROPER

2

3

4

5                  August 5, 2021

6                   10:19 a.m.

7

8          Remote Deposition of ADAM ROPER, held

9    via Zoom before Judith L. Leitz Moran, Registered

10   Professional Reporter, and Certified Court Reporter

11   for the State of Georgia.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    ADAM ROPER
 2   REMOTE APPEARANCES OF COUNSEL:
 3
 4        NATIONAL ASSOCIATION OF THE DEAF
 5        Attorneys for Plaintiffs
 6             8630 Fenton Street
 7             Silver Spring, Maryland  20910
 8        BY:  BRITTANY SHRADER, ESQ.
 9
10        DISABILITY RIGHTS EDUCATION & DEFENSE FUND
11        Attorneys for Plaintiffs
12             3075 Adeline Street
13             Berkeley, California  94703
14        BY:  CLAUDIA CENTER, ESQ.
15
16
17        HOLLBERG & WEAVER
18        Attorneys for Georgia Attorney General's
19        Office representing the Defendants
20             2921 Piedmont Road, N.E.
21             Atlanta, Georgia  30305
22        BY:  GEORGE WEAVER, ESQ.
23
24
25
```

1              ADAM ROPER

2  ALSO PRESENT:

3      * BRIAN DIMMICK, ESQ.

4      * DARRELL SMITH

5      * SHANNON HILLIARD

6      * DAVID WOODFORD, VIRTUAL VIDEO TECHNICIAN

7      * JOHN REIDT, VIRTUAL VIDEO TECHNICIAN

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          ADAM ROPER

WITNESS APPEARING REMOTELY FROM CUMMING, GEORGIA

3          AUGUST 5, 2021 - 10:19 A.M.

4

5          VIDEO TECHNICIAN:  Good morning,

6  counselors, my name is David Woodford, legal

7  videographer, in association with TSG Reporting,

8  Inc.

9          Due to the COVID pandemic, I will not be

10  in the same room with the witness, instead I will

11  record this videotaped deposition remotely.

12          The court reporter, Judith Leitz Moran,

13  will also not be in the same room and will swear

14  the witness remotely.

15          Do all parties stipulate to the validity

16  of this video recording and remote swearing and

17  that it will be admissible in the courtroom as if

18  it had been taken following Rule 30 of the Federal

19  Rules of Civil Procedure and the state's rules

20  where this case is pending?

21          MS. SHRADER:  Yes.

22          MR. WEAVER:  The Defendants, yes.

23          VIDEO TECHNICIAN:  Thank you.

24          This is Media Unit No. 1 of the

25  video-recorded deposition of Adam Roper.

1                     ADAM ROPER

2                This is in the matter of Brandon Cobb, et

3     al., versus Georgia Department of Community

4     Supervision, et al.  It's being heard before the

5     United States District Court for the Northern

6     District of Georgia, Atlanta Division.  Civil

7     Action number is 1:19-cv-03285-WMR.

8                This deposition is taking place remotely

9     on August 5th, 2021, beginning at 10:19 a.m.

10                My name is David Woodford, legal video

11     specialist, and the court reporter is Judith Leitz

12     Moran, both here on behalf of TSG Reporting, Inc.

13                Will counsel present please introduce

14     yourselves and your affiliations and the witness

15     will be sworn.

16                MS. SHRADER:  For Plaintiffs in this

17     case, Brittany Shrader, from the National

18     Association of the Deaf.

19                MR. WEAVER:  George Weaver on behalf of

20     the Georgia Attorney General's Office representing

21     Defendants.

22                MS. CENTER:  This is Claudia Center,

23     C-E-N-T-E-R, representing the Plaintiffs.  I am

24     with an organization called Disability Rights

25     Education & Defense Fund.

```
1                    ADAM ROPER

2              THE COURT REPORTER:  Will the witness

3    please raise his right hand, Mr. Roper.

4                       ADAM ROPER,

5    being first duly sworn, was examined as follows:

6              MR. ROPER:  I do.

7              VIDEO TECHNICIAN:  We are on the record,

8    counsel.

9                     EXAMINATION

10   BY MS. SHRADER:

11        Q    Good morning, Mr. Roper.  Thank you so

12   much for being with us over this Zoom today.  My

13   name, as I just mentioned it before, is Brittany

14   Shrader.  I'm one of the attorneys representing the

15   deaf Plaintiffs in lawsuits that's been filed

16   against the Georgia Department of Community

17   Supervision.

18              You just heard my colleague, Claudia

19   Center, introduce herself.  She's another attorney

20   for the Plaintiffs who's here today.

21              So we're here for your deposition.

22   Before we start, have you ever had a deposition

23   before?  Are you familiar with -- with what it

24   looks like?

25        A    Never done a deposition.  I've testified,
```

1                    ADAM ROPER

2    technical difficulties that we were having this

3    morning.  Do you occasionally have technical

4    difficulties with the wireless internet at your

5    office?

6         A    Sure.

7         Q    And in your office building?

8         A    Yes.

9         Q    Have you experienced technical

10   difficulties with the connection with LanguageLine?

11        A    Not that I can recall.  I don't believe

12   I've ever had one -- I don't believe I've ever had

13   one interruption of LanguageLine.

14        Q    Okay.  And so I just want to clarify what

15   I mean by technical difficulties because

16   interruptions can happen, like it happened before

17   when I hopped off and hopped back on.

18             But we've also had some other like

19   glitchiness during today's deposition, right?  Like

20   sometimes maybe my voice is not completely crystal

21   clear, sometimes our videos freeze or there's

22   pixillation and things like that and it's hard to

23   see the other person; is that fair?

24        A    Yeah, that's fair.

25        Q    So when you're using LanguageLine with

1                    ADAM ROPER

2    Ms. Hill, is the laptop typically faced towards

3    Ms. Hill so that she can see the screen or is it

4    typically faced towards you so you can see the

5    screen?

6         A    The initial moment that I connect with

7    LanguageLine, I just catch them up on what's going

8    on, and I turn the computer screen to her and it is

9    on -- it is in her direction in front of her for

10   the remainder of the time.

11        Q    Do you ever watch the computer screen to

12   ensure that there isn't that kind of glitchiness

13   with the picture, that freezing or pixillation that

14   might interrupt Ms. Hill's ability to understand

15   what the interpreter is saying?

16        A    So I'm -- I've set -- I set us up at a

17   conference table.  It's a very large conference

18   table.  And she will sit to my right and -- you

19   know, she's at kind of a 90 -- the table is a

20   90-degree angle from where -- where she sits next

21   to me.

22             Obviously, I don't want to get too close

23   because I have my weapon and stuff like that, and

24   it's -- you know, it's not really -- you know, it's

25   not safe to do for anybody, so, but I have my

1                    ADAM ROPER

2  distance.

3           But we're sitting in swivel chairs with

4  wheels on them, so I'm -- I angle it just so -- so

5  that I'm there.  And, you know, I -- she has the

6  majority of the screen but I have view of the

7  screen.

8           So I had not had any disruptions while

9  speaking with her at any time on LanguageLine.

10          Now, that may be a -- a rare thing to not

11 have disruption, but it -- it is not so with her.

12     Q    Have you ever had one of the interpreters

13 on LanguageLine tell you that Ms. Hill seems to be

14 having trouble seeing the interpreter?

15     A    I believe one -- seeing the interpreter,

16 no, no, no.

17     Q    You've never had an interpreter tell you

18 that there's glare on the screen, that you're

19 backlit, and because of the light in Ms. Hill's

20 vision she's having trouble seeing the interpreter?

21     A    I will take --

22          MR. WEAVER:  Objection.  Objection.

23 Objection.  Lead -- asked and answered.

24 BY MS. SHRADER:

25     Q    You can answer.

1                    ADAM ROPER

2       A    I will take a step back.  I will say that

3  in the jail I had one instance that because of the

4  setup they provided me, they didn't give me a room,

5  I did have to hold the cam- -- I had to hold the

6  computer up to the glass so that she could see it

7  while reading the consent order.  And it was

8  awkward, I will say that.

9            And there was, I believe, two occasions

10  where Mary said, "I can't see," but I stopped, got

11  -- made sure that the interpreter and her were on

12  the same page visually before I continued.

13            And I was reading the consent order to

14  her and discussing, you know -- discussing the set

15  of circumstances of what was going on.

16            So, yes, and I believe it was on two

17  occasions that had happened within the jail.

18       Q    And that -- that situation in the jail

19  that you just brought up, I want to make sure we

20  kind of iron out what that looked like.

21            You and Ms. Hill met, Ms. Hill was on one

22  side of a panel of glass, and you were on the other

23  side; is that right?

24       A    Yes.  It's what they call their attorney

25  visitation room.

1            ADAM ROPER

2        Q    And it's kind of that like reinforced

3    glass to make sure that there's no contact, it's

4    got that kind of wave in the glass; is that right?

5        A    Yeah, it's thick.  I don't know about a

6    wave, but yeah.  And it's got the little hole where

7    you can talk through and then it's got a little

8    phone set up.  So, yeah, it's -- it's thick.

9        Q    And you're kind of at an awkward -- have

10    to be in an awkward position holding that laptop up

11    because that glass isn't really like -- it's not

12    like you're sitting at a table and can put the

13    laptop down, and Ms. Hill is sitting on the other

14    side and -- and can see straight across kind of

15    like we all have our laptops on a -- on a surface

16    here, you're actually having to hold that laptop up

17    kind of higher because of the -- where the glass

18    is; is that right?

19        A    Well, I mean, I could have made a request

20    that she stand up and look down, but I -- I just

21    out of courtesy so she could sit because it was

22    kind of a lengthy process.  And I held it up for

23    her so that she could see.  But again, it was my

24    hand that was controlling the angle.

25        Q    Yeah.  And that -- that pane of glass is

1                     ADAM ROPER

2    between the laptop and Ms. Hill, right?  The laptop

3    isn't on her side so she's seeing the screen like

4    kind of in realtime, she's -- she's looking at the

5    screen through that pane of glass; is that right?

6         A    That's correct.

7         Q    And -- and you're -- you're physically

8    holding it up and controlling the angle; is that

9    right?

10        A    Yeah, and was using one hand and angling

11   it, yes.

12        Q    And I'm sure that was pretty

13   uncomfortable, huh?

14        A    It was.  Yes, that was.

15        Q    And that conversation took about like 20

16   minutes, is that right, of you talking to her,

17   holding that laptop up with one hand?

18        A    I assume so.  I don't remember how long

19   it took, but it sounds about right.

20        Q    And trying to ensure that she could see

21   the interpreter?

22        A    Correct.

23        Q    And is it fair to say that during that

24   conversation there was a lot of confusion on

25   Ms. Hill's behalf as to the amount of time she

                          ADAM ROPER

1

2    would be staying in -- in the jail?

3        A    Initially, yes.  She provided me reasons

4    why it was not good for her to do that.  But I felt

5    confident she understood because I explained to her

6    what the typical punishment was and what -- what --

7    and I -- and I justified the 60 days versus the

8    PDC.

9            And so I explained to her that she would

10   just be serving the time in the county.  I didn't

11   want to deal with -- I didn't -- I didn't really

12   know the -- it could be difficult to send her to

13   PDC and it just wasn't -- it wasn't -- I didn't

14   think it was appropriate for the situation.

15           So I explained that to her, and she made

16   some comments that made me feel comfortable that

17   she understood what -- what we -- the conversation.

18       Q    Well, during that conversation you -- you

19   were consistently talking about 60 days that she

20   was going to stay at the Forsyth jail; is that --

21   is that right?

22       A    Yes.

23       Q    And Ms. Hill asked you several times if

24   she was staying for -- for 30 days; is -- is that

25   right?

1                    ADAM ROPER

2       A    Yes, and I can elaborate on that if you'd

3   like.

4       Q    Sure.

5       A    The common practice in the jail, Forsyth

6   County Jail specifically, I'm only speaking of

7   them, is that with good behavior -- and I mean, not

8   picking up a new charge, they get two for one

9   credit.

10           And so a lot of them come with the --

11  come to me with the assumption that they're going

12  to be receiving the two for one credit.  And she

13  had that assumption.

14           And so I informed her that it was common

15  practice -- or that -- that is the typical

16  punishment they serve a minimum of 60 days.  And

17  that's why -- that's why she came with the 30-day

18  remark is it was something that -- a preconceived

19  notion that she -- she came with.

20      Q    Now, did Ms. Hill bring up that two for

21  one credit or was that kind of your -- your

22  assumption that that was in her mind because she

23  was saying 30 days rather than that perhaps this

24  was a communication issue?

25      A    I guess you could say it's my assumption,

1              ADAM ROPER

2    waiting, she -- she was trying to convince me not

3    to arrest her.  I had not formally said I was going

4    to arrest her, I didn't give any signs that I was

5    going to.

6              And I believe that's when our pen and

7    paper got initiated.  She was trying to communicate

8    quickly with me and voice her frustration about the

9    situation and tell me about the hardship she's

10   going through at home, and that, you know, being

11   arrested, you know, would -- you know, between --

12   between the interpreter and the writing, how being

13   arrested would, you know, hurt her situation and

14   why financially and all of that.

15             And that's what I remember of that

16   situation.

17     Q    So I guess I just want to make sure that

18   I understand.  You're saying that when she came

19   back into the room she was writing on the paper,

20   but that the LanguageLine was still connected and

21   that she was still able to communicate to you

22   through the LanguageLine?

23     A    Right.  So there was a long pause as I

24   was waiting for further instruction.  And the --

25   the LanguageLine was still sitting there, the pen

1                   ADAM ROPER

2    and paper were still sitting there.  And I was

3    essentially just stalling and I was -- to wait till

4    I -- I didn't want her to know she was going to be

5    arrested until we knew -- until it was time to do

6    it.

7              That's -- that's -- that's not a common

8    thing that you want to do is tell someone they're

9    going to be arrested and then sit and wait for, you

10   know, 15 minutes and wait for further instruction.

11   That's not a good thing to do.  It can cause a lot

12   of problems.

13             And so she -- she -- I believe she knew

14   she was going to jail and she got very desperate

15   when -- when communicating with me about issues she

16   was going through, things at home, just trying to

17   justify the -- the positive drug screen, so on and

18   so forth.  And there was some communication through

19   writing at that time.

20             I don't know if she felt more comfortable

21   with writing down, if it was more -- more quick, I

22   don't know.  But that's where some of the -- some

23   of the writing came in.

24        Q    So I just want to -- I guess I just want

25   to make sure I understand.  You're saying that at

```
 1                      ADAM ROPER
 2    no time was the laptop with the interpreter not
 3    connected when she was -- when she came back?
 4            There wasn't a time where the
 5    LanguageLine was disconnected and then you had to
 6    reboot and connect the LanguageLine?
 7        A    Even during the arrest, the LanguageLine
 8    -- I -- the LanguageLine interpreter still sat
 9    staring at the seat she was sitting in.  At no
10    point did it disconnect, at no point did I turn it
11    off, at no point did I close it.
12        Q    Okay.  So I -- I'm looking at the case
13    notes and I'm going to pull them up for you
14    momentarily.  But I'm just going to read something
15    from the case notes to you and ask you if it's --
16    if it's correct.
17            It says:  "Defendant reported as directed
18    on this date, 10/26/2020.  Performed community
19    service for roughly one hour.  Upon completion of
20    community service, this writer met with her to
21    discuss her sentence.
22            This writer connected with LanguageLine
23    to use an interpreter for the Defendant due to her
24    speaking American sign language as a primary form
25    of communication.
```

1                       ADAM ROPER

2            I asked the Defendant if she had any

3    contact with law enforcement and the Defendant

4    stated no.  I asked the Defendant if she had any

5    legal drugs and the Defendant stated no.  I asked

6    the Defendant how many community service hours she

7    completed.

8            Defendant stated that she had some

9    medical issues hindering her from completing the

10   recommended 16 hours a month.  The Defendant was

11   instructed through the interpreter to provide a

12   copy of medical documentation as an excuse for not

13   completing the recommended hours.  The Defendant

14   agreed to comply.

15           Defendant provided four prescriptions and

16   a copy was made to put in the portal.

17           Defendant was then asked if she had

18   changed any of her contact information, and she

19   stated no.

20           I then informed her through the

21   interpreter that she would need to submit to a drug

22   screen.  The Defendant complied.

23           Defendant was sent with Officer Johnston

24   to do the drug screen.  At this time the video call

25   with the interpreter ended.

1               ADAM ROPER

2          Upon completion of the drug screen, she

3     returned to our meeting place in the conference

4     room with her hands out for me to hand -- put -- to

5     place handcuffs on.  I pointed to the chair for her

6     to sit down.  Officer Johnston informed me that she

7     tested positive for THC.

8          The Defendant took my notepad and began

9     writing that she used THC.  And I began writing

10    that she used THC.  Defendant stated I know I made

11    a mistake I shouldn't do.  I was over at a

12    friend's.

13         I wrote back to the Defendant to relax

14    and allow me a moment to figure out what we need to

15    do next.  I addressed the situation with Chief

16    Hilliard.

17         While waiting for an answer on how to

18    address the violation, the Defendant signed an

19    admission form for THC use.  She wrote that she

20    used THC two weeks ago.

21         This writer wrote the date 10/12/2020 and

22    presented the form to Defendant to sign.  The

23    Defendant agreed and signed the form.

24         At this time the Defendant became very

25    agitated and appeared to become angry.  My body

1                   ADAM ROPER

2    camera was upstairs in my office and was not

3    accessible under the circumstances that were

4    developing.

5              At this time, we contacted LanguageLine

6    to request an interpreter again."

7              Does that help?  Is that accurate as to

8    what occurred?

9              (Off the record.)

10             (Deposition continued, as follows:)

11             MS. SHRADER:  Can you hear us now?

12             THE COURT REPORTER:  I can hear you now,

13   I'm sorry.

14             MS. SHRADER:  You're on -- you're still

15   on mute.

16             THE COURT REPORTER:  Okay, hold on.  I

17   can you hear now.  Can you hear me?

18             MS. SHRADER:  Yes, yes.  Where did you

19   stop hearing us?

20             THE COURT REPORTER:  Yes, hold on.

21             MS. SHRADER:  I was reading from

22   something and then I saw you --

23             THE COURT REPORTER:  Well, no, here's

24   what we got.  Can you hear me okay?

25             MS. SHRADER:  Yes.

1             ADAM ROPER

2        THE COURT REPORTER:  I'm sorry, I don't

3   know what happens.

4        You read through the whole thing and you

5   then said, "Does that help?  Is that accurate as to

6   what occurred?"

7        And then he started answering and I

8   didn't get it.  I'm sorry.  So can you pick up from

9   there?

10        THE WITNESS:  You ready?

11        THE COURT REPORTER:  Let me turn my

12   microphone up.  Hold on one second.  Okay, go

13   ahead.

14    A    (WITNESS CONTINUING)  Addressing the body

15   cam comment.  I did not have the middle, the

16   magnetic piece connected because I didn't have mine

17   set up yet.

18        And my chief had a camera available in

19   her office, but I felt that it would be

20   inappropriate for me to hold that while I was

21   trying to have this interaction with her,

22   especially as it escalated.

23        Addressing the LanguageLine.  I do not

24   remember disconnecting it, but if it was

25   disconnected, it probably would have been when she

1                  ADAM ROPER

2  left to go to the -- to do the drug screen.  Not

3  letting the person sit there.

4            I don't recall disconnecting it, but I

5  know that the computer sat there and stayed in the

6  same -- if it was disconnected, that's -- that's

7  when it would have been, within that 5 to 10

8  minutes not making the interpreter sit there and

9  stare at me for no reason.

10           So that could have happened.  I'm not --

11  I'm not going to deny that.  I don't -- I don't

12  remember the exact detail of when and where and how

13  I did with the LanguageLine.

14           But as for like an interpretation or a

15  disconnection as in like for Internet issues, no,

16  that wasn't addressed.

17  BY MS. SHRADER:

18     Q    So these notes that you wrote, the case

19  notes are quite detailed about exactly what

20  occurred.  Were they written at or about the time

21  that this interaction with Ms. Hill took place?

22     A    They would have been written I think

23  later that afternoon before I went home was one of

24  the -- one of the last things I did before I went

25  home, I believe.

ADAM ROPER

1

2        Yeah, I think that's when I -- I

3   completed those case notes.  I mean, I didn't want

4   to wait until the next day and forget all of that

5   information.

6        Q    So that was written when the events were

7   fresh in your mind?

8        A    Correct.

9        Q    So is it fair to say that the events as

10  described in the case notes you had a far sharper

11  recollection of the order of events when you typed

12  up those case notes than you do as you sit here

13  today?

14       A    Yes.

15       Q    Okay.  And when you typed up those case

16  notes, they were accurate?

17       A    Yes, there was no -- no -- no lies in

18  them, they were all straight.

19       Q    And you -- you didn't have any kind of

20  like -- I'm not exactly sure that this is how it

21  happened, you were -- you were certain that that's

22  how it happened at the time that you wrote the case

23  notes?

24       A    Yes.

25       Q    Okay.  So we can rely on the case notes

1                    ADAM ROPER

2    as an accurate description of the events that

3    happened and how they occurred on October 26th?

4         A    Yes, exactly.

5         Q    All right.  So I am going to share the

6    case notes that we have with you.  And we actually

7    have them, I think, in three separate formats

8    because the format -- they're in this like Excel

9    spreadsheet that can be quite difficult to read.

10   That's how they were provided to us from your

11   office.

12              So I'm going to show you that version

13   first, though, I have a feeling it might be quite

14   difficult to read.  We've blown up some of the

15   narrative section so they're easier to read.

16              MS. SHRADER:  George, I don't know, would

17   you prefer us to put into evidence just in terms of

18   reading -- readability the Excel spreadsheets with

19   the boxes extended so that you can see the text?

20   Or how would you prefer us to do that in terms of

21   the exhibit itself?

22              MR. WEAVER:  Whatever is easier for the

23   witness to read.

24              And by the way, we're not putting

25   anything into evidence.  What you're doing is

```
 1                    ADAM ROPER

 2  identifying documents during a deposition.

 3          MS. SHRADER:  Yes, for the deposition,

 4  George.

 5          MR. WEAVER:  Well, so whatever the

 6  witness finds readable I would say make that your

 7  exhibit.

 8          MS. SHRADER:  Okay.

 9          MS. CENTER:  And do you want me to put in

10  the chat so the witness can -- or do you want to

11  have it at Screen Share?

12  BY MS. SHRADER:

13     Q    I think -- Officer Roper, would it be

14  easier for you to have a copy so that you can

15  manipulate it on your end and scroll back and forth

16  to what you need to look at?

17          We have the ability to drop it -- the

18  document into the chat for you so you can open it

19  on your computer and manipulate it yourself.

20          Would that be easier for you?

21          MR. WEAVER:  Well, he probably can look

22  at the case notes himself.

23     A    Yeah, I mean, if you just tell me date

24  and time of what you're looking at, I can pull it

25  up.
```

1                    ADAM ROPER

2    BY MS. SHRADER:

3       Q    Sure.  Whatever is easier for -- for you.

4    I want to make sure that we have the best access.

5       A    This will probably be the most readable.

6    You just have to tell me the date and time the note

7    was made and so I can find it easier.  Or the date

8    -- not the time but a date.

9            Give me one moment to pull it up.

10           I'm working off a dual screen here so

11   it's easier for me to read.

12           All right, I went to the case notes.

13   Which one do you want to look at?

14      Q    Okay.  So it looks like there's a lot of

15   case notes from the same day.  Is there something

16   that would help me to give you another description

17   since there are one, two, three, four, five, six,

18   seven, seven case notes from the same date?

19      A    What is the -- what is the subject line

20   of it and I'll -- and I can find it?

21      Q    We have 10/26 Face to Face Office

22   Instructions; Note Summary.  Does that help?

23      A    10/26.  Hang on one second.  I got it,

24   Instructions; Note Summary, got it.  Okay.

25           MS. SHRADER:  And so we're going to mark

1                    ADAM ROPER

2    the case notes, I think, as Exhibit 112.

3             (Deposition Exhibit 112 marked.)

4             MR. WEAVER:  And just so I know,

5    Brittany, what is the last entry on that document

6    that you're marking as Exhibit 112, the last date?

7             MS. SHRADER:  The most recent date looks

8    like it's 1/11/2021.

9             MR. WEAVER:  Okay.  Okay.  All right.

10             MS. CENTER:  Brittany, are we going to

11   mark it -- we're going to mark the spreadsheet as

12   we received it?

13             MS. SHRADER:  No, I think the one with

14   the Royal Height formatting.

15             MS. CENTER:  Okay.

16   BY MS. SHRADER:

17      Q    Were you able to take a read through the

18   case note from that date?

19      A    Are you speaking to me?

20      Q    Yes, sorry.

21      A    Yes, I was just glancing at it.  I'm

22   ready when you're ready.

23      Q    Okay, great.  So now having taken a look

24   at that case note, it appears to me from your case

25   note that you ended the call with the interpreter

1                       ADAM ROPER

2     after you informed Ms. Hill that she needed to

3     submit to a drug screen, and she agreed to comply;

4     is that -- is that right?

5          A     Correct.

6          Q     And Officer -- Officer Johnston came and

7     took Ms. Hill for a drug screening, and came back

8     and let you know that Ms. Hill had tested positive

9     for THC; is that right?

10         A     Yes.

11         Q     And then you wrote to Ms. Hill that she

12    tested positive for THC, and it's at that time that

13    she tried to explain to you that I know I made a

14    mistake, I was over at a friend's; is that right?

15         A     So -- yes, yes, it is.

16         Q     And that was in writing?

17         A     Yes.

18         Q     And then you wrote another note to her

19    and said, relax, I'm trying to figure out what --

20    what's going to happen; is that right?

21         A     Right.  So that -- that time frame, like

22    I said before, was a downtime.  My intentions were

23    just to sit there and not say -- not say anything

24    until I got further instructions because I didn't

25    want to get her amped up about being arrested.  She

```
 1                      ADAM ROPER

 2  was already on edge.

 3          So with the conversation, her being --

 4  she wanted -- she wanted answers and I wasn't going

 5  to just sit there and stare at her, so that notepad

 6  was put into use.

 7          Until I got more information to -- and

 8  then to bring LanguageLine back up to explain

 9  properly instead of -- instead of just sitting

10  there.  Because I know there was phone calls being

11  made by my chief.  I wasn't sure of the length of

12  time.

13          So she initiated a conversation and I

14  answered as minimal as I could, but she had a

15  general sense of what was going to be going on.

16      Q    So I guess I want to make sure I

17  understand what you're saying.

18          So are you saying that you had shut down

19  the LanguageLine because you didn't really want to

20  have communication with her during that time?

21      A    No, it was shut down when -- okay, it was

22  shut down when she went to the bathroom because

23  there was going to be -- again, it takes about 5,

24  10 minutes to do it.  I wasn't going to have the

25  LanguageLine person sitting there staring at the
```

1                    ADAM ROPER

2    wall.

3              And then when she came back, I was

4    informed, I was waiting for the decision on what

5    was going to happen, if we were going to arrest

6    her, if we were going give her an admin hearing,

7    what was going to happen, and that's when the

8    writing took place.

9         Q    And so it said -- it says here that after

10   you told her, relax, give me a moment to figure out

11   what to do, that's when you then addressed the

12   situation with Chief Hilliard.  Do you see that?

13        A    Right.  And then there -- there was

14   conversation before.  So it was really just waiting

15   for -- waiting for further direction.  There was --

16   again, the offices were connected as well, so

17   literally the door frame is in that same room.  So,

18   yes.

19        Q    So I just want to ask you, taking a look

20   again at your description of the 10/26/2020

21   interaction.

22              The first time I see any mention of you

23   talking to Chief Hilliard is -- is there when you

24   say, "I wrote back to the Defendant to relax and

25   allow me a moment to figure out what to do next.  I

1                    ADAM ROPER

2    case notes?

3        A    That's correct.  And it's also a common

4    practice among them.  Even when someone admits, I

5    -- unless it's some volatile situation where

6    somebody is getting violent with me, I always get

7    the signed admission and we -- or I'm sorry, I get

8    an admission and then I go and still test them

9    anyway.  And then I get the form and get it signed.

10            So that's -- that's a common practice for

11   me.

12       Q    But what you did, in fact, document here

13   is that she said no and agreed to take -- that no,

14   I did not use illicit substances, agreed to take a

15   drug test, and then came back and you were informed

16   that she was positive; that's what you, in fact,

17   documented, correct?

18       A    Right.  In the beginning of the

19   conversation, yes, when we're going over the

20   sentence, yes.  When it come time to do the drug

21   screen, that's when I'm saying that may be that --

22   that that conversation occurred.

23       Q    Okay.  But the only part of that

24   conversation that you remember is that she went

25   over to a friend's and made a mistake; is that

1                    ADAM ROPER

2    right?

3         A    The only part that -- that is -- what I'm

4    speaking of is from my memory.

5         Q    Right.  So -- and that's my question.

6    It's the only part of this alleged verbal admission

7    that you recall is that she was over at a friend's

8    and that she made a mistake and -- and used; is

9    that right?

10        A    Sure.  Yes.

11        Q    You don't recall any discussion of how

12   that -- that use happened or any explanation

13   surrounding it, right?

14        A    No, I do remember the conversations of

15   having -- of her trying to not -- have justified it

16   based off being stressed out.

17             And she was naming -- I don't remember

18   the exact circumstances, but the situations that

19   she was stressed out about, and she talked about

20   her husband, and she talked about -- I think that's

21   it.

22        Q    And -- and I just want to be clear, all

23   of those things you're recalling happening

24   verbally, is -- is that your testimony?

25        A    With the -- with the LanguageLine.

1                          ADAM ROPER

2       Q     Is that your testimony?

3       A     Yes.

4       Q     Would it surprise you to know that those

5  are actually things that she wrote on the paper

6  that you wrote back and forth?

7       A     Because that time when -- when we were

8  writing was a time of desperation.  She was

9  reiterating those things to me.

10      Q     Yet, the only time that you record that

11 they were said to you is in the context of writing

12 in your case note; is that right?

13      A     Correct.

14            MS. SHRADER:  And Claudia, can we pull up

15 the handwritten notes, please.  We're going to mark

16 them as 113.

17            MS. CENTER:  Just one moment.

18            Let me know how -- or actually,

19 Mr. Roper, if there's a way to present that's

20 easier, I'll do my best.

21            (Deposition Exhibit 113 marked.)

22 BY MS. SHRADER:

23      Q     Officer Roper, are these the handwritten

24 notes from the date October 26th, 2020, in question

25 that we've been discussing?

1                    ADAM ROPER

2        A    Yes.

3        Q    And the first two lines written here,

4   those are written by you; is that correct?

5        A    Yes, that's my handwriting.

6        Q    And then the third line -- the third

7   paragraph there that's kind of indented, is that

8   Ms. Hill's writing?

9        A    Yes.

10        Q    Okay.  And this was all written prior to

11   the LanguageLine being turned on the first time; is

12   that right?

13        A    Yes.

14        Q    Okay.  The next line, that "you are

15   positive for THC," you wrote that, right?

16        A    Correct.

17        Q    And you wrote that when Officer Johnston

18   came back in and let you know that she tested

19   positive for THC, right?

20        A    Correct.

21        Q    So you initiated conversation with her?

22        A    Well, there was -- she wanted -- she

23   asked me, you know, what -- what the -- what the

24   results was.

25        Q    All right.  How did she ask you that?

1                    ADAM ROPER

2       A    And I went straight to the notepad.

3       Q    How did she ask you that?

4       A    Verbally.  Actually, verbally, not

5  through sign language.

6       Q    What did she say?

7       A    She was wanting to know the -- I don't

8  know verbatim.  She wanted to know the results

9  because Officer Johnston took her straight back

10 after -- with the -- straight back and told me she

11 was positive for THC, sat her down in the chair,

12 and that was -- that was the interaction.

13      Q    And that's when she wrote "I know, I made

14 a mistake I shouldn't do.  I was over a friend to

15 stiff."

16           Is that what she wrote?

17      A    Yes.

18      Q    Okay.  At this point there is no

19 interpreter on LanguageLine, right?

20      A    No.

21      Q    Laptop is still closed?

22      A    It was open, but no, it was not -- the

23 LanguageLine was not -- the interpreter was not on

24 the screen.  LanguageLine was up, but it was not --

25 no interpreter was on the screen.

```
 1                    ADAM ROPER
 2      Q    And that's when you write "Relax, I'm
 3  waiting to see what happens"?
 4      A    Uh-huh.
 5      Q    And this is actually all written verbatim
 6  in your case notes, correct?
 7      A    I'll have to go back and review again.
 8           (Witness reviews document.)
 9           That's correct.
10      Q    And then this is where she writes, and
11  this is Mary's handwriting, right, "You don't
12  understand, I am in really hard life.  My husband
13  in prison.  I really have hard time.  I don't want
14  to go jail and lost my job."
15           Is that -- Mary wrote that?
16      A    Yes.
17           MS. SHRADER:  And can we scroll down,
18  Claudia?
19  BY MS. SHRADER:
20      Q    And the -- at this point the interpreter
21  is still not on the screen, right?
22      A    Correct.  Interpreter -- interpreter
23  doesn't come on the screen until Chief Hilliard
24  gets involved and we -- we talk to her formally
25  about what's going to happen.
```

1                        ADAM ROPER

2       Q    And you at that point write, "Using drugs

3  resolves none of those problems."

4            That's your writing?

5       A    Yes, it is.

6       Q    Okay.  And you're assuming that what she

7  was writing before was in reference to her using

8  drugs and not in reference to her not wanting to go

9  to jail, was that your -- your assumption about her

10 previous remark?

11      A    That was the -- the center of most of the

12 conversation at that point.

13      Q    Based on what you are reading from what

14 she wrote?

15      A    Correct.

16      Q    Okay.  And so you believed when she was

17 talking about having a hard life and not wanting to

18 lose her job, that she was talking about reasons

19 that she used THC as opposed to reasons she didn't

20 want to go to jail?

21      A    Can you repeat the question?

22      Q    So when you write her previous

23 statement --

24           MS. SHRADER:  And Claudia, maybe you can

25 scroll back up a little bit.

1              ADAM ROPER

2  BY MS. SHRADER:

3      Q    "You don't understand I'm in a really

4  hard life.  My husband's in prison.  I really have

5  hard time.  I don't want to go jail and lost my

6  job."

7          You assumed that this "I have a really --

8  I'm having a hard life and my husband is in prison"

9  was her talking about why she used THC as opposed

10  to why she didn't want to go to jail?

11     A    So at some point through the interpreter,

12  there was conversation about -- I'm guessing after

13  it came back on -- conversation about why she was

14  using and it related to stress and she made a

15  mistake.  It was written in here also.  And we

16  circled back on that a few times.

17          And that -- so when I asked her that

18  question, I might be talking about something that

19  happened after this, but it was related to stress,

20  and that's what she was claiming was why she made

21  the slip-up and used.

22     Q    Okay.  So let's scroll back down.  And

23  then she writes, "Can I call my dad to let him

24  know?"

25          That's Mary's writing?

```
 1                    ADAM ROPER

 2        A     Correct.

 3        Q     And Mary doesn't seemingly respond to

 4   your statement about "using drugs resolves none of

 5   these problems"?

 6        A     Correct.

 7        Q     And you write, "I need the date you last

 8   used THC."

 9        A     That was when I was filling out that

10   acknowledgement form, that's part of -- that's part

11   of the form.

12        Q     Okay.  And at that point the interpreter

13   is still not on the screen, right?

14        A     That's correct.

15        Q     Okay.  And she writes, "Please give me a

16   chance.  I will not do again.  I promise, I will

17   come here every day to do community service.  I

18   will proof to you."

19              That's Mary's writing?

20        A     Correct.

21        Q     Okay.  And the interpreter is still not

22   on screen?

23        A     Not at that point, no.

24        Q     Okay.  We can stop the screen share.

25              So during this interaction with Ms. Hill,
```

1                    ADAM ROPER

2    I think you write in your case note that you then

3    -- and I think you just said you were filling out

4    that admission form.  You then have her sign that

5    admission form, and she's becoming agitated; is

6    that -- is that accurate?

7         A    That is correct.

8         Q    Okay.  And all of that happened while the

9    interpreter -- the computer was there, LanguageLine

10   was booted up, but the interpreter was not on

11   screen; is that right?

12        A    That is correct.

13        Q    Okay.  And so you gave her the admission

14   form to sign and told her to sign it?

15        A    I'm not sure on that part.  I don't -- I

16   know when Chief Hilliard came back into this --

17   came into the room with what was going to happen, I

18   do know at some point in that time frame it was

19   turned back on.  I do not know when exactly that

20   was turned on.  I cannot remember that part.

21             At some point -- and obviously, I'm

22   struggling with some of my memory here -- but at

23   some point -- at some point during this time it was

24   cut back on.

25        Q    And according to your case note, that

1                    ADAM ROPER

2   happened after she had signed the admission form,

3   right?

4        A    That's what I wrote, yes.

5        Q    Yes.

6             And that's -- that kind of tracks because

7   there's also the note, the handwritten notes we

8   were just looking at, when you're asking her for

9   the date because you need it for that admission

10  form, right?

11       A    Right.

12       Q    So it makes sense that based on your case

13  note and the handwritten notes that that had --

14  that the interpreter wasn't present until after she

15  had signed the admission form; is that right?

16       A    Yes.

17            MS. SHRADER:  Okay.  Can we pull up the

18  admission form and mark that as 114?

19            MS. CENTER:  Sure can.

20            MS. SHRADER:  Thank you.

21            (Deposition Exhibit 114 marked.)

22  BY MS. SHRADER:

23       Q    And this is the admission form, what's on

24  the screen right now, Exhibit 114.

25            Officer Roper, is this the form we've

1                    ADAM ROPER

2   been talking about?

3        A     Uh-huh.

4        Q     Okay.

5        A     Yes.

6        Q     Thank you.

7              So at the top Mary Hill, is that Mary's

8   writing there?

9        A     I think it's -- I think it's my

10  handwriting.

11       Q     Okay.

12       A     The way I do it is I fill it completely

13  out, check all the boxes, write everything in and

14  then let them review it.  So that's -- that's

15  typically the way I do it.  That should be on --

16  everything should be on there except for the

17  signature.

18       Q     Okay.  And so I see the GDC number is

19  written in different color.  Is that because it's

20  filled in at a later time?

21       A     Yes, because I didn't have that -- that

22  number up in front of me with the computer having

23  the LanguageLine on it.

24       Q     And so I want to scroll down to the

25  bottom.  That's Mary's signature there next to the

```
 1                    ADAM ROPER
 2   star?
 3        A    Yes.
 4        Q    And then your signature there below it?
 5        A    Correct.
 6        Q    And did you write that star so that Mary
 7   would know where to sign her name?
 8        A    Yeah, I do that any time I get them to
 9   sign anything, it doesn't matter what it is.
10             MS. SHRADER:  And can you scroll back up
11   a little bit, Claudia, please.
12   BY MS. SHRADER:
13        Q    There's also a star next to where it says
14   "2 weeks ago one time."  Did you star there so that
15   Ms. Hill would know where to write in when it had
16   happened?
17        A    Correct.  And she put two weeks ago, but
18   I was looking for a specific date.
19        Q    And you wrote in that date --
20        A    Correct.
21        Q    -- October 12, 2020?
22             So here at the bottom, right below -- or
23   right above, rather, Mary's signature, it reads:
24   "I also acknowledge that by signing this admission,
25   my probation or parole sentence could be revoked or
```

1                      ADAM ROPER

2    a lesser sanction may be imposed."

3              Do you see that?

4         A    Yes.

5         Q    Okay.  Did you -- well, we've already, I

6    guess, established that the interpreter was

7    unavailable at that time until after she signed the

8    form, correct?

9         A    Correct.

10        Q    So at no time did you have -- did you

11   explain that to her in American sign language that

12   signing the form could result in her probation

13   sentence being revoked or a lesser sentence being

14   imposed?

15        A    The answer is, no, we did not discuss

16   that her parole or probation could be revoked.  But

17   that is something that is discussed during intake

18   when we -- when we discuss the violations as well

19   as what typical punishments would be -- at least

20   from my intake, would be a -- a result of a

21   positive drug screen.

22        Q    And you didn't conduct Ms. Hill's intake,

23   correct?

24        A    That's correct.

25        Q    And why is that sentence written on this

1                    ADAM ROPER

2    form?

3        A    Why is the -- the sentence we just

4    discussed, the -- the revoked sentence?

5        Q    Yes, correct.

6        A    Because it could be.

7        Q    Is that because signing this document has

8    consequences?

9        A    The positive drug screen, the admission,

10   the signing that, at that point this is just

11   confirmation on top of confirmation on top of

12   confirmation.  So it didn't -- doesn't change the

13   result.

14             So by signing this form does it change

15   anything?  No, it doesn't change anything of what's

16   already occurred.  Is it going to make it worse

17   because she signed this?  No, it is not.

18       Q    But signing this form has significance,

19   it's an admission of guilt, correct?

20       A    Correct.

21       Q    So again, the reason that that sentence

22   is written there is to make the person aware that

23   signing this form could have consequences.  It

24   could have the consequence of probation being

25   revoked or a lesser sentence being imposed,

1                    ADAM ROPER

2    correct?

3        A    Correct.

4        Q    And it's your testimony today that that

5    -- that warning was not provided to Ms. Hill in --

6    in her language, in ASL, correct?

7        A    Correct.

8        Q    And that's despite the fact that there

9    was a laptop there with LanguageLine booted up, and

10   you could have easily gotten an interpreter on the

11   line to explain this to Ms. Hill.  You chose to

12   have her sign an admission that could result in

13   consequences without an interpreter; is that right?

14            MR. WEAVER:  I'm going to object to the

15   extent that you're assuming that ASL is Ms. Hill's

16   only language.  You've just shown some handwritten

17   notes using English where she communicated in

18   English.  So you're misstating and omitting

19   pertinent facts.

20            MS. SHRADER:  We can agree to disagree as

21   to whether or not those sentences are written in --

22   in English or written using English words.

23            MR. WEAVER:  Well, hang on a second.

24            MS. SHRADER:  That's another issue in the

25   case.

1                        ADAM ROPER

2    BY MS. SHRADER:

3         Q    My question stands, Officer Roper.

4              MR. WEAVER:  Well, how could you say they

5    weren't written in English, you just read them to

6    him?

7              MS. SHRADER:  I read English words off of

8    a page.  Were they written in grammatical English?

9    Absolutely not.

10             MR. WEAVER:  A lot of people don't use

11   proper grammar but that doesn't mean they don't

12   speak English.

13             MS. SHRADER:  Again, that's an issue of

14   fact for the case going forward.  That doesn't

15   negate my question.

16   BY MS. SHRADER:

17        Q    Officer Roper, you had access to an

18   interpreter.  You had access to LanguageLine.  In

19   fact, you used it with Ms. Hill earlier in the day.

20             The laptop was sitting there next to you.

21   LanguageLine was booted up.  You could have easily

22   gotten an interpreter on the line, but instead you

23   decided and chose to have Ms. Hill sign this

24   document without explaining to her potential

25   consequences of the signature using an interpreter?

1              ADAM ROPER

2          MR. WEAVER:  Objection, assumes,

3   misstates and omits pertinent facts.  And also is

4   compound.

5          You can go ahead and answer if you're

6   able.

7     A    Okay.  I'm sorry, I paused because you

8   were talking.

9          I -- I did not use LanguageLine.  Could I

10  have used LanguageLine?  Yes, I could have used

11  LanguageLine.  We were in a conversation writing,

12  and I guess at that time I felt comfortable with

13  the fact that she understood what was going on with

14  -- with what we had communicated through writing.

15         She showed zero -- she was very adamant

16  about not only using -- she was using her voice,

17  which I didn't use, I used the writing.  She was

18  very animated about the situation.

19  BY MS. SHRADER:

20    Q    And is it possible that she was agitated

21  and animated and upset because she was having

22  trouble communicating and expressing herself to you

23  without the interpreter?

24    A    I believe that she was agitated

25  because --

1                    ADAM ROPER

2              MR. WEAVER:  Hang on.

3       A    -- she knew she was going to go to jail.

4              MR. WEAVER:  Hang on.  Objection, calls

5    for speculation.  It's also argumentative.

6    BY MS. SHRADER:

7       Q    You can answer.

8       A    Go ahead?

9       Q    Yes.

10      A    I believe that she was agitated because

11   she knew there was a possibility of going to jail.

12      Q    And Officer Roper, if we are to believe

13   your testimony, she knew the possibility of going

14   to jail prior to voluntarily submitting to the drug

15   screen that you asked her to take, correct?

16      A    The comment was made, yes.  I don't --

17      Q    And -- and she complied at that time,

18   correct?

19      A    To do the drug screen?

20      Q    Yes.

21      A    Yes, she did.

22      Q    And that was when she had an interpreter?

23      A    Yes.

24      Q    And she came back into the room.  And in

25   fact, from your case note, it sounds like she was

1              ADAM ROPER

2    ready to be arrested, she put her wrists out for

3    you to handcuff her, correct?

4        A     Yes, but it was not determined that it

5    was -- it was going to be an arrest at the time.  I

6    was trying to figure out what steps were going to

7    be -- I was going to be told to take forward.

8        Q    So at that point, even though you knew

9    she had used, you weren't sure whether or not she

10   was going to be arrested; is that right?

11       A     Not only that, but to make sure I

12   properly arrested her, there was -- there was that

13   concern, too.  I didn't want to make it impossible

14   for her to communicate knowing that her hands were

15   what -- what she needed to communicate.

16             So I was waiting for the instructions on

17   what to properly do.  And she, yes, came forward

18   with her hands out to -- for me to arrest her.

19       Q    So at that time when she knew that she

20   was likely to be arrested, in fact, she was putting

21   her hands out for you to arrest her, she was

22   complying, correct?  She's saying, here you go,

23   here are my hands, handcuff me, right?

24       A    I mean, I wouldn't say complying, just

25   due to the fact that I never told her she was under

1                    ADAM ROPER

2   the screen share.

3        A    It was her -- her body demeanor, her --

4   her voice.  Like it was very -- very assertive.

5   You could tell just by looking at her face that she

6   was very, very frustrated.

7   BY MS. SHRADER:

8        Q    And that's the moment that she came back

9   from the drug test, she looked frustrated?

10       A    Yeah, she stormed straight in and threw

11  her hands out and said, let's -- you know, arrest

12  me.  Or that's not exactly what she said, I don't

13  remember the exact words, but that was what she was

14  insinuating.

15       Q    And in your case note, you, in fact,

16  write that she became agitated and angry after

17  signing the form; is that right?

18       A    Yes.

19       Q    Okay.  So according to your case note,

20  she didn't become agitated and angry until after

21  she signed that consent form, correct?

22       A    Well, I'm using your definition of

23  agitated.  When you say she came in with her hands

24  out, arrest me, that wasn't like, okay, well, let's

25  go to jail, it was more of like let's go.

1                     ADAM ROPER

2             All right.  So we can, I guess, define

3    agitation all day.  It wasn't a sign of submission

4    that was my point.

5             Maybe me using the word "agitation" is

6    inappropriate.  But what I'm saying is, it wasn't

7    compliant, it was more of maybe sarcasm.  I'm not

8    exactly sure, but it wasn't compliance.

9        Q    But you don't know because you didn't

10   have the interpreter there to communicate with her,

11   right?  All you could do is try to read her body

12   language?

13       A    Correct.  And she -- she does -- she does

14   communicate.  I wouldn't say well, but she does

15   communicate with her words.  So I can get a general

16   sense of the situation by her -- by when she speaks

17   verbally -- or audibly.

18       Q    Have you ever had any training in terms

19   of like deaf auditory communication with people who

20   have auditory loss?

21       A    No.

22       Q    In terms of like the quality of their

23   speech, the intonation of their voice, the volume

24   of their voice, are those things that you have had

25   training on or even thought about in terms of

1            ADAM ROPER

2    communicating with a deaf or hard of hearing person

3    orally?

4        A    I have not had any training on that, no.

5        Q    Would it make sense to you that a deaf

6    person who cannot hear their own voice may speak

7    louder or quieter then an average person speaking

8    simply because they can't hear the volume and

9    modulate the volume of their voice?

10       A    I would say that assumption was not based

11   off just one thing, it was based off body language.

12   Yes, okay, the -- the voice, you know, how -- how

13   -- how she came into the room, a variety of -- a

14   variety of things.

15       Q    And when she left the room to go with

16   Officer Johnston, there was no interpretation for

17   any -- that interaction, to your knowledge,

18   correct?

19       A    I informed her what was going to be

20   occurring.  And then Officer Johnston would either

21   have told her to submit to a drug screen and she

22   was familiar with the process.  She had done one

23   before.

24       Q    So it's fair to say that there was not

25   communication access for Ms. Hill during that time

1                    ADAM ROPER

2    either, correct?

3        A    Correct.

4        Q    Okay.  And so -- and then -- and back to

5    your case note, you note that after signing the

6    form that you put in front of her without an

7    interpreter, after she had this back and forth

8    writing conversation with you trying to express

9    herself, she then became very agitated and appeared

10   to become angry?

11       A    That's correct.

12       Q    And you didn't think that perhaps her

13   agitation had to do with the fact that despite the

14   fact that you had the ability to have an

15   interpreter there, you refused to provide her with

16   the interpreter and instead forced her to

17   communicate with you through written notes?

18            MR. WEAVER:  Objection, misstates

19   evidence, assumes facts not in evidence, omits

20   pertinent facts.  And also, it's repetitive.  It's

21   asked and answered and it's argumentative.

22       A    All right.  Yes, LanguageLine was

23   available.  Yes, I guess I could have used it, but

24   with the situation -- what my -- what my goal at

25   that moment was, is I was trying to get the

1            ADAM ROPER

2    information to be able to formally address her with

3    what was going to happen next.

4            Sitting there -- and I had wanted to -- I

5    did not want to partake in anything to do with

6    making her believe she was going to be arrested to

7    agitate her more.

8            I wanted to make sure that when I spoke

9    with her I was prepared with what was going to

10   occur and it was all -- I didn't want to sit there

11   and argue with her, whether it be on paper, through

12   LanguageLine, I just wanted to make sure that the

13   next step was what we were -- how we were going to

14   act to the positive drug screen.

15           She knew that she was positive and that

16   she -- and I think that was clearly stated to her.

17           And that downtime in the office was

18   waiting for what was going to happen next, and not

19   -- not necessarily to have an argument with her.

20   BY MS. SHRADER:

21       Q    But during what you're calling downtime,

22   you had her sign an admission form, right?

23       A    Correct.  Correct.

24       Q    So it wasn't exactly downtime, there was

25   actually something of legal significance happening?

1                         ADAM ROPER

2        A    Correct.

3        Q    And if I recall before your conversation

4    with Chief Hilliard, she told you that Ms. Hill

5    required sign language interpreters and -- except

6    for -- for very informal communication, like

7    introductions, chitchat, things like that before

8    you could get an interpreter, right?

9        A    That's correct.

10       Q    And in fact, when Chief Hilliard came

11   into the room, she booted up LanguageLine, right?

12       A    Yes, she turned the button on because we

13   were prepared for what was going to happen next.

14       Q    And she started to explain to Ms. Hill,

15   using the interpreter, that she was going to be

16   taken into custody; is that right?

17       A    That's correct.

18       Q    And Ms. Hill began to attempt to sign

19   back with the interpreter to communicate; is that

20   right?

21       A    One moment.  I need to pull back up the

22   case note.

23            Yes, that's what the case note says.

24       Q    And you were attempting to handcuff her

25   while Chief Hilliard was explaining what was

1                    ADAM ROPER

2    happening through the interpreter; is that right?

3              I'm sorry, I think you're frozen.

4      A    I lost signal.  Yeah, I lost signal.

5              Can you start over with whatever you

6    said?  Did you hear my --

7      Q    No, I'm sorry, I didn't.

8      A    I apologize.  Yeah, my internet did

9    something.

10              I said that, yes, that's what the case

11   note states that happened, yes.

12     Q    And you were at that point attempting to

13   handcuff Ms. Hill while Ms. -- while Chief Hilliard

14   was explaining to her what was happening; is that

15   right?

16     A    I believe what happened is when we were

17   explaining to her what was going to happen, the --

18   the agitation, she kind of snapped and she said,

19   all right, let's go.

20              I was trying to handcuff her in the

21   front, and if I can remember correctly, I don't

22   think I had the handcuffs on her and she went to

23   the door, not to run away, but just like let's go

24   to the car.

25              And she -- before -- before us having

1                   ADAM ROPER

2    like hands on her, she -- she stepped that way.

3    And we were like, whoa, whoa, whoa, you need to

4    come back.

5              And then in front of the front door,

6    that's when the handcuffs were placed on her.

7              So the LanguageLine interpreter was in

8    the middle of explaining and she -- she was just

9    like let's go.  And just -- again, not -- not run,

10   not -- I don't think -- I'm not accusing her to try

11   to run off from us, she was just like let's go to

12   the car and let's get this over with kind of.

13             That's not a verbatim quote, but that's

14   just the general sense I got.

15   Q    And she was trying to sign with the

16   interpreter while you were trying to handcuff her.

17   And so you kind of had to -- to pull her hands in

18   because she was trying to sign with the interpreter

19   while you were -- were handcuffing her; is that

20   right?

21   A    At that point we had explained it

22   thoroughly to her through the interpreter.  She was

23   sitting in a chair in front of LanguageLine.

24             And so it was communicated to stand up,

25   we're going to place the handcuffs on you, and then

                        ADAM ROPER
1

2  know, at any appropriate time there's an

3  interaction.

4      Q    And what do you mean by "any appropriate

5  time"?

6      A    You know, when you're arresting someone,

7  you know, it's not exactly an appropriate time to

8  be holding LanguageLine up in front of them to make

9  sure it's communicated.

10           But, you know, what being an appropriate

11  time to use LanguageLine.  In the middle of a drug

12  screen, that would be -- that would be a violation.

13           You know, there's certain circumstances

14  that it would not be appropriate.

15      Q    So in terms of -- you just said that

16  during an arrest and during a drug screen, that

17  LanguageLine would not be appropriate.  Can you

18  elaborate on that?

19      A    Yeah.

20      Q    Let's first start with an arrest.

21      A    Not -- not exact -- not during the entire

22  process of an arrest, but when placing handcuffs on

23  the person, you know, holding LanguageLine in front

24  of their face, at that moment while placing the

25  handcuffs on, is not an appropriate time to be --

1                    ADAM ROPER

2    you know, we can't -- can't place handcuffs on with

3    one hand.

4            So, you know, think -- you know, that

5    there's certain times it's not -- it's not

6    practical or reasonable to use at that -- in those

7    particular -- in some particular moments.

8        Q    And what is the policy then as to how to

9    ensure effective communication during, for example,

10   an arrest?

11       A    Well, when we performed the arrest with

12   Ms. -- Ms. Hill, we explained the process to her

13   beforehand, placed the handcuffs on, and obviously

14   there were some -- some issues in between.

15           And then allow that -- if -- if -- if

16   deemed appropriate, there's no struggle, there's

17   no -- no noncompliance, then continue to use the

18   LanguageLine until trans -- you know, until we

19   transport.

20           And obviously, I can't use a device and

21   -- and drive a vehicle at the same time.

22       Q    So it sounds to me that your concerns

23   revolve around your ability to maneuver the device

24   with your hands while trying to do tasks like

25   handcuffing or drive a vehicle; is -- is that fair?

1                    ADAM ROPER

2      A    Yes, I don't think it's a practical time

3  to use, correct.

4      Q    And in terms -- so in terms of freeing up

5  your hands, what training have you received on when

6  it's appropriate to bring in a live in-person

7  interpreter?

8      A    I've not been -- I've not discussed a

9  live in-person interpreter.  I imagine if there was

10  a scenario where something was -- you know, a need

11  was met, I would go to my supervisor about it and

12  follow -- follow what -- what she says.

13            If LanguageLine --

14      Q    So --

15      A    If LanguageLine didn't work, then, you

16  know -- or if there's something about it didn't

17  work and I can't think of an example, I would

18  present that to my supervisor.

19            So I don't -- I don't know that -- I

20  don't know that answer.

21      Q    So, for example, when you're going to

22  meet with someone at a jail and you're meeting with

23  them with a pane of glass in between you and having

24  to hold a computer up for 22 minutes with your

25  hands while trying to read a document, that's not a

1                   ADAM ROPER

2    circumstance in which you think it might be

3    appropriate to bring in an in-person interpreter?

4         A    I think the appropriate actions would

5    have been to have me sit face to face with her with

6    a table in between as I would have had here in the

7    office to allow me to have easier accommodations

8    with her.

9              So, having a live interpreter or

10   LanguageLine, you know, it's not -- I don't think

11   that was the issue.  I think it was just the

12   accommodations.

13        Q    Right.  But you didn't have the

14   opportunity to sit with her face to face.  You were

15   sitting with her with a pane of glass between you.

16   So that was the circumstance you had.

17             You could have, like you said, sat with

18   her in a private room face to face and used the

19   computer so that would be easier for her to see and

20   for you to use.

21             But because that didn't happen and you

22   had a pane of glass between you, at that point you

23   didn't think that perhaps it might be helpful to

24   have a person there that would be easier to see

25   through the glass, there wouldn't be a glare, there

1                    ADAM ROPER

2    wouldn't be a light reflecting behind that person,

3    and you wouldn't have to hold up a computer screen

4    for 22 minutes to try to keep it level?

5        A    I mean, I --

6             MR. WEAVER:  Objection, compound, calls

7    for speculation.

8             THE WITNESS:  May I continue?

9             MR. WEAVER:  Go ahead.

10   BY MS. SHRADER:

11       Q    Yeah, I'm certainly not asking for

12   speculation, I'm asking whether or not you thought

13   about that.

14       A    Of course, sure, I thought if there were

15   -- I'm sure there are easier ways.  I did -- at the

16   end, I did -- I feel, I thought, effectively

17   communicated what I needed to communicate with her.

18   And that's on camera.  And she -- she agreed to the

19   consent order and sign, so.

20             And I felt like I -- you know, it did

21   take me a little longer and it was uncomfortable,

22   but I did feel like I got the message across

23   effectively.

24       Q    Well, I -- I want to talk about that for

25   a minute.  Because you told us before that your

1               ADAM ROPER

2    practice in terms of the consent order is to read

3    it verbatim to the person before the person is

4    asked to sign it; is that -- is that right?

5         A    Sure, yes.

6         Q    And that you read each and every part of

7    that consent order, and we talked about -- and let

8    me just look back.  I think you said there were

9    four or five different parts to it and I had it

10   written down here.

11              The first part being their original

12   charges.  The second part being the violation.  The

13   third part being what the punishment is.  The

14   fourth part being that verbiage you talked about

15   that you couldn't quite recall what it was.  And

16   then the last part being the signature.  Is that

17   right, those five parts?

18        A    That is correct.  I mean, it -- and it

19   really varies by circumstances due to the fact

20   that, you know, I will -- I will ask -- I will ask

21   them.  Sometimes they don't want to listen to it.

22   They don't -- they don't have patience for it.

23   They know their sentence.  They don't care.

24              And so I -- I make sure I acknowledge the

25   fact that this is there, this -- you know, I -- I

1                    ADAM ROPER

2    am reading the violations of the sentence above,

3    would you like to know what the -- do you know what

4    the sentence above is?  Would you like me to read

5    it to you?  And a lot of -- some -- many times, no,

6    I don't care, I don't want to hear it.

7              So, you know, it is -- it is a practice

8    for me to ask and it is a practice, you know, to

9    make sure that it's -- it's there for -- it's there

10   for them if they want.

11        Q    And do you also explain to them what it

12   is that you're reading from, what that document is?

13        A    Yes.

14        Q    And you told us earlier that that video,

15   the body cam video, reflected everything that

16   happened during that interaction you had with

17   Ms. Hill; is that right?

18        A    That's correct.

19        Q    So during that interaction with Ms. Hill,

20   you -- you go in and you knock on the glass to get

21   her attention, it takes you a little bit of time,

22   you've booted up LanguageLine, you have an

23   interpreter on screen; is that right?

24        A    That's correct.

25        Q    And you start reading from the document;

```
 1                    ADAM ROPER
 2   is that right?
 3        A    I'd like to pull up my case note first,
 4   which I have.
 5                (Witness reviews document.)
 6                Okay.  Would you repeat the question?
 7        Q    So you went into that room where you were
 8   on one side of the glass and she was on the other
 9   and you booted up the LanguageLine on the laptop
10   and you -- you knocked on the glass to get her
11   attention because she was looking down; is -- is
12   that right?
13        A    I don't have the body cam footage in
14   front of me, so I'm going to have to say if that's
15   what's on the video, then yes.
16        Q    And you start reading the -- the consent
17   order to her; is that right?
18        A    I do remember reading it to her, yes.
19        Q    Okay.  And you read to her that first
20   part about her charges --
21        A    Okay.
22        Q    -- first; is that right?
23        A    Yes.
24        Q    And then she asks you some questions
25   about the charges because the first, I think, 9 or
```

1                    ADAM ROPER

2    10 of them apply only to the co-defendant.  So

3    she's confused and asking questions about the

4    charges because she's like I -- what are you

5    talking about?  I didn't do that.

6              I think you tell her they apply to the

7    co-defendant.  She didn't know what that meant.

8              So she asked you some more questions and

9    you eventually say "your husband," to try to help

10   her understand; is -- is that right?

11       A    I do remember that conversation.  The

12   specifics, I don't, but I do remember the

13   confusion, yes, I do.

14       Q    And so after you kind of get past that

15   confusion about the charges, you move on to the

16   violation; is that right?

17       A    I believe I read the charges and also the

18   conditions as well.

19       Q    Yes, yes.

20              And then after reading the charges and

21   the conditions, you move on to the piece about what

22   it is that she has -- has not done, what --

23       A    Correct.

24       Q    -- condition she has not met?

25              And in that consent order, you included

1                     ADAM ROPER

2    two conditions that she had not met, the first

3    being that she had tested positive for THC, and the

4    second being that she had not completed her

5    community service; is -- is that correct?

6         A    Correct.

7         Q    And at that time she says to you -- and

8    actually, before that the interpreter tells you

9    that they're having trouble seeing each other, you

10   try to make some adjustments; is -- is that right?

11        A    I believe that happened I think twice.

12        Q    And she's confused at that point about

13   the community service piece and why that's included

14   because she was told not to complete community

15   service during the COVID-19 pandemic because the

16   probation office was closed; is that right?

17        A    I don't know that answer because I wasn't

18   working here then.

19        Q    But did Ms. Hill express to you confusion

20   about the community service being included as a

21   violation?

22        A    I do remember a conversation about the

23   community service work and why I added it to the --

24   the consent order, yes.

25        Q    Why did you add it to the consent order?

```
1                    ADAM ROPER

2       A    Well, if you remember back in the

3  conversation during the arrest I asked for medical

4  documentation to ex -- to be able to exclude her

5  from doing the required 16 hours a month.  So,

6  therefore, I -- it's going to -- it's going to pop

7  up as a case review for me.

8            And something my supervisor is going to

9  ask why it's not being -- why it's not done yet in

10 the -- in the allotted amount of time.

11           The sentence reads that it has to be done

12 in 365 days.  So therefore, it wasn't completed in

13 a timely manner that it should -- or being

14 completed in a timely manner it should have been.

15           So I have to add it as a violation

16 because technically it is a violation.

17      Q    So I'm going to refer us back to

18 Exhibit 112, the case notes.  And I know you're

19 pulling them up on your computer so I'm going to

20 ask you to pull up a case note from 10/26/2020.  It

21 says Specific Case Action, Informal, Manager's

22 Comments, and it was entered by your supervisor,

23 Shannon Hilliard.

24           It starts out "Warrant prepared by CSO

25 Roper."  Do you see that?
```

1                    ADAM ROPER

2      A    Yes, there.

3      Q    "Warrant prepared by CSO Roper on Forsyth

4  Docket reviewed and approved this date.  CSW," that

5  stands for community service work; is that right?

6      A    Correct.

7      Q    -- "violation removed as COVID has

8  delayed the performance of hours and the Defendant

9  has completed more hours than are currently posted,

10  so the amount reflected is not factual."

11          Do you see that?

12      A    Yes, I do.

13      Q    Did you review that entry by your

14  supervisor?

15      A    Well, I can say that, yes, that would

16  look like it's a mistake, but that doesn't --

17  didn't change the fact that the positive drug

18  screen still has the same -- same disposition

19  whether the community service was on there or not.

20      Q    Well, right now we're not talking about

21  the drug screen, we're just talking about the

22  community service.

23          So you see -- you see there that your

24  supervisor who had previously supervised Ms. Hill

25  is indicating that, in fact, it's not a factual

1                       ADAM ROPER

2      allegation --

3           A     Okay.

4           Q     -- in terms of the community service

5      work.

6           A     Right.

7           Q     Do you see that?

8           A     I acknowledge I made a mistake.

9           Q     Okay.  And I'm going to refer you back

10     also to a case note dated -- give me just a second

11     to get the date -- 8/21/2020.  And it says

12     telephone contact.  And it's entered by again

13     Shannon Hilliard, your supervisor.

14                Do you see that -- that case note?

15          A     I am there.  Got it.

16          Q     "Defendant called via assistance of relay

17     service.  Defendant reports that she is out of work

18     for 3 days while awaiting her COVID results as she

19     was exposed.  Defendant continues to work at

20     McDonald's and intends to return.  Defendant

21     continues to reside with and care for her in-laws.

22     Defendant went to the ER this week due to stomach

23     pain which she believes is a result of her hernia.

24     She was prescribed amoxicillin and was granted

25     permission to take it.  Defendant normally performs

1                     ADAM ROPER

2   community service in the DCS office and was advised

3   to continue to hold off due to her situation and to

4   COVID in general."

5            Do you see that?

6   A    Yes, I do.

7   Q    Okay.  Before today, had you reviewed

8   that case note?

9   A    No.

10   Q    So were you aware prior to today that not

11   only had Ms. Hill been exposed to COVID-19, but

12   also that your supervisor had told her to hold off

13   on performing her community service work because of

14   the pandemic?

15   A    No, but I was aware as of April she sent

16   me a photo of the actual surgery.  And that was --

17   again, I was looking for medical documentation from

18   a doctor as a work excuse to formally excuse her of

19   it.  That would be something that I could submit to

20   the judge with the proper documentation to have

21   that excused.

22            And I had made that request, but

23   obviously, the end result didn't allow her to go do

24   that.

25   Q    And I want to refer you now to a case

1                      ADAM ROPER

2    note dated June 7th, 2020.  So this is the case

3    note that immediately precedes the August 21st,

4    case note.

5               And it's a field-to-field interaction

6    with video and it's entered by Nadiene Junius.

7         A    All right.

8         Q    "Late Entry: Video interaction was

9    conducted on June 4th, 2020.  No contact with law

10   enforcement.  No drugs or alcohol.  Confirmed

11   residence and still resides at address in portal.

12   Lives at residence with her in-laws and

13   brother-in-law.  No contact with the victims on her

14   case.  Confirmed employment and still employed with

15   employer in portal.  Talked about CSW."

16              Again, that's community service work; is

17   that right?

18        A    Correct.

19        Q    "And when she will be able to come in

20   office and do CSW.  Informed offender I will have

21   to look into it and let her know.  Everything

22   checks out fine with offender.  Next report date is

23   August 21, 2020."

24              So you see, again, her that Ms. Hill is

25   inquiring when she can come back and to do

1            ADAM ROPER

2       Q    Yes.

3       A    -- 2020?  No, I had not.

4       Q    Okay.  So is it fair to say that there

5  are multiple points in the record where Ms. Hill is

6  told not to come into the office to do her

7  community service due to the pandemic, and that

8  she's told that she will hear back from the

9  probation office as to when she can return?

10      A    Yes, she was doing community service the

11 day that she reported.

12      Q    And in fact, the last case note before

13 you take over her case is the case note dated

14 8/21/2020 in which Shannon Hilliard told her to

15 continue to hold off doing the community service

16 due to COVID; is that correct?

17      A    Yes.

18      Q    So if you had read the case notes leading

19 up to you taking over Ms. Hill's caseload, you

20 would have known that she, in fact, wasn't

21 performing community service because your office

22 told her not to, correct?

23      A    Correct.

24      Q    And if you had read the case note

25 inserted by your supervisor, you would have known

1          ADAM ROPER

2    that the -- that, in fact, Ms. Hill had completed

3    more than two hours of community service and that

4    the allegation that she failed to comply was

5    factually inaccurate, correct?

6        A    Correct.

7        Q    And you, I believe testified before that,

8    at least during your training, you didn't receive

9    any training requiring you to read through the case

10   notes when you take over supervision of a new

11   supervisee?

12       A    I'm not sure how to answer that question.

13   It's very broad.  I do review many things when I --

14   when I do that.  Obviously, in this situation I did

15   not read that, but there's many things to review

16   when it comes to preparing these things.

17            So do I not do any research before I do

18   it, is that what you're asking or just in general

19   the case notes?

20       Q    No, I'm talking specifically about these

21   narrative entries in the case notes from the

22   previous supervisors.

23            Does DCS have a policy requiring you to

24   review them when you take over supervision of a new

25   supervisee?

1                    ADAM ROPER

2      A    I don't have that answer.  It could be

3  somewhere, I don't know.

4      Q    To your knowledge?

5      A    I don't know.

6      Q    Are you aware of a policy --

7      A    I am not.

8      Q    -- that requires you to read those case

9  notes?

10      A    I am not aware of the policy, no.  I

11  couldn't name it to you if there was one.

12      Q    And just to be clear, that consent order

13  was filed with a judge; is that correct?

14      A    Yes, in the clerk's office.

15      Q    So there is currently a consent order on

16  record with the court that your office knows has

17  factually inaccurate information in it; is that

18  correct?

19      A    She did not complete the -- the community

20  service work so -- when she was performing it that

21  day.

22           So as for the specifics, you know, you're

23  telling me that back in January, all the way into

24  August, that she was told that she didn't have to

25  and to refer back.

1              ADAM ROPER

2           Clearly something was said because I

3   doubt she came straight in and just decided to do

4   community service work that day without talking to

5   someone first.

6           But there wasn't -- and I looked to this

7   moment.  Although, there is a case note, I don't

8   see any -- let me make sure I'm correct on this --

9   I don't see any medical documentation saying that

10  she's unable to work.

11          So yes, even if there was a case note, I

12  still would have the question of when does -- when

13  does it start, when does it end, when is she

14  better.  And that's -- that's on her to provide to

15  me on when she's better.

16          And I don't -- I don't know -- I don't

17  know, you know -- there's -- there's so many

18  questions that's involved in just that one answer.

19  So -- or the answer you're seeking.  So I don't

20  know -- I don't know how to answer that.

21     Q    Okay.  So just to be clear, your

22  supervisor told her to hold off on community

23  service due do COVID-19 in general.  And that's

24  noted several times in the case notes.

25          Is it true that your office was closed

1                    ADAM ROPER

2    for a period of time during COVID-19?

3        A    I don't know.  I didn't work here.

4        Q    And your testimony today is that despite

5    the fact that your supervisor, your boss, told her

6    to hold off on doing community service, that's not

7    sufficient documentation for you; is that correct?

8        A    No, I didn't say that.  I said that I

9    made a mistake on it.

10        Q    Okay.

11        A    And I said when it come to the warrant.

12    I admitted the mistake already.

13             But when it comes -- when it comes to the

14    knowledge of knowing that somebody -- somebody made

15    a note from such and such time frame, yes, the --

16    the -- in the warrant or in the document -- the

17    case note acknowledging the warrant, yes, it does

18    say that.  So I admit that was a mistake.

19             But to say that a case note back in

20    August is sufficient to say that somebody doesn't

21    have to do community service work that many months

22    ahead without any proper medical documentation,

23    that -- that -- yes, of course, that's -- that's

24    not a sufficient way.  But yes, I acknowledge the

25    case note reads what it reads.

1                    ADAM ROPER

2              But if you're saying just as in general,

3    if that case note didn't exist, I would need

4    medical documentation to prove it.  And if she

5    provided to me mow or wanted to do a contested

6    hearing, then there would have been opportunity for

7    her to -- to prove that, but I didn't have it.

8        Q    But at no point did you tell Ms. Hill

9    that she had the right to have a contested hearing

10   when you met with her, did you?

11       A    I can't remember that.

12       Q    Right.

13       A    I would have to -- I would have to review

14   the video.

15       Q    And -- and we'll get there.  We'll pull

16   it up because you didn't.

17             And my question, though, to you was that

18   the consent order that you filed with the judge

19   says that she's completed two hours of community

20   service, that she is 38 hours of community service

21   in arrears.

22             Your office knows that information to be

23   factually inaccurate; isn't that right?

24             MR. WEAVER:  Objection, asked and

25   answered.  I mean, why are you beating a dead

```
 1                    ADAM ROPER
 2   horse?
 3            MS. SHRADER:  Well, I don't believe he's
 4   answered this question, George.
 5            MR. WEAVER:  I think he has.
 6            Go ahead.
 7       A    I acknowledge the fact that I made a
 8   mistake.  Did my office know?  Did they knowingly
 9   put it on a consent order to punish her?  No, that
10   did not -- that did not occur.
11            I did not -- I did not do that on
12   purpose, it was a mistake and I -- I acknowledge
13   it.
14   BY MS. SHRADER:
15       Q    Okay.  And that document remains on
16   record with the court, correct?
17       A    Yes, it does.
18       Q    Between October -- or November 3rd, when
19   you filed that document with the court and today,
20   your office has made no effort to correct the
21   record with the judge; is that right?
22       A    That's correct.  Not to -- not to my
23   knowledge.
24       Q    And I know that you -- you made a comment
25   before saying she came in the morning of October
```

1                     ADAM ROPER

2    26th when she was supposed to meet with me and

3    perform community service that week.

4              So she must have talked to someone

5    between August and then to know that she could come

6    in that morning to perform community service; is

7    that what you just testified to a few minutes ago?

8        A    I -- I assume so.  I don't know why she

9    would just come in and do community service work.

10       Q    So I'd like us to pull up document 109 --

11   Exhibit 109 again, the text messages between

12   yourself and Ms. Hill.

13       A    Okay.  I have them up.

14       Q    Let's scroll it down.  Do you see that

15   message right there?

16       A    Yes.

17       Q    "Can I come in at 8 a.m. to do community

18   service on Monday morning?"

19       A    Correct.

20       Q    And you responded, "Okay."

21       A    Yes, I do.  I guess the answer should

22   have been yes.

23       Q    So -- so the person that she talked to

24   about coming in to do community service on October

25   26th, 2020, was you, sir; is that not right?

1                    ADAM ROPER

2       A    But I had no prior knowledge of anything

3  -- of any of the situation.  I had no prior

4  knowledge of the injury.  So I made that -- I'm not

5  going to tell her no.

6            Yes, I'm going to answer yes.  Somebody

7  wants to come in and do community service work, by

8  all means, yes.

9       Q    You can take the exhibit down, please.

10           So -- and the reason you had no knowledge

11  is because you didn't review the case notes?

12      A    Correct.

13      Q    Okay.  And just taking a look at the case

14  notes, it appears that Ms. Hill has had four

15  community supervision officers between the time

16  when she was put on supervision in November of 2019

17  and now; is that accurate?

18      A    I don't know because they could have come

19  in and she could have seen the officer in charge of

20  the day.  I don't know how many times she's been

21  assigned.  I have no clue.  She could have seen --

22  it could have just been a female that she saw.  I

23  have no idea.  That would be not a question I can

24  answer.

25      Q    So it appears that -- so I guess let me

1          ADAM ROPER

2     Q    So it would be fair to say that you don't

3  have much information at all about her history on

4  supervision until you took over her case in

5  October; is that right?

6     A    That -- that's correct.  That was part of

7  the reason of calling her in is to review her case

8  and to speak with her about any issues I have.

9     Q    And in fact, this was really your first

10  interaction with her, aside from those text

11  messages, where she asked you if she could perform

12  community service?  She initiated that

13  conversation, correct?

14     A    The community service conversation, yes,

15  yes, she did initiate that question.

16     Q    Just one moment.

17          So I want to take a look actually because

18  we've kind of talked about two different documents

19  here.  We talked about the warrant and then we've

20  talked about the consent order.

21          So I want us to first take a look at the

22  warrant.  And I -- before we pull it up, I have a

23  couple of questions.

24          You arrested Ms. Hill that day on October

25  26th in your office based on the positive tox

1                    ADAM ROPER

2    screen for THC; is that right?

3        A    Correct.

4        Q    And you then later filed a warrant for

5    her arrest, why?

6        A    I arrested her on a 48-hour hold, and I

7    replaced that 48-hold in the jail with a warrant.

8             MS. SHRADER:  So I'd like us to pull up

9    and mark as Exhibit 115 the warrant.

10            (Deposition Exhibit 115 marked.)

11   BY MS. SHRADER:

12       Q    Is this the warrant that was filed the

13   following day with the judge?

14       A    I believe I submitted it and it had to be

15   approved by my supervisor.  So I submitted it the

16   day of, but it didn't make it through to the judge

17   until a day or two after.  I'm not exactly -- the

18   27th, yes, so the next day.

19       Q    And I noticed that the warrant says that

20   the -- that Ms. Hill admitted to prior use on or

21   about 10/25/2020.  Do you see that?

22       A    I do.

23       Q    Okay.  Let's pull back up the admission

24   form which I believe is Exhibit 114.

25       A    All right.

1              ADAM ROPER

2      Q    So this admission form indicates that the

3   admission was to use on 10/12/2020.  Was that a

4   typo in the warrant?

5      A    Let me see.  Yeah, it looks like it is.

6      Q    And I notice the warrant itself, it looks

7   like Chief Hilliard removed the community service

8   piece from the warrant that was submitted to the

9   court, but it still made its way into the consent

10  order.  Can you explain that?

11     A    I admitted that that was a mistake.  And

12  I -- you know, I don't know what else to say about

13  it.

14          MS. SHRADER:  So let's pull up the

15  consent order and let's mark that as Exhibit 116.

16          (Deposition Exhibit 116 marked.)

17  BY MS. SHRADER:

18     Q    Just let us know when you're ready for --

19  for Ms. Center to scroll down.

20     A    I -- I got it here so it doesn't matter,

21  she can scroll down.

22     Q    Oh, okay.  Great.

23     A    We're good.

24          Okay.

25     Q    And you prepared this consent order; is

```
 1                   ADAM ROPER
 2   that right?
 3       A    Yes, I submitted it to my -- my
 4   supervisors for approval.
 5       Q    And then you met with Ms. Hill at the
 6   Forsyth County Jail to go over this warrant with
 7   her; is that right?
 8       A    That's correct.
 9       Q    Or I'm sorry, I think I said warrant, I
10   meant consent order?
11       A    Consent order, yes.
12            MS. SHRADER:  I think we can take the
13   consent order down.  Actually, can you scroll down
14   further on it, Claudia, I apologize.
15            Okay.  Go back up so we can see 4 and 5
16   on the screen.  Right there.  Perfect.
17   BY MS. SHRADER:
18       Q    4, right here, is that the verbiage that
19   you were referring to earlier?
20       A    Yes.
21       Q    Okay.  And I'm -- I'm going to read that
22   and you just let me know if what I've read is
23   accurate.
24            "By affixing my signature to this
25   document I am acknowledging that I understand that
```

1                     ADAM ROPER

2    I am entitled to a formal revocation hearing before

3    the sentencing Court and that I am entitled to

4    legal representation at said hearing.

5              I further understand that I have the

6    right to be represented by an attorney at said

7    hearing and if I cannot afford an attorney, one may

8    be appointed to me at no cost.

9              I understand that the purpose of the

10   revocation hearing is to allow the Court to

11   determine and adjudge whether or not the terms of

12   probation have been violated."

13             Did I read that accurately?

14        A    Yes, you did.

15        Q    Why is this language included in the

16   consent order?

17        A    So they deny the violations, and then,

18   therefore, they can -- they have a right to fight

19   those -- the accusations of those violations in

20   court.

21        Q    And it's included here to give the

22   individual -- to make them aware of their rights;

23   is that right?

24        A    Yes.

25        Q    And in 5, is this also part of the

```
 1                   ADAM ROPER
 2           MS. CENTER:  This is Claudia, Brittany's
 3   asked that I play the video while she's rejoining.
 4           (Recording stopped.)
 5           VIDEO TECHNICIAN:  Okay.  Let me just
 6   skip my recorder's stopped and then I'll get us
 7   right back on again then, okay?
 8           Was -- was that Brittany that was
 9   speaking?
10           MS. CENTER:  I'm sorry, this is Claudia.
11           VIDEO TECHNICIAN:  Claudia, okay.  Thank
12   you, Claudia, I'm sorry.  Okay.
13           MS. CENTER:  It will take me a moment in
14   any event.
15           VIDEO TECHNICIAN:  Okay.  Just let me
16   know when you're ready for me to take us back on
17   the record.
18           MS. CENTER:  I think we can go back on
19   the record.
20           VIDEO TECHNICIAN:  Okay.
21           MS. CENTER:  I will try to share the
22   video and I will try to advance over what we've
23   watch already.
24           VIDEO TECHNICIAN:  Okay.  Please stand
25   by.  I'll put us back on.
```

```
 1                    ADAM ROPER

 2            We're going back on the record.  The time

 3    is 5:16.

 4            THE WITNESS:  Is there volume?

 5            VIDEO TECHNICIAN:  This is the

 6    videographer.  Is there audio volume that should be

 7    audible from the audio clip?

 8            MS. SHRADER:  Claudia, you have to turn

 9    your sound on in order for us to be able to hear

10    the video that you're playing.

11            MS. CENTER:  I think -- my sound is on,

12    but I think I have to link the sound.  Is that the

13    issue?  Or do you just want it louder?

14            MS. SHRADER:  We couldn't hear anything.

15    I can try to put it back up on my computer, but I

16    can't guarantee that it won't cause me to get

17    kicked off again.

18            MS. CENTER:  Let me try -- I'm going to

19    click a couple of options here that may help.  Let

20    me go back a little.

21                (WHEREUPON, VIDEO RECORDING RESUMED.)

22            MS. SHRADER:  The sound is on.  Thank

23    you, Claudia.

24            Claudia, we can't see the video.

25            MS. CENTER:  I'm sorry.
```

1            ADAM ROPER

2            MR. WEAVER:  By the way, if you could

3  show the video at full screen.  You're not doing

4  that.

5            MS. CENTER:  Okay.

6            (WHEREUPON, VIDEO RECORDING RESUMED.)

7            (WHEREUPON, VIDEO ENDED.)

8  BY MS. SHRADER:

9      Q    Sir, now you have seen the entirety of

10  the body cam footage.

11            Would you agree with me that not once did

12  you tell Ms. Hill that this was a proposed consent

13  order?

14      A    Yes.

15      Q    And would you agree with me that not once

16  did you tell Ms. Hill that she did not have to sign

17  this form?  In fact, you told her she did have to

18  sign the form, right?

19      A    I said -- I discussed the violations.  I

20  never said you have to sign this.

21      Q    Well, wasn't one of the last things you

22  said to her "Just one more thing, I need you to

23  sign my copy of this paper before I go," isn't that

24  what you said to her?

25      A    If you want to break it down as saying

1               ADAM ROPER

2    that I forced her to do it, then, I mean, that's

3    your perception on it.  If she agreed to it, then I

4    needed her to sign it to be able to move forward.

5         Q    I'm simply asking you, sir, what you

6    said.  Isn't it true that you said to her "Before I

7    go, I need you to sign my copy of this form"?

8         A    Correct.

9         Q    Yes.  And you -- not once did you tell

10   her that she had the right to have a hearing and

11   tell her side of the story to the judge, correct?

12        A    That's correct.

13        Q    Not once did you tell her that she had

14   the right to an attorney, correct?

15        A    That's correct.

16        Q    Not once did you tell her that she had

17   the right to not sign the form and to ask for a

18   hearing before the judge, correct?

19        A    The words never came out of my mouth

20   saying you don't have to sign this.

21        Q    And in fact, you never told her that by

22   signing that form she was agreeing to the contents,

23   right?

24        A    You're saying that I didn't communicate

25   to her by signing the form that she was agreeing to

1                    ADAM ROPER

2    what contents?  All of it?

3         Q    Right.

4         A    I'm not sure if those words ever came out

5    of my mouth.  Sure, no.

6         Q    And you never informed her that by

7    signing that form she was waiving her right to

8    counsel, right?

9         A    I did not.

10        Q    And you never informed her she was

11   waiving her right to a hearing, right?

12        A    I did not.

13        Q    Okay.  And in fact, during that

14   interaction Ms. Hill told you that the community

15   service part of the violation was inaccurate,

16   right?

17        A    That's correct.

18        Q    And in fact, she had a story that she

19   wanted to tell about that, right?

20        A    That's correct.

21        Q    And you never told her that she could

22   tell that story to the judge, right?

23        A    That's correct.

24        Q    And earlier you told me that it is part

25   of your almost robotic process to read that

1                   ADAM ROPER

2  verbiage at the bottom of the consent order to

3  every one of the individuals who you meet with who

4  have an alleged violation to discuss the consent

5  order.  Do you recall giving that testimony?

6       A    I do not, but that was not a typical

7  situation.

8       Q    And can you explain that?  What do you

9  mean that wasn't a typical situation?

10       A    Just the chaos of that situation.  The

11  question -- the threatening to be sued, the -- the

12  complaint about not getting the rights that she

13  deserved, the conversation about communicating with

14  her family, the holding the computer, the reading

15  from the consent order, all that -- all that in

16  general did make the situation much different and

17  my mind went elsewhere.

18       Q    And so I just want to be clear.  All of

19  those things that you mentioned, the -- the threat

20  to be sued, that was because she didn't have

21  communication access; is that -- is that right?

22  That was what she was saying?

23       A    Yeah.  The jail didn't provide her any

24  way of making a phone call, yes.

25       Q    And the -- the holding of the computer,

1                     ADAM ROPER

2    that was because she's deaf, and again, an ADA

3    issue, wanting to ensure that there was

4    communication; is that right?

5        A     The holding of the computer because I

6    wasn't provided the table or something to use.  So,

7    yes, it can be related to a lot of issues.

8        Q     But what it ultimately comes down to is

9    that you wouldn't have been holding the computer

10   but for the fact that she's deaf and you needed a

11   way to communicate with her, right?

12       A     Correct.

13       Q     Okay.  And the conversation about her car

14   being towed and her inability to call her father

15   and make sure he could pick up her car, that was

16   also related to the fact that she was deaf and

17   didn't have communication access; is that right?

18       A     I don't know what happened in the jail

19   besides what was in front of me, so I don't -- I

20   represented those things to the command staff, so I

21   can't answer that question.

22       Q     What I'm talking about, though, is during

23   your conversation with Ms. Hill, what she was

24   articulating to you was a concern that she couldn't

25   call her father because she didn't have a

1                    ADAM ROPER

2    telecommunications device for deaf people, she

3    didn't have a way to contact her father because the

4    prison wasn't accessible for her as a deaf person;

5    that's what she told you, right?

6         A    Yes.

7         Q    Okay.  And I'm sorry, what were the other

8    things that you indicated were -- made the

9    situation chaotic?  I think there were a couple

10   more things you mentioned.

11        A    Let's see, I stated holding the laptop,

12   reading the consent order, threatening to be sued,

13   never had that one before.  The family issues that

14   she discussed.  I'm sorry, I don't know what else I

15   said earlier.  That's all I recall.

16        Q    So what it really boils down to is that

17   the circumstance was chaotic because Mary is deaf

18   and she was upset because she didn't have

19   communication access and was bringing to your

20   attention all of those things; the fact that she

21   couldn't communicate with her family; the fact that

22   her car had been towed because she didn't have

23   communication access and couldn't get her father to

24   go pick up her vehicle; the fact that she had lost

25   her job because she was incarcerated and that she

1                    ADAM ROPER

2    couldn't communicate that with her employer; the

3    fact that you were holding that laptop while you

4    were trying to read the form; all of those things

5    that made this interaction chaotic were because

6    Mary was deaf, right?

7         A    Yes.  I mean, I made this issue -- or

8    when -- as soon as I walked out that door, I went

9    straight to the command staff and told him what she

10   had said.  And they had said otherwise, that she

11   had been provided opportunity, but I don't --

12   that's as far as I took it.

13             And I said, "I just want to make you

14   aware of this situation."

15             And they stated that they had gone above

16   and beyond to try to get her opportunities.  So

17   that's -- that's what they said, that's their

18   hearsay, and I don't have any control over that.

19             But I tried to provide as best I could

20   with what her allegations were.

21        Q    But the end result is that Mary signed a

22   document that she knew was factually inaccurate,

23   that your office knows was factually inaccurate,

24   and that document was provided to the judge as an

25   order without her being advised of any of her

```
 1                    ADAM ROPER

 2  rights; is that right -- is that fair?

 3      A    Correct.

 4      Q    And in fact, as a result, she was

 5  incarcerated for 60 days; is that right?

 6      A    That's correct.

 7      Q    In a place where she indicated she had no

 8  communication access as a deaf person; is that

 9  right?

10      A    That's what she said, yes.

11           MS. SHRADER:  I don't have anything

12  further at this time.

13           MR. WEAVER:  Okay.  Let's take a -- just

14  a three-minute break and then I'll finish up.

15           If -- the videographer, is it John now,

16  could you put me in a private room with the

17  witness, Mr. Roper, and with Darrell Smith and

18  Shannon Hilliard.

19           VIDEO TECHNICIAN:  Yes, counsel.  Would

20  you like to go off the record?

21           MS. SHRADER:  Yes, please.

22           VIDEO TECHNICIAN:  We're going off the

23  record.  The time is 5:47.

24           (Recess taken.)

25           VIDEO TECHNICIAN:  We're going back on
```

1          ADAM ROPER

2          Let me ask you this:  As I probation

3   officer or community supervision officer, do you

4   have the authority or power to make decisions about

5   punishment, including modification of sentences or

6   revocation of sentences or the conditions of

7   supervision?

8      A    No, they are just strictly

9   recommendations to present to the judge.

10     Q    Okay.  And one more thing.

11  Communications in the courtroom between -- or

12  involving an offender, do you have any

13  responsibility or control as a community

14  supervision officer over the means and mechanisms

15  of communications that are used in the courtroom to

16  communicate with an offender who has a disability

17  involving -- involving communication?

18     A    No, I do not, not within the courtroom or

19  in the jail.

20     Q    Okay.  So when it comes to the jail, I

21  think you told us earlier in your deposition that

22  the sheriff in Georgia is in charge of the jail; is

23  that right?

24     A    That's correct.

25     Q    Okay.  In fact, I think you told that the

1                    ADAM ROPER

2     Forsyth County Jail which is run by the Forsyth

3     County sheriff, right?

4          A    That is correct.

5          Q    Okay.  So when it came to the

6     interactions you had with Ms. Hill, Plaintiff Mary

7     Hill, Forsyth County Jail back in the fall of 2020,

8     did you have any ability to control the

9     circumstances of those communications, including

10    being able to sit with her at a table in a -- in

11    the same room?

12         A    I requested them but was denied.

13         Q    Did you have any ability to overrule that

14    decision by the sheriff's office?

15         A    None at all.

16         Q    And is that why you had to show the

17    interpreter through the glass as we saw in the

18    video, Exhibit 117?

19         A    That is correct, that is why.

20              MR. WEAVER:  Okay, that's all I have.

21              MS. SHRADER:  I have just a few follow-up

22    questions based on your questions, Mr. Weaver.

23                    FURTHER EXAMINATION

24    BY MS. SHRADER:

25         Q    Mr. Weaver just asked you about whether

1                   ADAM ROPER

2  or not you were able to control where you

3  communicated with Mary within the jail, and you

4  indicated you requested a room without the glass

5  and you were denied; is that right?

6       A    That's correct.

7       Q    And you indicated that it was for that

8  reason that you had to use the video interpreter

9  through the pane of glass; is that correct?

10      A    That's correct.

11      Q    The Forsyth County Jail and the Forsyth

12 County Sheriff's Office did not tell you that you

13 could not bring a live, in-person interpreter with

14 you into their jail, did they?

15      A    No, I never asked.

16      Q    So they didn't impede your ability to

17 bring an in-person interpreter?

18      A    I mean, I didn't ask.

19      Q    It was your decision not to do that,

20 correct?

21      A    My decision -- I don't know how to answer

22 that.  It wasn't an option for me.

23           Are you saying I'm expected to pay out of

24 pocket for one or -- I mean, there was one provided

25 to me to do that, so I'm not sure how to answer

1                    ADAM ROPER

2    that.

3        Q    Well, you could have gone and -- well,

4    let me take a step back.  Are you saying that the

5    Georgia Department of Community Supervision has a

6    policy that they will not provide in-person sign

7    language interpreters in circumstances that require

8    them?

9        A    I did not say that, no.

10       Q    Okay.  So you did have the option to get

11   an in-person sign language interpreter through the

12   Georgia Department of Community Supervision, and

13   you decided not to do that; is that -- is that

14   right?

15       A    I never requested an in-person

16   interpreter to come to the jail, so yes.

17       Q    And you just were asked by Mr. Weaver

18   whether or not you have the power to make decisions

19   about the punishment that a person faces for a

20   violation of supervision.  Do you recall being

21   asked that?

22       A    Yes.

23       Q    And you testified, I believe, that you

24   simply make a recommendation to present to the

25   judge.  Was that your testimony?

1               ADAM ROPER

2       A    Yes.  And I misspoke earlier and said

3   "I," and I shouldn't have said "I," it's the judge

4   who makes the final decision.

5       Q    But in fact, the Georgia Department of

6   Community Supervision, you as the CSO working for

7   GDCS, are the one who drafted the consent order; is

8   that correct?

9       A    That's correct.

10      Q    And you are the one who put in the

11  consent order the 60-day essentially agreement to

12  incarceration between yourself and Ms. Hill; is

13  that right?

14      A    I typed that in there, yes.

15      Q    And you presented that to Ms. Hill as a

16  document that she needed to sign?

17      A    Correct.

18      Q    And you filed it with the judge; is that

19  right?

20      A    I submitted it for signature with the

21  judge, yes.

22      Q    Okay.  So in fact, you are the one who

23  came up with the punishment that you proposed to

24  Ms. Hill, couched as an order from the court; is

25  that right?

1              ADAM ROPER

2      A    Yes, I submitted it to the judge and he

3  agreed to it and I -- and then it was submitted to

4  the clerk's office.

5      Q    And in fact, had Ms. Hill had a hearing

6  before the court, it would have been the judge's

7  discretion that determined the punishment for the

8  violation; is that right?

9      A    Yes, he would have had the end game on

10 making the decision, yes.

11     Q    And it would have been the judge who

12 determined whether or not had Ms. Hill had, in

13 fact, violated the terms of her supervision had she

14 had a hearing, right?

15     A    That's correct.

16     Q    I'm sorry, did you respond?

17     A    I said that's correct.

18     Q    But Ms. Hill didn't have a hearing, you

19 bypassed that hearing by having her sign the

20 consent order which had the punishment that you

21 dictated in it; is that right?

22     A    I wrote the punishment on there, yes.

23          MS. SHRADER:  Nothing further.

24          MR. WEAVER:  Just a couple of follow-up.

25

1                    ADAM ROPER

2               FURTHER EXAMINATION

3    BY MR. WEAVER:

4        Q    So even though it would be theoretically

5    possible to have a live interpreter back on

6    November 3rd of 2020 when you went through the

7    proposed consent order with Ms. Hill, would it have

8    taken any time in order to make those arrangements?

9        A    Through my experience some things that

10   occur in the jail of -- of that nature, it would

11   take -- it would have had to seek approval from the

12   sheriff or from the major of the jail.  And, yes,

13   that would have taken a substantial amount of time.

14       Q    Okay, yeah.

15            Would it have taken more than a day?

16       A    To request, yeah, I imagine it would,

17   yes.

18       Q    All right.  And then even if you had a

19   live ASL interpreter on that day to go through the

20   proposed consent order with Ms. Hill, the decision

21   of the sheriff's office that you had to stay on the

22   other side of this glass in the attorney visitation

23   area from Ms. Hill, would that have also applied to

24   an ASL interpreter?

25       A    That's correct.

1                    ADAM ROPER

2      Q     Okay.  So an ASL interpreter would have

3  also been separated by glass from Ms. Hill,

4  correct?

5      A     That's correct.

6      Q     Okay.  And the consent order that we

7  talked about that you presented to Ms. Hill on

8  November 3rd, I believe it was, of 2020, was that

9  signed by the judge at some point?

10      A     That was the final step before it was

11  filed with the clerk's office.

12      Q     Okay.  And in order for that to be

13  effective, did it have to be signed by the judge?

14      A     It has to be.  There's no other way.

15      Q     Did you have any power or control over

16  the judge?

17      A     No, none.

18           MR. WEAVER:  Okay.  That's all I have.

19  Thank you.

20                FURTHER EXAMINATION

21  BY MS. SHRADER:

22      Q     Mr. Roper, would it have taken 60 days to

23  have gotten an interpreter there?

24      A     I'm not sure.  I know that as -- as of

25  recently, you know, we weren't even allowed to have

1          ADAM ROPER

2       DISCLOSURE OF NO CONTRACT

3

4       I, Judith L. Leitz Moran, do hereby disclose
pursuant to Article 10.B. of the Rules and
5  Regulations of the Board of Court Reporting of the
Judicial Council of Georgia that TSG Reporting was
6  contacted by the party taking the deposition to
provide court reporting services for this
7  deposition and there is no contract that is
prohibited by O.C.G.A. Sections 15-14-37(a) and (b)
8  or Article 7.C. of the Rules and Regulations of the
Board of Court Reporting for the taking of this
9  deposition.

10      There is no contract to provide reporting
services between TSG Reporting or any person with
11  whom TSG Reporting has a principal and agency
relationship nor any attorney at law in this
12  action, party to this action, party having a
financial interest in this action, or agent for an
13  attorney at law in this action, party to this
action, or party having a financial interest in
14  this action.  Any and all financial arrangements
beyond our usual and customary rates have been
15  disclosed and offered to all parties.

16

17      This 19th day of August 2021.

18

19  *Judith Moran*

20  _____
Judith L. Leitz Moran, B-2312
Georgia Certified Court Reporter

21

22

23

24

25

1                        ADAM ROPER

2              CERTIFICATE OF COURT REPORTER

3

4    STATE OF GEORGIA      )

5    COUNTY OF DEKALB      )

6

7          I hereby certify that the foregoing deposition
     was reported as stated in the caption, and the
8    questions and answers thereto were reduced to
     writing by me; that the total transcript pages 1
9    through 277 represent a true, correct, and complete
     transcript of the evidence given on August 5, 2021,
10   by the witness, ADAM ROPER, who was first duly
     sworn by me.

11

12         I further certify that I am not related to any
     of the parties to this action by blood or marriage;
13   and that I am in no way interested in the outcome
     of this matter.

14

15         I certify that I am not disqualified for a
     relationship of interest under O.C.G.A. Section
16   9-11-28(c); I am a Georgia Certified Court Reporter
     here as a representative of TSG Reporting; I was
17   contacted by TSG Reporting to provide court
     reporting services for this deposition; I will not
18   be taking this deposition under any contract that
     is prohibited by O.C.G.A. Sections 15-14-37(a) and
19   (b) or Article 7.C. of the Rules and Regulations of
     the Board of Court Reporting.

20

21         This 19th day of August 2021.

22

                        *Judith Moran*
23                      _____
                        Judith L. Leitz Moran, B-2312
24                      Georgia Certified Court Reporter

25

```
 1                    ERRATA SHEET

 2  Case Name:

 3  Deposition Date:

 4  Deponent:

 5  Pg.  No. Now Reads      Should Read  Reason

 6  ____ ____ _____    _____   _____

 7  ____ ____ _____    _____   _____

 8  ____ ____ _____    _____   _____

 9  ____ ____ _____    _____   _____

10  ____ ____ _____    _____   _____

11  ____ ____ _____    _____   _____

12  ____ ____ _____    _____   _____

13  ____ ____ _____    _____   _____

14  ____ ____ _____    _____   _____

15  ____ ____ _____    _____   _____

16  ____ ____ _____    _____   _____

17  ____ ____ _____    _____   _____

18  ____ ____ _____    _____   _____

19  ____ ____ _____    _____   _____

20

                            _____

21                          Signature of Deponent

22  SUBSCRIBED AND SWORN BEFORE ME

23  THIS ____ DAY OF _____, 2021.

24  _____

25  (Notary Public)   MY COMMISSION EXPIRES:_____
```