# Exhibit W

1            UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF GEORGIA

3                 ATLANTA DIVISION

4

5    _____
                                )
6    BRANDON COBB, et al.,      )
                                )
7            Plaintiffs,        )
                                )    Civil Action
8    vs.                        )
                                )    No. 1:19-cv-03285-WMR
9    GEORGIA DEPARTMENT OF      )
     COMMUNITY SUPERVISION,     )
10   et al.,                    )
                                )
11           Defendants.        )
     _____)

12

13

14

15          DEPOSITION OF BARRY S. MARANO

16             (Via videoconference)

17               August 16, 2021

18

19

20

21

22

23

24   Reported by:  John L. Harmonson, RPR

25   Job No. 198393

1

2

3

4

5                    August 16, 2021

6                    10:03 a.m.

7

8

9        Deposition of BARRY S. MARANO, taken via

10   videoconference with the witness and all parties

11   appearing remotely, pursuant to the Federal Rules

12   of Civil Procedure, subject to such stipulations

13   as may be recited herein or attached hereto,

14   before John L. Harmonson, a Registered

15   Professional Reporter and Notary Public of the

16   Commonwealth of Virginia, who officiated in

17   administering the oath to the witness.

18

19

20

21

22

23

24

25

```
 1              A P P E A R A N C E S

 2

 3   On behalf of the Plaintiffs:

 4        ACLU FOUNDATION, INC.

 5        39 Drumm Street

 6        San Francisco, CA 94111

 7        BY:  BRIAN DIMMICK, ESQ.

 8             TALILA LEWIS, ESQ.

 9

10        NATIONAL ASSOCIATION OF THE DEAF

11        8630 Fenton Street

12        Silver Spring, MD 20910

13        BY:  BRITTANY SHRADER, ESQ.

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                APPEARANCES (Cont.'d)

 2

 3    On behalf of the Defendants:

 4         HOLLBERG & WEAVER

 5         2921 Piedmont Road, NE

 6         Atlanta, GA 30305

 7         BY:  GEORGE WEAVER, ESQ

 8.

 9

10

11    ALSO PRESENT (via videoconference):

12         ROBERT RINKEWICH, Legal Video Specialist

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                  EXAMINATION INDEX

 2   WITNESS                                    PAGE

 3   BARRY S. MARANO

 4      Examination by Ms. Shrader                 8

 5      Examination by Mr. Weaver               291

 6      Examination by Ms. Shrader              303

 7                      * * *

 8

 9                   EXHIBIT INDEX

10   EXHIBIT NO.                                PAGE

11   Exhibit 128   2010 Virginia Department of    37
                   Corrections settlement
12                 agreement

13   Exhibit 129   Collection of emails; D-002934  140
                   3037
14
     Exhibit 130   Expert Report of Barry S.      230
15                 Marano

16                      * * *

17

18      REFERENCE TO PREVIOUSLY MARKED EXHIBITS

19   EXHIBIT NO.                                PAGE

20   Exhibit 110 . . . . . . . . . . . . . .    106

21   Exhibit 111 . . . . . . . . . . . . . .    117

22   Exhibit 116 . . . . . . . . . . . . . .    209

23

24

25
```

```
 1                      B. MARANO
 2   ---------------------------------------------------
 3               P R O C E E D I N G S
 4                  MORNING SESSION
 5                   10:03 a.m.
 6   ---------------------------------------------------
 7            THE VIDEOGRAPHER:  Good morning,
 8      counselors.  My name is Robert Rinkewich.  I
 9      am a legal videographer in association with
10      TSG Reporting, Inc.
11            Due to the severity of COVID-19 and
12      following the practice of social distancing,
13      I will not be in the same room with the
14      witness.  Instead, I will record this
15      videotaped deposition remotely.  The
16      reporter, John Harmonson, also will not be
17      in the same room and will swear the witness
18      remotely.
19            Do all parties stipulate to the
20      validity of this video recording and remote
21      swearing and that it will be admissible in
22      the courtroom as if it had been taken
23      following Rule 30 of the Federal Rules of
24      Civil Procedure and the state's rules where
25      this case is pending?
```

1                    B. MARANO

2          MR. WEAVER:  On behalf of defendants,

3    yes.

4          MS. SHRADER:  On behalf of plaintiffs,

5    yes.

6          THE VIDEOGRAPHER:  Thank you.

7          This is the start of media labeled

8    number 1 of the video-recorded deposition of

9    Barry S. Marano, in the matter of Brandon

10   Cobb, et al. v. Georgia Department of

11   Community Supervision, et al., in the United

12   States District Court for the Northern

13   District of Georgia, Atlanta Division, Civil

14   Action Number 1:19-cv-03285.

15         This deposition is being held

16   telephonically and video streamed on

17   August 16, 2021, at approximately 10:04 a.m.

18         My name is Robert Rinkewich.  I am the

19   legal video specialist from TSG Reporting,

20   Inc., headquartered at 228 East 45th Street,

21   Suite 810, New York, New York.  The court

22   reporter is John Harmonson in association

23   with TSG Reporting.

24         Counsel, please introduce yourselves.

25         MS. SHRADER:  For plaintiffs, Brittany

Page 8

```
 1                        B. MARANO

 2        Shrader from National Association of the

 3        Deaf.

 4             MR. WEAVER:  George Weaver on behalf

 5        of the Georgia Attorney General's Office

 6        representing defendants.

 7             THE VIDEOGRAPHER:  Will the court

 8        reporter please swear in the witness.

 9                      * * *

10   Whereupon:

11                     BARRY S. MARANO,

12   after having been first duly sworn or affirmed,

13   was examined and did testify under oath as

14   follows:

15                    EXAMINATION

16   BY MS. SHRADER:

17        Q.   Good morning, Mr. Marano.  As I just

18   said a few minutes ago, my name is Brittany

19   Shrader.  I am one of the attorneys representing

20   the plaintiffs in this case.  I work for the

21   National Association of the Deaf.  With me here

22   are Talila Lewis and Brian Dimmick, also

23   attorneys representing plaintiff.  Mr. Dimmick

24   and Talila Lewis have their videos off to kind of

25   conserve space but they will be observing.  I
```

```
1                        B. MARANO
2    through his office with the person that had the
3    tracking.  I was wondering how did they know who
4    to provide services to.  So I talked to that
5    person.
6              Then I went back and I looked at the
7    background information, the court information,
8    why they were under supervision.
9              And I looked at Mary Hill's employment
10   record or application for employment, trying to
11   get an idea of where she's at, what she does, how
12   she maintains her daily existence.
13             And for Cobb, and why are they being
14   supervised, how long are they being supervised,
15   and were there any violations and things of that
16   nature.
17             So he gave me a general idea of the
18   history and status of the plaintiffs, and then I
19   watched again the videos, keeping in mind their
20   policy.
21        Q.   Did you review the case notes for the
22   individuals?
23        A.   I may have.  It's been some time now,
24   but I think I did, yes.  I read, as you said,
25   volumes of information.
```

```
 1                      B. MARANO
 2        Q.    Did you read through all of the
 3   documents that Mr. Weaver provided to you that
 4   were --
 5        A.    Quite a bit.
 6        Q.    Just to let you know, the discovery
 7   materials in this case relate not only to the
 8   named plaintiffs that you just named -- Mr. Cobb,
 9   Mr. Nettles and Ms. Hill -- but they relate to
10   all of the deaf and hard of hearing individuals
11   under supervision.  Were you aware of that?
12        A.    I saw that, but that wasn't where I
13   was focused.
14        Q.    So in terms of reading through the
15   documents, you focused on the documents for the
16   named plaintiffs in this case; is that right?
17        A.    Correct.
18        Q.    I know you said that you more recently
19   reviewed the documents for Mary Hill.  Is that
20   right?
21        A.    Correct.
22        Q.    Did you review the case notes for
23   Ms. Hill?
24        A.    No.  I looked at her -- I looked at
25   the videos.  I looked at some of the history of
```

```
 1                    B. MARANO
 2  why she's under supervision briefly.  And I
 3  looked at an employment application.
 4       Q.    Why didn't you review the case notes?
 5       A.    I didn't feel as though I needed to at
 6  that point.
 7       Q.    Can you elaborate on that?
 8       A.    I believe that I formed an opinion
 9  watching her communication with the parole
10  officer, and I believe that I formed an opinion
11  based on that.
12       Q.    And I just want to make sure the
13  record is clear.  Ms. Hill was communicating in
14  American Sign Language; is that right?
15       A.    She was.  And there was an
16  interpreter, either VRI or -- I think there was
17  one case where there was a person in-person.  I
18  remember the VRI.  I remember she was in
19  detention, and the person was holding the
20  computer up.  And I remember, oh, she came back
21  with her McDonald's uniform on and eyeglasses and
22  was having a conversation.
23       Q.    And you yourself don't communicate in
24  ASL; is that right?
25       A.    I do not.  I listened to the
```

1                        B. MARANO

2    interpreter provide the communication.

3         Q.    And so you base your opinion on the

4    assumption that the interpreter is adequately

5    interpreting what Ms. Hill is saying; is that

6    right?

7         A.    I believe there was every indication

8    that that was true.

9         Q.    But my question was a little bit

10   different.  You base your opinion in part on your

11   assumption, which is necessary because you don't

12   use ASL, that what the interpreter is signing to

13   Ms. Hill is what was spoken by the officer in its

14   entirety and that what the interpreter is saying

15   is what Ms. Hill is signing in its entirety; is

16   that right?

17        A.    Yes.

18        Q.    And you testified earlier that in

19   determining the appropriate auxiliary aids and

20   services and things of that nature, the history

21   is important.  Is that fair?

22        A.    The history is important as to the

23   accommodations they're provided, yes.

24        Q.    And so you would agree with me --

25   well, actually, let me go back for a second.

1                      B. MARANO

2               Were you aware that the Georgia

3   Department of Community Supervision has access to

4   the system which is called, I believe, Scribe

5   that's used by the Georgia Department of

6   Corrections to make case notes for the people who

7   were under --

8        A.    Yes.

9        Q.    So you were aware of that?

10       A.    Yes.

11       Q.    And you're aware that the Georgia

12  Department of Community Supervision's Portal

13  system, the system they use for their case notes,

14  actually connects to Scribe and that they can

15  access the DOC records through that system; is

16  that right?

17       A.    I was told that they had access.

18       Q.    And what is your understanding in

19  terms of the policy regarding reviewing --

20       A.    Reviewing what?

21       Q.    Reviewing the prior notes from, say,

22  the Scribe system.

23               MR. WEAVER:  Let me ask for

24          clarification.  Are you talking about

25          offenders who come from prison into

```
 1                        B. MARANO
 2         probation or parole?
 3                MS. SHRADER:  Well, anyone who has an
 4         entry in the Scribe system.  So typically
 5         yes, but maybe someone who had been in
 6         prison in the past.
 7    BY MS. SHRADER:
 8         Q.    What is your understanding of the
 9    Georgia Department of Community Supervision's
10    policy in terms of whether the officer should
11    review the Scribe notes for a person who is
12    coming on to their supervision?
13         A.    My understanding is they do a review
14    and they particularly do the tracking for
15    accommodations for communications.  In my
16    discussions with Darrell Smith, it left me with
17    the impression that the parole officers or
18    probation officers, these people do do reviews as
19    to the needs of the people they're supervising.
20         Q.    Would it surprise you to learn that
21    multiple community supervision officers have
22    testified in this case at their depositions and
23    that they've each testified that they do not in
24    fact review the Scribe notes for incoming persons
25    under supervision and that there is no DCS policy
```

1                      B. MARANO

2    terms of connectivity than VRI does because they

3    have a wired connection versus a wire --

4    something relying on a wireless connection or a

5    wi-fi connection?

6         A.    I have fewer complaints about the

7    videophone operation.  Now, we go through phases.

8    Things happen.  These video calls -- and I'm

9    probably talking to the choir, but they get

10   handed off to different contractors, that signal.

11   It goes from us to Verizon -- from GTL that works

12   for the prison system to Verizon, to Z which I

13   think is now owned by Purple, to a local.  And it

14   comes back and forth.  And things happen to those

15   calls.  So they're not all problem-free by any

16   means.  Pixelation is an issue sometimes.

17             We have fewer, though, significantly

18   fewer with videophones than we have with the more

19   remote VRI.

20        Q.    And in terms of the issues that you

21   see come up with VRI, can you describe those for

22   us?

23        A.    Well, there's the connectivity issue.

24   Sometimes there a granular pixelation to the

25   picture.  So we've had to enhance our system with

1                    B. MARANO

2   boosters to the wire net -- to the signal which

3   increased our productivity quite a bit when we

4   use it.

5           But VRI is not something we use a lot

6   in Virginia.

7        Q.   And why is that?

8        A.   Because in Virginia, we have a

9   different system.  And our system in Virginia,

10  unlike Georgia, is that we have office visits and

11  the VRI is seen as a backup to the system that we

12  have.

13       Q.   So is it your understanding that

14  Georgia doesn't have office visits?

15       A.   Yes, generally speaking.  And we've

16  cut back on it in COVID.  And we've even

17  separated them in a different room and talked

18  through a barrier.  But we're able to do that.

19           In our system also we have what is

20  known as telemed, which is similar to VP we can

21  pull up.  So we don't have to use VRI; we can use

22  our Internet system.  In Virginia, it's an

23  in-house system through our own servers for the

24  VP and our other communications and then it's

25  handed off to whoever is carrying the lines.

1                    B. MARANO

2           So the person could be taken to

3    medical where we have a Polycom unit that's hard

4    wired in to do our after-hours and emergency.  We

5    don't have to use VRI, but there may be

6    instances.  Some of our facilities are very, very

7    large and it can be a quarter of a mile from one

8    building to another.  So we may have to move the

9    person away from where medical is for an

10   investigation or if there is a threat, something

11   like that.

12        Q.    So in Virginia, your system is that

13   your go-to is an in-person interpreter and VRI is

14   the backup.  And part of the reason for that is

15   because you are having in-person in the office

16   communications with the supervisees.  Is that an

17   accurate description?

18        A.    You're talking about the community?

19        Q.    I'm sorry?

20        A.    Community supervision or inside

21   facilities?

22        Q.    Well, I guess let's talk about --

23   let's talk about both, because I'm not sure I was

24   sure on the distinction that you were making.  So

25   if you could clarify that for me, that would be

```
 1                    B. MARANO

 2  great.

 3       A.    We often have the interpreter in the

 4  community come to the office, the parole office,

 5  because we do office visits.  And we have

 6  programs at the office.  Now, that's been cut

 7  back because of COVID.  But in addition to that,

 8  we have VRS where we can pull them up on a

 9  screen, a hardwired screen and talk to them.

10            We have some remote areas in Virginia

11  so we can't have an interpreter there all the

12  time.  But the person under supervision wants to

13  stay in that area.  So we have an agreement.  In

14  the institutions, I have interpreters at the

15  major home base for the deaf -- there are some in

16  other places -- every day.  Because we have

17  school, we have medical appointments, dental

18  appointments, mental health, work.  All these

19  things are going on.

20            So I have one or two at our main base,

21  and then we have them several times a week at the

22  other places where the deaf are located.  We'll

23  have videophones that are hard wired in.  We have

24  a schedule for that.  And we can use those

25  videophones also for emergency, the Polycom
```

1                    B. MARANO

2   units, whether it be in medical or in the housing

3   unit.  We have access to that.  We can just go

4   through our central communications channel and

5   flip it over and contact Purple or wherever we

6   want to go.

7            We have VRI.  So if the person has to

8   be moved from the main housing unit to somewhere

9   else because of a conflict with someone else or

10  it's an emergency, we have VRI on a laptop.

11           That's just pretty much what we do.

12  So we have the in-person, we have the video, the

13  Polycom, and we have VRI on a laptop.

14      Q.    So in terms of -- you indicated that

15  in some remote places it's really hard to get an

16  interpreter out there in person but the deaf

17  person wants to go to that office so you have an

18  agreement with them to use the remote

19  interpreters.

20           What type of -- I think you said

21  something about a screen.  So I'm curious --

22      A.    A Polycom unit, like a monitor or a

23  television.  They come in.  It's wired and they

24  come in on that.

25      Q.    And how large are those screens?

1                      B. MARANO

2       A.    The smallest one I think is 19 inches.

3  And they go to 20 inches or so.  Some are laptops

4  sitting on the desk that are hard wired through

5  the system which we can connect with cable.

6       Q.    And being in your office, you have

7  more control over the connectivity.  You

8  indicated you actually hard wire the cables in

9  your office than if you were out somewhere in the

10  community that maybe doesn't have great wireless

11  reception.  Is that right?

12       A.    When you say "in your office," I'm

13  speaking of the office where the facility is,

14  where the case manager is.

15       Q.    Yes.

16       A.    Okay.  In those offices, we have the

17  videophones.  We have all the stuff hard wired

18  in.  We also have the laptop.  So in the parole

19  offices, probation, out in the field at the

20  detention centers and pre-release centers, they

21  have the option if they have a deaf person to use

22  the Polycom that we use for training and other

23  things.  They also have the laptops.

24       Q.    And you indicated that it was your

25  understanding that DCS does not have -- that the

```
 1                       B. MARANO
 2   sentence that the probation officer is
 3   suggesting; right?
 4        A.    Correct.
 5        Q.    And Paragraph 5 again talks about
 6   Ms. Hill's rights.
 7               "I freely and willingly admit the
 8   alleged violations of my probation as outlined
 9   above, without duress, and hereby waive the right
10   of hearing as provided by the Criminal Code of
11   Georgia.  Additionally, I do hereby waive my
12   right to have an attorney represent me unless my
13   attorney has signed below.  I, therefore,
14   petition the Court to accept this consent."
15               Do you see that there?
16        A.    I do.
17        Q.    And the officer didn't read that to
18   Ms. Hill either through the interpreter; correct?
19        A.    Correct.
20        Q.    Okay.  So here we have yet a second
21   situation where we have an interpreter available
22   but we fail to utilize the interpreter to read to
23   the deaf supervisee the critical language about
24   the person's rights and the implications of
25   signing the document; is that right?
```

1                    B. MARANO

2         MR. WEAVER:  Objection.  Objection to

3    the extent that you're equating this event,

4    November 3, 2020, with the previous event,

5    October 26, 2020.

6  BY MS. SHRADER:

7         Q.    Is that right?  This is now a second

8  time in a matter of days where there has been a

9  VRI interpreter available but the same officer

10  has not used that interpreter to explain the

11  rights and the consequence of waiving those

12  rights to the deaf person under supervision?

13         A.    I believe that was left out of it,

14  yes.

15         Q.    And have you had the opportunity to

16  review the expert reports of Dr. Judy

17  Shepard-Kegl, Dr. Amy Rowley and Dr. Erin

18  Moriarty Harrelson in this case?

19         A.    Oh, yes.

20         Q.    And have you had the opportunity to

21  read the section of Dr. Shepard-Kegl and Dr. Amy

22  Rowley's reports concerning this consent order?

23         A.    Yes.  Yes, I did read it.

24         Q.    And you're aware that Dr. Shepard-Kegl

25  and Dr. Rowley have opined that the language

```
 1                    B. MARANO
 2   contained in Paragraphs 4 and 5 would have been
 3   impenetrable to Ms. Hill in terms of her reading
 4   comprehension.  Are you aware of that?
 5        A.    I'm aware of that.
 6        Q.    And, Mr. Marano, you're not a
 7   linguist; right?
 8        A.    I am not.
 9        Q.    You're not a forensic anthropologist
10   or a linguistic anthropologist?
11        A.    No.
12        Q.    And you don't have any training in
13   terms of assessing the reading comprehension or
14   language abilities of people who are deaf and
15   hard of hearing; correct?
16        A.    Correct.
17        Q.    And so do you have a basis to disagree
18   with Dr. Rowley and Dr. Shepard-Kegl's opinion
19   that Paragraphs 4 and 5 would have been
20   impenetrable to Ms. Hill?
21        A.    Speaking of the paragraphs that were
22   not read to her?
23        Q.    Yes.
24        A.    I would assume that adjustments would
25   be made in interpreting if it was read to try to
```

1                        B. MARANO

2    get her a vocabulary that she could understand or

3    comprehend.

4        Q.    Yes.  And I think that's what I'm

5    asking.  Her trying to read that document in

6    English would have been impenetrable to her.  Do

7    you agree with that?

8        A.    I agree --

9        Q.    I'm sorry.  Go ahead.

10       A.    Go ahead.  You finish.

11       Q.    Or do you have any reason to disagree

12   with that?

13       A.    Well, not being a linguist, I cannot

14   issue a professional opinion.  What I can say is

15   that for a person that English is not their basic

16   language and they use sign and the education

17   level may not be to the level that they would

18   easily understand that, it would be difficult.

19   Legal terms are often difficult for people

20   whether they're deaf or not.

21             So I can see that it would require

22   efforts by the interpreter to adjust that

23   vocabulary.

24       Q.    And that didn't happen here, right,

25   because he didn't relay that information through

```
1                      B. MARANO
2     the interpreter?  The only way that Ms. Hill
3     would have had access to it is through the
4     document itself; is that right?
5          A.    That seems to be true.
6          Q.    And so, Mr. Marano, you recently
7     submitted an addendum to your expert report in
8     which you opined that the communication with
9     Ms. Hill was effective; is that right?
10         A.    In my opinion at the time watching it,
11    it was, because I didn't know other information,
12    that things were left out at the time that I saw
13    that.
14         Q.    So now as you sit here today with the
15    additional information that you have, do you
16    still believe that the communication with
17    Ms. Hill was effective?
18         A.    I believe mistakes were made, and I
19    believe a better job could have been done.  And I
20    believe the effectiveness of it was diminished by
21    leaving out information and, like I said,
22    adjusting the vocabulary to terms that she would
23    understand.
24         Q.    And in fact, that information that was
25    left out was her right to a hearing; right?
```

1                       B. MARANO

2       A.    Yes.  The right that she could go to a

3  hearing about that violation.

4       Q.    And the right to counsel; is that

5  right?

6       A.    It does say that.

7       Q.    And the fact that by signing that

8  document, she was waiving those rights?

9       A.    She did.

10      Q.    And agreeing to be incarcerated for 60

11  days?

12      A.    She did agree to the suggestion of the

13  probation officer, yes.  She accepted the

14  sentence.

15      Q.    And she wasn't made aware that it was

16  an option to not do that; right?

17      A.    It was not explained to her in the

18  best possible way, the ideal way.  I agree.

19  There's a possibility she did not understand.

20      Q.    And if you were the ADA coordinator

21  and you became aware of this situation, the

22  incident that we talked about where Ms. Hill was

23  at the DCS office, taking the drug test, the VRI

24  was available but it was replaced instead with

25  handwritten notes, and then several days later

1                    B. MARANO

2   this interaction that you watched on the body

3   camera video occurred with the same officer and

4   the same DCS supervisee, what corrective actions

5   would you take?

6        A.    Again, we would meet with management.

7   We would have a dialogue as to this issue and to

8   what would be ideal, what would be the best

9   practice to do.  And we would talk about training

10  and refreshment, refreshing our knowledge of

11  these situations.  And we would probably do

12  something in writing to document corrective

13  action.

14        Q.    We spoke to the community supervision

15  officer who handled this case a little over a

16  week ago and to his supervisor, Chief Shannon

17  Hilliard.  And one of the questions that I asked

18  was why wasn't an in-person interpreter provided

19  to do a sight translation to avoid this issue of

20  holding up a laptop to this pane of glass to make

21  the situation essentially, you know, an easier

22  ebb and flow of communication.  And the officer

23  indicated that he didn't believe that he could

24  get an in-person interpreter, and the chief

25  indicated that she didn't believe that that was

```
 1                        B. MARANO
 2   something that she could approve.
 3              Would that surprise you based on your
 4   conversations with Darrell Smith about the DCS
 5   policy for obtaining in-person interpreters?
 6        A.    It surprises me that the chief would
 7   accept that.  But that is not my organization.
 8   So we have a different way, a different pathway.
 9   So I don't know what the restrictions are that
10   they could not get a person.  I wasn't informed
11   of that, that a chief said that they didn't think
12   they could get an in-person person.  You would
13   think that there was a time issue in effect.
14              But there are also other ways that you
15   could adjust that issue.  One, you could try --
16   if you want me to suggest -- maybe not in that
17   setting behind that glass, try to get this
18   document done.
19              So a mistake was made there.  Did you
20   want more?
21        Q.    No.  I'm going to pull up another
22   document.  I'm sorry.
23              And you indicated that you had
24   reviewed the report both of Drs. Judy
25   Shepard-Kegl as well as the report of Dr. Erin
```

```
 1                    B. MARANO
 2   Moriarty Harrelson.  Did you also review the
 3   rebuttal report that Dr. Moriarty Harrelson filed
 4   in response to your report?
 5        A.    To the addendum?
 6        Q.    No.  In response to your original
 7   report.
 8        A.    Let's see.  From what I remember, I
 9   was agreed with about the need for evaluation.
10   And then there was -- I think I did.  There was a
11   discussion of the nuances and the hand movement
12   and the width of the screen itself to convey the
13   sign language.
14        Q.    And so you indicated that Dr. Moriarty
15   Harrelson agreed with you about the need for
16   individualized assessment.  So can you tell us
17   about that, your opinion concerning the need for
18   individualized assessment?
19        A.    Well, I think I've alluded to this
20   earlier, that in order to know what to provide,
21   what works -- I think we're discussing effective
22   communication here.
23        Q.    Yes.
24        A.    We need to set a foundation as to what
25   works for the individual.  So you look at what
```

1                         B. MARANO

2    the person is telling you or conveying to you,

3    and what has worked for this person in the past

4    and what the resources are.  So you try to

5    develop, then, a plan to accommodate that.  And

6    if that doesn't work, you go back and try

7    something else.

8         Q.    And in terms of Dr. Moriarty

9    Harrelson's report in response to your report,

10   Dr. Moriarty Harrelson indicates that she herself

11   is deaf and a fluent signer.  Is that right?

12        A.    (Nodding head.)

13        Q.    I see you nodding your head, but I

14   think we need an oral response for the reporter.

15        A.    Yeah.  I'm thinking before I answer.

16        Q.    Oh, that's fine.

17        A.    So yes, indeed, she indicated it.

18        Q.    And she's also a linguistic forensic

19   anthropologist; is that right?

20        A.    So the record states, yes.

21        Q.    And she described the process that she

22   used to review the body camera footage.  Did you

23   see that?

24        A.    I did.

25        Q.    And you don't have any reason to

1                    B. MARANO

2   dispute the process that she used in reviewing

3   the body camera footage; is that right?

4        A.    I hadn't thought of disputing her

5   method.  I accept that this is the method that

6   she is trained and a professional to do.

7        Q.    And you would agree that Dr. Moriarty

8   Harrelson is able to catch some of the nuance in

9   terms of the sign language itself because she

10  understands ASL?

11            MR. WEAVER:  Objection; calls for

12       speculation.

13            THE WITNESS:  I do not know what her

14       skills are.  She is a deaf person, an

15       educated person, and uses sign language.  I

16       would assume that she has techniques that

17       have developed over the years in her life as

18       a person who uses sign language and in her

19       training.

20  BY MS. SHRADER:

21       Q.    And she would be able to understand

22  the sign language that she's viewing on the video

23  that you would not be able to understand.  Is

24  that fair?

25       A.    Yes.

```
 1                        B. MARANO

 2        Q.    And Dr. Moriarty Harrelson goes

 3   through each of the videos that we understand

 4   from Mr. Weaver that you viewed.  The body camera

 5   footage for Ashley Barnett Moss, for Arin Daniel,

 6   for Jeremy "Jay" Woody, for Ernest Wilson, for

 7   Joseph Nettles, Brandon Cobb, Huzzie Willis.  And

 8   then you later reviewed the body cam footage for

 9   Mary Hill that we've already spoke about; is that

10   right?

11        A.    Yes, with focus on Cobb and Nettles to

12   great detail, I thought.

13        Q.    In terms of Ashley Barnett Moss, were

14   you aware that she's an ASL user?

15        A.    I suspected it.

16        Q.    But you would agree that in the

17   videos, they do not provide her with an

18   interpreter; correct?

19        A.    Correct.

20        Q.    In fact, in one of the videos they ask

21   her, "Do you prefer text message or writing?"

22   Those are the two options that she's provided?

23        A.    That is correct.

24        Q.    She's not offered VRI or an in-person

25   interpreter?
```

1                        B. MARANO

2    could have been done better.

3              So after having reviewed all of that

4    evidence, do you still believe that the system

5    that the Georgia Department of Community

6    Supervision is utilizing is within the standards

7    that organizations like the Virginia Department

8    of Corrections meets those standards?

9              MR. WEAVER:  Let me ask for

10         clarification.  What you're looking at in

11         his report, Exhibit 130, says the current

12         practice or policies, and some of the

13         material that you're citing occurred in the

14         past, like two years ago.  So can you

15         specify what you're talking about in your

16         question when you ask if the practices are

17         consistent?

18             MS. SHRADER:  Well, I think all of the

19         things that we reviewed, all of those emails

20         were within the last year.  All of --

21         Ms. Hill's incident was within the last six

22         months, or maybe a little bit more than

23         that, from the time that this report was

24         filed.  So my question stands.

25             MR. WEAVER:  Well, Ms. Barnett --

```
 1                        B. MARANO
 2   BY MS. SHRADER:
 3        Q.    Is it still your opinion --
 4              MR. WEAVER:  Ms. Barnett was almost
 5        two years ago.
 6   BY MS. SHRADER:
 7        Q.    Is it still your opinion based on the
 8   information we discussed today that the Georgia
 9   Department of Community Supervision's policy is
10   consistent with national standards?
11        A.    I believe that they follow the outline
12   that they've been given and the training.  It is
13   effective.
14              Now, you've pointed out to me some
15   mistakes.  But I don't know where those mistakes
16   fit in and how big the picture is.  Are we
17   looking at 300, 400 people and there were nine
18   instances of issues?
19              So I think the question doesn't have a
20   simple answer.  When I spoke to the Georgia, I
21   got a very enthusiastic response and many
22   documents that show that they want to do this,
23   that they are in communication, Department of
24   Community Services.
25              So whether you are able to find these
```

```
 1                       B. MARANO
 2   mistakes to not understand that we want those
 3   corrected, what ratio is it, in my mind, to the
 4   overall picture?  Because I believe where I am,
 5   we have a pretty good tight ship we're running,
 6   but I still, even today, have found a couple of
 7   instances that we have to go back and look at.
 8              So what is the number of errors that
 9   you see in relation to the number of daily
10   encounters that are happening with disabled
11   people in providing accommodations?
12        Q.    If I told you that that number is less
13   than 50 according to the information that we've
14   been provided by DCS, would that impact your
15   opinion?
16              MR. WEAVER:  If the number is less
17         than 50 what now?  I didn't understand the
18         question.
19              MS. SHRADER:  Let me rephrase that.
20   BY MS. SHRADER:
21        Q.    Let's start with if I told you that
22   according to what we've been provided by DCS, the
23   total number of people who are -- and I'm talking
24   about deaf and any form of hard of hearing across
25   the spectrum, including people who have minimal
```

```
 1                      B. MARANO
 2   hearing loss and communicate with spoken English
 3   just fine, that that number is less than 100,
 4   it's approximately 80 people, would that
 5   influence your opinion?
 6        A.    I still think the capability is there
 7   working with them that they can.  But I am
 8   concerned when you can point out nine instances,
 9   maybe ten here, of issues.  So yes, some
10   tightening up needs to be done.
11        Q.    And I heard you say that the people
12   you've talked to, Darrell Smith in particular,
13   seem to be enthusiastic and they want to do --
14   they want to make this work.  Is that what you
15   said?
16        A.    Yes.
17        Q.    And so the ADA coordinator being
18   enthusiastic and wanting to make this work is
19   great.  But without the buy-in of the CSOs, what
20   happens?
21        A.    Well, you have dysfunction at times.
22   You have mistakes made.
23              So again, I would like to know the
24   whole picture.  I would like to know how many
25   mistakes are made and what are the total numbers
```

```
 1                      B. MARANO
 2   of CSOs that are dealing with people with
 3   disabilities.
 4         Q.    And in terms of the numbers, I told
 5   you that there are approximately 80 people with
 6   hearing loss as has been disclosed to us by DCS.
 7   What if I told you that approximately 20 of those
 8   were sign language users?  Would that impact your
 9   thought as to whether or not DCS in their current
10   practice is in compliance with national
11   standards?
12         A.    I'm thinking.  See, I focused on three
13   plaintiffs basically, not the entire spectrum,
14   although I did look at it.  Now looking at this,
15   I would say that adjustments have to be made.
16   Should be made.  I don't mean to say have to be
17   made.  They should be made.
18              I don't know what the follow-up was to
19   any of the people you pointed out in emails,
20   whether calls were made and the situation was
21   rectified.  I don't have any of that information.
22   All I have is where the training went off the
23   rails somewhat and I don't know what was done to
24   adjust that.
25         Q.    And we don't have any physical
```

```
 1                        B. MARANO

 2   training documents that we can point to that

 3   address this; right?

 4        A.    That address fixing the problems?

 5        Q.    Correct.

 6        A.    I haven't seen any.

 7        Q.    I want to go to the next point in your

 8   report, number ii.  "DCS training materials are

 9   adequate to inform its community supervision

10   officers of DCS policies related to ADA Title II.

11   I interviewed the ADA coordinator of the agency

12   who was knowledgeable of ADA mandates for Title

13   II organizations, and I am convinced that he is

14   maintaining required training and follow-up to

15   ensure compliance."

16             Do you see that?

17        A.    Yes.  In that interview, he went to

18   great lengths to tell me about his communication

19   with people in the field and electronic messages

20   and their Portal system and how they're tracking

21   and open to situations to adjust if need be.

22        Q.    And after today, hearing that the

23   chief of the Bell-Forsyth office testified that

24   she wasn't aware that she had the ability to get

25   in-person interpreters; that the CSO testified to
```

1                         B. MARANO

2   the same thing, that he didn't know he had the

3   ability to get in-person interpreters; and seeing

4   the email exchanges with the same canned response

5   to most of those emails, do you still believe

6   that the training materials are adequate to

7   inform the CSOs of the policies?

8       A.    Well, the question in my mind, if I

9   may elaborate a moment, is it the training

10  materials or -- like how many chiefs do we have

11  in this system, and is this the only one that

12  doesn't understand this?

13           So again, I would like to see a bigger

14  picture of it before I could adequately answer

15  that.  But it is rare when I talk to -- and I've

16  talked to a lot of states, and I forgot to

17  mention that I've also done training in the North

18  Carolina system.  When I talk to them, I get the

19  response that I got from Darrell Smith about

20  somebody who wants to get this done and he wants

21  his organization to do this.

22           Now, I don't know the follow-up and I

23  don't have the big picture of how many people are

24  saying they don't know if they can do this.  So

25  this may be something that's quickly fixable or

```
 1                    B. MARANO
 2   it may be something that we might have to look at
 3   in the structure of the organization.
 4        Q.    And if I represented to you that each
 5   of the community supervision officers that were
 6   deposed in this case indicated that they didn't
 7   know how to get an in-person interpreter, would
 8   that help to broaden your perspective?
 9             MR. WEAVER:  Objection.  Assumes,
10        misstates or omits pertinent facts.
11             THE WITNESS:  I would still want a
12        bigger picture.  You interviewed a limited
13        number of people.  I would really -- to make
14        that statement, I would like a survey done.
15        I don't know how many districts we're
16        talking about here.
17   BY MS. SHRADER:
18        Q.    So to be fair --
19        A.    Are all of these CSOs in the same
20   district?
21        Q.    No, they're all in different
22   districts.
23             To be fair, you interviewed two
24   people; is that right?
25        A.    Yes.
```

1                        B. MARANO

2      Q.    Darrell Smith and someone who talked

3  to you about the Portal system?

4      A.    Someone that ran me through it to give

5  me an idea of Georgia's community supervision,

6  what their outlook is and how their operation

7  functions, yes.

8      Q.    So if I understand what you're saying

9  today, information from at least five or six CSOs

10  in addition to Darrell Smith is not a big enough

11  picture for you to determine whether or not the

12  training materials are adequately conveying

13  information to CSOs.  Is that what you're saying?

14      A.    I'm saying that although I see an

15  issue, I would like to know how profound the

16  issue is.  Do we have another 100 CSOs that do

17  get it, maybe it's some that are more senior?  I

18  would like to see some research done on it.

19            To correct the problem, just like the

20  interactive situation of accommodations, this has

21  to be interactive to look at the staff and see

22  what the knowledge is of the staff and if there

23  are structural changes that need to be done or is

24  it some spots that need to be adjusted.

25      Q.    And as we sit here today, we don't

1                      B. MARANO

2    have that information; is that right?

3         A.    I don't have it.

4         Q.    We don't have the ability to do that

5    full survey, and we don't know if it's been done

6    by Mr. Smith or someone else at DCS; right?

7         A.    I don't have it so I assume we don't.

8         Q.    So without that information, is it

9    fair to say that you can't reach an opinion as to

10   whether or not the training materials have been

11   sufficient to inform the DCS community

12   supervision officers of the Title II policy?

13        A.    I can say with the limited picture

14   that I have, that adjustment should be made

15   because obviously there is -- there are staff

16   that don't know.  So these should be addressed.

17             I address that daily.  We hire new

18   people all the time, or we have people that

19   misunderstand despite all of the training that we

20   do.

21             So what I would say is that I see a

22   limited number of complaints about it.  I don't

23   know what the ratio of the complaints is yet to

24   the total number.  So I would hope that the

25   system that they have -- and I'm optimistic that

1                    B. MARANO

2   they can make the changes to eliminate, even if

3   it's a small number, that small number.

4        Q.    And you indicate -- your next point is

5   that "ASL interpreters over VRI may provide

6   effective communications with deaf or hard of

7   hearing individuals."  Is that right?

8        A.    They can.  Sometimes we cannot get

9   in-person interpreters in situations, as I've

10  explained in Virginia and other places.

11       Q.    And the reason that you could not or

12  they may provide effective communications is

13  because sometimes it might and sometimes it might

14  not.  Deaf and hard of hearing people, like you

15  said before, have a panoply of needs and it's not

16  a one size fits all.  Is that right?

17       A.    Correct.

18       Q.    And your next point is related to that

19  point, that "ASL interpreters over VRI may be

20  sufficient to provide effective communication

21  with deaf or hard of hearing individuals,

22  particularly with respect to routine visits in

23  which predictable or routine information is

24  communicated."  Is that right?

25       A.    Yes.

```
 1                     B. MARANO

 2       Q.    And that's because when the

 3  information is predictable or routine, the deaf

 4  person already kind of has familiarity with

 5  what's going to be asked of them; is that right?

 6       A.    Generally they understand the process

 7  after they've been under supervision, like

 8  anybody else would.  They know what the interest

 9  is, unless something else has happened to change

10  the status.

11       Q.    Like, for example, if a person is

12  alleged to have violated their supervision and

13  are going to be arrested?

14       A.    That would be a change in status.

15       Q.    And your point v is:  "Where VRI is

16  available, it is not necessary for ASL

17  interpreters to be physically present for

18  effective communications between law enforcement

19  officers and offenders on home field visits."

20            Do you see that point there?

21       A.    Yes.

22       Q.    And so again, your point in the

23  previous two, you were very clear that VRI may

24  provide effective communication in these

25  circumstances.  And that holds true here as well;
```

```
1                    B. MARANO

2    is that not right?  For many offenders in home

3    field visits, VRI would be sufficient but not for

4    all offenders; is that right?

5         A.    It's possible that it would not be.

6    We would need some indication, particularly from

7    a person who feels -- who's being supervised that

8    it's not.  But when you're dealing with home

9    field visits, you're dealing with unknown

10   situations when you walk into a home and you

11   don't know what's going on there, as opposed to

12   an office or an institution where you have

13   control of that area.

14        Q.    And you indicated just now that there

15   might be situations in which VRI wouldn't work

16   and we would need to kind of rely on the deaf

17   person to let us know that.  One of those

18   situations would be like those three emails that

19   we saw before where the Internet connection at

20   the person's home is not strong enough to support

21   the VRI service; is that right?

22        A.    And that might -- yes.  But that might

23   be fixable by technology.

24        Q.    Yes, it could be fixable.  But my

25   question is a little bit different.
```

```
1                        B. MARANO
2    us what works for them.
3         Q.    And in terms of the body cam footage
4    that you reviewed, you talked earlier about a
5    method you used to ensure understanding, the
6    teach-back method where you ask questions to make
7    sure the person is understanding you.
8              Did you observe that method being used
9    by any of the CSOs in any of the body cam videos
10   that you reviewed?
11        A.    Not verbally, no.
12        Q.    And that teach-back method is used
13   because of that situation that we just talked
14   about, the fact that you as a hearing non-signer
15   don't understand what's going on on the deaf
16   person's side of the communication so you need a
17   way to make sure that they're understanding you;
18   right?
19        A.    Yes.  You use the services of an
20   interpreter to tell you whether the message has
21   been delivered and to convey to you their
22   acknowledgment of it.  So I believe that using
23   the questions that I do to confirm it is going
24   beyond what you have to do.  I don't know a lot
25   of people that do that, a lot of systems that do
```

1          B. MARANO

2    it.

3          Q.    And you've never been involved in a

4    training concerning cultural awareness or

5    sensitivity for deaf and hard of hearing people

6    that talks about the teach-back method?

7          A.    I have, but I don't see it universally

8    used.

9          Q.    And you're aware that it's actually a

10   standard technique that when you're talking to

11   people who are experts in deaf communication, it

12   should be used; is that right?

13              MR. WEAVER:  Objection.  Assumes,

14         misstates, omits pertinent facts.  That's

15         just testimony from you.

16              THE WITNESS:  Okay.  So regarding that

17         issue, I'm saying again that is not

18         universally used.  So it's been my

19         experience in many places that we are a

20         rarity, particularly in my office, using

21         this.  I can't say that not anyone else uses

22         it to deal with the deaf.  But I have worked

23         with corrections officials and probation in

24         other places, and this is not something that

25         is regularly used.

```
 1                    B. MARANO

 2   BY MS. SHRADER:

 3        Q.    And just to clarify, those

 4   correctional facilities that you're working with

 5   and that you're running into, those are typically

 6   the ones that are being sued; is that right?

 7        A.    Well, several of them were not.  But

 8   they don't want to be.

 9        Q.    And so you're talking to them about

10   these communication issues because either they're

11   being sued or they're trying to avoid being sued;

12   is that right?

13        A.    Well, they've been sued.

14              MR. WEAVER:  Objection; misstates the

15        testimony.

16   BY MS. SHRADER:

17        Q.    I'm sorry, Mr. Marano.  What were you

18   saying?

19        A.    I'm saying or they've been sued and we

20   are discussing ideas.

21              So I do not see this used.  You

22   brought up the training and cultural sensitivity.

23   Yes, as a matter of fact, a couple of weeks ago I

24   was just in a class on that.  However, I could

25   tell by the audience that this is not something
```

1                    B. MARANO

2  that is readily used.

3      Q.    And I guess that's kind of what I'm

4  asking about, is that the audience that you're

5  talking about that's not readily using this

6  technique is the audience of people who have

7  either been sued, are being sued, or are

8  concerned about being sued.  Is that right?

9      A.    Yes.  On that and a number of issues,

10  yes.  So this is a technique that I found to be

11  effective.

12      Q.    And it's a technique that in fact is

13  taught in trainings like the one that you just

14  went to about cultural sensitivity and ensuring

15  effective communication with people who are deaf

16  and hard of hearing?

17      A.    Yes, it is.  And unfortunately, I

18  didn't invent it.

19      Q.    One of the -- just going to point viii

20  in your report, you indicate:  "There are serious

21  security concerns in bringing live ASL

22  interpreters with law enforcement officers on

23  field visits to the homes of criminal defendants

24  on probation or parole."

25                   Do you see that?

1                          B. MARANO

2       A.      I do.

3       Q.      What research have you done in terms

4   of the safety concerns?

5       A.      I have talked to the people in the

6   field, and I've talked to them about their

7   concerns.  And again, walking into, like we saw

8   on some of the body cams of Mr. Traineau, where

9   you come in the middle of the night to make a

10  home visit checking on someone.  This could lead

11  to some very difficult situations.  You don't

12  know who is in the home.  They may not know who

13  you are.  The deaf person is asleep.  The

14  situation is delicate and possibly dangerous.

15          When you do this in your office, when

16  you do this in your correctional center and all,

17  again, you're bringing the person to you and you

18  have control of that.

19          So when you go out into it, I listen

20  to the parole officers talking to me about it,

21  and they have concerns.  And we've had parole

22  officers and deputy sheriffs assaulted.  We've

23  had incidents and miscommunications develop.  So

24  we're very leery of taking people that we don't

25  have to have with us to go into a facility.  And

```
 1                      B. MARANO
 2   it's not always convenient to bring them outside
 3   of their home, depending on the weather or the
 4   situation, to have an in-person interpreter
 5   there.
 6              So in Virginia, we use office visits.
 7   We do home visits, but we don't do them with an
 8   interpreter to question them.  We tell them that
 9   we're coming in to do this home visit, and we get
10   it over with.  But we don't need an interpreter,
11   really, for that.  But we have VRI if we do need
12   communication.
13              So in Virginia, we're focused on
14   office visits where we have control of the
15   environment.
16       Q.    And you mentioned that you talked to
17   some of the correctional officers -- or some of
18   the probation officers, rather, about their
19   concerns, their security concerns.
20       A.    Yes.
21       Q.    But have you done any sort of research
22   in terms of what other states are doing or in
23   terms of any evidence-based research about safety
24   concerns of bringing interpreters into the home?
25   Or is this just more like a gut feeling that
```

1                        B. MARANO

2   people think this is unsafe?

3            MR. WEAVER:  Objection.  It assumes,

4       misstates or omits pertinent facts.  He

5       never said it was a gut feeling.  He said he

6       talked to people.

7            MS. SHRADER:  This is my question, and

8       the witness can answer.

9            MR. WEAVER:  Well, your question

10       assumes and misstates and omits pertinent

11       facts.

12            THE WITNESS:  Okay.  So I surveyed our

13       parole officers at our conferences and I

14       talked to them about their issues.  Plus I

15       go out and visit the districts and I'm in

16       communication with them.

17            This is an overriding concern with

18       them.  And they do not want to take other

19       people, particularly people that are not

20       employed by our agency, and they feel that

21       the more you have the greater the chance

22       into an unknown situation.  Some of these

23       people that are on supervision are on

24       supervision for violent reasons, and the

25       situation could get out of hand.

1                        B. MARANO

2            Now, do I have a lot of statistics

3       where it has?  No.  But I have the concerns

4       of the people that are providing the

5       service.  So we found another way to do it.

6  BY MS. SHRADER:

7       Q.    Have you talked to any interpreters

8  about safety concerns in terms of bringing

9  interpreters to home visits in the field?

10      A.    I have.

11      Q.    Are you aware that interpreters

12 routinely conduct home visits with community

13 supervision officers in other states?

14      A.    Yes.

15            MR. WEAVER:  Objection.  Assumes,

16       misstates and omits pertinent facts.  That's

17       testimony from you, Brittany.

18            MS. SHRADER:  That's testimony that's

19       in the record.  Dr. Shepard-Kegl has

20       testified about this.

21            MR. WEAVER:  No, she did not.  She

22       said in one state.

23            MS. SHRADER:  No.  She testified to

24       multiple states.

25            MR. WEAVER:  I disagree.

1                    B. MARANO

2          MS. SHRADER:  I'm looking at the

3      transcript.

4  BY MS. SHRADER:

5      Q.    Mr. Marano, so you are aware that

6  interpreters are brought out to home visits in

7  other states?

8      A.    I am aware that some states do this.

9  And I'm aware that when you have local parole or

10 probation, sometimes sheriff departments do this.

11 But I have an overwhelming concern by the staff

12 that I work with that this is an issue for them

13 and a concern.

14          So as I've said, we have changed the

15 way we do most of our contact to office visits or

16 even in another location, a neutral location like

17 a classroom or something like that.

18          And I talked to my interpreters, and

19 interpreters do do home visits here for medical

20 reasons or some person is an invalid or assisted

21 living at home.  But they have concerns going out

22 with people convicted on probation, on parole.

23 They would do it, but we've decided that we can

24 manage without doing it.

25     Q.    And the way that you've managed

1                          B. MARANO

2  without doing that is by modifying the structure

3  of the supervision so that your deaf and hard of

4  hearing supervisees are meeting with their

5  community supervision officers in the probation

6  office where you can control the environment; is

7  that right?

8       A.    Where we feel safer, and we have

9  multiple access between VRI, with Polycom and

10  in-person interpreters.  So it works out.

11            And the feedback that I've gotten from

12  the few that we have on probation and parole in

13  Virginia is they would rather be having these

14  meetings at our offices or our classrooms than in

15  their homes.  So where I am, this is what's

16  working.  I don't have any complaints about that.

17       Q.    And that avoids the issue of

18  connectivity problems with the VRI at someone's

19  home that's in a remote area; right?

20       A.    Yes.  That wasn't the primary concern

21  at the time.  We can develop hot spots.  We have

22  technology that we're overcoming that,

23  particularly in the mountainous areas.  However,

24  again, it was an overriding safety, express

25  safety concern to our director and to me about

1                      B. MARANO

2   this.

3        Q.    And that's because in Virginia, the

4   preference is to use in-person sign language

5   interpreters for these meetings; is that right?

6        A.    Generally we do.  I'm not saying it's

7   100 percent again, because we have remote areas,

8   and we have classes sometimes that we use a

9   combination of an in-person and a person on a

10  screen, VRI.  It depends on what is available.

11       Q.    Mr. Marano, your next point, point ix,

12  is that "A team or teams of both hearing and deaf

13  ASL interpreters are seldom if ever necessary for

14  effective communications between law enforcement

15  officers and criminal defendants on probation and

16  parole on home field visits."

17             What is the basis of that opinion?

18       A.    Because I only know of one instance

19  that we had to use a CDI.  And that actually

20  wasn't on a home visit.  That was an office

21  visit.  And we've not had to have a team, and

22  we're not doing the invasive home field visits

23  now.  So we're in the office, and it's working.

24       Q.    Okay.  So this is -- essentially what

25  you're talking about here is the way that

1                    B. MARANO

2  Virginia conducts home visits; is that right?

3       A.    That's been my experience, yes.

4       Q.    So this point ix is related to the way

5  that Virginia conducts home visits and not the

6  way that Georgia conducts home visits; is that

7  right?

8       A.    It is in reference to how Virginia --

9  my experience.  Virginia -- I mean Georgia has

10  electronic VRI for interpreter services.  So

11  Virginia went from bringing them to the home to

12  the office, and we have had to have a team once,

13  only once.

14       Q.    And that depends on the individual

15  under supervision; right?  Some deaf people need

16  CDIs, some don't?

17       A.    Correct.

18       Q.    And can you tell us, what is your

19  understanding of CDIs?

20       A.    Well, a certified deaf interpreter is

21  what we're talking about.  This is usually a deaf

22  person who has unique skills in understanding

23  those people who do use sign language.  But their

24  sign language can be different.  It can be almost

25  nonexistent.  They develop their own method.

```
 1                    B. MARANO
 2   Some of them are so disabled, like blind, deaf or
 3   other types of disability, only one appendage,
 4   things like that.  They assist us with using a
 5   regular interpreter to be able to communicate
 6   with the person.
 7             The only time that we've used it in my
 8   tenure has been when a person had developmental
 9   disabilities and they had a very limited use of
10   sign language but had to use sign language in
11   order to communicate.  So we brought in a CDI.
12      Q.    And that was based on that person's
13   individualized needs; is that right?
14      A.    And it was assessed by our contractor
15   that this is what would be needed.
16      Q.    And I just want to ask you a little
17   bit about what you just said, that that was
18   assessed by your contractor.  Who is that
19   contractor that did the assessment?
20      A.    Well, it was an interpreter for
21   Purple.  It was one of their managers actually,
22   one of their senior people.
23      Q.    And why is it that you relied on the
24   assessment of this contractor for communication
25   needs?
```

1                    B. MARANO

2        A.     Part of their contract is they do

3    consult with us, and we -- I wanted some other

4    options because things were not going well with

5    this person.  So in order to prepare them to go

6    out, and with their developmental disability and

7    with their hearing disability and their

8    situation, I wanted to look at other options.

9    And this was brought to my attention as a

10   possible option.

11              And we had to search far and wide, but

12   we did find someone who was internationally known

13   and was working for the UN at the time.  And she

14   worked with our senior interpreter, and it was

15   quite a learning experience.

16       Q.     And so would you agree with me that

17   this individualized assessment that you talked

18   about is really kind of what is needed to

19   determine if a person needs a CDI?  That's how

20   you figure that out?

21       A.     I was looking for options, and this

22   came up and it worked.

23       Q.     And you have reviewed the reports of

24   Dr. Judy Shepard-Kegl and Dr. Amy Rowley?

25       A.     Yes.  I think we're on record that I

```
 1                        B. MARANO
 2  wider screen, yes.  But it doesn't prohibit
 3  someone from being able to communicate using a
 4  cellular device.  It may not be the preferable
 5  method.  And I don't know why the person used
 6  that.  I don't know if something was not
 7  available, broke, not working, or what the
 8  situation was.
 9      Q.   What if I told you that the officer
10  testified that they in fact did have their laptop
11  with them and in fact could have used it but they
12  did it because they -- in terms of their hand
13  space, it was easier for them to just use the
14  cellular device?
15           MR. WEAVER:  Object.  Assuming,
16      misstating, omitting pertinent facts.  There
17      is evidence, as you know, that some of the
18      officers did use laptops and tablets.
19           THE WITNESS:  Okay.  So can you bring
20      your question back up?  What if the officer,
21      I believe you said, decided just to use the
22      cell phone?
23  BY MS. SHRADER:
24      Q.   No.  What I said was you indicated,
25  well, I don't know the circumstances surrounding
```

1                    B. MARANO

2   why the officer, for example, in Brandon Cobb's

3   video used a cellular telephone to communicate

4   with him through VRI as opposed to a laptop.

5            And I said to you, what if I told you

6   that the officer indicated that they did have a

7   laptop available but that their preference was to

8   not have to carry that with them into the home so

9   they just used their cell phone to free up their

10  hand space.

11       A.    I don't believe that utilized the best

12  option there.

13       Q.    And would you agree with me that

14  training would help to ensure that officers are

15  utilizing the best technology to ensure that

16  communication is effective?

17       A.    Training may address that problem.

18  But I would like to know how many people are

19  doing that.  Is that just this instance that this

20  person was doing it?  Did they do it all the

21  time?  Did we have a -- did anybody complain

22  about this, that it was ineffective and what was

23  the response to it?  So I would want to dig into

24  that.

25       Q.    Were you aware that a cellular

1                    B. MARANO

2    telephone device was used for VRI with another

3    individual who is a previously named plaintiff in

4    this case; he's no longer named but still a

5    person under supervision who is deaf with low

6    vision and utilizes often two sets of eyeglasses

7    to try to see?

8         A.    No.   That was not brought to my

9    attention.   But you said he's not a plaintiff

10   now.

11        Q.    I said he's not a named plaintiff.

12   But you're aware that this is a class action

13   lawsuit; is that right?

14        A.    Yes.

15        Q.    So you're aware that this case

16   involves not only the named plaintiffs but all of

17   the deaf and hard of hearing people who are under

18   supervision?

19        A.    I know that that's a possibility, yes.

20   However, I am concentrated on the people that

21   have complained that are listed as the

22   plaintiffs.   So I haven't gone through every

23   record of every person that could become part of

24   your class action.

25        Q.    But you did in fact go through some of

1                    B. MARANO

2    them that are not named, like Arin Daniel, Ashley

3    Barnett Moss.  Ernest Wilson was a previously

4    named plaintiff but is no longer named in this

5    case.  Huzzie Willis and Brian Byle.  You

6    reviewed videos for those folks who are not

7    currently named plaintiffs; is that right?

8         A.    I did.  And several of them were by

9    mistake.  But yes, I certainly remember Huzzie.

10        Q.    So I'm curious as to how you chose

11   those videos to view.

12        A.    Well, I was new to that layout, that

13   software, and I was just clicking to see how this

14   would operate.  So then I would look at it and

15   then click on the next one.  And then I sort of

16   got myself oriented to what I needed to do and

17   when.

18        Q.    So I just want to make sure that I

19   have a clear understanding.  Your intention was

20   to view the videos for the named plaintiffs, but

21   you kind of viewed some extra videos as you were

22   familiarizing yourself with the system; is that

23   right?

24        A.    I did.  I wanted to see how this

25   worked and how these body cams -- we don't use

Page 279

```
1                      B. MARANO

2    them in Virginia, but I am certainly going to

3    make a recommendation that we do.

4         Q.     In terms of the reports that you

5    reviewed for the plaintiffs' experts in this

6    case, do you have reason to dispute the findings

7    of -- any of the findings of Dr. Amy Rowley and

8    Dr. Judy Shepard-Kegl?

9         A.     I don't have the skills to dispute.

10   What I can say is, again, I watched the body cams

11   of Cobb and Nettles, and I believe that looking

12   at it, and those simple exchanges, that they

13   understood the officer and the officer understood

14   them.

15              I was looking for some pattern of

16   difficulty or complaints or grievances about the

17   way the officers are doing it.  I'm not seeing

18   it.  And I'm also not seeing the violations,

19   other than Ms. Hill who was added on who got

20   the -- what was it, a positive test for THC or

21   something.

22              Nettles seemed to be quite jovial,

23   entertaining the officer with tales of his

24   construction skills as to tile that the boss

25   wanted him to do his house and somebody else's
```

```
 1                       B. MARANO

 2        review of the same videos.  Is that what

 3        you're asking?

 4             MS. SHRADER:  I'm asking if the

 5        witness has a basis to dispute the opinions

 6        of Dr. Moriarty Harrelson.

 7             MR. WEAVER:  Objection; asked and

 8        answered.  He's already gone into length

 9        about his view of the videos versus her view

10        of the videos.

11             THE WITNESS:  I believe they are

12        communicating with their supervisor, and

13        they're able to maintain their supervision

14        successfully.  It may not be perfect, but

15        they certainly are able to get their

16        thoughts across, and the interpreter service

17        is able to provide the supervising officer

18        with responses to the questions asked.

19   BY MS. SHRADER:

20        Q.    Have you ever --

21        A.    May I ask something?  How much longer

22   do we have?  I'm just --

23        Q.    I'm wrapping up shortly.

24        A.    But for the whole thing?  It's what, a

25   seven-hour --
```

```
 1                      B. MARANO
 2           MR. WEAVER:  Seven hours is the limit
 3      under the federal rules.  I don't know how
 4      much time we've taken so far.
 5           THE WITNESS:  Can we ask?
 6           MR. WEAVER:  You can ask the court
 7      reporter.
 8           THE VIDEOGRAPHER:  We've used about
 9      six hours and one minute.
10           THE WITNESS:  Okay.  I've got it.
11 BY MS. SHRADER:
12      Q.   And you, in watching these body cam
13 videos, relied entirely on what you could hear
14 from the officer as well as the interpreter; is
15 that right?
16      A.   And what I observed.
17      Q.   And in terms of what you observed, I
18 just want to make sure that we're clear.  You may
19 have observed the individual signing, but you
20 couldn't understand what it is that they were
21 saying without the assistance of an interpreter;
22 is that right?
23           MR. WEAVER:  Objection; asked and
24      answered.
25           THE WITNESS:  That's correct.
```

1                      B. MARANO

2    BY MS. SHRADER:

3        Q.    And in terms of the videos that you

4    watched -- actually, I just want to go back to

5    your expert report.

6              As you sit here today, do you -- you

7    mentioned that you believed that you needed some

8    more information after some of the things that we

9    talked about.  Do you feel that you, with the

10   information that you have, can form an opinion as

11   to whether or not the DCS supervising officers

12   have received adequate training involving their

13   responsibilities under Title II of the ADA?

14             MR. WEAVER:  Objection; asked and

15        answered.

16             THE WITNESS:  Okay.  I believe that

17        maybe some adjustments can be made.  But

18        from the videos I'm watching, they are

19        generally, other than the mistake we saw

20        with Ms. Hill, communicating with these

21        people and supervising them, and they're

22        getting the responses they're seeking.

23             So I'm not seeing these people under a

24        great deal of duress.  I'm seeing these

25        people being supervised, like I said, and

```
 1                    B. MARANO
 2        going on with their lives under supervision.
 3   BY MS. SHRADER:
 4        Q.    And, Mr. Marano, how many videos did
 5   Mr. Weaver provide to you?
 6              MR. WEAVER:  Objection; asked and
 7        answered.  I've already told you he was
 8        provided all the videos.
 9              MS. SHRADER:  I'm asking for a number.
10   BY MS. SHRADER:
11        Q.    How many body cam videos were you
12   provided with?
13        A.    I didn't count them.
14        Q.    Was it more than 50?
15              MR. WEAVER:  Objection; asked and
16        answered.  You were provided with about 2000
17        videos, as was he.
18   BY MS. SHRADER:
19        Q.    So more than 2000 videos; is that
20   right?
21        A.    I assume that could be it.  I didn't
22   count them.  I focused on the named plaintiffs
23   because this was the issue for me.  And talking
24   to the relevant staff as far as the policy and
25   the -- their system of tracking, which I was very
```

```
 1                        B. MARANO
 2    interested in.
 3              So I watched these people, as I've
 4    said.  I've watched them communicate with their
 5    supervisors.  And I see them going about their
 6    business and explaining what is going on to the
 7    satisfaction of the supervisor and the supervisor
 8    wishing the best of luck until the next visit
 9    shows up.  And I'm not seeing difficulties here.
10              I have certainly seen many cases of
11    difficulties in Virginia far greater than what
12    I'm seeing these people being supervised on.
13         Q.   So I just want to be clear.  Out of
14    over 2000 videos, you watched 12; is that right?
15         A.   12, 13, something like that, yeah.
16         Q.   And including the two additional
17    videos that you watched for Ms. Hill, that would
18    be 14 altogether; right?
19              MR. WEAVER:  I think there are three
20         additional videos of Ms. Hill.
21              MS. SHRADER:  I think you're right,
22         Mr. Weaver.  I think that it is three.
23    BY MS. SHRADER:
24         Q.   So 15 videos altogether out of over
25    2000; is that right?
```

```
 1                     B. MARANO

 2      A.    Yes.

 3            MR. WEAVER:  Let me also correct.  The

 4      evidence was approximately 2000 videos, not

 5      over 2000 videos.

 6 BY MS. SHRADER:

 7      Q.    And what we saw today in terms of the

 8 email exchanges with Darrell Smith, the video

 9 exchange with Mary Hill as well as the document,

10 each of those evidenced some sort of concern

11 about communication.  Is that right?

12      A.    There are concerns.  There are

13 mistakes.  And again, I don't know what -- how it

14 fits in the big picture of how many things are

15 going well.  That is something I would like to

16 see.  But how many do we not have problems with?

17 How many of these people are being -- receiving

18 violations?  And what does that picture look

19 like?

20            With those that I concentrated on,

21 that I was given to focus on, I believe that they

22 were communicating with their supervisor, both

23 parties understood each other.

24      Q.    And who asked you to focus on those

25 videos?
```

```
 1                    B. MARANO

 2        A.    I think that because they were the

 3   plaintiffs, I assume that would be my focus.

 4        Q.    So what I'm hearing you say, and

 5   please correct me if I'm wrong, is that you would

 6   like more information.  Is that right?

 7              MR. WEAVER:  Objection; misstates his

 8         testimony.  More information?  He was given

 9         everything you were given.

10              THE WITNESS:  So summing it up again,

11         I don't have the responses to the Darrell

12         Smith nine emails.  I don't know what

13         follow-up was done.  So the situation could

14         have been corrected.  It wasn't the

15         principal focus of my attention.  My

16         attention was focused on the people that are

17         the named plaintiffs and whether they were

18         able to communicate effectively with those

19         that are supervising them.

20              And there were issues with Hill.

21         Certainly there were issues.  I did see her

22         in another one, like I said, in her

23         McDonald's uniform and a pair of glasses

24         communicating without all of those other

25         issues going on.
```

1                          B. MARANO

2              However, the ones that I watched, I

3        believe they were communicating with each

4        other, the information was correctly going

5        on, and they were not suffering any

6        difficulties with their supervisor.

7              I found the videos to show that the

8        community supervisor was quite understanding

9        and quite liberal about, sure, you're going

10       to go out of town, that's fine.  Everything

11       they asked, he was agreeable to.  He just

12       asked for some basic information and then

13       left.

14   BY MS. SHRADER:

15       Q.    So my question to you was a little bit

16   different.  My question was that when we've

17   talked about these circumstances that we reviewed

18   today where there were clearly issues, you've

19   indicated that you would like to know more about

20   what came from these interactions or these

21   emails; is that right?

22              MR. WEAVER:  Let me object to your

23        statement as your question is misstating the

24        record.  You said these interactions

25        involved --

1                    B. MARANO

2          MS. SHRADER:  Mr. Weaver, your

3      objection is noted for the record.  I would

4      ask that you --

5          MR. WEAVER:  That's a misstatement of

6      the record.

7          MS. SHRADER:  -- suspend your coaching

8      and your speaking objections.  Your

9      objection to the form of my question is

10     noted for the record.

11  BY MS. SHRADER:

12     Q.    Please respond to my question.

13         MR. WEAVER:  Same objection.

14         THE WITNESS:  Okay.  So what I'm

15     saying is I don't have that information.  So

16     I can't tell without that information how

17     bad a mistake that is or where that plays in

18     the big picture.  As I said, I don't know

19     what percentage are problems.  So I said

20     without that information, I couldn't tell

21     you how bad it is or how good it is.

22         MS. SHRADER:  And that was my

23     question.  Thank you.

24         I have nothing further.

25         MR. WEAVER:  Okay.

1                        B. MARANO

2          THE WITNESS:  Can I take one brief

3     moment?

4          MR. WEAVER:  Okay.  Let's take a short

5     break.  And let's see.  I have a few

6     questions, hopefully very few, and then

7     hopefully we can wrap this up.

8          THE WITNESS:  Okay.  All right, I'll

9     be right back.

10          THE VIDEOGRAPHER:  The time is

11     6:25 p.m.  This is the end of media number

12     4.  We're off the record.

13          (Off the record.)

14          THE VIDEOGRAPHER:  The time is

15     6:45 p.m.  This is the start of media number

16     5.  We're on the record.

17                    EXAMINATION

18 BY MR. WEAVER:

19     Q.    Mr. Marano, just a few questions here

20 in follow-up to Ms. Shrader's questions.

21          Let me ask you this.  Assuming that

22 Mr. Darrell Smith, the Georgia ADA coordinator at

23 the Department of Community Supervision, had a

24 phone conversation with the officers who were

25 mentioned or involved in those email

```
 1                        B. MARANO

 2   communications that were discussed with

 3   Ms. Shrader, and this was Exhibit 129, assuming

 4   that Mr. Smith had a telephone conversation with

 5   those officers after they raised a question or an

 6   issue and provided coaching and guidance in that

 7   phone conversation, how would that affect your

 8   opinion?

 9            MS. SHRADER:  Objection; assumes facts

10        not in evidence.

11   BY MR. WEAVER:

12        Q.    Go ahead and answer.

13            MS. SHRADER:  Mr. Marano, you're on

14        mute.

15   BY MR. WEAVER:

16        Q.    You're muted, Barry.  Barry, you're

17   muted.

18        A.    It wouldn't respond.  Can you hear me

19   now?

20        Q.    Yeah.

21        A.    Okay.  So I believe that if he

22   followed up those emails about these potential

23   issues, it would go a long way to providing them

24   the corrective action needed to stay within the

25   effective communication mandate.
```

1                          B. MARANO

2    have you seen in what you've reviewed here, the

3    body cam video and the other documents, have you

4    seen evidence that there is a high percentage or

5    ratio of problematic encounters versus those that

6    do not seem to have a problem?

7         A.    Well, I don't have all of the figures.

8    But when you talk about 85 and follow-ups being

9    done to those identified as problems, I would not

10   say there is an outstanding issue there.

11        Q.    All right.  Do you know or do you

12   recall from looking at all these materials that

13   have been provided to you, Mr. Marano, how often

14   each of the named plaintiffs that you focused

15   on -- Brandon Cobb, Joseph Nettles and Mary

16   Hill -- do you recall how often in the past

17   before they became involved in this case they had

18   the services of a certified deaf interpreter?

19        A.    Well, I did not see any record that

20   they did.  So I don't know of them using them.  I

21   certainly didn't see requests for such on the

22   body cams or I didn't see any documents where

23   they -- that this was an issue from time past.

24        Q.    Okay.  Let me ask you one last

25   question about Mary Hill.  So she -- we looked at

1                      B. MARANO

2     the consent order and talked about the fact that

3     her officer, Mr. Roper, failed to read certain

4     portions of that order through the interpreter to

5     her.  Do you recall that testimony?

6          A.    I do.

7          Q.    Okay.  Do you know whether Ms. Hill

8     admitted that she had ingested or used THC and

9     whether, if so, that would have caused her

10    revocation regardless -- or her incarceration for

11    60 days regardless of her community service

12    hours?

13         A.    Well, I recall her saying in the video

14    that she didn't know that she would test

15    positive.  And I don't remember what she said she

16    did.  But also, she said that in the group that

17    she hung around, that maybe this experience would

18    be helpful because it obviously wasn't helping

19    her life.

20         Q.    You're talking about like breaking her

21    connection to people who were using drugs?

22         A.    Yes.

23               MR. WEAVER:  All right.  That's all I

24         have.  Thank you very much.

25               MS. SHRADER:  I just have brief

1                          B. MARANO

2        follow-up.

3                          EXAMINATION

4    BY MS. SHRADER:

5        Q.    Mr. Marano, you indicated that today

6    you've not been shown all the documents that you

7    looked at to develop your opinions regarding

8    training; is that right?

9        A.    Correct.

10       Q.    Can you please specifically identify

11   to us the documents that you reviewed to develop

12   your opinion as to training.

13            MR. WEAVER:  You want him to give you

14       Bates numbers?  Is that what you want?

15            MS. SHRADER:  I would like them to be

16       specifically identified.  If that's by Bates

17       numbers, sure.  If that's by showing us the

18       documents, that's fine.  However it's

19       easiest for the witness to do.

20            MR. WEAVER:  Well, I don't think you

21       really want it to be easy on the witness.

22       But you've been told that he was provided

23       with all of the documents you've been

24       provided, and there are numerous documents,

25       probably 30 or 40, that involve training.

```
1                    B. MARANO
2         MS. SHRADER:  The witness has
3    specifically testified that he did not
4    review all of the documents.  He may have
5    been provided with them, but he did not
6    review them.  I would like to know the
7    documents the witness reviewed in
8    determining his opinion.  And I'm entitled
9    to know that.  In fact --
10        MR. WEAVER:  Well, only in the --
11        MS. SHRADER:  -- that's required to be
12   provided --
13        MR. WEAVER:  -- limited respect that
14   you're restating his testimony.
15        MS. SHRADER:  -- in his expert
16   disclosure prior to this deposition.
17        MR. WEAVER:  Let me object.  Let me
18   object if you'll let me say something.  Let
19   me object.  He never said he didn't review
20   all the training documents.  He didn't
21   review all the documents regarding all 85
22   offenders.
23        MS. SHRADER:  Mr. Weaver, I am asking
24   the witness a question.  If he would like to
25   say he's reviewed X, Y and Z policies or
```

```
 1                    B. MARANO
 2   training documents, that's fine.  But the
 3   witness needs to respond to the question.
 4        He's testified repeatedly today that
 5   he was provided with thousands of documents
 6   but that he did not review them all.  I am
 7   entitled to know, and the plaintiffs are
 8   entitled to know, what specific documents
 9   this witness reviewed in reaching his
10   opinions in the case.  That's required to be
11   disclosed at the time of the expert
12   disclosures, not at the 11th hour on the
13   last day of discovery.
14        So I'm asking again --
15        MR. WEAVER:  Hold on.  I don't need
16   your legal opinion.
17        MS. SHRADER:  -- for the specific
18   documents that the witness -- that the
19   witness reviewed --
20        MR. WEAVER:  You were told he was
21   provided with all the training documents.
22        MS. SHRADER:  Please do not speak over
23   me, Mr. Weaver.
24        MR. WEAVER:  You've been told he was
25   provided with all the training documents.
```

```
 1                         B. MARANO

 2         He never said he didn't look at all the

 3         documents.   There are 30 or 40 such

 4         documents, and there are 25,000 pages of

 5         documents plus Excel spreadsheets and about

 6         2000 videos.  So it's --

 7              MS. SHRADER:  And my question to the

 8         witness stands.

 9   BY MS. SHRADER:

10         Q.   What documents did you specifically

11   review in reaching your opinion in this case --

12              MR. WEAVER:  Objection.

13   BY MS. SHRADER:

14         Q.   -- concerning training?

15              MR. WEAVER:  Same objection.

16              MS. SHRADER:  And you can object.  The

17         witness has to answer.

18              MR. WEAVER:  He has to answer if he's

19         able.

20              MS. SHRADER:  If he's not able, then

21         we'll be making the appropriate motions to

22         the court.

23   BY MS. SHRADER:

24         Q.   What documents --

25              MR. WEAVER:  You can make appropriate
```

1                      B. MARANO

2      motions --

3  BY MS. SHRADER:

4      Q.    -- did you review to reach your

5  opinion as to the training in this case?

6              MR. WEAVER:  He was provided with all

7        the documents.  You've been told that

8        repeatedly.

9              MS. SHRADER:  That's not the question,

10       and that's not what the disclosures require.

11 BY MS. SHRADER:

12     Q.    What documents did you review to reach

13 your opinion?

14             MR. WEAVER:  He told you he looked at

15       all the documents regarding training.

16             MS. SHRADER:  Mr. Weaver, please allow

17       the witness to answer the question.

18             MR. WEAVER:  Well, if your question

19       made sense, that would be fine.

20             THE WITNESS:  Do I answer?

21 BY MS. SHRADER:

22     Q.    Yes, you have to answer.

23     A.    Okay.  To my knowledge, I looked at

24 the training documents that were provided.  Some

25 of them dealt with, like, online training from

1                          B. MARANO

2    what I remember.  And there were other documents

3    that they put out.

4              So I don't remember the total numbers,

5    and I don't remember the specific titles.  But I

6    looked at them, and I said that they are

7    providing training to the staff about

8    accommodations.

9        Q.    My question is:  What specific

10   documents did you review?  And I understand that

11   you have been provided with a lot of documents.

12   But you are obligated to inform us of what

13   documents you reviewed in reaching your

14   conclusions.

15             MR. WEAVER:  Same objection.  You've

16        been told on page 2 of his report he looked

17        at DCS training materials.

18             MS. SHRADER:  DCS training materials

19        doesn't tell me what documents he reviewed.

20             MR. WEAVER:  Yes, it does.

21             THE WITNESS:  I looked at what they

22        provided me for training.

23   BY MS. SHRADER:

24       Q.    Were they entitled "Training"?  How do

25   you know that those are the only documents that

```
 1                    B. MARANO
 2   were regarding training?  How did you pull these
 3   specific documents and say, "These are the
 4   training documents and I reviewed them all"?
 5        A.    I received documents from -- what's
 6   his name? -- Darrell, about their training.  And
 7   I reviewed them.  They were forwarded to me, so I
 8   opened them up and skimmed them.  And I believe
 9   that some of them dealt with online training for
10   the officers, for the supervising officers.
11              How many of them there were that I
12   looked at, I don't remember that.  I remember
13   going through them and reading them.
14        Q.    So this was a specific communication
15   from Darrell Smith that included an attachment
16   with the training materials.  Is that what your
17   testimony is?
18        A.    Talking to Darrell Smith, I received
19   documents regarding their training and their
20   operation.  Now, whether he sent them or somebody
21   else sent them, I don't know that now.
22        Q.    But it was --
23        A.    I think --
24        Q.    I just want to make sure I'm clear.
25   You didn't receive a Dropbox with over 3000
```

```
 1                    B. MARANO
 2    documents in it.  You actually received a
 3    specific separate either email or some other
 4    communique that included just training materials.
 5    Is that what you're testifying to?
 6         A.    From what I remember, there was other
 7    material in there.  But at the beginning of it,
 8    from what I remember, there was training.  And
 9    there were other notices and policies.  So I was
10    specifically looking at the training, do they
11    train their staff.  That was my question.
12         Q.    So was this through an email
13    communication?  Or how did you receive this
14    information?
15         A.    Electronically.
16         Q.    How?  Through an email communication
17    or through some other means?
18         A.    It was an email.  It was an email that
19    I would open up and I would have what you call
20    Dropboxes and lots of documents.  And I went
21    hunting for -- I had specific missions as I read
22    these things in sections.  And I was looking for
23    training.  I was looking for policy.  I was
24    looking for references to other issues like ADA
25    overviews and things of that nature.
```

1                      B. MARANO

2        Q.    And how did you do your search of

3    these thousands of pages of documents to

4    determine which of them contained information

5    regarding training?

6        A.    I put the curser on there, and it

7    would tell me briefly what that document was.

8    And sometimes it was hit or miss.

9        Q.    So you're saying the documents had

10   names, and you went by the names of the documents

11   to determine whether or not they were something

12   that you --

13       A.    There was some sort of label when I

14   went over it, and I would try them and open them

15   and see what it was about.  But I requested

16   information on the training.  I requested

17   information on the policy.

18       Q.    So when --

19       A.    And then I spoke to Darrell Smith

20   regarding that.

21       Q.    So when you requested the information

22   on the training and on the policy, were you

23   provided with that information separately in a

24   separate communication?

25            MR. WEAVER:  Objection; asked and

```
 1                     B. MARANO
 2      answered.
 3           THE WITNESS:  I don't remember what
 4      else was included.  I received a large
 5      number of emails and documents.  So early on
 6      I looked for the training.  That I no longer
 7      remember.  This was a long time ago.
 8 BY MS. SHRADER:
 9      Q.    I understand it was a long time ago.
10 But when you're an expert in a case, you have to
11 advise the other attorney of the documents, the
12 specific documents you reviewed.  And here you've
13 testified that you had access to all of the
14 documents in this case but you didn't review them
15 all.  So I'm trying to make sure we're very
16 granular so that we know what documents it is
17 that you reviewed to reach your opinion.  We're
18 entitled to know that.  That's a very --
19      A.    And I'm --
20      Q.    -- important piece of information,
21 because you just testified that we haven't talked
22 about all of the documents that you reviewed.  I
23 would like us to talk about all the documents you
24 reviewed, but you're not able to tell me what
25 those were.
```

1                        B. MARANO

2        A.    I'm not able to recall all of them,

3   but I know that I looked at the training

4   documents because it was of special interest to

5   me.

6        Q.    And did the training document have a

7   specific name that you looked at?

8        A.    It could have had -- each one had a

9   label of what it was when you opened it up.

10       Q.    And how many of these training

11  documents do you believe you reviewed?

12       A.    Well over 20.

13            MR. WEAVER:  Can I ask the court

14       reporter, what is the time we're at now on

15       this deposition?

16            THE VIDEOGRAPHER:  We're at

17       approximately six hours and 39 minutes on

18       the record.

19  BY MS. SHRADER:

20       Q.    So I just want to make sure I

21  understand this clearly.  You received multiple

22  email communications with documents.  You didn't

23  just receive one invitation to a Dropbox that

24  contained numerous files; is that right?

25       A.    That's my recollection, yes.

1              B. MARANO

2         MS. SHRADER:  So we would like

3    production of what was provided to the

4    witness in the fashion in which it was

5    provided to the witness.

6         MR. WEAVER:  Well, you're not going to

7    get it.  We produced everything to him.  His

8    attention was called to a subset of the big

9    class of everything.  And your production,

10   our production has labels indicating

11   training materials.  So he searched for

12   training materials and looked at them.

13   That's what he just said.

14        You've got everything he had.

15        MS. SHRADER:  Mr. Weaver, you know

16   very well that the rules require you to

17   provide a list of the documents that were

18   reviewed by the expert in preparing for

19   their report and preparing their conclusions

20   in the case.

21        MR. WEAVER:  He's done that.

22        MS. SHRADER:  That means with

23   specificity.

24        MR. WEAVER:  We've done that.

25        MS. SHRADER:  That doesn't mean that

1              B. MARANO

2    you just say he's been provided with all the

3    files.

4         MR. WEAVER:  Well, I just explained to

5    you --

6         MS. SHRADER:  He has to identify with

7    specificity --

8         MR. WEAVER:  Okay.  I explained to

9    you --

10        MS. SHRADER:  -- the documents that he

11   reviewed.

12        MR. WEAVER:  -- what he was provided.

13   That's all you're entitled to.

14        MS. SHRADER:  No.  We are entitled to

15   what he reviewed.

16        MR. WEAVER:  It says in his report he

17   looked at all the training materials.

18        MS. SHRADER:  We are entitled to know

19   what he reviewed.

20        MR. WEAVER:  Well, I'm not interested

21   in your so-called expert opinion.

22        MS. SHRADER:  Mr. Weaver, it's not my

23   expert opinion.  But we're going round and

24   round because you failed to provide adequate

25   disclosures prior to today's deposition.  So

1                   B. MARANO

2          ACKNOWLEDGMENT OF DEPONENT

3

4      I, BARRY S. MARANO, have read or have had

5   the foregoing testimony read to me and hereby

6   certify that it is a true and correct

7   transcription of my testimony with the exception

8   of any attached corrections or changes.

9

10

11   _____

12   BARRY S. MARANO

13   [ ] No corrections

14   [ ] Correction sheet(s) enclosed

15

16      SUBSCRIBED AND SWORN TO BEFORE ME, the

17   undersigned authority, by the witness, BARRY S.

18   MARANO, on this the _____ day of

19   _____, _____.

20

21

22

23

24

25

1                          B. MARANO

2                 C E R T I F I C A T E

3

4    COMMONWEALTH OF VIRGINIA

5              I, JOHN L. HARMONSON, a Notary Public

6    within and for the Commonwealth of Virginia, do

7    hereby certify that BARRY S. MARANO, the witness

8    whose deposition is hereinbefore set forth, was

9    duly sworn by me and that such deposition is a

10   true record of the testimony given by such

11   witness.

12             That before completion of the

13   proceedings, review and signature of the

14   transcript was not requested.

15             I further certify that I am not related

16   to any of the parties to this action by blood or

17   marriage; and that I am in no way interested in

18   the outcome of this matter.

19             IN WITNESS WHEREOF, I have hereunto set

20   my hand this 26th day of August, 2021.

21             *John L. Harmonson*

22             _____

23             JOHN L. HARMONSON, RPR
               Virginia CCR #0613313
24             Notary Public for the
               Commonwealth of Virginia #7349255
25             My commission expires: 01/31/22

2                     ERRATA SHEET

3  CASE:     Cobb, et al. v. Georgia Dept. of

                   Community Supervision, et al.

4  DATE:     August 16, 2021

   WITNESS:  BARRY S. MARANO

5  Reason Codes:

6          1.  To clarify the record.

           2.  To conform to the facts.

7          3.  To correct transcription errors.

8  Pg. Ln.  Now Reads          Should Read        Reason

9  ___ ___  _____   _____   _____

10 ___ ___  _____   _____   _____

11 ___ ___  _____   _____   _____

12 ___ ___  _____   _____   _____

13 ___ ___  _____   _____   _____

14 ___ ___  _____   _____   _____

15 ___ ___  _____   _____   _____

16 ___ ___  _____   _____   _____

17 ___ ___  _____   _____   _____

18 ___ ___  _____   _____   _____

19 ___ ___  _____   _____   _____

20

                              _____

21                            Signature of Deponent

22

23 SUBSCRIBED AND SWORN BEFORE ME

24 THIS ____ DAY OF _____, _____

25 _____

   (Notary Public)  MY COMMISSION EXPIRES:_____