# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **BRANDON COBB, MARY HILL, and JOSEPH NETTLES, on behalf of themselves and all others similarly situated,** | Civil Action No. 1:19-cv-03285-WMR |
| *Plaintiffs,* | <u>**CLASS ACTION**</u> |
| v. | |
| **GEORGIA DEPARTMENT OF COMMUNITY SUPERVISION, and MICHAEL NAIL, in his official capacity as Commissioner of the Georgia Department of Community Supervision,** | |
| *Defendants.* | |

## <u>PLAINTIFFS' LOCAL RULE 56.1 STATEMENT OF ADDITIONAL MATERIAL FACTS</u>

                                            /s/ Tyler J. Fink

Susan Mizner, *pro hac vice*              Tyler J. Fink, *pro hac vice*
Zoe Brennan-Krohn, *pro hac vice*         ARNOLD & PORTER KAYE SCHOLER LLP
Brian L. Dimmick, *pro hac vice*          250 West 55th Street
West Resendes, *pro hac vice*             New York, New York 10019
Talila A. Lewis, *pro hac vice*           Phone:  (212) 836-8000
AMERICAN CIVIL LIBERTIES UNION            Fax:  (212) 836-8689
DISABILITY RIGHTS PROGRAM                 Tyler.Fink@arnoldporter.com
39 Drumm Street
San Francisco, CA 94111                   Stephanna F. Szotkowski, *pro hac vice*
Phone: (415) 343-0781                     ARNOLD & PORTER KAYE SCHOLER LLP
Fax: (415) 395-0950                       70 West Madison Street, Suite 4200
SMizner@aclu.org                          Chicago, Illinois 60602
ZBrennan-Krohn@aclu.org                   Phone: (312) 583-2354
BDimmick@aclu.org                         Fax: (312) 583-2591
WResendes@aclu.org                        Stephanna.Szotkowski@arnoldporter.com
Talila.A.Lewis@gmail.com                  Kathryn.Geoffroy@arnoldporter.com

Andrés M. López-Delgado,                  Ian Hoffman, *pro hac vice*
GA State Bar No. 552876                    Rebecca A. Caruso, *pro hac vice*
AMERICAN CIVIL LIBERTIES UNION            ARNOLD & PORTER KAYE SCHOLER LLP
FOUNDATION OF GEORGIA, INC.               601 Massachusetts Ave, NW
P.O. Box 77208                            Washington, DC 20001
Atlanta, GA 30357                         Phone: (202) 942-5000
Phone:  (732) 666-3300                    Fax: (202) 942-5999
Fax:  (770) 303-0060                      Ian.Hoffman@arnoldporter.com
SYoung@acluga.org                         Rebecca.Caruso@arnoldporter.com

Claudia Center, *pro hac vice*            Brittany Shrader, *pro hac vice*
DISABILITY RIGHTS EDUCATION AND           NATIONAL ASSOCIATION OF THE DEAF
DEFENSE FUND                              LAW AND ADVOCACY CENTER
3075 Adeline St, Suite 210                8630 Fenton Street, Suite 820
Berkeley, CA 94703                        Silver Spring, MD 20910
Phone: (510) 644-2555                     Phone: (301) 587-2907
CCenter@dredf.org                         brittany.shrader@nad.org

                                          *Attorneys for Plaintiffs*

Pursuant to Rule 56.1(b)(2)(B) of the Local Rules of the United States District Court for the Northern District of Georgia (the "Local Rules") and Section II.g.ii of this Court's Standing Orders Regarding Civil Litigation ("Standing Orders"), Plaintiffs Brandon Cobb, Joseph Nettles and Mary Hill submit this Statement Of Additional Material Facts identifying facts not included in Defendants Georgia Department of Community Supervision ("DCS") and Michael Nail's (collectively, "Defendants") Statement of Material Facts (ECF No. 200-1) (the "SOF") which are material to this action and raise genuine issues of material fact for trial. All facts are considered by Plaintiffs to be undisputed unless otherwise indicated below.

## The DCS ADA Policy

1.      Darrell Smith was appointed to the role of ADA Coordinator in September 2019. No DCS employee had held the position of ADA Coordinator prior to Smith's appointment. Ex. E, Smith 2020 Dep. at 42:2-8, 48:20-49:3.

2.      When Smith became the ADA Coordinator, he decided to look into issues related to DCS's communication with supervisees who are deaf and hard of hearing because he identified it as  "the biggest thing that I saw that needed to be addressed quickly." He stated that the information "that was given to me to show me what was going on with our offenders who were deaf, I saw that there was a need." He reached this decision only after reviewing documents related to this lawsuit. Smith has not been made aware of supervisees with other types of disabilities nor

has he focused on addressing the needs of supervisees with other types of disabilities. *Id*. at 229:4-231:16.

3.      DCS began developing its ADA policy in September or October 2019. *Id*. at 72:13-17.

4.      The research that went into developing the policy consisted of pulling ADA policies from two other government agencies. *Id*. at 170:19-172:15.

5.      After the policy was adopted on or about November 29, 2019, nothing about the policy was communicated to DCS Community Supervision Officers ("CSOs") until on or about January 31, 2020. *Id*. at 176:7-12.

6.      When DCS communicated to CSOs and other staff that the ADA policy had been adopted, DCS did not communicate that the prior policy on securing interpreters was no longer in effect. Ex. F, Smith 2021 Dep. at 54:14-21, 63:21-64:12. That interpreters policy continues to be a "direction and common practice" by DCS for how to obtain an in-person interpreters. *Id.* at 65:9-66:6.

7.      The ADA policy was modified in or about September 2020.  The reason for this update to the policy was that "[s]ome updates needed to be added from our previous meeting that we had with [Plaintiffs' counsel]." Ex. F, Smith 2021 Dep. at 205:8-207:13. The current version of the policy was adopted on or about June 1, 2021. MSJ Ex. B (Smith Decl. 3) ¶ 6.

8.     The current version of the ADA policy states that DCS "will generally, upon request, provide appropriate aids and services leading to effective communication for qualified persons with disabilities." The policy does not make the provision of appropriate aids and services mandatory. MSJ Ex. B (Smith Decl. 3), Attachment 1 (the "ADA Policy") at IV.E. In introducing a section that lists services offered by Georgia Relay, the policy also states that DCS "encourages supervisees to utilize the services listed below to assist with communication with DCS when supervisees are not in DCS presence." *Id.* at IV.J.

9.     Mr. Smith is still the only staff member in the DCS ADA unit, although he stated in 2020 that he hoped to have more staff. Ex. E, Smith 2020 Dep. at 158:3-17; Ex. F, Smith 2021 Dep. at 236:22-237:16.

10.     DCS engaged Barry Marano to provide opinions about the ADA policy, among other topics. Marano does not know American Sign Language ("ASL"). Ex. W, Marano Dep. at 82:23-83:2. He is not a linguist. *Id.* at 219:6-8. He is not a forensic or linguistic anthropologist. *Id.* at 219:9-11. He has no training in assessing the reading comprehension or language abilities of people who are deaf and hard of hearing. *Id.* at 219:12-16. He concedes that he is not qualified to issue an opinion as to whether a deaf person could read and understand a document written in English. Nonetheless, Marano acknowledges that, in his experience, legal language is often

difficult for people to read and understand whether they are deaf or not. *Id.* at 219:17-220:20.

11.     In rendering his opinions, Marano concentrated on the experiences of the named plaintiffs and whether he believed that communication with them was effective, even though he was aware this case was brought as a class action. Ex. W, Marano Dep. at 277:15-24. He interviewed only two people in forming his opinion, and did not interview any CSOs. *Id.* 241:23-242:7. Out of about 2,000 body camera videos from DCS that he was provided, he watched about 15 videos in formulating his opinions. *Id.* 285:4-287:5.

12.     Marano's universe of comparison for what other organizations do in terms of policies for providing effective communication consists entirely of entities that are either being sued or are worried about being sued for failing to provide effective communication to deaf and or hard of hearing people. *Id*. at 251:3-20. Mr. Marano opined that DCS' policies were in line with these other entities. ECF 185-1, Marano Expert Report, dated May 2021, at 1.

## Training

13.     CSOs need "training in terms of identifying when a deaf individual may need another method of communication." Ex. E, Smith 2020 Dep. at 117:3-7.

14.     The DCS Annual Training Policy does not require ADA training for any DCS employees. Ex. X, Annual Training Policy.[1]

15.     DCS "doesn't have formal training on . . . how to identify communication needs of deaf and hard of hearing individuals." Ex. F, Smith 2021 Dep. at 179:20-180:9; Ex. G, Hilliard Dep. at 30:11-15. DCS does not provide formal training "concerning the provision of auxiliary aids and services for people who are deaf and hard of hearing" apart from a training provided by LanguageLine, DCS's VRI provider. Smith 2021 Dep. at 181:17-24. DCS also has no formal training, other than what was provided by LanguageLine, on when CSOs should use video remote interpreting ("VRI"). *Id*. at 78:9-17.

16.     DCS provides no formal training to CSOs on the fact that some supervisees who are deaf or hard of hearing do not read or write English, nor how CSOs should recognize whether an individual can understand written communication. Ex. E, Smith 2020 Dep. at 110:21-111:9. DCS provides no formal training to CSOs on how to determine whether supervisees who are deaf or hard of hearing can understand written questions such as whether they need an accommodation or what their preferred method of communication is. *Id*.

---

[1] Unless stated otherwise, all references to exhibits herein refer to the exhibits listed in the Declaration of Tyler Fink submitted in support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment.

17.     DCS provides no formal training to CSOs on how to appropriately use VRI during field interactions or whether "VRI is adequate to allow for communication with the [supervisee]." Ex. A, Driver Dep. at 133:9-21, 140:4-15.

18.     DCS provides no formal training to CSOs on how to determine whether the size of the screen on a device is appropriate for VRI. Ex. F, Smith 2021 Dep. at 40:24-42:15, 45:3-14; Ex. A, Driver Dep. at 134:3-6.

19.     DCS provides no formal training to CSOs on how to communicate with supervisees in the field when VRI is not working. *Id*. at 139:17-21.

20.     DCS provides no formal training to CSOs on how to obtain in-person interpreters. Ex. F, Smith 2021 Dep. at 66:21-67:13; Ex. G, Hilliard Dep. at 47:18-48:6.

21.     Even though Mr. Smith agreed that training might be helpful, and even though training on determining communication needs was being "considered" by DCS starting at least by February 2020, Mr. Smith testified that no such training had been implemented as of January 2021, nearly a year and a half after the case was filed.  Ex. E, Smith 2020 Dep. at 62:18-63:15; Ex. F, Smith 2021 Dep. at 181:6-182:20.

22.     Marano lacked sufficient information to formulate an opinion as to whether DCS's training is adequate. Ex. W, Marano Dep. at 284:3-290:21 ("So what I'm saying is I don't have that information. So I can't tell without that information

how bad a mistake that is or where that plays in the big picture. . . . As I said, I don't know what percentage are problems. . . . So I said without that information, I couldn't tell you how bad it is or how good it is.").

### The Initial Interview

23. The initial interview is intended to be a discussion where both the CSO and the supervisee communicate information to each other. Ex. A, Driver Dep. at 26:13-17. DCS wants the input of the supervisee during the meeting because "[w]e feel like that if they . . . have a say-so in their case, in developing their case plan of what they can and cannot do, and we can work with them on those things, then they're more bought into the supervision process because they had a part in helping plan it." Ex. A, Driver Dep. at 25:18-23.

24. Due to the details discussed at the initial interview, effective communication between the CSO and supervisee is necessary. Ex. F, Smith 2021 Dep. at 151:6-21; 152:13-18; 156:4-161:12. The initial intake meeting sets the tone for the entire period of supervision. *Id.* at 151:15-24; Ex. A, Driver Dep. at 24:21-25:11. At this meeting, CSOs are required to go over all conditions and requirements of the parole or probation. Ex Y, Initial Interview Policy at  IV.B.1; Ex. F, Smith 2021 Dep. at 156:4-10; Ex. A, Driver Dep. at 24:21-25:11. CSOs are supposed to make sure the supervisee understands all the rules they must follow, such as the drug testing policy, and how not following these rules will result in violations and

sanctions. Ex. F, Smith 2021 Dep. at 156:11-24; Ex. A, Driver Dep. at 24:21-25:25. During this interview, CSOs explain specific or relevant policies to the supervisee, including any special conditions of the court order or release certificate, the grievance process, paying restitution fees, or sex offender registration. Ex. F, Smith 2021 Dep. at 157:10-161:9.

25.     At intake, it is also important to make sure the supervisee's needs are addressed—such as counseling, mental health, housing, or employment—and that the supervisee is given referrals to the appropriate services depending on their needs. Ex. A, Driver Dep. at 27:6-28:11; Ex. F, Smith 2021 Dep. at 158:23-159:4.

26.     Despite the recognized importance of the initial interview, DCS has failed to provide effective communication during the intake interview on multiple occasions. *See, e.g.*, infra at ¶¶ 70-72 (Plaintiff Cobb's initial interview); 87-88 (Plaintiff Hill's initial interview), 112-114 (Plaintiff Nettles' initial interview); Ex. Z, Shields Decl. ¶ 20 (even though CSO knew that class member was deaf and needed an interpreter, she attempted to talk to him for five minutes without using VRI).

**Assessment of Communication Needs**

27.     As part of its initial interview process, CSOs are directed to ask supervisees the question "Do you require an ADA (American with Disabilities Act) accommodation due to a physical or mental impairment that substantially limits a

major life activity?" CSOs are not required to ask any other questions to determine whether an individual needs accommodations or auxiliary aids and services due to a disability.  Ex. AA, Initial Interview Questionnaire at 3; Ex. A, Driver Dep. at 40:19-41:11.

28.    DCS does not have a method to ascertain if a supervisee who is deaf or hard of hearing needs any aids or services if the supervisee is not able to communicate what he or she needs to the CSO. Ex. A, Driver Dep. at 46:19-47:9.

29.    DCS does not require or expect its CSOs to ask class members whether the communication they are receiving is working properly or is effective after the initial interview. *Id*. at 61:23-62:10.

30.    Smith acknowledges that once DCS is aware that a supervisee is deaf or hard of hearing, DCS needs to "find out exactly what [the individual's] needs are and what level they are." Ex. E, Smith 2020 Dep. 291:7-292:14.

31.    A communication assessment performed by a specialist would be the best way for DCS to determine the communication needs of each supervisee. Ex. T, Harrelson Dep. at 109:15-110:6; Ex. W, Marano Dep. at 225:14-226:7. CSOs have been repeatedly incorrect in their assessments of what auxiliary aids and services are needed by class members. Szotkowski Decl. Ex. K; Ex. I, Harrelson Report (November 2020) (the "Harrelson Report") at 17 (While CSO states that Barnett reads lips well, and uses written notes to communicate with class member,

Plaintiffs' expert determined that class member in fact primarily communicates using ASL); Ex. BB, Case Notes for Gabriel Cohen (7/25/19); Ex. I, Harrelson Report at 24-26 (CSO appears to believe that Cohen can communicate effectively through text and speaking, when in fact Plaintiffs' expert concluded that his primary method of communication was ASL); Szotkowski Decl. Ex. M, BodyCam Video of Courtney Phillips (3/20/19) (CSO insisted that class member could read lips even after his mother stated that he could not); Ex. CC, Case Notes for Anthony Reid (5/12/19 and 8/27/20) (DCS staff believed that Reid could communicate using Facebook Messenger, even though on previous office visit he had been observed having difficulty with written communication).

32.    DCS expects that CSOs will be able to determine whether communication using VRI is effective based only on whether the CSO believes the supervisee is able to process information that is being provided to them.  Ex. A, Driver Dep. at 51:15-52:2.

## DCS Supervision

33.    CSOs have the authority to change or modify conditions or rules of supervision. CSOs can add conditions of probation during the course of supervision, based on the supervisee's behavior. These can include requiring that supervisees attend alcohol or drug classes, anger management classes, or submit to a drug or alcohol evaluation and participate in any recommended treatment. Ex. B, Branch

Dep. at 79:3-81:14; Ex. C, Mays Dep. at 41:7-44:2. On occasion, CSOs can waive conditions such as community service requirements. *Id.* at 209:7-24. CSOs can also choose the curfew for a supervisee in some cases. Ex. D, Worley Dep. at 67:21-70:9; 72:11-74:18.

34.     DCS assists supervisees in obtaining information about, and finding treatment and rehabilitative services like, substance abuse treatment and mental health services. CSOs are often knowledgeable about local service providers and can assist supervisees by making referrals or contacting service providers. Ex. A, Driver Dep. at 68:12-70:4, 77:20-78:15, 84:10-85:19. Assisting supervisees in accessing these services leads to better integration into the community and better outcomes on supervision. *Id*. at 65:15-67:9.

35.     CSOs can make referrals for services to address housing, employment, and other needs. CSOs are also expected to discuss these services with the supervisee during the initial interview and at subsequent meetings. *Id*. at 89:9-91:10, 100:21-103:18, 104:8-106:10.

36.     If the supervisee's answers during the initial interview indicate a need for employment or housing, the CSO "would be expected to talk to the supervisee about providing services or helping the supervisee address that need." *Id*. at 34:3-35:2.

## Video Remote Interpreting

37.    While VRI can be useful with the right technology, the right context, and a strong interpreter, VRI does not provide an equivalent experience to that provided by a live interpreter. VRI is most appropriate for people fluent in ASL during routine interactions. But it is not a one-size-fits-all solution to interpreting needs. VRI's effectiveness is strongly influenced by the size of the video screen, the quality and speed of the Internet connection, and the skills of the interpreter. Sign language interpretation includes subtle hand and finger positions that can be difficult to discern on a flat, two-dimensional screen (particularly a small one). Using VRI over a poor Internet connection may make communication impossible. Ex. J, Kegl-Rowley Report (Aug. 2020) (the "Kegl-Rowley Report") at 48-49.

38.    VRI—especially when it is used on a small screen, such as on a phone—may not be the best match for someone who has difficulty seeing. Ex. E, Smith 2020 Dep. at 97:2-6; Ex. Z, Shields Decl. ¶¶ 4-5 (gets headaches and eye pain when staring at VRI on small screen), 19 (when VRI is provided on a cell phone, "[t]he small screen makes it harder to understand the interpreter – the interpreter seems very far away.").

39.    In-person interpreters normally "check in" with the deaf or hard of hearing person before the interpreting begins to learn their signing style, to understand the context of the interaction, and to confirm that the communication is

effective.  VRI interpreters seldom, if ever, provide this "check in."  Ex. J, Kegl-Rowley Report at 48-49.

40.    The appropriateness of VRI must be evaluated for the individual and for the situation. VRI may be appropriate in some situations but not others. Ex. U, Shepard-Kegl 2020 Dep. at 102:23-104:18; Ex. W, Marano Dep. at 244:4-17.

41.    DCS has no policies or practices it expects CSOs to follow regarding which device or screen size should be used for VRI when communicating with a supervisee. Ex. A, Driver Dep. at 131:14-24, 133:22-134:6.

42.    When a supervisee requires an interpreter, DCS expects CSOs to begin by using VRI through the LanguageLine app and to consider obtaining an in-person interpreter only if the supervisee so requests. *Id*. at 49:15-50:7, 117:7-21. DCS has instructed CSOs that it is best practice to use VRI in all interactions unless the supervisee requests another form of communication. Ex. F, Smith 2021 Dep. at 87:22-88:14; Szotkowski Decl. Ex. I (e-mail from Patrick Holsey).

CSOs have on multiple occasions attempted to communicate with Plaintiffs and class members even though the Internet connection was poor or intermittent. Ex. KK, Nettles Supp. Decl. ¶ 6 (VRI is often blurry or pixelated during CSO's visits with Nettles, making it difficult to understand ASL signs); Ex. R, Nettles Day 1 Dep. at 36:1-18; Ex. M, Hill Day 1 Dep. at 10:10-20:20 (VRI with probation officers did not work and was not effective due to problems with the Internet); Szotkowski Decl.

Ex O, Cobb Suppl. Decl. ¶ 25 (VRI took a long time to connect and was choppy due to poor Internet connection); Ex. G, Hilliard Dep. at 78:6-18 (describing interruptions of VRI connection due to technical issues); Szotkowski Decl. Ex. N, BodyCam video of Steven Miller dated Nov. 7, 2019  (CSO and class member have difficulty communicating because VRI video keeps freezing); Szotkowski Decl. Ex. S, BodyCam video of Kathy Bullock dated May 6, 2020 (CSO has to use a third party to communicate with class member during a home visit because VRI signal is poor); Szotkowski Decl. Ex. T, BodyCam video of Brian Boozer dated Mar. 3, 2020 (CSO attempts to communicate with class member by VRI but the internet connection is too weak to allow for effective communication).

43.    In May and June of 2020, DCS ADA Coordinator Darrell Smith emailed the CSOs who supervise deaf and hard of hearing individuals to ask "[w]hat form of communication are you using to communicate with [him/her]? I noticed [she/he] knows ASL, have you used the app to communicate yet?"  *See, e.g.,* Stephanna Decl. Ex. U.  At that time CSOs reported issues with VRI due to poor internet connection directly to Mr. Smith. *Id.* at 68 (CSO unable to use VRI service due to lack of internet connection availability; instead utilized talk to text function on phone and supervisee's wife to facilitate communication); *Id.* at 103 (CSO indicates that using supervisee's lack of good internet service at his home presents a

problem with the effective use of VRI); *Id.* at 55 (CSO indicates that they had to stop using VRI due to "video issues").

44.    CSOs also routinely use VRI on mobile devices (like cell phones) that are so small that class members have difficulty seeing and understanding the interpretation. Szotkowski Decl. Ex O, Cobb Suppl. Decl. ¶ 26 (conversation through VRI interpreter on a cell phone screen was difficult because the image was not crisp or clear on the small screen); Harrelson Report at 31 (class member Vernon McCorkle appears to have difficulty seeing VRI on a phone and has to lean close to the phone in order to see); Ex. Z, Shields Decl. ¶¶ 5, 15, 26 (has difficulty understanding communication on a small phone screen).

45.    The interpreters used by DCS through VRI on multiple occasions have not been able to successfully interpret because they are not fluent in ASL and make frequent signing errors. Szotkowski Decl. Ex. P, Nettles Supp. Decl. ¶ 7 (some VRI interpreters contracted by DCS use unclear signs or have poor ASL interpretation skills, and CSO often responds to things that Nettles did not sign due to interpretation errors); Szotkowski Decl. Ex O, Cobb Suppl. Decl. ¶ 18 (interpreter used signs that were difficult to understand and did not appear confident in the interpretation being provided).

**Field Interactions**

46.     DCS does not provide in-person interpreters during home visits or other field interactions. Ex. A, Driver Dep. at 119:13-25; Ex. E, Smith 2020 Dep. at 55:25-56:5; Szotkowski Decl. Ex. P, Nettles Suppl. Decl. ¶ 16. For class members who require interpreters, the only option DCS will provide during field interactions is VRI.   Ex. A, Driver Dep. at 130:24-131:4. Cell phone or Internet reception may sometimes be poor during field interactions, which can make VRI difficult or impossible to use. *Id*. at 134:12-135:6; see supra at [¶ 42.]

47.     DCS has prohibited in-person interpreters during home visits since the creation of the agency. Ex. A, Driver Dep. at 120:24-121:2. But DCS's corporate designee could not say who made the decision to institute this practice. *Id*. at 120:24-121:5. There have been no discussions within DCS about whether this is an appropriate or necessary practice or about its impact on supervisees who are deaf or hard of hearing.  *Id*. at 122:3-6, 127:24-129:6. DCS has not considered whether there are any modifications to practice that could reduce the alleged risk of having interpreters present during field interactions. *Id*. at 129:23-130:7.

48.     DCS has a ride along program that allows individuals who are not DCS staff to accompany CSOs during field interactions.  *Id*. at 121:15-23.

49.     Interpreters conduct home visits with community supervision officers in states other than Georgia. Ex. W, Marano Dep. at 256:7-14; Ex. U, Shepard-Kegl 2020 Dep. at 71:7-73:25.

50.     For example, Virginia has modified its supervision practices so that visits with deaf and hard of hearing sign language users take place in the office, as opposed to the supervisee's home, with the preference that in-person sign language interpreters be used to ensure effective communication. Ex. W, Marano Dep. at 179:12-180:9; 257:25-259:10.

### Deaf Interpreters

51.     A Deaf interpreter is a deaf individual who has native or near-native fluency in ASL, knowledge of deafness and Deaf community/culture, and specialized training and/or experience in ways to enhance communication.  They often work on a team with a hearing interpreter to facilitate effective communication. Ex. J, Kegl-Rowley Report at 35-37. A Deaf interpreter generally has more familiarly with ASL variations and local/non-standard signs. In contrast, hearing interpreters are often native English speakers and non-native ASL users, and they communicate with a deaf or hard of hearing person in a second language. Many deaf or hard of hearing individuals also grew up with language deprivation and were never fully fluent in any language, and Deaf interpreters could increase communication effectiveness for them. Ex. I, Harrelson Report at 6.

52.     Some deaf people need a Certified Deaf Interpreter ("CDI") for communication to be effective. Ex. W, Marano Dep. at 260:14-17; Ex. J, Kegl-Rowley Report at 36, 46.

53.     DCS does not provide Deaf interpreters to individuals who need them for effective communication. Ex. L, Cobb Day 2 Dep. at 56:5-7; Szotkowski Decl. Ex O, Cobb Suppl. Decl. ¶¶ 4-5, 29; Szotkowski Decl. Ex. P, Nettles Suppl. Decl. ¶¶ 4, 11-14, 17; Ex. M, Hill Day 1 Dep. at 22:6-23:19; Ex. N, Hill Day 2 Dep. at 118:13-23; Ex. J, Kegl-Rowley Report at 145; Ex. HH, Kegl-Rowley Report - Hill Assessment at 40-45.

## Family Members and Friends as Interpreters

54.     When communicating with an individual who is deaf or hard of hearing, some people believe that it is appropriate to rely on hearing family members and friends of that individual for communication; however, this is problematic for a number of reasons. Ex. I, Harrelson Report at 9-10. Family members and friends are usually not trained as interpreters and often use "homesign" that is not standard ASL and is inappropriate for conveying complex information like that discussed during supervision meetings. *Id.* at 10. When family members and friends are used as interpreters, a CSO will often find it easier to communicate directly with that person, rather than the deaf or hard of hearing individual. This can lead to a loss of agency as the deaf and hard of hearing individual is mostly or completely left out of the conversation as the third party speaks for them and answers questions on their behalf. Ex. J, Kegl-Rowley Report at 15, 51; Ex. I, Harrelson Report at  9.

55.     Even if family members know ASL and have the specialized legal vocabulary necessary to interpret accurately and effectively—which most family members of deaf and hard of hearing individuals do not—family members are not neutral when serving as interpreters.  They may have interests that are different from the deaf or hard of hearing person.  Similarly, when speaking with DCS, the deaf or hard of hearing person may be motivated to alter or conceal information that they do not want shared with a family member who is interpreting for them. Ex. I, Harrelson Report at 9; Ex. J, Kegl-Rowley Report at 15, 51.

On multiple occasions, CSOs have relied on family members, friends, or acquaintances to interpret for Plaintiffs and class members. ECF 34-1, Mitchell Decl. ¶ 17 (CSO relied on Plaintiff's sister to interpret); ECF 34-4, Worley Decl. ¶ 16 (CSO relies on Plaintiff's mother and children); ECF 2-6, Nettles Decl. ¶¶ 9-10, 12 (CSO asking Nettles' mother—who was not an ASL interpreter and not fluent in ASL—to interpret for Nettles' first probation meeting following his release from prison), 16 (CSOs regularly ask Nettles' family members—if they are home—to interpret for meetings with Nettles), 18 (because CSOs did not provide an ASL interpreter during an office visit, Nettles' daughter—who is not fluent in ASL— attempted to interpreted for him); Ex. I, Harrelson Report at 14-15 (communication breakdowns occurred when class member's father tried to interpret for her); Szotkowski Decl. Ex. T, BodyCam video for Brian Boozer dated Mar. 3, 2020 (CSO

asks family member to interpret for class member because of poor VRI signal); Szotkowski Decl. Ex. S, BodyCam video of Kathy Bullock dated May 6, 2020 (CSO did not bring an interpreter to a home visit and has to communicate through a third party)

56.    In May and June 2020, CSOs reported the use of friends and family members to assist with communication with deaf and hard of hearing supervisees dicretly to Mr. Smith. Szotkowski Decl. Ex. U at 76 (When asked how CSO communicates with Mr. Wooden, CSO indicated that "he normally had an interpreter with him (family or friends) [and that w]hen [the family or friends] were not available [the CSO and Mr. Wooden] used pen and paper to communicate"); *see also* id. at 39, 68.

CSOs also routinely communicate with third parties directly about the class member's situation without involving the class member in the communication at all. Szotkowski Decl. Ex. JJ, BodyCam video of Gabriel Cohen dated Jan. 27, 2020 (CSO communicates with person who lives with class member and answers questions for him); Szotkowski Decl. Ex. EE, BodyCam video of Ashley Barnett dated Dec. 3, 2019 (CSO appears to be communicating with and getting information from class member's companion who had a physical altercation with her, rather than from the class member herself); Ex. I, Harrelson Report at 27 (noting numerous instances where class member brought family members to office visits and CSO

communicated with them, such that class member was not an active participant in her supervision); Ex. DD, Case notes for Walter Wallace dated July 17, 2019, and Mar. 3, 2020 (CSO contacts class member's wife directly because class member is deaf, and wife does most of the talking for class member during interactions); Ex. I, Harrelson Report at 39 (CSO relies on class members' girlfriend to interpret during home visit).

When DCS has relied on family members and friends to help class members communicate, those individuals have often been unable to interpret successfully and/or had conflicts of interest. Szotkowski Decl. Ex O, Cobb Suppl. Decl. ¶¶ 12-14 (DCS relied on plaintiff's sister to communicate with him even though she does not know ASL and he cannot understand her notes in English); Szotkowski Decl. Ex. T, BodyCam video of Brian Boozer dated Mar. 3, 2020 (CSO attempted to use class member's fiancée to interpret for him, but she has an accent and communication appears to be difficult); Ex. FF, Case Notes for William Jones dated June 16, 2020 (indicating that class member's son assisted with communication); Ex. I, Harrelson Report  at 38 (Courtney Phillips' mother attempts to assist him during office visit by finger spelling, which is slow and difficult to understand, without using any ASL signs, and also answers questions for him directly); Szotkowski Decl. Ex. KK, BodyCam video of Jeffrey Wilson dated Feb. 21, 2018 (CSO relies on group home staff member to interpret during a home visit even

though staff member tells CSO that class member previously slapped him because of his poor interpreting).

### Written Communication

57.   ASL and English are two completely distinct languages that are mutually unintelligible. Ex. J, Kegl-Rowley Report at 25. ASL is a language completely distinct from English in grammar, structure and usage. *Id.* at 10-11.

58.   ASL does not have a written component, and many deaf people in America learn English only as a second language. Ex. I, Harrelson Report at 6; Ex. J, Kegl-Rowley Report at 20.  Thus, many people who are deaf and or hard of hearing have an extremely limited ability to read and write English. Ex. I, Harrelson Report at 6-7, 10.

Plaintiffs' primary language is ASL.  English is not their first language, and they have difficulty communicating in written English.  Szotkowski Decl. Ex O, Cobb Suppl. Decl. ¶¶ 3–4; ECF 2-6, Nettles Decl. ¶ 4 (Nettles' first language is ASL; he does not understand many words in English); Ex. R, Nettles Day 1 Dep. at  14:12-15:15,(Nettles used ASL in school, not English); Ex. GG, Hill Decl. at ¶ 3 (Hill communicates using ASL and knows only a few words in English); Ex. HH, Kegl-Rowley Report - Hill Addendum at 38, 39 (Hill's primary and preferred language is ASL; her English ability is that of a partial second-language learner).

59.     Even when individuals understand some basic written communication, interactions can be shortened and less information may be communicated in writing because writing takes longer than speaking. Ex. E, Smith 2020 Dep. at 127:13-18, 128:4-17.

60.     Plaintiffs found it difficult to understand the lengthy and complex written documents that were provided to them as part of supervision with the communication methods utilized by DCS. Szotkowski Decl. Ex O, Cobb Suppl. Decl. ¶¶ 11-12 (DCS officers failed to provide interpreter necessary to understand lengthy and complex documents about supervision requirements); ECF 2-6, Nettles Decl. ¶ 10 (same); Ex. S, Nettles Day 2 Dep. at 126:7-128:18 (Nettles signed under duress a Sex Offender Registration Notification form, on which CSO had checked off a box saying "I have read or had read to me this registration notification form and understand its contents."—despite no one doing so); *Id. at* 156:3-157:18, (Nettles signed numerous DCS documents without understanding them, and only understood one document after a DI translated it); Ex. M, Hill Day 1 Dep. at 10:4-14:25 (Hill could not understand written documents provided at intake, and VRI with probation officers did not work; Hill had to sign documents without understanding them); Ex. N, Hill Day 2 Dep. at 96:17-24 (Hill not sure about the rules in the documents regarding where she is permitted to drive); *Id. at* 162:18-165:2 (Hill not sure if she's seen a rule in the documents about maintaining employment, does not

understand if she is required to notify her probation officer if she moves, is not sure about the rules for going on vacation or leaving the state, and does not understand the rules about prescription medications); Ex. Z, Shields Decl. ¶ 7 (struggled to understand the forms because CSO did not have VRI interpreter interpret the paperwork).

Plaintiffs and class members have had difficulty communicating with CSOs through writing. ECF 2-6, Nettles Decl. ¶ 15 (CSO used typed notes on his phone to communicate with Nettles and asked Nettles to type notes back, despite Nettles not understanding most of these notes because he does not understand English well); Szotkowski Decl. Ex. P, Nettles Supp. Decl. ¶ 10 (CSO continued to text him in English despite Nettles not understanding many words); Ex. R, Nettles Day 1 Dep.at 22:25-23:25 (Nettles would show CSO's texts to his son to ensure that he understood the CSO's texts, and Nettles would sign to his son who would then transcribe his signs into text replies to the CSO); *Id.* at 30:19-31:4 (Nettles' daughter would help with texts to the CSO), *Id.* at 34:6-15 (Nettles would often have to write notes again because the CSO did not understand Nettles' attempts to write, and Nettles did not feel comfortable writing as he could not communicate well with the CSO); Ex. M, Hill Day 1 Dep. at 80:15-81:20 (testifying about miscommunication between Hill and probation officer using text); Ex. N, Hill Day 2 Dep. at 147:7-149:2 (describing miscommunications that occur through text); Ex. O, Roper Dep. 162:24-170:4,

173:23-174:17, 186:23-201:18, 208:4-210:23 (Roper used pen and paper to communicate with Hill about positive drug test and had her sign admission form admitting to use of THC, without a sign language interpreter, even though a laptop that could access VRI was on the table); Ex. I, Harrelson Report at 16  (CSO used written notes to communicate with class member Ashley Barnett during initial assessment even though she requires ASL for communication), 18 (communication through written notes to class member Jerry Blackmon appears laborious and frustrating), 19-20 (written notes used at initial assessment of class member Nicholas Brown, even though case notes indicate that he needs an interpreter), 29 (CSO uses written notes to communicate with class member Kerry Kines, even though case notes indicate that [he] struggles with reading); Szotkowski Decl. Ex. II, BodyCam video of Kathy Bullock dated Oct. 21, 2019 (CSO tries to communicate with class member through written notes on a clipboard during a home visit); Ex. CC, Case Notes for Anthony Reid (4/11/18) (CSO attempts to use written notes to communicate with class member because no interpreter was present, but class member only shrugs in response).

61.    Plaintiffs and class members have found it difficult to understand the terms and conditions of their supervision when those terms and conditions are not communicated with the aids and services the individuals need.  Ex. I, Harrelson Report at 29 (CSO indicated that class member Kerry Kines understood the

conditions of his supervision because he gave a thumbs up signal, but this may not be a reliable indicator of understanding, and class member was subsequently arrested for rules violations); Szotkowski Decl. Ex. HH, BodyCam Video of Brittany Wills dated Feb. 17, 2018 (class member appears not to understand what it means to "report" for supervision, and asks several times for clarification on this basic concept).

62.    In May and June of 2020, CSOs reported the use of text messages, written notes, and lip-reading for communication with deaf and hard of hearing supervisees directly to Mr. Smith. *See* Szotkowski Decl. Ex. U at 2, 12, 13, 18, 24, 28, 30, 32, 33, 41, 47, 51, 68, 76, and 78.

### Plaintiff Brandon Cobb

63.    Brandon Cobb identifies as Deaf. Cobb lost his hearing as a toddler, following an illness. Szotkowski Decl. Ex O, Cobb Suppl. Decl. ¶ 3. Cobb's only language is ASL, and his understanding of English is very limited. *Id.* at ¶ 4. Cobb' ability to read and write English is not higher than that of a second grader. Ex. K, Cobb Day 1 Dep. at 50:15-51:1. He can only read and write very basic words in English, and he cannot understand lip-reading. Szotkowski Decl. Ex O, Cobb Suppl. Decl. ¶ 4.

64.    Cobb needs to have one hearing interpreter and one Deaf interpreter present when he communicates with hearing people about important information. *Id.*

at ¶ 5; Ex. J, Kegl-Rowley Rep.  at 58. When not provided a Deaf interpreter, Cobb cannot communicate clearly. With a Deaf interpreter, Cobb can more fully understand what is being communicated because it is through ASL rather than English. Ex. K, Cobb Day 1 Dep. at 35:1-16. DCS has never provided Cobb with a Deaf interpreter.

65.     Even when provided with VRI, Relay, Video Phone ("VP"), or in-person interpreters, Cobb does not fully understand without a Deaf interpreter. Szotkowski Decl. Ex O, Cobb Suppl. Decl. ¶ 8; Ex. K, Cobb Day 1 Dep. at 57:10-58:10. Cobb is able to communicate through VRI on simple topics, but not on more in-depth topics.

66.     Cobb was in prison in Georgia from June 4, 2014, until April 1, 2019. Szotkowski Decl. Ex O, Cobb Suppl. Decl. ¶ 6. On March 28, 2019, Cobb's counselor in prison used VRI to tell him for the first time that he would be released a few days later on April 1, 2019. *Id.* at ¶¶ 9,10. The counselor informed him that he must report to the Douglas County DCS office on April 2, 2019. Cobb was unable to ask any further questions or understand the rules of parole because the VRI was not working well. *Id.* at ¶ 9.

67.     During his first visit to the DCS office on April 2, 2019, Cobb was accompanied by his sister because he needed transportation to the DCS office. Since there was no ASL interpreter present, Cobb was unsure what to do when he arrived

at the office. *Id.* at ¶ 11. His sister signed him in and received a packet of documents written in English for him to sign. Cobb's sister does not know ASL, so she tried to explain the documents through written notes. However, since Cobb cannot read English, he did not understand his sister's notes.  *Id.* at ¶ 12. When Cobb's sister gestured to explain that he should sign the documents, Cobb felt like he had no choice but to sign the documents even though he did not understand them. *Id.* at ¶ 13. Cobb feared he would be sent back to prison if he did not sign the documents *Id.* Cobb was given no information prior to this first meeting about how to request an ASL interpreter as a Deaf person. Ex. K, Cobb Day 1 Dep. at 32:7-33:21.

68.     Cobb fears that he will have to go back to prison because rules are not communicated to him in language that he can understand. Szotkowski Decl. Ex O, Cobb Suppl. Decl. ¶ 17. Cobb is frequently concerned about the possibility of reincarceration, which has been heightened because of the lack of communication and lack of interpreters present. *Id.*; Ex. K, Cobb Day 1 Dep. at 24:8-25:7; 29:17-30:4.

69.     After his sister returned the signed documents to the front desk, Cobb's CSO met them outside in the waiting room rather than a private room. Even though the CSO should have known Cobb was required to report to them on April 2, and that he was Deaf, the CSO did not bring an ASL interpreter to this meeting. Szotkowski Decl. Ex O, Cobb Suppl. Decl. ¶ 14,16. The CSO did not attempt to

communicate directly with Cobb; instead, the CSO communicated with Cobb's sister. However, she could not tell Cobb what the CSO was saying since she did not know ASL. *Id.* at ¶ 14. Since there was no ASL interpreter at his first meeting on April 2, Cobb did not understand any of the rules he was supposed to follow while on parole. *Id.* at ¶ 17.

70.    At his next meeting at the parole office on May 16, 2019, there was an ASL interpreter present and his meeting was held in a private room. *Id.* at ¶ 17. During this meeting, the interpreter interpreted documents that listed the rules that Cobb was supposed to follow while on parole. Although Cobb was able to better understand with an interpreter present, he was still not able to understand all the rules because only a hearing interpreter was present at this meeting. The hearing interpreter used English-based signing that was difficult for Cobb to clearly understand. He had to repeat himself on multiple occasions, and he could tell that the interpreter was not confident in the translations. *Id.* at ¶ 18.

71.    During this May 16 meeting, the CSO informed Cobb that she might visit him at his home. Cobb said she would need to bring an interpreter to these visits, but she did not promise to do so. Cobb was afraid that if an interpreter did not join her in these visits that there would be no way for him to communicate with her or ask questions. *Id.* at ¶ 20. After this meeting, Cobb signed documents that the CSO kept. Cobb was not given a copy of these documents and is unsure whether these

were the same documents he was asked to sign at the April 2, 2019, meeting. *Id.* at ¶ 19.

72.     At a meeting with his CSO on November 9, 2019, Cobb communicated using VRI. Although it is hard for Cobb to know when VRI will be good or bad, the connection that day was decent and the interpreter was capable. *Id.* at  ¶ 22.

73.     Cobb has had many technical difficulties using VRI. Ex. K, Cobb Day 1 Dep. at 59:9-60:5; 57:10-58:10. At his next meeting in August 2020, there were many problems with the video connection on the VRI. Szotkowski Decl. Ex O, Cobb Suppl. Decl. ¶ 24. At his meeting on November 20, 2020, the officer attempted to connect to VRI but the connection was very choppy. *Id.* at ¶ 25. On March 28, 2021, the CSO visited Cobb at his home. At this visit the VRI took a few tries to connect and it was difficult to see the interpreter because the image was not clear. Cobb had to ask the interpreter to repeat themselves many times because of technical issues. Using the VRI on a cellphone sized screen and with poor connection made communication difficult. Cobb spent a lot of time trying to explain to the interpreter that he could not understand their signs and that they were misunderstanding him. *Id.* at ¶ 26.

## Plaintiff Mary Hill

74.     Plaintiff Mary Hill is deaf and has also been diagnosed with Usher syndrome. Ex. M, Hill Day 1 Dep. at 58:7-10. The Usher syndrome diagnosis means

that Hill's field of vision is limited, and she has spots in her vision. When it is bright, Hill has to close her eyes and let them adjust to the brightness. *Id*. at 58:11-24.

75.    "[Hill] grew up signing, starting at age three," but did not learn ASL until a couple of decades later. Ex. HH, Kegl-Rowley Report, Hill Addendum at 38. As a result, Hill communicates using ASL. Ex. GG, Hill Decl. ¶ 3.

76.    When communicating with someone who does not sign, Hill is "*best served by a Deaf/hearing team or a Deaf ASL signing service provider.*" *Id.* at 41 (emphasis added). A Deaf/hearing team or a Deaf ASL signer "provide[s] the highest likelihood of matching [Hill's] communication and visual needs" and "ensure[s] that interpretation is adequately adapted to the communication needs of a somewhat atypical signer." *Id*. at 41. Indeed, there "are no ideal situations where information could be accurately and effectively shared via English in a manner that would afford her access equivalent to that of a hearing individual who is a fluent user of English" without a live interpreter fluent in ASL, particularly when the interpreters are a Deaf/hearing team. *Id.* at 40; Ex. N, Hill Day 2 Dep. at 116:25-118:1 (Hill will cancel appointments when a live ASL interpreter is not provided).

77.    Hill does not understand English very well. "Ms. Hill has a second- to third-grade command of reading" and "written English competency," and her "speech is of limited intelligibility." Ex. HH, Kegl-Rowley Report - Hill Addendum at 38, 39. In fact, "[s]he does not read. At best she looks at pictures . . . and watches

movies with closed captioning that she can only understand with the help of" her family. *Id*. at 38-39; Ex. N, Hill Day 2 Dep. at 103:25-104:16 ("if it's simple words, [she] can get it."). Her overall command of "English clearly is that of a partial, second-language learner, rife with grammatical errors and influence from ASL." Ex. HH, Kegl-Rowley Report - Hill Addendum at 38, 39.

78.    Because of Hill's limited English comprehension, she struggles to understand written notes. Accordingly, Hill only writes notes to communicate as a last resort and will write notes "[o]nly for very short things or simple things." Ex. N, Hill Day 2 Dep. at 115:4-15.

79.    Hill uses reading glasses and corrective lenses to assist with her vision. *Id*. at 63:2-7. While her reading glasses "are for [her] to be able to read the printed page or to see the words on the page, [her glasses] doesn't [sic] give [her] the ability to understand what's written." *Id*. 63:8-15. Hill always has her glasses with her, including when she meets with her CSOs or probation officers, but only wears them when she feels it is necessary. *Id*. at 64:5-23.

80.    Hill has four daughters. She taught her daughters ASL when they were babies, and so they use ASL to communicate with each other. Ex. M, Hill Day 1 Dep. at 45:6-9, 47:22-48:14. Hill uses ASL to communicate with her friends as well. *Id*.

81.     Hill lives at home with her mother, father-in-law, and brother-in-law. *Id*. at 56:7-12. Hill's brother-in-law is hard of hearing and uses ASL; however, her parents-in-law do not understand ASL. *Id*. at 56:25-57:3; 56:18-24. The family relies upon Hill's brother-in-law to pass messages back and forth. *Id*. at 56:18-24. Sometimes they use "home signs" and "gestures" as well, and hardly ever "use written notes or written communications." *Id*. at 57: 9-21.

82.     Hill has been under supervision and on probation since late 2019. *Id*. at 6:24-7:2.

83.     Hill was sentenced to probation on November 5, 2019, in Forsyth County Superior Court. *Id*. at 21:14-22:1. Ms. Hill pled guilty without a trial "because [she] was not happy with the interpreters." *Id*. at 21:23-22:1. There was only one live ASL interpreter at her hearing, and the interpreter was not a Deaf interpreter. *Id*. at 25:6-19; 22:2-9. Consequently, Ms. Hill did not find the paperwork she was given at this hearing clear and did not understand it. *Id*. at 8:17-9:4.

84.     Shortly after her hearing, Ms. Hill went to DCS's Forsyth office to meet with Shannon Hilliard for her initial intake meeting. *Id*. at 10:4-9. She had to communicate with Hilliard using VRI, as no in-person interpreter was present. *Id*. at 10:10-11:9. However, Hill could not understand the interpreter because "[t]he image was too jumbly, and there was too much lag" due to technological and connectivity issues." *Id*. at 11:10-19. Hilliard then handed Hill papers and told her

to read them. *Id*. Hill did not understand what she was reading nor what Ms. Hilliard was attempting to verbally communicate to Hill. *Id*. at 11:21-12:3. Hill "kept pointing to the screen and showing her, Look, it's frozen" to no avail *Id*. Because Hill "couldn't follow anything [Hilliard] was saying," she "finally . . . just told [Hill] to take these papers home with [her] to read." *Id*.

85.     Hill took the papers home and tried to understand them. *Id*. at 12:4-17. She read them again, and googled words she did not know. *Id*. But Hill still could not understand the papers Hilliard had given her. *Id*.

86.     When Hill returned to the DCS office, she spoke with a different CSO, Kim Nero, and explained to this CSO that she "couldn't see the interpreter on the laptop," at her previous meeting, and, therefore, "d[idn't] understand the[ papers]." *Id*. at 12:22-13:11. Hill then asked Nero for "a live interpreter . . . a deaf certified interpreter, or a hearing interpreter," but, instead, Nero also attempted to use a laptop with a remote interpreter to assist Hill. *Id*. at 13:17-14:12. Again, "the laptop couldn't get a clear connection," and "[they] spent all [their] time waiting for that thing to connect or waiting for the picture to clear up." *Id*. Hill "tried repeatedly to try to understand what the interpreter might be saying through th[e] fuzzy picture," which was so bad" that "it looked kind of like a picture puzzle with all the colors and everything on that screen." *Id*. at 14:3-12. But again, Hill was unable to

understand the interpreter and communicated this to Nero, but Nero had her "sign them anyway;" so she signed the papers. *Id*. at 12:22-13:11.

87.     CSOs have unsuccessfully tried to use VRI to communicate with Hill at other times as well. *Id*. at 14:16-25. Every time Hill "had these VRI instances, they were very pixelated. The internet connection was lost frequently over and over again, and then Zoom meetings, there was no interpreter present." *Id*. at 17:18-18:5. Hill was unable to "understand any of those interactions." *Id*.

88.     Each of Hill's CSOs were made aware of Hill's inability to understand her officers. *Id.* at 18:7-19:6. At every meeting where the VRI was not working, Hill would "gestur[e] to the probation officer and sh[ake her] head in a negative manner[,] indicating that it[] [was] not working and that [she was] not understanding what [was] happening on the screen." *Id.* at 18:7-22.

89.     Hill rarely writes to communicate with her CSOs. Once, Hill exchanged handwritten notes with one of her CSOs, Adam Roper. *Id.* at 74:16-75:13. Additionally, she had to email Hilliard a picture of a prescription one time when she was hospitalized. *Id*. at 78:4-11.

90.     Hill also exchanged a few simple text messages with Hilliard in an attempt to explain that she was "frustrated at not being able to find somebody to accept [her] for community service hours." *Id*. at 79:21-81:8. In response, Hilliard texted back: "Good news, okay. [Hilliard] clearly did not understand [Hill]." *Id*.

91.     Hill's text messages were not understood by Adam Roper, another CSO who supervised her, either. *Id*. at 82:7-84:8. Hill was attempting to explain to Roper that she was trying to get her community service requirements "taken care of so that [she could] move onto other needs." *Id*. at 83:2-9. Hill wanted to discuss with Roper how she could finish up her community service requirements and wanted an interpreter in the office instead of VRI to discuss this issue. *Id*. at 82:7-83:22. Hill was unable to get this message across to Roper sufficiently over text message. *Id*.

92.     Lastly, Hill has attempted to communicate with her CSOs over Google Meet, "but that . . . communication was impossible because there was no interpreter present." *Id*. at 84:9-18.

93.     Hill does not understand the terms of her probation, including her community service requirements. Ex. N, Hill Day 2 Dep. at 96:17-24; 172:20-179:22. She rarely "drive[s] to other cities or states besides Cumming, Georgia" because she is "not entirely familiar . . . with what's on that paper" that was given to her at her initial intake, and so is "not sure if that [is] acceptable according to [her] probation." *Id*. at 96:17-24.

94.     Hill did not understand pertinent details of her community service requirement, and was not provided paperwork explaining these details either. *Id*. at 178:5-179:22. For example, Hill did not know "that there was a minimum hour requirement per month that [she] had to complete." *Id*. at 178:12-17.

95.    Hill also did not understand the rules pertaining to the community service hours she completed at the probation office. *Id*. at 172:20-179:22; Ex. GG, Hill Decl. at ¶ 5-8. Hill met with Hilliard alone to learn about how she could clean the probation office for community service hours. Ex. N, Hill Day 2 Dep. at 174:5-21. Hilliard communicated with Hill by pointing and gesturing, such as pointing toward a list of tasks to be completed such as washing the dishes, mopping, and vacuum. *Id*. at 173:21-174:21. There was no VRI used at this meeting, and Hill did not understand what was being communicated to her. *Id*; Ex. GG, Hill Decl. at ¶ 7. Ultimately, Hill needs an in-person interpreter when someone is moving around and showing her what to do. *Id.*

96.    Hill did not understand the rules about when she could and could not vacuum a room at the probation office. Ex. N, Hill Day 2 Dep.. at 176:25-177:12. For example, Hill thought it was okay to vacuum if the door to an office or room was open, but she was incorrect. *Id*. "[She] thought [she] was supposed to vacuum everywhere but . . . one of the things [she] learned" after vacuuming in the wrong space "was that the vacuum was noisy." *Id*. at 175:19-176:6. The noise of the vacuum was why she could not vacuum when office doors were open; something she did not learn when Hilliard first explained the rules to her. *Id*.

97.    Hill's community service—cleaning the probation office for four hours once a week—was put on "hold" after the COVID-19 pandemic started until she was told otherwise.  Ex. O, Roper Dep. 232:9-237:6; Ex. G, Hilliard Dep. 93:3-18.

98.    On or about October 26, 2020, during a meeting with CSO Roper, he informed her that she had violated her probation conditions by failing to complete community service and by failing a drug screen. Hill had no access to communication during the drug screen. Ex. O, Roper Dep. at 207:15-209:3. Roper nonetheless had her sign an acknowledgment form in which she "admitted" to using THC, again without the use of a sign language interpreter—even though a laptop with access to VRI was available on the table. *Id.* at 194:12-201:14, 208:4-210:23. The form she signed stated that: "I also acknowledge that by signing this admission, my probation or parole sentence could be revoked or a lesser sanction may be imposed." Szotkowski Decl. Ex. X, Hill Testing Form. Roper proceeded to arrest Ms. Hill and transport her to jail.

99.    Later, at the jail, Roper used VRI instead of an in-person interpreter to review with Hill a consent order requiring 60 days incarceration. Roper was not in the same room as Hill but in a room separated by a thick glass window. He "awkwardly" held up the laptop with VRI using his hand up to the window with Hill on the other side of the window trying to see the VRI interpreter on the laptop screen. With the reflection and glare interfering with her already limited vision, Hill could

not understand the VRI interpreter. Ex. O, Roper Dep. at 115:7-118:22, 222:4-224:23. Roper did not request an in-person interpreter. *Id*. at 270:11-271:16. The consent order listed THC use and a failure to complete community service. However, the failure to complete community service was Roper's mistake, and Hill never had a chance to explain how she could have tested positive for THC. *Id*. at 228:20-232:8. Roper failed to communicate to Hill her right to counsel and to a contested hearing, even though communicating those elements is part of his regular practice.  When asked about this failure, Roper said "that was not a typical situation;" it was chaotic because Hill is deaf. *Id*. at 224:14-226:13, 259:11-264:15. Despite these failures, Roper testified that "I did feel like I got the message across effectively." *Id*. at 224:11-23.

100.    Roper later had Hill sign the consent order requiring 60 days incarceration in jail without reviewing the order with an interpreter present so that Hill could knowingly waive her right to a contested hearing and counsel. *Id.* at 222:4-227:18. Roper did not follow his regular practice of reviewing those elements with supervisees; instead, he told Hill, "[j]ust one more thing, I need you to sign my copy of this paper before I go." *Id*. at 259:11-262:7.  Roper drafted the consent order with the punishment, had Hill sign it, and then he filed it with the judge. *Id*. at 272:5-273:22.  If Hill had a contested hearing with the judge, she would have been able to

explain that a friend had given her food with marijuana in it, and she had consumed it without knowing about the marijuana. Ex. GG, Hill Decl. at ¶ 11.

**Plaintiff Joseph Nettles**

101.    Joseph Nettles identifies as Deaf. Nettles lost his hearing when he was three, after surviving a near-fatal illness. ECF 2-6, Nettles Decl. ¶ 3. Nettles' only language is ASL, and his understanding of English is limited. *Id.* at ¶ 4.  He has the English proficiency of a first grader. Ex. R, Nettles Day 1 Dep. at 16:9-17:15. "[H]e can read and write some simple words and sentences written in English, but [he] do[es] not understand many words in English." ECF 2-6, Nettles Decl. ¶ 4. "Because [he] cannot read English very well," he has a hard time understanding written notes. *Id.* at ¶ 15; Ex. R, Nettles Day 1 Dep. at 16:9-17:11.

102.    Nettles needs to have a Deaf interpreter present in addition to a hearing interpreter when he communicates with hearing people about important information. Szotkowski Decl. Ex. P, Nettles Suppl. Decl. ¶¶ 3-4; Ex. S, Nettles Day 2 Dep. at 157:19-158:16; Ex. J, Kegl-Rowley Rep.  at 140-41. When Nettles worked with a certified Deaf interpreter for the first time in August 2020, he found the Deaf interpreter "was able to match[his] language better" than a hearing interpreter, and that "[he] understood the hearing people [he] was communicating with more clearly." Szotkowski Decl. Ex. P, Nettles Suppl.  Decl. ¶ 3. Nettles was "shocked" to "realiz[e] how much [he's] been missing all this time" with hearing interpreters,

as deaf interpreters interpret the meaning of signed words that hearing interpreters typically do not. Ex. S, Nettles Day 2 Dep. 158:17-159:14. Deaf interpreters "worked so much better for [his] communication style" and he "understood them so much better." Ex. R, Nettles Day 1 Dep. 43:5-25. Nettles has informally relied on deaf interpreters all his life. *Id.* Although hearing interpreters have been provided at times, Nettles needs a Deaf interpreter and needs interpreters at every meeting in order to have full communication. Ex. J, Kegl-Rowley Rep.  at 140-41.

103.   Nettles began his probation in 2011 and had three different probation officers. ECF 2-6, Nettles Decl. ¶ 13; Ex. R, Nettles Day 1 Dep. at 34:16-19, 77:10-18. "The rules that [Nettles] ha[d] to follow while [he was] on probation [we]re complicated," and many of these rules changed throughout his time on probation. ECF 2-6, Nettles Decl. ¶ 19. However, Nettles has never completely understood the details of his probation, including all the rules he was supposed to follow. For example, he was not sure exactly when his probation period was supposed to end. Szotkowski Decl. Ex. P, Nettles Suppl. Decl. ¶ 20.

104.   Defendants have never provided Nettles with a Deaf interpreter. This has directly led Nettles to be confused about documents that Defendants provided him due to the hearing interpreters' unclear interpretation. Szotkowski Decl. Ex. P, Nettles Suppl. Decl. ¶¶ 11-18. Nettles' confusion was only resolved when Plaintiffs'

attorneys hired a Deaf interpreter to interpret the documents to him. *Id.*; Ex. S, Nettles Day 2 Dep. at 160:9-161:7.

105.   Even when provided with VRI, Nettles does not fully understand what the hearing person is saying without a Deaf interpreter. Ex. R, Nettles Day 1 Dep. at 75:9-22; Szotkowski Decl. Ex. P, Nettles Suppl. Decl. ¶ 6. Hearing VRI interpreters often do not understand Nettles' signs, and Nettles is unable to "get [his] point across." Ex. R, Nettles Day 1 Dep. 76:3-18. When VRI interpreters do not understand him, it is "frustrating" and makes him feel "awful" when trying to communicate with his parole officer. *Id*.

106.   Defendants frequently experience technological issues when using VRI interpreting for Nettles, such as a "screen image [that] is often blurry and pixelated[.]" Szotkowski Decl. Ex. P, Nettles Suppl. Decl. ¶ 6. "If the video image is blurry, it is hard [for Nettles] to understand ASL signs and communication is not possible." *Id.*

107.   If the VRI image is clear, Nettles still experiences communication challenges with VRI interpreters. The VRI interpreters were often "not a good match" for Nettles "to the point where sometimes [he would] just smile and nod" while not "really understand[ing] everything that they" signed. Ex. R, Nettles Day 1 Dep. at 36:1-18. Many VRI "interpreters are not clear with their signing" due to their poor ASL skills. Szotkowski Decl. Ex. P, Nettles Suppl. Decl. ¶ 7. VRI interpreters

often misinterpreted Nettles' signs and CSO Worley's responses, which resulted in inaccurate and ineffective communication. *Id.* at ¶ 7. Relatedly, VRI interpreters cannot convey ASL to Nettles the same way a Deaf interpreter can in part because "ASL is a 3-D, interactive language that is best understood in person." *Id.* at ¶ 9. Moreover, VRI interpreters could not "read papers to [Nettles]" nor "see things in the room that Officer Worley talk[ed] about," and so "struggle[d] to make the point[s] clearly for [Nettles]." *Id.* And because Nettles cannot hear VRI interpreters, "[he] ha[d] no idea if VRI interpreters [were] able to voice accurately what [he] said." *Id.*

108.   Nettles "can count one or two times when communication went really well with VRI"; "[a]ll the other times, communication has been difficult or impossible." *Id.* at ¶ 7. "[T]o [Nettles], it shows that VRI doesn't meet [his] needs" and was "not the best solution for [him]." Ex. R, Nettles Day 1 Dep. at 36:1-18, 76:3-18.

109.   On September 4, 2011, the day before he was released, prison officers met with Nettles without an ASL interpreter. ECF 2-6, Nettles Decl. ¶ 7. The officers "showed [him] a map," "circled places on the map[,] and wrote down dates and times." *Id.* Nettles thought they may have been trying to explain "what [he] was supposed to do once [he] was released from prison," but because there was no ASL interpreter, he did not understand any of it. *Id.*

110.   Upon release the following day, Nettles learned from his mother that he was supposed to report to the Waycross probation office; the prison officials spoke to her, and she communicated this to Nettles. *Id.* at ¶ 8. "When [he] arrived at the probation office, there was no ASL interpreter." *Id.* at ¶ 9. Nettles then tried to communicate to his CSO "that [he] c[ould] not read or write English," and needed "an ASL interpreter." *Id.* His CSO denied his request because he believed that "[Nettles] needed special permission from the court to get an ASL interpreter, and that the court was supposed to arrange for an ASL interpreter to come to the probation office." *Id.*

111.   Nettles' CSO relied upon his mother as an interpreter during that initial meeting, and he handed Nettles a large packet of "long and complicated . . . documents written in English." *Id.* at ¶ 10. Nettles' mother "was not an ASL interpreter" and Nettles "could not read" the documents." *Id.* Nettles "signed the documents even though [he] did not understand them" because "[he] was afraid that if [he] did not sign the documents, [he] would not be allowed to leave the probation office and [he] would be sent back to prison." *Id.* at ¶ 11. Nettles left the probation office that day without "understand[ing] the rules that [he was] supposed to follow while [he was] on probation" because "there was no ASL interpreter at [his] first meeting." *Id.* at ¶ 12. He "had a lot of questions" but had no accessible way to ask the CSO these questions. *Id.*

112.   Home visits have been especially problematic for Nettles during his supervision. His CSO visited his home at least once a month to check in on his surroundings, update him on his supervision requirements, and he sometimes went "through [Nettles] belongings, without explaining why." ECF 2-6, Nettles Decl. ¶ 14. His CSOs did not bring an ASL interpreter to these home visits until around November 2019 when his CSO started using VRI. Szotkowski Decl. Ex. P, Nettles Suppl. Decl. ¶ 5.  Before then, the CSO would rely upon Nettles' family members to interpret or pass typed or written notes. ECF 2-6, Nettles Decl. ¶¶ 15-16. No one in Nettles' family is an ASL interpreter. Ex. R, Nettles Day 1 Dep. at 27:7-21; Ex. S, Nettles Day 2 Dep. at 98:6-17, 103:6-9.

113.   During his probation home visits, Nettles often nodded and pretended that he understood his officer because he didn't "want the probation officer to be angry at [him]." ECF 2-6, Nettles Decl. at ¶ 15.

114.   Nettles' CSO also often texted him, which concerned Nettles because "English is not [his] language." Szotkowski Decl. Ex. P, Nettles Suppl. Decl. ¶ 10. Because Nettles "do[es] not understand many words in English," he had to ask other people to help interpret these messages, including his son. *Id.*; Ex. R, Nettles Day 1 Dep. 22:25-23:25.

115.   Nettles also did not have the interpreters necessary for him to understand his probation requirements for Halloween 2020. His CSO attempted to

"explain[] a form he had about Halloween through VRI." Szotkowski Decl. Ex. P,

Nettles Suppl. Decl. ¶ 11. Nettles struggled to understand this form, including the

rules and procedures listed on the form that he would have to follow on Halloween.

*Id.* "[Nettles] asked [the VRI] to repeat things several times because [he] didn't

understand everything in detail," and he "asked his CSO if [he] could take a picture

of the form" because "he wanted someone to help [him] understand the form later

by interpreting it into ASL with a CDI." *Id* . His CSO denied this request at that time.

116.   "Shortly before October 25, 2020, [his CSO] handed [him] a copy of

the form." *Id.* at ¶ 12. Nettles then reviewed the form with his lawyers and a CDI.

*Id.* "The CDI translated the form from English to ASL," and "[i]t was the first time

[he] fully understood the form." *Id.* Nettles then realized that he had not

"underst[ood] everything that the VRI interpreter was signing when Officer Worley

summarized the form to [him] . . . because the VRI interpreter seem[ed] to not have

explained the form to [him] clearly or fully." *Id.* at ¶ 13. He now had many more

questions, including "what the 'GBI' letters meant;" "why Officer Worley was

talking to GBI;" "where [he] was supposed to 'report to' for Halloween—to Officer

Worley or to the probation office;" and why "[t]he form said that [he] was supposed

to stay home from Thursday night, October 29, through Friday morning, October

30," but nothing about Halloween night on the 31st. *Id.*

117.   Halloween was celebrated in his county on October 29th that year. Szotkowski Decl. Ex. P,  Nettles Suppl. Decl. ¶ 14. Two DCS Officers arrived at his house that evening with "a form with the 'GBI' letters on it." *Id.* at ¶ 14. Nettles still did not understand what "GBI" meant and had not been told about the form. *Id.* The officers brought a VRI interpreter with them, but positioned the laptop screen out of Nettles' line of sight. *Id.* "Both [officers] had no idea about VRI or how it worked— so they turned the laptop away, not knowing that [he] needed to see the interpreter to be able to communicate." *Id.* When Nettles "tried to turn the laptop back, [an officer] put her hand on her weapon" and "became defensive," as if Nettles was about to "do something." *Id.* When he was able "to adjust the angle of the laptop screen so the camera could see [him] clearly and so [he] could see the VRI interpreter clearly . . . the VRI video image was blurry that night, and the interpreter was pixelated." *Id.* Nettles felt "very uncomfortable as [he] did not have the ability to communicate with the officers." *Id.* This inability to communicate "made [him] feel unsafe. . . . It was very jarring and unexpected. [He] was very confused why they were [at his house that night] and not Officer Worley." *Id.*

118.   On February 4, 2021, after Mr. Nettles requested that a hearing-deaf interpreting team be present in person for all supervision meetings, CSO Worley came to Nettles' house to tell him that his request had been denied. *Id.* at ¶¶ 15-16. Worley then presented Nettles with a letter from DCS  human resources and "told

[him] that HR denied [his] request for live interpreters." *Id.* at ¶ 16. Because Worley only summarized the letter to the VRI interpreter, "[Nettles] didn't get a complete interpretation of the letter in ASL." *Id.* When Nettles then told Worley that "VRI didn't work for [him,] Officer Worley said that [he] would be fine with VRI and he mentioned a 'safety concern' in the letter but [Nettles] d[id] not know what that mean[t]." *Id.* Nettles asked follow up questions, but could not understand much of the VRI interpreter's interpretation. *Id.* at ¶ 17. "The VRI interpreter kept asking [him] to repeat [him]self because the interpreter couldn't understand [Nettles]," and "used sign language that was more focused on English than ASL," which "was hard for [Nettles] to understand." *Id.*

119.    While on probation, Nettles rarely "communicate[d] with people in [his] daily life who d[idn't] know ASL," such as "people in [his] job, or people in a store, or family, or friends, or neighbors." Ex. R, Nettles Day 1 Dep. at 61:1-12. "[He] d[idn't] want to talk to the wrong person and get in trouble and possibly be revoked." *Id.* Because of this fear, his world was essentially "home and work, home and work." *Id.*

120.    Nettles spent all of probation afraid that he would be sent back to prison as a result of his misunderstanding. Specifically, he was "very afraid that [he] might accidentally break a rule that has not been explained to [him];" "that if there is a misunderstanding and the probation office thinks [he] did something wrong, [he]

will not be able to tell [his] side of the story;" and "that [he] will not be able to ask [his] probation officer for answers" to important questions he has had. ECF 2-6, Nettles Decl. ¶ 20.