# FINAL APPROVAL MOTION

# EXHIBIT A

## SETTLEMENT AGREEMENT

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **BRANDON COBB, MARY HILL, and JOSEPH NETTLES**, on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs,*<br><br>v.<br><br>**GEORGIA DEPARTMENT OF COMMUNITY SUPERVISION, and MICHAEL NAIL**, in his official capacity as Commissioner of the Georgia Department of Community Supervision,<br><br>*Defendants.* | Civil Action No.<br>1:19-cv-03285-WMR<br><br><u>**CLASS ACTION**</u> |

<u>**SETTLEMENT AGREEMENT**</u>

## TABLE OF CONTENTS

**Page**

RECITALS ................................................................................................1

DEFINITIONS ..........................................................................................2

TERMS AND CONDITIONS ...................................................................7

Applicability ............................................................................................7

Communication Assessment and Plan .....................................................7

Notation, Tracking, and Following Communication Plan ......................10

Communication Assessment and Plans for Current Supervisees ...........11

Use of VRI .............................................................................................11

Auxiliary Aids and Services for Critical Interactions ...........................12

Deaf Interpreters ...................................................................................14

Written Documents ................................................................................14

Supervisee Interpreter and Disability Service Refusal Form .................15

Classes, Polygraphs, and Programming .................................................15

Training ..................................................................................................16

ADA Policy ............................................................................................16

Periodic Evaluation ...............................................................................16

Compliance Plan and Opportunity to Cure ...........................................17

Fees and Costs .......................................................................................20

Class Action Settlement Procedures ......................................................20

Construction, Effect, and Standard Terms of Agreement ......................21

i

Binding Effect ........................................................................21

Governing Law .......................................................................21

Implementation and Time Frames ......................................................21

Severability ...........................................................................22

Modification ..........................................................................22

Release ................................................................................22

Execution and Effective Date ..........................................................23

Term of Agreement ..................................................................23

Plaintiffs Brandon Cobb, Mary Hill, and Joseph Nettles, on behalf of themselves and all others similarly situated (the "Plaintiffs"), and Defendants Georgia Department of Community Supervision ("DCS"), and its Commissioner Michael Nail (collectively "Defendants" and, together with Plaintiffs, the "Parties"), hereby enter this Settlement Agreement (the "Agreement") as a resolution of all claims for prospective relief asserted by Plaintiffs in this action.

## <u>RECITALS</u>

**WHEREAS**, on July 19, 2019, six Plaintiffs, including Cobb and Nettles, initiated a putative class action in the U.S. District Court for the Northern District of Georgia by filing a complaint initially alleging that Defendants are violating Title II of the Americans with Disabilities Act, 42 U.S.C. S 12131 *et seq.*, Section 504 of the Rehabilitation Act, 29 U.S.C. S 794 *et seq.*, and Plaintiffs' due process rights under the Fourteenth Amendment by failing to make reasonable modifications to their policies and practices for Deaf or Hard of Hearing individuals on probation or parole in the State of Georgia;

**WHEREAS**, on July 1, 2021, Plaintiffs Cobb, Nettles, and Hill filed their Second Amended Complaint (hereinafter "Complaint").

**WHEREAS**, on October 13, 2022, the Court issued an Order denying Defendants' motion for summary judgment and certifying a class of

[a]ll present and future deaf or hard of hearing individuals supervised by DCS, whose hearing qualifies as a disability under the ADA and Rehabilitation Act and who require hearing-related accommodations and services to communicate effectively and/or to access or participate equally in programs, services, or activities available to individuals supervised by DCS[;]

**WHEREAS** the Parties subsequently engaged in productive settlement negotiations and jointly agreed to mediate the case before proceeding to trial;

**WHEREAS**, the Parties, by and through undersigned counsel, participated in mediation sessions before Magistrate Judge Christopher C. Bly at the courthouse for the Northern District of Georgia located in Atlanta, Georgia on March 2, 2023, March 14, 2023, April 3, 2023, May 11, 2023, June 15, 2023, and July 24, 2023;

**WHEREAS**, as a result of these mediation sessions, the Parties reached a mutually agreeable resolution of the case as set forth in this Agreement;

**WHEREAS**, the policies and practices that Defendants will implement pursuant to this Agreement are within the relief Plaintiffs seek in their Complaint;

**WHEREAS**, during the pendency of the litigation, Defendants have taken remedial measures;

**WHEREAS**, the Plaintiffs believe that the resolution of this matter with this Agreement is in the best interest of the members of the certified plaintiff class;

**WHEREAS**, the Parties desire, through this agreement, to avoid the costs and burdens associated with further litigation, the Parties have determined to settle this matter as set forth in this Agreement;

**NOW, THEREFORE,** in consideration of the mutual promises, conditions, and covenants set forth below, the Parties agree, through their respective authorized representatives, to be bound by the terms and conditions set forth below.

## <u>DEFINITIONS</u>

a.      **"ADA Coordinator"** means the individual appointed by the Commissioner to coordinate DCS' compliance with ADA requirements.

2

b.      **"Appears to be Deaf or Hard of Hearing"** means, for any individual, any one of these four criteria are met: (i) an individual appears to be using sign language or gesture; (ii) an individual is visibly using a device to assist with hearing (e.g., hearing aid, cochlear implant/implantable device, etc.); (iii) an individual self-identifies as being Deaf or Hard of Hearing or as someone with hearing loss who uses an alternative means of communication; and/or (iv) an individual for whom DCS observes communication barriers that appear to be related to hearing ability.

c.      "**Auxiliary Aids and Services**" means auxiliary aids and services as defined by 28 C.F.R. § 35.104, which includes: Qualified Interpreters on-site or through Video Remote Interpreting services; notetakers; real-time computer-aided transcription services; written materials; exchange of written notes; telephone handset amplifiers; assistive listening devices; assistive listening systems; telephones compatible with hearing aids; closed caption decoders; open and closed captioning, including real-time captioning; voice, text, and video-based telecommunications products and systems, including text telephones (TTYs), videophones, and captioned telephones, or equally effective telecommunications devices; videotext displays; accessible electronic and information technology; or other effective methods of making aurally delivered information available to individuals who are Deaf or Hard of Hearing.

d.      **"Communication Assessment"** means the assessment of Auxiliary Aids and Services that would provide for Effective Communication based upon a supervisee's responses to the DCS Communication Assessment Form.

e.      **"Communication Assessment Form"** means the DCS form which documents an individual's hearing disability and all information needed for completion of a supervisee's

3

Communication Plan.  The Communication Assessment Form agreed upon by the Parties is attached to this Agreement as Exhibit 1.

f.      **"Communication Plan"** means the individualized list of Auxiliary Aids and Services and reasonable modifications that will be provided by DCS to individuals with hearing disabilities in the various different categories of interactions between DCS and the individual to provide Effective Communication.  The form agreed upon by the Parties that DCS uses to generate the Communication Plan is attached to this Agreement as Exhibit 2.

g.      **"Critical Interactions"** means those interactions in which the risks of miscommunication or misunderstanding are high and the consequences of miscommunications or misunderstandings may have serious repercussions for Deaf or Hard of Hearing supervisees.  By way of example, Critical Interactions shall include: (i) the initial explanation of the conditions of DCS supervision at Intake, any subsequent changes thereto, and any other instances in which the contents of legal documents are provided or reviewed; (ii) instances in which a communication with DCS occurs with the intention of substantively discussing the reasons leading to and the consequences of arrest or revocation, such as waivers; and (iii) any interactions with a supervisee in a carceral setting.

h.      **"Deaf or Hard of Hearing"** means a supervisee, if unaided by hearing aids or any medical device, is unable to hear to a sufficient degree to be able to understand the spoken word such that this hearing level or loss qualifies as a disability under the ADA and the Rehabilitation Act.

i.      **"Effective Communication"** means communication with individuals who have hearing disabilities that is as effective as communications with others.  Effective Communication

4

is achieved by furnishing appropriate Auxiliary Aids and Services and reasonable modifications where necessary.

j.    **"Effective Date"** means the date this Agreement receives final approval by the Court following the final approval hearing.

k.    **"External Communication Assessment"** means a Communication Assessment conducted by a Qualified Assessor to determine what Auxiliary Aids and Services which would provide for Effective Communication.  An External Communication Assessment will be used as set forth in Paragraphs 2-9 to complete an individual's Communication Plan.

l.    **"Intake"** means the process from the point of time an individual initially reports to DCS as a new or former felony probationer or parolee under the supervision of DCS through the conclusion of orientation and explanation of the conditions of DCS supervision.

m.    **"Internal Communication Assessment"** means a Communication Assessment conducted by the ADA Coordinator to determine what Auxiliary Aids and Services would provide for Effective Communication.

n.    **"Internal Intake Assessment"** means the initial inquiry, conducted when the supervisee first encounters DCS as a new or former felony probationer or parolee, regarding whether the individual may Appear to Be Deaf or Hard of Hearing.

o.    **"Presumed to Know Sign Language"** means, for any supervisee, that (i) the CSO observes the supervisee appearing to use sign language or gesture; (ii) the supervisee responds affirmatively to the CSO verbally asking the supervisee: "Do you know sign language?," or does not appear to understand the question; or (iii) the supervisee indicates, by pointing, gesture, or

5

nodding affirmatively to an "ASL interpreter" symbol with "A.S.L." written and finger-spelled underneath on a prepared document shown by the CSO.

p.     **"Qualified Assessor"** means a person, contracted through the Georgia Department of Behavioral Health and Developmental Disabilities ("DBHDD") or otherwise, who is familiar with American Sign Language, oral communication, gestural communication, who has experience assessing the reading and writing ability of Deaf and Hard of Hearing individuals, and who is able to determine which appropriate Auxiliary Aids and Services including all types of Qualified Interpreters would provide Effective Communication.   The Qualified Assessor performs an External Communication Assessment.

q.     **"Qualified Individual with a Disability"** means an individual with a disability who with or without reasonable modifications to policies, practices, or procedures, or the provision of Auxiliary Aids and Services meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.   42 U.S.C. § 12131(2).

r.     **"Qualified Interpreter"** means an interpreter who, via a VRI service or an on-site appearance, is able to interpret effectively, accurately, and impartially, both receptively and expressively, using any necessary specialized vocabulary, given the individual with hearing disabilities' language, skills, and education.   Qualified Interpreters include, for example, sign language interpreters, oral transliterators, and cued-language transliterators.   In accordance with O.C.G.A. § 24-6-651, a qualified interpreter must be certified as an interpreter for hearing impaired persons by the Registry of Interpreters for the Deaf or be a court qualified interpreter.   For purposes of this Agreement, a Certified Deaf Interpreter ("CDI") is also considered a Qualified Interpreter.

s.      **"Unplanned Critical Interaction"** means a Critical Interaction between a Deaf or Hard of Hearing supervisee and DCS where DCS did not have sufficient advance notice to allow for DCS to arrange for Auxiliary Aid and Service(s) required for a Critical Interaction.

t.      **"Video Remote Interpreting"/"VRI"** means a fee-based service that uses video conferencing technology to access an off-site interpreter to provide real-time sign language or oral interpreting services for conversations between hearing people and people who are deaf or have hearing loss.

## **TERMS AND CONDITIONS**

**Applicability**

1.      The terms in this Agreement apply to Deaf or Hard of Hearing individuals who are under the supervision of DCS.

**Communication Assessment and Plan**

2.      Each supervisee shall receive an Internal Intake Assessment to determine whether the supervisee Appears to be Deaf or Hard of Hearing.

a.      For any supervisee who Appears to be Deaf or Hard of Hearing and is Presumed to Know Sign Language, all subsequent communication at the initial meeting with DCS will take place with VRI until a Communication Plan is completed.  Intake shall not proceed further without an in-person interpreter consistent with the Communication Plan.

b.      For any supervisee who Appears to be Deaf or Hard of Hearing and is not Presumed to Know Sign Language, DCS will contact the ADA Coordinator to determine

7

which other Auxiliary Aids or Services to provide and until the ADA Coordinator is available to discuss, Intake will not proceed.

c.     If DCS staff is unable to establish any meaningful communication via any of the methods outlined above, DCS staff shall contact the ADA Coordinator for guidance on how to proceed and until the ADA Coordinator is available to discuss, Intake will not proceed.

3.     Upon a determination by DCS staff that the supervisee Appears to be Deaf or Hard of Hearing, DCS staff will arrange to have the ADA Coordinator join the meeting to describe what communication access is, explain the supervisee's right to Effective Communication during supervision, and outline the Communication Assessment process.  As a part of this discussion, if the supervisee became Deaf or Hard of Hearing as a minor, the ADA Coordinator will offer the supervisee an opportunity to consent to an External Communication Assessment.  The outline the ADA Coordinator will follow for his discussion is attached to this Agreement as Exhibit 3.  If the ADA Coordinator is unavailable to join the call, DCS staff and the supervisee will reschedule that call for a later date and not proceed with Intake in the interim time period.  The ADA Coordinator and DCS staff will have the supervisee execute a Communication Assessment Acceptance/Refusal form to the External Communication Assessment, the form of which is attached to this Agreement as Exhibit 4.

4.     A Communication Assessment will be completed for every supervisee who Appears to be Deaf or Hard of Hearing as follows:

a.     Supervisees who were born Deaf or Hard of Hearing, or who answer yes to the question "Were you a minor when you became deaf or hard of hearing?" shall

receive an External Communication Assessment, unless the supervisee does not consent to such External Communication Assessment, in which case the ADA Coordinator shall complete the Internal Communication Assessment with the supervisee.

b.      Supervisees who became Deaf or Hard of Hearing as an adult shall receive an Internal Communication Assessment to be completed by the ADA Coordinator unless conditions are present that the ADA Coordinator believes warrant an External Communication Assessment.

5.      If the supervisee consents to an External Communication Assessment, DCS will then engage an outside agency to assist in completing the External Communication Assessment. DCS will give preference to the services of DBHDD. The memorandum of understanding between DCS and DBHDD is attached to this Agreement as Exhibit 5. Defendants will be responsible for scheduling the External Communication Assessment (virtual or in-person) with the supervisee and the outside agency. If DCS staff was unable to establish meaningful communication with the supervisee in order to obtain consent at Intake, the outside agency will seek such consent before proceeding to the External Communication Assessment. The results of the External Communication Assessment will be documented on the Communication Assessment Form.

6.      If the supervisee does not consent to the External Communication Assessment, the Communication Assessment Acceptance/Refusal Form must be completed. If the supervisee does not consent to the External Communication Assessment or became Deaf or Hard of Hearing as an adult, the ADA Coordinator will complete the Internal Communication Assessment using the Communication Assessment Form. The supervisee's responses to those questions, as well as any

Auxiliary Aids and Services used in filling out the Communication Assessment Form will be documented on the form.

7.     The Communication Assessment Form completed during the Internal Communication Assessment or External Communication Assessment will be used by the ADA Coordinator to create the supervisee's individualized Communication Plan which will list all effective Auxiliary Aids and Services.

8.     The Communication Plan will list the supervisee's accommodations, including the appropriate Auxiliary Aids and Services that will be provided to the supervisee to provide Effective Communication as well as the supervisee's preferred method of communication.

9.     A copy of the supervisee's Communication Plan will be provided to the supervisee and loaded into the DCS Portal system.

**Notation, Tracking, and Following Communication Plan**

10.     The information recorded in a supervisee's Communication Plan will be recorded in the DCS Portal, provided to the supervisee, and communicated to DCS staff.

11.     DCS staff will comply with the Communication Plan unless specific showings of fundamental alteration or undue burden pursuant to 28 C.F.R. § 35.164 are made or a departure is made in accordance with Paragraph 13.

12.     Third party vendors approved by DCS will be contractually required to meet all requirements required by the ADA and the Rehabilitation Act.  Vendors who are found by DCS to have violated the ADA and the Rehabilitation Act will lose approval status.

13.     Departures from the Communication Plan will require approval from the DCS ADA Coordinator.  Departures will be documented in the DCS Portal and, where appropriate, remedial measures taken.

**Communication Assessment and Plans for Current Supervisees**

14.     DCS will provide DBHDD with the expert reports of Drs. Judy Shephard-Kegl and Amy June Rowley, including the individual assessments for named-plaintiffs Brandon Cobb and Mary Hill.  Consistent with Paragraphs 2-9, DBHDD will then complete a Communication Assessment Form and the ADA Coordinator will complete a Communication Plan for Mr. Cobb and Ms. Hill.

15.     For all other current Deaf or Hard of Hearing supervisees, a Communication Assessment and a Communication Plan will be completed in accordance with Paragraphs 2-9 herein.

**Use of VRI**

16.     DCS' use of VRI for interactions between DCS and Deaf or Hard of Hearing supervisees will be subject to the following conditions:

a.     VRI is identified as appropriate in the supervisee's Communication Plan;

b.     The technical requirements specified in 28 CFR § 35.160(d) for VRI are met or exceeded and VRI is functioning; and

c.     In accordance with O.C.G.A. § 24-6-657, the interpreter must be in full view of and spatially situated so as to assure Effective Communication with the Deaf or Hard

of Hearing supervisee and the screen size of the device used for VRI must be sufficient to meet this requirement.

17.    For any supervisee who is Deaf or Hard of Hearing and VRI is identified as appropriate in the supervisee's Communication Plan, DCS staff will use the agency issued Chromebook as the primary delivery method for VRI services to supervisees who are Deaf or Hard of Hearing.

18.    DCS staff should ask the supervisee to repeat back the supervisee's understanding of the directions/information given.

19.    A DCS-issued cell phone should only be utilized in emergency situations when a properly charged and maintained Chromebook has failed to connect to VRI services.  The nature of the Chromebook's failure and the circumstances necessitating emergency use of a different device shall be documented in the case management system.  Any interactions with supervisees employing VRI services should be treated as a qualifying event requiring recording with a body-worn camera.   If a Chromebook and/or similar device is used for VRI services, the CSO shall record both the Chromebook screen and the supervisee.  If such a recording cannot be accomplished with one DCS staff member, a second DCS staff member with a body-worn camera should record simultaneously to ensure both the supervisee and VRI services are captured for the duration of the interaction.

**Auxiliary Aids and Services for Critical Interactions**

20.    DCS will provide in-person interpreter(s) for Critical Interactions for supervisees who require any type of interpreter(s) in their Communication Plans.  For supervisees who do not require any type of interpreter(s) in their Communication Plans, DCS will provide one or more

Auxiliary Aids and Services for Critical Interactions that are the same as those identified on supervisees' Communication Plans for Intake.

21.     In the event of an Unplanned Critical Interaction, DCS shall immediately arrange for one or more Auxiliary Aids and Services required for Critical Interactions set forth in Paragraph 20 above.  If those Auxiliary Aids and Services for Critical Interactions are not immediately available, DCS will use one or more Auxiliary Aids and Services identified in the supervisee's Communication Plan as appropriate stop-gap measures until the Auxiliary Aids and Services required for Critical Interactions become available.  To the extent the stop-gap measures identified in the supervisee's Communication Plan are unavailable, DCS staff will immediately contact the ADA Coordinator to determine next steps.  In any situation in which DCS uses these stop-gap measures, DCS shall seek remedial action as necessary to ensure that any information that was attempted to be shared during the stop-gap period is communicated effectively.  For example, if DCS calls an interpreting agency and requests an in-person interpreter and that interpreter will not arrive on-site for two hours or more, then DCS may use VRI as a stop-gap measure to communicate with the supervisee to the extent that is consistent with the supervisee's Communication Plan, until the in-person interpreter arrives.

22.     For any Critical Interaction between DCS staff and supervisees occurring in a jail post-arrest in which DCS is implicated, DCS staff will notify jail administration beforehand of the supervisee's need for appropriate Auxiliary Aids and Services and seek permission to provide appropriate Auxiliary Aids and Services during DCS interactions.  These Auxiliary Aids and Services are set forth in Paragraph 20 above.  The CSO must document any denial of DCS provided Auxiliary Aids and Services for attempted DCS encounters in the GA Reentry Web Portal and notify the ADA Coordinator within the next business day of notification of denial.  The attempt to

schedule or otherwise arrange for these Auxiliary Aids and Services should occur immediately, and no later than, within one (1) business day of notification of the post-arrest and should be documented in the case management system. The expectation will be that the meeting between DCS staff and supervisees occurring in jail will be within four (4) business days of notification of arrest and every effort will be made to retain Auxiliary Aids and Services within that time frame. A good faith effort that results in a failure to obtain Auxiliary Aids and Services within that time frame will not constitute a material breach of this Agreement.

**Deaf Interpreters**

23.     DCS will provide a CDI or equally effective Auxiliary Aid or Service, as identified in the Communication Assessment and Communication Plan of an individual Deaf or Hard of Hearing supervisee for that type of interaction.

**Written Documents**

24.     Communication Plans will include information about whether, to what extent, and in what circumstances Deaf or Hard of Hearing supervisees can understand written documents and can communicate in written English.

25.     Supervisees who, because of their disability, cannot read and write in English, will receive information in another, accessible form which will be reflected on the Communication Plan.

26.     DCS will utilize the appropriate Auxiliary Aids and Services to ensure that Deaf or Hard of Hearing supervisees who cannot read and write English receive Effective Communication to access the content of written information throughout the duration of their supervision.

27.     DCS will communicate the contents of any documents mailed to or delivered to a supervisee's residence that are not Critical Interactions for example, guidelines or instructions such as Halloween guidelines, using the Auxiliary Aids and Services provided for in the Communication Plan for Field Interactions.

**Supervisee Interpreter and Disability Service Refusal Form**

28.     To the extent that a Deaf or Hard of Hearing supervisee seeks to decline the use of Auxiliary Aids and Services, that supervisee may complete a Supervisee Interpreter and Disability Service Refusal Form, in the form of the one attached to this Agreement as Exhibit 6.

29.     To the extent that a supervisee seeks to decline the use of Auxiliary Aids and Services prior to the completion of a Communication Plan, DCS Staff is required to immediately notify the ADA Coordinator.

**Classes, Polygraphs, and Programming**

30.     Third-party contractors that DCS approves for use by supervisees for programs or services related to their supervision must comply with the ADA and the Rehabilitation Act, including providing Effective Communication to supervisees free of charge.

31.     To that end, as a condition of an entity being listed as an "approved vendor" by DCS, the entity must agree to comply with the ADA and the Rehabilitation Act.  DCS will assess third-party contractors' compliance with the ADA and the Rehabilitation Act and will remove entities from its "approved vendor" list in the event that an entity fails to provide Effective Communication or equal access to supervisees with disabilities.

32.     DCS will ensure that all supervisees who are Deaf or Hard of Hearing are provided notice that third-party contractors must comply with the ADA and the Rehabilitation Act and will require DCS staff to report any third-party contractor who fails to comply with the ADA and the Rehabilitation Act.   DCS shall provide supervisees' Communication Plans to third-party contractors that provide programs or services related to those supervisees' supervision.

**Training**

33.     DCS staff will be trained annually and as needed on principles and practical skills to comply with DCS' ADA Policy, the ADA and the Rehabilitation Act, and with the terms of this Agreement.

34.     This training shall include the "teach back" or "restatement" technique which shall be used with Deaf or Hard of Hearing supervisees whenever practical.  The Parties will collaborate on how to incorporate this technique into training materials.

**ADA Policy**

35.     DCS will require all employees to receive training on and to adhere to DCS' ADA Policy, the form of which is attached to this Agreement as Exhibit 7.

36.     The ADA Policy will maintain a grievance process to be used by Deaf or Hard of Hearing supervisees substantially in the form of the one attached to this Agreement as Exhibit 7.

**Periodic Evaluation**

37.     DCS will make biannual attempts in good faith to evaluate whether communication access is effective and in compliance with the ADA and the Rehabilitation Act and make changes to their ADA Policy, practices, and procedures as necessary.  This will include periodic attempts

to discuss with Deaf or Hard of Hearing supervisees whether the communication they are being provided is effective and whether they understand information that is being communicated to them.

**Compliance Plan and Opportunity to Cure**

38.     Plaintiffs will provide DCS written notice of any perceived violation of this Agreement.  This process will include:

a.      Plaintiffs' counsel will report concerns to DCS and/or its counsel and initiate a process for addressing violations;

b.      DCS will timely investigate each concern for a period of time not to exceed two (2) weeks, unless additional time is needed to thoroughly investigate.  Defendants will notify Plaintiffs' counsel should additional time be required within the two (2) week period.   Within two (2) weeks following the conclusion of the investigation, Defendants will provide a mechanism for feedback, counseling, training, and potential adverse employment action for DCS staff who fail to comply with this term sheet and the final settlement agreement; and

c.      While the investigation is ongoing, DCS will cure the deficiency by repeating the interaction to the extent possible, using the appropriate Auxiliary Aids and Services to ensure Effective Communication.

39.     DCS will provide Plaintiffs' counsel the following documents every three months for the term of this Agreement, to begin on the date of final approval of this Agreement for a period of four (4) years, consistent with the term of this Agreement.  If a motion brought by Plaintiffs

pursuant to Paragraph 42 is pending at the time the term of the Agreement is set to expire, the term of the Agreement shall be extended until the Court rules on the motion.

    a.    A roster of all current Deaf or Hard of Hearing supervisees, to include names and the most current contact information available to DCS.

    b.    Copies of Deaf or Hard of Hearing supervisees' Communication Assessment Forms and Communication Plans.  Subsequent production will include only new or revised Deaf or Hard of Hearing supervisees' Communication Assessments and Communication Plans.

    c.    Copies of the Supervisee Communication Assessment Acceptance/Refusal Form and the Supervisee Interpreter and Disability Service Refusal Form.

    d.    Documentation of any departure from Communication Plans pursuant to Paragraphs 11 and 13.

    e.    Face sheets and Portal case notes for all current Deaf or Hard of Hearing supervisees.

    f.    BodyCam videos for all Deaf or Hard of Hearing supervisees.

    g.    DCS staff communications concerning scheduling the use of Auxiliary Aids and Services, including any Receipts for the same.

    h.    Copies of documents establishing requirement that third-party contractors comply with ADA and the Rehabilitation Act.

      i.      Documents establishing completion of training by DCS staff actively supervising Deaf or Hard of Hearing supervisees on ADA policy, practices, and procedures. DCS currently offers training once a year in February, March, and May.

40.      Any complaints or concerns by any Deaf or Hard of Hearing supervisees relating to this Agreement shall be referred to DCS counsel, who shall investigate the complaint and determine whether remedial action is required within two (2) weeks of receipt of any complaints or concerns, unless additional time is needed to thoroughly investigate.  Defendants will advise Plaintiffs' counsel should additional time be required within the two (2) week timeframe. Within two (2) weeks following the conclusion of its investigation of any complaints or concerns,  DCS will provide a written response to each complaint and provide a copy of the complaint and the written response to Plaintiffs' counsel.

41.      If, after using the process described above, Plaintiffs believe that Defendants are in material breach of this Agreement, Plaintiffs will provide Defendants written notice describing the alleged breach.  Defendants will provide a written statement responding to the notice within 15 business days of receipt of notice.   Should Plaintiffs believe that Defendants' response is inadequate, counsel for the Parties will confer in a good faith effort to resolve their dispute. Plaintiffs will not file an enforcement motion unless and until the Parties confer and the dispute remains unresolved.

42.      Only after following the above procedure, Plaintiffs may request enforcement of this Agreement by seeking an Order requiring DCS to show cause why it should not be held in contempt, or by seeking an order for other relief upon noticed motion before the Court.  Any such

motion will cite the provision(s) at issue and allege that Defendants have breached said provision(s).

**Fees and Costs**

43.     The Defendants have agreed to pay Plaintiffs' counsel the total sum of $1,250,000 in attorneys' fees and costs in complete resolution of the *Cobb* case, the payment of which is contingent upon the Court's final approval of the Agreement.  The payment represents settlement of Plaintiffs' counsel's attorney's fees and costs in litigating this matter to settlement as well as anticipated fees and costs associated with monitoring Defendants' compliance with the Settlement.

44.     Defendants shall make payment and transfer of the fees to Plaintiffs' counsel within thirty (30) days of the Court's final approval of this Agreement.

**Class Action Settlement Procedures**

45.     The Parties shall jointly submit this Agreement to the Court for preliminary approval pursuant to Fed. R. Civ. P. 23, which will include the proposed written notice to the class.

46.     The Parties agree to the following notice procedure ("Notice") to notify the class of the Agreement:

a.     Within ten (10) calendar days following the Court's preliminary approval of this Agreement, Defendants will provide Plaintiffs' counsel a roster of all current Deaf or Hard of Hearing supervisees known to DCS, to include names and the most current contact information available to DCS.

b.     Within sixty (60) calendar days following receipt of the roster above, Plaintiffs shall cause the written settlement notice to be mailed to all Deaf or Hard of Hearing

supervisees identified by Defendants, and shall cause the same to be made available, in both written and ASL video format, online at the location indicated in the settlement notice.

47.     The Parties agree that they shall jointly seek to set the final approval hearing within forty-five (45) days after Notice is completed pursuant to Paragraph 46, or as otherwise directed by the Court, for the Court to consider and determine whether the final approval order and the judgment should be entered.

**Construction, Effect, and Standard Terms of Agreement**

**Binding Effect**

48.     This Agreement contains the entire Agreement between the Parties and is binding upon Plaintiffs and the class, the Defendants named in the lawsuit in their official capacities, and on Defendants' successors in office, employees and agents.

49.     The Court will retain jurisdiction during the term of the Agreement to enforce the terms of this Agreement.

**Governing Law**

50.     This Agreement is governed by, and interpreted under, federal law and the laws of the State of Georgia.

**Implementation and Time Frames**

51.     The Parties shall work in good faith to carry out all of the terms of this Agreement. Unless a more specific time frame is specified in this Agreement, the Parties will complete all actions required by this Agreement in a reasonable period of time.

**Severability**

52.     The obligations governed by this Agreement are severable. Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if for any reason a part of this Agreement is determined to be invalid or unenforceable, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of this Agreement.

**Modification**

53.     The Parties may jointly stipulate to make changes, modifications, and amendments to the requirements of this Agreement.

**Release**

54.     All claims for declaratory and injunctive relief asserted in the Complaint shall be finally and fully settled and released, subject to the terms and conditions of this Agreement, which the Parties enter into freely, voluntarily, knowingly, and with the advice of counsel. The named Plaintiffs and unnamed class members hereby release the Defendants in their official capacities from, and are barred and precluded from prosecuting any claims, causes of action or requests for any injunctive or declaratory relief that have been asserted in this litigation, provided that in no event shall this release be deemed to release or otherwise affect in any way: (a) any claim for money damages; (b) any claim not directly related to the effectiveness of communication provided by DCS to class members; (c) any claim related to medical or mental health diagnosis or treatment; (d) any defenses or objections able to be asserted in a revocation hearing or criminal proceeding; or (e) any claim regarding any act, incident, or event that occurs after the expiration of the Agreement.

**Execution and Effective Date**

55.     This Agreement may be executed electronically in multiple counterparts and emailed or faxed signatures will be valid and enforceable.  This Agreement shall be effective upon the Effective Date.

**Term of Agreement**

56.     Unless otherwise agreed by the Parties with approval of the Court, this Agreement and the Court's order approving and entering it shall terminate four (4) years from the Effective Date.  For the avoidance of doubt, this Agreement shall not terminate upon the filing and/or adjudication of a motion pursuant to Paragraph 42 of this Agreement.

IN WITNESS WHEREOF, the Parties, by and through their authorized counsel, intending to be legally bound, have executed this Agreement this 21st day of September, 2023.

**ON BEHALF OF PLAINTIFFS:**

AMERICAN CIVIL LIBERTIES UNION
DISABILITY RIGHTS PROGRAM

*s/ Brian L. Dimmick*
Susan Mizner, *pro hac vice*
Zoe Brennan-Krohn, *pro hac vice*
Brian L. Dimmick, *pro hac vice*
West Resendes, *pro hac vice*
39 Drumm Street
San Francisco, CA 94111
Phone: (415) 343-0781
Fax: (415) 395-0950
SMizner@aclu.org
ZBrennan-Krohn@aclu.org
BDimmick@aclu.org
WResendes@aclu.org

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF GEORGIA, INC.

*s/ Andrés M. López-Delgado*
Cory Isaacson
Andrés M. López-Delgado (552876)
P.O. Box 77208
Atlanta, GA 30357
Phone: (732) 666-3300
Fax: (770) 303-0060
ADelgado@acluga.org

ARNOLD & PORTER KAYE SCHOLER LLP

*s/ Stephanna F. Szotkowski*
Ian S. Hoffman, *pro hac vice*
601 Massachusetts Ave, NW
Washington, DC 20001
Phone: (202) 942-5000
Fax: (202) 942-5999
Ian.Hoffman@arnoldporter.com

**ON BEHALF OF DEFENDANTS:**

DEPARTMENT OF COMMUNITY SUPERVISION

*s/ George M. Weaver*
Michael W. Nail
Commissioner
2 MLK Jr Dr. SE
Suite 886 E
Atlanta, GA 30334
Phone: (678) 783-4337

George M. Weaver (743150)
Special Assistant Attorney General
HOLLBERG & WEAVER LLP
6185 Mountain Brook Way
Sandy Springs, Georgia 30328
Phone: (404) 760-1116
Fax: (404) 760-1136
gweaver@hw-law.com

Russell Alan Britt (473664)
Special Assistant Attorney General
Pearson K. Cunningham (391024)
Blake Walker (993236)
HALL BOOTH SMITH, P.C.
191 Peachtree Street, N.E.
Suite 2900
Atlanta, GA 30303
Phone:  (404) 954-5000
Fax:  (404)-954-5020
rbritt@hallboothsmith.com
pcunningham@hallboothsmith.com
bwalker@hallbothsmith.com

24

Stephanna F. Szotkowski, *pro hac vice*
70 West Madison Street, Suite 4200
Chicago, Illinois 60602
Phone: (312) 583-2354
Fax: (312) 583-2591
Stephanna.Szotkowski@arnoldporter.com

Tyler J. Fink, *pro hac vice*
250 West 55th Street
New York, New York 10019
Phone: (212) 836-8000
Fax: (212) 836-8689
Tyler.Fink@arnoldporter.com

NATIONAL ASSOCIATION OF THE DEAF LAW
AND ADVOCACY CENTER

*s/ Brittany Shrader*
Brittany Shrader, *pro hac vice*
8630 Fenton Street, Suite 820
Silver Spring, MD 20910
Phone: (301) 587-2907
brittany.shrader@nad.org

DISABILITY RIGHTS EDUCATION AND
DEFENSE FUND

*s/ Claudia Center*
Claudia Center, *pro hac vice*
3075 Adeline St, Suite 210
Berkeley, CA 94703
Phone: (510) 644-2555
CCenter@dredf.org

Tina M. Piper (142469)
Susan Rutherford
Meghan Davidson
GEORGIA DEPARTMENT OF LAW
40 Capital Square, S.W.
Atlanta, GA 30334-1300
Phone:  (404) 656-3355
Fax:  (404) 463-8864
tpiper@law.ga.gov

# SETTLEMENT AGREEMENT

# EXHIBIT 1

## COMMUNICATION ASSESSMENT FORM



**DEPARTMENT OF COMMUNITY SUPERVISION**
**Auxiliary Aids and Services Assessment**
**for Deaf or Hard of Hearing Supervisees**

**Please upload the completed form to the supervisee's case file and email a copy to**
**ADA.request@dcs.ga.gov.**

Name: _____ UPI #: _____ Circuit: _____

Date: _____ Disability: (Check one): ☐ Deaf ☐ Hard of Hearing

**Onset of Hearing Loss** ☐ Adult ☐ Minor

**Assessment of Sign Language Ability**

A. Supervisee uses sign language? (Check one): ☐ Yes ☐ No
B. If yes, is sign language the supervisee's primary language? ☐ Yes ☐ No
C. Supervisee's proficiency: ☐ Beginner ☐ Conversational ☐ Fluent
D. Type of interpreter (Generally provided through Remote Interpreter/VRI) (Check all that apply):
   ☐ ASL (American Sign Language) ☐ Signed English
   ☐ ASL + Certified Deaf Interpreter (CDI) ☐ Sign Language from another country
   ☐ Other _____
E. Are there any circumstances when VRI should not be used? (If yes, describe) ☐ Yes ☐ No

_____
_____
_____

**Assessment of Reading/Writing Ability**

Is the person able to read and understand English fluently? (Describe) ☐ Yes ☐ No

_____
_____
_____

Is the person able to write in English fluently? (Describe) ☐ Yes ☐ No

_____
_____
_____

Is the person able to read and write in a foreign language? ☐ Yes, Language _____ ☐ No

Does the person engage in basic communications through reading/writing? (An example of basic communications might be agreeing to a date, time, and place for an appointment. An example of complex communications might be answering questions about the past) ☐ Yes ☐ No (Describe)

1

_____

If so, are there conditions required for this person to be able to read and write, such as large print, etc.?

_____
_____
_____
_____
_____

**Assessment of Speaking Ability**

Can the person speak sufficiently clearly for the average person to understand them?  ☐ Yes  ☐ No

(Note: If the person does not feel comfortable using speech to communicate or otherwise refuses to speak to the assessor orally, the answer to this question should be no.)

If so, are there conditions required for this person to be able to be understood by another person, such as a quiet setting or an amplifier?

_____
_____
_____
_____
_____

Assessment of Lip Reading Ability (To be completed by a qualified expert only)

(Example: Can the person read lips? If so, are there conditions required, such as only when the person speaking speaks clear and slowly, or only when the conversation is one-on-one and in a quiet setting with adequate lighting; allowing the person to understand through a combination of lip reading and a hearing device?)

_____
_____
_____

**Primary Language:** _____

**Preferred Method of Communication:** _____

**Hearing Devices for Communication**

   A.  Uses:  ☐ Hearing Aid  ☐ Cochlear Implant/Implantable Device

**If this is a Re-Assessment, Changes Since Prior Assessment**

_____

_____

_____

**Additional Communication Assessment**

_____

_____

_____

_____

_____

**The Following Were Used to Assist in Communicating with Supervisee in completing this form**

_____

_____

### Recommendations

*Note whether Supervisee would benefit from an interpreter under the column marked "Interpreter" (Yes or No)*

*Note whether Supervisee would benefit from other Auxiliary Aids/Services or Accommodations, such as one-on-one meetings in quiet room, exchange of written note, visual aids, etc. under the column "Other Accommodation" (List Accommodation)*

*In the event that any interaction with a supervisee is a "Critical Interaction" or escalates to a "Unplanned Critical Interaction" as those terms are defined in Addendum A to the ADA Policy, those provisions should govern the types of auxiliary aids and services provided*

| Program, Service or Activity | Interpreter (Yes or No) | Type of Interpreter (ASL, Signed English, ASL + CDI, Sign Language from Another Country, Other) | Remote VRI or In-Person Interpreter | Other Accommodation (List Accommodation) |
|---|---|---|---|---|
| 1. Intake (Including Conditions and any Modifications or Amendments to Conditions) | For supervisees who use any type of interpreter, the answer is Yes for this category. | | For supervisees who use any type of interpreter, the answer is In-Person for this category. | |
| 2. Office Interaction | | | | |
| 3. Field Interaction | | | | |
| 4. Drug Testing (Up to the point the client enters the bathroom to take the test) | | | | |

3

| | | | | |
|---|---|---|---|---|
| 5. Administrative Hearing | | | | |
| 6. POM Hearing (Probations Operations Management) | | | | |
| 7. Substance Abuse Counseling | | | | |
| 8. Cognitive Behavioral Counseling | | | | |
| 9. One-on-One Mental Health Counseling | | | | |
| 10. Interview with OPS (Office of Professional Standards) | | | | |
| 11. Any other activity required as a condition of supervision | | | | |

**During Critical Interactions, the following should never be used (List all that apply):**

_____

_____

_____


**Stop-Gap Measures that could be used for Unplanned Critical Interactions include (List all that apply):**

_____

_____

_____

Signatures:

Qualified Interviewer:

_____

Title          Printed Name              Signature              Date

Supervisee:

_____

Printed Name                Signature                    Date

# SETTLEMENT AGREEMENT

# EXHIBIT 2

## COMMUNICATION PLAN



**DEPARTMENT OF COMMUNITY SUPERVISION**
**Auxiliary Aids and Services Communication Plan**
**for Deaf or Hard of Hearing Supervisees**

**Please upload the completed form to the supervisee's case file and email signed copy to ADA.request@dcs.ga.gov.**

Name: _____  UPI #: _____  Circuit: _____

Date: _____  Disability: (Check one): ☐ Deaf  ☐ Hard of Hearing

Accommodations for the following programs, services, and activities:

*Note whether Supervisee would benefit from an interpreter under the column marked "Interpreter" (Yes or No) and if so note which type of interpreter in the next column*

*Note whether Supervisee would benefit from other Auxiliary Aids/Services or Accommodations, such as one-on-one meetings in quiet room, exchange of written note, visual aids, etc. under the column Other Accommodation (List Accommodation)*

*In the event that any interaction with a supervisee is a "Critical Interaction" or escalates to a "Unplanned Critical Interaction" as those terms are defined in Addendum A to the ADA Policy, those provisions should govern the types of auxiliary aids and services provided*

| Program, Service or Activity | Interpreter (Yes or No) | Type of Interpreter (ASL, ASL + CDI Signed English, Sign Language from Another Country, or Other) | Remote VRI or In-Person Interpreter | Other Accommodation (List Accommodation) |
|---|---|---|---|---|
| 1. Intake (Including Conditions and any Modifications or Amendments to Conditions) | For supervisees who use any type of interpreter, the answer is Yes for this category. | | For supervisees who use any type of interpreter, the answer is In-Person for this category. | |
| 2. Office Interaction | | | | |

1

| | | | | |
|---|---|---|---|---|
| 3.  Field Interaction | | | | |
| 4.  Drug Testing (Up to the point the client enters the bathroom to take the test) | | | | |
| 5.  Administrative Hearing | | | | |
| 6.  POM Hearing (Probations Operations Management) | | | | |
| 7.  Substance Abuse Counseling | | | | |
| 8.  Cognitive Behavioral Counseling | | | | |
| 9.  One-on-One Mental Health Counseling | | | | |
| 10. Interview with OPS (Office of Professional Standards) | | | | |
| 11. Any other activity required as a condition of supervision | | | | |

**During Critical Interactions, the following shall never be used (List all that apply):**

_____

_____

_____


**Stop-Gap Measures that could be used for Unplanned Critical Interactions**:

_____

_____

_____


**Preferred Method of Communication:** _____

**Hearing Aids**

Per the supervisee self-identifying or medical documentation on record, the supervisee would benefit from wearing a hearing aid in the following (Mark all that apply):

☐ Hearing aid for the right ear   ☐ Hearing aid for the left ear   ☐ No hearing aid is being worn

**Battery type and size (Disposable or Rechargeable):**
_____

2

**Other Technologies**

Supervisee uses the following form(s) of technology (Mark all that apply)

☐ Captioned Phone     ☐ TTY     ☐ Video Phone     ☐ Amplified Phone

☐ Traditional Phone     ☐ Cell Phone
☐ Vibrating Watch     ☐ Tactile Notification System     ☐ Over-the-ear headphones     ☐ Amplifier

☐ Cochlear Implant

**Other Beneficial Auxiliary Aids/Services or Accommodations**

_____

_____

_____

**Assessment of Reading/Writing Ability (To Be Transferred from Auxiliary Aids and Services Assessment)**

Is the person able to read and understand English fluently? (Describe)     ☐ Yes     ☐ No

_____

_____

_____

Is the person able to write in English fluently? (Describe)     ☐ Yes     ☐ No

_____

_____

_____

Is the person able to read and write in a foreign language?     ☐ Yes, Language _____     ☐ No

Does the person engage in basic communications through reading/writing? (An example of basic communications might be agreeing to a date, time, and place for an appointment. An example of complex communications might be answering questions about the past)     ☐ Yes     ☐ No (Describe)

_____

If so, are there conditions required for this person to be able to read and write, such as large print, etc.?

_____

_____

_____

_____

_____

**The Following Were Used to Assist in Communicating with Supervisee in Completing this Form**

_____

_____

Signatures:
ADA Coordinator:

_____

Printed Name                         Signature                              Date

Supervisee:

_____

Printed Name                         Signature                              Date

4

# SETTLEMENT AGREEMENT

# EXHIBIT 3

## ADA COORDINATOR OUTLINE

**OUTLINE OF POINTS TO COVER:**

**Auxiliary Aid/Service Check:** If you do not understand me with this Auxiliary Aid/Service, tell me and we can try a different way to communicate

**Goals**

1. You understand the conditions of your sentence and the rules you need to follow
2. You can ask questions at any time during your supervision term.
3. You communicate effectively with Supervision staff
- Teachback 1, 2, 3

**Importance of understanding information**

1. There are lots of rules when you are on supervision and things you need to do, and we want to make sure you understand what's required.
2. All information shared during supervision meetings is important for you to fully understand, and it's not enough that you understand part of it.  We want to make sure you understand it all.

**Effective communication**

1. You have the right to effective communication.
2. "Effective communication" means that you can communicate with, receive information from, and give information to DCS in a way you understand.
3. We may need to use communication options to have "effective communication."
4. When communication is effective, everyone understands each other.
- Teachback 2 & 4

**Communication options available for free:  ASL, VRI, CDI, CART, WRITING, OTHER FORMS of EFFECTIVE COMMUNICATION**

1. Options preferred by you
2. Options you have used in the past
- Teach back on Options available

**External Assessment**

1. Age at loss of hearing (as minor? or as adult?)
2. Willing to take assessment
   a. Explain that an outside assessment is available
   b. Explain that communication expert is a fluent signer
   c. The assessment can help determine what form of communication is effective for you
   d. You will not be charged for this assessment or punished for speaking to the assessor
3. Presentation of External Assessment Form
- Consent/Declination of External Assessment

- If External Assessment declined – identify appropriate communication options for effective communication
- Teach back effective communication meaning (ensure that you can communicate with, receive information from, and give information to DCS)
- Confirm Offered External Assessment Decision

**ADA Coordinator**

1. Contact Information
2. Provide and explain copy of DCS ADA Policy, if the external assessment is declined.
   a. If external assessment is needed, provide copy of DCS ADA Policy after the external assessment, when the appropriate method of communication is identified.
3. Accommodation request
4. Grievance procedure
- Teach back accommodation request/grievance procedure

Reminder: Please tell your Officer if you do not understand your Officer or what you need to do to follow the rules of parole/probation.

# SETTLEMENT AGREEMENT

# EXHIBIT 4

## COMMUNICATION ASSESSMENT ACCEPTANCE/REFUSAL FORM



**DEPARTMENT OF COMMUNITY SUPERVISION**
**SUPERVISEE COMMUNICATION ASSESSMENT**
**ACCEPTANCE/REFUSAL FORM**
HUMAN RESOURCES FORM  03-13-2023

---

**STATE OF GEORGIA/COUNTY OF** _____

Office Location:_____

Circuit:_____

Chief:_____

| | |
|---|---|
| **Supervisee Name:** | |
| **Supervisee UPI #:** | |
| **Auxiliary Aid/Service Used for This Meeting:** | |

I, _____ **(Supervisee Name)**, understand that I have the choice to participate in an External Communication Assessment. The External Communication Assessment was explained to me via _____ **(Auxiliary Aid/Service Used)**. I understand that this is my choice and that no one can make the choice for me.

At this time, I choose to accept/decline the External Communication Assessment. **(Choose one) (Only to be filled out by Supervisee)**

    ▪  ACCEPT     (I want to participate in)
    ▪  DECLINE   (I do not want to participate in)

☐ Check if this Form was filled out in part by someone other than the Supervisee.

| | |
|---|---|
| **Name of Person(s) Completing Form Above:** | |

If the document was filled out in part by someone other than the Supervisee, the person who filled out the form attests that the person has read this form in its entirety to the above-named Supervisee with the assistance of the Auxiliary Aid/Service listed above. This person also attests that they have filled out this form based upon the answers provided by the Supervisee with the assistance of the Auxiliary Aid/Service listed above.

| | |
|---|---|
| **Supervisee Signature:** | |
| **Date:** | |

| | |
|---|---|
| **Officer Name:** | |
| **Officer Signature:** | |
| **Officer Telephone Number:** | |
| **Date:** | |

| | |
|---|---|
| **Communication Assessment Explained to Supervisee By (Print Name):** | |
| **Communication Assessment Explained to Supervisee By (Signature):** | |
| **Date:** | |

CC: ADA Coordinator
Attach Copy in Georgia Reentry Web Portal

Sworn and subscribed before me on this _____ day of _____
20_____

_____
Notary Public
My Commission Expires:

# SETTLEMENT AGREEMENT

# EXHIBIT 5

## MEMORANDUM OF UNDERSTANDING

# MEMORANDUM OF UNDERSTANDING
## BETWEEN
## DEPARTMENT OF BEHAVIORAL HEALTH AND DEVELOPMENTAL DISABILITIES
## AND
## DEPARTMENT OF COMMUNITY SUPERVISION:
## COMMUNICATION ASSESSMENTS FOR INDIVIDUALS WHO ARE DEAF OR HAVE HEARING LOSS

This Memorandum of Understanding ("MOU") reflects the agreement of two executive agencies of the State of Georgia, namely the Department of Behavioral Health and Developmental Disabilities ("DBHDD") and the Department of Community Supervision ("DCS") (which two agencies are collectively referred to as the "Parties"), concerning DBHDD's provision of communication assessments for individuals entering into supervision by DCS.

WHEREAS, DBHDD has an Office of Deaf Services which trains and coordinates Communication Specialists who conduct communication assessments for individuals who are deaf or have hearing loss and who thus require accommodations for effective communication under the Americans with Disabilities Act; and

WHEREAS, DCS sometimes supervises individuals who are deaf or hard of hearing, and DCS thus has a need for communication assessments for those individuals;

NOW THEREFORE, the Parties agree as follows:

1. The parties will work together to establish and maintain a quality process for the assessment of the communication needs of deaf and hard of hearing supervisees and the development of effective communication plans for those supervisees. At the request of either party, a meeting or conference will be conducted promptly to resolve problems and develop improvements to the process. For the first twelve months of the term of this MOU, the parties will meet monthly to discuss the work and to develop improvements to the process.

2. The parties agree the services performed pursuant to this MOU are without charge to DCS so long as the number of assessments needed in any given one-year term is ten or less. Should more than ten assessments be required, DBHDD and DCS will confer in good faith to discuss cost-sharing measures for the assessments.

3. DBHDD will:

   a) Provide communication assessments to individuals who are coming through intake into DCS supervision. These communication assessments will be performed in offices of DCS. DBHDD will provide these communication assessments free of charge.

   b) Use communication assessment forms provided by DCS and share the completed assessment forms with DCS. DBHDD's communication specialists will include all feasible forms of effective communication suitable for the

*Memorandum of Understanding*
*DBHDD and DCS--*
*Communication Assessments for*
*Individuals who are*
*Deaf or Have Hearing Loss*
*Page 2 of 3*

supervisee who was assessed. (In-person interpreting and VRI will be considered two forms of effective communication.) Where more than one communication form or accommodation is listed, the completed assessment may prioritize the communication form(s) or accommodation(s) which the communication specialist believes would be most effective for the individual.

c) Also complete a DBHDD Communication Assessment Report for each individual, and retain that Communication Assessment Report in the records of DBHDD's Office of Deaf Services for reference in the event that the individual later utilizes DBHDD services and requires accommodations in connection with those services.

d) Provide the individual with information on how to access DBHDD's deaf-accessible behavioral health services.

e) DBHDD will hold in strictest confidence and will not disclose to others for any reason whatsoever, any works, writings, plans, proposals, documents, contracts, records, data, analyses, compilations, forecasts, studies, reports, recordings, maps, or other information or material relative to supervision of individuals by DCS (collectively, the "Information"), except to the extent that such Information (a) is otherwise available from third persons without restriction on its further use or disclosure, (b) is required by order of any court or by law (including but not limited to the Georgia Open Records Act) or by any regulatory agency to which DBHDD is subject or in connection with any civil or administrative proceeding, or (c) to the extent such Information is or becomes publicly known other than through actions, direct or indirect, of DBHDD. It is provided, however, that DBHDD may share its own DBHDD Communication Assessment Report with a DBHDD-contracted provider agency, as long as the DBHDD Communication Assessment Report does not reflect that the assessed individual is under DCS supervision.

f) DBHDD agrees to maintain for the duration of this MOU all licenses, certifications, and permits applicable to the services under this MOU.

g) DBHDD and any of its agents, employees, officials or subcontractors who enter any office or other premises of DCS or who come into contact with any employee of DCS shall comply with DCS's Policies and Procedures relating to Standards of Conduct and Sexual Harassment. If DBHDD or any of its agents, employees, officials or subcontractors should be accused of violating any of these policies or procedures or otherwise violating this provision, then DBHDD will allow and assist the DCS in investigating the charge or accusation. If the charge is established, DBHDD will take appropriate action in response to the violation and to ensure that there are no further violations. DCS may also bar anyone from its premises whom it finds to have violated these policies or procedures or who has otherwise violated this provision.

*Memorandum of Understanding*
*DBHDD and DCS--*
*Communication Assessments for*
*Individuals who are*
*Deaf or Have Hearing Loss*
*Page 3 of 3*

4. DCS will:
   a) Contact DBHDD's Office of Deaf Services at least five (5) days in advance to schedule communication assessments.
   b) Provide a safe and secure environment for DBHDD's communication assessors.
   c) DCS will not alter its communication assessment forms without prior notice to DBHDD's Office of Deaf Services.
   d) Provide individuals with the DBHDD-provided information regarding the communication assessment form.
   e) DCS will be solely responsible for implementing the recommended accommodations.

5. This MOU will be effective immediately upon its signature by both Parties, and can be renewed annually by mutual consent of the parties. This MOU may be terminated without cause and for the convenience of either party with 90 days prior written notice to the other.

6. Written notices required by or pertaining to this MOU shall be in writing, shall be transmitted via e-mail, and shall be addressed and sent to the following persons, or to their successors in the positions identified below—

   For notices to DBHDD:
   Kelly Sterling
   Director, DBHDD Office of Deaf Services
   Kelly.Sterling@dbhdd.ga.gov

   For notices to DCS:
   Darrell Smith
   ADA Coordinator, DCS
   darrell.smith@dcs.ga.gov

IN WITNESS WHEREOF, the undersigned have set their hands on the dates indicated.

FOR THE DEPARTMENT OF
BEHAVIORAL HEALTH AND
DEVELOPMENTAL DISABILITIES:

Kevin Tanner, Commissioner

Date: _6/28/23_

FOR THE DEPARTMENT OF
COMMUNITY SUPERVISION:

Michael Wayne Nail (Jun 29, 2023 16:45 EDT)

Michael W. Nail, Commissioner

Date: 06/29/23

# SETTLEMENT AGREEMENT

# EXHIBIT 6

## SUPERVISEE INTERPRETER AND DISABILITY SERVICE REFUSAL FORM



**DEPARTMENT OF COMMUNITY SUPERVISION**
**SUPERVISEE INTERPRETER AND DISABILITY SERVICE**
**REFUSAL FORM**
V.4

**STATE OF GEORGIA/COUNTY OF** _____

Office Location:_____

Circuit:_____

Chief:_____

| | |
|---|---|
| **Supervisee Name:** | |
| **Supervisee UPI #:** | |
| **Auxiliary Aid/Service Used for This Meeting:** | |

1. I, _____ **(Supervisee's Name)**, have been offered _____ **(Offered Auxiliary Aid/Service)** to help make sure that DCS and I can communicate successfully.

2. I understand that DCS will provide me with _____ **(Offered Auxiliary Aid/Service)** for free.  I understand it is my choice whether to use it.

3. I do NOT want to use _____ **(Offered Auxiliary Aid/Service)**.

4. Instead, I choose to use _____.

If the document was filled out in part by someone other than the Supervisee, the person who filled out the form attests that the person has read this form in its entirety to the above-named Supervisee with the assistance of the Auxiliary Aid/Service listed above. This person also attests that they have filled out this form based upon the answers provided by the Supervisee with the assistance of the Auxiliary Aid/Service listed above.

1

☐ Check if this Form was filled out in part by someone other than the Supervisee.

Note: If the Supervisee is a sign language user and is declining an interpreter, this form must be reviewed in its entirety with the Supervisee with the assistance of an interpreter before the Supervisee can sign off on the declination.

| Name of Person(s) Completing Form Above: | |
|---|---|

| Supervisee's Name: | |
|---|---|
| Supervisee Signature: | |
| Supervisee's Number. | |
| Date: | |

| Officer Name: | |
|---|---|
| Officer Signature: | |
| Officer Telephone Number: | |
| Date: | |

CC: ADA Coordinator
Attach Copy in Georgia Reentry Web Portal

Sworn and subscribed before me on this _____ day of _____
20_____

_____
Notary Public
My Commission Expires:

# SETTLEMENT AGREEMENT

# EXHIBIT 7

## ADA POLICY

**Department of Community Supervision
Policy & Procedure Statement**

| Title: | Americans with Disabilities Act, Title II | Policy Number: | 6.340 |
|---|---|---|---|
| Effective Date: | November 29, 2019 | Page: | 1 of 11 |
| Last Revision: | July 24, 2023 | Authority: | Legal Services / Commissioner |
| Forms/Attachments: | ADA Public Notice, Supervisee with Disabilities ADA Service Referral, Supervisee Interpreter and Disability Services Refusal Form,  ADA Grievance Form,  ADA Reasonable Accommodation Request, Deaf and Hard of Hearing Guidelines | | |

**I.    INTRODUCTION AND SUMMARY:** It is the policy of the Georgia Department of Community Supervision (DCS) to maintain compliance with the Americans with Disabilities Act (ADA), a Civil Rights Law, which requires accessibility to programs, services, and activities to individuals with disabilities and prohibits discrimination. The DCS Policy and Procedure provides an open and meaningful accommodations request process and resolution to ADA related complaints and allegations, which includes an appeals process.

In addition to the provisions below, the policies and procedures outlined in the Deaf and Hard of Hearing Guidelines shall apply to the supervision of Deaf or Hard of Hearing supervisees specifically, and to the extent there is an inconsistency with this Policy, the Deaf and Hard of Hearing Guidelines shall control.  We adopt herein any definitions used in the Deaf and Hard of Hearing Guidelines.  As used herein, Policy refers to the Policy and the Deaf and Hard of Hearing Guidelines, collectively.

**II.    AUTHORITY:** The Commissioner of the Department is vested with the authority to issue and approve all necessary directions, instructions, orders and rules applicable to employees of the Department. O.C.G.A. § 42-3-5(b).

The Americans with Disabilities Act of 1990: 42 U.S.C. §12102, § 12131-34, and 28 C.F.R. §35.101 et seq.;

Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 794 (a) – (d); O.C.G.A. § 30-3-3

**III.    DEFINITIONS:**

**ADA Coordinator** - An individual appointed by the Commissioner to coordinate the Department's

compliance with ADA requirements.

**Americans with Disabilities Act (ADA)** - The ADA is a civil rights law that prohibits discrimination against individuals with disabilities in all areas of public life, including jobs, schools, transportation, and all public and private places that are open to the general public. The purpose of the law is to make sure that people with disabilities have the same rights and opportunities as everyone else. The ADA gives civil rights protections to individuals with disabilities similar to those provided to individuals on the basis of race, color, sex, national origin, age, and religion. It provides equal opportunity for individuals with disabilities in public accommodations, employment, transportation, state and local government services, and telecommunications.

**Auxiliary Aids and Services includes**:

- (1) Qualified interpreters on-site or through video remote interpreting (VRI) services; note takers; real-time computer-aided transcription services; CART (Communication Access Real-Time Translation); written materials; assistive listening devices; assistive listening systems; or other effective methods of making aurally delivered information available to individuals who are deaf or hard of hearing;

- (2) Qualified readers; taped texts; audio recordings; Brailed materials and large print materials; or other effective methods of making visually delivered materials available to individuals who are blind or have low vision;

- (3) Acquisition or modification of equipment or devices; and

- (4) Other similar services and actions

**Direct Threat to Health and Safety** - Under the ADA, a direct threat may exclude an individual from a public entity's program, service, or activity. A Direct Threat must be a significant risk to the health and safety of self or others that cannot be eliminated or reduced to safe levels through a Reasonable Accommodation. A direct threat cannot be based upon stereotypes or unfounded fears.

**Disability** - The term "disability" means, with respect to an individual:

1.  A physical or mental impairment that substantially limits one or more of the major life activities of such individual;
2.  A record of such an impairment; or
3.  Being regarded as having such an impairment.

**Fundamental Alteration** - A change that is so significant that it alters the essential nature of the goods, services, facilities, privileges, advantages, or accommodations offered.

**Major Life Activity** - Functions to include, but not limited to, caring for oneself, performing manual tasks, walking, seeing, hearing, eating, speaking, breathing, learning, and working.

**Mental Impairment** - Any mental or psychological disorder to include, but not limited to, intellectual and developmental disabilities, organic brain syndrome, emotional or mental illness, traumatic brain injuries, and learning disabilities.

**Physical Impairment** - Any physical disorder or condition, to include but not limited to cosmetic

disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, hemic and lymphatic, skin, and endocrine.

**Qualified Individual with a Disability** - For the purposes of Title II of the ADA, a qualified individual is an individual with a disability who meets the essential eligibility requirements for receipt of services or participation in a public entity's programs, activities, or services with or without reasonable modifications to a public entity's rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of Auxiliary Aids and Services. The "essential eligibility requirements" for participation may be minimal.

**Reasonable Accommodation** - For the purposes of Title II of the ADA, any change or adjustment that would not fundamentally alter the nature of a service, program, or activity of a living or work environment; including reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of Auxiliary Aids and Services that permit participation of qualified supervisees with disabilities.

**Undue Burden** - Significant difficulty or expense incurred by a covered entity, when considered in light of certain factors. These factors include: the nature and cost of the action; the overall financial resources of the site or sites involved; the number of persons employed at the site; the effect on expenses and resources; legitimate safety requirements necessary for safe operation, including crime prevention measures; impact of the action on the operation of the site; the geographic separateness, and the administrative or fiscal relationship of the site or sites in question to any parent corporation or entity; if applicable, the overall financial resources of any parent corporation or entity; the overall size of the parent corporation or entity with respect to the number of its employees; the number, type, and location of its facilities; and if applicable, the type of operation or operations of any parent corporation or entity, including the composition, structure, and functions of the workforce of the parent corporation or entity.

IV.     **STATEMENT OF POLICY AND APPLICABLE PROCEDURES:** The Department of Community Supervision (DCS) shall provide equal access to its programs, services, and activities as required by Title II of the ADA. DCS will provide Reasonable Accommodations to supervisees who have disabilities to provide an equal opportunity to participate in programs, services, and activities outlined in required conditions of supervision. Accommodation requests that will cause a fundamental alteration to programming or undue burden to DCS will not be granted. (See section IV. G. of this policy for additional information.)

A.     **ADA Public Notice**

The DCS ADA Public Notice compliant with 28 C.F.R. 35.106 is conspicuously displayed in the lobby of all DCS field offices and the Department's public website. The Department of Community Supervision (DCS) will not discriminate against qualified individuals with disabilities on the basis of disabilities in its programs, services and activities. Anyone who requires an auxiliary aid or service for effective communication, or a modification of policies or procedures to participate in a program, service or activity should contact the ADA Coordinator at DCS ADA Coordinator's Office. 2 Martin Luther King Jr. Drive, S.E., Suite 458, East Tower,

Atlanta, Georgia 30334. ADA.request@dcs.ga.gov, 404-793-0301.

Posters notifying supervisees of the provisions of the ADA and reasonable accommodations will be conspicuously displayed in the lobby of all DCS field offices. In addition, the ADA policy and reasonable accommodations will be discussed with each supervisee at their initial interview.

**B.    ADA Coordination**

DCS has an ADA Agency Coordinator, who is appointed by the Commissioner of the Department of Community Supervision. The Agency ADA Coordinator oversees and coordinates the agency's efforts to comply with ADA requirements. The Agency ADA Coordinator is an appropriately trained and knowledgeable individual, who will work collaboratively with other DCS staff members, state agencies, and other ADA experts who assists in interpreting the law and introducing viable accessibility solutions.

1.    Specific Responsibilities and Authorities of the Agency ADA Coordinator:

a.    In concert with the DCS Training Division, that all staff members who interact with supervisee, citizens, or visitors who have disabilities are provided with adequate and appropriate information and training on ADA, auxiliary aids and services, and potential ADA issues;

b.    In concert with the Operations and Information Technology Divisions, the DCS ADA Coordinator will compile and maintain information concerning supervisee(s) who have disabilities, as is necessary to carry out the duties and responsibilities of the position;

c.    Provide procedures for the prompt and equitable resolution of requests for Reasonable Accommodation and/or complaints are in place, publicized, and implemented;

d.    Review all supervisee requests for Reasonable Accommodations and process the requests, in concert with the Operations and Legal Divisions, in order to comply with ADA Title II Requirements. (See Section IV. F. and G. of this policy for additional information);

e.    Review all ADA grievances and coordinate a resolution to concerns involving alleged violations of the ADA;

f.    Conduct site visits and evaluations of all DCS offices biennial.

2.    Provide guidance to DCS staff members regarding ADA matters, such as, but not limited to the following:

a.  Procurement of programs and auxiliary aids or services

b.  Contract review

c.  Emergency evacuation of Community Supervision Offices

d.  All recommendations for denial of accommodations

e.  All supervisee accommodation requests

f.  All ADA related grievances

C.  **Responsibilities of the Community Supervision Officers (CSO)**

1.  At the initial interview, the CSO will go through a module to determine the supervisee's disability if there is one. If the supervisee is a transfer, the CSO will review the supervisee's completed module in his case to determine the supervisee's possible ADA accommodation needs. The CSO will use auxiliary aids and services (AAS) as necessary in order to have effective communication with the individual regarding the module. The information in the module is uploaded to the Portal. If the module cannot be completed electronically then a written form shall be completed.

    Note: If the supervisee answers in the affirmative to a request for accommodation, the CSO shall provide reasonable accommodations and communicate these actions to the agency ADA Coordinator. The CSO will document the preferred mode of communication and requested accommodations in the Departmental case management system.

2.  The CSO will inform the supervisee of how to access the Department's ADA Title II Provisions policy.

3.  The CSO is responsible for ascertaining if there are any emerging supervisee issues or concerns related to effective communication and requests for accommodations during the entire time an individual is under supervision of DCS.

4.  The CSO will document all supervisee ADA accommodation requests, modifications, and recommended denials in the Departmental case management system and maintain consistent communication with the Agency ADA Coordinator regarding ADA matters.

D.  **Applicable Procedure**
    The Department of Community Supervision will comply with the ADA Title II provisions for supervisees who have disabilities.

1.  Office and Field Interactions

Effective supervision requires meaningful interactions with the supervisee. During the initial interview, the CSO will explain conditions of Probation/Parole, drug testing expectations, Out of State Conditions, special conditions of supervision, grievance processes, fine, restitution, and supervision fee as stated in DCS Policy 3.129.  If a reasonable accommodation for an individual who has a disability is necessary during an Office/Field Interaction, the CSO will utilize the services provided by the department for effective communication.

2.    **Revocation Hearings**
      If the individual needs accommodations during the revocation hearings, DCS staff members should make the Court/Clerk of Court/DOM aware of the need for accommodations.

E.    **Effective Communication**
      Effective Communication is vital to ensuring compliance during supervision. DCS will generally, upon request, provide appropriate aids and services leading to effective communication for qualified persons with disabilities so they can participate equally in programs, services, and activities.  Auxiliary aids such as qualified sign language interpreters, documents in Braille, note-takers, or other effective solutions will be utilized for individuals with speech, hearing, or vision impairments.

F.    **Refusal of Services**
      The Department of Community Supervision respects the right of any supervisee declining to use the services available for assisting with their disability needs. The supervisee must complete the Supervisee Interpreter And Disability Service Refusal Form with the officer who is attempting to assist them. The following process will be followed for declination of services:

      1.    The form will be completed and notarized by a current sworn notary

      2.    The document will be uploaded in the file of the supervisee

      3.    A legible copy of the completed notarized document will be emailed to the ADA Coordinator.

G.    **Reasonable Accommodation Request Process**

      1.    All supervisees have the ability to request accommodations for a disability.

2.     If the supervisee orally or otherwise expresses the need for an accommodation the ADA Reasonable Accommodation Request Form 2 will be completed. If the individual is unable to complete the form the staff member must assist them which may include reading the form to the offender or using one of the services outlined to assist the supervisees with the disability.

3.     The staff member will forward the ADA Reasonable Accommodation Request Form to the ADA coordinator via email using the email address: ADA.request@dcs.ga.gov.

4.     The ADA Coordinator will review the ADA Reasonable Accommodation Request Form and make a decision regarding the accommodation request within twenty four (24) business days. When further evaluation is needed to make a determination the ADA Coordinator will notify the officer of record via email. The officer of record will notify the supervisee and request any further information if needed. All notifications to the supervisee or request for further information shall be notated in the Departmental case management system.

5.     In making a decision for reasonable accommodation, the Department will consider the choice of accommodation made by the supervisee. The Department may grant an alternative accommodation if such accommodation will provide the same or comparable level of accommodation.

6.     If the request for accommodation is for a disability that is unknown the supervisee may be required to provide verification of the disability. A determination or reasonable accommodation will not be made until the disability is verified.

7.     The ADA Coordinator will forward his or her decision to the officer of record via email. The officer of record will attach the completed ADA Reasonable Accommodation Request Form to the supervisee's file in the Departmental case management system. The ADA Coordinator will maintain a copy of the form in a central depository for the Department.

8.     The supervisee will be notified of the decision regarding their request or will be notified if additional time is necessary and approximately how much time will be necessary to complete the determination.

9.     Interpreter/CART Service Request Process:

   a.     Once the CSO has received a request for an In-Person Interpreter/CART Service, the CSO shall contact the Chief or Assistant Chief with the request.

   b.     The Chief or the Assistant Chief shall review the Interpreter/CART Services Request Form in the Portal and complete it.

   c.     The Chief or Assistant Chief shall email to

purchasing@dcs.ga.gov (Purchasing) and
ADA.request@dcs.ga.gov (ADA Coordinator)

  d.  Purchasing shall assign the request to a procurement specialist.

  e.  Upon confirmation of a supplier, Procurement shall communicate this status to the requester of the services.

## H. ADA Grievance Procedures

1. All supervisees have the right to register a formal complaint to the ADA Coordinator in regards to their belief they are not being accommodated for their disability.

2. The supervisee will complete the ADA Formal Complaint Form Version 1 and either fax it or mail it to the attention of the ADA Coordinator using the information on the form.

3. To the extent a supervisee needs assistance understanding the ADA Formal Complaint Form Version 1 and/or needs assistance understanding the process of this grievance procedure, DCS will provide the auxiliary aids and services in deaf or hard of hearing supervisees' Communication Plans as defined in the Deaf and Hard of Hearing Guidelines. Grievances may be submitted to the ADA Coordinator by video utilizing signed language.

4. Upon receiving a formal complaint, the ADA Coordinator will respond to the supervisee within two (2) business days of receiving the complaint to acknowledge receipt.

5. Upon reviewing and researching the complaint, the ADA Coordinator will respond in writing via email or mailed letter to the supervisee within thirty (30) days for the findings. The supervisee may contact the ADA Coordinator for further explanation of the findings if he or she has further questions concerning the outcome.

## I. ADA Grievance Appeals Process

1. A supervisee must submit a notice in writing to the HR Director, 2 MLK Jr. Drive, S.E., Atlanta, Georgia, 30334; hrdirector@dcs.ga.gov, within fifteen (15) days of the decision.  The notice should be a description of why the decision was wrong.

2. The HR Director will acknowledge receipt of the appeal within ten days.

3. The HR Director will respond in writing within thirty (30) days of receiving

the grievance appeal.    The HR Director will notify the supervisee if additional time is required.

4.    To the extent a supervisee needs assistance understanding the notice and/or needs assistance understanding  the appeals process, DCS will provide the auxiliary aids and services in deaf or hard of hearing supervisees' Communication Plans as defined in the Deaf and Hard of Hearing Guidelines.  Grievances may be submitted to the ADA Coordinator by video utilizing signed language.

## J.    REFERRAL FOR SERVICES

The Department of Community Supervision (DCS) encourages supervisees to utilize the services listed below to assist with communication with DCS when supervisees are not in DCS presence. DCS will use several different services to assist supervisees with disabilities to communicate effectively with the Department and its employees. These services will come from various resources to provide a variety of options to assist supervisees in obtaining and getting the information they need.

1.    Georgia Relay - Georgia Relay is a FREE public service provided by the State of Georgia to make communicating by telephone easy, accessible and reliable for everyone, including people who are deaf, hard of hearing, deaf-blind or have difficulty speaking. Georgia Relay is available 24 hours a day, 365 days a year. Georgia Relay allows users to stay connected through a variety of Traditional Relay and Captioned Telephone services. Georgia Relay can be reached by calling the following numbers:

To make a Relay Call

Dial 7-1-1 or call one of the toll free numbers below

TTY: 800-255-0056

Voice: 800-255-0135

Speech to speech: 888-202-4082

Spanish to Spanish: 888-202-3972

(Includes Spanish-to-Spanish and translation from English to Spanish)

2.    Services offered by Georgia Relay:

a.    TTY (Text Telephone) - Allows a person who is deaf or hard of hearing to type their messages and read the other person's responses.

b.    VCO (Voice Carry Over) - Using a TTY (Text Telephone)

and standard telephone or a specially designed telephone that also has a text screen, the VCO user speaks directly to the person being called. In response, the words of the person being called are typed by the Georgia Relay Communications Assistant (CA), and the user reads those words on the text screen of his or her phone.

c.    HCO (Hearing Carry Over) - This service allows the HCO user to type his or her side of the conversation, using a TTY or similar device, and the Communications Assistant (CA) voices the typed words to the other person. When the other person speaks, the HCO user listens directly to what is being said.

d.    Speech to Speech (STS) - Designed for people who have mild-to-moderate speech difficulties who can hear what is being said over the phone. The STS user speaks, a specially trained Communications Assistant (CA) listens to the words. The CA then revoices those words to the other person. When the other person speaks, the STS user listens directly to what is being said.

e.    Captioned Telephone (CapTel) - User speaks directly to the other person, and when the other person responds, the CapTel user can listen while reading what's said. During the conversation, a specially trained operator at the CapTel captioning service uses the latest in voice recognition software to convert everything the other person says into captioned text.

f.    Deaf-Blind Service (DBS) - DBS users type their messages and read the other person's responses, typed by the Communications Assistant (CA), on a braille display.

g.    Voice Users - Makes it easy for voice users to communicate by phone with anyone who is deaf, hard of hearing, deaf-blind or has difficulty speaking

h.    Video Relay Services (VRS) - is a video telecommunication service that allows deaf, hard-of-hearing, and speech impaired individuals to communicate over video telephones with hearing people in real time.

i.     Georgia Relay offers several additional services to assist those with disabilities in need of assistance.

**K.**    **Miscellaneous**

1.     DCS does not provide supervisees employment, housing, education, food stamps, hunger assistance, medical, or other needs.

2.     If a supervisee is required to attend activities or treatment provided by the department, DCS will provide auxiliary aids and services (AAS) as needed for effective communications in the activity. The AAS will be provided as long as it does not create an undue burden or hardship, or will cause an alteration to the day-to-day functions of the agency.

# LINKED

# Deaf and Hard of Hearing Guidelines

**The Deaf and Hard of Hearing Guidelines constitute and include the Settlement Agreement, which will be available via a link in the ADA Policy**